## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LEE E. STEPHENS, JR.,

    Petitioner,

          v.

STEPHEN T. MOYER, Maryland Secretary
of the Public Safety & Correctional
Services,
DAYENA M. CORCORAN, Maryland
Commissioner of Correction,
BRIAN FROSH, Maryland Attorney
General, and
TERRY ROYAL, Warden of the Oklahoma
State Penitentiary,

    Respondents.

Case No. 18-cv-00493

## APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

# VOLUME I

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

<u>APPENDIX TABLE OF CONTENTS</u>

| App. # | Description | Post-Conviction Hearing Ex. | Appendix Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 1. | Statement of Reasons and Order of Court | | 1 - 37 |
| 2. | Petition for Post-Conviction Relief | | 38 - 73 |
| 3. | Amendment to Petition for Post-Conviction Relief | | 74 - 77 |
| 4. | State Supplemental Response to Petition for Post-Conviction Relief | | 78 - 114 |
| 5. | Post-Conviction Hearing Transcript Day 1 (4/18/17) | | 115 - 349 |
| 6. | Post-Conviction Hearing Transcript Day 2 (4/19/17) | | 350 - 604 |
| 7. | Post-Conviction Hearing Transcript Day 3 (4/20/17) | | 605 - 715 |
| 8. | Post-Conviction Hearing Transcript Day 4 (4/26/17) | | 716 - 909 |
| **VOLUME II** | | | |
| 9. | Anne Arundel County Trial Transcript (1/3/12) | Def. Ex. W | 910 - 1227 |
| 10. | Anne Arundel County Trial Transcript (1/11/12) | Def. Ex. W | 1228 - 1464 |
| 11. | Anne Arundel County Trial Transcript (1/12/12) | Def. Ex. W | 1465 - 1637 |
| **VOLUME III** | | | |
| 12. | Anne Arundel County Trial Transcript (1/17/12) | Def. Ex. W | 1638 - 1927 |
| 13. | Anne Arundel County Trial Transcript (1/18/12) | Def. Ex. W | 1928 - 2170 |
| 14. | Anne Arundel County Trial Transcript (1/19/12) | Def. Ex. W | 2171 - 2446 |
| 15. | Anne Arundel County Trial Transcript (1/23/12) | Def. Ex. W | 2447 -2594 |
| **VOLUME IV** | | | |
| 16. | Anne Arundel County Trial Transcript (1/24/12) | Def. Ex. W | 2595 - 2778 |
| 17. | Anne Arundel County Trial Transcript (1/30/12) | Def. Ex. W | 2779 - 2994 |
| 18. | Anne Arundel County Trial Transcript (1/31/12) | Def. Ex. W | 2995 - 3106 |
| 19. | Anne Arundel County Trial Transcript (2/1/12) | Def. Ex. W | 3107 - 3202 |
| 20. | Anne Arundel County Trial Transcript (2/9/12) | Def. Ex. W | 3203 - 3211 |
| 21. | Anne Arundel County Trial Transcript (2/13/12) | Def. Ex. W | 3212 - 3322 |
| **VOLUME V** | | | |
| 22. | Anne Arundel County Trial Transcript (2/15/12) | Def. Ex. W | 3323 - 3537 |
| 23. | Anne Arundel County Trial Transcript (2/16/12) | Def. Ex. W | 3538 - 3737 |
| 24. | Anne Arundel County Trial Transcript (2/21/12) | Def. Ex. W | 3738 - 4031 |
| 25. | Anne Arundel County Trial Transcript (2/22/12) | Def. Ex. W | 4032 - 4143 |
| **VOLUME VI** | | | |
| 26. | Anne Arundel County Trial Transcript (2/29/12) | Def. Ex. W | 4144 - 4164 |
| 27. | Wicomico County Trial Transcript (6/28/99) | Joint Ex. 2 | 4165 - 4239 |
| 28. | Wicomico County Trial Transcript (6/29/99) | Def. Ex. DD | 4240 - 4302 |
| 29. | Stipulated Facts for Post-Conviction Hearing | Joint Ex. 1 | 4304 - 4305 |

| 30. | Letter from Edward Jason Freed | Def. Ex. B | 4306 - 4317 |
|---|---|---|---|
| 31. | Photographs of Cell 38 | Def. Ex. C | 4318 - 4323 |
| 32. | McGuinn Autopsy Report of Dr. Donna Vincenti | Def. Ex. E | 4324 - 4338 |
| 33. | Expert Report of Dr. Daniel Spitz | Def. Ex. G | 4339 - 4343 |
| 34. | Wicomico County Petition for Post-Conviction Relief | Def. Ex. K | 4344 - 4365 |
| 35. | Trial Stipulation | Def. Ex. P | 4366 - 4368 |
| 36. | State's Version of Wicomico County Facts | Def. Ex. Q | 4369 - 4374 |
| 37. | Stephens' Commitment Record | Def. Ex. R | 4375 - 4377 |
| 38. | Expert Report of Dr. Geoffrey Loftus | Def. Ex. T | 4378 - 4384 |
| 39. | Proposed Jury Instruction | Def. Ex. BB | 4385 - 4387 |
| 40. | Suber Ballistics Report | Def. Ex. CC | 4388 - 4390 |
| 41. | Wicomico County Case Docket | Def. Ex. L | 4391 - 4408 |
| 42. | Denial of Application for Leave to Appeal (Md. Ct. Sp. App. Jan. 12, 2018) | | 4409 - 4411 |
| 43. | Unaltered Picture of Jamie Foxx Used as Basis for Figure 1 in Expert Report of Dr. Geoffrey Loftus, at App. 4384 | Def. Ex. V-5 | 4412 - 4413 |

Appendix No. 1

Statement of Reasons and Order of the Court



**MARYLAND**
8 Church Circle
Annapolis, Maryland 21401

Civil: 410-222-1431
Criminal: 410-222-1420
Juvenile: 410-222-1427
Trust/Adoption: 410-222-1331
TTY for Deaf: 410-222-1429
Maryland Relay Service: 711


**To:** ISLEY M. GOSTIN
1875 PENNSYLVANIA AVENUE NW
WASHINGTON DC 20006

<table>
<tr><td align="right">**Case Number:**</td><td>02-K-08-000646</td></tr>
<tr><td align="right">**Other Reference Number(s):**</td><td></td></tr>
</table>

**STATE OF MARYLAND VS LEE EDWARD STEPHENS**

| LEE E. STEPHENS, JR. | * | IN THE |
|---|---|---|
| *Petitioner* | * | CIRCUIT COURT |
| v. | * | FOR |
| STATE OF MARYLAND | * | ANNE ARUNDEL COUNTY |
| *Respondent* | * | Case No.: 02-K-08-646 |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## STATEMENT OF REASONS AND ORDER OF COURT

The above-captioned matter came before the Court on a Petition for Post Conviction Relief submitted by Lee E. Stephens, Jr. ("Petitioner"). A hearing having been held over the course of four (4) days (April 18th, 19th, 20th, and 26th of 2017), counsel heard, and the Court having carefully considered the arguments and the record in this case, the Court now presents its conclusions.

### Background

On May 12, 2015, Petitioner filed a Petition for Post Conviction Relief.[1] Through the Petition and the State's Supplemental Response, the following background information was provided: On March 28, 2008, a grand jury in the Circuit Court for Anne Arundel County indicted the Petitioner for First Degree Murder and Conspiracy to Commit First Degree Murder, and also charged co-defendant, Lamar Harris with the same counts. The two trials were severed after motion hearings on the issues. On January 3, 2012, a fifteen (15) day jury trial in the Circuit Court for Anne Arundel County began before the Honorable Paul A. Hackner. The trial lasted until February 1, 2012 and after six (6) days of deliberations, on February 9, 2012, the jury found petitioner guilty of one count of murder in the first degree in violation of Md. Code Ann.

---

[1] On October 5, 2016, Petitioner filed an amendment to Petition for Post Conviction Relief. The main purpose of the amendment is to clarify that counsel was ineffective for not securing the *vacatur* before proceeding to trial in this case.

Crim. Law §2-201 and found him not guilty of the conspiracy to commit murder. On February 29, 2012, the jury voted unanimously for a sentence of life without the possibility of parole, and rejected the State's request to sentence the Defendant to death. The Court sentenced Petitioner on June 15, 2012 to life without parole. A timely notice of appeal was filed on June 20, 2012, and the Court of Special Appeals affirmed the conviction in an unreported opinion dated December 10, 2013.[2] Writ of Certiorari was filed and subsequently denied.

The events which led to Petitioner's convictions and subsequent sentence occurred on July 25, 2006.[3] At the time, the Petitioner was an inmate at the Maryland House of Corrections ("MHC") in Jessup, Maryland, serving a life-plus-15 year sentence for a murder committed in Salisbury, Wicomico County in April of 1997. Corporal David McGuinn was employed by the Department of Corrections ("DOC") as a correctional officer ("CO"). He had held the position for eighteen (18) months, whereupon he was assigned to MHC.

On or about July 25, 2006, at around 10:00 p.m., Corporal McGuinn was making his normal rounds through the cell block; he was assigned to the fourth floor of the west wing of MHC. His duties included checking each cell to make sure the inmate assigned to that cell was inside. He would also pull on each cell door to ensure that it was locked in place. When he almost reached cell number 44 near the "back end" of the walkway, he was approached from behind and reportedly attacked by two inmates. During the attack, he was stabbed and cut multiple times in the back, neck, head, and thighs. Eventually, he was able to call for help and was rushed to the medical area of the institution where nurses attempted to stop the bleeding. Corporal McGuinn was eventually transported to Baltimore-Washington Medical Center

---

[2] COSA #0772, Sept. Term 2012.
[3] Factual background provided by Petition for Post Conviction Relief (May 12, 2015), State's Supplemental Response to Petition for Post Conviction Relief (April 12, 2017), and the Court of Special Appeals unreported opinion (COSA #0772, Sept. Term 2012).

2

**App. 4**

whereupon he died at approximately 11:06 p.m. that night from injuries incurred from the incident.

Concurrently with these events, other MHC officers attempted to secure the crime scene and began taking photographs of the area and collecting evidence. When officers followed the blood trail along the fourth floor and pulled inmates' curtains away from the front of their cells, they found Lamar Harris, washing bloody clothes in his toilet. Upon further search, officers found the Petitioner, Lee Stephens, wearing boxers with what appeared to be blood on them, and a search of his cell revealed a wet shirt under his mattress, a pair of boots, and a plastic garbage bag, all with blood on them, presumably belonging to Corporal McGuinn. T. 1/12/12 p. 19. The two suspects were eventually taken into custody and processed, leading to the procedural events described above.

On July 12, 2013, the Circuit Court for Wicomico County vacated the murder conviction that Petitioner was originally serving at the time of Corporal McGuinn's murder. In that case, the State agreed to a *vacatur* after concluding that a flawed ballistics analysis was admitted in Petitioner's murder trial. As a condition of the State's Attorney's Office vacating the conviction, the Petitioner agreed to plead guilty to the First Degree Murder charge and received a sentence of time served, with probation.

### **Allegations of Error**

On May 12, 2016, Petitioner filed a Petition for Post Conviction Relief, his first. On October 5, 2016, Petitioner filed an Amended Petition. In these petitions, and at the post conviction hearing, Petitioner raised the following allegations of error:

1.    Trial counsel rendered ineffective assistance by failing to request a limiting instruction informing the jury that the State was required to prove beyond a reasonable doubt that a blow struck by Petitioner was independently sufficient to cause, or a "substantial cause," of the death of Corporal David McGuinn.

**App. 5**

2.      Trial counsel rendered ineffective assistance by failing to undermine the search of Petitioner's cell and stipulating that physical evidence against Petitioner was maintained properly despite potential for contamination.

3.      Trial counsel rendered ineffective assistance by failing to effectively cross-examine the State's witness, Jason Freed, on the benefits that he would receive in exchange for his testimony.

4.      Trial counsel rendered ineffective assistance by failing to reasonably investigate and identify at trial alternative suspects for murder.

5.      Trial counsel rendered ineffective assistance by failing appeal the trial court's ruling barring testimony regarding the planting of evidence on inmates (specifically Bradford Matthews) at the Maryland House of Corrections.

6.      The aggregate of trial counsel's errors constituted ineffective assistance.

7.      Petitioner is entitled to a new trial because his decision not to testify on his own behalf was based on the State's ability to use his prior murder conviction for impeachment purposes (which was later vacated).

8.      Petitioner is entitled to a new sentencing hearing because the life-plus-15-year sentence he received for his previously vacated conviction was a material factor considered by the jury in his sentencing.

## Standard of Review

The Uniform Post Conviction Procedure Act, MD. CODE ANN. CRIM. PROC. §§ 7-101 et seq. (2012), states that an individual who is convicted of a crime may challenge the judgment or sentence if: (1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the maximum allowed by law; or (4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy. MD. CODE ANN. CRIM. PROC. § 7-102(a)(1)-(4).  The alleged error must not have been previously and finally litigated or waived in the proceeding resulting in conviction, or any

4

**App. 6**

proceedings the petitioner has taken to secure relief from the conviction. *Id.* at § 7-102(b)(1)-(2). Further, a person generally "may file only one petition for relief . . . ." *Id.* at § 7-103(a). A petition under the Act ordinarily should be filed within ten (10) years after the sentence was imposed. § 7-103(b)(1).

Post conviction proceedings are designed to determine "whether the constitutional right of the accused to due process was violated and the trial thereby nullified." *State v. Long*, 235 Md. 125, 128 (1964). The petitioner is required to set out the facts substantiating the violation. A mere allegation that one has been denied constitutional guarantees is not a sufficient reason for setting aside a sentence under post conviction proceedings. *Barbee v. Warden of Md. Penitentiary*, 220 Md. 647 (1959). The petitioner must not allege issues regarding his guilt or innocence or the sufficiency of the evidence that was used to convict him, as these are issues which are not available for post conviction proceedings. *Greene v. Warden of Md. Penitentiary*, 238 Md. 651 (1965).

The court conducting the post conviction hearing must make findings of fact upon all contentions raised by the petitioner. *Farrell v. Warden of Md. Penitentiary*, 241 Md. 46, 49 (1965) (holding that the court should make findings of fact as to every claim raised); *Prevatte v. Director, Patuxent Inst.*, 5 Md. App. 406, 414 (1968) (holding that it is incumbent upon the judge who conducts the post conviction hearing to make findings of fact upon all contentions raised by the petitioner). Pursuant to Md. Rule 4-407, "[t]he judge shall prepare and file or dictate into the record a statement setting forth separately each ground upon which the petition is based, the federal and state rights involved, the court's ruling with respect to each ground, and the reasons for the action taken thereon."

**App. 7**

## Ineffective Assistance of Counsel

The Maryland Court of Appeals has held that a post conviction hearing is the proper forum for a petitioner to litigate claims of ineffective assistance of counsel. *Johnson v. State*, 292 Md. 405, 434-35 (1982). A defendant's right to counsel includes the right to have effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970) (internal citations omitted). "In ruling on a claim of ineffective assistance of counsel, a hearing judge must give substantial deference to counsel's judgment." *Premo v. Moore*, 562 U.S. 115 (2011). "There is a strong presumption that counsel's representation is within the wide range of reasonable professional assistance." *Id.*; citing *Harrington v. Richter*, 562 U.S. 86 (2011).

In *Strickland v. Washington*, 466 U.S. 687 (1984), the United States Supreme Court defined the two-prong test that a petitioner must establish in order to demonstrate that trial counsel rendered ineffective assistance. First, the petitioner "must show that counsel's performance was deficient." *Id.* Second, the petitioner "must show that the deficient performance prejudiced the defense." *Id.* "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698. Each prong is discussed in more detail below.

To establish deficient performance, a person challenging a conviction bears the burden of: (1) identifying the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment; (2) showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment," *Id.* at 687; and (3) overcoming the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.* at 690. In order to demonstrate that counsel was not functioning as the counsel guaranteed by the Sixth Amendment, the challenger must show

6

**App. 8**

that trial "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. While the Court has declined to articulate specific guidelines for appropriate attorney conduct, such conduct should be measured against "[prevailing] norms of practice as reflected in American Bar Association Standards and the like." *Id.* However, the Supreme Court went on to stress that these standards are merely guides, and that a violation of a particular rule or ethical standard does not necessarily indicate a denial of the Sixth Amendment guarantee of assistance of counsel. *Id.*; see also *Nix v. Whiteside*, 475 U.S. 157, 165 (1986). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "There is a presumption that trial counsel's actions were reasonable and the petitioner must overcome the presumption that trial counsel's actions were not sound trial strategies." *Id.* Hearing courts should not, aided by hindsight, second-guess counsel's decisions. See, e.g., *Gilliam v. State*, 331 Md. 651, 666 (1993).

In an effort to "eliminate the distorting effects of hindsight," the Court of Appeals of Maryland directed reviewing courts to evaluate the challenged conduct of counsel from counsel's perspective at the time of the alleged misconduct. See e.g. *Oken v. State*, 343 Md. 256, 283 (1996). Although the standard is highly deferential to lawyers, each strategic decision must be founded upon adequate investigation and preparation. While choices made after a thorough investigation are "virtually unchallengeable . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances . . ." *Strickland*, 466 U.S. at 690-91.

To establish prejudice under *Strickland*, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Strickland court considered "a reasonable probability" as a probability "sufficient to undermine confidence in the outcome." *Id.* It is not

**App. 9**

enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

In assessing Strickland's prejudice prong, the Court of Appeals of Maryland found that "many [court] decisions apply the Supreme Court's 'reasonable probability' language without any particular attempt to define the term with more precision." *Bowers v. State*, 302 Md. 416, 426 (1990). In its discussion of the prejudice prong, the Strickland court stated that "the defendant must show that the particular and unreasonable errors of counsel 'actually had an adverse effect on the defense.'" *Id.* at 425 (quoting *Strickland*, 466 U.S. at 693). The court in *Bowers* reasoned that to show such an error "may seem to be an almost impossibly high requirement . . . [b]ut surely the Supreme Court did not intend a *Strickland* analysis to be a total barrier to relief in ineffective assistance cases." *Id.* The *Strickland* opinion indicates that the prejudice standard language should not be read literally, *Bowers*, 320 Md. at 425, but instead requires a petitioner to show something more than "some conceivable effect on the outcome." *Strickland*, 466 U.S. at 693. However, *Strickland* also noted that a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*

In an effort to further clarify Strickland's prejudice prong, the Maryland Court of Appeals articulated and adopted the following "prejudice" standard: a "substantial or significant possibility that the verdict of the trier of fact would have been affected." *Bowers*, 320 Md. at 426 (citing *Yorke v. State*, 315 Md. 578, 588 (1989)). Additionally, the *Bowers* court noted that the term "substantial possibility" was used synonymously with "may well have produced a different result." *Id.* at 427 (citing *Yorke*, 315 Md. at 588).

8

**App. 10**

A finding of ineffective assistance "requires both a finding of an inadequate trial performance and a finding of consequential prejudice." *Schmitt v. State*, 140 Md. App. 1, 47-48 (2001). However, "even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be." *Bowers*, 320 Md. at 436. When a finding of deficiency is absent, there can be no prejudice. *Schmitt*, 140 Md. App. at 47-48. On the other hand, "where there is a deficient trial performance . . . there may or may not be resulting prejudice." *Id.* at 48. Further, "even though an individual instance of prejudice may not be enough, standing alone, to overturn a verdict, an accumulation of prejudice from two or more errors may well be enough to undermine confidence in the reliability of the trial verdict." *Id.* In making a cumulative effect determination, "[i]t is necessary to look at the trial as a whole." *Id.*

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). "An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

### Discussion of Specific Allegations

#### A. Petitioner Was Denied Effective Assistance of Counsel

1. **Trial counsel failed to request an instruction that the State was required to prove beyond a reasonable doubt that some felonious blow struck by Petitioner was independently sufficient to cause—or at minimum, a "substantial cause"—of the death of Corporal David McGuinn.**

In the Petition for Post Conviction Relief, Petitioner argues that he was entitled to a jury instruction that would require the jury to find that Petitioner only caused the death of Corporal

**App. 11**

McGuinn if his conduct was a "substantial factor" that resulted in the Corporal's death. Petitioner basis this argument on the State's main witness, inmate Jason Freed, who was serving a sentence for robbery with a deadly weapon on the same cell block and who, according to him, could not have witnessed Corporal McGuinn's murder at the hands of Lee Stephens and Lamar Harris on the night in question. Freed testified that he was housed in the same tier (row of single prison cells) as the Petitioner and Mr. Harris, the original co-defendant. Freed explained how the inmate in Cell 2 (Gales, known to Freed as "G"), told him earlier that day that something was going to happen during the "count" that night.[4]

Mr. Freed recounted the night of Corporal McGuinn's murder and described how he used a "looking out" mirror to see down the rows and out into the hallway of the tier. T. 1/17/12 p. 111. Freed stated, "... as soon as Junie [Lamar Harris' nickname] came out and started stabbing, Shy [Lee Stephens' nickname] came out of his cell and started stabbing too." *Id.* at p. 114. When prompted about whether he saw a weapon in the Petitioner's hands, Freed responded with, "Just the—I didn't see the actual weapon *per se*, but I seen something in his hand." *Id.* at p. 117. Freed described Corporal McGuinn as physically being trapped between two figures as he was trying to protect himself from the stabbing. *Id.* at p. 118. After explaining the assault, Freed mentioned that he heard something metal drop as one of the men involved ran away from the scene and towards his cell. *Id.* at p. 119.

Petitioner argues that Freed could not distinguish which individual was stabbing Corporal McGuinn, nor was it possible to differentiate between Harris' and Stephens' separate strikes or swinging arm motions. Petitioner highlights how defense counsel never addressed the issue of causation at trial, and how during cross-examination, counsel failed to undermine Freed's testimony with the use of expert testimony on vision capabilities. There were twenty-

---

[4] State's Response at p. 12.

**App. 12**

four (24) wounds inflicted on Corporal McGuinn: twelve (12) stab wounds and twelve (12) cutting wounds--both "circular" and "linear." The Assistant Medical Examiner's Report shows that four (4) of the wounds were potentially lethal.

Petitioner argues, "When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called proximate cause) of the result." *Burrage v. United States*, 134 S. Ct. 881, 887 (2014) (internal quotation marks omitted).[5] Accordingly, Petitioner contends that the State has to prove beyond a reasonable doubt that the defendant's conduct was an "independently sufficient" cause of the victim's death.

Petitioner argues that defense counsel was ineffective in failing to request a jury instruction on substantial causation, failing to argue to the jury the lack of proof that defendant caused the death of Corporal McGuinn, and failing to undermine the testimony of Freed and/or the Assistant Medical Examiner Dr. Vincenti.

### a. Analysis

### i. Causation Instruction

As is noted in the State's Response, "In order for the trial court to give a requested jury instruction, the instruction must be appropriate based on three criteria: 1) whether the instruction was generated by the evidence, 2) whether it is a correct statement of law; and 3) whether it otherwise was fairly covered by the instructions actually given." See *Gimble v. State*, 198 Md. App. 610, 627, cert. denied, 421 Md. 193 (2011) (internal citations omitted).[6] Using this standard, the Court need not consider whether the instruction was generated by the evidence as it is clear that causation is an element of a first degree murder charge. The second prong of this

---

[5] Petition for Post Conviction Relief at p. 23.
[6] State's Response at p. 15.

11

**App. 13**

analysis requires that the proposed instruction be an accurate statement of the law. *Id.* Here, Petitioner claims that an instruction stating, "...the State was required to prove beyond a reasonable doubt that some felonious blow struck by Petitioner was independently sufficient to cause—or at minimum, a 'substantial cause'—of the death of Corporal David McGuinn" would have been appropriate.[7] The instruction that Judge Hackner gave at the close of the trial was as follows:

> First degree murder is the intentional killing of another person with willfulness, deliberation and premeditation. In order to convict the Defendant of first degree murder, the State must prove, one, **that the conduct of the Defendant caused the death of David McGuinn**. And two, that the killing was willful, deliberate and premeditated.

> Willful means that the Defendant actually intended to kill the victim. Deliberate means that the Defendant was conscious of the intent to kill and premeditated means that the Defendant thought about the killing and that there was enough time before the killing, though it may only have been brief, for the Defendant to consider a decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.[8]

As the comments supporting this instruction cite, "The third threshold issue is the requirement of both factual and legal or proximate causation between the act or omission of the defendant and the death of the victim. The factual causation requirement is satisfied if the defendant's act or omission was a substantial factor in bringing about the death." *See generally* CLARK & MARSHALL, *supra*, § 10.01, at 603-16; LAFAVE, *supra*, § 6.4-6.4(c), at 350-57; PERKINS & BOYCE, *supra*, at 769-824. It is this "substantial factor" language that the Petitioner claims trial counsel failed to request from the trial judge in this case.

As explained above, deficient acts of trial counsel are, "assessed based on a comparison to 'prevailing professional norms' and counsel's actions must be presumed reasonable until

---

[7] Petition for Post Conviction Relief at p. 1.
[8] T. 1/31/12 pp. 104 & 105, lines 23 through 12 & MPJI-Cr 4:17 HOMICIDE -- FIRST DEGREE PREMEDITATED MURDER AND SECOND DEGREE SPECIFIC INTENT MURDER (NO JUSTIFICATION OR MITIGATION GENERATED), MPJI-Cr 4:17 (emphasis added).

**App. 14**

proven otherwise." *Smith v. State*, 394 Md. 184, 207 (2006) and *Premo v. Moore*, 562 U.S. 115

(2011). "In ruling on a claim of ineffective assistance of counsel, a hearing judge must give

substantial deference to counsel's judgment." *Id.* "There is a strong presumption that counsel's

representation is within the wide range of reasonable professional assistance." *Id.*; citing

*Harrington v. Richter*, 562 U.S. 86, 110 (2011).

However, in the opinion of this Court, the defense was not prejudiced by the omission of

the Petitioner's requested language on causation. As the State points out, the use of Maryland

Criminal Pattern Jury Instruction 4:17 was proper in this case. It is clear to the Court that the

decision of trial counsel not to request any further causation instruction was not improper as the

instruction given covered the area in question. The instruction that was given by the trial judge

was proper and appropriate for the case at hand, and the Court can find no error in this regard.

Furthermore, on February 13, 2012, during Phase I of the sentencing portion of the trial,

Judge Hackner instructed the jury on "principalship" and stated:

> The State also alleges and must prove that the Defendant is a principal in the first-degree
> to the act of murder. A principal in the first-degree means that the Defendant committed
> the murder by his own hand. The Defendant's conviction of first-degree murder does not
> by itself establish that either of these allegations has been proven. You must make a
> separate independent finding based on the evidence for each allegation. The State must
> persuade you beyond a reasonable doubt that these allegations which are in Part 1 of the
> sentencing form have been proven. And the Defendant is not required to persuade you
> that the allegations have not been proven. T. 2/13/12 p. 60, lines 3-14.

Later that same day, the jury found that Mr. Stephens to be a principal in the first degree

in the murder of Corporal McGuinn, further emphasizing that there was no confusion as to the

causation element of the crime.

It is clear to this Court that there was enough direct evidence (the eyewitness testimony

of Jason Freed, the blood on the bottom of Petitioner's shoes, the bloody tank top underneath of

Petitioner's mattress, the drop of blood on Petitioner's underwear) as well as circumstantial evidence (Petitioner's neighbor hearing watering running during/after the time of the event, the discovery of a "key" in Petitioner's cell with which to open the cell door, and more) upon which the jury based its conclusion. As is articulated in the State's Supplemental Response to the Petition for Post Conviction Relief, "Defendant [Petitioner] cannot demonstrate that, but for this jury instruction, there is a reasonable possibility that the jury's verdict would have been different."[9]

Therefore, this Court finds Petitioner failed to establish that counsel were ineffective under the standards required under *Strickland*, its progeny and Maryland case law. Accordingly, Petitioner's request for post conviction relief based on this allegation is **DENIED**.

### ii. Failure to Interview Medical Examiner

Petitioner argues that the decision of trial counsel not speak with Dr. Vincenti prior to the trial, thereby not learning which cuts and stabs inflicted the most harm to Corporal McGuinn, was deficient. During the post conviction hearing, Dr. Vincenti testified as an expert witness and described the wounds that were inflicted to Corporal McGuinn. Although she could not testify as to how many weapons were used to inflict the wounds, she did provide information that it was possible for Corporal McGuinn to have lived but for the two most lethal wounds (Wounds 'A' and 'E,' respectively).[10]

Petitioner called Dr. Daniel Spitz, the Chief Medical Examiner from Macomb County, Michigan, to further describe the wounds and the cause of death of Corporal McGuinn. Dr. Spitz agreed with Dr. Vincenti that Corporal McGuinn died from the totality of the loss of blood that he suffered due to the wounds. However, he indicated that some wounds bleed more profusely

---

[9] State's Response at p. 17.
[10] Post Conviction Hearing, Day One, April 18, 2017, Dr. Donna Vincenti.

14

than others and made the connection that Wound 'A' was fatal regardless of the other wounds existing.[11] His testimony was similar to Dr. Vincenti's in that he could not definitely say the number of weapons that caused such wounds.[12]

When asked during the post conviction hearing why he did not reach out to Dr. Vincenti before the trial, Mr. Proctor, indicated that it was not a strategic or tactical decision. Mr. Proctor did explain that he reached out to their own Medical Examiner in Delaware, a Dr. Richard Callery. Counsel indicated that he sent Dr. Callery the autopsy report of Corporal McGuinn but that no further meetings or followed up occurred with him or his office. He also explained that this was not a tactical decision on his or Mr. Lawlor's parts.[13]

In the course of his testimony, Mr. Proctor explained his rationale behind not asking many questions of Dr. Vincenti on the witness stand. He said he may not have asked her one single question. He explained that it is possible if he had known about any conflicting reports as to the cause of death of Corporal McGuinn that he could have explored the distinctiveness of the injuries and the number of weapons issue further. However, during cross-examination, he elaborated that he usually does not delve into detailed testimony with medical examiners because the less that the jury hears from them the better. He explained that he prefers to get them off the stand as soon as possible, so as to not focus too much on the graphic details of the victim's injuries. He admitted to have "erroneously believed" that the Medical Examiner was off limits in this way.[14]

Mr. Harry Trainor, Esq., an attorney with substantial criminal experience, was called by the Petitioner to testify on this and other issues. Mr. Trainor was accepted as an expert in death

---

[11] Post Conviction Hearing Day One, April 18, 2017, Dr. Daniel Spitz.
[12] *Id.*
[13] Post Conviction Hearing Day Two, April 19, 2017, Gary Proctor, Esq.
[14] *Id.*

**App. 17**

penalty litigation and was permitted to offer opinions in this case.  In his opinion, Mr. Lawlor

and Mr. Proctor's failure to interview Dr. Vincenti was clearly deficient.  He cited to *ABA*

*Guideline* Rule 10.7 and Rule 10.8.[15]  During cross-examination, Mr. Trainor conceded that it

was not per se ineffective assistance to not interview Dr. Vincenti, but that in this case it is

something that he definitely would have done.  Mr. Trainor indicated that this was a particularly

troubling choice of action as there seemed to be no reason for not interviewing the Doctor,

particularly if cause of death or manner of death was at issue.[16]

　　　The Court finds that it was not deficient of trial counsel to not speak with Dr. Vincenti

prior to trial.  Despite his assertion, that it was not a tactical decision to not speak to Dr.

Vincenti, Mr. Proctor gave tactical reasons for not speaking to her that have previously been

outlined above, including wanting to limit the amount of graphic details that the jury would hear

about the killing.  Even if counsel's performance was deficient, Petitioner has failed to prove the

prejudice prong of Strickland. "The Supreme Court has noted that while it is possible that an

isolated error (defective act) can constitute ineffective assistance, it is difficult to establish

---

[15]    A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to
the issues of both guilt and penalty.

　　　1. The investigation regarding guilt should be conducted regardless of any admission or statement by the
client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the
client that evidence bearing upon guilt is not to be collected or presented.

　　　2. The investigation regarding penalty should be conducted regardless of any statement by the client that
evidence bearing upon penalty is not to be collected or presented.

　　　B.1. All post-conviction counsel have an obligation to conduct a full examination of the defense provided
to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel
and members of the defense team and examining the files of prior counsel.

　　　2. Counsel at every stage have an obligation to satisfy themselves independently that the official record of
the proceedings is complete and to supplement it as appropriate.

American Bar Association: *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty
Cases*, Revised Edition, February 2003, Guideline 10.7 (2003).

[16] Post Conviction Hearing Day Two, April 19, 2017, Harry Trainor.

**App. 18**

ineffective assistance based on a single act where counsel's overall performance reflects active and capable advocacy." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Here, if counsel's failure to talk to the Medical Examiner before the trial was deficient, that act did not so influence the trial as to prejudice the Defendant. Given the Court's original causation instruction, which was properly given, and the limited difference in opinions of the wounds suffered, the Court cannot find that the result would have been different. Accordingly, Petitioner's request for post conviction relief based on this allegation is **DENIED**.

   **2. Trial counsel failed to undermine the search of Petitioner's cell and stipulated that critical physical evidence against Petitioner was maintained properly despite mounting evidence that such evidence could have been contaminated by the State's sloppiness and mishandling thereof.**

   Petitioner argues that counsel failed to demonstrate the inadequate investigatory techniques of the correctional officers who responded to the crime scene and E4 tier immediately after the incident. Petitioner's concerns include the "shoddy" collection of evidence, tampering of the crime scene by officers that were untrained in crime scene preservation, and an improper chain of custody of certain pieces of evidence. The main issue, according to Petitioner, is that defense counsel failed to clearly demonstrate the inconsistencies surrounding the searching of the prison cell and collection of purportedly incriminating pieces of clothing.

   The stipulation entered into by both sides of trial counsel is as follows:

   9. Both parties stipulate that on July 25, 2006, at 10:25 pm, CO Winslow Veney relieved CO Rodney Sampson as Officer in Charge of Center Hall at the Maryland House of Corrections. Officer Veney maintained proper chain of custody of State's Exhibit #34 (tank top t-shirt), State's Exhibit #35 (pair of tan boots), and State's Exhibit #36 (mesh laundry bag). These items were not disturbed or altered in any way prior to their being collected by Crime Scene Technician Annie Kalathis on July 26, 2006 at 10:23 am.

   10. Both parties stipulate that on July 26, 2006, at 10:23 am, Crime Scene Technician Anne Kalathis took custody of State's Exhibit #34 (tank top t-shirt), State's Exhibit

**App. 19**

#35 (pair of tan boots), and State's Exhibit #36 (mesh laundry bag).  These items were sealed in separate evidence bags and turned over to Crime Scene Technician Kristine Amspacker on July 26, 2006, at 12:00 pm.

11. Both parties stipulate that proper chain of custody was maintained throughout for all physical items of evidence collected by MSP Crime Scene Technicians at the Maryland House of Corrections on July 25, 2006 and July 26, 2006.[17]

Petitioner argues that paragraph number nine (9) is poorly written and may have confused the jury.  Petitioner argues that the stipulation makes it seem as though defense counsel is not challenging the transportation of evidence during the entire collection process after the incident on tier E4.  At the post conviction hearing, Mr. Proctor made it clear that without a doubt he and Mr. Lawlor wanted to challenge the chain of custody and evidence before it arrived at the Center Hall location.  He stated that he usually considers stipulations to be "defense tactics" but was unsure as to whether this one in particular was discussed with Mr. Stephens.  When pressed by Petitioner's counsel, Mr. Proctor responded that he was unsure of whether this particular language in the stipulation was "strategically written."[18]

On cross-examination, Mr. Proctor agreed that there were twelve (12) versions of the stipulation that were exchanged between the State and defense trial counsel until one final version was decided on for use at trial.[19]  The State argues that the stipulation is accurate and that it is not confusing or misleading.  The State further points out that this stipulation, regardless of whether it was deficient, fails to satisfy the prejudice prong of the Strickland analysis.  The jury never sent a note during deliberations indicating that they were confused by the wording of the stipulation, the State never argued contrary to the stipulation, and the defense argued consistent

---

[17] Marked as Petitioner's Exhibit "P" at the Post Conviction Hearing.
[18] Post Conviction Hearing Day Two, April 19, 2017, Proctor.
[19] *Id.*

18

**App. 20**

with their position. As such, it would not have changed the outcome of the case if it were written differently.[20]

On cross-examination, both Mr. Lawlor and Mr. Proctor stated the crime scene evidence was not well-preserved and that they presented this argument to the jury. Some of their concerns included the fact that supposed blood found in the sink of Mr. Stephen's cell and inside the door jamb of his cell were left untested by lab technicians, indicating that the MHC officers failed to do their job properly.[21] The State pointed out that defense counsel actively highlighted the problems with the DNA evidence during Petitioner's trial to the jury. The Petitioner conceded in his opening statements that trial counsel's highlighting of the problems with the DNA evidence was one of the stronger points that trial counsel made during the trial. However, Petitioner maintains that the language in the stipulation was a "devastating oversight" that precluded defense counsel from challenging the integrity of the chain of custody of some of those items of evidence in question.[22]

Based on the outlined Strickland test above, "There is a presumption that trial counsel's actions were reasonable and the petitioner must overcome the presumption that trial counsel's actions were not sound trial strategies." *Strickland*, 466 U.S. at 689. Based on the testimony provided during the Post Conviction Hearing, this Court finds that the actions of counsel were not deficient as to challenging the search of Petitioner's cell and subsequent collection of evidence. The stipulation created and settled upon by trial counsel appropriately stated the facts and was a clear trial strategy. As such, counsel's actions were not unreasonable. Accordingly, Petitioner's request for post-conviction relief based on this allegation is **DENIED**.

---

[20] Post Conviction Hearing Day Four, April 24, 2017, Russell.
[21] Post Conviction Hearing Day Two, April, 19, 2017, Proctor.
[22] Post Conviction Hearing Day One, April 18, 2017, Hutt's Opening Statements.

**App. 21**

### 3. Trial counsel failed to effectively cross-examine the only State witness who identified Stephens as a participant, Jason Freed, on benefits he would receive in exchange for his testimony.

Petitioner argues that defense counsel did not effectively cross-examine the State's

principal eye-witness, Jason Freed, and failed to fully expose the Federal and State benefits that

Freed was to receive in exchange for his testimony.[23] Petitioner concedes that defense counsel

was "successful to some extent" in demonstrating the Federal deal that Freed was a part of, but

that the real problems was in the failure to show what benefits the State had offered Freed in

exchange for his testimony.[24]

According to Petitioner, approximately two weeks after being indicted with a federal

firearms charge in 2007 (before Defendant's trial) Mr. Freed decided to come forward with

information and meet with prosecutors to describe what he witnessed as to the assault of

Corporal McGuinn. At trial, defense counsel was precluded from asking Freed about bargains

between him and the State in connection with reduced jail time after Freed denied knowing

whether his lawyer had spoken with the State about such deals. However, Petitioner argues that

there were other ways in which defense counsel could have challenged Freed's motives,

including a letter that Freed had written to Maryland State Police Corporal John Branham on

February 23, 2007. The letter, which was never utilized by defense counsel at trial, stated in

part, "I remember someone sayin' ya'll can help me out with my state issues."[25] Petitioner

contends that there were multiple ways in which defense counsel could have brought this issue to

light, resulting in Freed's credibility being questioned by the jury.

Michael Lawlor testified that he had certain goals in mind when he cross-examined Mr.

Freed during the trial. He explained that the cross-examination of Freed was multi-faceted and

---

[23] Petition for Post Conviction Relief at p. 15.
[24] *Id.*
[25] *Id.*, at p. 17.

20

**App. 22**

that he wanted to show three things: 1) Freed was biased and he came forward very late in the investigation, 2) Freed's ability to perceive the events of the night was not realistic (all the way down the hallway, small mirror, etc.), and, 3) He only came forward when he was charged federally, furthering illustrating the unreliability of his testimony.[26]  Mr. Lawlor believed his cross-examination was not as successful as he wanted it to be, that he "stumbled out of the gate" and "lost his legs" during the examination.  Mr. Lawlor indicated it was important to show that Freed had a federal deal and he tried to "hammer" the point home during closing argument at trial.  As for not using the letter that Freed sent to Corporal Branham, Mr. Lawlor did not recall if that was a strategic decision or not.[27]

Harry Trainor, Petitioner's expert witness, testified that Mr. Freed likely had a hope or expectation that the State would help him if he testified, and that this could have been explored further by defense counsel.  Mr. Trainor also opined that if the letter from Freed to Corporal Braham had been overlooked then that would have been a deficient act on the part of defense counsel.

Mr. David P. Ash, Assistant State's Attorney, testified regarding this issue.  Mr. Ash was one of the trial prosecutors in the case.  Mr. Ash testified that there was no agreement between Mr. Freed and the State connected to his state charges in Howard County.  When questioned about the letter sent from Freed to Corporal Braham, Mr. Ash answered that he advised Corporal Braham that there were no deals with Freed.  Mr. Ash explained that at the time that Mr. Freed was to testify as a State's witness, he had already made the federal deal and thus he was "damaged goods" according to the State.[28]  On cross-examination he elaborated that the deal was made by the federal prosecutor's office and was not originated by the Anne Arundel County

---

[26] Post Conviction Hearing Day One, April 18, 2017, Lawlor.
[27] *Id.*
[28] Post Conviction Hearing Day Four, April 26, 2017, Ash.

**App. 23**

State's Attorney. Mr. Ash explained that Mr. Freed had no impact on the State's case and that the best evidence the State presented was the overwhelming physical evidence.[29]

It is well-settled State law that, the State must disclose any bargain or benefit it offers to any of its witnesses. *Wilson v. State*, 363 Md. 333 (2001). During the Petitioner's trial and the post conviction hearing, no evidence was presented to support a State-level deal in exchange for Freed's testimony. The jury was aware of Freed's Federal charges, potential sentence, and related deal. As the State phrased it, "In the end, the jury was aware that Mr. Freed was testifying based on a deal from the Federal government and the jurors either believed his testimony despite the deal or they disregarded his testimony and convicted the Defendant because of the overwhelming physical evidence presented by the State."[30]

While Mr. Lawlor had concerns over the feeling that he "lost his legs" during cross-examination, that admission does not automatically qualify as a deficient act by trial counsel. With no State deal in place, there could be no cross-examination as to a deal that did not exist. Mr. Lawlor had a clear strategy in cross-examining Mr. Freed—his intentions were to show his bias, the inability for him to perceive what he thought he saw, and the fact that he waited a long time to come forward with his information. Even though according to counsel the cross-examination did not go "as planned," that does not mean that he was ineffective in conducting the examination in that way. *Harrington v. Richter*, 562 U.S. 86 (2011).

Mr. Lawlor wanted the jury to understand that Freed's visual perception of the murder could not have been as clear as he indicated that it was to the jury. He wanted to highlight the problems with the lighting on the tier and to show that conditions were far from ideal to observe

---

[29] *Id*, noting the blood on the treads of the boots, blood spot on the underwear, and wet tank top under the mattress.
[30] State's Response at p. 30.

**App. 24**

what Freed claimed that he saw.[31]  The attack on Corporal McGuinn was described as having

occurred more than one hundred (100) feet away from Freed's cell (number 16).  Petitioner

contends that defense counsel should have presented the environmental problems more clearly to

the jury, including, but not limited to: the lack of lighting in the tier, the loud noise coming from

the large ceiling fans above, and the resulting ability to perceive such a scene from a far distance

(not to mention only viewing the scene from a small handheld mirror).[32]

During the post conviction hearing, Petitioner argued that defense counsel could have

called expert witnesses in the fields of human perception and audiology in order to demonstrate

the near impossibility of Freed to actually see what he claimed to have seen that night.  To

bolster their argument, Petitioner called Dr. Bradford May to testify as an expert on hearing and

deafness.  He described his qualifications and how the audibility of sound is measured.  He

formed an opinion that an individual one hundred (100) feet away would not be able to hear the

sound of a stab, as Mr. Freed claimed he heard the night of the attack.  In support of his opinion,

Dr. May conducted an experiment with a laboratory sound quality machine and measured the

decibel level of the sound of stabbing a piece of meat with a sharp object.  He equated this to the

potential sound of a human being getting stabbed by a sharp object and the similar sound that

such action would make.  He testified that the sounds of stabbing the meat were hardly

detectable and that even a slight change in environmental background noise would greatly

change the outcome and as a result one could not hear what Mr. Freed claimed he heard.

---

[31] As properly articulated by Judge Hackner during jury instructions: "You are the sole judge of whether a witness
should be believed.  In making this decision, you may apply your own common sense and everyday experiences...In
determining whether a witness should be believed, you should carefully judge all the testimony and evidence and
circumstances under which the witness testified.  And you should consider such factors as, the witness's behavior on
the stand and the manner of testifying...You may not believe any witness, even if the testimony is uncontradicted.
You may believe all, part or none of the testimony of any witness. " T. 1/31/12 p. 100, lines 5-7, 8-12, & 23-25.
[32] Post Conviction Hearing Day One, April 18, 2017, Petitioner's Opening Statements.

On cross-examination, Dr. May admitted that he did not know exactly how far away Freed was from the crime. He also testified that he had never visited the Maryland House of Corrections and did not know the noise level that existed at that evening. He also did not consider the difference between stabbing a piece of meat in a controlled setting versus stabbing a live human being wearing a shank proof vest during a violent fight with two (2) individuals.[33]

Petitioner also called Dr. Geoffrey Loftus as an expert on human perception and sight. Dr. Loftus testified that a person's ability to see under certain conditions is different due to "scotopic" (dark) and "photopic" (light) environments. Dr. Loftus explained that even in the most ideal lighting and distance situations, it is very unlikely that an individual would have been able to see and identify the Petitioner from such a distance.[34] On cross-examination, Dr. Loftus admitted to not knowing the level of "luminance" on the tier that night, and that he had no actual data from the night in question to use to support his opinions.

Pursuant to Maryland Rule 5-702:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a *sufficient factual basis exists to support the expert testimony*. (Emphasis added)

In this case, although qualified in their respective fields, both Drs. May and Loftus based their testimony on unknown environmental conditions. Neither individual knew the exact lighting, background noise, or positions of the parties during the night of Corporal McGuinn's murder and admitted to such during their testimony. Although their testimony was admitted at the post conviction hearing, the Court would not have allowed the experts to testify at trial.

---

[33] Post Conviction Hearing Day One, April 18, 2017, Dr. May.
[34] Post Conviction Hearing Day Two, April 19, 2017, Dr. Loftus.

Neither expert had a "sufficient factual basis" upon which to base their opinions and their testimony would not have helped the trier of fact in this case.  Further, the Court of Appeals has not accepted the use of expert testimony to challenge the perception of an eye-witness, "We again shall decline to adopt a new standard regarding the admissibility of an extrajudicial eyewitness identification, or for incorporating expert testimony into challenges of an eyewitness identification, because our jurisprudence already provides suitable means to assay an eyewitness identification." *Smiley v. State*, 442 Md. 168, 185 (2015).

For the reasons stated above, the relief sought in this allegation is hereby **DENIED** as the testimony of the witnesses do not prove that counsel's performance was ineffective.

### 4. Trail counsel failed to reasonably investigate and identify at trial alternative suspects for the murder.

Petitioner claims that defense counsel were deficient in failing to name possible alternate suspects for Corporal McGuinn's murder.  Petitioner argues that defense counsel did not "connect[ed] those dots for the jury" in highlighting the friendship between Lamar Harris and inmate Carlton Gales, or the fact that Gales broke lights on the E4 tier earlier that day.[35] Petitioner mentions that multiple witnesses suggested that the DOC had ordered a "hit" on Corporal McGuinn and that inmates Collins and Hill had told DOC officers that they heard McGuinn was the next officer to be killed.[36]

In the State's Supplemental Response, it calls the supposed lack of pursuing alternate suspects a "bald allegation" and the idea that there were larger plans at work in the prison including plots to kill Corporal McGuinn "conspiracy theories."  The State contends that defense

---

[35] Petition for Post Conviction Relief p. 18, referencing T. 1/30/12 p. 183.
[36] *Id.*

**App. 27**

counsel conducted an exhaustive investigation into potential suspects, including "interviewing every witness in the case and every inmate that was on E4 tier the night of the murder."[37]

Mr. Lawlor testified that he could not remember the specifics of the conversations that he had with Mr. Proctor, on the issue, but acknowledged that they generally spoke of the prospect of alternate suspects. Mr. Proctor testified that alternate suspect ideas were discussed "often" and that he personally thought that Mr. Gales had something to do with the murder.[38] However, Mr. Proctor clearly stated that he wanted to keep the focus of the trial on the State having to prove their case against Mr. Stephens beyond a reasonable doubt instead of trying to contort the case to fit some different theory.[39]

Counsel's decision not to pursue alternate suspects was a tactical decision and therefor presumptively appropriate. Further, there has never been any evidence developed that an alternate suspect defense exists, existed, or was even possible. Therefore, Petitioner's request for post-conviction relief on this allegation is hereby **DENIED**, as the tactical decision of counsel not to pursue that defense is not ineffective assistance of counsel.

**5. Appellate counsel failed to appeal the trial court's ruling barring testimony regarding the planting of evidence on inmates (and specifically Bradford Matthews) by officers at Maryland House of Corrections.**

The Petitioner argues that days after Corporal McGuinn's murder, a knife suspected to have been used to kill Corporal McGuinn was planted on inmate Bradford Matthews by prison guards. This testimony was excluded at trial by Judge Hackner and that decision was subsequently affirmed by the Court of Appeals. The only testimony that was presented in regard to this issue at the post conviction hearing was offered by Mr. Proctor. He provided some

---

[37] State's Response at p. 19.
[38] Post Conviction Hearing, Day Two, April 19, 2017.
[39] *Id.*

**App. 28**

background information on the issue and explained how Bradford Matthews was allegedly beaten and then framed by prison guards. A bald, unsupported allegation of error does not constitute a ground for post-conviction relief. *Johnson v. Warden of Md. Penitentiary*, 244 Md. 695, 696 (1966). As no testimony was presented during the post conviction hearing to support this allegation, and the Petitioner did not argue this point, the relief sought for this allegation is hereby **DENIED.**

6. **The errors of counsel individually and collectively prejudiced the outcome of Petitioner's case under *Strickland*.**

Petitioner contends that the aggregate of the errors of trial counsel constituted ineffective assistance. Petitioner asserts that the nature and number of the errors committed by trial counsel in this matter constitute ineffective assistance of counsel.

The State argues that in hindsight, it is easy to nit-pick the actions of trial counsel and question their decision-making, but in this case, that the real crux of the case rests upon the lack of prejudice experienced by the Petitioner. Hearing courts should not, aided by hindsight, second-guess counsel's decisions. See *Gilliam v. State*, 331 Md. 651, 666 (1993). The cumulative effect of numerous errors may constitute an independent reason for ruling that counsel's representation was ineffective. *Bowers*, 320 Md. 416, 437 (1990). When a Bowers claim is made but there are no errors, the court is dealing only with a compilation of zeros and a sum of zeros equals zero. *Gilliam*, 331 Md. 651, 686 (1993), cert. denied, 510 U.S. 1077 (1994).

In making a cumulative effect determination, "[i]t is necessary to look at the trial as a whole." *Schmitt v. State*, 140 Md. App. 1, 48 (2001). In the present matter, it is clear from the record that experienced trial counsel adequately represented Petitioner by doing, among other things, the following: meeting with Petitioner prior to trial, developing a strategy of the case, preparing the case they intended to argue, preparing witnesses, litigating pretrial motions, and

27

**App. 29**

appealing motions, presenting strong arguments and a theory of the case during their opening statement and closing argument, making objections during the State's examinations of witnesses, thoroughly and zealously cross-examining each of the State's witnesses, and immediately filing a direct appeal of the final outcome of the case.

The State was seeking a death sentence for an individual serving life due to a prior murder conviction. The jury rejected the State's request for death. Counsel not only did not provide ineffective assistance of counsel, but provided competent professional assistance of counsel. The Court finds Petitioner has failed to prove the cumulative effect standard for an ineffective assistance of counsel claim. Accordingly, Petitioner's request for post conviction relief based on this allegation is **DENIED**.

### B. Petitioner Was Denied the Right to Testify in His Own Defense

**1. Petitioner is entitled to a new trial because his decision not to exercise his fundamental right to testify in his own defense at trial was based on the State's ability to use, for impeachment purposes, Petitioner's prior murder conviction and life sentence thereof, which was later shown to be illegally obtained and vacated.**

The decision of the Petition not to testify during his trial was based on the fact that counsel and the Petitioner anticipated the State would impeach him by using his prior murder conviction from Wicomico County against him. Trial counsel advised the Petitioner that his previous murder conviction could be used to impeach him if he testified, but it was Petitioner's decision whether to testify. During the post conviction hearing, the Petitioner maintained that he wanted to testify at trial and tell the jury that he was not involved in the murder. However, he explained that after consulting with his attorneys, he decided to waive his right to testify so as to not to be impeached on cross-examination with his prior conviction.[40]

---

[40] Post Conviction Hearing, Day Two, April 19, 2017.

**App. 30**

Petitioner also asserts that if his prior conviction post conviction has been aggressively prosecuted by counsel, and his conviction was vacated, he would have testified and the result in the case would have been different. We now know that the Wicomico County murder conviction was vacated on July 12, 2013 due in part to a State's ballistic expert witness, Joseph Kopera, falsifying his expert credentials and offering faulty ballistics testimony.[41] Petitioner's counsel for this case also represented the Petitioner in his Petition for Post Conviction Relief in the Wicomico County trial. The Kopera issue, along with other issues, led to an eventual reexamination and retest of the ballistics. It was found that Mr. Kopera lied about his credentials, and his conclusions on the ballistics were wrong. After the re-examination, the State offered to vacate Petitioner's murder conviction only if Mr. Stephens plead guilty to murder in exchange for a sentence of life, suspend all but time served. The *vacatur* and plea occurred after the Petitioner was found guilty of the Anne Arundel County murder and sentenced to life imprisonment without the possibility of parole.

Every defendant has a constitutional right to remain silent, but can also waive the right and testify in his own defense. Petitioner argues that "but for" the Wicomico County conviction, he would have testified on his own behalf. He argues the jury here would have excused his prior conviction for murder, since he received only a "time served" sentence.

This argument, however, is misguided. Even if the Wicomico County murder conviction was vacated prior to the termination of the Anne Arundel County trial, and the defendant still plead guilty to that murder for time-served (as he did), the jury still would have been made aware of the defendant's murder plea through the State's cross examination of the defendant. As Mr. Proctor stated, once the jury learned of the prior conviction it was "game over."[42] To quote from

---

[41] Petition for Post Conviction Relief, p. 2.
[42] Post Conviction Hearing, Day Two, April 19, 2017.

29

**App. 31**

the State's Response to the Petition for Post-Conviction, "The fatal flaw of the Petitioner's claim regarding his right to testify lies in his premise that his conviction for murder from Wicomico County could have been removed from his record...The Petitioner daftly suggests that a jury would understand that his subsequent plea of guilty to the Wicomico murder would be received as something less than an admission of guilt. Such testimony would not only alert the jury to his murder conviction, it would open the door to the State inquiring about, and potentially presenting evidence on, the facts of the Wicomico County murder."[43]

In order to get to this argument, we must work backwards in determining whether defense counsel was deficient in not pursuing the Wicomico County post conviction in a timely manner. Petitioner's argument summarized is, "If, at the time of trial for the death of Corporal McGuinn, Mr. Stephen's prior illegal murder conviction had already been vacated and Mr. Stephens had already plead guilty in exchange for a sentence of time served, he would have decided to testify in his own defense."[44] If Petitioner's counsel at the time was deficient in not following through with the Wicomico County post conviction, then we can move on to the next step in the process, which is, the prejudice aspect of this decision of counsel.

As noted above in the *Strickland* analysis, "prejudice" means: a "substantial or significant possibility that the verdict of the trier of fact would have been affected." *Bowers*, 320 Md. 416, 426 (1990) (citing *Yorke v. State*, 315 Md. 578, 588 (1989)). Additionally, the Bowers Court noted that the term "substantial possibility" was used synonymously with, "may well have produced a different result." *Id.* at 427.

In order to agree with Petitioner, however, this line of thinking assumes one crucial point: that the defendant would have been successful in his Wicomico County post conviction hearing

---

[43] State's Response at p. 23 & 24.
[44] State's Response p. 31.

**App. 32**

and obtain a *vacatur* of the conviction *prior* to the trial in this case (emphasis added). We know that defense counsel submitted a Petition for Post Conviction in Wicomico County. We also know that the Wicomico County post conviction proceeding was continued or postponed about thirteen (13) times by defense counsel because their main concerns focused on the capital trial in Anne Arundel County.[45] Gary Proctor testified during the hearing that the main reason the post conviction process in Wicomico County took so long was that the capital trial in Anne Arundel County consumed their workload.[46] When pressed on cross-examination by the State, Mr. Proctor explained that if he had extra time during those five (5) years it took to go to trial, that he wanted to spend it on the capital case in lieu of the post-conviction.[47]

Harry Trainor opined that the failure by defense counsel to pursue the post conviction first in Wicomico County was "below prevailing professional norms."[48] His focused his analysis on how this failure impeded the defendant's decision to testify and that an attorney has a duty, under the ABA guidelines, to investigate prior convictions. Mr. Trainor argued that if a conviction can be used as an aggravating factor or will otherwise come into evidence during the trial, then there is a duty to investigate that prior conviction and possibly get it set aside.[49]

To counter these arguments, the State called Mr. Joel Todd, Esq., the prosecutor who handled the Wicomico County post conviction case. Mr. Todd was an experienced prosecutor and explained that the fact that the Petitioner had been found guilty of murder as a result of the Anne Arundel County trial was behind his decision to vacate the Wicomico County murder conviction. He explained that he agreed to the post conviction and the subsequent guilty plea solely due to the conviction and sentence in this case. Mr. Todd testified that if the Petitioner

---

[45] Post Conviction Hearing Day Two, April 19, 2017.
[46] *Id.*
[47] *Id.*
[48] Post Conviction Hearing, Day Three, April 20, 2017.
[49] *Id.*

had not been convicted in Anne Arundel County, then the Wicomico County State's Attorney's office would have re-tried the Wicomico County case and fought it on the merits. The Court finds Mr. Todd's testimony credible and finds that but for the Anne Arundel County murder conviction he would not have agreed to the *vacatur* of the Wicomico County murder conviction.

While the Court finds that trial counsel's lack of due diligence in pursuing the Wicomico County Post Conviction was a deficient act, there can be no prejudice to the Petitioner. Prejudice, as noted by the *Bowers* court means the deficient act, "may well have produced a different result." *Bowers*, 320 Md. 416, 427 (1990) (citing *Yorke v. State*, 315 Md. 578). In this case, the Court would have to assume that first, the defendant would have been successful in the Wicomico County post conviction, and second, that the outcome of the Anne Arundel County case would have been different as a result of that post conviction. Here, the connection between the Wicomico County case and the outcome of this trial is too tenuous to give any prejudicial weight.

Further, having heard the Petitioner's testify as to the facts surrounding the murder of Corporal McGuinn, the Court must comment on his testimony. The Court finds the Petitioner was not credible and he has no credible explanation for his actions that night. His testimony would not, in the Court's opinion, have helped him at trial, but would have hurt him. He had no credible explanation for the bloody clothing, and was not believable in any regard. Further, he testified to using the same mirror system Freed did to see what was going on in the tier. This would have given credibility to Freed's ability to see and hear what he testified to. Additionally, upon hearing of his conviction in Wicomico County, the Court cannot find that a jury would excuse the conviction as the Petitioner argues. Therefore, the post conviction relief requested for this allegation is hereby **DENIED**.

### C.  Petitioner is Entitled to New Sentencing Hearing

**1.  The life-plus-15-year sentence he received for his previous, illegally obtained conviction that was later vacated was a material factor considered by the jury in his sentencing.**

In their Petition for Post-Conviction Relief, Petitioner cites to Section 7-102(a)(1) of the Uniform Post-Conviction Procedure Act, Maryland Code Ann. Crim. Procedure which provides for relief if, "sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State." MD. CODE ANN. CRIM. PROC. §7-102. Petitioner contends that during the Sentencing Phase of the trial that the jury relied on false evidence that was introduced by the State to make their finding. Petitioner argues that if the jury had known that Defendant's prior murder conviction had been vacated, then at the time of sentencing there would have been a "substantial or significant possibility" that the Defendant would have received a sentence of life *with* the possibility of parole (instead of without).[50]

Petitioner made a Due Process argument at the Hearing, stating that the Wicomico County conviction was based on "false evidence" and therefore, the jury in the Anne Arundel case based their sentencing of the Defendant on a tainted conviction. In their Response, the State points out that, "the petitioner's case was overturned conditionally with the understanding that the Petitioner, who was already serving a life sentence in the above-captioned case, would agree to plead guilty to the murder and receive a reduced sentence."[51]

This Court is inclined to agree with the State on this claim for relief. The case before us is not an after-the-fact typical vacated conviction, but a vacated conviction that was based on the Petitioner pleading guilty to murder, thus maintaining the murder charge on his record. At this point, it would be too speculative in nature to pretend that if the *vacatur* had been secured before

---

[50] Petition for Post Conviction Relief, p. 33.
[51] State's Response, p. 24.

**App. 35**

the Anne Arundel County trial that it would have made any difference to the jury. It is purely speculative that this information would have swayed the jury towards a sentence of life with the possibility of parole. The connection between the two is tenuous, and for the reasons articulated above, the relief sought in this allegation is **DENIED**.

### Conclusion

For the reasons stated in the foregoing Statement of Reasons, all of Petitioner's claims for post conviction relief are **DENIED**. The Court shall enter an accompanying Order, consistent with this Memorandum.

Signed: 6/30/2017 04:29 PM

Judge William C. Mulford, II

_____

**William C. Mulford, II, Judge**

Please cc:
All parties

34

**App. 36**

| LEE E. STEPHENS, JR. | ★ | IN THE |
|---|---|---|
| *Petitioner* | ★ | CIRCUIT COURT |
| v. | ★ | FOR |
| STATE OF MARYLAND | ★ | ANNE ARUNDEL COUNTY |
| *Respondent* | ★ | Case No.: 02-K-08-646 |

★   ★   ★   ★   ★   ★   ★   ★   ★   ★   ★   ★

## ORDER

The above-captioned matter, having come before the Court on April 18th, 19th, 20th, and 26th, 2017 for a hearing on Lee E. Stephens Jr.'s Petition for Post Conviction Relief, and counsel having been heard and arguments made, and for the reasons stated in the accompanying Statement of Reasons and Order of Court, it is this 30th day of ____June____, 2017, by the Circuit Court for Anne Arundel County hereby

**ORDERED**, that Lee E. Stephens Jr.'s Petition for Post Conviction Relief is **DENIED**.

Signed: 6/30/2017 04:30 PM

Judge William C. Mulford, II

**William C. Mulford, II, Judge**

App. 37

Appendix No. 2

Petition for Post-Conviction Relief

**IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND**

**LEE E. STEPHENS, JR.**    :
     **Petitioner,**

       **v.**       :    **Case No. _____**
                            (original case # K-2008-000646)

**STATE OF MARYLAND**
     **Respondent.**    :

## PETITION FOR POST-CONVICTION RELIEF

**I.**    **INTRODUCTION**

     1.    Petitioner Lee E. Stephens respectfully seeks post-conviction relief

pursuant to the Uniform Post-Conviction Procedure Act, Maryland Code Ann. Crim.

Procedure, Sections 7-101 through 7-109 and Maryland Rules 4-401 through 4-408,

vacating the judgment of conviction upon a verdict of guilty of murder in the first degree

and/or the sentence of life without possibility of parole imposed therefor.  After six days

of deliberations, on February 9, 2012, a jury in the Circuit Court for Anne Arundel

County (Honorable Paul A. Hackner, J., presiding) returned a verdict of guilty on one

count of murder in the first degree in violation of Md. Code Ann. Crim. Law § 2-201 and

a verdict of not guilty on one count of conspiracy to commit murder.  On February 29,

2012, the same jury voted unanimously for a sentence of life without parole.  The court

formally sentenced Mr. Stephens on June 15, 2012.

     2.    The jury found Mr. Stephens guilty for the July 25, 2006 murder of David

McGuinn, a corrections officer serving at the Maryland House of Corrections in Jessup.

At the time of the crime, Stephens was an inmate at the House of Corrections where he

was serving a term of life-plus-15 years for a murder committed in Salisbury, Wicomico

1

County in April 1997 and for which he was convicted in August 1999. On July 12, 2013, the Circuit Court for Wicomico County vacated the murder conviction and sentence that Mr. Stephens had been serving at the time of McGuinn's murder. It did so when the State agreed to the *vacatur* after concluding that a flawed and false ballistics analysis was admitted in Mr. Stephens's murder trial and had been supported by materially false testimony by an expert witness. (The State re-tested the ballistics in advance of the hearing on Mr. Stephens's petition for post-conviction relief in Wicomico County because the ballistics analysis had been performed by Joseph Kopera, an expert who, it was earlier revealed, had falsified his credentials in testimony on numerous occasions). Following the *vacatur*, Mr. Stephens agreed to and did plead guilty to the crime in exchange for the State's agreement to reduce his sentence thereon to time served.

## II.   PROCEDURAL HISTORY, SUMMARY OF TRIAL EVIDENCE, AND ISSUES RAISED ON APPEAL

3.       A grand jury in Anne Arundel County charged Mr. Stephens and a co-defendant, Lamar Harris, with murder in the first degree and conspiracy to commit first-degree murder. On motion, the charges against the two were severed. Trial on the murder and conspiracy charges against Mr. Stephens was initially scheduled for February 8, 2010. Mr. Stephens was subsequently determined to be entitled to representation by the Office of the Public Defender, and the case was assigned to three panel attorneys, Gary E. Proctor, Michael E. Lawlor, and Gwendolyn Waters.

4.       On August 12, 2008, the State served notice that it intended to seek the death penalty for Mr. Stephens in the event of a guilty verdict.

5.     Pre-trial motions included one seeking to strike the notice of intent to seek the death penalty on the ground that the fees and costs that were being paid to Messrs. Proctor and Lawlor and Ms. Waters were seriously deficient in a capital prosecution, would impede the retention of necessary experts and an acceptably thorough investigation of the crime, and that, as a result, Mr. Stephens was being denied the effective assistance of counsel to which he was entitled under the Sixth Amendment and the Maryland Declaration of Rights.  The court conducted an evidentiary hearing on that motion on June 16, 2008, August 12, 2008, and November 21, 2008, at which numerous witnesses testified.  The court denied the motion on April 14, 2009, on the ground that "despite the OPD [Office of the Public Defender]'s budgetary limitations, the low rate of attorney compensation and the significant personal hardship experienced by counsel and some of the defense experts, this Defendant has not been deprived and is not likely to be deprived of the effective assistance of counsel or experts necessary for his defense."  On January 3, 2012, the first day of trial, Messrs. Proctor and Lawlor and Ms. Waters filed a motion seeking to withdraw as counsel based on lack of funding.  That motion was denied.  T 1/3/12 at 62 to 63.

6.     Mr. Stephens also argued that he was entitled to a determination, pre-trial, on the issue whether he was eligible as a matter of law for the penalty of death, and the resolution of this motion led to a substantial delay in the start of the trial.  Under then-recent amendments to the Maryland death-penalty regime (since repealed by statute), a defendant convicted of first-degree murder was death-eligible only if, among other requirements, there was biological or DNA evidence that linked him to the murder.  The court rejected Mr. Stephens's argument that death-eligibility should be determined pre-

trial, and Stephens accordingly prosecuted an appeal challenging that ruling. Following argument before the Court of Appeals, that court determined that the trial court's ruling could not be challenged on interlocutory appeal.

7. Trial commenced on January 3, 2012, and presentation of evidence in the guilt phase extended over nine days. In its case-in-chief, the State presented the testimony of 30 witnesses. The State's principal witness, and only eyewitness who connected Mr. Stephens to the crime, was Edward Jason Freed, who was serving an eight-and-a-half year sentence for robbery with a deadly weapon. Freed, the head "shot caller" for the Bloods gang on the prison tier on which he and Stephens resided (T 1/17/12 at 125, 184-85), testified that he had heard in advance that Corporal McGuinn was to be attacked that night (T 1/17/12 at 185), and so he watched the murder unfold. Freed said that, at a distance of 120 feet in a very dark space, and using a mirror, he watched from his cell bunk, cell 16 on the fourth story (E4 tier) of the West Wing of the prison. Freed claimed that he saw first Harris, and then Stephens leave their cells, surround McGuinn, and then make repeated stabbing motions. Freed testified that he did not see whether either Harris or Stephens actually landed a blow on Corporal McGuinn's body, or, if so, where the blow or blows landed. Freed said, however, that, at a distance of 40 yards, he could "hear" the stabbing blows land on their intended target. He claimed that, although the blows were delivered simultaneously, he heard distinct blows from both Harris and Stephens individually strike McGuinn.

8. The State also presented the testimony of numerous prison guards and officials of the Maryland State Police who testified about the investigation into the crime, which began shortly after its commission. They described, among other things, steps

taken to preserve the crime scene, to investigate possible suspects, to locate evidence, and to establish chains of custody for that evidence. They also testified that inmates at the House of Corrections were often able to manipulate the locks on their cell doors and then leave their cells.

9.      The State presented an Assistant Medical Examiner (Dr. Donna Vincenti), who testified to her opinion that Corporal McGuinn had died from loss of blood incident to wounds created by stabbing, and that each stab wound "contributed" to the loss of blood. Her report was also admitted in evidence.

10.      Finally, the State presented testimony from a serologist and an expert in DNA analysis. He testified that a t-shirt, boots, and two plastic bags recovered from Mr. Stephens's cell and a pair of boxers Stephens was wearing the evening of July 25, 2006 contained blood that, based on DNA testing, was determined to contain DNA belonging to Corporal McGuinn.

11.      The defense presented testimony of seven witnesses, all inmates at the House of Corrections, during one day of the trial. The defense witnesses described the poor lighting and loud noise on the E4 tier, the condition of and chaos on the E4 tier immediately following the McGuinn killing, and the presence of blood all over the floor of the cell tier, in inmate cells, and on inmate clothing.

12.      Mr. Stephens declined to testify in his own defense. Mr. Stephens's waiver of his right to testify was based on the fact that if he did testify, the State would be able to introduce on cross-examination and impeach him with his prior murder conviction and sentence therefor of life plus 15 years (which had not yet been vacated). During the

guilt phase of Mr. Stephens's trial, the jury was not made aware of his prior murder conviction or sentence.

13.     The jury deliberated over six days before it returned verdicts of guilty on the charge of first-degree murder and not guilty on the charge of conspiracy to commit murder.

14.     Sentencing was bifurcated into two phases.  In the first phase, concerning eligibility for a death sentence, the jury was asked to decide, as the statute then required, whether Stephens was a principal in the first degree and whether biological and/or DNA evidence connected Stephens to the crime.  On the first eligibility issue, the court instructed the jury that "a principal in the first degree means that the Defendant committed the murder by his own hand."  No additional evidence, beyond what was offered at trial, was presented on these issues.  During argument, the State asserted, without objection, that "[t]he M.E. told you that there are clearly two indicative wound patterns, circular and elongated with a double edge, what appeared to be a double edged blade.  She tried to manipulate the wounds to see if it's possible, but she could not conform one wound to the other.  Clearly two distinct wound patterns.  There's two weapons there and there's a weapon in Mr. Freed's hand, I mean Mr. Stephens' hand."  T 2/13/12 at 91.  After argument by counsel and brief deliberation, the jury answered both eligibility questions in the affirmative on February 13, 2012.

15.     Accordingly, sentencing moved to the second phase, in which the jury had to determine whether certain aggravators were proved beyond a reasonable doubt, find any mitigators, and then determine whether the aggravators outweighed mitigators.  This phase commenced on February 15, 2012.

16.     Among the matters of which the jury was aware during its consideration of sentence was the assertion (not then contested or contestable by the defense) that Stephens was, at the time of the crime, serving a sentence of life plus 15 years for murder.  After four days of hearing evidence, on February 29, 2012 the jury imposed a sentence of life without possibility of parole.  In so doing, the jury rejected both the death penalty and a sentence of life with parole.

17.     Counsel for Mr. Stephens timely noticed an appeal.  Mr. Stephens made four arguments in his appeal, relating to the trial court's refusal to give an instruction on missing or destroyed evidence, the instruction that the jury could consider concealment as evidence of guilt, admission in evidence of a document containing inadmissible hearsay, and inappropriate limitations on the cross-examination of Jason Freed.  The Court of Special Appeals affirmed on December 10, 2013.  The Court of Appeals denied a petition for certiorari on March 24, 2014.  The time for seeking review in the Supreme Court of the United States expired on June 22, 2014.

18.     This petition is timely under Maryland Code Ann. Crim. Procedure §7-103.

19.     Mr. Stephens is currently incarcerated in the Oklahoma State Penitentiary in McAlester, Oklahoma.  His inmate identification number is 663670.

20.     Petitioner is not able to pay costs of this proceeding or to employ counsel but is represented in this proceeding by the Maryland Office of the Public Defender and the law firm of Wilmer, Cutler, Pickering, Hale and Dorr LLP *pro bono*.

### III.   FACTS MATERIAL TO CLAIMS FOR RELIEF

#### A.   Trial on Guilt/Innocence

21.   Experienced trial counsel in this case were overwhelmed by the complexity of the case and—especially in contrast to the meager compensation they received—the resources that the State was able to marshal in its investigation and prosecution of the charges.

22.   As a result, they were unable to provide the effective assistance to which Mr. Stephens was constitutionally entitled.  The deficiencies were prejudicial; if Mr. Stephens had been effectively represented, there is a substantial likelihood that the verdict on the murder count, which the jury took six days to reach, would have been not guilty. **Counsel's ineffective assistance infected essentially every aspect of the defense:**

23.   *First*, counsel failed to ensure that the State proved the essential elements of its case beyond a reasonable doubt.  Among other things, to prove Mr. Stephens guilty of first-degree murder, the State was required to prove beyond a reasonable doubt that a felonious act by the defendant *caused* the death of Corporal McGuinn.

24.   With respect to the essential element of causation, Mr. Stephens was entitled to an instruction that told the jury that Stephens only caused the death if his conduct was independently sufficient (or, at minimum, a "substantial factor") in bringing it about.

25.   No such instruction was requested or obtained.

26.     The result was two-fold:  First, the jury could—and here did—convict Mr. Stephens of murder in the absence of evidence showing that any act by Mr. Stephens caused Corporal McGuinn's death in *any* way, much less *substantially.*

27.     Second, there was no basis on which to argue in closing to the jury that the State had failed to carry its heavy burden on causation.  Such an argument could have been convincingly presented.  In the first place, the State had offered only non-credible testimony from Jason Freed as to whether Mr. Stephens had ever struck Corporal McGuinn.  Freed testified after McGuinn passed Harris's cell and was walking down the tier in the direction of Stephens's cell, he saw Harris emerge from his cell and make stabbing motions at McGuinn's back.  Freed further testified that Stephens then emerged from his cell, and Stephens and Harris surrounded McGuinn (with Harris at McGuinn's back) and made repeated stabbing motions.  With respect to Harris, Freed testified that he saw a weapon in Harris's hand.  With respect to Stephens, the totality of Freed's testimony was as follows:

Q:     Okay.  Now you indicated that Shy [Stephens's alleged nickname] came out later.  Did you see any weapons in Shy's hand?

A:     I just seen the same – the same action.

Q:     Did you see the actual weapon or just the action?

A:     Just the – I didn't see the actual weapon per se, but I seen something in his hand.

Q:     Okay.  And then what motion was Shy doing?

A:     The same motion.

Q:     Was he making contact with Officer McGuinn?

> A:      Yes, sir.
>
> Q:      Could you hear the contact?
>
> A:      Yes, sir, you could hear it.

(T 1/17/12 at 117).  Freed claimed, wholly incredibly, that although the blows were

delivered simultaneously and *from 40 yards* away, he was able to aurally differentiate the

blows of *both* Harris and Stephens *individually, and hear blows from both strike*

*McGuinn.*  Furthermore, while Freed claimed that he could *hear* the differentiated

stabbing blows land on their intended target, he did not testify that he actually *saw*

whether either Harris or Stephens landed a blow on Corporal McGuinn's body or where

the blow or blows landed.  The insubstantiality of this evidence in proving causation was

never highlighted for the jury—or even argued to it—because the issue of causation was

never flagged by counsel for jury consideration.  Likewise, counsel failed to, on cross-

examination and/or through expert testimony, undermine this testimony from Mr. Freed

by demonstrating that he was not, and could not have been, a percipient witness.

        28.     Moreover, even if the jury had believed Freed's testimony that Mr.

Stephens actually had stabbed Corporal McGuinn, no evidence offered by the State

would have permitted the jury to determine that any blow or blows inflicted by Stephens

had been lethal.  The evidence presented by the State showed that the assailant or

assailants had inflicted 24 wounds—12 stab wounds, and 12 cutting wounds, some of

which were "circular" and some of which were "linear."  The report of Assistant Medical

Examiner Vincenti, admitted in evidence, showed that only four of these wounds were

potentially lethal, and the jury had no way to identify whether any of the four had been

from Stephens. (And, as will be shown at the hearing, any such blow almost certainly could not have been.)

29.     The testimony by the Assistant Medical Examiner sought to hedge what her report unambiguously showed. She did not express any opinion as to which of the wounds, if any, would have been independently sufficient to cause death. In her testimony, she merely said that the cause of death was "loss of blood" to which each cut had "contributed." But that evasion was never highlighted because defense counsel did not ask the AME a single question on cross-examination or call its own expert witness, yet further derelictions of counsel on this issue. Moreover, that testimony in no way demonstrates that all 24 wounds were or could have been causes of death. Clearly, and as graphically demonstrated by the AME's own report of the autopsy, they were not.

30.     The Court ruled that the AME was not permitted to testify as to whether the wounds were produced by more than one weapon, or even to suggest that the circular wounds came from one weapon and that the linear wounds came from another. In closing (during both the guilt phase and phase one of sentencing), however, the State was permitted to argue, without objection, that the AME's testimony supported the conclusion that the wounds were produced by two distinct weapons. Defense counsel was ineffective in failing to take additional steps to preclude such argument by the State in closing. And even if that argument were properly permitted, defense counsel was ineffective in failing to argue in response that, based on the AME's autopsy report, the four potentially fatal wounds were all produced by the linear blade (in contrast to the circular blade) and were all delivered to the back of McGuinn's body, which strongly suggested (if not proved) that all of the fatal blows were delivered by Harris alone.

31.     Because a conviction based on accomplice/aiding and abetting liability would have precluded the imposition of the death penalty, the State made a tactical decision not to request an instruction on aiding and abetting liability. Additionally, during the first phase of sentencing on eligibility for the death penalty, defense counsel requested an aiding and abetting instruction which the State opposed (and the Court ultimately denied). (Under the State's conspiracy theory, Stephens might have been convicted based on his liability for the acts of his co-conspirator Harris. But, as noted, the jury *acquitted* Mr. Stephens on the conspiracy charge.)

32.     ***Second,*** counsel failed to adequately undermine the search of Mr. Stephens's cell and evidence allegedly collected therefrom. Through cross-examination of the parade of State witnesses about the investigation and direct examination of defense witnesses, defense counsel attempted to paint a vivid picture of:

(a)     a heavily bleeding victim, whose blood was spurting uncontrollably as he walked and ran off the tier in an attempt to escape his attackers and get help;

(b)     a too-hasty identification of Mr. Stephens as a suspect because of what was thought to be a possible blood stain on his cell door, which was never even tested;

(c)     the victim's blood found all over the floor of the E4 cell tier, where the many guards sent to the tier could not avoid traipsing through it and spreading it throughout the tier;

(d)     the victim's blood on clothing hung on railings outside cells, as well as on clothing of at least one inmate who had never left his cell, thereby demonstrating that McGuinn's blood might similarly have gotten on Mr. Stephens's clothing;

(e)     corrections personnel unfamiliar with basic crime-scene processing who failed to wear gloves while investigating the scene; failed to keep a record of their review of the crime scene; placed important evidence in their pockets; commingled clothing belonging to Mr. Stephens that had blood stains, thereby cross-contaminating this important potential evidence; and kicked the possible murder weapon off of the tier, after which it disappeared;

(f)     possible deliberate crime-scene alteration and planting of incriminating evidence by a rogue corrections officer who subsequently choked Mr. Stephens while he was detained and handcuffed.

33.     In their efforts to demonstrate the shoddiness of the investigation, however, counsel were ineffective in a number of respects.  Witnesses that allegedly searched Stephens's cell in the hours after McGuinn's death provided testimony regarding, among other things, the discovery and collection of Stephens's boots and other pieces of evidence allegedly found in Stephens's cell.  Their testimony on those issues— most notably with respect to who was actually in the cell and where the boots were found—was inconsistent, but defense counsel failed to clearly elicit those inconsistencies during cross-examination or lay them out for the jury in closing argument.  In addition, the testimony of these witnesses was seemingly contradicted by photographs of Stephens's cell produced in discovery, but defense counsel failed to use those photographs in any capacity at trial.

34.     Counsel also failed to expose the potential bias of one of the key witnesses who allegedly searched Mr. Stephens's cell—Lieutenant Mayfield of the Maryland Division of Correction.  Lieutenant Mayfield testified that after receiving a tip that more than one inmate may have been involved in the attack on Corporal McGuinn, he reexamined tier E4 and noticed what appeared to be blood on the door of Mr. Stephens's cell in a place that would only be exposed if the cell door were open.  Upon that discovery, he removed Mr. Stephens from his cell and proceeded to search it.  Lieutenant Mayfield testified that upon searching the cell, he discovered items of clothing with what appeared to be blood on them.  Defense counsel overlooked information produced in discovery that would have undermined the credibility of this important witness for the

13
**App. 51**

State. According to documents produced by the State, Lieutenant Mayfield was involved

in the decision to assign Corporal McGuinn to indoor duty on tier E4 on July 25, 2006

notwithstanding known threats against McGuinn's life and a prison policy to assign all

threatened officers to outdoor duty. Lieutenant Mayfield thus had a strong incentive to

try to quickly button up the McGuinn case to avoid any blame being placed on the

Division of Correction. Defense counsel failed to expose this bias at trial.

35.     Most significantly, whatever groundwork counsel had successfully laid as

to the shortcomings and fundamental sloppiness of the State's investigation and handling

of the crime scene was wholly undermined by a careless error made by counsel. Defense

counsel and the State agreed to a stipulation that stated:

> Both parties stipulate that on July 25, 2006, at 10:25 pm, CO Winslow
> Veney relieved CO Rodney Sampson as Officer in Charge of Center Hall
> at the Maryland House of Corrections. Officer Veney maintained proper
> chain of custody of State's Exhibit #34 (tank top t-shirt), States Exhibit
> #35 (pair of tan boots), and State's Exhibit #36 (mesh laundry bag). These
> items were not disturbed or altered in any way prior to their being
> collected by Crime Scene Technician Annie Kalathis on July 26, 2006, at
> 10:23 am.

That stipulation was both read into the record (T 1/24/15 at 118-119) and provided to the

jury in hard copy for consideration during their deliberations. Defense counsel had

explained to the court that the defense acknowledged that the evidence was not disturbed

or altered *after* it was brought to Center Hall but made no such concession with respect to

the treatment of the evidence *before* it was brought to Center Hall. That distinction,

however, was entirely blurred by the language of the stipulation and was never made to

the jury. Accordingly, the jury would have been fully justified in taking this agreed-to

fact to mean exactly what the words said (but were not intended to say): that critical items

of evidence were not disturbed or altered in any way *at any time* up to the processing of evidence in Center Hall by Ms. Kalathis.

36.     ***Third***, counsel did not effectively cross-examine the State's only eyewitness, Jason Freed.  The principal attack on Freed's credibility was that he had worked out a deal to cooperate with the prosecutors in return for assistance in reducing sentences to which he was exposed as a result of theretofore unprosecuted criminal offenses.  Counsel was successful to some extent, drawing out that:  (a) Freed had pled guilty to a federal felon-in-possession-of-a-firearm charge, for which he faced a potential 15-to-life sentence (and a potential 15-year mandatory minimum sentence); (b) Freed had negotiated a sealed addendum to his federal plea agreement, which expressly contemplated his cooperation in the prosecution of Mr. Stephens; (c) in exchange for Freed's cooperation, the government agreed to reduce his sentence by four levels and would not oppose Freed's request that his federal sentence run concurrently with his violation of parole sentence.

37.     But counsel fired only blanks when they attempted to show that Freed had also received comparable benefits *from the State* in return for his cooperation in the case against Mr. Stephens.  Freed had been sentenced between July 2000 and December 2000 on five serious crimes that had been prosecuted in Harford County: robbery with a deadly weapon, assault, two separate instances of resisting arrest, and possession of a controlled dangerous substance with intent to distribute.

38.     Freed was sentenced to eight and one-half years on the robbery charge, and to 10 years on each of the last three crimes, with all but three years of executed incarceration suspended.  Freed was released from custody on those charges on July 5,

2007.  Following his July 2007 release and before Stephens's trial, Freed was charged

with and, pursuant to a plea agreement, agreed to plead guilty to the federal felon-in-

possession-of-a-firearm charge.

39.     Approximately two weeks after being indicted with the federal crime,

Freed met with prosecutors, at which point he decided to reveal, for the first time, that

from cell 16, he had clearly witnessed the assault of Mr. McGuinn outside cell 44.  In

prior interviews with investigators, Freed had maintained that he did not know who had

been involved in McGuinn's death.

40.     At the time of Stephens's trial, Freed had not yet been sentenced on the

federal felon-in-possession-of-a-firearm charge.  Freed testified that according to his

lawyer, notwithstanding the plea agreement, the federal government was taking the

position that Freed was an armed career criminal and thus subject to a mandatory

minimum sentence of 15 years (to life).  (T 1/17/12 at 148-150).  In addition, he testified

that his federal offense exposed him to charges that he violated his probation, which

subjected him to an additional seven years of incarceration.[1]

41.     The trial court precluded defense counsel from asking Freed whether he

had bargained his cooperation with the State in exchange for less prison time after Freed

denied knowing that his lawyer had discussed and/or negotiated a deal on the matter with

the State.  That ruling, which we believe erroneous, was the subject of the direct appeal,

and is not at issue here.

42.     Given that ruling, therefore, it became especially important to explore

Freed's motives in other ways.  But defense counsel never asked Freed the obvious

---

[1] Freed also potentially faced a felon-in-possession charge under Maryland law.

related questions: Did you hope also for reduction in your State time? Did you and counsel discuss cooperation in return for such reduction? Did you discuss whether your lawyer would raise this with the prosecutors? Did you expect that she would raise this with the prosecutors? Did she tell you she would do so? Nor did counsel cross-examine Freed using a letter Freed had written to Corporal John Branham of the Maryland State Police on February 23, 2007, which said that "I remember someone sayin yall can help me out with my state issues." Thus, the full reward to Freed for his cooperation never became known to the jurors and was seriously understated. And in fact, although Freed was facing 22 years incarceration on State crimes at the time of Stephens's trial in 2012, he was released from custody in early 2015, and thus did in fact receive a substantial benefit in exchange for his testimony.

43.    In addition, defense counsel's cross-examination opened the door to the prosecutor's rehabilitation of Freed on re-direct examination. The State was permitted to elicit from Freed that he was cooperating out of his fear of Stephens, who, he said, had sent him a threatening letter.

44.    **Fourth**, counsel was ineffective in failing to identify alternative suspects for the murder. Counsel's failure here was three-fold. First, counsel failed to highlight trial testimony suggesting that someone other than Mr. Stephens participated in the murder with Mr. Harris. For example, Freed testified that he had heard about the attack on Corporal McGuinn in advance from an inmate named "G" who was housed in cell 2 on the E4 tier and that G, along with the inmate housed in E4 cell 1, put blankets over the railing of the tier to make it darker for Corporal McGuinn. Michael Canty, a witness for the defense, similarly testified that he knew that something was going to happen the night

of Corporal McGuinn's murder because Carlton Gales, the inmate in cell 2, had been breaking lights in the cells on tier E4 earlier that day. T 1/30/12 at 183. Counsel never connected those dots for the jury.

45.    Counsel also failed to introduce evidence produced in discovery suggesting that Gales and/or others were involved in the murder. For example, witness statements produced in discovery, including statements from testifying witnesses, indicated that Gales was good friends with Harris and that the size of the person that stabbed Corporal McGuinn was closer in size to Gales than to Stephens. This information was not elicited at trial.

46.    In addition, counsel failed to investigate an array of tips given to the State Police and produced to defense counsel in discovery exculpating Stephens and inculpating other inmates and prison staff for the murder. For example, multiple inmates provided corroborating statements indicating that a certain member of the Department of Corrections staff ordered a hit on McGuinn. Another inmate told the State Police that certain members of DOC staff (who were in fact on duty the night of July 25, 2006 according to prison records) allowed inmates from another tier onto E4 to plant bloody clothes in Harris's and Stephens's cells. And, following an attack on a correctional officer earlier in 2006, two inmates (Collins and Hill) told DOC offices that Corporal McGuinn was going to be the next officer attacked. Counsel failed to pursue these and other similar leads.

47.    *Fifth*, appellate counsel was ineffective in failing to appeal a critical ruling by Judge Hackner. At trial, defense counsel sought to elicit testimony explaining that, days after Corporal McGuinn's death, a knife suspected to have been used to kill

McGuinn was planted on inmate Bradford Matthews by prison guards at the Maryland House of Corrections. Such testimony, which was excluded by the court at trial, was critical to establishing that officers at the Maryland House of Corrections had a propensity to plant evidence on and frame inmates for crimes in the prison, and would have undermined the testimony of DOC officers that clothes containing Corporal McGuinn's DNA were in fact obtained from Mr. Stephens's cell and person.

### B.   Sentencing

48.   As set forth in Paragraph 2 above, the conviction for which Mr. Stephens was serving a sentence of life plus 15 years at the House of Corrections was vacated upon a petition for post-conviction relief on July 12, 2013. During the sentencing phase in February 2012, the jury was told multiple times that Mr. Stephens had a prior murder conviction for which he was already serving a life sentence, and a version of his Pre-Sentence Investigation Report, which stated that he was serving a sentence of life plus 15 years for felonious homicide and a related charge, was admitted into evidence and provided to the jury. There is an overwhelming likelihood that the sentencing jury, which understood that Mr. Stephens was already serving a life sentence, would have viewed matters differently had they known that such conviction had not been legally obtained by the State. Because the jury lacked this crucial information, Mr. Stephens is entitled to be re-sentenced.

## IV.    CLAIMS FOR RELIEF

### A.    Mr. Stephens Is Entitled To A New Trial

#### 1.    Mr. Stephens Was Denied Effective Assistance of Counsel

49.    With respect to a claim for ineffective assistance of counsel, Maryland

courts have adopted the Supreme Court's standard set forth in *Strickland v. Washington*,

466 U.S. 668 (1984).  The Maryland Court of Appeals "has not distinguished between

right to counsel" provided in the U.S. Constitution and the right to counsel "provided by

Art. 21 of the Maryland Declaration of Rights." *Harris v. State*, 303 Md. 685, 695

(1985).  To obtain post conviction relief on the basis of ineffective assistance of counsel,

a petitioner must establish that: "(1) counsel's performance was deficient; and (2) the

deficient performance prejudiced the defense." *Williams v. State*, 326 Md. 367, 373

(1992); *see also Strickland*, 466 U.S. at 688, 694 (petitioner must show that (1) counsel's

representation "fell below an objective standard of reasonableness," and (2) "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different").

50.    Under the first prong, "[t]he proper measure of attorney performance

remains simply reasonableness under prevailing professional norms." *Bowers v. State*,

320 Md. 416, 424 (1990) (quoting *Strickland*, 466 U.S. at 688).  Counsel has the "duty to

bring to bear such skill and knowledge as will render the trial a reliable adversarial

testing process." *Strickland*, 466 U.S. at 688.  And although an attorney is afforded a

heavy measure of deference with respect to his or her trial strategy, "counsel [also] has a

duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary." *Id.* at 691.  Failure to investigate a meritorious

defense, *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), or to conduct a "reasonably thorough investigation into potentially mitigating evidence may be considered unreasonable as well as prejudicial." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003).

51.     To prove prejudice under the second prong, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *State v. Jones*, 138 Md. App. 178, 208 (2001) (citing *Strickland*, 466 U.S. at 693). "Nor must the prejudicial effect satisfy a preponderance of the evidence standard." *Jones*, 138 Md. App. at 208 (internal citations omitted). Instead, the petitioner must show that the attorney's deficiency gives rise to "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. Here, "[t]he focus is not merely on the effect of error on the 'outcome.' Rather, a 'proper analysis of prejudice' includes consideration of 'whether the result ... was fundamentally unfair or unreliable.'" *Jones*, 138 Md. App. at 208 (citing *State v. Purvey*, 129 Md. App. 1, 10 (1999)).

52.     Moreover, a post-conviction court may consider each attorney error individually or cumulatively to find ineffective assistance of counsel. *Bowers*, 320 Md. at 431-37 ("Even when individual errors [by trial counsel] may not be sufficient to cross the threshold [of showing prejudice], their cumulative effect might be.. ... We hold that the cumulative effect of [counsel's] actions and non-actions was enough to establish that his representation of [petitioner] did not meet constitutional muster." (citing cases)). In the event, therefore, that no ground asserted below on its own satisfies *Strickland*'s two-prong standard for ineffective assistance of counsel, the Court may consider whether these trial errors, taken together, deprived Mr. Stephens a fair trial.

First Claim for Relief

53.     Petitioner incorporates paragraphs 1 – 52 as though fully set forth herein.

54.     Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because trial counsel failed to request an instruction that the State was required to prove beyond a reasonable doubt that some felonious blow struck by Petitioner was independently sufficient to cause—or, at minimum, a "substantial cause" of—the death of Corporal David McGuinn.  Such failure gravely prejudiced Petitioner.

55.     "When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result." *Burrage v. United States*, 134 S. Ct. 881, 887 (2014) (internal quotation marks omitted) (citing 1 W. LaFave, Substantive Criminal Law § 6.4(a), pp. 464–466 (2d ed. 2003); ALI, Model Penal Code § 2.03, p. 25 (1985)).  Accordingly, the State was required to prove that Mr. Stephens's conduct was both the actual and legal cause of Corporal McGuinn's death. *See also Jackson v. State*, 286 Md. 430, 442 (1979).

56.     To establish "actual cause," the State is generally required to prove that the death would not have occurred in the absence of (or "but for") the defendant's conduct.  In cases in which multiple sufficient causes independently, but concurrently, produce a result, the "but for" requirement has been relaxed; but even in such cases, to establish actual cause, the State still must prove beyond a reasonable doubt that the defendant's conduct was an *independently sufficient* cause of the victim's death (even if it

was not a "but for" cause of the death). *Burrage v. United States*, 134 S. Ct. 881, 890 (2014).[2]

57.     In failing to request a jury instruction that the State was required to prove beyond a reasonable doubt that Petitioner's conduct was independently sufficient to cause—or, at minimum, a "substantial cause" of—the death of Corporal David McGuinn, in failing to argue the absence of such proof to the jury, and/or in failing to undermine the tesimony of Mr. Freed[3] and/or Assistant Medical Examiner Vincenti though cross-examination or by expert testimony, counsel's respresentation of Petitioner was deficient. *See, e.g., Luchenburg v. Smith*, 79 F.3d 388 (4th Cir. 1996) (counsel ineffective for failing to request expanded instruction that more accurately explained to the jury that,

---

[2] Some states appear to have endorsed a rule that a defendant's act or omission is an "actual cause" if it is a "substantial" cause of the victim's death; however, "the substantial factor test only applies to situations 'where two causes, *each alone sufficient* to bring about the harmful result, operate together to cause it." *State v. Montoya*, 61 P.3d 793, 799 (N.M. 2002) (emphasis added); *accord State v. Tribble*, 790 N.W.2d 121, 127 n.2 (Iowa 2010) ("we employed the 'substantial factor' test to permit the fact finder to decide the existence of factual cause when multiple causes were present that alone would have been sufficient to be a factual cause of the harm"); *State v. McDonald*, 953 P.2d 470, 474 (Wash. Ct. App. 1998) (explaining that "substantial factor" test holds a defendant criminally responsible "[i]f two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result"), *aff'd*, 138 Wash. 2d 680 (1999); 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(b), at 468-69 (2d ed. 2003) (explaining that "substantial factor" test applies where "two causes, *each alone sufficient to bring about the harmful result*, operate together to cause it" (emphasis added)); *see also Burrage*, 134 S. Ct. at 890 ("'[e]xcept in the classes of cases indicated'" (an apparent reference to the situation where each of two causes is *independently effective*) 'no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it'" (emphasis added)). But even if (a) the substantial factor test were applicable under Maryland law and (b) the substantial factor test did not require the State to prove that the defendant's conduct was independently sufficient to cause the death, counsel was still ineffetive in failing to request a causation instruction.

[3] In addition, counsel's failure to demonstrate that Mr. Freed was not, and could not have been, a percipient witness also provides a independent basis for finding that Mr. Stephens received ineffective assistance of counsel.

under Maryland law, it could not convict defendant of compound handgun charge unless it first found him guilty of predicate crime of violence, and that common-law assault was not predicate crime of violence); *Cox v. Donnelly*, 387 F.3d 193 (2d Cir. 2004) (counsel's performance was deficient and prejudicial where he failed to object to jury instruction that relieved prosecution of burden of proof on question of intent to kill); *State v. Soboroff*, 798 N.W. 2d 1 (Iowa 2011) (counsel's failure to request jury instruction that defined element of the offense was prejudicial ineffective assistance); *Nelson v. Hall*, 573 S.E.2d 42, 43 (Ga. 2002) (appellate counsel ineffective in failing to challenge jury instruction that omitted essential element of bodily injury regarding kidnapping offense). There was no reasonable strategic reason for doing so. *See State v. Peterson*, 158 Md. App. 558, 597 (2004) (claim of "trial strategy" will not lie where strategy "is a consequence of trial counsel's not being adequately familiar with the law" (citing *United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996)).

58.     In the absence of these deficiencies by counsel, either alone or together with counsel's other oversights, there is a substantial or significant possibility that the outcome of the proceeding would have been different.

<u>Second Claim for Relief</u>

59.     Petitioner incorporates paragraphs 1 – 58 as though fully set forth herein.

60.     Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because trial counsel failed to undermine the search of Mr. Stephens's cell and stipulated that critical physical evidence against Petitioner was maintained properly despite

mounting evidence that such evidence could have been contaminated by the State's
sloppiness and mishandling thereof.  This error gravely prejudiced Petitioner.

61.     Neither the stipulation providing the physical evidence against Mr.
Stephens had been handled correctly nor counsel's failures in testing the adequacy of the
search could have conceivably been the result of reasonable trial strategy.

62.     Despite ample evidence, trial counsel was ineffective in failing to
underscore the sloppy, substandard investigation and search that resulted in the only
apparent physical evidence against Mr. Stephens, *see generally Evans v. State*, 151 Md.
App. 365, 382-83 (2003) (ineffective assistance found where trial counsel failed to move
to suppress search resulting in physical evidence that enhanced defendant's sentence),
and in failing to impeach a key investigating witness based on bias. *See, e.g.,*
*Steinkuehler v. Meschner*, 176 F.3d 441 (8th Cir. 1999) (ineffective assistance found
where trial counsel failed to impeach the credibility of investigating officers in first
degree murder case); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995) (ineffective assistance
found where trial counsel failed to adequately cross-examine serologist and impeach state
witness with prior inconsistent statement).

63.     Moreover, counsel was ineffective in agreeing to the stipulation regarding
the handling of key physical evidence.  Stipulations are only considered to be strategic
if—unlike here—they are reasoned and do not "thr[ow] away a valuable, meritorious
defense." *State v. Coleman*, 25 N.E. 3d 82, 92 (Ill. App. 2015) (ineffective assistance
found where trial counsel had no reasonable basis to enter into stipulation that fifteen
bags of comingled substance equaled 926.0 grams of cocaine because the State was
required to prove that each individual bag contained cocaine and the evidence only

showed that one bag contained cocaine); *see also United States v. Williams*, 403 F. App'x 707, 709 (3rd Cir. 2010) (stipulations are "legitimate trial tactics" and "part of a prudent trial strategy" if they "do[] not constitute ineffective assistance of counsel" (*citing United States v. Aptt*, 354 F.3d 1269, 1284 (10th Cir. 2004))).

64.     In the absence of these deficiencies by counsel, either alone or together with counsel's other oversights, there is a substantial or significant possibility that the outcome of the proceeding would have been different.

Third Claim for Relief

65.     Petitioner incorporates paragraphs 1 – 64 as though fully set forth herein.

66.     Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because trial counsel failed to effectively cross-examine the only State witness who identified Stephens as a participant, Jason Freed, on benefits he would receive in exchange for his testimony.  This error gravely prejudiced Petitioner.

67.     Counsel was deficient for failing to develop through cross-examination of Mr. Freed the "vital question" for establishing bias of "what the witness underst[ood] he [would] receive" in exchange for his testimony. *See Hoover v. State of Maryland*, 714 F.2d 301, 305 (4th Cir. 1983) (explaining that even in the absence of a deal, a defendant has a right to confront witnesses on their understanding of benefits that may be received through testimony).  The failure to draw out the clear bias of the State's sole eyewitness connecting Stephens to the crime is patently prejudicial and could not have been the result of reasonable trial strategy. *See State v. Delgado*, 535 N.W. 450 (Wis. Ct. App. 1995) (ineffective assistance found where counsel in murder case failed to impeach the

26

**App. 64**

state's primary witness with evidence that would have shown that the witness had been promised a reduction in charges in exchange for testimony); *see also Brown v. Baskin*, 690 S.E. 2d 822 (Ga. 2010) (ineffective assistance found where appellate counsel did not raise trial counsel's failure to present authority that would have allowed trial counsel to explore whether key witness's pending indictment motived his testimony).

68.  In the absence of this deficiency by counsel, either alone or together with counsel's other oversights, there is a substantial or significant possibility that the outcome of the proceeding would have been different.

Fourth Claim for Relief

69.  Petitioner incorporates paragraphs 1 – 68 as though fully set forth herein.

70.  Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because trial counsel failed to reasonably investigate and identify at trial alternative suspects for the murder.  This error gravely prejudiced Petitioner.

71.  It is axiomatic that an attorney's conduct is deficient when he or she "neither conduct[s] a reasonable investigation [into alternate defenses] nor ma[kes] a showing of strategic reasons for failing to do so." *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Here, the failure of trial counsel to investigate and present to the jury alternative potential suspects was not the result of a reasonable decision that any investigation was unnecessary and deprived the jury of hearing substantial evidence implicating at least one other inmate.  Courts routinely hold that such failure is a ground for finding ineffective assistance of counsel.  *See, e.g., Rios v. Rocha*, 229 F.3d 796 (9th Cir. 2002) (trial counsel ineffective for failing to adequately investigate evidence about

other possible suspects); *Avila v. Galaza*, 297 F.3d 911 (9th Cir. 2002) (trial counsel ineffective in attempted murder case for failing to adequately investigate and present evidence that defendant's brother was the shooter); *Henderson v. Sargent*, 926 F.2d 706 (8th Cir. 1991) (trial counsel ineffective for failing to investigate that the victim's husband committed the murder).

72.     In the absence of this deficiency by counsel, either alone or together with counsel's other oversights, there is a substantial or significant possibility that the outcome of the proceeding would have been different.

<u>Fifth Claim for Relief</u>

73.     Petitioner incorporates paragraphs 1 – 72 as though fully set forth herein.

74.     Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because appellate counsel failed to appeal the trial court's ruling barring testimony regarding the planting of evidence on inmates (and specifically Bradford Matthews) by officers at the Maryland House of Corrections. This error gravely prejudiced Petitioner.

75.     Such evidence was admissible under, *inter alia*, Maryland Rule of Evidence 5-403, 5-404, and 5-406. *See Sessoms v. State*, 357 Md. 274, 291 (2000) ("The majority rule for the interpretation of FRE 404(b) and of individual states other crimes evidence statutes, is that when evidence of other crimes, wrongs, or acts committed by a third party is proffered by the defendant, the risks of prejudice against the defendant normally are not present. Thus, such evidence does not fall under the exclusionary provision of Rule 404(b). We hold that the same interpretation shall be given to Maryland Rule 5–404(b)."); *see also People v. Gill*, 60 Cal. App. 4th 743, 750 (1997).

Defendant had the right to effective assistance of counsel on direct appeal. *Wilson v. State*, 284 Md. 664, 669 (1979). Appellate counsel's failure to appeal the trial court's evidentiary ruling could not have been the result of a reasonable tactical decision. *See, e.g., Millam v. State*, 745 N.W.2d 719, 722-24 (Iowa 2008) (defense counsel ineffective where he failed to raise in a sexual assault case that the alleged victim had previously made false accusations of rape against another one of her mother's boyfriends and later recanted them).

76.     In the absence of this deficiency by counsel, either alone or together with counsel's other oversights, there is a substantial or significant possibility that the outcome of the proceeding would have been different.

Sixth Claim for Relief

77.     Petitioner incorporates paragraphs 1 – 76 as though fully set forth herein.

78.     Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because the errors of counsel individually and collectively prejudiced the outcome of Mr. Stephen's case under *Strickland*. *See Bowers*, 320 Md. at 431-37. In the absence of these deficiencies, there is a substantial or significant possibility that the "result of the proceeding would have been different." *Peterson*, 158 Md. App. at 584 (*quoting Strickland*, 466 U.S. at 694).

### 2.     Mr. Stephens Was Denied The Right To Tesify In His Own Defense

Seventh Claim for Relief

79.     Petitioner incorporates paragraphs 1 – 78 as though fully set forth herein.

29

**App. 67**

80.     Petitioner is entitled to a new trial because his decision not to exercise his fundamental right to testify in his own defense at trial was based on the State's ability to use, for impeachment purposes, Mr. Stephens's prior murder conviction and life sentence therefor, which was later shown to be illegally obtained and vacated.  Though Mr. Stephens did eventually plead guilty to that murder charge, he did so only because the State had agreed that the sentence to be imposed after such plea was to be time served.

81.     Section 7-102(a)(1) of the Uniform Post-Conviction Procedure Act, Maryland Code Ann. Crim. Procedure provides for post-conviction relief if a "sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State."

82.     It is unquestionable that a defendant has a fundamental constitutional right to testify in his own defense. *See Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987) ("The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution.  It is one of the rights that 'are essential to due process of law in a fair adversary process.'"); *Morales v. State*, 325 Md. 330, 335 (1992).  A defendant is denied that right when he decides not to testify to avoid impeachment by his prior convictions, and the use of those prior convictions to impeach the defendant (had he testified) would have been improper or those prior convictions are later vacated. *See, e.g., id.* at 339-40 ("Since Morales apparently changed his decision to testify based on the trial court's incorrect implication that all of his prior convictions could be used to impeach him, the defendant's decision to waive his constitutional right to testify and to exercise his constitutional right to remain silent was not knowingly and intelligently made."); *Louisiana v. Thompson*, 825 So. 2d 552, 556-58 (La. Ct. App. 2002) (granting post-

conviction relief where defendant chose not to testify based on the admissibility of a prior armed robbery conviction that was subsequently vacated after trial); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991) (granting habeas relief where state court's refusal to exclude evidence of prior convictions resulted in defendant's decision not to take the stand); *cf. Tyler v. State*, 793 So. 2d 137, 141 (Fla. Dist. Ct. App. 2001) (defendant received ineffective assistance of counsel where counsel incorrectly informed defendant regarding the use of prior convictions as impeachment and because of the misinformation, defendant did not testify); *Horton v. State*, 411 S.E. 2d 252, 254-55 (S.C. 1991) (petitioner received ineffective assistance of counsel when trial counsel erroneously informed him that he could be cross-examined on prior convictions resulting in petitioner not testifying).

83.     There is a split of authority with respect with to whether the denial a defendant's right to testify is subject to "harmless-error" analysis. *See United States v. Stevens*, 129 F.3d 1261, n.3 (4th Cir. 1997) (noting split of authority); *compare Savoy v. State*, 218 Md. App. 130, 157 n.11 (2014) (suggesting that harmless-error analysis applies) *with Thompson*, 825 So. 2d at 557 (harmless-error analysis does not apply); *Com. v. Freeman*, 564 N.E. 2d 11, 15-16 (Mass. Ct. App. 1990) (same).

84.     Mr. Stephens was denied his constitutional right to testify in his own defense, and even if "harmless-error" analysis applies, Mr. Stephens is entitled to a new trial. If, at the time of trial for the death of Corporal McGuinn, Mr. Stephens's prior illegal murder conviction had already been vacated and Mr. Stephens had already pled guilty in exchange for a sentence of time served, he would have decided to testify in his own defense. (He would have been able to explain his decision to plead guilty following

31

**App. 69**

the *vacatur*; the jury would have understood that the plea was likely something less than an admission of guilt; and Mr. Stephens was never asked, in connection with the plea, whether he was pleading guilty because he was guilty.) Had Mr. Stephens's testified, his testimony would have been exculpatory, and there is a substantial or significant possibility that the result of the proceeding would have been different.

**B.**   **Mr. Stephens is Entitled to a New Sentencing Hearing**

Eighth Claim for Relief

85.   Petitioner incorporates paragraphs 1 – 84 as though fully set forth herein.

86.   Petitioner is entitled to a new sentencing hearing because the life-plus-15-year sentence he received for his previous, illegally obtained conviction that was later vacated was a material factor considered by the jury in his sentencing.

87.   Section 7-102(a)(1) of the Uniform Post-Conviction Procedure Act, Maryland Code Ann. Crim. Procedure provides for post-conviction relief if a "sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State."

88.   Courts consistently hold that Due Process entitles a defendant to a reduction in sentence if the original sentence was based on a prior conviction that was vacated. *See Johnson v. United States*, 544 U.S. 295, 303 (2005) (Due Process requires that "a defendant given a sentence enhanced for a prior conviction [be] entitled to a reduction if the earlier conviction is vacated"); *United States v. Tucker*, 404 U.S. 443, 447-48 (1972) (vacating sentence based on convictions that were later overturned because the sentence was "founded at least in part, upon misinformation of constitutional magnitude" and "might have been different" if the judge had accurate information);

*Townsend v. Burke*, 334 U.S. 736, 741 (1948) (holding that the defendant's Due Process rights were violated when he was "sentenced on the basis of assumptions concerning his criminal record which were materially untrue"); *Green v. Johnson*, 2009 U.S. Dist. LEXIS 118299 at *18 (E.D. Va. June 29, 2009) ("[I]f the original trial court judge bases a sentence, at least in part, on a prior conviction, and the prior conviction is later held to be unconstitutional, then Due Process entitles the prisoner to a new hearing on his sentence.").

89.    If, at the time of sentencing for the death of Corporal McGuinn, the jury had known that Mr. Stephens's prior illegal murder conviction had been vacated and Mr. Stephens had pled guilty in exchange for a sentence of time served, there is a substantial or significant possibility that Mr. Stephens would have received a sentence of life *with* the possibility of parole.

## V.    **STATEMENT OF NON-WAIVER**

90.    The errors alleged in this case have not been waived because they were the result of ineffective assistance of counsel in violation of Mr. Stephens's Sixth Amendment right to counsel or are based on developments that occurred after Mr. Stephens's trial and sentencing.  Additionally, Mr. Stephens has not "intelligently and knowingly" waived the issues complained of in this petition.

## VI.    **CONCLUSION**

WHEREFORE, the Petitioner requests the following relief:

91.    An evidentiary hearing on all matters raised in this Petition;

92.    A determination that counsel at trial and on appeal rendered ineffective assistance to Mr. Stephens;

93.    A determination that Mr. Stephens's conviction and/or sentence was

imposed in violation of his right to Due Process;

94.    A new trial;

95.    A vacation of sentence and resentencing;

96.    The right to further supplement this Petition as necessary if new issues

arise; and

97.    Such further relief as this Court may deem necessary and appropriate.

Respectfully submitted,

May 12, 2015

Allison Hester-Haddad
Isley Markman Gostin
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6551
Fax: (202) 663-6363
isley.gostin@wilmerhale.com

A. Stephen Hut, Jr.
Office of the Public Defender
6 St. Paul Street, Suite 1400
Baltimore, MD 21202
(410) 767-4851
Fax: (410) 333-8496
ahut@opd.state.md.us

*Counsel for Petitioner Lee E. Stephens, Jr.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May, 2015, this Petition for Post-

Conviction Relief was mailed, postage prepaid, to:

Office of the State's Attorney for Anne Arundel County
7 Church Circle, Suite 200
Annapolis, MD 21401

_____
Allison Hester-Haddad

Appendix No. 3

Amendment to Petition for Post-Conviction Relief

**IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND**


LEE E. STEPHENS, JR.    **:**
    **Petitioner,**

     **v.**        **:**     **Case No. K-2008-000646**

**STATE OF MARYLAND**
    **Respondent.**     **:**


<u>**AMENDMENT TO PETITION FOR POST-CONVICTION RELIEF**</u>

Pursuant to Maryland Rule 4-402(c), Petitioner Lee E. Stephens hereby amends his petition for post-conviction relief dated May 12, 2015 filed in the above-captioned case (the "Petition").   Petitioner believes that the substance of this amendment is fairly contained the in the Petition such that no formal amendment is necessary.  The Petition asserts claims for ineffective assistance of counsel, including Claim Six (¶¶77-78), which incorporates all averments in the Petition.  In addition, the Petition contains averments regaring the *vacatur* of Petitioner's Wicomico County conviction and life sentence therefor (¶2), and asserts that Petitioner was denied the right to testify and is entitled to a new sentencing hearing because Petitioner's decision not to testify and Petitioner's sentence were based on that unlawful conviction and sentence (¶¶12, 16, 79-89).  Out of an abundance of caution, Petitioner amends the Petition simply to clarify that counsel was ineffective for failing to secure that *vacatur* before proceeding to trial in this case.  In the event the Court believes that this amendment requires leave of the Court, Petitioner hereby respectfully requests such leave.

**App. 75**

### Amendment A

Amending Part IV.A.1 of the Petition, Petitioner adds the following averments following paragraph 76 on page 29:

### Additional Claim for Relief

1.      Petitioner incorporates paragraphs 1-89 as through fully set forth herein.

2.      Petitioner was deprived of his right to effective assistance of counsel secured by the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because trial counsel failed to secure a *vacatur* of Petitioner's Wicomico County conviction and life sentence therefor before proceeding to trial in this case.  This error gravely prejudiced Petitioner.

### Amendment B

Amending Part IV.A.1 of the Petition, Petitioner amends paragraph 77 on page 29 to state:

77.      Petitioner incorporates paragraphs 1-89 as through fully set forth herein.

October 5, 2016

Respectfully submitted,
*/s/ Isley M. Gostin*
Isley Markman Gostin
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6551
Fax: (202) 663-6363
isley.gostin@wilmerhale.com

A. Stephen Hut, Jr.
Office of the Public Defender
6 St. Paul Street, Suite 1400
Baltimore, MD 21202
(410) 767-4851
Fax: (410) 333-8496
ahut@opd.state.md.us

*Counsel for Petitioner Lee E. Stephens, Jr.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of October, 2016, this Amendment to

Petition for Post-Conviction Relief was mailed, postage prepaid, to:

>Office of the State's Attorney for Anne Arundel County
>7 Church Circle, Suite 200
>Annapolis, MD 21401

/s/ Isley M. Gostin
Isley Gostin

Appendix No. 4

State Supplemental Response to Petition for Post-Conviction Relief

**IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND**

LEE STEPHENS                              *

              v.                          *              02-K-08-646

STATE OF MARYLAND

*     *     *     *     *     *     *     *     *     *     *     *     *

**STATE'S SUPPLEMENTAL RESPONSE TO PETITION FOR POST CONVICTION RELIEF**

      Comes now the State of Maryland, by and through David Russell, Assistant State's Attorney for Anne Arundel County, pursuant to Maryland Rule 4-404 and in response to the petition for post conviction relief filed by the Petitioner, and respectfully states the following:

      1.     Petitioner is not illegally imprisoned, detained, restrained of his liberty, or otherwise in custody in violation of the Constitution of the United States or the Constitution or laws of the State of Maryland.

      2.     Petitioner was legally convicted of crimes in, and legally sentenced by, a court of competent jurisdiction; neither Petitioner's convictions nor his sentence nor the judgment against him were imposed in violation of the Constitution of the United States or the Constitution or laws of the State of Maryland; Petitioner's sentence does not exceed the maximum allowed by law.

      3.     Any allegation of error that could have been raised, but which was not made, before trial; at the time of trial; on direct appeal, whether or not an appeal was taken; in a habeas corpus proceeding commenced by Petitioner; in a prior petition under Maryland's Uniform Post

Conviction Procedure Act; or in any other proceeding commenced by Petitioner may have been waived or may have been finally litigated and if so, should not be excused.

**Procedural history**

4.      On March 28, 2008, the Petitioner was indicted on one count of murder in the first degree and one count of conspiracy to commit murder in the first degree.  Prior to trial, defense counsel filed the following pre-trial motions:

Motion for Effective Penalty Phase Representation (4/7/08)

Motion to Preclude the Death Penalty Due to Insufficient Defense Funds (5/29/08)

Motion Opposing State's Request to Preclude Identifying Witnesses from Testifying at a Suppression Hearing (8/13/08)

Motion for Notice and Limitation of Victim Impact Evidence. (10/14/08)

Motion to Require the State to Comply with Maryland Rule 4-343(c)(10/14/08)

Motion to Include Non-Statutory Mitigating Factors on the Penalty Phase Verdict Form(10/14/08)

Motion for Proportionality Review (10/14/08)

Motion to Compel Discovery (10/14/08)

Motion to Set Aside the Court's Ruling and Refer to the Administrative Judge (10/21/08)

Motion to Order the DOC to Move the Defendant (12/30/08)

Notice of Appeal from Denial of Motion to Preclude Death Penalty Due to Insufficient Funds (5/5/09)

Motion to Preclude the Death Penalty as the New Statute is Unconstitutional (8/5/09)

Motion to Strike Appearance of Defense Counsel (11/09/09)

Notice of Appeal from Court's Denial of a Full Evidentiary Hearing on the Issue of Whether There is DNA Sufficient to "Link" the Defendant "to the Murder or to the Act of Murder" (11/16/09)

Motion to Determine if Conflict Exists (2/23/10)

Motion for Effective Assistance of Expert Private Investigator Sharon Weidenfeld (2/23/10)

Motion for Subpoena for Tangible Evidence (8/3/11)

Motion for Appropriate Relief (8/3/11)

Motion to Strike the Death Penalty Notice and Request for an Evidentiary Hearing (8/3/11)

Motion and Memorandum of Law in Support of Motion to Strike State's Notice of Intention to Seek Sentence of Death Because Maryland's Death Penalty Law is a Sanguinary Law which Violates Article 16 of the Maryland Declaration of Rights. (8/3/11)

Motion to Dismiss Notice of Intent to Seek Death For Violation of Maryland Rule 4-263(d)(11) (8/3/11)

Motion to Waive Jury Sentencing Prior to the Start of Trial (9/22/11)

Motion to treat as Conceded the Motion to Dismiss Notice of Intent to Seek Death for Violation of Maryland Rule 4-263 (d)(11) (9/22/11).

This list does not include the host of motions filed during and after the trial, nor does it encompass any filing from the two interlocutory appeals or the subsequent direct appeal.

Defense counsel litigated at least 10 days of motions hearings prior to trial.

5.      On January 3, 2012, a 15 day jury trial began before Judge Hackner.  The trial lasted until February 1, 2012.  The State called 31 witnesses and the Defendant called seven witnesses.  The jury deliberated for 6 days between February 1, 2012 and February 9, 2012.  The Defendant was convicted of murder in the first degree and acquitted of conspiracy to commit murder in the first degree.  Sentencing proceedings were held before a jury beginning on February 15, 2012.  On February 29, 2012, the jury found the appropriate punishment to be Life without the possibility of parole.  That sentence was imposed by Judge Hackner on June 15, 2012.  A timely notice of appeal was filed on June 20, 2012 and the Court of Special Appeals affirmed the conviction in an unreported opinion dated December 10, 2013. (COSA #0772, Sept. Term 2012).  Writ of Certiari was filed and subsequently denied.

### Factual  History (per COSA Opinion)

6.      In July of 2006, Corporal David McGuinn was employed by the Department of Corrections ("DOC") as a correctional officer ("CO"). He had held that position for approximately 18 months, during which he was assigned to MHC. Cpl. McGuinn quickly earned a reputation as a CO who was "by the book." Inmates and other COs described him as strict, but fair. They nicknamed him "Homeland Security" or "Homeland" for short. At that time, the appellant was incarcerated at MHC. He was housed in Cell 38 on the E4 tier in the West Wing of MHC. The West Wing housed inmates on the second, third, and fourth floors. Each housing tier on the West Wing had an "B" side and an "F" side. E4 was the "B" side of the fourth tier. It housed up to 49 inmates in adjacent, single—occupant cells

**App. 82**

running in a straight line. The cells were numbered 1 through 49. Harris, who, as mentioned, also

was charged with Cpl. MeGuinn's murder, was housed in Cell 32.

Each cell on E4 was approximately 40 square feet in size and was enclosed on three

sides with concrete walls and on the fourth side with steel bars, a portion of which formed

a sliding door. Each cell contained a single bed attached to a side wall, a toilet and desk

attached to the opposite wall, a sink attached to the back wall, and a fluorescent ceiling light.

A walkway approximately four feet wide ran adjacent to the fronts of the cells.

Beyond the walkway was a steel railing ending about halfway up the height of the tier and,

beyond the railing, a floor to ceiling mesh fence. Beyond the mesh fence was a straight drop

down to the ground level, known as the "flats." The walkway could be accessed at entrances

at the "front end" by Cell 1 and at the "back end" by Cell 49. The entrances had locking steel

grilles.

During much of the day, the cells on E4 were unlocked and inmates were allowed

freedom of movement within the tier. During the four daily institutional count times,

however, the inmates had to "lock in" to be counted. They also were supposed to be locked

in overnight, from the 10 pm. count until the morning count.

When locked, each cell was designed to be controlled by an electronic switch on a

control panel located outside the tier. The control panel had lights indicating whether the cell

was locked. When the light was green, it was supposed to mean that the cell door was fully

locked. By flipping a switch on the control panel, a CO could unlock the cell, causing the

sliding door to pop open slightly. The inmate or a CO then could manually open the door the

rest of the way.

In reality, however, many of the cell doors on the tiers in the West Wing, including

E4, easily could be jammed by inmates to prevent the locking mechanism from functioning

**App. 83**

properly. The inmates fashioned what were known as "keys" out of the handle ends of disposable razor blades or cardboard. A "key" could be inserted into the locking mechanism of the cell door from the inside while the cell was unlocked. When the door was manually closed at lock-in times, it would appear to be securely locked and would trigger the green light on the control panel. The key prevented the lock from fulling engaging, however, which meant the inmate could open the door from the inside of his cell after lock-in.

On July 25, 2006, Cpl. McGuinn was working the 4 pm. to midnight shift and was assigned to the E4 tier. At 10 p.m., the traffic officer called out over the radio, "[i]t's count time." Cpl. McGuinn entered the front end of the walkway on E4, next to Cell 1, and began checking each cell to make sure the inmate assigned to the cell was present. He also checked that the cell door was locked by pulling against it. Cpl. McGuinn was wearing a dress uniform, with long sleeves and pants, work boots, and a "shank-proof vest" that covered his chest and back.

After Cpl. McGuinn passed Cell 32, where Harris was housed, but before he reached Cell 44, where an inmate by the name of Cornelius Christy was housed, he was attacked. Other inmates on the tier described seeing two inmates hitting Cpl. McGuinn, one from the front and one from the back. Cpl. McGuinn ran back and forth along the back end of the tier, trying to escape his attackers. Eventually, he managed to get to the front end of the tier, unlock the door, escape through the grille door, and stumble down the staircase. He called for help over his radio.

Officers throughout MHC reported hearing a very faint, barely audible radio call shortly after 10 pm. of "help me, help me." Officers came running from all directions. Sergeant Sharon James and Sergeant Gerald Lane were the first to encounter Cpl. McGuinn. He was standing on the landing at the bottom of the West Wing. He appeared calm, but was covered in blood. He was holding his hand to the right side of his neck. He could not speak.

**App. 84**

Sgts. James and Lane grabbed Cpl. McGuinn under his arms and carried him to the infirmary. Glenn Palmer, a CO assigned to the infirmary, called 91 l. The two nurses on duty in the infirmary placed Cpl. McGuinn on a stretcher, cut off his clothes, and tried to stanch the bleeding. They observed multiple stab wounds to Cpl. McGuinn's upper back, the right side of his neck, his right and left chest above the clavicle, and his lower back. He was bleeding profusely, particularly from his neck wound. The nurses attempted to start an intravenous line, but Cpl. McGuinn's veins were collapsed due to massive blood loss. Paramedics from the Anne Arundel County Fire Department responded to MHC. At 10:38 p.m., Cpl. McGuinn was transported by ambulance to the Baltimore-Washington Medical Center. He arrived at the hospital at 10:53 pm. He was pronounced dead less than twenty minutes later.

Meanwhile, at MHC, the correctional staff was trying to secure the prison and determine who had stabbed Cpl. McGuinn. CO James Lampson was the first to respond to E4. He discovered the grille door at the front end of the tier sitting open. He did not see any inmates out on the walkway. He stayed at the door and awaited further instruction. Lieutenant James Mayfleld, the officer in charge of the entire prison during the 4:00 pm. to midnight shift, arrived shortly thereafter. He instructed CO Lampson to monitor E4 from outside the grille door and to make sure no one entered or exited the tier without permission He instructed CO Amanda Rushton to retrieve a Polaroid camera" and begin photographing the scene. She took fifty photographs, all of which were introduced into evidence at trial. She began in the infirmary and worked her way up to the E4 tier, where she photographed large quantities of blood along the walkway, particularly in the vicinity of 'Cells 40 through 46. In that area, the walkway was covered with blood and was smeared. Partial boot prints were visible. In contrast, the blood closer to the front of the tier was a trail of droplets.

At the same time, Lt. Mayfield along with Sergeant Howard Barksdales and multiple
other COS, including Palmer, Nickea Johnson, and Robin Collick, entered the tier. Sgt.
Barksdale followed the blood trail along the walkway, pulling up inmate's "curtains" as he
walked. When he reached Cell 32, where Harris was housed, he saw a "blue piece of razor
handle" lying on the walkway outside the cell and heard "a whole lot of flushing" inside the
cell. He pulled the curtain up and saw Harris washing "bloody clothes" in his toilet. He
ordered Harris to hold out his hands to be cuffed. Harris complied. Harris was wearing a
white T-shirt and gray sweatpants. There was what appeared to be blood visible on his shirt
and socks. Sgt. Barksdale escorted him off the tier and down to Center Hall, which was the
central administrative area at MHC. Sgt. Rodney Sampson searched Harris's cell and placed
the items he collected, including a pair of tennis shoes, a sweatshirt, sweatpants, and a Tshirt,
into a clean, unused trash bag also taken from Harris's cell. All of the items were wet.
Sgt. Sampson took the trash bag to Center Hall and waited there with it.

Lt. Mayfield also traversed the walkway, "[l]ooking for signs of a struggle." He
noticed a bloody yellow apron on the walkway in the vicinity of Cell 44, which, as
mentioned, was Christy's cell. He pulled back the curtain and observed Christy, who was
"quiet" and appeared "[k]ind of [shaken] up." He cuffed Christy, took him to Center Hall
and spoke to him briefly.

Based upon his conversation with Christy, Lt. Mayfield came to believe that Cpl.
McGuinn may have been attacked by two inmates. He returned to E4. As he walked along
the tier, he observed what appeared to be blood on the door of Cell 38, which, as mentioned,
was the appellant's cell. The blood was on "the front of the grill that hits up against the part
where it locks." He pulled up the appellant's curtain and observed the appellant lying in bed.
Lt. Mayfield ordered the appellant removed from his cell and taken to Center Hall.

C0 Palmer searched the appellant's cell while CO Johnson and Lt. Mayfield watched.

**App. 86**

CO Palmer lifted up the appellant's mattress and found a "wet[,] balled up" white sleeveless T-shirt with what was suspected to be blood on it. A pair of tan colored state-issued work boots were found sitting underneath the appellant's sink with what appeared to be blood on the toes, insteps, outsteps, and in the treads on the soles. CO Palmer placed these items in a mesh laundry bag taken from the appellant's cell, along with a roll of toilet paper that also appeared to have blood on it. CO Johnson took the laundry bag downstairs to Center Hall and turned it over to Sgt. Sampson, who maintained control of the evidence until he turned it over to crime scene technicians ("CST") with the Maryland State Police ("MSP").

Around 1:00 a.m., MSP investigators and investigators from the Internal Investigative Unit ("IIU") of the Department of Public Safety and Correctional Services ("DPSCS") arrived at MHC. After being briefed, officers with both divisions began conducting interviews, taking photographs, and searching the E4 tier.

Katherine Amspacker, a CST with the MSP, was briefed by MHC administrators and then proceeded to photograph blood on the E4 walkway, the railings, clothing and other items hanging over the railing, and cell doors. She unsuccessfully attempted to collect fingerprints from both the railing and cell doors.

One MSP investigator, Sergeant Michael Grant, initially responded to the E4 tier around 5:00 am. He was directed to search a "pipe chase" that ran behind the cells between the E and F sides of the fourth tier. The pipe chase was sometimes a repository for contraband, as inmates could push small items through a plumbing access grate on the back wall of each cell. On the catwalk in the pipe chase, Sgt. Grant discovered a homemade shank around the area of the back of Cell 24 or 25. It had a "small red stain" on it. While photographing it, he accidentally kicked it off the catwalk and it fell down to the ground level. A CO took him downstairs to find it inside a utility area. The lighting in that area was very poor, however, and Sgt. Grant decided to return to photograph and collect the shank

after he had completed his other investigatory responsibilities. He was advised that the area would be locked until he could return.

After 6:00 a.m., Sgt. Grant went to Central Hall to assist in photographing inmates from E4, beginning with Christy, the appellant, and Harris. CST Amspacker also was present. The appellant was wearing a pair of pants over two pairs of boxer shorts and a white T—shirt. Sgt. Grant photographed each layer of the appellant's clothing. The innermost pair of boxer shorts had a "suspect red substance" on them. All of the appellant's clothing was collected for processing by the MSP crime lab.

Forty more inmates from the E4 tier also were photographed.  One of them, Carlton Gayles, had a red stain on his T-shirt. Gayles's T—shirt was collected and sent to the crime lab. Testing revealed that the stain was not blood.

Forty-three inmates housed on E4 were photographed. As mentioned, there were 49 cells on the tier. According to a roster introduced into evidence at trial, three cells were empty on July 25, 2006. Sgt. Grant testified that he did not know why the other three inmates housed on E4 were not brought to him to be photographed. One of those inmates was Edward Jason Freed, the State's lead eyewitness.

By the time Sgt. Grant completed photographing the inmates, more than twelve hours had elapsed since the stabbing. He then returned to the utility area to photograph and bag the homemade shank. When he got there, the shank was gone. More than two days later, the same shank was confiscated from an inmate at MHC and turned over to the MSP. It was processed for blood evidence, but none was found.

Meanwhile, on the morning of July 26, 2006, IIU officers were dispatched to search every cell on the E4 tier except Cells 32, 38, and 44. Those three cells were taped off, awaiting crime scene processing. Before each cell was searched, the inmate was removed, patted down, and taken downstairs. The search team did not find any contraband or other

items of "evidentiary value" in any of the cells. An officer with the IIU testified that this was not surprising given that the inmates on the tier had had more than 12 hours before the search to flush contraband down their toilets or throw it off the tier.

That night, around 8:00 p.m., James Mayo, the supervising CST for the MSP's Forensic Sciences Division, and CST Andrea Kalathas, processed Cells 32 (Harris), 38 (the appellant), and 44 (Christy). CST Mayo observed a smudge of suspected blood on the sliding portion of the door to Cell 38 at a location that would not be exposed when the door was in the closed position. He also observed what he suspected was blood in the appellant's toilet and sink. Photographs of the suspected blood were introduced into evidence. Samples were not taken from any of these locations for further testing, however. CST Mayo testified that he simply "forgot" to swab the suspected blood from inside the appellant's toilet and sink. He did not explain why the suspected blood on the door to the cell was not swabbed.

CST Mayo also collected several items of evidence from the appellant's cell: two clear plastic bags found inside the appellant's sink, one small piece of tightly folded cardboard found on the floor, and one small piece of plastic also found on the floor. The latter two items were suspected to be "keys."

CSTs Mayo and Kalathas processed Cell 44, which, as mentioned, was where Christy was incarcerated. A pair of white tennis shoes with what was suspected to be blood on them was recovered from the cell. Suspected blood also was observed on a newspaper and a yellow apron inside the cell.

After they finished processing the three cells, CSTs Mayo and Kalathas returned to Center Hall. There, CST Kalathas received from Sgt. Sampson the items of clothing that previously had been removed from the appellant's and Harris's cells. She rebagged the items in separate evidence bags, and later turned them over to CST Amspacker.

Damon Burman and Bruce Heidebrecht, both MSP forensic scientists, testified at trial.

**App. 89**

Burman explained that he tested numerous items of evidence for the presence of blood. The sleeveless T-shirt found under the appellant's mattress and the boots recovered from beneath his sink both tested positive for blood on multiple locations, as did the plastic bags recovered from his sink. Blood also was found on the boxer shorts the appellant was wearing when he was removed from his cell shortly after the attack on Cpl. McGuinu. Cuttings of the clothing and the plastic bags and a swab taken from the tread of the sole of one of the boots were sent for DNA analysis.

Heidebrecht testified that the blood on the appellant's boxer shorts, T-shirt, and one of the plastic bags found in his sink was consistent with Cpl. McGuinn's DNA. The swab taken from the sole of the appellant's boot showed the presence of two types of DNA, with the "major component" of the sample being consistent with Cpl. McGuinn's DNA and the "minor component" being unidentified.  The statistical probability of anyone other than Cpl. McGuinn having the same DNA profile was 1 in 340 quadrillion within the Caucasian population and l in 8.5 quadrillion within the African-American population. The population of the earth is 6 billion.

Donna Vincenti, an assistant medical examiner with the Office of the Chief Medical Examiner, testified that Cpl. McGuinn sustained twelve stab wounds and twelve cutting wounds. The majority of the stab wounds were front to back in direction, with a few being back to front in direction. The stab wound to Cpl. McGuinn's neck hit his right internal carotid artery and his right jugular vein and was so deep that it nicked his cervical spine. Three inmates with information about the murder testified for the State: Christy, Freed, and one Garrison Thomas. As noted, Christy had been incarcerated at MHC, in Cell 44 on E4, on the day of the murder. He was serving a sentence for violating parole on an underlying conviction for second degree assault. He worked in the kitchen as a dishwasher and had worked the 11:00 am. to 7:00 pm. shift on the day Cpl. McGuinn was killed. His

work clothes consisted of a yellow kitchen apron, rubber gloves, and black boots.

That night, Christy returned to the tier around 7:30 pm. As was his usual practice, he removed his clothes, which were wet from washing dishes, put on dry clothes, and hung his wet clothes to dry outside his cell on the railing on the far side of the walkway. At 10 p.m., when Cpl. McGuinn entered the tier to do the count, Christy was asleep in his cell. He had a curtain up, blocking more than half of the front of his cell. He woke up to a noise "like somebody was pacing." He looked up and saw "an officer running back and forth" and a "guy stabbing the officer." The assailant was wearing a gray sweatsuit, with the hood down. He identified Harris as the inmate he saw stabbing Cpl. McGuinn. Christy saw Cpl. McGuinn run toward the back end of the tier, but then turn back towards the front of the tier. He did not see a second assailant.

The second eyewitness called by the State was Edward Jason Freed. At the time of the murder, Freed had been serving a sentence for robbery with a deadly weapon and was housed in Cell 16 on the E4 tier. Freed knew the appellant as "Shy" and knew Harris as "Junebug."

At 10:00 pm. on July 25, 2006, Freed was in his cell waiting for Cpl. McGuinn to appear. He explained that the inmate in Cell 2 (who was Gaylcs, but was known to Freed only as "G") had told him earlier in the day that something was going to happen during the count. That word spread, and many inmates on the E4 tier put up curtains to darken the walkway and make it more difficult for Cpl. McGuinn to see. After Cpl. McGuinn passed Freed's cell, he (Freed) put out his "peeper," a mirror about the size of a piece of notebook paper. This allowed him to see all the way down the tier. He saw other inmates on the tier put out their peepers too, "like a domino effect."

After Cpl. McGuinn passed Cell 32, Freed saw Harris let himself out of his cell and attack Cpl. McGuinn from behind. Harris was wearing a gray sweatsuit and tennis shoes. He

**App. 91**

then saw the appellant come out of his cell and begin attacking Cpl. McGuinn as well.
According to Freed, the appellant also was clothed in a gray sweatsuit and was wearing tan
and brown boots. After Cpl. McGuinn managed to escape, Freed heard the "clank" of metal
objects being dropped through the mesh fence onto the flats and then saw Harris and the
appellant reenter their cells. After that, the tier was "super quiet." A few minutes later, COs
appeared at both ends of the tier.

The next day, Freed was removed from his cell and placed on a bus for a prescheduled
transfer to another correctional facility." He was not transported to that facility,
however, but instead was returned to MHC to be interviewed by MSP investigators. At that
time, he told the detectives he had seen "two individuals out on the tier" but did not know
who they were. He explained at trial that he was a member of the Bloods gang and that he
knew that the consequence of "snitch[ing]" on another inmate was "[b]asically death."
About a year after Cpl. McGuinn was murdered, Freed was released from prison on
parole. Just a few months later, he was stopped by the police and found to be in possession
of a handgun. Ultimately, in September of 2008, Freed was indicted federally for unlawful
possession of a handgun. Because he had three prior felony convictions, Freed was alleged
to be an "armed career criminal" within the meaning of 18 U.S.C. § 924(6). That statute
imposes a mandatory minimum sentence of 15 years.

In October 2008, Freed reached a deal with the government under which he agreed
to plead guilty in his federal case and provide information about Cpl. McGuinn's murder.
In exchange for Freed's testifying truthfully in the murder prosecution, the federal prosecutor
would recommend a reduction in his offense level, thus allowing his defense attorney to
argue that he should be sentenced to a term of between zero and ten years.

Thereafter, Freed told "the whole truth," as he put it, identifying the appellant and
Harris as the two men he had seen attacking Cpl. McGuinn. He also revealed that the

**App. 92**

appellant had shown him a weapon on the day Cpl. McGuinn was killed and had offered to give it to him. Freed had not taken the weapon, however.

Garrison Thomas testified that, on the day of the murder, he was housed in Cell 37 on the E4 tier, next to the appellant. He was serving a sentence for murder. Thomas did not witness the attack on Cpl. McGuinn because he was trying to sleep and was wearing earplugs. He thought he heard the sound of keys jingling near his cell door and someone "running." Immediately thereafter, a female CO shined a flashlight into his cell. The CO then left the tier and Garrison heard the appellant's cell door open and shut very quickly. Garrison knew the appellant had a key because he often saw the appellant out of his cell after count. After Garrison heard the appellant's cell door open and close, he heard the water running in the appellant's sink for two to three minutes.

In his defense, the appellant called seven inmates housed on E4 on July 25, 2006. The first, Raymond Hinton, was not in his cell when Cpl. McGuinn was stabbed. He was working in the infirmary, where he was on "blood spill detail." He testified that he did not return to the tier until July 27, 2006, around 2 am. He was assigned to clean the tier. He saw "blood everywhere," particularly in the vicinity of cells 20 through 46. The blood was on the walkway, the cell bars, the cell doors, and inside the cells in that area of the tier.

Four inmates, Phillip Custis (Cell 25), Johnny Evans (Cell 41), Michael Canty (Cell 48), and Terrence Baker (Cell 43), described having seen two inmates, both wearing gray sweat suits and masks, attacking Cpl. McGuinn. Canty explained that the masks appeared to be DOC issued "skull caps" with slits cut in them for eye holes. None of the four could identify the masked assailants, but Custis, Evans, and Canty testified that the assailants were taller than the appellant and one of them also was stockier than the appellant.

Several of the appellant's witnesses also testified that they had had time to clean up blood, dispose of contraband, and dispose of bloody clothing in their cells before their cells

**App. 93**

were searched. Baker testified that, after the attack ended, he quickly cleaned up his cell with ammonia because he did not want to be linked to the crime. Custis testified that, after the attack, he threw a knife and cell phone through the mesh fence beyond the walkway railing. Finally, one Kenneth Lee Spencer (Cell 29) testified that he washed his face and hands after the attack and flushed bloody clothing and a cell phone down his toilet.

### **Petitioner's Post Conviction Claims**

7.      The Petitioner raises eight "claims for relief" in the original Petition for Post Conviction Relief and one further claim raised in the Amended Petition for Post Conviction Relief.  The Petitioner also supplies "Facts Material to Claims for Relief" which the State challenges and will be addressed separately in this response.  Of the nine total claims, six claims in the original petition and the sole claim in the amended petition relate to the failure to provide effective counsel.  The Petitioner claims that trial counsel failed to request a jury instruction on causation; undermine the search of the Defendant's cell and improperly entered into a stipulation; effectively cross examine Jason Freed on benefits he would receive in exchange for testimony; investigate alternative suspects and secure the vacatur of the Defendant's previous conviction for Murder in Wicomico County prior to trial.  The Petitioner claims that appellate counsel failed to appeal the trial court's ruling barring testimony regarding the planting of evidence on inmates by officers that the Maryland House of Corrections.  The Petitioner also claims that the cumulative effect of counsel's errors prejudiced his right to effective counsel. The Petitioner also claims that he was denied the right to testify at trial.  Finally, the Petitioner claims that he is entitled to a new sentencing hearing.

**Standard for Claims of Ineffective Assistance of Trial Counsel**

8.        *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, provide the analytical framework for assessing Petitioner's allegations of ineffective assistance of counsel at trial. Under *Strickland*, a defendant claiming that ineffective assistance rendered his conviction(s) or sentence(s) invalid must show that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  Like *Strickland*, Maryland case law recognizes that the defendant bears the burden to show both deficient performance and prejudice, *Bowers v. State*, 320 Md. 416, 424 (1990), but characterizes the showing necessary to establish prejudice as "a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Oken v. State*, 343 Md. 256, 284 (1996), cert. denied, 519 U.S. 1079 (1997); *Bowers v. State*, 310 Md. at 426-27.

9.        Petitioner's claims of ineffective assistance of counsel at trial do not warrant relief under *Strickland* and its progeny. As it stands, trial counsel is strongly presumed to have acted within the wide range of reasonable professional assistance, and it is for Petitioner to overcome that presumption. *Strickland v. Washington*, 466 U.S. at 694-95; *Gilliam v. State*, 331 Md. 651, 665-66 (1993); *Cirincione v. State,* 119 Md. App. 471, 484-85, cert. denied, 350 Md. 275 (1998). Furthermore, assessment of counsel's performance must be conducted with the following admonition of the Supreme Court in *Strickland* in mind:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac*, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to

**App. 95**

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."
466 U.S. at 689.

**The Petitioner Was Not Denied Effective Assistance of Trial Counsel**

10.     **Trial counsel provided effective assistance.**  The record indicates that Mr. Lawlor, Mr. Proctor and Ms. Waters represented the Petitioner through every stage of the proceedings and provided not only effective, but superior, representation.  The defense team filed over two dozen written pre-trial motions; employed an investigator to interview every witness including all of the inmates on the E4 tier, despite the fact that those witnesses had been dispersed around the State;  filed and litigated two interlocutory appeals; cross examined State witnesses at trial; presented defense witnesses at trial; argued motions throughout trial; raised objections; argued in closing and opening to the jury and prepared for and successfully presented mitigation to the jury which prevented the Defendant from receiving the Death Penalty.   The record clearly indicates that the Petitioner received effective assistance of counsel.

11.     **Trial counsel was not deficient in failing to request a jury instruction on causation.**  In order for the trial court to give a requested jury instruction, the instruction must be appropriate based on three criteria: 1) whether the instruction was generated by the evidence, 2) whether it is a correct statement of law; and 3) whether it otherwise was fairly covered by the instructions actually given. See *Gimble v. State*, 198 Md. App. 610, 627, cert. denied, 421 Md.193 (201 1) (citing *Gunning v. State*, 347 Md. 332, 348 (1997); *Grandison v. State*, 341 Md. 175, 21 1(1995)).  The second and third requirements should be the basis of court's inquiry.

12.     **The Petitioner's suggested jury instruction is not a correct statement of law.** No Maryland case law exists that states that actual causation requires "a felonious blow struck by

Petitioner was independently sufficient to cause the death of Corporal David McGuinn". The case law upon which the Petitioner attempts to rest his argument, *Burrage v. State* 134 S. Ct. 881 (2014) is woefully misplaced. *Burrage* is a Supreme Court case, decided 2 years after Petitioner's trial, that deals with a statute prohibiting distribution of heroin resulting in death. The *Burrage* opinion discusses causation in the context of an overdose resulting from multiple drugs and the requirement of causation in such a proceeding. The facts of *Burrage* are a far cry from the case at bar in which two men are alleged to stab one man to death simultaneously. The Petitioner's citation to the Maryland case of *Jackson v. State* 286 Md. 430 is also misplaced. Jackson involves the felony-murder conviction of Mr. Jackson when police accidentally shot and killed a hostage during a robbery in which the robbers were holding the hostage at gunpoint. Once again, the facts are extremely distinguishable from the case at bar in which two men simultaneously stab another to death. In fact, a search of Maryland case law for the phrase "independently sufficient" yields only 9 cases, none of which are remotely related to causation in a murder trial.

**13.    The correct statement of the law can be found in the comments of the Maryland Criminal Pattern Jury Instructions 4:17**. The comments state in part "The factual causation requirement is satisfied if the defendant's act or omission was a *substantial factor* in bringing about the death." (emphasis added). If trial counsel had asked for a jury instruction on causation, this is the instruction that should have been given. As for the instruction suggested by the Petitioner, the Maryland Court of Appeals has held, "An attorney is not deficient in failing to obtain instructions to which a defendant is not entitled." *State v. Colvin* 314 Md. 1 (1984).

**14.    The jury instruction given was fairly covered by the instructions actually given**. The jury instructions in this case included Pattern Jury Instruction 4:17. This instruction

**App. 97**

is actually superior to the suggested causation instruction that the Petitioner now suggests his defense team should have sought.  Maryland Criminal Pattern Jury Instruction 4:17 states in part, "that the defendant *caused* the death of Corporal David McGuinn.".  The Pattern Jury Instruction not only requires causation, but to request the instruction proposed by the Petitioner, would be to lower the bar for the State from 'caused the death' to 'was a substantial factor in bringing about the death'.

**15.     The Defense team requested the more appropriate jury instruction.**  The more appropriate jury instruction for the defense to request was an aiding and abetting instruction, which was requested and denied by the court, based partly on the State's opposition. The aiding and abetting instruction could have led to a finding of guilt in which the Petitioner would not have been a principle in the first degree and therefore would not have been eligible for the death penalty.

**16.     The suggested instruction does not fit the defense theory of the case**.  The defense raised in this case centered around the allegedly poor investigation by authorities and suggested that the Defendant was not one of the assailants that murdered Corporal David McGuinn.  The suggested instruction leads the defense to argue an incongruous alternative to the jury- that the defendant was not one of the attackers, but if he was, his blows to the victim did not cause death.  Arguing such alternative theories to the jury would have been the equivalent of admitting the Defendant's involvement.  As the Maryland Court of Special Appeals explains in *Lanham*, "Asserting factually inconsistent defenses is widely considered to be a poor criminal defense tactic, because it undermines the defendant's credibility by suggesting to the jury that the defense is merely "throwing out possible scenarios" in the hope that one will "stick," instead of giving a truthful account of what happened." *State v. Lanham* 182 Md. App. 597 (2008).

**App. 98**

**17.     The Defendant's trial counsel was not deficient in failing to request the suggested instruction but any such failure would not have produced prejudice.**  The argument first assumes that the trial court would have accepted this instruction and agreed to give it.  That assumption aside, the evidence before the jury at trial included testimony from multiple inmates that two men attacked and murdered Corporal McGuinn.  One witness specifically identified the Defendant as one of the men that murdered Corporal McGuinn.  Suspected blood was found on a portion of the Defendant's cell door that could have only been exposed if his door was open.  The blood of Corporal McGuinn was found in the treads of the Defendant's boots and on a wet t-shirt concealed under the Defendant's mattress immediately following the murder.  Defendant cannot demonstrate that, but for this jury instruction, there is a reasonable possibility that the jury's verdict would have been different.  The verdict in this case is based on a fair and proper jury trial and can be relied upon by this court.

The Petitioner has failed to demonstrate that the representation he received at trial was not effective and therefore the petition should be denied.

**18.     Trial counsel was not deficient in failing to undermine the search of the Defendant's cell and was not deficient for improperly entering into a stipulation.** Trial counsel presented a robust defense theory surrounding the shortcomings of the State's investigation of this case.  The defense team, largely through cross examination, elicited that crime scene technicians had failed to test suspected blood on the door to the Defendant's cell and in his sink; that the alleged murder weapon had been lost by investigators in the prison and later recovered; and that one of the correctional officers involved in the investigation had been in a physical altercation with the Defendant immediately after the murder.  Defense counsel

presented a defense that largely centered around the inadequate investigation of the murder.

That defense as presented was fully formed and adequate.

19.  **The stipulation entered into was proper and reasonable**.  The stipulation in

question, in full context was as follows:

1.  Both Parties stipulate that on July 25, 2006, at 10:25 pm, CO Winslow Veney relieved CO Rodney Sampson as Officer in Charge of Center Hall at the Maryland House of Corrections.  Officer Veney maintained proper chain of custody of **State's Exhibit #34** (tank top t-shirt), **State's Exhibit #35** (pair of tan boots), and **State's Exhibit #36** (mesh laundry bag). These items were not disturbed or altered in any way prior to their being collected by Crime Scene Technician Annie Kalathis on July 26, 2006, at 10:23 am.

2.  Both Parties Stipulate that on July 26, 2006, at 10:23 am, Crime Scene Technician Annie Kalathis took custody of **State's Exhibit #34** (tank top t-shirt), **State's Exhibit #35** (pair of tan boots), and **State's Exhibit #36** (mesh laundry bag).  These items were sealed in separate evidence bags and turned over to Crime Scene Technician Kristine Amspacker on July 26, 2006, at 12:00 pm.

3.  Both Parties stipulate that proper chain of custody was maintained throughout for all physical items of evidence collected by MSP Crime Scene Technicians at the Maryland House of Corrections on July 25, 2006 and July 26, 2006.

20.  The stipulation in question is not ambiguous in that it defines a specific point in

time during which Officer Veney maintained proper chain of custody of Exhibits 34-36.  The

stipulation concedes nothing that the defense intended to argue.  The suggested confusion to

jurors has been created out of whole cloth and the stipulation states exactly what defense counsel

intended to convey, that the evidence was not altered after it was brought to Center Hall.  In

order to be confused by the stipulation, a juror would have to ignore the first two lines of the

stipulation that state exactly when Officer Veney relieved Officer Sampson and that Officer

Veney maintained proper chain of custody.

21.  **The alleged deficiencies would not have produced prejudice to the**

**Defendant**.  As previously stated, the defense properly put on a defense that attacked the

investigation of the murder.  That defense included attacking the manner in which the Defendant's cell was searched.  The jury obviously rejected the argument, most likely do to the overwhelming physical evidence and eye witness testimony in this case.  The motive of Leutenant Mayfield in performing the search of the cell or the location of the Defendant's boots, with Corporal McGuinn's blood in their treads, would have been de minimis evidence in the face of stronger evidence already presented by the defense at trial.  The jury rejected stronger evidence regarding the investigation and there is no reasonable possibility that attempting to add such straws would have suddenly broke the camel's back.

As to the stipulation in this case, stipulations are a vital part of trial, in particular in large complex litigation such as a death penalty case.  Failing to enter into stipulations would result in a protracted trial in which jurors would be buried under the avalanche of monotonous, unchallenged evidence production.  The potential result is a jury that is unreceptive to, or unaware of, the important pieces of information at trial.  The stipulations in this case not only shortened the trial, they prevented the jury from hearing witness after witness testify about situations in which the State properly handled the evidence.  The result of which could have been to minimize the points in which the defense intended to show that the investigation was less than thorough.  Again, the Petitioner has failed to demonstrate that, but for the 3 sentence stipulation in question, there is a reasonable possibility that the jurors would have found differently in this case.  That possibility does not exist and the verdict in this case is sound and is the result of a fair trial in which the Defendant received constitutionally sufficient representation.

The Petitioner has failed to demonstrate that the representation he received at trial was not effective and therefore the petition should be denied.

**App. 101**

22.     **Trial counsel was not deficient for failing to effectively cross examine Jason Freed on benefits he would receive in exchange for testimony**.  Trial counsel cross examined Mr. Freed at great length regarding any pending charges and any agreements that he was aware of that would lead to benefits in exchange for his testimony.  See T 1/17/12 at 148-176.  The cross examination is not only thorough, it is conducted despite the objection of the State.  The court's ruling on the cross examination was also the subject of the appeal in this case and the ruling was affirmed.  There can be no doubt based on a review of the record that Mr. Lawlor, who conducted the cross examination, was thoroughly aware of the pending charges and potential sentences faced by Mr. Freed, both at the Federal and State levels.  Mr. Lawlor was aggressive in attempting to elicit as much information as possible to demonstrate that Mr. Freed's testimony was solely the result of agreements that he had obtained in exchange for his cooperation.  In fact, defense counsel was so aggressive in attempting to cross examine Mr. Freed fully, they filed a motion on January 30th, 2012 requesting that the cross examination be re-opened to allow the defense to probe the areas that the court had ruled to be off limits.  It can truly be said that there was no more that the defense could have done to cross examine Mr. Freed on this point.

23.     **Even if trial counsel had been deficient in cross examining Jason Freed on the benefits he would receive in exchange for his testimony, there was no prejudice to the Petitioner.**  Trial counsel was able to specifically question Mr. Freed at great lengths about the agreement he had entered into with Federal prosecutors in exchange for his testimony in this case.  Mr. Freed testified very candidly and in great detail about the Federal charges, the potential sentence, and the details of that agreement.  Mr. Freed further testified that he was not

aware of any agreements with the State regarding potential benefits he would receive on his State charges.  Even if defense counsel had been able to elicit from Mr. Freed that this alleged agreement existed, it is hard to imagine that jurors would have been swayed.  The argument supposes that jurors would find Mr. Freed's testimony credible if he was receiving a benefit on his sentence of 15 years to life in Federal prison but if you were to add in the benefit of another 7 year sentence at the State level, the jurors would suddenly find Mr. Freed's testimony to be unpalatable.  In the end, the jury was aware that Mr. Freed was testifying based on a deal from the Federal government and the jurors either believed his testimony despite that deal or they disregarded his testimony and convicted the Defendant because of the overwhelming physical evidence presented by the State.  In either case, there can be no reasonable possibility that the jurors would have acquitted the Defendant, but for this alleged misstep by counsel.  Counsel effectively cross examined Mr. Freed but the efforts were in vain.  The jury found the Defendant guilty beyond a reasonable doubt based on a fair trial in which the Defendant received constitutionally sufficient representation by his defense team.  The verdict in this case is the result of that sound process and can be relied upon. The Petitioner has failed to demonstrate that the representation he received at trial was not effective and therefore the petition should be denied.

**24.    Trial counsel was not deficient for failing to investigate alternative suspects.**

The claim that trial counsel failed to investigate alternative suspects is not only a bald allegation, it is squarely incorrect.  The evidence will demonstrate what the record in this case already implies, that the defense team in this case performed an incredibly thorough and exhaustive investigation that included interviewing every witness in the case and every inmate that was on E4 tier the night of the murder.  That includes the witness alluded to by the Petitioner, Mr.

Carlton Gales.  The only evidence that could have been presented regarding Mr. Gales, according the Petitioner, would be that he was friends with the co-defendant Harris and possibly closer in size to the description given by some witnesses than the Defendant.  The Petitioner also suggests that defense counsel should have pursued any number of conspiracy theories within the prison community, including that the DOC staff (which attempted to save his life after the attack) ordered the hit on Corporal McGuinn or that DOC staff implausibly allowed other inmates to plant evidence in the Defendant's cell (which begs the unanswered questions of how and why that would be done) or that two inmates had allegedly made previous threats to Corporal McGuinn or simply the mysterious "other similar leads".

**25.     Trial counsel conducted a thorough investigation into all aspects of the case and presented the case in the manner they found to be most effective.**  The decision on how best to present a defense is a tactical one. *Oken v. State* 343 Md. 256 (1996).  The law does not require counsel to raise every available nonfrivolous defense.  *Knowles v. Mirzayance* 556 U.S. 111 (2009).  A defense lawyer acting competently may decide, as a matter of strategy, to pursue only one of two or more available defenses, when pursuing more than one defense could undermine any of  them.  *State v. Peterson* 158 Md. App. 558 (2004).  At the end of the day, trial counsel employed an investigator that completed an exhaustive investigation of this case, thereby arming defense counsel with all of the information necessary to make strategic decisions in this case.  Further, the strategic decisions regarding "alternative suspects" made by counsel were sound.  Had trial counsel attempted to put on evidence of Mr. Gales involvement, it would have only served to demonstrate that the Defendant was the more likely culprit when comparing the overwhelming physical evidence against the Petitioner.  In contrast, Mr. Gales was found to be wearing a shirt with a red spot that, upon testing, turned out not to be blood.  Even more

**App. 104**

dangerous in attempting to paint Mr. Gales as the attacker was the fact that Mr. Gales had made statements to the investigator for the defense that specifically inculpated the Defendant. Attempting to shine a light on Mr. Gales would likely have resulted in further evidence against the Defendant coming to light.

26.     **The alleged failure of trial counsel to investigate these "alternative suspects" would not have created prejudice.**  It is clear that, by presenting these under developed alternative theories, the Defense only would have given the jury scenarios that were less and less likely to have occurred and would only have bolstered the State's case in comparison.  And in the case of Mr. Gales, potentially could have bolstered the evidence against the Defendant. These alternative suspects are inferior to the State's case in chief and would have only led the jury to select the better of the two competing theories.  There is no reasonable possibility that, but for trial counsel's failure to put on this underwhelming defense, that the jury would have found differently in this case.  The jury's verdict is the result of a fair trial in which the Petitioner was provided constitutionally adequate counsel.  The verdict in this case should be considered reliable.

The Petitioner has failed to demonstrate that the representation he received at trial was not effective and therefore the petition should be denied.

27.     **Trial counsel was not deficient for failing to secure a vacatur of the Petitioner's Wicomico County conviction and life sentence.**  The very concept that trial counsel could perform a deficient act in a wholly separate case in a different jurisdiction with no legal or factual connection to the case at bar is supported by absolutely no case law of any kind. The attempt to make this dexterous legal maneuver comes about from the following path.  Deep within the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death

Penalty Cases, in a section labeled "Miscellaneous Concerns", resides the following sentence: "If a prior conviction is legally flawed, counsel should seek to have it set aside." (p.1027).   The Guidelines point to two separate cases as potentially giving legal credence to this requirement. The first is *Lackawanna County Dist. Attorney v. Coss* 532 U.S. 394 (2001) and the second is *Johnson v. Mississippi* 486 U.S. 578 (1988).   A cursory review of the cases demonstrate that they do not stand for the proposition that trial counsel is deficient for failing to post convict his clients' convictions in other cases.   The ABA guidelines, while often cited by the Supreme Court as a measuring stick for proper representation, do not carry the weight of law and have not been adopted as the legal standard for representation in Maryland.   Not only does no case law exist to support the contention that defense counsel is required to represent his client in post conviction proceedings in other cases, the concept presents a host of problems.   Which county court has jurisdiction to hear such a claim?   Must the Petitioner perform a Shakespearian 'post-conviction within a post-conviction' to demonstrate that trial counsel could have overturned the previous conviction?   Which Office of the State's Attorney would handle such a hearing, the one that handled the original conviction or that one that now handles the subsequent conviction? Fortunately, these questions are moot because there is no prejudice that can be derived from this alleged deficiency.

**28.     There is no prejudice to the Petitioner arising from the claim that trial counsel failed to secure a vacatur in his prior Murder case.**   As will be presented at the post conviction hearing, the agreement of the State to concede the issues raised in the Wicomico County murder case were based solely on the fact that the Petitioner was already serving a life sentence in the case currently before the court.   Put another way, had trial counsel in this case attempted to marshall the same agreement to resolve the Wicomico County post conviction that

was later reached, he would have been rebuffed.  It was not until the Defendant received a Life sentence in the case at bar that the State's Attorney's Office in Wicomico County would have agreed to the resolution that later took place.  It should also be noted, that the Petitioner's conviction for Murder in Wicomico County is still in place and still a valid conviction.  That conviction has been in place continuously from the time he was first convicted, save for the very short period of time during the single hearing in which the conviction was vacated and the Petitioner pleaded guilty to Murder per the agreement with the State.  The Petitioner's argument assumes that at some point his trial counsel would have had the ability to make the conviction dissipate from his record.  That is not the case.  At best, the Petitioner would have been re-tried, but for his plea of guilty, and he very likely would have been convicted once again.  It should also be noted that the Petitioner's argument on this point suggests that trial counsel, who on several occasions suggested that they did not have the proper resources or funding to go forward on the death penalty trial in this case, should instead focus those reserves on trying to overturn a different murder for which the Defendant has previously been convicted, all within the time confines of an already proceeding Death Penalty case.  The Petitioner's claim is without merit because the outcome that the he claims was available to his trial counsel was not.  The Petitioner further claims that this improbable change to his criminal record would have led to the more remote possibilities that the Petitioner would have testified in his own defense even though it would then been disclosed to the jury that he had been previously convicted of murder or that the jury, upon learning that his previous conviction for murder was overturned and reinstated through his own plea of guilty, would have therefore changed their sentencing decision to a life sentence with the possibility of parole for the two-time convicted murderer.  Petitioner's counsel was not deficient in representing the Petitioner in an unrelated post conviction in a different

jurisdiction and there would be no prejudice to the Petitioner even if such a claim were

cognizable.  The conviction and sentence in this case were the result of a fair trial before a jury in

which the Petitioner received constitutionally adequate counsel at every stage demonstrating that

the verdict and sentence in this case are reliable.  The Petitioner has failed to demonstrate that the

representation he received at trial was not effective and therefore the petition should be denied.

### Standard for Claims of Ineffective Assistance of Appellate Counsel

**29.**     An appellate attorney renders ineffective assistance of counsel by failing to

preserve or omitting on direct appeal a claim that would have had a *substantial possibility of*

*resulting in a reversal* of petitioner's conviction.  The crucial inquiry is *whether confidence in the*

*reliability of the conviction is undermined* by the failure to preserve or raise the claims on appeal.

*Gross v. State,* 371 Md. 334, 350-51, 809 A.2d 627, 636-37 (2002)(emphasis added).

"The decision whether to raise an issue on appeal is quintessentially a tactical decision of

counsel." *State v. Gross*, 134 Md.App. 528, 561-62, 760 A.2d 725, 743 (2000) aff'd 371 Md. 334

(2002) quoting *Oken v. State*, 343 Md. 256, 271 (1996).

"In light of the strong presumption of effective assistance of counsel… it can only be said

that the decision not to raise a preserved significant issue(s) on appeal was "objectively

unreasonable" when, compared to those which were raised, are clearly stronger than those

presented. *State v. Gross*, 134 Md.App. 528, 561-62, 760 A.2d 725, 743 (2000) citing *Gray v.*

*Greer,* 800 F.2d 644, 647 (1986).

Proving that an unraised claim is clearly stronger than a claim that was raised is generally

difficult "because the comparative strength of two claims is usually debatable." *Shaw v. Wilson*,

721 F.3d 908, 915 (7th Cir. 2013)

**App. 108**

In *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983), the Supreme Court held that appointed counsel is not required to raise every colorable issue on appeal.

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id., 463 U.S. at 751-52, 103 S.Ct. at 3313.

"There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." Id., 463 U.S. at 752, 103 S.Ct. at 3313.

"A brief that raises every colorable issue runs the risk of burying good arguments in a verbal mound made up of strong and weak contentions." Id., 463 U.S. at 753, 103 S.Ct. at 3313.11

The Supreme Court later went on to state that this process of "winnowing out weaker arguments on appeal and focusing on "those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667 (1986).

### The Petitioner was not Denied Effective Assistance of Appellate Counsel

**30.     There is not a substantial possibility of reversal based on the Petitioner's 5-404(b) argument.**  The Petitioner cites to the case of *Sessom v. State* 357 Md 274 (2000) for the proposition that other crimes evidence pertaining to third parties do not require the same analysis as those pertaining to the Defendant.  This statement is true but it demonstrates an incomplete analysis of this issue within Maryland case law.  In order to understand the full landscape of such 5-404(b) claims, one must consider the court's subsequent holding in *Moore v. State* 154 Md. App. 578 (2004) in which the court affirms the lower courts rejection of the use of such 5-404(b)

evidence in situations where such evidence does no exculpate the Defendant, as in the case at bar.  Even if the issue raised by the Petitioner could be considered colorable, it falls well below the *Gross* standard of a substantial possibility of reversal.

The Petitioner is also unable to overcome the presumption that appellate counsel strategically chose the issues raised on appeal based on their merit and excluded this issue due to its relative weaknesses.

It should also be noted that the Petitioner does not list a belated appeal as a form of relief requested in his Petition.  It is clear that the proper relief in the case of ineffective assistance of appellate counsel cases is the belated appeal.  *State v. Gross*, 134 Md.App. 528, 560, 760 A.2d 725 (2000) aff'd *Gross v. State*, 371 Md. 334 (2002) (the appropriate relief for ineffective assistance of appellatecounsel would be the awarding of a belated or new appeal, at which issues which should have earlier been raised may ultimately be considered).

### The Cumulative Effect of the Alleged Errors by Counsel do not result in prejudice to the Petitioner.

**31.** "Twenty times nothing still equals nothing." *Oken v. State*, 343 Md. 256, 300 (1996) (citing *Gilliam v. State*, 331 Md. 651, 686 (1993) (*Gilliam II*).  As ever, the touchstone is whether, in view of all the circumstances, our confidence in the result has been undermined by counsel's failings. *Cirincione v. State* 119 Md. App. 471 (1998).  The Petitioner has failed to demonstrate any claim that he was denied constitutionally adequate counsel.  The cumulative effect doctrine does not assist the Petitioner in reaching the high bar of demonstrating that the result of his trial has been compromised by his counsel's failings.

## **The Petitioner was not Denied the Right to Testify in his Defense.**

**32.     Criminal Procedure Article Section 7-106 states:**

(b)(1)(i) Except as provided in subparagraph (ii) of this paragraph, an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation:

1. before trial;
2. at trial;
3. on direct appeal, whether or not the petitioner took an appeal;
4. in an application for leave to appeal a conviction based on a guilty plea;
5. in a habeas corpus or coram nobis proceeding began by the petitioner;
6. in a prior petition under this subtitle; or
7. in any other proceeding that the petitioner began.

(ii) 1. Failure to make an allegation of error shall be excused if special circumstances exist.

2. The petitioner has the burden of proving that special circumstances exist.

(2) When a petitioner could have made an allegation of error at a proceeding set forth in paragraph (1)(i) of this subsection but did not make an allegation of error, there is a rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation.

**33.     There is a presumption that the Petitioner has intelligently and knowingly failed to raise these allegations on Appeal.**  There is no evidence before the court rebutting that presumption and no special circumstances have been shown.  The allegations have been waived.

If a defendant is represented by counsel, a rebuttable presumption arises that counsel has fully advised his client of the right to testify or remain silent. There is no provision that requires that the waiver be obtained in any particular form, that it be placed on the record, or that it be done in open court. See *Tilghman v. State*, 117 Md. App. 542, 555 n.5 (1997).

The fatal flaw of the Petitioner's claim regarding his right to testify lies in his premise that his conviction for murder from Wicomico County could have been removed from his record. As argued above, the Petitioner has the same murder conviction that he would have had at trial and that he would have had if trial counsel had challenged the Wicomico conviction.  Based on the argument of the Petitioner, it's conceivable that his current conviction is actually more prejudicial now after his post conviction challenge then it was at the time of trial.  The Petitioner

**App. 111**

contends that he would have testified, either at trial or at sentencing, that his previous conviction had been overturned.  The Petitioner daftly suggests that a jury would understand that his subsequent plea of guilty to the Wicomico murder would be received as something less than an admission of guilt.  Such testimony would not only alert the jury to his murder conviction, it would open the door to the State inquiring about, and potentially presenting evidence on, the facts of the Wicomico County murder.  The Petitioner was given the proper opportunity to testify and, based on the circumstances at the time of his trial, knowingly and voluntarily elected to remain silent.  The Petitioner may have remorse over the decision he made at the time of trial, but such remorse does not rise to the level of a deprivation of the right to testify.

### The Petitioner is not Entitled to a New Sentencing.

**34.**    The State agrees that, had the Petitioner's conviction for murder in Wicomico county been reversed, been nolle prossed, had not been re-tried, or had led to an acquittal, such as in the cases cited by the Petitioner, the Petitioner would be entitled to a new sentencing.  Unlike those cases, the Petitioner's case was overturned conditionally with the understanding that the Petitioner, who was already serving a life sentence in the above captioned case, would agree to plead guilty to the murder and receive a reduced sentence.  There is no case law that suggests that such a scenario would entitle the Petitioner to a resentencing.  The State would argue that the operative part of a Defendant's criminal record as it applies to sentencing is the conviction, not the sentence served for the conviction.  The Petitioner has now, and has had at all times, the same conviction for murder that he had at the time of the murder in this case.  Given that no changes have occurred to Petitioner's criminal record, there is no reason to award a new sentencing.

**The Petitioner's "Facts Material to Claims for Relief" are Challenged by the State.**

Although listed separately from the enumerated "claims for relief", the State challenges the following "facts material to claims for relief" within the original petition for post conviction relief.

35.    **Trial counsel was overwhelmed by the complexity of the case in contrast to the compensation that was received for their services.**  Trial counsel did challenge the compensation received in this case as insufficient.  Nonetheless, trial counsel also demonstrated a commitment to excellent representation of the Defendant despite the compensation.  The Petitioner offers no evidence that trial counsel was overwhelmed and the State does not accept that as a "fact".

36.    **The State offered only non-credible testimony from Jason Freed.**  The credibility of witness testimony is not a cognizable claim on post conviction.  This has been a long standing tenet of post conviction law in Maryland.  See *McCoy v. Warden, Md. Penitentiary*, 1 Md.App. 108 (1967); *Walls v. Warden, Md. Penitentiary*, 242 Md. 401 (1966); *Gray v. State*, 158 Md.App. 635, 648 (2004) credibility issues are not ordinarily reviewable in a postconviction proceeding, citing *Walls v. Warden, Maryland Penitentiary*, 242 Md. 401 (1966).  The Petitioner's claim that Mr. Freed's testimony was "incredible" is squarely misplaced and the State does not accept it as either a proper argument or a "fact".

**Conclusion**

For the foregoing reasons, Petitioner is not entitled to post conviction relief, and the State of Maryland respectfully requests that Petitioner's petition for post conviction relief be denied.

**App. 113**

Respectfully submitted,


_____/s/_____
David L. Russell, Esq.
Assistant State's Attorney
8 Church Circle
Annapolis, MD 21401
(410) 222-1740
Fax: 410-222-1196
david.russell@aacounty.org
CPF# 0412150243


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12th day of April, 2017, a copy of the foregoing was electronically submitted to Ms. Isley Gostin, Esq. and Mr. Stephen Hut, Esq. counsel for the Petitioner.


_____/s/_____
David L. Russell
Assistant State's Attorney

## CERTIFICATE OF RESTRICTED INFORMATION

**I HEREBY CERTIFY** that the above filing contains no restricted information per Maryland Rule 20-201


_____/s/_____
David L. Russell
Assistant State's Attorney

Appendix No. 5

Post-Conviction Hearing Transcript Day 1 (4/18/17)

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

- - - - - - - - - - - - - - x
                             :
STATE OF MARYLAND            :     Criminal No. 02-K-08-000646
                             :
     v.                      :
                             :
LEE EDWARD STEPHENS,         :
                             :
          Defendant.         :     Annapolis, Maryland
                             :
- - - - - - - - - - - - - - x     April 18, 2017


**POST CONVICTION HEARING**


WHEREUPON, proceedings in the above-entitled matter

commenced.

     BEFORE:  THE HONORABLE WILLIAM C. MULFORD, II, Judge

     APPEARANCES:

     FOR THE STATE:

     DAVID RUSSELL, Esq.
     Office of the State's Attorney
     8 Church Circle
     Annapolis, Maryland  21401

     FOR THE DEFENDANT:

     A. STEPHEN HUT, JR., Esq.
     6 Saint Paul Street
     Suite 1400
     Baltimore, Maryland 21202

     ISLEY M. GOSTIN, Esq.
     THAD EAGLES, Esq.
     1875 Pennsylvania Avenue, NW
     Washington, DC  20006

lnc                                                                        2

I N D E X

|                                                              |      | Page |
| ------------------------------------------------------------ | ---- | ---- |
| Preliminary Matters                                          |      | 4    |
|                                                              |      |      |
| Opening Comments:                                            |      |      |
|                                                              |      |      |
| by A. Stephen Hut, Esq.<br>Attorney for the Defendant        |      | 22   |
|                                                              |      |      |
| by David Russell, Esq.<br>Attorney for the State            |      | 51   |

| WITNESSES<br>For the Defendant: | DIRECT   | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
| ------------------------------- | -------- | ----- | -------- | ------- | ------------ |
| Michael Lawlor                  | 57(AH)   | 98    | 143(AH)  | 150     | --           |
| Donna Vincenti                  | 154(IG)  | 160   | --       | --      | --           |
| Daniel Spitz                    | 169(IG)  | 184   | --       | --      | 164(IG)      |
| Bradford May                    | 202(TE)  | 211   | 221(TE)  | --      | 192(TE)      |

| EXHIBITS:<br>For the Defendant: | FOR IDENTIFICATION | IN EVIDENCE |
| ------------------------------- | ------------------ | ----------- |
| A                               | 60                 | 88          |
| B                               | 76                 | 88          |
| C                               | 88                 | 98          |
| D                               | 145                | --          |
| E                               | 156                | 156         |
| F                               | 168                | 168         |
| G                               | 170                | 183         |
| H                               | 180                | 180         |
| I                               | 195                | 195         |
| J                               | 204                | 204         |

**App. 117**

I N D E X (Cont.)

| EXHIBITS:<br>For the State: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1 | 131 | 135 |
| 2 | 135 | 138 |
| 3 | 138 | 140 |
| 5 | 141 | 142 |

KEYNOTE:  "---" Indicates inaudible in transcript.

lnc                                                                    4

1                        P R O C E E D I N G S

2              (Whereupon, at 9:40 a.m., the hearing began.)

3              MR. RUSSELL:   Thank you, Your Honor, call Lee

4    Stephens versus the State of Maryland, case number 02-K-08-

5    646, David Russell, R-u-s-s-e-l-l on behalf of the State.

6              THE COURT: If I could have counsel identify

7    yourselves for the record? Spelling your last names.

8              MR. HUT:  Good morning, Your Honor, Stephen Hut,

9    for petitioner Mr. Stephens.  That is H-u-t.

10             MS. GOSTIN:  Good morning, Your Honor, Isley

11   Gostin, G-o-s-t-i-n for the petitioner.

12             THE COURT:  And your first name?

13             MS. GOSTIN:  It is Isley, I-s-l-e-y.

14             THE COURT:  You don't have to lean into the

15   microphone, just have to talk okay.

16             MR. EAGLES:  Good morning, Your Honor, Thad Eagles,

17   for the petitioner and that is T-h-a-d E-a-g-l-e-s.

18             THE COURT:  All right.  Ms. Waters, if you are

19   going to be a witness, please don't cross over to the bar.

20             MS. WATERS:  Pardon me?

21             THE COURT:  If you are going to be a witness,

22   please do not cross the bar and approach the defendant.

23             MS. WATERS:  Sure, I am not going to be a witness.

24             THE COURT:  Okay.

25             MS. WATERS:  Thank you.

**App. 119**

lnc                                                                        5

1              THE COURT:  All right, so again if you are a

2     spectator, you are not allowed to cross the bar and approach

3     the defendant or any one else.

4              MS. WATERS:  Understood, thank you, Your Honor.

5              THE COURT:  Okay.  You know the rules.  The

6     attorneys are allowed to cross but if you are no longer an

7     attorney in the case, then don't come up.

8              MS. WATERS:  I apologize.

9              THE COURT:  All right.  Case is here for a post

10    conviction case.  And I have asked the security  officers to

11    make sure that Mr. Stephens is allowed to use his hands, but

12    since it is not a jury trial, I indicated to counsel before

13    he came in that he will have to have the appropriate

14    shackling on.  It is not a jury, there is no presumption of

15    innocence.  So it is not an issue as far as I am concerned.

16              A lot of these cases I sometimes I even do them

17    without anybody here.  So it is more in the nature of a legal

18    issue with testimony.  So I just want to make sure he knew

19    and that if counsel at some point in time, you find that he

20    can't read documents or write notes to you, just  let me

21    know.  Do you have something for him to make notes?

22              MR.          :  We do.

23              THE COURT:  Is that big enough?  Or do you want

24    something bigger?

25              MR.          :  We have a legal pad as well, Your

**App. 120**

lnc                                                                        6

1    Honor.

2              THE COURT:  Yes, I don't know how much you need for

3    him okay.  All right. Just so the parties are aware. I have

4    read all of the petitions in the matter as they have come in

5    and I have read various portions of the transcript that have

6    been filed, so when the petition raises an issue that

7    references something in a transcript, I have gone and looked

8    at that.  All right.  So I have some basic familiarity with

9    the allegations so in terms of an opening statement, I am

10   happy to hear an opening statement.  But I would ask you to

11   not spend an hour on an opening statement.  And focus more on

12   who you intend to call and what witnesses and what the theory

13   of the post conviction is and why you believe that relief

14   should be granted and what relief should be granted.

15             I don't need an hour opening statement like you

16   would give a jury because the jury obviously has no idea what

17   issues may be.  So I am happy to hear from the parties --

18   anything preliminary that we need to deal with.

19             MR. HUT:  There are one or two preliminaries, Your

20   Honor, if I may.  One I think from the petitioner and one

21   from the State.  For petitioner, Your Honor, may recall that

22   at some point either earlier this year or last, when Mr.

23   Stephens was confined out of state in Oklahoma --

24             THE COURT:  He was in the federal system.

25             MR. HUT:  He was then, but only by virtue of --

**App. 121**

7

1          THE COURT:   Right.  A loan.

2          MR. HUT:  In any event you ordered for purposes of

3    the hearing he would be brought to confinement at a place

4    further.  That was done.  And he is -- and or either although

5    he is at Cumberland.  Apparently the DOC plans to keep him

6    there and transport him from there every day to the courtroom

7    here.  Now, I realize that there is only so much that a Court

8    can or may be inclined to do and so I obviously leave this to

9    Your Honor's judgement of discretion.  But I would ask if

10   possibly if he can be brought closer.

11         THE COURT:  I can't have him transferred locally.

12         MR. HUT:  I know that.

13         THE COURT:  Because Mr. Cocollus(sic) I think would

14   not be happy if I asked.  I mean, I think the Department

15   knows how important it is to have him here.  And I will tell

16   you, in 30 plus years, this is the first time that I have

17   actually had everybody here early and with no issues.  So I

18   have pretty good confidence that the gentlemen who are

19   sitting over there are going to get him here.  And again, I

20   am not insensitive to the nature of the conviction.  And I

21   don't think you are either.

22         So for me to say house him at Jessup or house him

23   somewhere else, I think they are going to have to deal with

24   their own internal security issues.

25         MR. HUT:  That is fine, Your Honor.  Just one more

**App. 122**

lnc                                                                          8

1    word on that.  And I know or I believe I know that there

2    probably is no right to be able to assist in the defense in

3    connection of the post conviction.  It does -- I just want to

4    say for the record, with him having to get up at 2:00 in the

5    morning and --

6              THE COURT: I think you have a lot more --

7              MR. HUT:  -- it indicates that to some extent.

8              THE COURT:  -- I think Maryland gives a lot more

9    Constitutions than perhaps some -- Arkansas.

10             MR. HUT:  So stipulated, Your Honor.

11             THE COURT:  You probably know what I am

12   referencing.

13             MR. HUT:  I do.

14             THE COURT:  Okay.  All right.

15             MR. RUSSELL:  Your Honor, a couple of things that I

16   wanted to note.  First of all, I contacted --

17             THE COURT:  And counsel, you are both going to be

18   here for a couple of days, so if you want to unbutton the

19   buttons on the jacket.

20             MR. RUSSELL:  Thank you, Your Honor. I will note

21   that I contacted chambers and I actually didn't tell anybody

22   about this and --

23             THE COURT:  Yes, I know.

24             MR. RUSSELL:  -- but with regards to the writs.

25             THE COURT:  Yes, let me -- I will put that on the

**App. 123**

lnc
9

1    record.  We got a call yesterday from Mr. Russell's office

2    indicating that all of the original trial writs went out for

3    all of the original trial witnesses.  So I did not speak to

4    Mr. Russell, my administrative assistant or my law clerk, I

5    don't even know which one of you it was.

6         MR. RUSSELL:  Both at different points.

7         THE COURT:  Both said call the criminal department.

8         MR. RUSSELL:  Correct.

9         THE COURT:  And that was the extent of our

10   conversation.  So I don't know what happened there.

11        MR. RUSSELL:  I -- I contacted the criminal

12   department.  Those writs are in the record but they were not

13   sent out luckily.  So there are not 18 inmates that were

14   transported today.

15        THE COURT:  Have any of you besides Mr. Russell

16   seen the computer system -- the  MDEC program that we have?

17   All right, so look down at your monitor.  And why is my

18   computer not working, madam clerk?  There it goes.  And if I

19   put it on correctly you should have on your screen, this is

20   called the Odyssey program and this is my working program in

21   terms of the computer system.  So this is what I call my cue,

22   this is where my work flow is.  So I have something there

23   that I have to deal with.  But there are two different ways

24   that you can go to find today's case, well there is actually

25   more than two.

**App. 124**

lnc                                                                        10

1       I have set it up so that I have my own resource

2  calendar and that way I don't have to search the various

3  dockets.  So my resource calendar  has it set up so that I

4  can go right to today from my resource calendar and it brings

5  up Mr. Stephens' case.  It is a little bit hard for you to

6  see, I have a better screen and a better monitor.  But every

7  single docket entry in this case -- every single pleading,

8  every single motion and as you can see, I am clicking back

9  and I am back in 2012.  And there are all the writs that Mr.

10  Russell was talking about.  I can go back in time to 2008 and

11  everything is scanned in.

12       So this is my program, so if you are going to refer

13  to something I will probably be able to pull it up right here

14  on the computer.  So if you see me with my head in the

15  computer, it is because I am just looking to see who is here

16  and what is going on.  And these are the writs that  Mr.

17  Russell was concerned about.  Because if you see witness for

18  the defense and state, well it is summonsed all the original

19  people.

20       So if you see me with my head in the computer,

21  please don't think that I am searching the internet.  If I

22  wanted to, I could.  Because that is right there, Google

23  chrome.  But I don't have Google chrome lined up.  So I have

24  everything there if you need it.  But I just didn't want you

25  to think when you see me with my head in the computer that I

1  am not paying attention to the case.  It is actually the

2  opposite.  Because that is the file.  So when you reference a

3  transcript, I can actually find it based upon the date that

4  it was filed and I have to do a little bit of research to go

5  through it.  All right.  So with that --

6           MR. RUSSELL:  The next thing I want to address if I

7  may Your Honor?

8           THE COURT:  The writs are taken care of and so I

9  have told you about the computer, what is the other issue?

10           MR. RUSSELL:  It is my understanding that Mr. Hut

11  would like to testify in this case.  And I think we should

12  address that as we get started.

13           THE COURT:  As to what?

14           MR. RUSSELL:  Ms. Gostin will address this Your

15  Honor.

16           THE COURT:  Okay.  Because the last time I checked

17  Rule 3.7 you can't be an attorney and a witness.

18           MS. GOSTIN:  Your Honor, we believe that Mr. Hut

19  should be permitted to testify in this proceeding.  He would

20  be providing limited testimony only as to rebut testimony

21  that we expect the State would be putting on from Mr. Todd,

22  regarding the Wicomico -- the petitioner's Wicomico County

23  post conviction proceeding in which Mr. Hut from the OPD also

24  represented Mr. Stephens.  He is the only witness who will be

25  able to provide that testimony for the petitioner and the

lnc                                                                    12

1    need for Mr. Hut's testimony only became apparent to us last

2    week when we received the State's answer.

3         We did allege facts in the petition regarding

4    petitioner's Wicomico County post conviction proceedings.   We

5    reached out to the State months ago and the State agreed that

6    the facts -- that we believed that all of the facts would be

7    for Mr. Hut, would be undisputed which is an exception under

8    Rule 3.7.  And the State agreed to either stipulate to those

9    facts or to permit Mr. Hut to testify without objection.   It

10   is only once he received the State's answer last week that we

11   realized that there may be disputed issues of fact that we

12   would need testimony from Mr. Hut.

13        And I would also note -- so for those reasons, we

14   think that not permitting Mr. Hut to serve as both an

15   advocate and a witness here, with substantial prejudice to

16   the petitioner. And I would also note that --

17        THE COURT:  So have you looked at rule 19-303.7

18   which was formerly rule 3.7?

19        MS. GOSTIN:  Yes.

20        THE COURT:  So let's go through it.  Does Mr. Hut

21   intend to act as an advocate at the trial?

22        MS. GOSTIN:  He does, although Your  Honor I would

23   first --

24        THE COURT:  First question, does he intend to act

25   as an advocate at the trial?

**App. 127**

lnc

1      MS. GOSTIN:  Well, one point Your Honor is that we

2   think that there is a difference between a trial and --

3      THE COURT:  Let me explain something to you.  I am

4   a very linear person.  When I ask what, I don't want to know

5   why and when I ask why I don't want to know what.  Okay.  I

6   have said this so many times, I just don't know how I can

7   avoid it again.  Please turn around and look and tell me what

8   time it is on the clock? Did I ask you where the clock came?

9   Did I ask you to tell me the story of whether it is on

10  eastern standard, central mountain -- Greenwich mean time,

11  did I ask if it was digital or analog?  I am a very direct

12  person.  Go ask Mr. Tran in the back if you don't believe me.

13  Does Mr. Hut intend to act as an advocate at trial?

14     MS. GOSTIN:  Yes.

15     THE COURT:  Do you believe that he is likely to be

16  a necessary witness?

17     MS. GOSTIN:  We do.

18     THE COURT:  Then we must move to even less.  Does

19  the testimony relate to an uncontested issue?

20     MS. GOSTIN:  A portion of the testimony -- a very

21  narrow portion, yes.

22     THE COURT:  Okay, that is the half answer.  Does

23  the testimony relate to an uncontested issue?

24     MS. GOSTIN:  Yes.

25     THE COURT:  So the issue is not contested at all?

**App. 128**

lnc                                                                          14

1              MS. GOSTIN:   Oh I am sorry, it does relate --

2    sorry.

3              THE COURT:   So there is testimony that relates --

4    so the answer is no.

5              MS. GOSTIN:   Yes.

6              THE COURT:   Does the testimony relate to the nature

7    and value of legal services rendered in a case?

8              MS. GOSTIN:   It does not.

9              THE COURT:   Or the disqualification of the attorney

10   would work substantial hardship on the client?  Is that what

11   you are hanging your hat on?

12             MS. GOSTIN:   Yes.

13             THE COURT:   All right.  So I am going to require a

14   proffer so that I can see whether it would be a substantial

15   hardship because Mr. Hut, it is not my courtroom you need to

16   worry about.  It is Glen Grossman's decision and it is Paul

17   DeWolf's decision.  Because I found it most interesting that

18   Delegate Anderson put a bill in that any attorney who is

19   successfully post convicted will have their case referred to

20   the Attorney Grievance Commission of the State of Maryland,

21   that didn't make it out but it is the first clear shot across

22   the bowel that we are seeing in post conviction and other

23   cases because of issues that have arisen where attorney's

24   confused their role as advocates and court officers.

25             So I am very concerned about an attorney who wants

**App. 129**

1  to testify as a witness in a contested case.  So what is the

2  proffer? What would Mr. Todd testify to?

3           MR. HUT:  Mr. Todd or myself, Your Honor? You want

4  to hear about Mr. Todd?

5           THE COURT:  Yes.

6           MR. HUT:  And I --

7           MS. GOSTIN:  We believe that Mr. Todd will be

8  testifying I guess two points.  One would be as alleged in

9  the State's answer but the only reason that the State agreed

10  to a sentence of time served for the petitioner in this

11  Wicomico County case, following post conviction was because

12  the petitioner had a life sentence in this case.  And also

13  that the State believed  that the Wicomico County charges

14  against our client were very strong and would result in

15  another subsequent conviction where it to proceed to trial.

16           THE COURT:  Okay so what would Mr. Hut testify to?

17           MS. GOSTIN:  Mr. Hut would be providing testimony

18  to rebut those points and in fact, to say that in his

19  discussions with the State and what the State said on the

20  record, to the Court in no way indicated that the State's

21  decision turned on the fact that the petitioner had a life

22  sentence in this case.

23           THE COURT:  You are going to have to make a choice.

24  You either have to be the advocate or the witness. Because

25  that is going to require me to judge credibility, it is going

lnc                                                                    16

1    to require me to make a factual assessment regarding what

2    Mr. Todd is saying, what Mr. Hut is saying and it may

3    actually require me to assess in some way the evidence in

4    that case which might require me to have statements of

5    charges and maybe even some trial testimony to see what the

6    original trial testimony was.  The Court of Appeals opinion,

7    whatever it is.

8            I am completely uncomfortable with having counsel

9    be an advocate for three days in front of me and then flip

10   over and take the stand and now I have to make determinations

11   regarding what counsel is saying is credible or not.  That is

12   the purpose of the rule. I am completely uncomfortable with

13   that and I am going to indicate that you are going to have to

14   pick.  You can either be an advocate or you can be a witness.

15   But that is something that I am just not comfortable with

16   that, because it is not like you are taking the stand and

17   saying, at the end of a three day trial, I billed $50,000 and

18   here is how much and here is why.

19           MR. HUT:  Understood, Your Honor.

20           THE COURT: I am not comfortable with that at all.

21   And I am not going to allow you -- you can pick or you can

22   choose but gentleman has two attorneys here, they have been

23   involved in this case for quite some time you have been

24   involved and that is going to be a contested issue and I am

25   going to have to make credibility determinations and I am not

**App. 131**

1   comfortable with that at all.

2           MR. HUT:  Well --

3           THE COURT:  And the other thing is, during a

4   hearing or during a trial there might be side bars, there

5   might be chambers conferences and there might be informal

6   interaction between counsel and the Court and then if you are

7   going to take the stand and be a witness and directly address

8   points that you believe relate to the post conviction, and

9   relate to the merits of the case, I am not going to allow it.

10  So you are going to have to pick.

11          I will give you 15 minutes if you want to go

12  outside and talk about it.

13          MR. HUT:  We don't need to chat, Your Honor.  If I

14  can and it is not in my habit to argue rulings once the Court

15  has reached them, and I don't really mean to, I would note

16  that the hardship issue is not so easily dispensed with by

17  saying that there are two other lawyers here.

18          THE COURT: No it is not so easily dispensed with

19  and I know you have substantial experience in this field.

20  And I am --

21          MR. HUT:  You can look at my scalp and know that.

22          THE COURT:  No, no you have been doing this for a

23  long time.  I mean, your reputation is established in terms

24  of this type of legal work that you do.  And you have been

25  dealing with the administrative issues and you know you have

1    been dealing with these cases for years.  And I understand

2    that it would be a hardship but my problem is, the issue is

3    contested, it doesn't relate to the nature and value of the

4    legal services and it is a three factor test.  And it doesn't

5    indicate one factor controls over another.

6              And I think that there is a issue that the Court is

7    not comfortable with in terms of having you as the advocate

8    in front of me for two or three days arguing the merits,

9    arguing the motions and then I have to make a credibility

10   assessment in terms of what you are telling me about  issues

11   with Mr. Todd.

12             MR. HUT:  Understood Your Honor, in that event and

13   because of the run up to this, it has been clear that I was

14   going to play a substantial role in -- a --- role.  I will

15   continue to remain in the case as advocate.  We will forgo

16   the ability to call me as a witness. I would simply ask the

17   Court that at such time as seems appropriate to you -- I

18   think it would be in our rebuttal case, that we be permitted

19   to make a proffer as to what I would have said and I be

20   permitted to take the stand?

21             THE COURT:  I think you have to in order to

22   preserve this issue.  I think you have to in order to

23   preserve the issue.

24             MR. HUT:  Thank you, Your Honor.

25             THE COURT:  There is no problem at all with that.

**App. 133**

lnc

1      MR. HUT:  Thank you, Your Honor.

2      THE COURT:  Okay, anything else?

3      MS. GOSTIN:  Your Honor, just to clarify, I believe

4   we have reached an agreement with the State as to Mr. Hut

5   providing testimony as to uncontested  issues.

6      MR. RUSSELL:  They have been stipulated to and I am

7   not --

8      MS. GOSTIN:  We are happy to do it by stipulation

9   or affidavit but I just wanted to clarify that we were not --

10      THE COURT: Is it in writing?  Is it in writing?

11      MR. RUSSELL:  Some of it is, I think.  At this

12   point, Your Honor, I told them from the beginning, it is an

13   issue that I am not contesting then I certainly will

14   stipulate to it.  So as far as that goes -- and I said from

15   the very beginning --

16      THE COURT:  Just put that together at some point.

17      MR. RUSSELL:  Fine.

18      THE COURT:  I don't have any problem with that.

19   Okay.  Ms. Gostin, that is fine.  You can just put something

20   together.  Either draft it out or I can -- you can just read

21   it to me -- sometimes it is easier if it is drafted that way,

22   you don't argue over the terms and the tenses.  Numerous

23   people are coming in. I know some and I don't know all of

24   them.  I will charge each party with being responsible if

25   there is any rule on witnesses that you would like.

**App. 134**

lnc                                                                            20

1          MR. HUT:  I am going to ask for a rule on

2   witnesses, Your Honor.

3          THE COURT:  I am -- the Court will grant the rule

4   on witnesses and I will charge each party to be responsible

5   for your witnesses since I don't know who the witnesses are

6   other than perhaps knowing some of the attorneys.  We are

7   going to have to do that --

8          MR. HUT:  Your Honor, I know that our one or two

9   recipient witnesses whom we expect to call are not in the

10  courtroom.  In the courtroom however, is Mr. Trainor whom we

11  expect to call at the conclusion of the case as a witness on

12  minimal professional standards.

13         THE COURT:  He would be allowed to remain in.

14         MR. HUT:  That is what I wanted to clarify, thank

15  you.

16         THE COURT:  That is what I assumed he was here for.

17         MR. HUT:  Yes.

18         THE COURT:  Yes he is -- he would be an expert

19  testifying on matters within the courtroom.  So that is fine.

20  All right, what else, Mr. Russell?

21         MR. RUSSELL:  Your Honor, I don't know if the Court

22  wants to wait until we get to this point but my understanding

23  from the witness list is that the defendant may want to

24  testify in this case.  Certainly he is allowed to I am not

25  objecting to that.  But I just want to make sure that it is

**App. 135**

1   clear that the State's intention to completely cross examine

2   him on anything that the Court will allow us to and to use

3   that on re-trial if that occurs.  That is our position and I

4   just want to make sure that he is aware of that before he

5   takes the stand.  And if the Court wants to wait until that

6   point, that is fine. But I just want to make sure that is on

7   the record.

8           THE COURT:  Okay.  The doesn't need a comment.

9           MR. RUSSELL: I agree, Your Honor.  And the other

10  thing I want to address is maybe the opening will take care

11  of this but the State has responded to the 9 enumerated

12  issues in the petitions that were filed.  This is not a pro

13  se petition so I have not sparced out other things that may

14  be in there.   If there is more than those issues, the State

15  has not responded to them at this point. So I just want to

16  make sure that that is clear.

17          THE COURT:  Okay, all right.  Again, it is not like

18  the normal ones we get which are my attorney was incompetent

19  and I will tell you why when I get to court.  We see that a

20  lot.  So we don't have that.

21          MR. RUSSELL:  That is true, Your  Honor, but I will

22  say that they were --

23          THE COURT:  If something new comes up, you can

24  respond to it.

25          MR. RUSSELL:  Absolutely, Your Honor.  And that is

22

1   all I have.

2              THE COURT:  Okay, Mr. Hut, opening statement?

3              MR. HUT:  Yes, Your Honor.  May I approach the

4   podium?

5              THE COURT:  You can use the trial table, you can

6   use the podium.  As long as you are not bothering me, you can

7   move about the well.  If it gets to the point that you are

8   bothering me, you can't move about the well.  Now did you

9   need the computer?

10             MR. HUT:  We do but not confident in my own ability

11  to multi task.

12             THE COURT:  No, no because I have to switch the

13  monitor controls --

14             MR. HUT:  Yes, we do have a couple of power points

15  that we would like to display.

16             THE COURT:  When do you want to do those?  Are you

17  going to start with that or is that later?

18             MR. HUT:  It comes at about 5 minutes from now.

19             THE COURT:  Okay.  Go ahead.

20             MR. HUT:  All set.  May it please the Court.  Your

21  Honor, I am mindful of your admonition to counsel a few

22  moments ago that you have fully read the materials in the

23  case and that we not go on an undue length. I invite you if

24  it appears at any point that I am doing so or intruding on

25  the Court's patience please stop me and ask me to move on.

**App. 137**

1    But let me start here at the beginning.

2              THE COURT:  You will hear me say 5403 or 5611(a).

3    And 403 actually uses the words "waste of time" and 611(a)

4    uses "needless consumption of time".

5              MR. HUT:  I hope I don't descend to either.

6              THE COURT:  So it is my two favorite rules.

7              MR. HUT:  Let me start though at the beginning,

8    which is as you know on the night of July 25, 2006, Corporal

9    David McGuinn then a guard at the Maryland House of

10   Corrections was fatally stabbed.  The petitioner here, Lee

11   Stephens and a co-defendant, Lamar Harris were charged with

12   first degree murder of Corporal McGuinn and with conspiracy

13   to commit murder.

14             Shortly thereafter, attorneys Gary Proctor and Mike

15   Lawlor accepted the appointment to defend Mr. Stephens.  And

16   not long after they started to immerse themselves in the

17   case, two things became quite clear to them.  The first was

18   that the State's case to them, seemed quite weak.  Especially

19   for a proceeding in which the State of  Maryland sought the

20   ultimate penalty of death.

21             The post crime of investigation at the House of

22   Corrections they thought had been very sloppy.  Items of

23   evidence had been mishandled and contaminated.  The blood

24   evidence on which the State seemed principally to rely

25   appeared explicable by this very sloppiness.  There did not

**App. 138**

1    seem to be at the time to an eyewitnesses who could credibly

2    implicate Mr. Stephens.

3         And there was no motive.  None whatsoever.  The

4    defense counsel continued to think that the case against

5    Mr. Stephens was weak as it proceeded through pre-trial and

6    then through the trial itself.  Their judgements seem to be

7    worn out.  When they jury found it necessary to deliberate,

8    Your Honor, for six days before reaching a verdict on guilt

9    or innocence.

10        There was in fact an acquittal on the conspiracy

11   count.  There was a conviction on the murder count.  And the

12   disappointment of the lawyers with that verdict was deep and

13   profound.  The second thing Your Honor that immediately

14   became apparent to Mr. Lawlor and Mr. Proctor was the vast

15   disparity between the ample resources available to the State

16   and the far more meager resources available to the defense.

17        The lawyers strongly believed that this disparity

18   would almost surely make it impossible to render to Lee

19   Stephens the effective assistance of counsel to which he was

20   Constitutionally entitled.  In due course, the defense team

21   brought this disparity to the attention of the trial court,

22   Judge Hackner in a motion to strike the death notice for want

23   of adequate funding and resources.

24        In the motion and at a hearing on the motion, they

25   predicted that if the motion were denied, the result would be

1    the ineffective assistance of counsel.  And in this, counsel

2    were perfected.  Now, Your Honor may have personal knowledge

3    of this but let me say right at the outside, Mike Lawlor and

4    Gary Proctor are fine lawyers, let there be no doubt about

5    that.

6            THE COURT:  Can I take -- let me just tell you my

7    personal knowledge of this case, my personal knowledge of the

8    case is that this is my courtroom and Judge Hackner used my

9    courtroom for the trial.  And that is my personal knowledge

10   of the case.  So that -- it was -- I got displaced and I

11   know at one point they had the door up here because I had to

12   wait for it to be moved so that I could get my courtroom

13   back.  That is all I personally know.

14           MR. HUT:  No my reference here was only to -- if

15   you had encountered him other matters and if not, not.  Let

16   there be no doubt about that.  But let there also be no doubt

17   that as we expect to show Your Honor over the next several

18   days, they were ineffective as criminal defense counsel in a

19   number of crucial respects.  At the conclusion of

20   petitioner's case here, we expect to present the expert

21   opinion of a respected Maryland criminal practicer, Harry

22   Trainor.

23           Mr. Trainor we expect will opine that in a number

24   of respects, the defense team failed to perform at or above

25   the minimum professional standards that are expected of

**App. 140**

lnc

1  criminal defense lawyers in Maryland.  The totality of our

2  evidence, Your Honor, will show that we easily meet the

3  defective performance prong of Strickland versus Maryland and

4  its prodigy including for example, Bowers versus State, and I

5  can provide a citation to you if you need it, the lead

6  Maryland  on ineffective assistance.

7       And the evidence that I respectfully suggest Your

8  Honor, will also show prejudice within the meaning of

9  Strickland's second prong. For it would not have taken many

10  instances of deficient  performance.  Or for that matter

11  performance in any one or two such instances that was very

12  deficient to have made the difference in this case.

13       As I noted a moment ago and as the Court can take

14  notice, the jury evidently found the case to have been

15  extremely close.  Given the length of its deliberations.  But

16  there were a number of defects in the job the lawyers did and

17  the defects affected numerous aspects of the case and the

18  fundamental rights of this defendant.

19       And I want now to move to catalog these defects and

20  performance.  And the evidence that we believe will show

21  them.  And some of the law that undergirds the petitioner's

22  claims.  I begin with the issue of causation and I do so even

23  though this issue assumes arguendo.  That Mr. Stephens may

24  have been involved, I will use that word advisedly in the

25  assault on Corporal McGuinn.

1    At trial, that proposition was of course

2  strenuously denied.  And it would be denied again if there

3  were a retrial or a result of this proceeding.  But on as to

4  causation.  The State's evidence viewed in the light most

5  favorable to it, showed that two residents on the tier E4 at

6  the House of Corrections assaulted Corporal McGuinn shortly

7  after 10 p.m. on the night in question.

8    As the corporal was performing the count which is

9  to say that making sure that all prisoners were present,

10  secured and accounted for.  The trial here proceeded against

11  Mr. Stephens alone.  The other suspect, Lamar  Harris, as the

12  Court may recall was and has apparently remained incompetent

13  to stand trial.  The State tried the first degree murder

14  charge against Mr. Stephens on the theory that Stephens had

15  caused the death of Corporal McGuinn.

16    The trial court charged the jury that the State was

17  required to prove  the causation element of the crime beyond

18  a reasonable doubt.  And it did so as Maryland pattern jury

19  instruction 417 prescribes.  In fact, Your Honor, the

20  undisputed pathology evidence could not support causation

21  beyond a reasonable doubt.  The problem was that counsel

22  failed to educe that pathology evidence or to highlight it to

23  the jury in cross examination or in argument or to develop

24  and to propose the appropriate and necessary jury

25  instructions that would have supported argument on this

**App. 142**

lnc

28

1   critical causation element.

2            The report of assistant medical examiner, Donna

3   Vincenti from whom you will hear this morning showed that

4   McGuinn had sustained 24 stab wounds.  The report gives as

5   the cause of death, "Multiple stab force wounds".  The

6   defense counsel did not speak and they never sought to speak

7   with Dr. Vincenti during their investigation.  Although she

8   as I understand it, as a matter of practice, routinely makes

9   herself available to the defense for  purposes of such

10  interviews.

11           Dr. Vincenti was not cross examined by the defense

12  at trial.  Had the defense team inquired however, they would

13  have learned that at most two -- two and in all probability

14  only one of the stab wounds would have been fatal in and of

15  itself.  Further, the remaining 22 or 23, assuming they had

16  been properly treated would not -- would not have been fatal.

17  Accordingly the question whether Mr. Stephens had caused the

18  death of Corporal McGuinn would turn on whether he had

19  inflicted the one or maybe either of two fatal blows.

20           And there was no evidence -- none offered by the

21  State or the principle eye witness on this point.  If

22  anything, the evidence from the State's own eye witness and

23  inmate by the name of Jason Freed, tended to show that it was

24  Lamar Harris, who struck the fatal blow or blows.  As you

25  will hear from Dr. Vincenti and a defense expert, Daniel

1    Spitz, a well credentialed forensic psychologist or

2    pathologist, the one wound that almost certainly was fatal

3    and which severed the carotid artery was inflicted from the

4    back.

5          The second wound which might in some circumstances

6    have been fatal was to the lung and it also was inflicted

7    from the back.  Importantly, the eyewitness Freed described

8    Lamar Harris as striking McGuinn in the back.  So to did a

9    witness named Cornelius Christie, also called by the State.

10   Who saw Harris strike and who in fact observed only Harris

11   committing the crime.

12         He too, saw Harris strike in the back.  The

13   location of the cells where Harris and  Mr. Stephens resided,

14   are consistent with this.  And no evidence was ever

15   presented, not from Freed, not from anyone else that Stephens

16   struck Corporal McGuinn from the back, assuming it was

17   Stephens.  This too, Judge Mulford was never argued to the

18   jury.  Because counsel failed to appreciate it and failed to

19   appreciate its significance to the causation issue.

20         But Your Honor, there is more.  Counsel could and

21   should have sought one or more jury instructions that would

22   bring and would have brought this hole in the State's case

23   into clear focus.  Directing your attention to the slide on

24   the screen.

25         THE COURT:  I just want to pull my jury

**App. 144**

1   instructions.

2           MR. HUT: These are Your Honor, the notes to pattern

3   jury instruction criminal 417.  And those notes as you will

4   see from the middle sentence which we have rolled it on the

5   screen, defines causing the death within the meaning of the

6   instruction as committing an act that was a "substantial

7   factor" in bringing about the death of the victim.  That

8   should have been communicated to the jury in this case.

9           In addition, substantial authority case law at

10  treatises(sic) defines substantial factor to mean that the

11  act would have alone been sufficient to bring about the

12  victim's death.  Professor LaFave who's work is cited and

13  relied on in the Maryland Pattern Jury Instructions and

14  Criminal Cases including 417 itself, define substantial

15  factor to mean and I quote, "Two causes.  Each alone

16  sufficient to bring about the harmful result operate together

17  to cause it."

18          That is at Section 6.4(b) of the LaFave Criminal

19  Law Treatis, fifth edition.  Substantively the same

20  definition Your Honor, is employed and supplied in the

21  Maryland case law including a case from 1996 in the Court of

22  Special Appeals, Yonce versus Smith Kline Beecham and other

23  cases that we will supply to the Court in due course.  Indeed

24  the Supreme Court recently stated the same principle in a

25  case called Burrage versus United States, that is 134 Supreme

**App. 145**

1   Court 881 at 892, this is a decision, Your Honor, from 2014.

2           There the Court surveyed state law and it concluded

3   that factual causation is established only when the

4   defendant's act is either the but for cause is "independently

5   effective to have caused the harmful result." Now we say that

6   counsel could and should have obtained jury instructions to

7   this effect and then argued forcefully to the jury that

8   nothing attributable to Lee Stephens could remotely be deemed

9   a substantial factor in the death of Corporal McGuinn much

10  less a substantial factor beyond a reasonable doubt.

11          Finally on this point, Your Honor.  It is important

12  to emphasize that the State never requested an instruction on

13  aiding and abetting.  The State sought conviction only for

14  the substantive offense of murder.  And there was good reason

15  for this.  The State was as you are aware bent on trying this

16  case as a capital case.  And seeking to execute the

17  defendant.  The State would not have wanted the jury to

18  convict only for aiding and abetting.

19          Since the State then would have been unable to show

20  the defendant to be a first degree principle which is to say

21  one who had caused death by his own hand.  Defense counsel

22  for their part, sought an aiding and abetting instruction in

23  the first  phase of the sentencing proceeding but only then.

24  The request was denied there and the Court defining

25  principalship in the first degree for the jury simply has

**App. 146**

lnc                                                                              32

1    whether defendant had caused the murder  by his own hand or

2    committed it.  And there and this again the first phase of

3    the sentencing stage, the defense argued in a single sentence

4    that Mr. Stephens had not done so.

5         They did not a defense team request an aiding and

6    abetting instruction in the guilt and innocence trial.  Had

7    counsel properly developed the evidence and investigated the

8    law on this essential causation element of the crime and

9    formulated appropriate instructions which we are confident

10   would have been given in this capital case an acquittal would

11   have followed.

12        I want to turn now to a second principle respect in

13   which we believe counsel failed to render effective

14   assistance and that is concerning the way they approached the

15   critical eyewitness in the case.  Your Honor may recall that

16   there was only one eyewitness to the assault who identified

17   Lee Stephens as the assailant.  His name as I mentioned

18   briefly earlier, was Edward Jason Freed, who goes by the name

19   Jason.

20        There were five other residents on the E4 tier who

21   testified at trial.  As I mentioned, one of them Cornelius

22   Christie called by the State testified to having seen only

23   one assailant, Mr. Harris.  Four others called by the defense

24   testified to two assailants but and I emphasize this, none of

25   those identified Mr. Stephens as one of the assailants and

**App. 147**

1  several of them testified to having observed physical

2  characteristics of the assailants such as height that were

3  inconsistent with the involvement of Mr. Stephens.

4          Now, Mr. Freed, the record will show, was a member

5  of the Bloods gang.  He had committed numerous crimes of

6  violence in Maryland.  He was at the time of the trial facing

7  a federal charge for handgun possession and on that charge,

8  he faced a sentence between 15 years and life if he were

9  convicted.  Freed also faced 7 years of backup time -- a full

10  7 years for parole and probation violations in connection

11  with his myriad State convictions.

12          Jason Freed resided in cell 16.  The assault, the

13  record will reflect took place at least 110 feet away from

14  his cell and there is credible testimony that it was farther

15  away at that.  Freed admitted that the tier was very, very

16  dark.  The lighting was poor.  There was a new moon that

17  evening and some of the lights that had existed had been

18  broken during the course of that day or previously.

19          Other witnesses testified also without

20  contradiction to the considerable noise on the tier that was

21  made by the large industrial sized fans that provided the

22  only source of cooling for the inmates who resided there.

23  Nonetheless, Jason Freed testified that at a distance of at

24  least 110 feet and using a mirror that was the size of a

25  page, he could see the assailants well enough to identify

1    them as Harris and Stephens.

2            This even though there were 31 other inmates on the

3    E4 tier, who were like Mr. Stephens and Mr. Harris African

4    American men with beards, and Freed testified that while he

5    actually could not see the blows being landed at the distance

6    of at least 110 feet, that even though he could at that

7    distance distinguish the faces of two out of total 33 African

8    American men with beards, even so he could hear the blows

9    being struck.

10           In fact, he claimed that at that distance, he could

11   not only hear the blows but he could distinguish the sounds

12   of the knife strikes by Harris and the knife strikes by

13   Stephens as they landed on the victim.  Well, the defense

14   counsel recognized that there were two main ways to attack or

15   challenge this to me, far fetched story.  One was to cast

16   doubt on Freed's perception.  His ability to see or hear what

17   he said he had seen or heard.

18           And the second way was to show the jury that Freed

19   had given his testimony in exchange for a huge benefit

20   provided to him.  That is the State's aide in limiting the

21   jail time that he faced on his myriad of fences, both federal

22   and State.  On his cross examination, Mr. Lawlor set about

23   the second of these objectives first.  But during the

24   cross -- excuse me, during the course of his cross

25   examination, Mr. Lawlor suffered an adverse ruling from the

1  bench.

2          This ruling concerned efforts to show that one

3  benefit Freed had received -- one large benefit was a

4  limitation on the State back up time that he would need to

5  serve.  And as to this, the matter of State back up time,

6  Judge Hackner ruled that only if Freed had actually seen or

7  had described to him an agreement between counsel and the

8  State, between Freed's counsel and the State, could the

9  defense then pursue this line of cross examination.

10          Now that ruling which we think was wrong, was the

11  subject of extensive colloquy at the bench at the time that

12  it was rendered and it was the subject of direct appeal.  We

13  don't challenge its correctness here.  But the ruling had a

14  devastating real life consequence at the trial.  And that is,

15  it threw Michael Lawlor for a loop.  At the bench he

16  described it to Judge Hackner as "bullshit".

17          And as I believe he will put it during his

18  testimony, he "lost his legs" and he certainly lost his

19  focus.  There were ways I respectfully submit entirely

20  consistent with a Court's ruling to ask Freed about the

21  substantial benefits he received, his 7 years of State back

22  up time to run concurrently with his federal prison sentence.

23  That benefit -- those benefits in exchange for the testimony

24  he gave against Lee Stephens.

25          Indeed Your Honor, one even more striking way to of

lnc

1   underscored those benefits was to have cross examined Freed

2   with a letter he had sent to the State police demonstrating

3   his understanding that the State was going to help him in

4   exchange for this testimony.  That letter -- a portion of

5   which we have blown up on the slide that I hope is now on the

6   screen, was and will be offered into evidence here, that

7   letter was provided to the defense in discovery.

8         Counsel having lost his focus never followed

9   through with this devastating way to impeach Mr. Freed.  No

10   less importantly counsel at best went through the motions of

11   undermining Freed's ability to see and hear what he said he

12   had seen and heard and more importantly still, the defense

13   team never made its own case that what Freed said he could

14   hear and see did not just strain credulity, it also was

15   contradicted by science.

16         Early on just after they had taken the case, the

17   defense team had visited the House of Corrections.  They had

18   seen there the conditions that would have prevailed in the

19   night on the night in question.  They saw for themselves how

20   dark it was and how noisy it was.  Shortly thereafter as Gary

21   Proctor will testify, he consulted with an expert in human

22   perception about whether Jason Freed could really have heard

23   and seen what he had claimed.

24         The defense team then sought to engage the expert

25   but the Office of the Public Defender declined to authorize

**App. 151**

lnc

1   that engagement on cost grounds.  As the case progressed, the

2   significance of Freed's testimony emerged in starker form.

3   That is to say as the case progressed through pre-trial and

4   up to the eve of trial, that accordingly the need for

5   expertise in perception to rebut Jason Freed became clearer.

6   But the defense team by now even more up to their eyeballs

7   with the multitude of tests that lawyers face in a capital

8   case, never really focused on going back to the idea of an

9   expert.

10          And so the defense team  never developed the expert

11  testimony on the stand as to the scientific limits of human

12  sight and hearing.  They never even tried to remake the case

13  for funding, expert testimony on these subjects.  The idea,

14  Your Honor, just fell between the cracks.  During the course

15  of this hearing, Your Honor, Mr. Stephens will offer the

16  testimony of experts  in these subjects.  Dr. Jeffrey Loftis

17  in  human vision.  And Dr. Bradford May in human hearing.

18  Dr. Loftis and Dr. May will put the scientific lie to what

19  Freed claimed.

20          The slide on the screen for example, details

21  Professor Loftis' efforts to reconstruct what Freed might

22  have seen using a photograph of a bearded African American

23  man actually perhaps well known to the Court.  Each of these

24  experts would have been available in 2012, and each would

25  have testified at trial as we believe they will testify here.

**App. 152**

lnc

38

1   The defense failure to develop similar testimony and to

2   present it at trial fell short of the minimum professional

3   standards and representation to which a client like Mr.

4   Stephens is entitled.

5        Third issue as to which we will offer proof, Your

6   Honor, concerns the efforts by the defense to under mine and

7   discredit the quality and thoroughness of the State's

8   investigation.  This was, as I indicated a moment ago, in

9   addition to attacking Jason Freed, a second critical prong of

10  the defense of the charge here.

11       DNA testing had found small traces of Corporal

12  McGuinn's blood on boots and on the band of a pair of under

13  drawers and on a tank top shirt all belonging to Mr.

14  Stephens.  On this issue, that is attacking the force of this

15  evidence, the follow through by the defense team was to be

16  sure better than it was on the causation issue and on Jason

17  Freed.  The lawyers were able to convey to the jury that

18  because McGuinn had suffered a severed artery, he had bleed

19  profusely and the tier was in fact covered with his blood.

20       There was also testimony that prison personnel most

21  of whom had not been trained in crime scene handling almost

22  certainly contaminated the crime scene themselves and co-

23  mingled and thus impermissibly contaminated the evidence.

24  During the cross examination of a parade of State witnesses,

25  counsel suggested through cross examination entirely

1    reasonably that blood may have spattered from the tier as

2    investigators walked or stumped along it and into Mr.

3    Stephens' cell.

4          The clothing items from his cell had not been

5    separated but in fact had been all thrown together in a

6    single bag and so the blood from one piece of clothing may

7    have gotten on others.  And that bag, the one that contained

8    the clothing that were items of evidence which was itself

9    made of mesh, may have as counsel suggested inadvertently

10   come into contact with McGuinn's blood outside Stephens' cell

11   38.

12         But in attacking the blood evidence, the defense

13   counsel also committed serious and prejudicial errors both of

14   commission and omission.  First, the commission, to simplify

15   and to stream line some of the testimony, counsel for both

16   sides agreed to stipulate concerning the handling of items of

17   evidence once they had been removed from the cell tier and

18   had reached a location in the House of Corrections called

19   Center Hall.

20         And so counsel for the parties agreed that from

21   that point on, meaning from and after the time that the items

22   reached Center Hall there was and would be no challenge to

23   the way the evidence had been  handled during the

24   investigation.  That is how the agreement was described at

25   the bench.  But and the stipulation to this effect is now

1   displayed on the screen in the courtroom.

2          But the form of the agreement that was actually

3   entered, was not in any way so limited.  And directing the

4   Court's attention to the last line of the stipulation, in

5   fact it reflected an agreement that at any and all times

6   before and after the evidentiary items reached Center Hall,

7   they were properly handled.  Utterly and without any

8   limitation as to time.

9          The stipulation was in due course, read to the jury

10  and it was received in evidence.  The jury took the

11  stipulation as it took all documentary evidence back with

12  them during deliberations.  And they had access to it

13  throughout their six days of deliberating.  We know that the

14  jury was thorough.  And as much as they took those six days

15  to reach that verdict.

16         There is every reason to believe, Your Honor that

17  they would have again reviewed the stipulation and again been

18  confused by it.  In short, through this rather devastating

19  oversight, I think really did it is no exaggeration to call

20  it gross negligence.  Defense counsel undermined essentially

21  all of the effective ground work that that they had  laid to

22  challenge the integrity of the investigation.

23         Mr. Stephens was gravely prejudiced as a result.

24  And now let me turn to the omission.  Jason Freed testified

25  that both of Mr.  McGuinn's assailants were wearing sweats.

lnc                                                                                      41

1   A sweatshirt and sweat pants.  Some of the other inmates who

2   testified also testified that they saw the assault and

3   described the assailants as wearing sweats.  No such sweats

4   however were ever offered in evidence.  And the investigators

5   testified that except for the boots and tank top, nothing of

6   evidentiary value was found in Mr. Stephens' cell.

7        Accordingly  Mr. Lawlor appropriately emphasized

8   his clothing that these facts raised at the very least

9   serious doubts about the investigation.  How he is asked,

10  could assailants clothed in sweats not have gotten blood

11  spurting from a severed artery all over them?  Just as blood

12  had gotten all over the floor and the sides of the tier.  If

13  there was nothing of evidentiary value, taken from Stephens'

14  cell then contrary to logic, no bloody sweats had ever been

15  found there.

16       Where therefore are you -- where were the sweats?

17  Well that was as good as far as it went but it could have

18  gone so much further.  For Mr. Lawlor overlooked the key

19  piece of evidence that had been introduced in evidence by the

20  State as a trial exhibit and then it could have turned his

21  argument from metaphorically speaking, a scratched single

22  into a home run.

23       That evidence is presented in the next slide on the

24  screen and these are photographs of the cell of Mr. Stephens

25  taken shortly after the assault.  The photos on the screen

**App. 156**

1   show what appeared clearly to be sweats that were stored in

2   the cell.  From the left and a different one on the right.

3         The State had admitted those sweats had been

4   determined to have no evidentiary value.  And therefore had

5   no blood on them.  So here, was a tangible piece of evidence,

6   photographs clearly inconsistent with the State's theory of

7   Mr. Stephens' involvement in the crime.  And yet, the

8   probative value of these photographs went entirely unnoticed

9   by the defense team and thus unmentioned to the jury at trial

10  and in the closing statement.

11        There is a final issue that I want to touch on Your

12  Honor.  And then I will conclude.  There is no right in our

13  system I believe, that is more important than the right of

14  any accused to take the stand and testify in his own behalf.

15  We lawyers are given broad authority in representing clients

16  but one of the few things that may only be done by a client

17  is surrendering his precious right to testify in his own

18  behalf.

19        As the Supreme Court put it, in Rock versus

20  Arkansas, from 1987 a quotation that I have displayed on the

21  screen, "Even more fundamental to a personal defense and the

22  right of self representation is an accused right to present

23  his own version of events in his own words."  Mr. Stephens

24  was denied that very fundamental right in his 2012 trial.

25  Although as a formality, he waived this right -- the waiver

1    in question we submit was neither knowing nor intelligent.

2    Because it was based upon a misperception of the facts.  It

3    was not the fault of the defendant.

4            Stephens and his lawyers understood that he was

5    then serving a sentence of life plus 15 years on a conviction

6    for a murder that had taken place in Salisbury, Wicomico

7    County after a 1999 trial in that county.  This was the

8    sentence he was serving in the House of Corrections at the

9    time of the murder of Corporal McGuinn.  That conviction and

10   the State's ability to use it for impeachment in the event

11   that Mr. Stephens took the stand inevitably affected his

12   decision whether to testify in his 2012 trial in his own

13   behalf.

14           But in fact, that  1999 Wicomico trial was

15   irreparably tainted by the State's reliance on testimony from

16   its ballistic expert that was erroneous and probably Your

17   Honor, knowingly false.  Wicomico County court records show

18   that at trial, the State relied on the testimony of a

19   ballistics expert named Joseph Kopera.  The records further

20   show that in that case, 380 shell casings and 45 shell

21   casings were each recovered  or a set of each I should say

22   were recovered at the crime scene.

23           The sole bullet recovered from the body of the

24   victim, albeit from a non-fatal wound, was from a 380

25   handgun. There was a dispute as to whether the fatal bullet

lnc

44

1   which was never recovered, had come from  a 380 or from a 45.

2   The State for its part argued insistently that a 380 had

3   caused the fatal wound.  The jury accepted that contention.

4         And in turn, Mr. Kopera testified that all the 380

5   casings recovered at the crime scene, there were six of them,

6   he said all of them were shot from the same 380 handgun.  A

7   weapon that was argued to have been in the possession of Mr.

8   Stephens.

9         The jury accepted that the fatal bullet came from a

10  380.  And Mr. Kopera's testimony therefore, in all of the 380

11  casings came from the same gun, lead inexorably to the

12  conviction of Mr. Stephens.  Judge Mulford as you may be

13  aware, Kopera was later found to have perjured himself --

14         THE COURT:  Perjury.

15         MR. HUT:  -- in numerous trials throughout

16  Maryland.

17         THE COURT: Perjury.  There has been a lot of

18  appellate litigation with him.

19         MR. HUT:  There has.  And you will remember that he

20  was found to have perjured himself in his testimony about his

21  credentials.  And as a result of that finding though, the

22  State went back and in some cases where he had testified, the

23  State also retested his ballistics analysis. The Stephens

24  prosecution in Salisbury was one of the cases in which the

25  State retested the ballistics.

**App. 159**

1          And   low and behold, what did it find?  It turned

2     out that contrary to Kopera, not all of the 380 casings

3     recovered from the crime scene and ascribed to a weapon in

4     the possession of Mr. Stephens, not all of them came from

5     that weapon.  Only 4 of 6 did.  2 came from one or more

6     different weapons. Kopera had not only falsified his

7     credentials at the 1999 trial of Lee Stephens but he had in

8     fact testified untruthfully about the ballistics.  Because

9     there were at least two weapons therefore, two 380s shown to

10    have discharged bullets at the crime scene in Salisbury, it

11    was no longer possible for the jury to have rationally

12    concluded beyond a reasonable doubt that Lee Stephens had

13    fired those fatal shots.

14         This ballistics retest which was supplied to

15    counsel for the State and counsel for the Defense, lead

16    directly to a court order on post conviction review that

17    vacated the Wicomico County conviction.  That vacater in turn

18    was the result of an agreement between the State and

19    Mr. Stephens.  Under the agreement, Mr. Stephens agreed to

20    plead to the murder charge but only on condition that the

21    sentence imposed be time served.

22         That arrangement was implemented.  Adhering into

23    the 2013 as reflected in the release order reflected on the

24    slide now displayed in the courtroom.  Had that post

25    conviction proceeding occurred, as it should have, before Mr.

**App. 160**

1    Stephens had gone to trial in this county on the murder of

2    Corporal McGuinn --

3                THE COURT:  Do you have the actual sentence because

4    that is actually a sentence? An actual sentence would be 12

5    years, 16 days, credit 12 years 16 days.  That is just what

6    the clerk wrote for the release.  Was it a Grecko(sic)

7    sentence where there was no probation or was there --

8                MR. HUT:  I believe there was a year of probation.

9    This was the only order -- well actually it may not be the

10   only order.  This was the one that I thought most graphically

11   made the point.  We can see whether --

12               THE COURT:  No, no I understand that.  But that is

13   the clerk -- the way they do it.  They --

14               MR. HUT:  There was a year probation in addition to

15   time served.

16               THE COURT:  A judge's sentence must be blank,

17   suspend all but with probation otherwise you run into the

18   Grecko situation where for a long time judges were giving

19   life suspend all but 55 with no probations.  So -- and then

20   you give the credit, so. If you actually have the actual

21   hearing -- if not I might be able to find it.

22               MR. HUT:  We don't and we inquired and I am told

23   that there is both  no transcript of it and no recording of

24   it.  That is what -- that is --

25               THE COURT:  There  has to be a guilty plea hearing.

1          MR. HUT:  There was.  It is just not as far as we

2     can find a recording but there was.

3          THE COURT:  But there should be a commitment, a

4     hearing sheet.  Signed by a judge.  If it was Wicomico, I

5     don't know --

6          MR. HUT:  Yes, this appears to be what you have in

7     mind, Your Honor, may I approach?

8          THE COURT:  Yes, can I see that?

9          MR. HUT:  This is the -- and the release is

10    assigned to this.  That is the signature of the Honorable

11    Judge Jackson.

12          THE COURT: Yes, this is what I was thinking.  Yes,

13    that is a probation order --

14          MR. HUT:  Yes.

15          THE COURT:  Oh wow, we could never do this.  Well

16    they are not going to be able to do this again in the future

17    once they get MDEC.

18          (Pause.)

19          THE COURT:  We have to do either years or months or

20    days and we cannot do a combination of years and months and

21    days.  And we have to actually specify what the time served

22    is in terms of years or months or days.  Otherwise you can't

23    enter it into the system under the new MDEC system.  So all

24    right.

25          MR. HUT:  Well in an effort to be clearer and

**App. 162**

lnc                                                                      48

1    shorter, that turned out to be more opaque and longer and I

2    apologize to the Court for that.

3            THE COURT:  No, no you --

4            MR. HUT:  But the --

5            THE COURT:  23 counties in Baltimore City had no

6    uniformity in the Circuit Courts, so.

7            MR. HUT:  That was the arrangement that it was

8    agreed to and the important point to stress here, Your Honor

9    is that --

10           THE COURT:  No no I can see what happened.

11           MR. HUT:  That had it been done in the timely way

12   that it ought to have been, Mr. Stephens decision whether to

13   take the stand in this county in the trial reviewed here, and

14   testify in his own defense would have been a very different

15   decision. He would not have had to confront the question of

16   possible impeachment for a murder sentence for which he was

17   serving 15 years.

18           And while we acknowledged, Your Honor, that the

19   conviction on plea would still have existed and would have

20   been usable by the State to impeach, Stephens for his part

21   would have been able to offer the fact that the sentence upon

22   that conviction was time served and the jury here of course

23   knew that he was incarcerated in a maximum security prison

24   that housed persons who had committed serious crimes and so

25   there may have been considerably reduced concern on the part

**App. 163**

1    of him and his counsel with the jury learning had he taken

2    the stand that he had a prior homicide conviction, indeed we

3    think that the very mild sentence would have been

4    substantially mitigated the impact on the jury from the

5    conviction itself and testifying therefore would have been a

6    highly viable option.

7            But the problem as the Court appreciates is that

8    the Wicomico post conviction challenge had not occurred

9    before the trial here.  And so Mr. Stephens' choice here was

10   not to testify and to waive this critical right.  And that

11   predicament we believe resulted from the deprivation of two

12   rights of Constitutional magnitude which are indeed two

13   separate and discrete claims for relief.

14           The first is that the State's use of erroneous and

15   even untruthful ballistics testimony is in and of itself,

16   violative of his rights to due process from the State.  And

17   it in and of itself entitles him to a new trial.  The second

18   related but different claim also a Constitutional deprivation

19   stems from counsel's gross derelictions in failing to move

20   the Wicomico post conviction challenge to resolution in any

21   sort of timely way.

22           Counsel at trial had also undertaken to represent

23   Mr. Stephens in his post conviction efforts and in 2009 they

24   filed a post conviction petition in time to meet the

25   statutory time table.  They failed to push the proceeding

lnc

1   forward however even though they knew at the time indeed they

2   had alleged that the Joseph Kopera had falsified his

3   credentials.  This was certainly not any sort of strategic or

4   tactical choice.  They were simply overwhelmed by other

5   obligations and preparing for the trial on the McGuinn death

6   and did not do as they should have.

7           There are as the Court knows, guidelines developed

8   by the American Bar Association for the appointment and

9   performance of defense counsel in death penalty cases.  And

10  these emphasize how important it is to have completed the

11  challenge to pre-existing conditions before trial in the

12  capital case.  The notes to guideline 10.07 for example, says

13  "Counsel must also investigate prior convictions,

14  adjudications or unadjudicated offenses that could be used as

15  aggravating circumstances or other wise come into evidence.

16  If a prior conviction is legally flawed, counsel should seek

17  to have it set aside.  Counsel may also find extenuating

18  circumstances that can be offered to lessen the weight of a

19  conviction, adjudication or unadjudicated offense.  And one

20  purpose served by this is to ensure that the decision whether

21  to take the stand in a capital case  may be made without the

22  encumbrance of a pre-existing condition that was inconsistent

23  with the law."

24          In sum, and I apologize to the Court for having

25  gone on longer than I candidly expected, throughout the 2013

**App. 165**

lnc

51

1   excuse me, the 2012 trial and the proceedings that lead up to

2   it, Mr. Stephens' able counsel tried very hard -- they did

3   many things well.  But in critical respects and ones that I

4   have just outlined, they made serious mistakes.  Sometimes in

5   the nature of things, even able lawyers make serious

6   mistakes.  When that occurs, the courts must be vigilant in

7   saying that the defendant did not have his Constitutional

8   entitlement to the effective assistance of counsel.

9        When you have heard all of the evidence, Your

10   Honor, we believe that you could come to no other conclusion

11   on the facts of this case.  We believe that you will also

12   conclude that there can be no confidence that Mr. Stephens

13   received a fair trial and that he was seriously prejudiced by

14   counsel's shortcomings.

15       We will ask at the conclusion of the case that you

16   provide the post conviction relief vacating the conviction to

17   which we believe the petitioner is entitled to.  Thank you.

18       THE COURT:  All right.  Mr. Russell?

19       MR. RUSSELL:  Your Honor, a couple of things that I

20   want to address first of all.  As I said before the State has

21   addressed specifically what was enumerated.  At no point in

22   this petition and I have gone through it as we have been

23   sitting here does it say that there is a due process

24   violation for the State's use of ballistics.  That is an

25   issue that Mr. Hut said they are raising, I don't see it in

**App. 166**

1  any petition that they have filed  and I would object to any

2  amendment at this point.

3          THE COURT:  Okay.

4          MR. RUSSELL:  And I will also add similarly with

5  regard to sweat clothes that were not located, there is no

6  mention of this as a potential issue.  Again the State didn't

7  know anything about this.  I will object to any amendment to

8  it at this point.  This is post conviction, we plead our

9  issues.  There is nothing in this pleading that gives us any

10 notice that that was an issue that is going to be raised.

11 And I will object to any amendment at this point, Your Honor.

12         Now with that said, I will significantly more brief

13 because I have written close to 40 pages on this and I know

14 the Court has that and I think that it is sufficient to

15 address all the issues that are going to be raised.  But

16 there are a few things that I want to point out.  First of

17 all, I think the record in this case is really what is going

18 to control.  We have transcripts of what happened in this

19 trial.  The Court can look at those transcripts and can

20 review what the attorneys did in this case.

21         And even if those transcripts are not enough, you

22 are going to hear from Mr. Proctor.  You are going to hear

23 from Mr. Lawlor and you are going to hear from Mr. Ash all of

24 them can expand on any questions that the Court has about

25 what was done in this case.  And at the end of the day, the

1   record is going to speak for itself.

2           Further the results already speak for themselves.

3   Mr. Stephens was a convicted murderer in prison who murdered

4   someone in prison.  He did not get the death penalty.  That is

5   a win.  That is a win by Mr. Proctor and  by Mr. Lawlor.  He

6   had the victim's blood on his shirt, a wet shirt under his

7   mattress.  The person in the cell next to him said they heard

8   him go in and out of his cell.

9           They found an apparatus for him to jimmy the door

10  open.  They found alleged blood on his cell door on a portion

11  that could not have been there unless the door was opened.

12  They found the victim's blood in the bottom of his boots in

13  his cell.  The bottom of his boots.  He didn't get the death

14  penalty in this case, that is a win.  That is almost

15  miraculous.

16          What you are going to find, Your Honor, once you

17  have heard all of the evidence is that the representation was

18  not only adequate in this case, it was superior. It was

19  commendable.  And in fact, it was selfless.  Now I understand

20  why Mr. Stephens would be here asking for post conviction

21  relief.  I think we all do.  Anybody in his situation would

22  probably do the exact same thing.  But once the Court has

23  seen the evidence and heard the argument and I ask the Court

24  to keep in mind I am sure that Mr. Hut and his --

25  petitioner's counsel are all going to do a wonderful job, I

lnc

54

1   have no doubt about that.  They are going to put on a good

2   case.

3          But I want the Court to keep in mind the State has

4   already done that.  Five years ago for nine weeks, Magistrate

5   Howell, Mr. Ash, they put on the presentation successfully.

6   And they put the case on.  So it takes a little bit of the

7   onus off of me and I admit you are going to hear more from

8   them then you are probably going to hear from me.  And I

9   would just ask the Court to keep an open mind until we get to

10  argument which is sort of my opportunity to draw all of this

11  together and answer all the questions that the Court is going

12  to have.

13         But I think in the end, once we get to that point,

14  the Court is going to find Mr. Stephens has committed murder

15  twice and but for Mr. Proctor and Mr. Lawlor and Ms. Waters,

16  he may not be here today.  And I understand why he would file

17  a post conviction in this case but instead of criticizing

18  those attorneys, he really should be thanking them.  And that

19  is the bottom line.  He had great attorneys.  They did a

20  great job.  And they kept him from the death penalty.

21  Thanks.

22              THE COURT:  Okay.  Who do you want to call first?

23              MR. HUT:  Call Michael Lawlor.

24              THE COURT:  That is fine.

25              MR. HUT:  And while we are waiting for Mr. Lawlor,

**App. 169**

1   we --

2           THE COURT:  Ms. Gostin, do you want to go get him

3   or --

4           MR. HUT:  If I may in response to two points that

5   Mr. Russell made about failures to alleged certain of the

6   claims that I identified and --

7           THE COURT:  Well you made a broad claim regarding

8   the failure to properly investigate a broad claim regarding

9   the testimonial aspect.   So these are -- I don't necessarily

10  consider them to be specific  matters like pleading, there

11  are more allegations within -- okay.

12          MR. HUT:  With respect to the photos, I would just

13  refer the Court and Mr. Russell to paragraph 33 of the

14  petition.  First and last sentences.  And I just to clarify,

15  we are not making due process argument with respect to the --

16          THE COURT: I understand.  And I just want you to

17  know that I tried to open up the transcripts to make sure I

18  was going to be able to get to them. And my computer crashed.

19  Don't know why --

20          MS. GOSTIN:  We have them in hard copy if that

21  would be helpful to Your Honor.

22          THE COURT:  Ms. Gostin, I don't know if I am going

23  to need them yet it is -- I don't know what just happened.

24  It does this occasionally and you lose it every so often.

25          MR. RUSSELL: I will also say, Your Honor, that I

lnc                                                                      56

1    have noticed that MDEC has a lot of trouble with this case

2    because there is so much in it.  A lot of times it will be

3    slow or it will crash.

4            THE COURT: It said that I needed an adobe reader

5    and I hit remind me later and it shut down.  Now it is

6    restarting.  I don't know why.

7            MR. RUSSELL:  Your Honor, may I approach to grab

8    the -- my exhibits.

9            THE COURT: Yes.

10   Whereupon,

11                       MICHAEL LAWLOR

12   was called as a witness by the Defendant, having been first

13   duly sworn, was examined and testified as follows:

14           THE WITNESS:  Yes.

15           THE CLERK:  Please state your name, your address

16   and spell your name for the Court reporters.

17           THE WITNESS:  Sure.  My name is Michael Lawlor.  My

18   last name is spelled L-a-w-l-o-r.  And my address is 6305 Ivy

19   Lane, Suite 608, Greenbelt, Maryland.

20           THE COURT:  That is your professional address?

21           THE WITNESS:  That is my professional address.

22           THE COURT:  All right, thank you.  And counsel, I

23   am going to grant you leave to lead under Rule 5-611(a) as it

24   may relate to some of the preliminary matters. How long he

25   has been practicing, how many cases he has had, jury trials

**App. 171**

lnc

 1   et cetera because I sincerely doubt that those are the type

 2   of leading questions which one would object to and I don't

 3   think Mr. Russell is going to get all upset if I allow you to

 4   just lead him through the basics, where he went to law

 5   school, when, et cetera.  Okay.  So you can save us all some

 6   time if you want to lead him through that.  If you know the

 7   answers.

 8                    DIRECT EXAMINATION

 9        BY MR. HUT:

10        Q    The Court has save me some effort and I don't need

11   to ask what you do for a living.  How long have you practiced

12   law?

13        A    I graduated in 1997 from law school.

14        Q    From what law school?

15        A    Catholic University.

16             THE COURT: I am sorry, do me a favor.  You got to

17   turn and talk more towards me.  Catholic --

18             THE WITNESS: Yes, no problem.

19             BY MR. HUT:

20        Q    You have been engaged in the --

21             THE COURT:  Wait a minute, you said Catholic U?

22             THE WITNESS:  Catholic, yep.

23             BY MR. HUT:

24        Q    You have been engaged in the private practice of

25   law since that time?

1          A     I have.

2          Q     Is your principle field of endeavor practice

3    criminal law?

4          A     Exclusively, yep.

5          Q     And you have represented defendants accused of

6    crimes of violence?

7          A     Yes.

8          Q     Including murders?

9          A     Yes.

10          Q     Approximately how many?

11          A     I would say 100 give or take but that is a real

12    ball park guess.

13          Q     And I am safe in assuming that there came a time

14    when you began to represent the petitioner at counsel table,

15    Lee Stephens?

16          A     Yes.

17          Q     Approximately when was that if you recall?

18          A     I don't remember the date off hand but it was -- I

19    mean, in the immediate aftermath of the crime.

20          Q     And the crime -- do you recall when the crime took

21    place?

22          A     Where or when?

23          Q     When?

24          A     No.

25          Q     If I told you July 26, 2006, would that refresh

1    your recollection?

2         A    Yes, that rings a bell yep.

3         Q    And your representation began shortly thereafter,

4    could you describe your role in that representation?

5         A    I was lead counsel for the defense.

6         Q    And did you also have additional colleague Gary

7    Proctor who assisted you with that defense?

8         A    Yes.

9         Q    Did there come a time, Mr. Lawlor, when you

10   undertook as part of that defense to represent Mr. Stephens

11   in connection with the post conviction challenge to --- crime

12   allegedly committed in Wicomico County?

13        A    Yes.

14        Q    Showing you what has been marked --

15             THE COURT:  Mr. Hut, just so you are familiar with

16   it, everything has to be scanned --

17             MR. HUT:  So the staples don't help?

18             THE COURT:  The staples don't help.

19             MR. HUT:  All right.

20             THE COURT:  Are these going to be -- and just so

21   you know once something is scanned, I have the access within

22   the system to immediately pull it up on an exhibit screen so

23   I don't need courtesy copies but if you just let me know that

24   something is going to be a courtesy, so is this a courtesy

25   copy?

**App. 174**

lnc

1          MR. HUT:  It is Your Honor.

2          THE COURT:  I don't actually need them because

3  madam clerk keeps the exhibits and when she scanned it, it is

4  in and I have the exhibits.  So you can keep the courtesy

5  copy for right now and --

6          MR. HUT:  And she scans it real time?

7          THE COURT:  Yes.

8          (Pause)

9          THE COURT:  I don't want anyone to think that I am

10  searching the computer, so just look at Mr. Lawlor's screen,

11  his should be up.  Or look at your screen, Mr. Hut.  Mr.

12  Lawlor's is probably up right there.  So once you move it and

13  once it is marked, the clerk scans it and then I have things.

14  Okay.  So she said -- so once you have it and then it is in

15  and I can get it, okay.  So that is why I don't need courtesy

16  copies.  I just have to go back and it has to refresh and all

17  of that.  But it will be there  within a few minutes.  Which

18  one is that, A?

19          THE CLERK:  Yes, A.

20          THE COURT:  See now it is in there for

21  identification.  Within a few minutes it will be available

22  for me.  All right?  Okay.  So go ahead, next question.

23                          (The document referred to was

24                          marked for identification as

25                          Defendant's Exhibit A.)

**App. 175**

lnc

       BY MR. HUT:

1      Q     I don't think it is yet up on the screen but --

2            THE COURT:  No because I took the screen away from

3      you.  You are not going to be able to -- if you want to be

4      able to use the computer, you have to tell me because I have

5      to switch back and forth.

6            MR. HUT:  Then I am going to need it back in order

7      to have the witness -- thank you.

8            BY MR. HUT: (Not near a microphone)

9      Q     Showing you what has been marked as Defendant's A,

10     is that a satisfactory designation of --- the petitioner's

11     marked defendant.

12           THE COURT:  Yes, you have the letters.

13           MR. HUT:  Okay.

14           THE COURT:  The State has numbers.

15           BY MR. HUT:

16     Q     Do you recognize what has been marked as Exhibit A,

17     Mr. Lawlor?

18     A     I do.

19     Q     What is it?

20     A     This is a letter that I wrote to Chip Dorsey who

21     was then the Deputy Public Defender sort of explaining the

22     circumstances of the bill that is attached for the time that

23     I submitted to the State after the completion of my

24     representation of Mr. Stephens.

**App. 176**

lnc                                                                    62

1       Q    And do you see on the cover letter to the billing

2   materials in the second sentence, it makes reference to the

3   review of prior murder conviction that Mr. Stephens had

4   obtained?

5       A    Yes, I see that.

6       Q    And what is that a reference to?

7       A    I think as you referenced, you know this crime

8   occurred in a correctional facility and Mr. Stephens was an

9   inmate of that facility because of a conviction that he had

10  obtained in the Circuit Court for Wicomico County.  So when

11  we were appointed to represent Mr. Stephens in this case, the

12  murder case at the jail, we undertook to review his prior

13  conviction.

14      Q    And did there come a point in time upon your review

15  of his prior conviction that you undertook to represent him

16  on a post conviction challenge to that conviction in Wicomico

17  County?

18      A    Yes we did.

19      Q    And did you consider that representation to be

20  within the scope of your representation at the case that was

21  going to trial in Anne Arundel County?

22      A    Yes, I did.

23      Q    And why was that?

24      A    Really for a multitude of reasons.  I think under

25  the ABA guidelines I think we have an ethical obligation to

lnc

1    undertake a review of that conviction.  I think because this

2    was a capital case, and sort of dovetails with the ABA

3    guidelines the circumstances of that case would be or could

4    be relevant in a variety of phases here. It could be an

5    aggravating factor, could have been an aggravating factor.

6    It could have affected our representation during the guilt

7    phase.  It was going to come in in the penalty phase.  So

8    there was just -- there were like I said just a variety of

9    reasons why it was important that we review that conviction.

10       Q    And was some of that work -- work for which you

11   sought compensation in connection with this case?

12       A    Yes.

13       Q    Did you have a co-counsel in the case?

14       A    I had co-counsel in the case which was Mr. Proctor

15   and then I had an associate in my firm, who was not appointed

16   technically but who assisted in really ever aspect of the

17   case.

18       Q    And who was that?

19       A    Gwynn Waters.

20       Q    And did Ms. Waters play any role at the trial in

21   terms of actual examination or cross examination of

22   witnesses, argument?

23       A    No, she research, she did client relations and she

24   helped mitigate him.  She helped  with every component of the

25   case but she didn't -- she didn't have a speaking role during

1    the trial.

2         Q    Did you and Mr. Proctor divide up responsibility

3    for areas of the case?

4         A    We did.

5              THE COURT:  Can I just interrupt.  Was she present

6    at the trial?

7              THE WITNESS:  She was at the trial table for the

8    entire trial.

9              THE COURT:  At the trial table?

10             THE WITNESS:  Yep.

11             THE COURT:  But no speaking role?

12             THE WITNESS:  Correct.

13             THE COURT:  Okay, go ahead.

14             BY MR. HUT:

15        Q    And did you similarly divide up responsibility for

16   a particular witnesses who testified at trial for State and

17   for the defense?

18        A    Yes,  both preparation, we did a lot together but

19   then obviously he had things that were sort of under his to

20   do list if you will in preparation.  He had I think more

21   experience which is more depth at mitigation and so I think

22   for example he took on a more significant role in the

23   preparation of the mitigation investigation and then yes

24   during the trial we each sort of wore different hats as well.

25        Q    And who had responsibility for the presentation of

lnc

65

1     the opening statement?

2          A     At the guilt phase --

3          Q     The guilt phase?

4          A     I did.

5          Q     And who had responsibility for the closing

6     argument?

7          A     I did.

8          Q     Do you recall who had responsibility for the

9     preparation of and any defense of the -- excuse me, the

10    preparation for any possible examination of a witness named

11    Dr. Donna Vincenti?

12         A     That was Gary.

13         Q     Who had the responsibility for the cross

14    examination of a State witness named Edward Jason Freed?

15         A     I did.

16         Q     Do you recall the gist of the testimony that was

17    supplied at trial by Mr. Freed?

18         A     I do.

19         Q     And what was that?

20         A     Mr. Freed was an inmate in Maryland House of

21    Corrections on the day of the offense, he was on the same

22    tier that Mr. Stephens lived on as well as the tier where the

23    murder occurred and he testified that he was an eye witness

24    to the crime.

25         Q     Did he identify Mr. Stephens as participating in

1    the crime?

2         A    Yes.   I believe he did.

3         Q    Did he also identify Lamar Harris as one of the

4    assailants?

5         A    I believe he did but my recollection on that is a

6    little imperfect.  But I do -- like I said I know that he was

7    an eye witness, he was from my money, the most critical

8    witness for the State at trial.  And but I can't remember the

9    particulars as I sit here now of the specificity with what he

10   identified Mr. Harris or Mr. Stephens.

11        Q    And when you say for your money he was the most

12   important State's witness -- did any witness -- did any other

13   witness who testified at trial testify to having seen Lee

14   Stephens assault ---

15        A    I don't believe so no.

16        Q    In general, Mr. Lawlor, what was your strategy as

17   you confronted the task of cross examining Jason Freed?

18        A    I think it was multi faceted.  So I think he had a

19   plea agreement with -- he actually -- I don't think he had a

20   charge pending in Anne Arundel County.  He had a charge

21   pending in the U.S. District Court in Baltimore in front of

22   Judge Bennett.  But I believe he was being remunerated for

23   his testimony there.  He was a cooperator.  And so I wanted

24   to demonstrate that he had a bias if you will, a motive to

25   testify.  I think he came forward very late you know the

lnc                                                                        67

1   crime itself and the trial were not close in time.  And he

2   didn't come forward anywhere near July 25, 2006.  And then I

3   believe we wanted to demonstrate that his testimony about his

4   ability to perceive what he said he perceived was not

5   consistent with reality because of the distance -- my

6   recollection is that he said that you know, guys in jail

7   would make kind of a homemade mirror and that he put his hand

8   out his window cell door with the mirror and sort of looking

9   you know, several dozen feet down the tier in reverse on a

10  small mirror and was able to see the events unfold.  I don't

11  think -- I didn't think -- well let me answer your question,

12  I endeavored to demonstrate that that wasn't really

13  plausible.

14       Q     So let's take the effort to show the benefits that

15  he may have received first.  When you say that he didn't come

16  forward until late, did he come forward with an

17  identification of Lee Stephens at any time before he was

18  charged in federal court on the gun charge?

19       A     No, my recollection is that he was released from

20  the jail.  He reoffended.  He was charged in Federal District

21  Court in Baltimore and it was only then that he came forward

22  with this information that Mr. Stephens was involved.

23       Q     And in addition to the benefits that he received in

24  connection or that you attempted to show that he received in

25  connection with this federal sentence, did you also attempt

**App. 182**

1   to show that he had received benefits with respect to back up

2   time that he faced with respect to certain state charges?

3       A    I know I tried to and I don't know if I was able to

4   achieve that.

5       Q    Do you recall in particular why you were not able

6   to achieve that?

7       A    Well, I can answer that sort of in two ways. One is

8   that the cross just didn't go well. I -- and it is kind of

9   hard to explain but it was a long obviously important cross

10  and I kind of stumbled out of the gate.  I had an idea of

11  this -- trying to demonstrate the timing that you and I were

12  just talking about and it just -- I couldn't make the point

13  that I was trying to  make and then the cross just -- I --

14  the way I would describe it is I feel like I just kind of

15  lost my legs.

16           During that cross, I was frustrated and the State

17  made a lot of objections and I thought the judge was reigning

18  me in unnecessarily. And I just -- it wasn't -- it didn't go

19  as I wanted it to.  So that was one component of it.  Another

20  component was that there was this notion that -- and I am

21  still a little befuddled by this candidly, that while there

22  was the potential for a benefit not only -- there was no

23  debate that he had the potential for a benefit in his federal

24  case and I practice in Federal Court so I am sort of

25  intimately familiar with how that works so I think I was

**App. 183**

1    comfortable in making that demonstration.

2              But back up time there was an odd explanation given

3    to me by the State that while they intended to give him a

4    benefit, they had not conveyed to him.  And I remember being

5    kind of befuddled by that.

6        Q    And did you -- did the State object on that ground

7    or did Judge Hackner issue a ruling in respect to that

8    objection?

9        A    Yes.  I -- I remember a bench conference because I

10   was so befuddled that I referred to the State's explanation

11   in a colorful term on the record and I can't remember the

12   judge's ruling though, I can't remember if he stopped me

13   short because of the State's explanation or if he gave me

14   some leeway, I don't recall that.

15       Q    Do you recall the ruling as one of the reasons for

16   which as you said a moment ago, you lost your legs?

17       A    Yes, I mean that was part of it.  Like I said, it

18   wasn't one thing.  I -- and it  may be hard to read on paper

19   and I don't know because I didn't read the transcript but as

20   I indicated I came out of the gate with an idea of how my

21   cross was going to proceed and the witness and I couldn't --

22   he didn't understand what I was asking him and so I got

23   exasperated and that -- and then I said --

24       Q    He the witness or he Judge Hackner?

25       A    He the witness.  We -- I was trying to walk him

lnc

1   through a time line of events and I think I was using

2   language that he wasn't comprehending and it just like I

3   said, I had a hard time there and it kind of snowballed from

4   there.

5       Q    Do you recall how many years if any Mr. Freed's

6   faced in terms of State back up time?

7       A    I want to say 7 but --

8       Q    And do you recall in what county he faced the

9   charges had been committed -- the probation and parole?

10      A    My recollection is Hartford but I am stabbing in

11  the dark on both of those a little.

12      Q    An did you add -- did there come a time when you

13  asked Mr. Freed on cross examination whether he had some sort

14  of agreement with the State or the federal prosecutors  with

15  respect to that ---

16      A    Did I ask him that?

17      Q    Yes.

18      A    I don't remember.

19      Q    Do you remember the --- that Judge Hackner issues

20  his ruling that precluded you from ---

21      A    Again I can't remember particulars but I remember

22  the bench conference which yes, I remember the bench

23  conference but I don't remember the ruling.

24      Q    Do you recall how you -- you called it colloquy at

25  the best -- in which you characterized the ruling with an

1    epithet?

2         A    With what?

3         Q    An epithet.

4         A    Yes.  I said it was colorful in my response but yes

5    an epithet.

6         Q    What was the word you used?

7         A    I thought it was bullshit.  That wasn't about the

8    ruling, that was about the State's explanation.  I probably

9    thought the ruling was that same word but I wouldn't have

10   said that to the judge.

11             THE COURT:  Probably a good idea.

12             THE WITNESS:  Yes.

13             BY MR. HUT:

14        Q    Now --

15             THE COURT:  Judge Hackner might have cut  you some

16   slack.

17             THE WITNESS:  Not by that point, Your Honor.  He

18   had had enough of me by that point.

19             BY MR. HUT:

20        Q    Did you think it was important that you be able to

21   delve as far as you could into any cooperation agreement

22   that Freed may or may not have had with the State on the

23   State charges and back up time?

24        A    Yeah.  I mean, that is -- I would say of the points

25   that I wanted to make on cross examination with him, and I

1   think I indicated that there were three primary -- you know

2   the coming forward, I would say was the third most

3   significant when he came forward and the two probably equally

4   significant components of that cross were the fact that he

5   had a deal and the proximity or lack thereof to the assault

6   on the corporal.

7          And I remember you know hammering that in closing.

8   Saying that you know he was -- I want to say the analogy I

9   made was how much money if I had paid a witness, a certain

10  amount of money instead of giving them years off of a

11  sentence, what would the jury think of that testimony?

12     Q     When you asked him about it -- he denied that he

13  had a deal on the back up time?

14     A     I don't recall his response.

15     Q     Could you -- even in light of the Court's ruling on

16  the subject, have asked a series of questions that did not

17  require acknowledgment by Freed as to whether he did or did

18  not have a deal with the prosecutors concerning the back up

19  time?

20     A     Yeah I mean, the point of that -- and this is -- it

21  is not different than the way the Federal system works, is it

22  is not necessarily about what has been promised you, it is

23  about what your expectation is.  And I mean, look I have

24  said, I practice in the Federal system and even in the State

25  system, it is not unfamiliar to me to have represented

**App. 187**

1   someone who was cooperating and has an expectation of a

2   benefit. So the issue isn't -- and because the benefits

3   rarely defined, it is usually a little grayer up to the judge

4   for example, in the Federal system they say you know you get

5   up to four levels off the range, your base offense level and

6   the Federal --- vernacular but the judge can give you more

7   and you hope for more.  So at the end of the day, I think the

8   issue is what your hope is or your expectation is and not

9   necessarily what has been promised you in black and white.

10      Q     And to that -- what I would like to now do, Mr.

11  Lawlor is compose a series of possible cross examination

12  questions for you.  Each one will be prefaced by the word,

13  "question" and the question I want you to respond to at the

14  conclusion is whether you considered asking questions like

15  this  or similar ones during your cross examination?

16          MR. RUSSELL:  I am going to object. I think that is

17  leading him.

18          MR. HUT:  I don't actually know how else --

19          THE COURT:  I don't know how else he can ask it.

20          MR. RUSSELL:  Well, --- leading him.

21          THE COURT:  He is not necessarily leading because

22  the question doesn't necessarily suggest the answer.  Mr.

23  Lawlor could say yes that would be one approach or he could

24  say that would not be an approach.

25          MR. RUSSELL:  Well, I think it is -- respectfully I

**App. 188**

1   think it is --

2          THE COURT: But it is not like leading him in the

3   sense of isn't it true that you saw blank happen?  I don't

4   know how you get around asking a question of a witness -- is

5   this a possible question?  I am going to overrule but I will

6   see where it goes.

7          MR. HUT: I was going to ask him --- and then ask if

8   that would have been a possible --- examination?

9          THE COURT:  Well, I mean, well that is pretty

10  speculative.  I am going -- go ahead and ask him and let me

11  see where you stand and let me think about it in light of the

12  State's objection.

13         BY MR. HUT:(Not near a microphone)

14    Q    So the end question would be for you whether you

15  considered any or all of the questions that I am about to

16  impose?  Question:  Mr. Freed, did you discuss with your

17  counsel the 7 years back up time that you face on State

18  charges?  Question:  Mr. Freed, did you or your counsel

19  discuss the possibility that you would receive a reduction of

20  time you faced on those charges if you testified against

21  Stephens? Question:  Mr. Freed, did you think that was a

22  possibility?  Question:  Mr. Freed, did you or your counsel

23  discuss that you would approach the State to seek reduction

24  of the time on your probation violation in return for

25  testimony against Stephens?  Question:  Mr. Freed, were you

1  hoping that the State would in response to any such approach

2  agree that back up time would be served and run concurrently

3  with your time under the Federal handgun charge?  Question:

4  Would you ever ask your lawyer whether she had discussed the

5  deal with the prosecutor?  Question:  Did she decline to

6  answer you?  Question:  Did she explain as she declined to

7  answer you that she wouldn't answer the question because she

8  didn't want you to have to testify as to what she told you?

9  Question:  Mr. Freed you expected that she had talked to the

10  State prosecutors didn't you?  Question:  You expected that

11  she would work a deal?  Question:  Or wouldn't ---.  Would

12  you have an answered -- asked those questions of the witness

13  consistent with Judge Hackner's ruling?

14       A     Yes I mean, again I think the point is in -- there

15  is the issue of whether or not a deal was disclosed to him

16  which apparently there was not.  So I guess that question was

17  cut off.  But whether or not and if I am understanding that

18  line of questioning correctly, whether or not he had either

19  had a conversation with her lawyer or merely had an

20  expectation that his lawyer would seek a benefit or reach out

21  on that front or he would get a benefit I think was still

22  game.

23       Q     And if he had answered no or declined to answer

24  some of those questions, would you have still have achieved

25  part of what you hoped to in suggesting benefits or hoped for

76

1    benefits?

2         A    Sure.

3         Q    If you had not as you say lost your legs, do you

4    think you might have asked some of those questions?

5         A    Yeah I just think I should have -- I mean I know

6    the law in this, I cross examined 50 cooperators like this, I

7    have represented 50 cooperators like this so I understand the

8    difference between an expectation and a black and white

9    promise and I think -- I think I just -- I should have been

10   hip to that.  That distinction.

11        Q    Was your decision not to ask questions like the

12   line that we just discussed a strategic decision by the

13   defense team?

14        A    No.

15        Q    Showing you what has been marked as Defendant's B,

16   Mr. Lawlor, do you receiving a copy of a letter dated January

17   14, addressed to you and Mr. Proctor signed by David Ash, on

18   or around the time that it was written?

19             THE COURT:  What year is that?

20             MR. HUT:  January 14, 2010.

21                              (The document referred to was

22                               marked for identification as

23                               Defendant's Exhibit B.)

24             THE COURT:  This case spanned a number of years.

25             MR. HUT:  It did.

**App. 191**

1          THE WITNESS:  I don't recall specifically receiving

2   this but that is my name and address and I trust that that I

3   did.

4          BY MR. HUT:

5      Q    Let me direct your attention to -- if you page

6   through it, the pages aren't numbered, but I am asking you to

7   focus on what is the 7th page I believe.  It is a letter on

8   lined paper to what appears to Mr. Branum and then it is

9   dated February 23, and the date is illegible.  Are you with

10  me?

11     A    Yep.

12     Q    And -- you see that on page -- the second page of

13  the letter, paragraph 5, describes a three page supplemental

14  report written by Corporal John Branum, --- homicide unit,

15  dated June 19, 2009, detailing receipt of a three page

16  handwritten letter attached from Jason Freed on February 23,

17  2009.

18     A    Paragraph 10?

19     Q    Paragraph 5.

20     A    Yes, I see. Yes.

21     Q    And looking at page 4, does that appear to be the

22  report from Corporal John Branum that is referred to in

23  paragraph 5?

24     A    Yes.

25     Q    Turning to the letter dated February 23, does that

1    appear to be the letter to Corporal Branum from Mr. Freed?

2        A    Yes.

3        Q    And directing your attention to the second

4    paragraph, you see the paragraph begins, "Also I remember"?

5        A    Also I remember, yes.

6        Q    And let me read it as best as I can, "Also I

7    remember someone saying ya'll can help me out with my State

8    issues, well I got my COP in Hartford County and I had to get

9    it postponed January 5, because they were going to give me

10   more time not knowing I was going to be helping in this

11   case." Did you -- do you see that?

12       A    I do.

13       Q    And although you testified that you had no specific

14   recollection, you have no reason to doubt that you received

15   this from the State as part of the State discovery on or

16   around the time it was written?

17       A    No, and I have  picture of the heavy sawed ---

18   steel real sharp(sic) so I do recall that.  But I am sure I

19   did receive this.

20       Q    You said you are sure you did receive it?

21       A    Did.

22       Q    Did you consider using this letter to cross examine

23   Mr. Freed about any benefits he had received from the

24   prosecutors with respect to the State back up time?

25       A    I don't recall -- I don't recall if I -- if this

**App. 193**

lnc

1    jumped out at my at this point.

2        Q    Well do you recall any -- do you recall whether not

3    using the letter during the cross examination of Mr. Freed

4    was  a strategic decision by the defense team?

5        A    No I mean, if he -- I mean, this just demonstrates

6    sort of beyond any doubt that he had a desire to achieve a

7    benefit by testifying.  Which he should I mean, that is --

8    there is no issue there.  That is the whole point of

9    cooperation is to achieve a benefit.  But it is obvious to in

10   addition to what was in his plea agreement in his federal

11   case that his indicates that he had a hope or expectation

12   that he would get some benefit on the State charge.

13       Q    And looking at this letter on page 7 of

14   Defendant's Exhibit B, how might you have used the letter in

15   your cross examination?

16       A    I would have just showed it to him and said please

17   read it.

18            THE COURT:  What -- you --

19            THE WITNESS: I would have just had him identify the

20   letter or Corporal Branum identify the letter and just had it

21   read into the record.  I don't know that it requires much

22   explanation beyond what he said right there.

23            BY MR. HUT:

24       Q    And let's turn now from the question of the

25   benefits to the question of Mr. Freed's ability to see what

lnc                                                                   80

1    he said he saw.  Do you recall that you established during

2    the course of the trial, the distance Mr. Freed's cell was

3    from the likely place of the assault?

4        A    I mean I know we made the effort to show you know

5    the width of each cell and therefore you could do basic math

6    that each cell door was 10 feet wide and the distance between

7    cell 10 and cell 20 would be 100 feet.

8        Q    And do you recall that during the closing argument

9    that you made in the case, that you argued that Freed's cell

10   was more than 100 feet away based on testimony from certain

11   of the eyewitnesses that the assault had occurred at or

12   around cell 44, does that refresh your recollection at all?

13       A    Yeah.

14       Q    Do you recall whether you elicited on cross

15   examination any testimony from Mr. Freed  about ambient noise

16   on the tier?

17       A    I don't know if I elicited that from him.

18       Q    Do you -- did you -- without regard from whom it

19   came, what was the tenure of the information you elicited

20   about noise on the tier?

21       A    I mean there were a number of inmates  obviously

22   and COs as well filed by both the State and the defense and I

23   mean, for example -- it is just noisy. You got 40 grown men

24   living in a small space and so you have TVs and radios but

25   also it was the summer and you know there is no central air

**App. 195**

1    there, so they had fans and it was you know it was loud.

2        Q    Did you Mr. Lawlor during the course of your cross

3    examination, impress Mr. Freed how getting the sound

4    conditions --- he was able to -- let me withdraw that and ask

5    a foundation question.  You recalled that we testified that

6    though he could not see the blows being struck by inmates

7    that he identified as Harris and Stephens, he could hear them

8    being struck?

9        A    Yeah I do recall that.

10       Q    Did you press him further on cross examination as

11   to how he could have heard those impacts given the noise

12   conditions?

13       A    Not that I recall.

14       Q    Do you recall why not?

15       A    I don't.

16       Q    Was that a strategic decision?

17       A    No, I think I was just surprised by that.  That

18   that made -- that didn't make a lot of sense that he would

19   hear and not see something from that distance.

20       Q    Other than your own surprise, did you do anything

21   to convey the disbelief ---

22       A    I don't think through Mr. Freed, no.

23       Q    On cross examination, did you elicit any testimony

24   from Mr. Freed about the lighting on the tier?

25       A    I don't recall whether or not I elicited any of

1    that through him.

2        Q    Whether or not you did through him on cross

3    examination, did you press Mr. Freed on how given the

4    prevailing lighting conditions he was able to see and

5    recognize either Mr. Stephens or Mr. Harris?

6        A    I can't say that I recall whether I did or I

7    didn't.

8        Q    You were aware were you not  that Mr. Stephens was

9    an African American?

10       A    Yes.

11       Q    And were you aware that -- do you recall whether

12   Mr. Stephens who is now has a beard, also had a beard at

13   trial?

14       A    I don't recall. He looks about the same except his

15   hair is shorter.  But I can't recall the beard honestly.

16       Q    Did you undertake to find out whether he was

17   wearing a beard at the time of the incident in July of 2006?

18       A    I mean I met with him a day or two later so I

19   probably would have known that then, but I don't recall

20   whether he did.  Like I said, my -- looking at him now, I

21   want to say that he did but I say that with no certainty

22   whatsoever. But I think I would have known then whether or

23   not he had a beard on the 25th of July.

24       Q    If the parties have stipulated that in addition to

25   Mr. Stephens there were 33 African American inmates on Tier

lnc

1    IV with beards.  Have you -- do you recall making an

2    investigation to determine anything like that?

3        A    I don't.

4        Q    So if you made no such investigation, did you make

5    a determination that you would consider highlighting in cross

6    examination that fact?  Instead of calling into question his

7    ability to distinguish 34 people who were African

8    American males with beards?

9        A    No, I don't remember -- I don't remember being -- I

10   mean, I met most of the men who lived on that tier and I saw

11   the cell assignments but I don't recall you know making a

12   sort of statistical analysis of how many were African

13   American versus white or how many had beards or didn't.

14       Q    Was not underscoring the point with respect to the

15   numbers of inmates with beards a strategic decision on the

16   part of the defense team?

17       A    No that is just something that I didn't

18   contemplate.

19       Q    Do you recall any thing about whether Freed

20   testified that the assailants he saw wore hats?

21       A    I don't recall.

22       Q    Was a decision -- did -- withdrawn, did you do

23   anything to call to the attention of the jury whether the

24   assailants as identified by Mr. Freed were wearing hats at

25   the time?

**App. 198**

lnc
84

1    A    Not that I recall.

2    Q    Was not doing so the result of a strategic choice

3    by the defense team?

4    A    No, I don't think I considered them or am aware now

5    the significance of it.

6    Q    Do you recall that Freed testified that both Harris

7    and Mr. Stephens were wearing gray sweats at the time of the

8    assault of Corporal McGuinn?

9    A    I do recall that yeah.

10   Q    If you recall that witnesses who resided on the

11   tier and were subsequently called by the defense also

12   testified that the attackers were wearing gray sweats.

13   A    Yes.

14   Q    Do you recall testimony by corrections officers who

15   performed a search of Mr. Stephens' cell if they didn't find

16   or did not recall finding any gray sweats in that cell? Do

17   you recall that Mr. Lawlor?

18   A    I can't remember the testimony but I recall arguing

19   it in closing so I can surmise that there was testimony to

20   that effect.

21   Q    Do you recall whether any of the State's witnesses

22   who may have performed the search of the cell testified that

23   they found nothing of evidentiary value of the cell?

24   A    Say that one more time?

25   Q    Do you recall individuals, correction officers who

**App. 199**

1   testified -- who participated I should say in the search of

2   of the cell testifying that they saw no sweats of evidentiary

3   value during the course of the search?

4        A    I don't recall no.

5        Q    Do you recall corrections officers who made a

6   search of the Harris cell testify that they had found a gray

7   sweatshirt in Harris' cell later determined to have Corporal

8   McGuinn's blood on it?

9        A    Vaguely yeah I do recall.

10       Q    And you mentioned earlier that you do recall making

11  mention of sweats and the absence thereof as it affected

12  Mr. Stephens during closing argument.  Did I understand you

13  right?

14       A    Right.

15            MR. HUT:  Court's indulgence.

16            THE COURT: Of course. I am going to go to about

17  12:00.  And since there is no jury, I am not going to take a

18  break.  If there was a jury,  I would take a break.  But if

19  you need to go to the bathroom tell me.

20            THE WITNESS:  Your Honor I have a meeting at 2:00

21  that given the timing now I don't know that I am going to

22  make. I am wondering could we take 5 and let me call and

23  cancel that?

24            THE COURT:  Where is it?

25            THE WITNESS: I have to meet an inmate with an

1   interpreter at the D.C. jail and I need to call off the

2   interpreter.

3          THE COURT:  Yes, we probably should.  So you can

4   make that phone call.  So against my previous comment we are

5   going to take a short break so you can may call.  Does your

6   client need to use the restroom? Because if he does, it takes

7   a while to go up and down.

8          MR. HUT:  He just indicated to me that he would

9   like to.

10          THE COURT:  All right.  Officers, deputy if you

11   woudl please have Mr. Stephens take him downstairs and bring

12   him right back up once he is done.  All right, so we will

13   take a short break.  Do you need -- do you have your phone?

14          THE WITNESS:  I have my phone and yeah if I can

15   just step in the hallway.

16          THE COURT:  Of course, you can.  All right, we will

17   take a short break.

18          THE WITNESS:  Thank you.

19          (Whereupon, at 11:22 a.m. a brief recess was taken

20   and the case was recalled at 11:29 a.m.)

21          THE COURT:  All right, recall the case.

22          MR. RUSSELL:  Your Honor, we will call Lee Stephens

23   versus the State of Maryland and it is case number 02-K-08 --

24          THE COURT: I think it is actually State versus Lee

25   Stephens. He has filed but it is in the system as State v

**App. 201**

1    Stephens and he is the respondent -- well he is the

2    petitioner but the official case title I think stays the

3    same.

4              MR. RUSSELL:  Okay then I will call it that way,

5    Your Honor, I apologize.  Call State versus Lee Stephens,

6    case number 02-K-08-646, David Russell, R-u-s-s-e-l-l on

7    behalf of the State.

8              THE COURT:  Thank you.  Counsel, could you restate

9    your name?  You don't have to spell your name.

10             MR. HUT:  Stephen Hut for the petitioner, Mr.

11   Stephens.

12             THE COURT:  Ms. Gostin?

13             MS. GOSTIN:  Isley Gostin for the petitioner.

14             THE COURT:  Mr. Eagles?

15             MR. EAGLES:  Thad Eagles for the petitioner.

16             THE COURT:  Thank you so much.  Madam Clerk, please

17   remind the witness.

18             THE CLERK:  Sir, I will remind you that you are

19   still under oath, if you could just state your name again for

20   the record.

21             THE WITNESS:  Sure, Michael Lawlor.

22             THE CLERK:  Thank you.

23             THE COURT:  All right, we will continue with the

24   testimony.  Did you make your phone call?

25             THE WITNESS:  I did, thank you.

**App. 202**

lnc                                                                 88

1              THE COURT:  Okay, certainly go ahead.

2              MR. HUT:  Your Honor, if I may just as a matter of

3    housekeeping. Petitioner offers Defendant's A and B in

4    evidence.

5              THE COURT:  All right.

6              MR. RUSSELL:  No objection, Your Honor.

7              THE COURT:  They will be admitted.

8                                   (The documents marked for

9                                    identification as

10                                   Defendant's Exhibits A and B

11                                   were received in evidence.)

12                  DIRECT EXAMINATION(Resumed)

13             BY MR. HUT:

14        Q    I put on your table Mr. Lawlor what has been marked

15   for identification as Defendant's C, do you see it?

16        A    Yes.

17        Q    And do you see that it is comprised of 4 photos,

18   the -- the first two appear to be substantially similar if

19   not identical?

20        A    Yes.

21                                   (The photos referred to were

22                                    marked for identification as

23                                    Defendant's Exhibit C.)

24             BY MR. HUT:

25        Q    Do you recall that the State produced to you photos

**App. 203**

lnc

1   taken by a crime tech named Ms. Kalothus(sic)?

2      A   I recall -- yeah I recall receiving pictures,

3   certainly.

4      Q   And do you recall that photographs from Ms.

5   Kalothus were offered and admitted into evidence at trial?

6      A   Yes.

7      Q   And directing your attention to the photographs

8   that comprise Defendant's C, do you by chance recall whether

9   these photographs were among those taken by Ms. Kalothus that

10   were admitted into evidence?

11      A   I do not recall that, no.  I don't recall whether

12   or not these photos were admitted in evidence.

13      Q   Do you recall testimony by an Officer Mayo during

14   the course of the trial about certain photographs that were

15   taken of Mr. Stephens' cell?

16      A   I can't say that I remember his name but I remember

17   obviously a pretty full exploration of photographs of Mr.

18   Stephens' cell.

19      Q   And directing your attention to --

20      THE COURT:  Can -- I don't know the gentleman in

21   the back but could you speak to him about that phone?

22      MR. HUT:  I can actually Your Honor -- I should

23   have -- with apologies for him, Your Honor, identify him as

24   he is Dr. Daniel Spitz. He will be one of our expert

25   witnesses later today and with Mr. Russell's agreement, he is

1   going to sit in the courtroom.

2          THE COURT:  He can sit in the courtroom but he

3   can't --

4          MR. HUT:  I know that he can't use his phone.

5          THE COURT:  But that big huge notice and then there

6   is the other over there, the red sign on the door and the

7   notice right over there.  And then he has got it right in

8   front of his face as he is working on it like an 18 year old.

9   A little too much.   If he wanted to be slightly discrete and

10  maybe told me about it.  So you do recall that there were

11  photos of the cell, you don't know if these were the photos

12  and you can't recall if that was Officer Mayo but you know

13  there were a lot of photos on the --

14         THE WITNESS:  Yes, obviously we spent a lot of time

15  talking about evidence in or around Mr. Stephens' cell.

16         THE COURT:  Okay, go ahead Mr. Hut.

17         BY MR. HUT:

18    Q    Looking at the photographs that comprised

19  Defendant's C, does it appear to you that they show sweats?

20  So for example directing your attention to the first two

21  pages, balled up just to the right of the navy garment on the

22  right hand side of the picture are -- is a gray object and it

23  appears -- does that look like a piece of sweat clothing?

24    A    The first three are hard to see but obviously the

25  last one is pretty evident. I am having -- I am having a hard

**App. 205**

1   time getting adjusted to the angle on the first three but --

2   obviously the fourth one is pretty plain.

3        Q    Did you consider Mr. Lawlor highlighting for the

4   jury that these photos and identical ones that may have been

5   in evidence showed in fact sweat clothing in  Mr. Stephens'

6   cell?

7        A    Well, I mean, given the circumstances I would have

8   wanted to do that.  I don't recall -- I want to answer it

9   this way, the way that the division of labor went during the

10  trial, Mr. Proctor had more responsibility if you will and I

11  don't know if it was all or more of the examination of

12  witnesses about certainly blood and experts but I don't

13  recall whether or not that division broke down to the people

14  who took the photographs as well, I don't recall.  But I

15  mean, that is of no moment.  Obviously I would have advised

16  him to make use of this photograph if we did not.

17       Q    From your perspective was any failure by the

18  defense team including you and Mr. Proctor to use these in

19  highlighting the existence of sweats in the cell a strategic

20  decision on your part?

21       A    No, I mean, especially given how much time we spent

22  you know talking about the contamination and you know where

23  blood was and wasn't -- the notion that the only State's

24  witness, eye witness said that the assailants wearing sweat

25  pants.  I would have wanted to highlight a clean pair of

**App. 206**

lnc

1   sweat clothing in Mr. Stephens' cell.

2        Q    So instead of arguing as you did, asking the jury

3   where were the sweats?  Would you have preferred to argue to

4   the jury had you known about evidence supporting it that

5   there were sweats in Mr. Stephens' cell, there were just no

6   sweats that contained any Corporal McGuinn's blood?

7        A    Yeah I mean as I said, you know the blood evidence

8   was a -- what we perceived to be the lack of reliability or

9   contamination of that evidence was significant and I would

10  have loved nothing more than to be able to wave a picture

11  around during closing as opposed to just arguing that where

12  are they if they were there and they were clean.

13       Q    Now, at the time of Mr. Stephens' trial, did you

14  have an understanding whether he had a prior murder

15  conviction, Mr. Lawlor?

16       A    I understood that he did, yes.

17       Q    And did you have an understanding as to his

18  sentence in connection with that conviction?

19       A    I am sure I did, yeah.

20       Q    Do you recall what it was sitting here today?

21       A    I mean I know it was life, I don't know if it was

22  life and change or just life.

23       Q    And did you have an understanding as to whether had

24  Mr. Stephens' elected to testify on his own behalf at trial,

25  he would have been impeachable with his prior conviction to

**App. 207**

lnc

1   which you just made reference?

2      A    I believe that murder is an impeachable conviction

3   under Maryland Rule 5609.  So I would assume -- do assume

4   that he could have been impeached with that prior conviction.

5      Q    And did Mr. Stephens in fact waive his right to

6   testify in his own behalf at trial on the record?

7      A    I know he didn't testify, I don't recall the waiver

8   with any particularity.

9      Q    Do you have any recollection whether the Court had

10  a colloquy with him prior to any waiver?

11     A    No, I don't recall a colloquy but I know he didn't

12  testify.

13     Q    Did you and Mr. Stephens discuss the question of

14  whether he shouldn't testify at his trial?

15     A    I am sure we did but I don't recall the

16  conversations.  I am -- maybe I should rephrase that.  I

17  don't even recall that I am the person who spoke with him

18  about that. But I am sure some member of the defense team

19  did.

20     Q    And do you know what advice if any one or more

21  members of the defense team would have conveyed to him

22  concerning testifying in his own behalf?

23     A    I don't recall.  I mean, he didn't testify and I

24  doubt that I advised him to testify.  But as I advise all of

25  my clients, it is not my decision. That is obviously that --

**App. 208**

lnc
94

1   there are three decisions a client gets to make.  Trial,

2   judge, testify.  So I would have made that -- I would have

3   made that plain.

4           THE COURT: You have to add a fourth. Insanity.

5   Treece versus State they are the only ones who can elect, you

6   can argue for competence but --

7           THE WITNESS:  I didn't know that.  You learn

8   something new every day.

9           THE COURT:  James McCarthy taught me that years

10  ago.

11          THE WITNESS: That is why you are a judge and I am

12  in the witness box.

13          THE COURT:  I don't know, Mr. Trainor might know

14  another but those are the four that I am well aware of.

15          MR. HUT:  I only know the three that Mr. Lawlor

16  just referenced to.

17          THE COURT:  Treece versus State it is a very old

18  case.  Only the defendant can elect to plead and go forward

19  on not criminally responsible however, any -- either the

20  Court or the defense or the State can go forward on

21  competence and allege that there is a lack of confidence.  So

22  it is actually an anomaly because you can get a situation

23  where someone  is not competent with a NCR and the defendant

24  can elect not to go forward.  The classic example is they are

25  NCR and they face 60 days on disorderly conduct.  You could

**App. 209**

lnc

1    prove NCR but why would you when they face a lifetime

2    commitment versus 60 days.  So, but <u>Treece</u>, is out there.   T-

3    r-e-e-c-e.  I don't think it has ever --

4         MR. HUT:  I remembered the case I just didn't

5    remember the whole --

6         THE COURT: Yes, it is the fourth one.

7         BY MR. HUT:

8    Q    Do you know Mr. Lawlor or  do you recall whether

9    the fact of Mr. Stephens' conviction in Wicomico County

10   factored into advice that you or the defense team gave him

11   about whether he should testify at trial?

12   A    Like I said I don't know that I am the person who

13   spoke to him.  But naturally that would have regardless of

14   who spoke to him the fact that he could be impeached and have

15   the jury in the guilt phase know that you were convicted of

16   murder would have been something we would have discussed.

17   Q    And during the guilt or innocence phase of trial

18   which was the first, I take it to the fact of Mr. Stephens'

19   incarceration --- be  known to the jury?

20   A    Right.

21   Q    And did the jury also know to your recollection

22   that the Maryland House of Corrections was a maximum security

23   facility?

24   A    That I don't know but you know they would have made

25   certain deductions based on  you know the people that did

lnc

1    testify because there weren't a shortage convicted of murder

2    who were witnesses.

3        Q    And when you say witnesses, witnesses for the State

4    and the defense, correct?

5        A    Both yes.

6        Q    And Mr. Lawlor, I may have asked you earlier about

7    the number of murder trials that you have participated in as

8    defense counsel.  If I did let me break it down a little bit

9    more specifically.  How many do recall charges of first

10   degree murder have you defended, approximately?

11       A    Like to trial or just representation period?

12       Q    How about to trial and through trial?

13       A    Probably more than 20 probably have gone to trial.

14       Q    And ones that have not proceeded to trial,

15   approximately how many of those?

16       A    You know maybe 50, maybe 75.  I am guessing there a

17   little bit but a lot.

18       Q    And in addition to the Stephens' trial, how many of

19   those were capital cases?

20       A    Other than Mr. Stephens' case, I have only had

21   other case that proceeded to a capital trial and it didn't

22   make it to the penalty phase.

23       Q    And given the array of murder cases --- how would

24   you assess the strength of the State's case in the

25   prosecution against Mr. Stephens?

lnc

1     A     I would say that the evidence here was not strong.

2     Q     Can you elaborate that in any way for His Honor?

3     A     Sure.  I mean there were really only two components

4     to the State's case. Which was well, two major components and

5     they were -- the testimony of Mr. Freed and then the blood

6     evidence.  Mr. Freed was impeachable for the reasons that we

7     discussed.  And the blood evidence was imperfect in my mind,

8     there was a lot of evidence.  I think there was evidence

9     undisputed that there was contamination.  There was this mesh

10    bag which became a thing during the trial in part because of

11    its evidentiary significance and in part because of Mr.

12    Proctor's accent he couldn't say mesh bag.

13         He couldn't say it in a way that people could

14    understand him but you know they had officers as opposed to

15    crime scene people coming in and just putting piece of

16    evidence A in a bag with piece of evidence B, so you have

17    cross contamination.  You had naturally because of the crime,

18    COs rushing the tier, the crime scene and trampling through

19    it.  There was the fact that Corporal McGuinn had ran

20    sprinted from one end of the tier to the other while

21    bleeding.

22         There was a suspected spot of blood somewhere in or

23    in the vicinity of Mr. Stephens' cell that when we asked

24    someone there collecting evidence why he didn't collect that,

25    he indicated that he forgot to.  So I just think that Mr.

**App. 212**

lnc

1    Freed's testimony had liabilities and the physical evidence

2    had liabilities.

3              MR. HUT:   Thank you, Mr. Lawlor, I have no further

4    questions of the witness.   We do offer Defendant's C in

5    evidence, Your Honor.

6              THE COURT:   I will accept that.

7              MR. RUSSELL:   No objection.

8              THE COURT:   All right.

9                                    (The document marked for

10                                   identification as

11                                   Defendant's Exhibit C was

12                                   received in evidence.)

13             THE COURT:   Cross examination?

14             MR. RUSSELL:   Thank you, Your Honor.

15                       CROSS EXAMINATION

16        BY MR. RUSSELL:

17        Q    Good morning, Mr. Lawlor.

18        A    Good morning.

19        Q    So you said that you had one death penalty case

20   that went to the actual penalty phase, is that right?   This

21   one?

22        A    Right and I --

23        Q    And one that did not go to the penalty phase, is

24   that right?

25        A    I am sorry.

**App. 213**

1      Q    And one that did not make it to the penalty phrase

2   but it went through the trial phase?

3      A    Yes, we went through the guilt phase and the

4   defendant was -- I was not lead counsel on that case.  But --

5           THE COURT:  I am sorry, I am confused.  I thought

6   you said you had only one other capital case that went to the

7   penalty phase?

8           THE WITNESS:  No, I only had one other capital case

9   that proceeded to trial and the defendant was not convicted

10  of first degree murder so it did not proceed to the penalty

11  phase.

12          THE COURT:  So one capital case that went to --

13          THE WITNESS:  This was the only trial that I have

14  ever had that I was a participant in another trial as the co-

15  defendant was death eligible but my client was not.  But this

16  is the only case I have represented the defendant that went

17  all the way to the penalty phase.

18          THE COURT:  That went to the penalty phase.

19          THE WITNESS:  Right.

20          THE COURT:  Okay.

21          BY MR. RUSSELL:

22      Q    And you represented two clients on death penalty

23  post convictions, is that right?

24      A    I represented more than two on death penalty post

25  convictions.

**App. 214**

1      Q      How many did you represent on death penalty post

2  convictions?

3      A      I worked for another lawyer when I first graduated

4  from law school, Fred Bennett and we represented Steven

5  Oakin, I mean so it was his representation but I was there

6  and I assisted in that.  And then I represented Wesley Baker

7  who was represented by the Federal Public Defender but they

8  retained me to handle a component of the warrant litigation.

9  So I didn't have -- I only represented him in a very narrow

10  piece of that case.  I represented Heath Burge(sic) on a post

11  conviction.  I for a moment represented Anthony Grandison,

12  Mr. Proctor and I but he discharged us.  And I think that is

13  it.

14      Q      Okay.  Some of these were federal cases and others

15  were State?

16      A      Those were all State.  I actually was -- I was

17  involved in a federal post conviction case but I had to

18  withdraw and I didn't see that through the hearing.

19      Q      Okay.  And you said you had at this point, you

20  guessed 100 trials?  Is that right?

21      A      No, no, no 100 is probably too many.  I have

22  represented probably more than 20 murder defendants have

23  proceeded to trial and I -- when I say 100 or even another 50

24  that didn't that is a real guess.  But I represented a lot of

25  other defendants in addition to 20 or 25 that went to trial,

1   I represented a lot more that didn't proceed to trial but

2   when I say 100 or 50 more that is a real, real guess.  That

3   sounds maybe to high now.

4        Q    Okay. And at the time that you undertook this

5   representation, you were aware of the ABA guidelines with

6   regard to capital cases, is that right?

7        A    Um hum.

8        Q    Okay and the ABA guidelines require that you had at

9   least two attorneys is that right?

10       A    Right.

11       Q    And so you had more than two attorneys, correct?

12       A    Correct.

13       Q    You had to have an investigator is that right?

14       A    We did.

15       Q    And you had an investigator?

16       A    Yep.

17       Q    They required that you had a mitigation specialist

18  is that right?

19       A    Correct.

20       Q    You had a mitigation specialist?

21       A    We had two.

22       Q    Two. Then you had to have somebody who had some

23  experience with metal health screening is that right?

24       A    Yep.

25       Q    And did you have somebody who had that experience?

1          A     We had professionals who could screen and we had

2     evaluations of Mrs. Stephens conducted by professionals.

3          Q     Okay.  And the guidelines also require that you

4     have access to the assistance of experts, investigative

5     professionals and other professional services, and you had

6     that isn't that correct?

7          A     We had -- yes we had assistance of experts and

8     investigators.

9          Q     And all of that was through the Office of the

10    Public Defender is that right?

11         A     Correct.  Everything was funded through them.  The

12    appointment was through the Office of the Public Defender so

13    they paid for my time and then they would retain I suppose

14    any experts that we requested and that they approved.

15         Q     Okay.  And the guidelines also required obviously

16    that you are licensed in the jurisdiction and you were,

17    correct?

18         A     Um hum.

19         Q     Also required that you had a commitment  to provide

20    zealous advocacy and high quality legal representation.

21    Would you say that you had that prior to this?

22         A     I would hope, yes.

23         Q     I would hope so too.  And I would assume if you

24    know that the public defender's office would look for that

25    sort of thing before they --- the case is that right?

lnc

1      A      I would assume that as well, yeah.

2             MR. RUSSELL:  Court's indulgence, Your Honor.

3             (Pause)

4             BY MR. RUSSELL:

5      Q      Now the guidelines also require that you had

6      certain skills in order to present somebody on a death

7      penalty case is that right?  Are you familiar with that?

8      A      Not offhand but I am sure that is true.

9      Q      Okay.  They require that you have a substantial

10     knowledge and understanding of the relevant State, Federal

11     and International law both procedural and substantive

12     governing capital cases. Would you say that you had that

13     skill going in?

14     A      I would hope, yes.

15     Q      So you would have to have the skill in the

16     management and conduct of complex negotiations and

17     litigation, would you say you had that skill going in?

18     A      I believe so.

19     Q      Says you have to have the skill and legal research,

20     analysis and the drafting of litigation documents, did you

21     have that skill going in?

22     A      Well I have someone who works for me who has that

23     skill.  And I am not sure I know my West Law password but I

24     hire well.

25     Q      The guidelines also require that you have a skill

1    in oral advocacy, would you say you had that skill going in?

2        A    Yes.

3        Q    The guidelines also require that you have a skill

4    in the use of expert witnesses and familiarity with common

5    areas of forensic investigation including finger prints,

6    ballistics, forensic pathology and DNA evidence, is that

7    something that you had skill in at that point?

8        A    I don't know if -- I have that but I think it was

9    covered by the defense in general.  Like I said, Mr. Proctor

10   I think -- I am not saying that I didn't have that skill as

11   much in more of the way the division of labor broke down that

12   Gary ended up handling more of those pieces of the

13   representation if you will.

14       Q    Okay.  The guidelines require that you have skill

15   in the investigation, preparation and presentation of

16   evidence barring upon mental status, is that something that

17   you would say that you or your team have skill in?

18       A    Sure.

19       Q    Okay.  The guidelines require that you have skill

20   in the investigation preparation and presentation of

21   mitigation evidence.  Is that something that you believe that

22   you have skill in at that point?

23       A    Yes.

24       Q    And finally they require that you have a skill in

25   the elements of trial advocacy such as jury selection, cross

**App. 219**

lnc

1  examination of witnesses and open and closing statements.  Is

2  that something that you had a skill in at that point?

3      A    Yes.

4      Q    Okay.  So based on the guideline, you were eligible

5  to represent somebody in death penalty cases is that right?

6      A    I believe so, yes.

7      Q    Okay.  Now you and Mr. Proctor filed quite a few

8  pretrial motions, is that right?

9      A    Um hum, yes.

10     Q    Any ball park idea of how many you think you filed?

11     A    I am not -- I just remember waves of hearings.

12     Q    Would you say dozens?  Is that a fair assessment?

13     A    I mean, a lot.  You know a lot -- obviously just

14  like the mandatory motions, search, ID but then there were a

15  capital case there is a lot of additional motions and then

16  death penalty law in the State was changing and so that

17  brought on additional number of motions as well.  So a number

18  I couldn't give you, but if we could think of something we

19  could put on paper, we would.

20     Q    And now you and or your investigator interviewed

21  every witness that was called is that right?

22     A    Every witness that was called?

23     Q    Yes.

24     A    By the State or the defense?

25     Q    Either.

**App. 220**

Case 1:18-cv-00493-RDB   Document 2   Filed 02/16/18   Page 223 of 912

1      A    Obviously we interviewed every witness that was

2  called by the defense.  We would have endeavored to have

3  identified  every witness that was called by the State, I am

4  sure that we never interviewed Mr. Freed but not because of

5  lack of desire but lack of permission.

6      Q    Right.  And in fact, you and your team interviewed

7  every person that was on that tier that day is that correct?

8  Or at least attempted to?

9      A    That is -- attempted to. Yes, we had a roster I am

10  sure and I recall going personally -- again I couldn't sit

11  her and say that I interviewed x number and our investigator

12  interviewed y number but I recollect you know, cris crossing

13  the state and interviewing people who lived on that tier.

14          THE COURT:  Let me interrupt.  How many were moved

15  following the --

16          THE WITNESS:  Well, the jail closed.  So everyone.

17          THE COURT:  The jail closed but you said you got in

18  right after --

19          THE WITNESS: I got in -- I was appointed right

20  after --

21          THE COURT:  After the charges or after the offense?

22          THE WITNESS: After the offense.  I met with Mr.

23  Stephens probably within 48 hours of the incident.

24          THE COURT:  I know but the House of Corrections

25  didn't close --

**App. 221**

1          THE WITNESS:  Yes,  I don't --

2          THE COURT:  -- it was a couple of years after that.

3          THE WITNESS:  That I can't recall. We didn't -- we

4    didn't probably have that roster until we got discovery. So

5    our interviews weren't instantaneous.

6          THE COURT: Okay but even if they had moved, they

7    told you where they moved to?

8          THE WITNESS:  Yes, I mean it is on the internet.

9          THE COURT:  Okay.  Right.

10          THE WITNESS: Right.  So we could find them and if

11    they were in Hagerstown, we went to Hagerstown and if they

12    were in Cumberland, we went to Cumberland.

13          THE COURT: Okay.

14          MR. RUSSELL:  Thank you.

15          BY MR. RUSSELL:

16     Q     And like I said you or your team interviewed or

17    attempted to interview every single person that was on that

18    tier that night is that right?

19     A     Right.

20     Q     You also filed two interlocutory appeals prior to

21    trial is that right?

22     A     Right.

23     Q     And those both actually went up on appeal, is that

24    right?

25     A     Meaning?

1      Q    Meaning that the Court of Special Appeals at least

2   responded to them is that correct?

3      A    I can't -- one went the Court of Appeals took and

4   dismissed and I can't remember the other -- I mean, I am sure

5   they did but I don't recall -- I can't even recall the

6   substance of them right now to be honest with you.

7      Q    Okay.

8           THE COURT:  About 5 more minutes and I want to take

9   a break because I need to be mindful of the staff and the

10  court reporters, the correctional officers, deputies and et

11  cetera.

12          MR. RUSSELL:  Okay.

13          THE COURT:  So if you are going to move to a new

14  area let me know.

15          MR. RUSSELL:  I was about to.

16          THE COURT:  All right.

17          MR. HUT:  Were you anticipating a lunch break in 5

18  minutes, Your  Honor?

19          THE COURT: Yes.  It is almost 12:00.  We have been

20  given instructions that our lack of desire to eat lunch

21  interferes  with certain requirements to allow the staff to

22  get lunch.  And certain laws.  So I have been trying to

23  follow the rule.

24          MR. HUT:  Okay I inquired only because I had hoped

25  to get the next witness in before lunch but if we can't, she

lnc

 1   will understand.

 2              THE COURT:  I -- downstairs they have certain times

 3   when they have food.  Hopefully he has a lunch plus I also

 4   have another about 70 items that I have to address back in

 5   chambers.  All right, we will take a break for lunch.  Can I

 6   see counsel at the bench for just a minute?

 7              (Whereupon, the bench conference follows.)

 8              THE COURT:  Who -- has --- notification been

 9   complied with?

10              MR. RUSSELL: Yes.

11              THE COURT:  Okay so then I don't know who the

12   people are --

13              MR. RUSSELL:  They are ---

14              THE COURT:  Are they friends? Family? I don't know

15   because they --

16              MS. GOSTIN:  Some of them are the family of the

17   petitioner.

18              THE COURT:  That is fine.  Because they normally

19   sit on this side.  That is why I wasn't sure and I just

20   wanted to make sure that you had complied with victim

21   notification and --

22              MR. RUSSELL:  And we have spoken with them and they

23   are in New Jersey and they chose not to come.

24              THE COURT: That is fine.  Again I don't know who is

25   coming in and it is you know something that I want to be

1    mindful of because of obviously security with people in the

2    courtroom.  So they were watching him and I have to repossess

3    deputies if let's just say they are not friendly to the

4    defendant.

5              MR. HUT:  They are --

6              MS. GOSTIN:  I believe that the people who are

7    still in the courtroom now are the defendant's family.

8              THE COURT:  That is fine then that alleviates a

9    concern.

10             MS. GOSTIN:  I did see another point --- but I know

11   that --

12             THE COURT:  It alleviates a concern, it makes it a

13   whole lot easier.  You can leave everything here.

14             MR. HUT:  What about overnight?  That would be now

15   be the question this afternoon?

16             (Whereupon, the bench conference ends.)

17             THE COURT:  You can leave your stuff overnight.

18             MR. HUT:  Okay, thank you.

19             THE COURT:  I have to teach tonight so I will be

20   leaving around 4:30 but you can leave everything.  There is

21   no problem with that is there?

22             THE CLERK:  Not at all, no.  The deputies will lock

23   the courtroom and then they leave --- courthouse personnel

24   and then we are usually back up here by 1:15, so --

25             MR. HUT:  I actually -- I communicated with

lnc

 1  chambers late last week to tell you that I think we are

 2  probably going to be short on witnesses today and possibly

 3  long tomorrow, but I don't think --

 4          THE COURT:  All right.

 5          MS. GOSTIN:  Possibly not because we still have

 6  three more witnesses today who are available.

 7          MR. HUT:  Yes but I think we will get through them.

 8  They are short.

 9          THE COURT:  Okay.  Just remember, the talking

10  heads, things fall apart, becomes better.  Scientific.  The

11  rest of my week? I am going back to my Socks case.

12          MR. HUT:  What is a socks case?

13          THE COURT:  You don't know about a Socks case?  My

14  Socks case.  No it is not over.  We have moved to attorney's

15  fees.

16          MR.            :  The red ones or the white ones,

17  Your Honor.

18          (Whereupon, another case was discussed.)

19          (Whereupon, at 12:03 p.m. a luncheon recess was

20  taken.)

21

22

23

24

25

**App. 226**

1              A F T E R N O O N   S E S S I O N

2              (Whereupon, at 1:31 p.m. the case was recalled.)

3              THE COURT:  Good afternoon, you can all have a

4      seat.  Mr. Russell if you could call the case?

5              MR. RUSSELL:  Thank you, Your Honor, it is the

6      State of Maryland versus Lee Stephens, case number 02-K-08-

7      646.  David Russell, R-u-s-s-e-l-l on behalf of the State.

8              THE COURT:  Counsel, if you could spell your name

9      and state your name for the afternoon session.

10             MR. HUT:  Good afternoon, Your Honor, Stephen Hut,

11     for petitioner Mr. Stephens.  That is H-u-t.

12             MS. GOSTIN:  Isley Gostin, G-o-s-t-i-n for the

13     petitioner.

14             THE COURT:  Thank you, Mr. Eagles.

15             MR. EAGLES:  Thad Eagles, for the petitioner and

16     that is T-h-a-d E-a-g-l-e-s.

17             THE COURT:  Thank you.  Mr. Lawlor, if you could

18     please come back up to the stand.

19             THE CLERK:  Sir, I will remind you that you are

20     still under oath, if you could state your name again for the

21     record please.

22             THE WITNESS:  Yes, Michael Lawlor.

23             THE CLERK:  Thank you.

24             THE COURT:  All right, you can go forward.

25             MR. RUSSELL:  Thank you, Your Honor.

1                     CROSS EXAMINATION (Resumed)

2               BY MR. RUSSELL:

3          Q     Good afternoon, Mr. Lawlor.

4          A     Good afternoon.

5          Q     Now the petitioner's claim is that this case was

6     overwhelming to you, would you describe that you were

7     overwhelmed by this case?

8          A     I mean I would -- I wasn't overwhelmed by the case

9     but the discovery was -- not necessarily just the discovery

10    too but we had subpoenaed records from the DOC and that came

11    in like 27 boxes of information.  It was massive, it was an

12    undertaking certainly.

13         Q     And was there anything specifically that the public

14    defender's office wouldn't pay for you to have that you asked

15    them to pay for?

16         A     Not that I am aware of, no not that we asked for.

17         Q     Okay.  Now you may have already answered this

18    question but let me make sure, with regard to the medical

19    examiner, that was Gary Proctor who was handling the cross of

20    the medical examiner, is that right?

21         A     That is right.

22         Q     Okay.  But you did consult with a medical examiner

23    of your own, is that correct?

24         A     I know that we did although again I don't recall

25    being a participant in that consultation.  And I believe

1    Mr. Proctor handled that himself.

2        Q    Okay.  Let's move on to the allegation that there

3    was a causation instruction that you didn't ask for.  Have

4    you seen the instruction that is suggested?

5        A    I mean, I read the petition and your reply.

6        Q    Okay.  And was that instruction -- the instruction

7    that was suggested was that ever discussed by you and Mr.

8    Proctor as being something you would ask for?

9        A    We never contemplated it at all.

10       Q    And just to be clear your theory of the case was

11   that Mr. Stephens did not stab Corporal  McGuinn is that

12   right?

13       A    Yes, our theory was that there was a perpetrator or

14   two, Mr. Stephens was not either.

15       Q    Okay.  And in fact part of your theory was that

16   this investigation was poorly done, is that fair statement?

17       A    Yes, I just -- you know I touched on this a little

18   with the questions from  Mr. Hut but if not the investigation

19   as a whole, certainly the crime scene itself was not well

20   preserved to put it mildly.

21       Q    And in fact you sought to introduce evidence that

22   the Department of Corrections had a history of planting

23   evidence is that right?

24       A    Yeah I have a recollection of an incident involving

25   someone by the name of Bradford Matthews but I don't think we

1    were permitted to get into that.

2        Q    Okay.  But that was something you sought to do and

3    Matthews was actually there at that time of trial is that

4    right?

5        A    I don't recall that but I recall you know, trying

6    to get into that.

7        Q    Okay.  And you were able to point out a number of

8    problems with the investigation particularly with the crime

9    scene is that right?

10       A    Yes like I said I -- you would have to remind me

11   about the investigation on a broader level.  I mean I am sure

12   that we brought out any problems that we perceived but

13   obviously the crime scene I think there was little doubt that

14   there were legitimate problems with contamination and

15   preservation and things of that ilk.

16       Q    And you brought that to the jury's attention, is

17   that right?

18       A    Yes, to the degree that we could, we tried to do

19   that yes.

20       Q    And in fact you pointed out that there was blood

21   evidence in the cell that hadn't been tested, is that right?

22       A    Yes.  I mean, like I said that was at least one

23   sort of particular line of questioning that I recall very

24   vividly.

25       Q    Okay. And you got out that the potential murder

lnc                                                                         116

1    weapon, the shank that they had found had been lost at one

2    point is that right?

3         A    I don't recall that.  I don't recall that specific

4    area.

5         Q    Okay.

6         A    But I mean I remember too them finding shanks in

7    the backs of cells and how much time there was delayed

8    between the crime and the search of cells and the nature of a

9    prison cell.  You know you could rid -- someone who lived

10   there could rid of themselves of that evidence in the time

11   there was between the crime and the search of the cells.

12        Q    And that -- the jury heard that right?

13        A    I believe -- I believe so.

14        Q    And you in fact brought out information that the

15   inmates were able to actually put things out of their cell

16   that would drop down into the -- another part of the prison,

17   is that right?  Do you recall that?

18        A    I don't recall that particular but I remember the

19   cell doors and my recollection is they were the hold -- like

20   you see on TV, bars. If I recall in fact, they brought one in

21   here I think.  So I can't remember if there was anything

22   between the door and the end of the tier and whether or not

23   there was mesh there or not.

24        Q    Do you recall the back of their cell actually

25   abutted what they called -- a pipe chase I believe is what

lnc

1    they called it?  Sound familiar?

2        A    Yes that sounds familiar.

3        Q    And there was a grate that they could actually put

4    things through that would end up in the pipe chase?  Does

5    that sound familiar to you?

6        A    Yes, without specificity vaguely it does, yes.

7        Q    And you also got out to the jury that a Officer

8    Palmer who was involved in the investigation of the crime

9    scene had actually later attempted to choke Mr. Stephens

10   right?

11       A    Yes, I think he admitted that though.  It was

12   disclosed and I think he had to testify to that fact.

13       Q    You also got in evidence that there was some

14   question about -- do you remember what they called the key?

15   Do you remember the key in this case?

16       A    That the doors wouldn't close and they could jam up

17   the mechanism so that they could open the doors?

18       Q    Right, the key was the mechanism that would jam the

19   doors.  Do you recall that?

20       A    Yes, I recall that, yes.

21       Q    And there was testimony about one that was located

22   in Mr. Stephens' cell, do you recall that?

23       A    A key?

24       Q    A key, yes.

25       A    I don't recall the testimony that they found the

1    key but I remember my recollection is that Mr. Stephens cell

2    was one that was capable of being jammed, I think.

3         Q    Let me ask you a few questions about Mr. Freed. So

4    you did the cross examination of Mr. Freed. Mr. Freed was

5    very forthcoming about his deal that involved his Federal

6    charges, is that a fair statement?

7         A    I don't recall whether he was but I mean, a federal

8    plea agreement is a very explicit document and as I

9    indicated, I practice in the federal court and so I know my

10   way around a federal plea.  So I don't think there was any

11   real debate there.

12        Q    Okay.  But he didn't make any denial that he was

13   getting  deal from the Federal Government?

14        A    No I don't recall him denying that, no.

15        Q    And you had asked him if he was getting a deal with

16   regard to his Hartford County case, correct?

17        A    I think I did, yeah.

18        Q    And he said he didn't know anything about a deal,

19   is that right?

20        A    That sounds right, yeah.

21        Q    Good.  And you tried to get into the violation of

22   probation and some of the things that he had done to violate

23   that probation is that right?

24        A    I don't recall that, no -- I don't recall that.

25        Q    Okay.

**App. 233**

lnc

1    A   I mean I assume the record speaks for itself so I

2  am not saying I wouldn't have explored that, I just don't

3  remember the -- all of the particular details of cross.

4    Q   Okay.  That is fine.  Now, Mr. Hut asked you some

5  questions that maybe potentially you could have asked him,

6  right?

7    A   Right.

8    Q   Do you know the answer to any of those questions?

9    A   Well only to the degree of the letter. I mean

10  obviously I don't know what he would have answered to any

11  question but the letter seems to indicate you know the

12  difference between being promised a benefit and having the

13  desire to obtain a benefit.

14    Q   So you would agree that he had a desire to obtain a

15  benefit?

16    A   So it appears yes.

17    Q   Which is probably true of most people wouldn't you

18  agree?

19    A   Well most cooperative -- not most people but most

20  people in Mr. Freed's situation are testifying you know,

21  cooperating.

22    Q   And other than what was put on the record by Mr.

23  Ash at the trial, you don't have any knowledge of any deal

24  that Mr. Freed was receiving for that State -- for his

25  testimony with regard to his State charges is that right?

lnc

1          MR. HUT:  Objection.  Then or now?

2          MR. RUSSELL:  At any point.

3          THE WITNESS:  I am not aware now whether or not he

4     was promised anything then or whether he received anything

5     later.

6          BY MR. RUSSELL:

7          Q    Okay.  And isn't it true that part of his federal

8     deal was that he could ask for a concurrent sentence?  Do you

9     recall that?

10         A    I don't.  But I don't know why he would have been

11    prohibited, I don't know that that needs to be an agreement.

12    I think that that just anybody could ask for concurrent time

13    in that situation.

14         Q    Okay.  Now with regard to Mr. Freed, when you went

15    in to cross examine him, was it our intention to make sure

16    that you could point out every single inconsistency of what

17    he had said?

18         A    Inconsistency in terms of prior statements or?

19         Q    Inconsistency with regards to his testimony of what

20    he had seen?  Well when I say inconsistency I mean things

21    that are inconsistent with being believable as opposed to

22    inconsistent with prior testimony?

23         A    Oh yeah I mean I guess that is right.  You tripped

24    me up a little bit with the inconsistency I mean  like I said

25    my goal was to -- and you know I don't have my file on him in

lnc

1    front of me so I am recollecting his testimony and I would

2    have wanted to show that he had a bias and that he had an

3    expectation of remuneration in exchange for his testimony.

4    That the physical layout of the tier made his testimony that

5    he could see what he said he saw implausible and then

6    obviously there was a delay in reporting -- I mean, there

7    were a number of other things that I recall he said that ou

8    know Mr. Stephens gave him  contraband or a shank on the day

9    of the offense.  And then you know just what i perceived to

10   be his callousness for a lack of a better term that according

11   to my testimony was that he recalled that he was aware of the

12   fact that this assault was going to occur and watched it.  So

13   that would have been sort of another component of the cross.

14   But -- I don't know if that answers your question but --

15       Q    Sure.  Just to clarify you went to make sure that

16   the jury knew what his bias was correct?  Because he was

17   getting a deal.

18       A    Right, right.

19       Q    And they knew that he was getting  a federal deal?

20       A    Right.

21       Q    You want them to know that what he was testifying

22   to was implausible?

23       A    I mean, in my mind, yes.

24       Q    In my mind --

25       A    Want to suggest that

**App. 236**

lnc

1    Q    Okay.  And do you feel like you were able to cross

2  examine him in a fashion that the jury would hear that?

3    A    I mean, I can't remember the particulars of that

4  line of inquiry with him so again I don't know if I -- how

5  far away he was like if he was 50 feet away from the crime

6  scene for example, I don't know if I could get that  out

7  through him because that is an issue of sort of new layout of

8  the tier.

9    Q    Right.  And you wanted to get out that he didn't

10  come forward until roughly five years later, is that right?

11    A    How ever long it was right.

12    Q    And that came out to the jury?

13    A    I assume.

14    Q    Now you said that you felt like you kind of lost

15  your footing is that the term that you used?

16    A    More or less.

17    Q    Okay.  Now was that the result that of not being

18  prepared?

19    A    No, I mean, you know witnesses are -- they are

20  unpredictable and I don't know how to quantify because I

21  don't think I can quantify it very well. But as I indicated,

22  I got into an exchange with him at the beginning of the cross

23  and it was -- I started to kind of flounder.  It was

24  literally a matter when I said I lost my legs, it was a

25  literally a by product of struggling and standing.  I should

lnc

1  have done my examination seated which sounds like a silly

2  thing I am sure but when it started to go well, I was sort of

3  physically -- I was unnerved I guess is how I put it.

4      Q    Okay and that wasn't as a result of not having the

5  experience to do cross examination for her is that correct?

6      A    No, I don't think it was a lack of experience.

7      Q    Okay.  And now later on, you actually  made a

8  motion to reopen the cross examination is that right?

9      A    Correct.

10     Q    And that was denied, is that correct?

11     A    Right.

12     Q    And part of the ruling was that Judge Hackner had

13  said well you have essentially you have already made the

14  point.  Is that fair to say?

15     A    I don't recall the ruling -- my recollection is

16  that that was on a narrow -- that that had to do with my

17  desire to ask him about institutional infractions that was

18  brought out of my motion, was broader than that.  And I know

19  the judge wouldn't allow me to reopen the cross but I don't

20  recall what the basis of the ruling was.

21     Q    Okay.  Now the petitioner also alleges that you

22  should have worked up some alternate suspects in this case.

23  Are you aware of that issue being raised?

24     A    I don't -- not specifically.

25     Q    Okay and at any point -- well let me back up.  I

 1    tink we have already established this, you or if somebody

 2    from your team interviewed or attempted to interview

 3    everybody on the tier is that right?

 4         A    Yes I mean we had a roster and I waived -- like I

 5    said I  know I personally met with people and we had an

 6    investigator who met with us so we certainly tried to.

 7         Q    Okay.  And do you recall Mr. Gales?  Was he

 8    somebody that he met with or somebody that you talked to?

 9         A    I recall him because he came forward at the

10    beginning of the case and then the State kind of dumped him

11    and I couldn't quite kind of figure out why and then I

12    remember -- I think I recall meeting with him and he was

13    cagey.  He wouldn't really speak with us.  I don't know if

14    our investigators spoke with him or not.  I don't think I

15    ever had a chance to interview him.

16         Q    Okay.  At any point did you and Mr. Proctor discuss

17    the possibility of raising an alternate suspect as a defense?

18         A    I am sure we discussed it but my recollection is

19    that we call four other inmates in the defense case in chief

20    and I don't believe that any of them could identify either

21    suspect, so I don't know.  I don't know -- I don't recall

22    discussing identifying a specific person as an alternative

23    suspect.  And whether or not that would have been consistent

24    with those witnesses testimony.

25         Q    Okay.  And isn't it true that raising that issue of

1    an alternative suspect that puts the burden on you then to

2    prove in front of the jury that somebody else did it, isn't

3    that right?

4         A    I mean it is not legal burden but you know

5    depending on -- depending on how you present it, that could

6    be a concern.

7         Q    Now with regard to the Wicomico County post

8    conviction, we have already seen the letter that you wrote to

9    Mr. Dorsey.  Were you paid for that work that you did on that

10   case?

11        A    Yes whatever I submitted they paid in full.

12        Q    Okay.  And there was never any question about

13   whether you had done the work?

14        A    I mean, the defense team did the work, I don't know

15   if it was me personally.   I mean, the bill that I sent

16   included time for Ms. Waters that she might have worked on

17   things that I didn't.

18        Q    And did that include the time that Mr. Proctor

19   spent?

20        A    No, he billed his own case.

21        Q    Okay.  So that is just your time?

22        A    Just my time.  Mine and Ms. Waters.  Like if we

23   were sitting in court together, I didn't bill her time and

24   mine but if she did discrete research on her own time, I

25   billed for that.

lnc

1    Q    Okay.  Now with regard to that Wicomico County

2  case, that was filed right before the 10 year deadline, is

3  that right?

4    A    That rings a bell now that you mentioned it, yes.

5    Q    Okay I mean literally days before the deadline.

6    A    Right.

7    Q    And in that filing there was an issue about Joseph

8  Kopera, is that right?

9    A    You know, I don't think I drafted the petition. I

10 know that as we sit here today that that is true. So yes.

11   Q    Okay.  And to your knowledge at any point that that

12 was pending did you get an offer from the State to resolve

13 it?

14   A    No, I mean, I don't think that we didn't reach out.

15 The litigation didn't progress that far.

16   Q    And is there any reason why the litigation hadn't

17 progressed?

18   A    Not a good one, no.

19   Q    Now, with regard to Mr. Stephens wanting to testify

20 in this case, I think you said you don't recall whether or

21 not you had ever talked to him about that is that right?

22   A    Yes.  I mean I don't know if I did or Gary did or

23 we both did.  I am sure someone talked to him.  But I don't

24 recall having that discussion with him personally.

25   Q    Okay and it would be correct that at that time he

lnc

1    had a conviction for murder and the jury did not know what

2    his conviction was for is that right?  At least during the

3    guilt portion?

4         A    During the guilt phase right.

5         Q    Okay.  And if you can recall would it have been

6    your intention to advise him not to testify in this case?

7         A    You know I can't say that really.  No, it is -- I

8    really can't answer that.  I don't know -- like I said it is

9    one of those things where it is not my decision to make, it

10   is his decision to make and I mean, he is a grown man and

11   he -- you know this was a different kind of case, somebody

12   with a life sentence facing a death sentence, I mean if he

13   wanted to testify I wouldn't have dissuaded him.

14        Q    Okay do you know what he would testify to?

15        A    I do know what he would have testified to.

16        Q    So you had discussions with him about  his

17   testimony?

18        A    Yeah.

19        Q    Okay.  And he was advised or you may have said that

20   you don't remember this, but he was advised on the record

21   that he could testify if he wanted to?

22        A    Yes I assume given that this was a capital case

23   that it was done on the record.  Not every judge has their

24   own sort of nuance with that, some want it on the record and

25   some make no mention to it and some will take the attorneys

**App. 242**

1  representation but what I know about Judge Hackner and the

2  capital case, I am sure it was on the record but I don't

3  recall the voir dire.

4      Q    Okay.  But we agree that if he had testified then

5  the jury would have learned that he was serving murder

6  sentence at that point, is that correct?

7      A    I mean, the conviction hadn't been vacated.  There

8  was no settlement at that time, so he would have been -- I

9  mean, we would have argued  you know 609 is a prejudice

10  component to it too.  So I think you know within 609 and

11  within 5403, we would have asked the judge not to permit that

12  impeachment.  But obviously I can't say what the judge would

13  have ruled on that so I would probably have assumed that the

14  judge would have permitted that impeachment.  And the jury

15  would have learned that.  I would have asked for an in limine

16  ruling on that which I think most judges will give you and

17  permit and again, given the circumstances of this case I

18  think he would have done that, Judge  Hackner would have done

19  that.

20      Q    So all that could have been done if he had asked

21  you -- if he had said to you I want to testify is that right?

22      A    Yes, we would have -- like I said now this isn't my

23  recollection of something that we talked about then just if I

24  have a client with a prior who wants to testify I would ask

25  for an in limine ruling on that.

**App. 243**

1      Q    All right, okay.

2           MR. RUSSELL: If I may approach, Your Honor?

3           THE COURT:  Certainly.

4           BY MR. RUSSELL:

5      Q    So the first thing I want you to look at, Mr.

6  Lawlor, is the -- what is already admitted as Petitioner's A,

7  this is your letter to Mr. Dorsey.

8      A    Okay.

9      Q    And according to that letter, your work was over

10  1,082 hours,  is that right?

11     A    Right.

12     Q    That is what you billed for?

13     A    Right.

14     Q    And you go on to say that you didn't bill for all

15  of the time of the case, is that right?

16     A    Right.

17     Q    Can you give us an estimate of how much time you

18  did that you didn't bill for?

19     A    No, because you know it is just like phone call,

20  Gary and I talk about something or you know you are working

21  at night on a cross and you are e-mailing back and forth or

22  you know.  But no I can't -- I couldn't give you an estimate.

23     Q    Okay.

24     A    But it is more just like if you are sitting down

25  and you are in trial, that is easy time to bill. If you are

1    writing a motion, that is an easy time to bill but you know

2    how it is the time is not quite as deliberate as you might

3    not keep as good of track of.

4         Q    Right.  And if you know, would you estimate that

5    Mr. Lawlor worked roughly the same amount of time?

6         A    Mr. Proctor.

7         Q    Mr. Proctor I am sorry.

8         A    I would have to assume in that ball park right.

9         Q    Okay so we would be saying minimum of 2,000 hours

10   spent?

11        A    Sure.

12        Q    Okay.  And the associate that you mentioned is

13   Ms. Waters, correct?

14        A    Right.

15        Q    And she worked essentially on -- you paid her to

16   work is that correct?

17        A    Well, like I said and this is still my practice and

18   I hope I don't get indicted for this by testifying to this

19   but you know if I have an associate working on a case, we are

20   in a meeting together, if we are in the jail together meeting

21   a client, if we are in court together, I don't bill two

22   times. But if I am reading the paper and she is writing a

23   motion, I bill for that time.

24        Q    Okay.  Mr. Lawlor I want to show you a document

25   that has been marked as State's 1. Do you recognize that

1    document?

2         A    Yes.

3         Q    And what is that document?

4         A    This is a internal to do list from this case.

5         Q    And that is from December of 2009, is that right?

6         A    That is the date of it, right.

7         Q    Okay and I would imagine these -- you probably did

8    more than one of these going through the course of the case

9    is that fair to say?

10        A    I mean I sure I personally did none of these but

11   yes many were created.

12        Q    Okay.  And so Mr. Lawlor would this be an accurate

13   reflection of the things that you were working at the time

14   with regard to this case?

15        A    Yes.

16                              (The document referred to was

17                              marked for identification as

18                              State's Exhibit 1.)

19             BY MR. RUSSELL:

20        Q    Okay.  I am going to point you to a few specific

21   pages.  So -- and I actually will tell you that I think this

22   is actually two different documents that I have put together

23   as one.  But so the pages actually start over again.  I am

24   going to start with the first page 6.  And what is listed as

25   H.

lnc

1    A    Okay.

2    Q    It says that you were requesting a base file for

3    each inmate on E4 at that time is that right?

4    A    You asked me whether or not we did request it or

5    whether or not --

6    Q    Well, first I am going to ask you whether it says

7    that?

8    A    It says that.

9    Q    And is that something that you actually did?

10   A    I can't answer that.  Like  I said we issued a

11   subpoena to DOC and we got 27 boxes in my mind -- so that is

12   my recollection of what we got.  And I can't remember if we

13   got them or if they were the State's Attorney's file or

14   office rather and we went there and reviewed them.  And there

15   was an issue of how to get them copied and who was going to

16   pay for that and the judge got involved, so.  I don't know if

17   we received these specifically but we get a lot of stuff from

18   DOC itself.

19   Q    Okay.  Now just below that I am looking at the

20   lower case A and that says, "Medical Examiner Dr. Richard

21   Cowley(sic)" is that the  medical examiner that you consulted

22   with?

23   A    Right again I don't know that I did personally but

24   that is who we as a team retained and discussed the case

25   with.

1      Q    Okay.   And according to this notation, that he

2   would have had the entire autopsy report including the

3   original photos is that right?

4      A    Right.

5      Q    I want to ask you to flip to what I am going to

6   call as page 8 but it is actually just the page after page 7.

7   No number on it,  it looks like it is handwritten?

8      A    Yep.

9      Q    About two thirds of the way down, there is a note

10  that says, "Trial experts, blood splatter, lighting, sound"

11  and what I assume says "Witness as"  Do you know if this was

12  something that you wrote?

13     A    I -- this is Gwynn Waters' handwriting.

14     Q    Okay and so clearly those were trial experts that

15  were at minimum in your mind as possible people that you

16  might call, is that right?

17     A    Correct.

18          MR. HUT:  Objection, foundation, Your Honor.

19          THE COURT:  Overruled.

20          BY MR. RUSSELL:

21     Q    Can you give your answer again Mr. Lawlor?

22     A    Yes we would have contemplated, I mean we would

23  have discussed experts of this ilk.

24     Q    Okay.  And I am going to ask you to go to what is

25  now marked 3 although keep going in order, pages start over

1  again as far as numbers?

2      A    Okay.

3      Q    So page 3 to page 4 there is information left hand

4  side, it says, "Gales" and there are about 18 entries under

5  Gales, is that right?

6      A    Uh huh.

7      Q    And does this accurately reflect your research into

8  Mr. Gales?

9      A    Well, I think that this was done at a time when we

10  believed him to be a witness but I don't think he was.  So I

11  don't know how much of this we actually obtained. But with a

12  witness who was on the tier who may implicate Mr. Stephens,

13  you know this is sort of you know, the universe of things

14  that we contemplate obtaining in preparation for his

15  examination.

16      Q    Okay and that probably wouldn't be an exhaustive

17  list is that fair to say?

18      A    I don't think I can answer that. It may be or it

19  may not be.  I can't recall what else we might have wanted

20  because I can't recall the particulars of him.

21      Q    Okay.

22          MR. RUSSELL:  Your  Honor, I am going to ask that

23  State's 1 be moved into evidence.

24          MR. HUT:  No objection.

25          MR. RUSSELL:  And I am going to switch with you,

**App. 249**

1    Mr. Lawlor if I may --

2              THE COURT:  1 will be admitted.

3                                 (The document marked for

4                                 identification as

5                                 State's Exhibit 1 was

6                                 received in evidence.)

7              BY MR. RUSSELL:

8        Q    And I am going to give you what has been marked as

9    State's 2.  And Mr. Lawlor do you recognize that document?

10       A    Yes.

11       Q    And what is that?

12       A    It is --- a cast of characters.

13       Q    Okay.  And now this document isn't numbered but it

14   is in alphabetical order, is that right?

15       A    Yes.

16       Q    And is this something that would have been created

17   in an effort to keep track of everybody in this case?

18       A    Correct.

19       Q    Okay.  That is a pretty lengthy list, is that

20   right?

21       A    Yes.

22                                 (The document referred to was

23                                 marked for identification as

24                                 State's Exhibit 2.)

25             BY MR. RUSSELL:

**App. 250**

lnc

136

1    Q    I am going to ask you to go to the M section -- and

2    at the top of one of the pages there is an entry for James

3    Mayfield, do you see that?

4    A    Okay.  And it says there across from him, is

5    "Herlow(sic) had never seen a hit list, Stewart had been on

6    outside assigned back in for a month when attacked.  He told

7    victim he was not supposed to work W wing."  Is that right?

8    A    Yep.

9    Q    Okay.  Do you recall any information whatsoever

10   about who was supposed to be assigned inside detail versus

11   outside detail?

12   A    Yes I have recollection of that notion.

13   Q    And to your recollection, who if anyone -- well who

14   was it that was in charge of that if you recall?

15   A    Making those assignments?

16   Q    Yes.

17   A    I don't recall.  I mean -- yeah I don't recall if

18   it was Mayfield or anyone else.

19   Q    Okay.  Now I am going to ask you to go down to the

20   P Section to Carol Parrish, she is the second on the list of

21   Ps.  The first full page of people with P names.

22   A    Okay.

23   Q    Isn't it correct that it says here that "reportedly

24   told Williams that outside posts should be maintained until

25   investigation shows no longer needed.  No record this

**App. 251**

1   happened with the victim.   Remember his list from Leonard

2   Johnson which turned out to be 517 list.   He turned over

3   threats to Captain Vincent.   No formal procedure exists to

4   deal with threats."   Is that what that says?

5        A    Uh hum.

6        Q    Okay and Carol Parrish is the Assistant Warden at

7   MCIJ, is that right?

8        A    Correct.

9        Q    And then I am going to ask you to go finally to the

10  first full page of people with W names.   The top of that page

11  is Major Denise Williams.   Is it correct that this says,

12  "Reportedly pressured those on outside posts to return

13  inside.   Told by Johnson that inmates were overheard saying

14  victim would be next.   According to her at one time, I said

15  they would all have to come back in but claims that they were

16  not brought in at that time."   Is that what that say?

17       A    Um hum.

18       Q    Okay.   And if you can recall Mr. Lawlor would you

19  say that this was an exhaustive  list of everybody involved

20  in the case or were there more people than this?

21       A    I am sure there were more than what is on this

22  list.

23       Q    Okay.

24            MR. RUSSELL: Your Honor, we would ask to have

25  State's 2 admitted into evidence.

**App. 252**

lnc                                                                    138

1          MR. HUT:  No objection.

2          THE COURT: It will be admitted.

3                                    (The document marked for

4                                    identification as

5                                    State's Exhibit 2 was

6                                    received in evidence.)

7          BY MR. RUSSELL:

8          Q    And once again  Mr. Lawlor, I am going to switch

9     with you and give you what is marked as State's 3.  If you

10    could tell us if you recognize that document?

11         A    I do, yep.

12         Q    And what is that?

13         A    This is a internal memo which is another to do list

14    in essence.

15         Q    And again this would have been created by Ms.

16    Waters, is that correct?

17         A    Maintained, yeah.

18         Q    Okay.  And this is dated June 15, 2011 is that

19    right?

20         A    Yes.

21                                   (The document referred to was

22                                   marked for identification as

23                                   State's Exhibit 3.)

24         BY MR. RUSSELL:

25         Q    I want to point you to page 2 of this document.  AT

the bottom, B1 where it says interviews?

A   Yep.

Q   "All inmates on the tier that night, see attachment B, a list of all on tier and statements that they have given, especially Gales." Is that what that says?

A   Right, right.

Q   And to your knowledge, were interviews done of all of the inmates on the tier that night?

A   I mean like I said, we would have endeavored to do that. I know I talked to a lot of people and I am sure our investigator did as well. Whether we talked to everybody, I don't know but we would have endeavored to.

Q   Okay. And then I am going to ask you to flip over to page 3, the next line says, "All officers that submitted a report or were on the tiers or tiers below, see duty rosters from discovery. To your knowledge, were all of those officers interviewed?

A   I am sure they were.

Q   But were efforts made to interview everyone?

A   That I don't recall. I mean, I know it is kind of like in a murder case on the street expecting to interview the lead detective, I don't know if you are going to get far in there. That may have been a wish list as opposed to a to do list.

Q   Okay. And then I am going to ask you to flip over

1   to page 5.   Under the heading "Three trial experts."   You

2   have "C, medical examiner Dr. Cowley.   And D, audio and

3   visual."

4        A     Uh hum.

5        Q     Is that correct?

6        A     Yep.

7        Q     So those would have been things even in 2011 that

8   you are still contemplating is that right?

9        A     Right.

10       Q     Okay.

11             MR. RUSSELL:   Your Honor, I would ask to move

12   State's 3 into evidence.

13             MR. HUT:   No objection.

14             THE COURT:   Will be admitted.

15                                      (The document marked for

16                                      identification as

17                                      State's Exhibit 3 was

18                                      received in evidence.)

19             BY MR. RUSSELL:

20       Q     And I am going to give you Mr. Lawlor what has been

21   marked as State's 5, I apologies that we skipped a number but

22   we have an exhibit that both sides are putting in.   All

23   right, Mr. Lawlor, do you recognize that document?

24       A     It is an e-mail or a series of e-mails between Gary

25   and I and Ms. Waters.

**App. 255**

lnc                                                                      141

1                                   (The document referred to was

2                                   marked for identification as

3                                   State's Exhibit 5.)

4          BY MR. RUSSELL:

5          Q    And I want you to look down at the middle section

6    of the e-mail and this is dated January 24, 2012 and you

7    write to Ms. Waters, "I am inclined to leave the Freed stuff

8    well enough alone" is that correct?

9          A    Right.

10              THE COURT:  Where am I looking?

11              MR. RUSSELL:  It is the middle -- there is three e-

12   mails, it is the middle e-mail.

13              THE COURT:  I see it now.

14              MR. RUSSELL:  Thank you, Your Honor.

15              BY MR. RUSSELL:

16         Q    And that is your e-mail to Ms. Waters is that

17   right?

18         A    That is -- she e-mailed Gary and I responded to

19   them both.

20         Q    Okay.  And then Ms. Waters responds again and says,

21   "I think the inconsistency in Freed's testimony should be

22   left alone and explained by the whole thing is a bought and

23   paid for lie."  Is that right?

24         A    Right.

25         Q    And does that fairly and accurately reflect your

**App. 256**

1  thinking on Mr. Freed's testimony at that time?

2      A    You know I can't remember what this relates to or

3  if this is before or after the cross or if there is some

4  particular additional item that I wanted to bring out -- I

5  guess I am having trouble understanding the context of these

6  e-mails.

7      Q    Okay.

8      A    I mean, obviously the first one is kind of a

9  variety of different things that we still need to deal with.

10 Instructions and MJOA but again I can't remember what that -

11 if there was another witness coming up that I wanted to

12 question about something specific or not.

13     Q    Okay.

14         MR. RUSSELL:  Court's indulgence, Your Honor.  I

15 would ask to move State's 5 into evidence, Your  Honor.

16         MR. HUT:   No objection.

17         THE COURT:  5 will be admitted.

18                            (The document marked for

19                             identification as

20                             State's Exhibit 5 was

21                             received in evidence.)

22         BY MR. RUSSELL:

23     Q    And just finally Mr. Lawlor, you said that you

24 don't have Mr. Freed's file or the section involving Mr.

25 Freed from  Mr. Stephens' file in front of you?  The entire

1   file itself is voluminous is that right?

2       A    My file?

3       Q    Your file, yes. How many boxes would you say it

4   was?

5       A    I don't know --

6       Q    Some where in the ball park of 20?

7       A    It could be 10, it could be 30, yes.

8            MR. RUSSELL:  I don't have anything further, Your

9   Honor.

10           THE COURT:  Okay.

11           MR. HUT:  May I examine, Your Honor?

12           THE COURT:  You may.

13                         CROSS EXAMINATION

14           BY MR. HUT:

15      Q    Mr. Lawlor, you were asked some questions on cross

16   examination concerning interviews of various potential

17   witnesses.  You did not did you interview Dr. Vincenti?

18      A    I did not.

19      Q    You personally?

20      A    Personally I did not.

21      Q    Do you know personally whether Mr.  Proctor ever

22   interviewed Dr. Vincenti?

23      A    I do not.

24      Q    With respect to items that which the State inquired

25   on cross examination that OPD did not pay for, do you recall

lnc

1    any expression on the part of OPD that it would not pay for

2    an audio visual expert after one was contacted in 2006?

3        A    I mean I know that from talking to Mr. Proctor but

4    I didn't have that conversation myself.

5        Q    And when you say you know that from talking to

6    Mr. Proctor, you know it from talking to Mr. Proctor at or

7    around 2006 correct?

8        A    Yeah.

9        Q    Mr. Russell asked you on cross examination whether

10   your principle objected in cross examination of Jason Freed,

11   withdrawn.  He asked you whether your principle objective in

12   regards to Mr. Stephens was to argue that one assailant or

13   two assailants neither was Lee Stephens, do you recall that?

14       A    I recall yes discussing that yes.

15       Q    In your view, would it have been inconsistent with

16   that theory of defense to have also argued that even if

17   Mr. Freed's testimony had been credited that -- and that the

18   jury believed Mr. Stephens to have been an assailant no fatal

19   blow was landed by Lee Stephens?

20       A    That wouldn't have been inconsistent with our

21   theory of the case.

22       Q    In assessing your cross examination of  Jason Freed

23   and at its conclusion, were you disappointed in what you had

24   done?

25       A    Yeah I mean, I you know funny things that you

1    remember.  I remember walking in the parking garage that

2    night with Gary and Gwynn and sort of you know shaking my

3    head that it had been not -- not good.

4         Q    Were you upset?

5         A    Yeah I was -- it was the key to the case, I

6    thought.

7         Q    Showing you what has been marked as Defendant's D,

8    do you recognize that document, Mr. Lawlor?

9         A    Yes, this is the motion to reopen the cross

10   examination of Mr. Freed.

11        Q    You described it I think in response to a question

12   put to you by Mr. Russell as limited in scope, do you recall

13   the limited grounds that were offered in support of the

14   motion to reopen?

15        A    I mean, I am looking at it and you know, my

16   recollection was that it pertained mainly to infractions that

17   he had obtained in DOC.

18        Q    Did he also concerned  or wish to explore some of

19   his violations on probation?

20        A    I don't recall that but if it is in here, I trust

21   that it is in here.

22        Q    Other than the DOC and possibly the probation

23   violations, did it address any other grounds as basis for

24   motion to reopen?

25        A    Not that I recall.

lnc

1      Q      On cross examination, you said in response to a
2  question from the State that there was not a good reason
3  according to my notes why the Wicomico litigation did not
4  progress, that is to say that the motion for post conviction
5  relief -- was there any sort of reason at all --

6      A      You know I don't know that there was.  I mean it
7  might be a little bit of being gun shy and a little bit of
8  defusion of responsibility but --

9      Q      Did you have other tasks that you needed to
10  accomplish at or around that time when you were getting ready
11  for trial?

12     A      I mean of course, but we have five and a half
13  years, so --

14     Q      Were those other tasks to get --- Wicomico
15  litigation?

16     A      Oh no no it wasn't a matter of being strapped for
17  time, that wasn't the reason.

18     Q      You were asked about whether you talked to
19  Mr. Stephens about his testimony in the event that he had
20  taken the stand, do you recall that question?

21     A      I recall talking to him about the substance of what
22  his testimony would be.  I don't recall as I said if  I was
23  the person to talk to him about the pros and cons of
24  testifying.

25     Q      And with respect to the substance of that testimony

**App. 261**

lnc

 1    I don't believe that the State asked you that question of

 2    cross.   What would be the substance of that?

 3        A    He would have testified that he was not involved in

 4    the homicide.

 5        Q    What would he have testified if he had ever opened

 6    the door to his cell after he was locked up on the night of

 7    January 25, 2006?

 8        A    That I don't recall. I mean, there was -- well let

 9    me answer it this way, I don't recall what he would have

10    testified to and I don't recall what he told me about that.

11    I mean, you have to understand that although this was in a

12    prison, inmates described that tier E4 as not what  you would

13    perceive a prison tier to be like.  And in terms of

14    materials that they could obtain and in terms of their

15    ability to go in and out of their cell and I know witnesses

16    told us and if not, Mr. Stephens, that they left clothes out

17    to dry on the tier and people had to retrieve those clothes

18    after the crime because they didn't want to be implicated in

19    it because their clothing was blood splattered.

20        Q    Well let me ask you this, I understand that you

21    don't recall --- testimony did he ever tell you or -- did he

22    ever tell you that he had been outside of his cell on that

23    night?

24        A    Not that I can recall.

25        Q    Do you recall what if anything he told you about

1   what he had seen and heard that night?

2        A    He didn't see or hear and I want to say that he

3   said he had headphones on.  And didn't see or hear it, but I

4   mean, obviously it has been a number of years but I recall yo

5   know, I mean, I was in the case for five and a half years

6   before trial, I talked to him a lot.  And I -- you know he

7   was vehement about his lack of involvement in the murder.

8             MR. HUT:  Court's indulgence.  May I approach the

9   witness, Your Honor?

10            THE COURT:  Of course.

11            BY MR. HUT:

12       Q    I am showing you the handwritten page in State's 1

13   and I think you identified this page as the handwriting was

14   Ms. Waters?

15       A    Yes.

16       Q    Is that correct?

17       A    Yes.

18       Q    Is that page dated as far as you can see?

19       A    No not this page specifically that I can see.

20       Q    Do you have any idea when that page may have been

21   created?

22       A    I mean if you gave me a long time I could probably

23   deduce it but no I don't know offhand.

24       Q    And on the previous page, I am sorry two prior

25   pages, --- directing your attention to the bottom of page

1    which is labeled, "Experts" do you see that?

2         A    Um hum.

3         Q    You see any reference to any audio visual expert

4    listed there?

5         A    On the bottom of this page?

6         Q    Yes, on the -- or the continuation on the next.

7         A    No. Not here, no.

8         Q    And with respect to State's 5, about which you were

9    questioned on cross examination, let me direct your attention

10   to the first paragraph of the document.  Does that paragraph

11   state in substance that the items that were listed in that to

12   do list were carry overs from lists that may have been or

13   were previously prepared in the same nature?

14        A    Yes.

15        Q    And you don't know sitting here today do you

16   whether the reference of the documents about which Mr.

17   Russell asked  concerning audio visual was an artifact excuse

18   me, from a previous list or whether it was something that was

19   in fact you were contemplating in the summer of 2011?

20        A    No I don't recall -- I mean, there is reference on

21   there that experts that a --- about and never pursued.  Aside

22   from audio visual.  Future dangerousness(sic) and POP experts

23   and things like that.

24        Q    But you don't know whether the audio visual experts

25   being banded about in 2011 do you?

lnc

1   A   No I don't recall.

2   Q   Did Mr. Proctor know that?

3   A   I mean, I know about --- was in this wheelhouse for

4   this trial, so I assume.

5         MR. HUT:  I have no further questions, Your  Honor.

6         MR. RUSSELL:  If I may, Your Honor?

7         THE COURT:  Okay.

8                    RECROSS EXAMINATION

9         BY MR. RUSSELL:

10   Q   Mr. Proctor -- Mr. Lawlor, this may be a question

11   for Mr. Proctor but I am going to ask you now.  With regards

12   to this audio expert that you guys tried to contact, isn't it

13   true that the public defender's office didn't say that you

14   can't have an audio expert, they just said we weren't paying

15   with that guy was asking for, is that right?

16   A   I wasn't a part of the conversation so I don't know

17   at all.

18   Q   So that maybe a question for Mr. Proctor.

19   A   I think it is.

20   Q   Okay.  When you talked to Mr. Stephens about his

21   potential testimony, did he ever say to you I want to testify

22   that I stabbed him but that I don't think I actually was the

23   one to kill him?

24   A   No, like I said, my discussions with him over five

25   and a half years were consistent that he had no involvement

**App. 265**

lnc

1   at all.

2       Q     Right.  And you are suggesting now that you could

3   have argued to the jury that he didn't have anything to do

4   with it but that they still could then find if he did have

5   something to do with it, it wasn't what actually killed

6   Corporal McGuinn, do you think that is a fair argument to

7   make to the jury?

8       A     I think it is the equivalent  of -- I mean, there

9   are -- look I will say this, I am not a tremendous fan of

10  argument in the alternative or theory of the case but there

11  are consistent alternative arguments and there are

12  inconsistent arguments.  I didn't shoot him but if I did, it

13  was an accident.  Not so good.  I didn't do the murder but it

14  is second degree.  That I will argue because you can argue he

15  didn't do and the State hasn't proven an element anyway like

16  you know causation of pre-meditation.  That to me is not

17  inconsistent.

18      Q     Okay, you feel like you need to get his permission

19  to make that argument?

20      A     I do not need his permission to make that argument,

21  no I don't.

22      Q     Okay.  Do you -- move to a different topic, do you

23  know Sam Vincent or did you know Sam Vincent?

24          MR. HUT:  Objection.  Beyond the scope --

25          THE WITNESS:  No.

**App. 266**

lnc                                                                    152

1            MR. RUSSELL:  No it isn't.

2            MR. HUT:  It was beyond the scope -- our agreement

3    was that they could beyond the scope of direct but I don't

4    know about beyond the scope of redirect.

5            THE COURT:  What is the proffer? Who is Sam

6    Vincent?

7            MR. RUSSELL:  He was the State's Attorney who was

8    handling the Wicomico County case during the time that it was

9    pending which I believe was just asked about.

10           THE COURT:  The Court is going to overrule.

11           MR. HUT:   He -- it is a trial, he didn't have -- I

12   dint' know that he handled the case.

13           MR. RUSSELL:  Well, let's ask Mr. Lawlor.

14           BY MR. RUSSELL:

15       Q   Mr. Lawlor, do you know Sam Vincent or did you know

16   Sam Vincent?

17       A   I know who he was.  And I met him in a post

18   conviction in a case unrelated to this and I believe he

19   passed.

20       Q   He did. Do you recall whether he was handling this

21   case when you first filed the post conviction?

22       A   I recall -- my vague recollection is one of our 30

23   continuances of the hearing speaking to him about it.

24       Q   And do you recall that he passed away in a car

25   accident in 2010?

**App. 267**

lnc                                                                   153

1        A    I don't know when or how but I do recall that he

2   had passed away, yes.

3        Q    Okay.

4             MR. RUSSELL:  I have nothing further, Your Honor.

5             THE COURT:  I need to ask you a couple of

6   questions.

7             THE WITNESS:  Judge, I hate to ask this of you but

8   I have a 2:30 conference call with Judge Messitte.

9             THE COURT:  It is not going to take but a minute.

10            THE WITNESS:  All right.

11            THE COURT:  In terms of your focus, were you

12  focused on one guilt or innocence and two, the death penalty

13  as opposed to a case where guilt or innocence is so clear

14  that you just focus on the death penalty.  Do you understand

15  what I am saying?

16            THE WITNESS:  I absolutely know what you are

17  saying?

18            THE COURT:  So it was a holistic, everything was on

19  the table?

20            THE WITNESS:  Yes.  During the guilt phase, I tried

21  this case to win it.

22            THE COURT:  Okay, all right.  That is what I was,

23  that was the impression that I got. Okay anything else for

24  him?

25            MR. HUT:  Nothing further from the petitioner, Your

**App. 268**

lnc

1   Honor.

2            MR. RUSSELL:  No, Your Honor.

3            THE COURT:  All right.

4            THE WITNESS:  Thank you, Your Honor.

5            (Witness is excused.)

6            THE COURT: Who is next?

7            MS. GOSTIN:  Petitioner now calls Dr. Donna

8   Vincenti.

9            THE COURT:  Okay.

10  Whereupon,

11                    DR. DONNA VINCENTI

12  was called as a witness by the Defendant, having been first

13  duly sworn, was examined and testified as follows:

14            THE WITNESS:  Yes.

15            THE CLERK:  You may be seated.

16            THE WITNESS:  Thank you.

17            THE CLERK:  If you could please state your full

18  name, your address and spell your  name for our court

19  reporters.

20            THE WITNESS:  Donna Vincenti, V-i-n-c-e-n-t-i and

21  it is 900 West Baltimore Street, Baltimore.

22            THE COURT:  Go ahead.

23                    DIRECT EXAMINATION

24       BY MS. GOSTIN:

25       Q    Good afternoon, Dr. Vincenti.

1       A       Hi.

2       Q       Where are you currently employed?

3       A       At the Office of the Chief  Medical Examiner for

4   the State of Maryland.

5       Q       And what is your current position there?

6       A       Assistant Medical Examiner.

7       Q       Where you employed in 2006?

8       A       The same place, the Office of the Chief Medical

9   Examiner.

10      Q       Did you perform the autopsy on Corporal McGuinn?

11      A       Yes.

12      Q       And did you prepare an autopsy report in connection

13  with that autopsy?

14      A       Yes.

15              MS. GOSTIN:  May I approach, Your Honor?

16              THE COURT:  Of course you can.

17              BY MS. GOSTIN:

18      Q       Dr. Vincenti I am showing you what has been marked

19  as Defendant's Exhibit E, is that the autopsy report that you

20  prepared in connection with your autopsy of Corporal McGuinn?

21      A       Yes.

22              MS. GOSTIN:  Petitioner offers Defendant's  Exhibit

23  E.

24              MR. HUT: I haven't seen it yet but I don't think I

25  am going to object to it.

lnc

1        MS. GOSTIN:  Oh I am sorry.

2        MR. HUT:  I have no objection, Your Honor.

3        THE COURT:  Okay.  It will be admitted.

4                              (The document referred to was

5                               marked for identification as

6                               Defendant's Exhibit E and was

7                               received in evidence.)

8        BY MS. GOSTIN:

9        Q    And did you testify at the trial in this case in

10   January 2012?

11       A    Yes.

12       Q    I want to turn to the opinions that you offered at

13   trial.  What is the number of stab wounds and cutting wounds

14   that you identified?

15       A    So there are 12 stab wounds and 12 cutting wounds.

16       Q    And with respect to the stab wounds, did you label

17   those A through L?

18       A    Yes.

19       Q    Can you please describe Stab wound A?

20       A    Stab wound A is a wound to the right side of the

21   back of the neck.  This wound continued through the skin and

22   soft tissue injuring the right internal carotid artery and th

23   right internal  jugular vein.  It then continued forward and

24   struck the second cervical vertebrae in the neck that nicked

25   the bone.

**App. 271**

1        Q     And can you describe the Stab wound E?

2        A     Stab wound E is an injury to the left upper back.

3    Within jury to the skin and soft tissue.  Going through the

4    left second intercostal soft tissues which means that it went

5    through the soft tissues that are between ribs.  And then

6    injured the left upper lung lobe.

7        Q     And to clarify were both A and E struck to the back

8    of the victim's body?

9        A     Yes, A was on the right side of the neck on the

10   back and E was on the left upper back.

11       Q     And did you testify that all of the wounds suffered

12   by Corporal McGuinn contributed to blood loss?

13       A     I did.

14       Q     And did you testify that it was the totality of the

15   blood loss that caused Corporal McGuinn's death?

16       A     Yes.

17       Q     Did all of the wounds suffered by Corporal McGuinn

18   contribute equally to blood loss?

19       A     No.

20       Q     And which wounds would have contributed more to the

21   blood loss?

22       A     Well wound A certainly with an injury to the

23   carotid artery and the jugular vein would definitely bleed

24   more briskly.  In addition to that, the other wound that you

25   had mentioned before to the left lung would also bleed or

**App. 272**

1    have the possibility to bleed quite a bit and stab wound H

2    which was an injury to the right lower back there was an

3    associated area of bleeding around the right psoas muscle in

4    the abdomen.

5        Q    Had Corporal McGuinn not received stab wounds A and

6    E and assuming he received standard medical treatment to a

7    reasonable medical certainty, would Corporal McGuinn have

8    died from his injuries?

9        A    Well without -- ignoring stab wounds A and E, the

10   one to the carotid and the one to the left upper lung lobe,

11   the other wounds though they would have been bleeding, they

12   would have been -- could have been managed.

13       Q    So then aside from stab wounds A and E and assuming

14   reasonable  medical treatment would the other wounds suffered

15   by McGuinn even together have been sufficient to cause his

16   death?

17       A    Well, they could have but if there was medical

18   treatment, they could  have been managed.

19       Q    And Dr. Vincenti, did you describe certain of the

20   stab wounds as linear and others as circular?

21       A    Yes.

22       Q    And can you please explain what those terms mean as

23   you used them?

24       A    Yes.  So when we have a stab wound that we are

25   looking at on the skin's surface, a linear wound would look

**App. 273**

1  like a line. Where as a circular one would be round.  Now the

2  wounds can look different on the skin's surface depending on

3  how they are made in the skin.  Or what kind of instrument is

4  made. But usually we can re-approximate the edges of those

5  wounds to see if it is indeed a linear wound or something

6  other than that.

7       Q     Was stab wound A, linear or circular?

8       A     Stab wound A was linear.

9       Q     And was stab wound E linear or circular?

10      A     Stab wound E was also linear.

11      Q     To a reasonable medical certainty can you rule out

12 that Corporal McGuinn's injuries were caused by a single

13 weapon?

14      A     No.

15      Q     And can you determine to a reasonable medical

16 certainty that McGuinn's  injuries were produced by more than

17 one weapon?

18      A     I am sorry, can you repeat?

19      Q     Sure.  Can you determine to a reasonable medical

20 certainty that Corporal McGuinn's injuries were produced by

21 more than one weapon?

22      A     I can't say for certain.

23      Q     And had you been asked at trial whether it was your

24 opinion that the wounds had been produced by two different

25 weapons, would you have been able to answer that question to

1    a reasonable medical certainty?

2         A    I would have had the same answer.

3              THE COURT:   Which is?

4              THE WITNESS:   Which is that I cannot say with

5    certainty.

6              BY MS. GOSTIN:

7         Q    And had defense counsel at the trial in 2012 asked

8    you the same questions that I asked you today, would you have

9    given the same answers?

10        A    Yes.

11        Q    In your testimony at trial in 2012, did you offer

12   any opinion as to which of the wounds were independently

13   sufficient to have caused Corporal McGuinn's death?

14        A    I believe that I just indicated what was injured

15   with each wound.

16        Q    And in your autopsy report, did you offer any

17   opinion as to which of the wounds were independently

18   sufficient to have caused Corporal McGuinn's death?

19        A    Well in the opinion -- in the opinion of the

20   autopsy I review stab wound  A, stab wound E, and stab wound

21   H and then indicate that the remaining stab wounds and

22   cutting wounds were associated with soft tissue  hemorrhage.

23        Q    That is all.  Thank you.

24              THE COURT:   Okay.

25                              CROSS EXAMINATION

**App. 275**

1              BY MR. RUSSELL:

2         Q    Good afternoon, Dr. Vincenti.

3         A    Hi, good afternoon.

4         Q    So at the trial, you didn't testify as to how many

5    weapons you thought were used is that right?

6         A    That is correct.

7         Q    And you actually were not allowed to be asked that,

8    is that right?

9         A    Correct.

10        Q    And so you agree as I think everyone does, it could

11   have been two, it could have been one?

12        A    Correct.

13        Q    It could have been more than two, is that fair to

14   say?

15        A    Yes.

16        Q    Could have been up to as many as 24 different

17   weapons, is that accurate?

18        A    That is accurate.

19        Q    Okay.  So in the end, we don't know how many

20   weapons were used?  Is that an accurate statement?

21        A    Correct.

22        Q    Okay.  Now you testified objectively about cutting

23   versus stabbing wounds, is that right?

24        A    Yes.

25        Q    And you explained objectively  that cutting wounds

**App. 276**

lnc

1    were  longer than they were deep and stabbing wounds were

2    deeper than they were long.  Is that correct?

3         A    Correct.

4         Q    And so there was no subjectivity -- it wasn't up to

5    you to decide which is a cut and which is a stab.  It is

6    based on those measurements, is that correct?

7         A    Correct.

8         Q    Okay.  And as you already said you testified about

9    wounds that were either  linear or circular  is that right?

10        A    Correct.

11        Q    And so the linear you would be able to put back

12   together into a line when pushed back together -- the -- is

13   that correct?

14        A    Yes.

15        Q    And the circular would not go back together, it is

16   something that a  lay person might call a hole.  Is that fair

17   and accurate statement?

18        A    Yes.

19        Q    Okay. And you testified that the cause of death was

20   loss of blood is that right?

21        A    The cause of death is multiple sharp force

22   injuries.

23        Q    That resulted in the loss of blood is that correct?

24        A    Yes.

25        Q    Okay.  And that is still true?  Is that -- that is

lnc

1      a true statement at this point is that correct?

2           A     Yes.

3           Q     And correct me if I am wrong, I believe you also

4      testified about the -- about blood in each of the wound that

5      would have indicated that the heart was still pumping at the

6      time the wounds were created, is that correct?

7           A     Yes.

8           Q     And it is your testimony now that both wound A and

9      wound E were potentially fatal, is that correct?

10          A     Yes.

11          Q     And that the others -- Corporal McGuinn possibly

12     could have lived with immediate treatment, is that right?

13          A     Yes.

14          Q     But in fact he didn't live, he passed away, is that

15     right?

16          A     Correct.

17          Q     Okay.

18               MR. RUSSELL:  I have nothing further, Your Honor.

19               THE COURT:  Anything else for the Doctor?

20               MS. GOSTIN:  No, nothing further.

21               THE COURT:  Thank you very much for coming in

22     today.  Please don't discuss your testimony with anyone.  I

23     forgot to tell Mr. Lawlor that.

24               THE WITNESS:  Yes, sir.

25               THE COURT:  All right, make sure you leave the

lnc

1    exhibit behind.  Could you give that to the clerk so she can

2    scan it?

3            MS. GOSTIN:  Oh she had scanned it before.

4            (Witness is excused.)

5            THE COURT:  All right. Your next witness please.

6            MS. GOSTIN:  Petitioner calls Dr. Daniel Spitz.

7    Whereupon,

8                        DR. DANIEL SPITZ

9    was called as a witness by the Defendant, having been first

10   duly sworn, was examined and testifies as follows:

11           THE WITNESS:  I do.

12           THE CLERK:  You may be seated.  Please state your

13   full name, your address and spell your name for the court

14   reporters.

15           THE WITNESS: Sure. Dr. Daniel Spitz, S-p-i-t-z and

16   office address is 34051 South Gratiot, G-r-a-t-i-o-t Avenue,

17   Suite 202, Clinton Township, Michigan 48035.

18           THE COURT:  And spell your last name slowly?

19           THE WITNESS:  Yes, S-p-i-t-z.

20           THE COURT:  Like the ---

21           THE WITNESS:  Correct.

22           THE COURT: Okay.

23                        VOIR DIRE

24   BY MS. GOSTIN:

25   Q    Dr. Spitz, where are you currently employed?

**App. 279**

1      A    I am employed as the Chief Medical Examiner for

2  Macomb County and St. Claire County, in Michigan.

3      Q    And how long have you been employed in the Office

4  of the Medical Examiner for  Macomb County?

5      A    I have held the position of Chief Medical Examiner

6  in  Macomb County since 2004.  And same position in St.

7  Claire County since 2006.

8      Q    And what are you responsibilities as chief medical

9  examiner?

10      A    Basically as the medical examiner, I oversee the

11  death investigations which occur within the county.

12      Q    And do you hold any teaching positions?

13      A    I do. I am an Assistant Professor of Pathology at

14  Wayne State University School of Medicine in Detroit.

15      Q    And how long have you held that position?

16      A    It was shortly after I became the medical examiner

17  in 2004.

18      Q    And where were you employed prior to 2004?

19      A    Prior to that I was an associate medical examiner

20  in Hillsborough County, Florida and at that time I was also

21  an associate professor of Pathology and Laboratory Medicine

22  at the University of South Florida.  And prior to that, I was

23  an associate medical examiner in Miami, Florida.

24      Q    And can you please provide your educational

25  background?

**App. 280**

lnc

1    A    Sure, I did four years of college followed by four

2    years of medical school.  I went to medical school at Wayne

3    State University School of Medicine in Detroit.  After

4    medical school I chose to do pathology and I did five years

5    of pathology training at Rush Presbyterian St. Luke's Medical

6    Center in Chicago.  Following that pathology training, I took

7    the board examination and was granted board certification in

8    anatomic and clinical pathology.  I then chose to do a one

9    year fellowship or subspecialty training in forensic

10   pathology and I did that at the Miami Dade County Medical

11   Examiner's Office in Florida.  And then following that

12   training, I successfully completed the board examination and

13   was again granted board certification in the subspecialty of

14   forensic pathology.

15        Q    And are you currently licensed as a medical doctor?

16        A    Yes.

17        Q    And in which states?

18        A    I have medical licenses in Florida and in Michigan.

19        Q    And when did you earn those licenses? In what year?

20        A    Florida, I believe it was around 2001 and in

21   Michigan prior to my employment which would have been around

22   2004.

23        Q    And was it around the same years that you received

24   your board certifications?

25        A    Yes.

lnc

1     Q     Have you published any books or articles in the
2     field of forensic medicine or pathology?

3     A     Yes.

4     Q     About how many books or articles have you
5     published?

6     A     I am guessing it is around 50 articles.  I am an
7     editor and author of one forensic pathology book and one
8     surgical pathology book.

9     Q     And have you received any accreditations?

10    A     While the Office of Medical Examiner in Macomb
11    County has received an accreditation which was granted by the
12    National Association of Medical Examiners.

13    Q     And do you know how many medical examiners offices
14    have received that accreditation?

15    A     I don't know exactly because it is a number that is
16    changing but it is a small number, it is about 5 percent of
17    the roughly 2,000 death investigation jurisdictions that
18    exist in the country.

19    Q     And how many autopsies have you performed in your
20    career?

21    A     It is around 6,000.

22    Q     And what percentage or number of those would have
23    been before the year 2012?

24    A     I would say maybe around 4,000 or so up until that
25    time.

1        Q    I am showing you what has been marked as

2   Defendant's Exhibit F.  Can you identify this document?

3        A    Yes, it is a copy of my curriculum vitae.

4        Q    And does that document accurately reflect your

5   education, training, and experience in the field of forensic

6   pathology?

7        A    Yes, it does.

8             MS. GOSTIN:  Petitioner offers Defendant's Exhibit

9   F, Your Honor.

10            MR. RUSSELL:  No objection, Your Honor.

11            THE COURT:  Admit it.

12                              (The document referred to was

13                               marked for identification as

14                               Defendant's Exhibit F and was

15                               received in evidence.)

16            BY MS. GOSTIN:

17       Q    Turning to pages 14 through 18 of that document.

18   Does that accurately reflect the publications you have

19   published in the years in which they were published?

20       A    Yes.

21       Q    And then turning to page 19, does that accurately

22   reflect the professional organizations of which you were and

23   are a member?

24       A    Yes.

25       Q    Have you testified as an expert in any courts in th

1   field of forensic pathology -- as an expert in the field of

2   forensic pathology?

3       A   I have.

4       Q   And in what courts?

5       A   I testified in State and Federal Court.  Testified

6   primarily in Michigan and in Florida.  But in approximately

7   15 or 16 additional states.

8       Q   And approximately how many times before 2012?

9       A   It was probably in court -- for court testimony

10  somewhere between 100 and 200 times.

11      Q   And have you testified at any courts in Maryland?

12      A   I believe I have many years ago.

13          MS. GOSTIN:  Your Honor, Petitioner offers

14  Dr. Spitz as an expert in the field of forensic pathology.

15          MR. RUSSELL:  No objection.

16          THE COURT:  Any voir dire?

17          MR. RUSSELL:  No, Your Honor.

18          THE COURT:  All right.  He will be admitted.  Go

19  ahead.

20                      DIRECT EXAMINATION

21          BY MS. GOSTIN:

22      Q   Dr. Spitz, were you retained by petitioner's

23  counsel in connection with this post conviction proceeding?

24      A   Yes.

25      Q   And what were you asked to do?

**App. 284**

1      A    I was asked to review a number of documents and to

2   render opinions regarding the cause of Corporal McGuinn's

3   death and to evaluate the wounds to see what could be gained

4   by that evaluation.

5      Q    And did you provide an expert report in connection

6   with this matter?

7      A    Yes, I did.

8      Q    I am showing you what has been marked as

9   Defendant's Exhibit G, is this the report that you prepared

10  in this matter?

11     A    Yes.

12     Q    Could you please turn to page 2, paragraph 7 of

13  your report?

14     A    Yes.

15     Q    Did you review the materials on that list in

16  connection with this assignment?

17     A    I am sorry, can you repeat that?

18     Q    Sure.   There is a -- if you look at paragraph 7,

19  there is a list of materials, did you review those materials

20  in connection the assignment in this matter?

21     A    I did.

22                              (The document referred to was

23                              marked for identification as

24                              Defendant's Exhibit G.)

25          BY MS. GOSTIN:

**App. 285**

1        Q    And did you review any other  materials that are

2   not on that list?

3        A    I have reviewed some additional materials.  Those

4   additional materials included some what I would call scene

5   photographs.  These were photographs that were Polaroid in

6   nature and taken of the various or some of the evidence

7   mainly blood evidence as well as Corporal McGuinn's body

8   following his injuries.  I have also reviewed a comprehensive

9   investigation report that was generated in conjunction with

10  this investigation.

11       Q    And included on the list in paragraph 7 I believe

12  is the post mortem examination report, do you see that?

13       A    Yes.

14       Q    So I am showing you what has been marked as

15  Defendant's Exhibit E, is that the autopsy report that you

16  reviewed?

17       A    Yes.

18       Q    And included on the list is also the testimony of

19  Dr. Vincenti, do you see that?

20       A    Yes.

21       Q    And is it your understanding that she performed the

22  autopsy of Corporal McGuinn?

23       A    Correct.

24       Q    And what is your understanding of the number of

25  stab wounds -- withdrawn.  What is your understanding of the

lnc

1  number of wounds suffered by Corporal McGuinn?

2      A    Well, as far as sharp force injuries, he suffered

3  24 separate and distinct wounds which were caused by a sharp

4  object.

5      Q    And do you have an understanding as to whether

6  those wounds were stab wounds or cutting wounds?

7      A    Many of them were stab wounds and many of them were

8  cutting wounds.

9      Q    And on what is your understanding based?

10     A    Well it is based on the autopsy report as well as

11  the evaluation of the photographs.

12     Q    And do you have an understanding as to what Dr.

13  Vincenti meant by the terms stab wound and cutting wound?

14     A    I do.  My definition is a little bit different

15  because it doesn't always work that a stab wound is deeper

16  than it is long and a cutting wound is longer than it is

17  deep.  In fact, some of her  measurements would indicate

18  otherwise.  But it is sort of a moot point.  But for the

19  Court's benefit, a stab wound is when the tip of a sharp

20  object is penetrated into the body and a cutting wound is

21  when the belly of a bladed object or a sharp object creates

22  injury by coming into contact with the skin.

23          So again one injury is caused by a bladed

24  instrument with the tip of the instrument going into the body

25  causing a penetrating wound, an incised wound or a cutting

1   wound is when the belly of a bladed instrument comes in

2   contact with the skin.  Most of the time the measurements are

3   such that a stab wound is deeper than it is long and an

4   incised wound is longer than it is deep.  But that is not

5   always the case.

6       Q    And is it your understanding that Dr. Vincenti

7   labeled the 12 stab wounds or the 12 wounds that she

8   identified as stab wounds, A though L?

9       A    Yes.

10      Q    Can you describe your understanding of stab wound

11  A?

12      A    Sure.  Stab wound A was a penetrating stab wound

13  that involved the right back of the upper neck.  It went

14  through the skin and soft tissues penetrating into the body

15  and along the wound track it injured the right internal

16  carotid artery and the right internal jugular vein.  These

17  are obvious very significant vascular structures of the neck.

18  It also caused a small defect or nick along the second

19  cervical vertebrae without damaging the spinal cord.

20          So that was the nature of stab wound A.

21      Q    And can you describe  your understanding of stab

22  wound E?

23      A    Yes, stab wound E was a stab wound that involved

24  the left side of the upper back.  It involved the skin and

25  soft tissues.  Penetrating into the wound it entered the

1   chest cavity and caused a defect or injury to the upper lobe

2   of the left lung.  And associated with that wound as was

3   associated with stab wound A, was bleeding along the wound

4   track because stab wound E was associated with a defect to

5   the lung, you could determine how much blood loss was the

6   result of that wound because the lung is within a contained

7   cavity which is called the chest cavity.

8           And there were 30ccs of blood within the left chest

9   cavity.  The wound track associated with A is exposed to the

10  environment so the blood loss with stab wound A is primarily

11  out into the environment making it much more difficult to

12  calculate if you will or determine exactly how much blood

13  loss was associated with that wound.  However it would be

14  very significant knowing what vascular structures were

15  damaged.

16      Q    Dr. Spitz do you have an opinion formed to

17  reasonable medical certainty concerning whether if Corporal

18  McGuinn had received stab wound A but none of the other

19  wounds identified in Dr. Vincenti's report he would have died

20  from that injury?

21      A    Yes, I believe stab wound A to be a fatal wound

22  regardless of the other wounds.

23      Q    And what is your basis for that opinion?

24      A    The basis is that the jugular vein and the carotid

25  artery are very severe vascular structures which would bleed

lnc

1   profusely and very rapidly.  The amount of blood loss would

2   be such that death would occur over a period of a relatively

3   short period of time.  And so these wounds again are fatal

4   injuries.

5       Q    And do you have an opinion formed to a reasonable

6   medical certainty concerning whether if Corporal McGuinn had

7   received stab wound E, but none of the other wounds, he would

8   have died from that injury?

9       A    I think that is a possibility but that wound is

10  readily treated.  There are some  potential complications

11  that you can get with a wound that involves the lung.  Such

12  as a pneuomothorax or bleeding if it is not  managed.  The

13  amount of blood loss here was only 30ccs so bleeding was not

14  a major component of this wound.  So in this situation, I

15  don't believe stab wound E to be a fatal wound, although it

16  does fall within the realm of possible.

17      Q    Did you review testimony concerning the nature and

18  timing of the medical treatment that Corporal McGuinn

19  received for his injuries?

20      A    Yes.

21      Q    And do you have any reason to believe that Corporal

22  McGuinn did not receive reasonable and appropriate  medical

23  treatment for his injuries?

24      A    I believe he did receive rapid evaluation and

25  treatment.  He was first seen at the prison hospital and then

1   EMS arrived on scene and continued care taking him to the

2   local hospital.

3        Q    Are you aware that Dr. Vincenti testified that all

4   the wounds suffered by Corporal McGuinn contributed to blood

5   loss?

6        A    Yes.

7        Q    And are you aware that Dr. Vincenti also testified

8   that it was the totality of the blood loss that cause

9   Corporal McGuinn's death?

10       A    Yes.

11       Q    What is your view as to the accuracy as to that

12  testimony?

13       A    Well, I think from a broad point of view that it is

14  accurate.  However, it needs to be understood that we are

15  dealing with wounds that involve skin and soft tissue which

16  will bleed, but bleed to a significantly lesser degree than a

17  wound that involves a  major vascular structure.  The wound

18  to the carotid artery and jugular vein are going to bleed

19  rapidly and profusely.  The other wounds are also going to

20  bleed but the amount of blood loss is negligible really

21  compared to the amount of blood that is going to be lost from

22  those injuries to the major vascular structures.

23            Such that had stab wound A been the only stab

24  wound, Corporal McGuinn would have passed from that or those

25  injuries.  Had he received the other wounds, it is very

**App. 291**

lnc

1    unlikely that death would have occurred.

2         Q     And do you have an opinion formed to reasonable

3    medical certainty concerning whether had Corporal McGuinn not

4    received stab wounds A and E he would have died from those

5    injuries?

6         A     No, I don't believe would have died those wounds

7    would have been readily treated.  The time frame to treat

8    those wounds would have been such that blood loss would not

9    have been to the point of causing death.  Again those

10   injuries only involved skin and soft tissues.  Without any

11   damage to major vascular structures.

12        Q     And do you have an opinion formed to a reasonable

13   medical certainty concerning whether had Corporal McGuinn not

14   received stab wound A, he would have died from his injuries?

15        A     I don't think he would have died.  Again it does

16   fall within the realm of possible. Complications can occur

17   but with the idea of medical intervention, it would be very

18   unlikely that he would have passed from his injuries aside

19   from stab wound A which really would not have been amenable

20   to treatment in the time frame that would have been required.

21        Q     Dr. Spitz, you did not perform an autopsy report on

22   Corporal McGuinn is that right?

23        A     Correct.

24        Q     Is there any  information that you would have had

25   if you had done the autopsy yourself that would have changed

**App. 292**

lnc                                                                      178

1    your opinion as to the fatality of the wounds?

2         A    No I don't believe so.  I think the information

3    that I have reviewed is certainly sufficient to answer these

4    questions and provide these opinions.

5         Q    Is it your understanding that Dr. Vincenti

6    describes certain of the wounds as linear and others as

7    circular?

8         A    Yes.

9         Q    And what is your understanding of those terms as

10   used by Dr. Vincenti?

11        A    Well my understanding is that a linear wound is one

12   that more has the configuration of a line.  And a circular

13   wound is one that is gaping or more oval in nature where the

14   skin has gaped to give the appearance of an oval defect.

15        Q    Are you familiar with the term "reapproximate"?

16        A    Yes.

17        Q    And how if at all does the term reapproximate

18   relate to the -- this concept of linear versus circular?

19        A    Well when you are evaluating stab wounds there is

20   usually some degree of separation of the skin edges.  And in

21   some situations it is very little and so those are more

22   linear and other situations there is a greater degree of

23   separation giving you an oval wound.  Reapproximation of

24   these wounds is done by manually pushing the edges of the

25   wound together.  Some wounds go together very easily.  Other

**App. 293**

1   wounds take a little bit more manipulation but really all of

2   them can be reapproximated.

3          And the idea of -- the reason behind that is

4   because you want to put the wounds back together to try to

5   have the wound give you more or some information about what

6   type of weapon may have been involved.  And you are doing --

7   you are reapproximating the skin edges to overcome the skin's

8   elasticity and that is an artifact of our skin that is

9   causing a wound to look different.  By reapproximating the

10  wound you are trying to create the wound that was actually

11  caused by the weapon and so that is done routinely.

12         Sometimes tape -- clear tape is put over the wound

13  to try to keep the edges together while taking measurements

14  and taking photographs and these kinds of things.  So

15  reapproximating of sharp force injuries is a pretty standard

16  forensic process.

17     Q    Are you familiar with the term langer lines?

18     A    Yes.

19     Q    And can you explain what that term means?

20     A    Sure.  Langer lines are lines of langer are the

21  normal skins elasticity.  All of our skin, human skin has a

22  degree of elasticity created by elastic fibers and collagen.

23  The lines run in a particular orientation and so this is very

24  important when it comes to surgical incisions for surgeons

25  who are operating on live patients.  And it is also important

1   for forensic pathologists when we are evaluating wounds where

2   the skin has been cut.

3          So if you have a sharp force injury that across the

4   lines of langer, there is a greater degree of the separation

5   of the skin because the skin's elasticity is pulling the

6   wound edges apart.  Whereas if a sharp force injury is

7   parallel or in line with the lines of langer, you don't have

8   nearly the degree of separation, so those wounds look more

9   linear.  Again it has nothing to do with the weapon and it

10  has everything to do with the skin's elasticity.

11     Q    I am showing you what has been marked as

12  Defendant's Exhibit H.  Does this picture appear to show the

13  lines of langer as you just described them?

14     A    Yes, kind of a rough depiction of these elastic

15  lines.

16          MS. GOSTIN:  Petitioner offers Exhibit H.

17          MR. RUSSELL:  No objection.

18          THE COURT:  It will be admitted.

19                                    (The document referred to was

20                                     marked for identification as

21                                     Defendant's Exhibit H and was

22                                     received in evidence.)

23          BY MS. GOSTIN:

24     Q    What affect if any do langer lines have on whether

25  a wound is circular or linear?

lnc

1     A    Well, again when you have a wound that cuts across

2  these lines, the elastic fibers will pull the wound edges

3  apart giving you the appearance of an oval or more circular

4  wound.  A wound that is parallel to the langer lines will not

5  have the elastic fibers cut to the degree that the other

6  wound would and so the wound would appear more linear or with

7  the wound edges much closer together.

8     Q    And do you have an opinion formed to a reasonable

9  medical certainty concerning whether this same object can

10  create both a linear and circular wounds?

11     A    Yes it can.

12     Q    And what is the basis for that opinion?

13     A    Well the basis is that when you have a wound --

14  when you have a sharp force instrument causing a wound, and

15  the wound enters the skin in parallel with the lines of

16  langer, then the wound may be linear.  Whereas that same

17  weapon that cuts across the elastic fibers will cause the

18  defect to be more circular or gaping giving the wound a

19  circular or oval appearance.

20     Q    Would an expert in the field of forensic pathology

21  be able to determine to a reasonable medical certainty

22  whether the wound suffered by Corporal McGuinn were produced

23  by a single weapon or multiple different weapons based on the

24  fact that some of the wounds were linear and others were

25  circular?

1      A    I don't think you could us that as a basis.   I

2 don't think you could use that as a basis.   I don't think you

3 could look at wounds and say some are circular and some are

4 linear, therefore  more than one weapon is involved.   And I

5 think I have explained the reasons why.   It has to do with

6 the skin, not so much the weapon.   So circular wounds, oval

7 wounds, linear wounds can all be caused by the same

8 instrument.

9      Q    Based on the materials that you reviewed, would an

10 expert in the field of forensic pathology be able to

11 determine to a reasonable degree of medical certainty whether

12 the wounds suffered by Corporal McGuinn were produced by a

13 single weapon or multiple different weapons?

14      A    No I don't think you would be able to make that

15 determination.   You would not able to say whether this was

16 one weapon or multiple weapons that have the same general

17 characteristics.

18      Q    At the trial the State argued in closing that

19 "Dr. Vincenti told you and described for you that there were

20 two very different and distinct wounds.   The circular wounds

21 and the non-circular wounds.   That supports what Mr. Freed

22 tells you about seeing people stabbing Corporal McGuinn."   In

23 your opinion is there any scientific basis for that

24 statement?

25      A    No, there is no scientific basis for that statement

1 and I don't think that was that intent of the testimony.  I

2 don't think that was -- the wounds were described. They

3 weren't described with the idea to say that there was one

4 wound or many wounds, they were just described by the way

5 they looked.  When you understand the reason they looked that

6 way, then you come to the conclusion that one weapon could

7 have caused these wounds or multiple weapons could have

8 caused these wounds.

9  Q Is there any reason that you would not have been

10 able to serve as an expert witness for the defense in this

11 case in 2012, had the defense retained you to do so?

12  A No I could have been available to review this.  And

13 testified.

14  Q And had defense counsel in 2012 asked you the same

15 questions that I asked you today, would you have given the

16 same answers?

17  A I would.

18   MS. GOSTIN:  My apologies, I can't remember if I

19 offered G, but otherwise I have no additional questions.

20   THE COURT:  Accept G.

21   MR. RUSSELL:  No objection --

22       (The document marked for

23       identification as

24       Defendant's Exhibit G was

25       received in evidence.)

lnc

```
 1            THE COURT:  All right, cross.
 2                     CROSS EXAMINATION
 3            BY MR. RUSSELL:
 4       Q    Good afternoon, Dr. Spitz, how are you?
 5       A    Good evening, thank you.
 6       Q    So you came from Michigan is that right?
 7       A    Yes.
 8       Q    I assume you took a flight here is that correct?
 9       A    I did.
10       Q    Are you staying in a hotel or are you going back
11  today?
12       A    The plan is to go back this evening.
13       Q    And did you stay at hotel last night?
14       A    No, I came in early this morning.
15       Q    Okay and you are being paid an hourly rate to work
16  on this case is that fair to say?
17       A    Correct.
18       Q    And what is that hourly rate?
19       A    It is $250 per hour.
20       Q    And is that the same as what you normally charge?
21       A    It is variable.  That is sort of a Government rate
22  if you will.
23       Q    Okay and who is paying you to testify in this case?
24       A    For my time, I believe it is the Maryland Public
25  Defender's Office.
```

**App. 299**

1        Q     Okay.  Anybody from the Public Defender's Office

2   ask you to change your rate for them?

3        A     No.

4        Q     Okay.  Now according to your report you reviewed

5   testimony from the transcript is that right?

6        A     Yes. I am sorry -- I reviewed certain components of

7   it.  Not the entire transcript.

8        Q      Not the entire transcript, just certain portions

9   of the transcript.

10       A     I reviewed Dr. Vincenti and I reviewed testimony

11  from some medical professionals as well as some other

12  individuals but I focused primarily on the testimony of

13  Dr. Vincenti and some of the nurse involved, the paramedic

14  and I believe the firefighter.

15       Q     Okay.  And you reviewed the autopsy report?

16       A     Yes.

17       Q     And you looked at the autopsy photos?

18       A     Correct.

19       Q     And you said you looked at an investigative report,

20  is that right?

21       A     Yes.

22       Q     And who prepared that report do you know?

23       A     Well I believe it is primarily generated by the

24  Department of Corrections and the Maryland police agency

25  which conducted the investigation.

**App. 300**

lnc

1     Q    Okay. Now you explained -- and maybe you can help

2    me out because maybe you loss me a little bit. You explained

3    the difference between stab -- what your definition was

4    between stab wound and a cutting wound. Could you explain

5    that for me again?

6    A    Sure. A stab wound is a wound that is caused when

7    a sharp object is essentially put into the skin with the tip

8    of the blade going in first. Usually they are deeper than

9    they are long on the skin. But not always. And an incised

10    wound is when a sharp injury is caused by the belly of a

11    bladed object, so not the tip so much but the bladed edge

12    comes in contact with the skin causing injury. Usually they

13    are longer than they are deep. But not always.

14    Q    So it depends what part of the knife inflicts the

15    wound, is that what you are saying?

16    A    Correct. Whether it is the tip of the blade going

17    in first and then having the rest of the blade follow into

18    the body to a certain depth or whether the bladed portion of

19    the instrument is coming in contact with the skin causing a

20    cutting or an incised wound.

21    Q    And Dr. Vincenti said her definition was based on

22    the measurements of the wound itself, is that right?

23    A    Right.

24    Q    So her definition would be a little bit more

25    objective, yours is subjective. You would have to know what

lnc                                                                    187

1    the actual implement is and how it is used in order to figure

2    out whether it is stabbing or cutting, is that right?

3         A    Well you can determine that by looking at the wound

4    but if you just look at Dr. Vincenti's measurements, not all

5    of the wounds that she characterized as stabbed and cutting

6    actually fit her definition.

7         Q    Okay so you are saying that the tip causes a stab

8    and the belly causes a incision using your term, is that

9    correct?

10        A    Correct.

11        Q    Okay.  So based on these wounds you should know

12   then what the weapon is, is that right?  Because you need to

13   know what part of the weapon is used and then the wound

14   itself should tell you what kind of weapon it is.  Is that

15   what you are saying?

16        A    Well you know it is sharp instrument, you don't

17   have every dimension or characteristic of that sharp

18   instrument but you know it is sharp object simply by the

19   nature of the wound.  That is one of the things that forensic

20   pathologist would try to distinguish is whether these are

21   caused by a sharp instrument or whether they are caused by

22   say a blunt object coming in contact.  So these wounds

23   clearly are sharp in nature.  Can I give you the dimensions

24   and exact characteristics of the weapon?  I certainly cannot.

25        Q    Okay.  Now, Dr. Vincenti testified that these

**App. 302**

lnc

1   wounds -- all of the wounds contributed to blood loss.

2       A    Yes.

3       Q    And you are saying that that is not a correct

4   statement?

5       A    No, all of the wounds would contribute to blood

6   loss.  Some obviously would --

7       Q    And she also said that blood loss was the cause of

8   the death.  Right, the cause of blood.  Would you say that is

9   an incorrect statement?

10      A    No and I don't think she said that.  She said that

11  the cause of death were the multiple sharp force injuries.

12      Q    Which lead to blood loss?

13      A    Right.  The mechanism of death would be loss of

14  blood.

15      Q    Okay.  Now let me clarify with regard to wound E.

16  Are you saying that would or would not have been fatal?

17      A    Under normal circumstances, that would not be a

18  fatal wound.

19      Q    Okay, so it could not have killed him?

20      A    No I didn't say it could not have, I said under

21  normal circumstances it would not cause death.  In other

22  words, with pretty standard medical treatment and treatment

23  that was likely going to be rendered if necessary in a timely

24  fashion, this wound would not be a fatal wound.  Can't --

25  could it cause death in certain situations, it could.  A lot

1   of things could potential cause death as you wouldn't expect

2   them to but under normal circumstances I would not expect

3   that wound to be fatal in and of itself.

4        Q    So the answer is maybe?

5        A    It is a possibility but under normal circumstances,

6   I would not expect it to cause death.

7        Q    Okay.

8        A    In other words, it didn't bleed to a degree that

9   would be significant and it didn't cause a pneuomothorax

10   which would be air causing collapse of the lung.

11        Q    Okay.  And you don't know which if any of these

12   wounds came from Mr. Stephens is that right?

13        A    I wouldn't have any knowledge as to who inflicted

14   what.  Whether this was one knife or more than one knife.

15        Q    And you don't have any medical way of knowing

16   whether none of them came from him or all of them came from

17   him?

18        A    I have no knowledge on who inflicted what wound.

19        Q    Okay and you said that this can all be inflicted by

20   one weapon is that right?

21        A    It is a possibility.

22        Q    That is a possibility?  It is also a possibility

23   that it could be inflicted by two weapons?

24        A    That is also a possibility.

25        Q    It is also a possibility it could be inflicted by

1    three weapons, is that true?

2         A    Yes.  Provided that the weapons more or less are of

3    similar configuration, I would say yes.

4         Q    And so we could get up to a total of possible 24

5    different weapons, is that correct?

6         A    Simply based on the analysis of the wounds, that

7    would be a possibility yes.

8         Q    So the bottom line is you don't know how many

9    weapons were used?

10        A    I don't.

11        Q    Okay.  Are you aware that Mr. Stephens wasn't

12   convicted of conspiracy?

13        A    I don't have knowledge as to the legalities of the

14   conviction or things of that nature.

15        Q    Okay.  Now you said you read Dr. Vincenti's

16   testimony is that right?

17        A    Yes.

18        Q    And she never actually testified as to how many

19   weapons were used is that right?

20        A    She  never did testify to that, no.

21        Q    Okay.

22             MR. RUSSELL:  I have nothing further, Your Honor.

23             THE COURT:  Any redirect?

24             MS. GOSTIN:  No redirect, Your Honor.

25             THE COURT:  Sir, thank you for your testimony

1    today.  I hope you have a safe flight back and please don't

2    discuss your testimony with anyone.

3         THE WITNESS: Yes, sir.  Thank you very much.

4         (Witness is excused.)

5         THE COURT:  You said you might be light on

6    witnesses, who do you have after this?

7         MR. HUT:  We have one more witness today who is --

8         THE COURT: Who would that be?

9         MR. HUT:  He is here from Baltimore, it is an

10   expert in audio and hearing.  His name is Bradford May.

11        THE COURT:  Okay.  Do you need to use the bathroom?

12        THE DEFENDANT:  I am fine, Your Honor.

13        THE COURT:  Okay does anyone need to use the

14   bathroom?  Just tell me.

15        MR. RUSSELL:  No, Your Honor.  I am fine.  Thank

16   you.

17        THE COURT:  All right get your next witness.

18        MR. EAGLES:  Petitioner calls Dr. Bradford May.

19        MR. RUSSELL:  Your Honor, I am going to make some

20   objection with regard to Dr. May.  I don't know if I -- if

21   you would like me to make those before he testifies or wait

22   until they call him as an expert.

23        THE COURT: What is it going to relate to?

24        MR. RUSSELL: It is going to relate to the ability

25   of an expert to challenge the credibility of a witness.  And

lnc

1   the fact that we don't have a failure to call witness as one

2   of the enumerated claims.

3           THE COURT: Well, I think it is probably the best if

4   you object as he is testifying and then I can rule on it all

5   at the end.

6           MR. RUSSELL:  That is fine, Your Honor.

7           THE COURT:  Okay.

8   Whereupon,

9                         DR. BRADFORD MAY

10  was called as a witness by the Defendant, was first duly

11  sworn, was examined and testified as follows:

12          THE WITNESS:  I do.

13          THE CLERK:  You may be seated.  Please state your

14  full name and profession and spell your name for the record

15          THE WITNESS:  My name is Bradford May and I am a

16  professor of otolaryngology at Johns Hopkins University.

17                          VOIR DIRE

18          BY MR. EAGLES:

19      Q    Thank you, Dr. May and how are you doing?

20      A    Good.

21      Q    Could you just repeat for me real quick where you

22  said you are employed?

23      A    Johns Hopkins University in the Department of

24  Otolaryngology.

25      Q    And what is otolaryngology?

**App. 307**

1     A    It is the study of hearing and deafness.

2     Q    And how long have you been employed at Johns

3  Hopkins University?

4     A    I came to Johns Hopkins in 1987 as a trainee and

5  joined the faculty in 1990.

6     Q    And what is your current position there?

7     A    I am a professor.

8     Q    And are you a full professor?

9     A    Yes, I am full professor.

10    Q    And how long have you held that position?

11    A    Pardon me?

12    Q    How long have you held that position?

13    A    Since 2003.

14    Q    And what was your previous position at Johns

15  Hopkins?

16    A    I advanced through the ranks as an assistant

17  professor then an associate professor.

18    Q    Could you please provide your educational

19  background?

20    A    I got my undergraduate training at Indiana

21  University, I got my PhD at University of Michigan and I did

22  a post doctoral fellowship at Johns Hopkins.

23    Q    Do you do research as a part of your job at Johns

24  Hopkins?

25    A    Yes I do.

1      Q      And what is the focus of your research?

2      A      It is on sound and the perception of sound.

3      Q      Have you published any books or articles in the

4  fields of neurobiology and sound?

5      A      Yes I have.

6      Q      And roughly how many?

7      A      Approximately 60 peer reviewed articles and

8  approximately 20 book chapters.

9      Q      Are you an editor of any journals related to the

10 science of hearing?

11     A      Yes, I am on the editorial board of hearing

12 research.

13     Q      Okay and I am showing you what has been marked as

14 Petitioner's Exhibit I, do you recognize what that is?

15     A      Yes, this is my curriculum vitae.

16     Q      And does this accurately reflect your education,

17 training and expertise in the field of neurobiology and

18 hearing?

19     A      Yes it does.

20            MR. EAGLES:  Petitioner offers Exhibit I.

21            MR. RUSSELL:  We have no objection to that, Your

22 Honor.

23            THE COURT:  To the CV?

24            MR. RUSSELL:  To the CV, that is his CV.

25            THE COURT: All right, we will accept it.

1                                          (The document referred to was

2                                          marked for identification as

3                                          Defendant's Exhibit I and was

4                                          received in evidence.)

5          BY   MR. EAGLES:

6          Q    And starting at the bottom of page 1, does this

7     accurately reflect your publications and the years in which

8     they were published?

9          A    Yes, it does.

10         Q    Turning to page 10 and on page 11, does this

11    accurately reflect the professional organizations of which

12    you are and were a member?

13         A    Yes it does.

14         MR. EAGLES:   Your Honor, petitioner offers

15    Dr. May as an expert in the field of sound and human hearing.

16         MR. RUSSELL:   And I have some objections, though,

17    Your Honor.

18         THE COURT:   How does this relate to an issue in the

19    post conviction hearing?

20         MR. EAGLES:   Well, Your Honor, we -- as we said in

21    our petitioner, on page 10, in paragraph 27 the last sentence

22    we said that counsel failed to on cross examination and

23    through expert testimony to undermine Mr. Freed's testimony

24    by demonstrating that he was not  and could not have been a

25    percipient witness.

1        THE COURT: So has the State of Maryland adopted the

2   rule in terms of identification including hearing that

3   requires expert testimony?

4        MR. EAGLES:  Well --

5        THE COURT:  Or has the trend been as Judge

6   Brattaglia teaches us in Smiley versus State dealing with

7   identification that we do not consider expert testimony as it

8   relates to identification especially as it relates to either

9   eye witness or hearing.

10        MR. EAGLES:  Well, Your Honor, I would draw a

11   distinction between expert testimony about eye witness

12   identification as in regards to things like memory loss or

13   cross racial identification --

14        THE COURT: Which have not been accepted at all by

15   the Maryland Courts.

16        MR. EAGLES: That is right.  Versus -- as compared

17   to expert testimony in terms of what the eye is capable of

18   seeing and under which conditions.  Or what the ear is

19   capable of hearing and under what conditions.

20        THE COURT:  So why wouldn't a witnesses common

21   sense in jury instruction 3.10 and why we need an expert

22   opinion to tell me that if you can't hear it, you can't  hear

23   it and if you can't see it, you can't see it.  And -- I am

24   trying --

25        MR. EAGLES:  Well, Your Honor, I would submit that

**App. 311**

lnc

1   it is not a --

2               THE COURT:  Hold on -- hold on you haven't let me

3   finish. I am trying to think in any way, shape or form how

4   this would have been admitted at trial.  An expert from

5   Hopkins who is going to come down and who is an expert on

6   sound and human hearing and isn't the question, what did you

7   see and what did you hear?  And then you ask about the

8   difference or the distance and then all of these other

9   things?

10              MR. EAGLES:  Well Your Honor, I would submit that

11  to an extent you can say --

12              THE COURT:  So do I need an expert here to tell me

13  what I am hearing?

14              MR. EAGLES:  I think there is a different -- well

15  certainly not to tell you what you are hearing, but for

16  example if someone else were to have to decide what you can

17  hear --

18              THE COURT:  I am the trier of fact.

19              MR. EAGLES:  That is true, Your Honor and but what

20  was at issue wasn't the testimony about what you, the trier

21  of fact heard.  What was at issue was the testimony about

22  what Mr. Freed, the State's lone eyewitnesses who identified

23  the petitioner could see or hear.  And I would --

24              THE COURT:  Was there any testimony that he

25  suffered hearing loss?  He had a hearing aide?  That is ear

lnc

1   drums were damaged in any way such that he wasn't going to be

2   able to see -- I mean, you got glasses and so do I.  I take

3   mine off and I am going to have trouble seeing if you give me

4   a three finger salute or a one.

5        MR. EAGLES:  Well Your Honor, I also -- I am sorry.

6        THE COURT: But that is you know, so if I said I

7   could see from here to the back wall, what the clock says and

8   then you brought somebody in and who said my vision is

9   uncorrected at 2600, 2800 I could understand that.  But I am

10  absolutely at a loss to understand how you are going to be

11  able to get this in undermine the testimony from Mr. Freed.

12       MR. EAGLES: Well, Your Honor, I would first say

13  that the analogy that I would draw is more akin to certainly

14  if I drop this pen, everyone knows it is going to fall. But

15  if there is a question about physics, you still need a

16  physicist to explain to you how it works.

17       THE COURT:  No, not in the courts.  We still accept

18  some elements of common sense despite the fact that many

19  people wish we didn't.  We haven't eliminated everything, we

20  have yet to have guilt by gadget.  Or guilt by expert.  Or

21  innocence by expert.

22       MR. EAGLES:  Your Honor, I would also suggest --

23       THE COURT:  And the amount of junk science which

24  tends to populate the Court's --- but I am not in any way

25  saying that Professor May is going to testify as a junk

1   science but it is a question under Rule 5701, 5702, 5703, 4

2   and 5 whether it would ever come in at all and I am just

3   absolutely flummoxed at this point to think how you were

4   going to get someone to come in and say it was  noisy and

5   therefore he couldn't have heard what he said he heard when

6   we got pattern jury instruction 3.10 and he never went to the

7   cell.   He never investigated the cell  and he has no idea

8   what the ambient noise is at the cell.  He never spoke to Mr.

9   Freed.  He never talked to Mr. Freed and he doesn't know what

10  Mr. Freed's hearing is.  How are you going to get this in in

11  terms of the sufficient factual basis to support any expert?

12  I don't even know what his opinion is going to be  --

13          MR. EAGLES:  Well that is exactly Your Honor why I

14  was going to --

15          THE COURT:  -- that is why I am having such a hard

16  time even considering this.

17          MR. EAGLES:  Well, Your Honor to that point I would

18  propose that you allow him to testify and then you can decide

19  whether or not --

20          THE COURT:  Doesn't really work that way in the

21  courts.

22          MR. EAGLES:  There is no jury Your Honor.

23          THE COURT: I know.  But you got to give me a

24  proffer first.  Tell me what your proffer is as to what 5702

25  his opinion is going to be having never interviewed Mr.

1   Freed, seen Mr. Freed and know Mr. Freed's audio capabilities

2   or unless you can tell me that he actually went to the House

3   of Corrections and knew what it was like on that cell.

4          MR. EAGLES:  Your Honor, I think --

5          THE COURT:  Calm down, Mr. Hut, I can see

6   everything including you raising your hand at least three

7   times, rolling your eyes, tossing your head -- I see it all

8   okay.

9          MR. HUT:  I didn't mean to be that demonstrative,

10  Your Honor.

11         THE COURT: I know what you did.

12         MR. EAGLES:  Your Honor, I think your questions

13  actually indicate the value of his testimony because his

14  testimony does not actually depend on any of the variables

15  that you mentioned. His testimony is about the how audible a

16  stab is? And that at the distance -- at the undisputed

17  minimum distance using and at the very maximum credible sound

18  that this could have made, under even ideal listening

19  conditions with even the optimal listener.

20         THE COURT:  Did you ever read that pattern jury

21  instruction 3.10 and 3.14?

22         MR. EAGLES:  I am sur I have, Your Honor.

23         THE COURT:  The jury is free to accept, part or

24  none of the testimony of any witness. So I will tell you what

25  I will do.  At this point in time, you have great skepticism.

**App. 315**

1    But he testify subject to a motion to strike and the State is

2    going to hold off on their voir dire and I will just do it

3    all at once. Because as Mr. Eagles points out so

4    appropriately there is no jury that I have to worry about.

5           But I am still having a hard time figuring out how

6    he is going to have a sufficient factual basis to support

7    whatever it is you want to tell me so that I can then find

8    the proper/law of ineffective and failure to call him, so go

9    ahead.

10          MR. RUSSELL:  But Your Honor, may I --

11          THE COURT:  Hold on Mr. Russell.

12          MR. RUSSELL:  I just want to make clear that there

13   is another issue that I want to raise beyond just his -- what

14   the basis is.  And I think the Court may have touched on this

15   and I apologize, I will be very brief.  But Hutton versus

16   State which is 339 Maryland 480, says, "We are asking of

17   witness not beyond the understanding of a jury and no matter

18   how learned is his or her field of expertise.  No expert is

19   in a better position to assess the credibility of the witness

20   than is the jury" and where these states --

21          THE COURT:  I think I said that when I talked about

22   we don't' determine guilt or innocence by gadget or --

23          MR. RUSSELL:  And exactly Your Honor, I just want

24   to make sure that the record is clear that I will cite one

25   more case and I promise that I will stop talking. Werr v

lnc

1   <u>State</u> which is from 2000, 360 Maryland 650 says, "A witness,

2   expert or otherwise may not give an opinion on whether he

3   believes a witness is telling the truth, testimony from a

4   witness relating to the credibility of another witness is to

5   be rejected as a matter of law."

6           THE COURT:  I know but you see the way they get

7   around it is he is not going to testify as to the credibility

8   of a witness, he is just going to testify that based upon the

9   science X distance away would not be able to hear something.

10          MR. RUSSELL:  Something -- and just one last point,

11  Your Honor, it is something that I am going to guess that he

12  has not ever tested to see how loud it is. I am guessing

13  people aren't getting stabbed in his laboratory.

14          THE COURT:  So that throws us back into 5702 which

15  is going to be an issue that I have already expressed

16  skepticism about.

17          MR. RUSSELL: Fair enough, Your Honor, thank you.

18          THE COURT:  All right, so go ahead, ask him your

19  questions and we will see where it goes.

20          MR. EAGLES:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22          BY MR. EAGLES:

23   Q      Dr. May, good to talk to you again.  Were you

24  retained by petitioner's counsel in connection with this post

25  conviction proceeding?

**App. 317**

1        A     Yes I was.

2        Q     And what were you asked to do?

3        A     I was asked to evaluate the detectability of the

4    sound made by a stabbing.

5        Q     And did you rely on expert disclosures or an expert

6    report in connection with this matter?

7        A     Yes, I did.

8        Q     Showing you what has been marked as Petitioner's

9    Exhibit J. Do you recognize that that is?

10       A     Yes, I do.

11       Q     And what is it?

12       A     This is the expert report that I filed.

13       Q     And please turn to page 2.

14             THE COURT:  Has that been scanned?

15             MR. EAGLES: Would you like a copy, Your Honor?

16             THE COURT:  No it is just not scanned.   It

17   refreshes in a minute.

18             BY MR. EAGLES:

19       Q     And please turn to page 2, does this accurately

20   list the materials you reviewed in connection with your

21   assignment?

22       A     Yes, it does.

23             MR. EAGLES:  Petitioner offers Exhibit J.

24             MR. RUSSELL:  No objection, Your Honor.

25             THE COURT: All right. Accepted it at this point in

**App. 318**

lnc

1      time.

2                              (The document referred to was

3                              marked for identification as

4                              Defendant's Exhibit J and was

5                              received in evidence.)

6           BY MR. EAGLES:

7      Q    Dr. May, how do you measure the audibility of the

8      sound?

9      A    You measure the level -- the sound level of a sound

10     with an instrument.  You measure the audibility of the sound

11     with an human observer.

12     Q    Okay and how are sound levels measured?

13     A    Sound levels are typically measured in terms of

14     decibels, relative to some standard -- usually sound pressure

15     level, SPL.

16     Q    And is that  measurement generally accepted in the

17     scientific community?

18     A    Yes it is.

19     Q    For reference can you estimate how many decibels

20     SPL your voice is right now?

21     A    My amplified voice is probably in the range of 60

22     to 70 DV.

23     Q    What affect if any does distance have on a person's

24     ability to hear a sound?

25     A    Under optimal conditions, the further you get away

lnc

1   from a sound, the less detectable it is.

2        Q     And can the effective distance on hearing be

3   quantified?

4        A     Yes it can.

5        Q     How?

6        A     So these are basic physical properties -- property

7   of the propagation of sound and it is as a sound, doubles in

8   distance.  The energy in that sound is inversely reported to

9   the square of that distance.  That is called the inverse

10  square line.

11       Q     Okay and if the person is far enough away, and what

12  would eventually happen to the decibel level?

13       A     At some point, the level of the sound would drop

14  below the level of detectability by an individual with

15  absolutely best hearing.

16       Q     And what other factors apart from distance can

17  affect someone's ability to hear?

18       A     As the judge brought up earlier, the hearing

19  ability of the observer and also the environment in which the

20  sound is propagating.

21       Q     And how does the level of background noise affect

22  the ability to hear?

23       A     So the general principle is that the more energy

24  you have in the background noise the less detectable an

25  auditory signal would be.

**App. 320**

lnc

1 Q For example, what is the background decibel level

2 of a business restaurant or office?

3 A Probably you are talking a sound level rating of

4 about 60 to 70 DB.

5 Q What about a library?

6 A A library considered very quiet environment, it is

7 usually thought of as being around 40 decibels.

8 Q And how do you know that?

9 A These have been measured many times and reported in

10 scientific literature.

11 Q Dr. May, do you have an opinion formed to a

12 reasonable scientific certainty concerning whether someone

13 with optimal hearing ability listening under optimal hearing

14 conditions could hear the sound of a stab from 110 feet away?

15 A Yes, I do.

16 Q And what is that opinion?

17 A They would not be able to detect that sound.

18 Q What about at 140 feet?

19 A It would be even less detectable.

20 Q What is the basis for your opinion?

21 A The inverse square law.  The level of the sound

22 would have dropped  an additional amount over that longer

23 distance and would be less detectable than up closer.

24 Q And have you estimated the sound of a stab?

25 A Yes, I have.

**App. 321**

1        Q    And how did you go about doing that?

2        A    Well, first what I would say is I went into the

3    forensic literature looking to see for scientific studies of

4    the sound of stab and did not find anything in the literature

5    describing that.  I estimated the level just on the

6    descriptions of stabbing sounds that were described in the

7    testimony and but I was concerned that this was just an

8    estimation on my part.  So I did a crude simulation and I

9    purchased a large piece of meat.  I got a sharp instrument.

10    I went to a very quiet environment.  I used my laboratory

11    grade sound level meter and I took several measures.  And I

12    reported as the level of the stab -- the loudest measure that

13    I got in all of my samples.

14        Q    And when did you run these simulations?

15        A    Last weekend.

16        Q    So that was after writing your report?

17        A    That is right.

18        Q    And what was the loudest recorded sound that you

19    got?

20        A    46 decibels.

21        Q    And what was the technology you used to read those

22    sounds?

23        A    Again, in a controlled quiet environment.  This was

24    an environment with an ambient noise level of about 30

25    decibels, so quieter than you would achieve in a typical

1    library and I used again laboratory quality sound level

2    meter.

3         Q    And using that 46 decibel SPL level, at what

4    distance did you measure the decibel level?

5         A    One foot.

6         Q    At a distance of 110 feet what would the decibel

7    level be?

8         A    The decibel level at that point would have followed

9    to about zero to 5 DB SPL.

10        Q    And is that audible?

11        A    That is audible under controlled laboratory

12   conditions about half the time by people with best reported

13   hearing.  So we are talking about young people  with no

14   history of sound exposure.

15        Q    What would the addition of background noises say at

16   a level of 60 to 70 comparable to a restaurant as you had

17   testified earlier what would that do?

18        A    So usually detectable signaling noise levels are

19   about minus 20 DB.  So if you had a 70 DB noise level, the

20   sound -- the signal that you are trying to detect would need

21   to be at least 50 DB.  40, it would be 20 DB.  60, it would

22   be 40 DB.

23        Q    And if it were a library -- if it were comparable

24   to a library, and the background --

25        A    That would be 40 DB and it would need to be still

**App. 323**

lnc

1    louder than my estimation of the level.  So it would need to

2    be 20 DB, I estimated 0-5 DB.

3        Q    And just so we are clear, do you have an opinion

4    formed to a reasonable scientific certainty concerning

5    whether someone with optimal hearing in an otherwise optimal

6    listening environment, could have heard the sound of a stab

7    from 110 feet away assuming that the presence of noise levels

8    in the background comparable to a quiet library?

9        A    I believe that they would have missed by

10   approximately 25 DB, so the answer is no.

11       Q    And is 25 DB close?

12       A    No.

13       Q    And could you just once again what is the basis of

14   that opinion?

15       A    Is it close?

16       Q    Yes.

17       A    Sound pressure level is measured in DB, which is an

18   a log arrhythmic scale.  So every -- you have to change

19   sounds level by a factor of 10 to increase by 20 decibels.

20   So that would be an order of magnitude plus change in the

21   sound pressure level to achieve detectability.

22       Q    And are there any other variables that can impede

23   someone's ability to hear?  For example, the make up of the

24   surrounding area?  Or things that are in the way?

25       A    So because I realized that I wasn't -- I didn't go

1    there, I didn't record these things when they happened, my

2    estimations are based on being as conservative as I can.

3    Taking the loudest values possible.  But when I am describing

4    an ideal listening condition, it is nothing like what we are

5    describing in terms of the environment where this incident

6    occurred.  So for example, if some -- if the sound is

7    generated at a point and an individual is standing between

8    the source of origin and the listener, that his going to

9    substantially drop the audible sound level.  And if the

10   environment is a pair of cell doors and each of those cell

11   doors has a blanket hanging over that door, that is going to

12   absorb that sound along its transmission.

13         So again all of these changes make it even more

14   impossible to hear the sound.  But my point is, we don't need

15   to deal with that because we are not really dealing with near

16   detectable sound levels to begin with.

17   Q    So you are setting aside all of those variables,

18   someone with optimal hearing capacity under optimal listening

19   conditions and an hearing optimal environment, do you have an

20   opinion about whether or not that person would be able to

21   hear the sound of a stab at 110 feet?

22   A    They would not.

23   Q    Dr. May, had counsel to Mr. Stephens retained you,

24   would you have been available to testify at trial in this

25   case back in 2012?

**App. 325**

1      A    Yes, I would.

2      Q    Would you have been able to serve as an expert

3    witness on sound and human hearing?

4      A    Yes I would.

5      Q    And had defense counsel asked at trial in 2012,

6    asked you the same questions that I just asked you, would you

7    have provided the same answers?

8      A    Yes, I would.

9      Q    Okay.

10         MR. EAGLES:   Thank you, Your Honor.

11         THE COURT:   All right, cross?

12         MR. RUSSELL: Your Honor, I am going to renew my

13    objection at this time and ask you to strike his testimony.

14         THE COURT:   Cross first.

15         MR. RUSSELL:   Okay.

16                   CROSS EXAMINATION

17         BY MR. RUSSELL:

18      Q    So Mr. May you are from Johns Hopkins, is that

19    right?

20      A    That is correct.

21      Q    And I assume you are being paid for your work?

22      A    Yes, I am.

23      Q    And you are being paid hourly?

24      A    Yes I am.

25      Q    And how  much are you being paid hourly?

lnc                                                                    212

```
 1      A    $150 an hour.

 2      Q    And is that your normal rate?

 3      A    No.

 4      Q    What is your normal rate?

 5      A    $250.

 6      Q    And who is paying you that?

 7      A    The Public Defender's Office I assume.

 8      Q    And have you ever testified in court before?

 9      A    No I have not.

10      Q    Okay.  So this is your first time?

11      A    Yes.

12      Q    Okay.  Now, Mr. May, taking a look at your CV, you
13   do a lot of work with animals is that fair to say?

14      A    That is correct.

15      Q    Mice, cats, monkeys?

16      A    Yes.

17      Q    Rats?

18      A    Yes.

19      Q    Not any work with humans?

20      A    No I do perceptual acoustics in human patients as
21   well.

22      Q    Okay.  So all of the information that you have
23   other than this crude simulation that you say you did, all
24   the other information that you have came from the transcript,
25   is that right?
```

**App. 327**

1       A      No, there is information from the transcripts about

2    the specifics of this incident.   But I relied on scientific

3    literature to make conclusions about what are typical ambient

4    sound levels.   Those sorts of inferences.

5       Q      But the facts that you used to come to these

6    conclusions, those were all facts from the transcripts, is

7    that correct?

8       A      I think that the one critical fact that I used was

9    something that I was told to assume which was where the

10   incident occurred, where the observer was located and then

11   from that I calculated the distance between those two

12   locations.

13      Q      Okay. Let's start with that then.   How far away was

14   Mr. Freed from the stabbing?

15      A      I don't know the answer to that.

16      Q      Right.

17      A      I know what I was told to assume.

18      Q      You know what you were told to assume but you don't

19   actually know how far away he was?

20      A      That is correct.

21      Q      Okay.  And were you -- did you ever do any

22   measurements at the  Maryland House of Corrections?

23      A      I was shown a schematic of the house -- that tier

24   and I was given the physical dimensions of the width of an

25   individual cell but I did not go there and measure that.

1       Q     Okay, so you have never been to the House of
2   Corrections?
3       A     No, I have not.
4       Q     And it is not there anymore so you can't now if you
5   wanted to. So how many decibels was the background noise at
6   the House of Corrections that night?
7       A     So --
8       Q     I am not asking you to estimate.  I am asking you
9   to say how much -- what was the background noise level that
10  night?
11      A     So I did not take a level -- a noise level
12  measurement at that location at that night.  So I don't know
13  the exact answer to that.
14      Q     Okay.  And now you did -- what you said was a crude
15  simulation is that right?
16      A     Yes.
17      Q     Stabbed a piece of meat?
18      A     Yes.
19      Q     Did the -- I assume the  meat was not alive?
20      A     That is correct.
21      Q     What did you stab it with?
22      A     I stabbed it with a sharp knife.
23      Q     Okay.  Was the -- so it seems kind of silly
24  question to ask, the meat wasn't wearing any clothing?
25      A     No, it was not.

1    Q   Okay so the meat was nude.  So meat is muscle, can

2 we agree on that?

3    A   Yes this was muscle.

4    Q   And so it wasn't a tense muscle, right?  It was

5 dead muscle?

6    A   Correct.

7    Q   Okay.  And if you don't mind me asking Dr. May, how

8 old are you?

9    A   I am 64 years old.

10    Q   Again, I don't want to impede on your Fifth

11 Amendment rights, but I assume you have never stabbed someone

12 to death is that fair to say?

13    A   I have not.

14    Q   Okay.  And what you came away with was you stabbing

15 a piece of meat with what I assume was a sharp knife?

16    A   Correct.

17    Q   An unclothed piece of meat is 46 decibels.

18    A   The loudest of many measurements was 46.

19    Q   So you used the same piece of meat?

20    A   Yes.

21    Q   Okay.  And the loudest was 46 decibels and you said

22 a library would be 40 decibels is that right?

23    A   Correct.

24    Q   Okay.  And you said you don't know what the

25 background noise was but you are assuming that there was

lnc

216

1    significant background noise is that right?

2        A    So I read testimony from people on the tier that

3    stated this was a noisy environment.  There were testimony

4    from both inmates and from correctional officers  that worked

5    on the tier that there were industrial fan noises.  And there

6    was testimony from the observer himself that he kept a small

7    purple fan running in his cell.  So those conditions are

8    without taking a measurement are certainly louder than 40

9    decibels.

10            THE COURT:  What day was that testimony?  Do you

11   recall?

12            MR. RUSSELL:  What specifically are you asking,

13   Your Honor?

14            THE COURT:  I am not sure -- I can't remember when

15   Freed testified?

16            MS. GOSTIN:  That was on January 17, Your Honor.

17            THE COURT:  Was it the 17th.  Just passing the

18   clerk a note.  I just cannot find the January 17 transcript.

19            MS. GOSTIN:  I have a copy if it will be helpful to

20   the Court.

21            THE COURT:  No I need it in here but I am just --

22            MR. RUSSELL:  Your Honor, while you are doing that,

23   I am about to ask everybody to look at January 18th as well.

24            THE COURT: I have the 17th open.  So you want to go

25   to the 18th?

**App. 331**

1          MR. RUSSELL:  I am going to in a couple of

2   questions.

3          THE COURT:  What page and what line?

4          MR. RUSSELL:  174, start around line 2.

5          THE COURT:  All right, go ahead, you can do that.

6          MR. RUSSELL:  Thank you.

7          BY MR. RUSSELL:

8     Q    So Mr. May this testimony here that you list here

9   in your report, that is all -- that is everything from the

10  transcript that you read, is that right?  Okay so you didn't

11  read Lieutenant Mayfield's testimony is that right?

12    A    I am not sure.

13    Q    Well, if it is not on here is it safe to assume

14  that you didn't read it?

15    A    Yes, it is.

16    Q    Okay.  Now how loud is a pin drop? How quiet does

17  it have to be to hear a pin drop?

18    A    It depends on how big the pin is.  And what the pin

19  is dropping onto.  And how far away from it you are taking

20  the measurement.

21    Q    Okay well what if I told you that Lieutenant

22  Mayfield testified -- he was asked, "Question:  And by quiet

23  do you mean by quiet you can hear a pin drop on that tier or

24  do you mean no one was talking?  Answer:  A pin drop on that

25  tier.  Question:  Weren't there large fans sir?  Answer:  Say

1    that again?  Question:  It is July, it is hot, there is no

2    air conditioning weren't there large fans going all the time?

3    Answer:  I am not sure if the fans were going at all?

4    Question:  Okay, but there are large fans on that side.  I am

5    not sure if they were on at night, people don't like fans

6    being on so that they can sleep."  Did you read any of that

7    testimony?

8         A    No, I read testimony that stated the fans were

9    functioning and testimony saying that the fans were not

10   functioning.  So I assumed both scenarios.

11        Q    And who gave you the portions of the transcript

12   that you should read?

13        A    The defense counsel here.

14        Q    Okay.

15        A    I am not sure they gave me portions of transcripts

16   as much as they gave me the full transcripts.

17        Q    Did they give you Mr. Mayfield's testimony?

18        A    No I mean, for the -- days of transcripts,

19   witnesses.  They hadn't given me excerpts of those.  They

20   gave me the full testimony.

21        Q    Okay.  Let me ask you a different question.  So you

22   are saying even though you don't know how far away Mr. Freed

23   was, you are assuming he was 110 feet away? Is that right?

24        A    Yes, for my calculations.

25        Q    So 110 feet away, so relatively speaking, baseball

1   second base is 127 feet 3 and three eights inches away.  So

2   this would be roughly 17 feet in front of second base to home

3   plate is that right?  Okay, now from that distance --

4        A    I am trusting your  numbers here. I don't really

5   know if those are correct numbers  or not.

6        Q    Okay I promise you they are.  Now from that

7   distance, you would agree you would be able to hear a bat

8   hitting a ball, right?

9        A    Yes.

10        Q    Okay and you would probably be able to hear a ball

11   hitting a catchers mitt, right?

12        A    I believe you probably would.

13        Q    Okay what do you think if you would be able to hear

14   from that distance a baseball hitting a batter's skin?

15        A    It depends I think on where it hit the person.  If

16   it hit the person in the skull, I think you might be able to

17   hear that. I think if it hit in softer tissue that absorbs

18   most of the energy of the baseball, I think it might be hard

19   to hear that.

20        Q    Okay so it might depend on what the person was

21   wearing?

22             THE COURT:  Trust me, it is not. Because my son is

23   playing baseball now and I watch every single one of his

24   teammates get hit with the ball and they all scream at the

25   same time.  Once they get hit, they are very proud because

**App. 334**

1    they get a free base and it makes a wonderful smacking sound,

2    especially when it gets them in the buttocks and the lower

3    back, in the ribs, in the shoulder.  Off the helmet it is a

4    really nice clunk and off the bat it is a completely

5    different sound.  So -- it is a really nice sound when the

6    bat -- when the ball hits the person.

7              BY MR. RUSSELL:

8         Q    Now to --

9              MR. RUSSELL:  I apologize, Your Honor, I didn't

10   mean to cut you off.

11             THE COURT:  Next question.

12             BY MR. RUSSELL:

13        Q    Mr. May so as we were  just saying, there could be

14   helmets, depends on what the person was wearing, could have

15   an effect on what the sound is, is that right?

16        A    Yes but I don't think your analogy is appropriate

17   for what we are really describing here.

18        Q    But the analogy of stabbing a piece of meat is more

19   appropriate is that what you are saying?

20        A    Yes.

21        Q    Okay.  Now, so let's assume that -- and this might

22   be a little facetious but let's assume that somebody was

23   wearing a vest of balloons, you would be able to hear

24   somebody stabbing them, right?

25        A    What are the circumstances?

**App. 335**

1    Q    From 110 feet, do you think you would be able to

2  hear somebody stabbing that person?

3    A    I think someone with hearing better than mine

4  probably would be able to hear that.

5    Q    What if they were wearing a metal suit of armor

6  that would probably make more noise than if they weren't, is

7  that right?

8    A    That is correct.

9    Q    Okay.  What is a shank proof vest?

10   A    I have no idea.

11   Q    Okay.

12        MR. RUSSELL:  Nothing further, Your Honor.

13        THE COURT:  All right.

14        MR. RUSSELL:  And again I will renew my objection

15  and ask that his testimony be stricken.

16        THE COURT:  Not until everything is done.

17        MR. RUSSELL:  I am sorry, Your Honor, I keep

18  jumping.

19        THE COURT:  For the third or the fourth time.

20                  REDIRECT EXAMINATION

21        BY MR. EAGLES:

22   Q    Dr. May, did you need to read the transcript to

23  know how loud a stab is at one foot under ideal listening

24  conditions?

25   A    No, the transcripts didn't help with that.

**App. 336**

lnc
                                                                    222

1        Q      Did you need to visit the prison to know how loud a

2    stab is at one foot under ideal listening conditions?   .

3        A      No.

4        Q      Did you need to read the transcripts to know how

5    sound decreases in audibility over distance?

6        A      No.

7        Q      Did you  need to visit the prison to know how sound

8    decreases in audibility over distance under otherwise ideal

9    listening conditions?

10       A      No I did not.

11       Q      Did you need the transcript to know that a sound of

12   a stab would not be audible to a human with optimal hearing

13   under ideal listening conditions so with no background noise

14   at a distance of 110 feet?

15       A      No I did not.

16       Q      Did you need to go to the prison to know that the

17   sound of a stab would not be audible to a human with optimal

18   hearing under ideal listening conditions at a distance of 110

19   feet?

20       A      No I did not.

21       Q      And based on the calculations that you did, under

22   ideal listening conditions at a distance of 110 feet, how

23   much loud would the stab have had to be in order to be

24   audible at that distance under ideal listening conditions?

25       A      The sound would have needed to be approximately 20-

1    25 DB louder if under the assumption that the ideal listening

2    conditions is a very quiet listening environment like a

3    library.

4         Q    And when you ran your simulation, how many times --

5    how many actual stabs did you do?

6         A    20.

7         Q    And the number you used in your calculations, where

8    did that fall in the range of --

9         A    It was the absolute loudest one.

10        Q    And what was the quietest one?

11        A    39.

12        Q    Was there a level of sound that your machinery

13   could not detect?

14        A    Yes.  But this -- I have a very good sound level

15   meter and all of these measures were above that.  My meter

16   will probably go to the high 20s.

17        Q    The other hypothetical that the State just asked

18   you about, have you run simulations on those?

19        A    On the baseball hitting no I have not.

20        Q    Okay.

21             MR. EAGLES: I believe that is all for me.

22             THE COURT:  Anything else for this gentleman?

23             MR. RUSSELL:  No, Your Honor.

24             THE COURT:  All right, sir, thank you very much for

25   being here today.  You can step down.

1            THE WITNESS:  Thank you.

2            (Witness is excused.)

3            THE COURT:  Please don't discuss your testimony

4    with anyone.

5

6            MR. RUSSELL:  Now Your Honor may --

7            THE COURT:  Well, he is still in the courtroom.

8            (Pause)

9            THE COURT:  Mr. Eagles, unless you are not going to

10   be recalling him, he is still in the courtroom.

11           MR. EAGLES:  My apologies, Your Honor.

12           THE COURT:  You would have to talk to the State

13   about that.  So I don't know that I can exclude the evidence

14   but I think it is a question of whether or not if this

15   witness  had been called, the Court would have to make an

16   assessment  as to whether or not this testimony might have

17   been admissible and if so what if any effect it would have

18   had.

19           But I will be very candid.  It doesn't even come

20   close to replicating what probably happened that night.  Or

21   according to the transcript you have two people in a violent

22   attack with at  last one steel shank stabbing a correctional

23   officer who has keys and a walkie talkie  and you have a

24   weapon being plunged into various parts of his body.  When

25   you talk about the sound of stabbing it is sort of like

1   talking about the sound of a fight.  And the sound of a fight

2   is not just (indicating) the fist hitting the skin.  But it

3   is everything else that goes along with it. The chairs, the

4   tables being overturned, the glass breaking, the bottle

5   breaking, the sound of a flashlight going upside someone's

6   head.  The crunch that comes when a bone is broken, you know

7   to say I think it was on page 117 line 24 and 25, you could

8   hear the contact.

9          I mean, what the doctor did was he took a meat and

10  he stabbed a knife into it.  Granted that is not going to

11  make any sound at all but I am pretty sure that if I took a

12  knife and I started carving you up 24 times and it is going

13  to be a sound and it is -- I just don't remember it being

14  specific and when he talked about you could hear the contact,

15  I mean, we are talking about the contact of the entire

16  encounter.  So I am going to deny the motion to strike it but

17  I am going to tell you when I start looking at it under 5701,

18  5702, 5703, I am not sure what if any weight it is going to

19  have in terms of Lawlor/Proctor not calling a witness who

20  could have testified to this.

21         And that also seems to have touched on credibility

22  but that is a different matter.  There is always ways get

23  around the credibility argument.  All right, who do you have

24  next today?

25         MR. HUT:  I think that actually concludes us --

1    THE COURT: All right, that is a good time because

2    it is 4:10 and I think Mr. Stephens has brought over -- did

3    you bring him over separately?  He doesn't come in the

4    normal DOC bus that we use does he?  All right, so that gets

5    him out about 20 minutes earlier.  Can you be here so you can

6    start at 9:00?

7    MR.          :   Yes, Your Honor.

8    THE COURT:  Okay, same rules tomorrow, make sure

9    his hands are accessible so that he can talk.  Who brings him

10   lunch? Is that our sheriff or is that DOC?

11   MR.          :   That was the sheriff today --

12   THE COURT:  Okay because I need to make sure that

13   he has his breakfast and lunch.  Okay.  All right, go ahead,

14   Mr. Hut?

15   MR. HUT:  Just Your Honor before the DOC transports

16   him back to Cumberland, I think that we had asked if we could

17   meet with him for a period of time.

18   THE COURT:  What you can do is the sheriff can call

19   downstairs and the attorney interview room, you can talk to

20   him downstairs in the attorney interview room, all right?  I

21   think all three can go in there, can't they?

22   MR.          :   Two sure, three may be crowded.

23   THE COURT: I know it is -- it is going to be

24   crowded.

25   MR. HUT:  Two chairs but Mr. Eagle will stand.

1      THE COURT:  That is fine.  Line up tomorrow, who do

2  you have -- do you have Mr. Proctor?

3      MR. HUT:  So we have Mr. Proctor and I think we

4  will be coming first with lead from Judge Blake in Baltimore,

5  we then have Dr. Loftus and without whom there will be the

6  same issues but -- and I don't know and I don't want to speak

7  for Mr. Russell so whether  he can truncate the argument, Dr.

8  Loftus is the vision expert.

9      THE COURT:  Okay.

10      MR. HUT:  Following him, we need to discuss the

11  matter further including with the client.

12      THE COURT:  What does Proctor have in Baltimore

13  City?

14      MR. HUT:  He has a trial before Judge Blake.  A

15  criminal trial and I spoke with him yesterday and --

16      THE COURT:  Is she not letting him come down?

17      MR. HUT:  She is, I was on the telephone with her.

18  We had served the subpoena and he made her aware of that and

19  so he will be here first thing in the morning.

20      THE COURT:  So I need to make a phone call or is

21  that covered?

22      MR. HUT:  I believe it is covered.

23      THE COURT:  Well, let me know if I do.

24      MR. HUT:  I was tempted to say it wouldn't hurt but

25  I don't want you to sort of charge in where I think the

lnc

1    matter is resolved.  I was on a conference call with Judge

2    Blake, Mr. Proctor and the United Stats Attorney and she said

3    that he could be here first thing in the morning tomorrow.

4                THE COURT:  That is fine, all right.  So let's try

5    and have him take the stand first and testify because I just

6    hate it when I have attorneys in two places, it is just --

7                MR. HUT:  That was our intention.

8                THE COURT:  All right, that is a good idea.  Okay.

9                MR. HUT:  And then quite likely Mr. Stephens and

10   then Mr. Trainor.

11               THE COURT:  Who do you have?

12               MR. RUSSELL:  Two maybe three people.  Mr. Ash,

13   Mr. Joel Todd from Wicomico County State's Attorney's office

14   and possibly Magistrate Howell.  But I am trying to avoid

15   calling her.  And I think we will make it without  me calling

16   her.

17               THE COURT:  Well -- how much time did we give you?

18   Tomorrow and --

19               MR. RUSSELL:  Half day Thursday.

20               THE COURT:  Mr. Todd can only testify on Thursday.

21   Yes, I restart my Socks case Thursday afternoon.  It is

22   really not a Socks case but I just like saying that.  Yes but

23   Todd -- Even if he is not -- I am just concerned about -- I

24   don't know how long -- I know the Federal Government, they

25   are sort of picky sometimes with men on loan, you know the

lnc

1    phrase, when there is a man on loan when you are getting

2    someone in a Federal institution and now I know that he is a

3    State inmate in a Federal institution but I don't remember

4    how long the writ was for, do you?

5              MR. HUT:  No, Mr. Todd is the --

6              THE COURT:  No, no Mr. Todd is the former State's

7    Attorney from Worcester who now works in Wicomico.

8              MR. HUT:  Right.  He is ---

9              MR. RUSSELL:  Actually now he is in Arizona.  He

10   is --

11             THE COURT:  He is Arizona?

12             MR. RUSSELL:  He is -- he is a Magistrate there.

13             THE COURT:  For who?

14             MR. RUSSELL:  That is all the information that I

15   know about it.  I was surprised too.  To find that out.

16             THE COURT:  Okay so he is only available Thursday?

17             MR. RUSSELL:  Yes he is flying in Wednesday night.

18             THE COURT:  Okay.  I just wanted to make sure that

19   he gets to hear everything.  And if not, Mr. Stephens.

20             MR. RUSSELL:  Right.

21             THE COURT: And if it is a witness like Mr. Todd who

22   is testifying to something unlike Mr. Proctor who had actual

23   dealings with him, I am less concerned if he had to go back.

24             MR. RUSSELL:  Right.

25             THE COURT:  Do you understand what I am saying?

**App. 344**

lnc                                                                    230

1              MR. RUSSELL:  I do, Your Honor.

2              THE COURT:  Okay.  I want to him to be present for

3    all stages of the post conviction hearing but if for some

4    reason there was to be a witness who was not one of the

5    original trial counsel or something like that, somebody who

6    he would be testifying in relation to.

7              MR. HUT:  But he will be here -- will he not be

8    here Thursday morning when Mr. --

9              THE COURT:  No, he will be here Thursday morning, I

10   am just worried that we might not finish in time.

11             MR. HUT:  Oh I would actually expect that we will

12   because I am hopeful and my best made plans always seem to go

13   awry on estimating the testimony but based on today, I think

14   we could finish so as to permit at least  Mr. Ash if

15   Mr. Russell is prepared to call him before Mr. Todd to --

16             THE COURT:  What about -- we can get Mr. Ash here

17   any day of the week --

18             MR. HUT: But I think we can finish with him or

19   start with him and then get to Mr. Todd Thursday morning.

20             THE COURT:  And I can get Ms. Howell here any day

21   of the week but I didn't know Todd was wherever Todd is.  All

22   right, so let's start tomorrow at 9:00 and be ready to go at

23   9:00 and I would suggest you -- if you want to leave your

24   materials at last fold them up so that it is not just out. If

25   you will come like Mr. Trainor and some of the other people

**App. 345**

1    are sitting, you will see the amount of debris that doesn't

2    get vacuumed up on Sundays, so it is not like anybody is

3    coming in here.

4            MR. HUT:   Ms. Gostin reminds me, Your Honor, just

5    to be clear that  Mr. Stephens is not in Federal custody.

6            THE COURT:   No he is in State.   I don't know how

7    long the writ was and people get very particular  about the

8    writs, how long the point to point and when to when.   It is

9    my concern.

10           MR. HUT:   One other housekeeping matters as long as

11   I have the floor, Your Honor, very briefly.   We have the

12   transcript but it seems to me ought to be marked as an

13   Exhibit and perhaps Joint Exhibit 1 but by the transcript I

14   mean, the transcript of the trial or for as much of the

15   proceeding --

16           THE COURT:   Well, that is what -- all right so do

17   this tomorrow --

18           (Pause)

19           MR. RUSSELL:   Your Honor, I will say that the

20   entire thing is scanned into MDEC, I don't know if --

21           THE COURT:   It is scanned but it is the issue that

22   we have all the time.   Just because it is in for one purpose

23   doesn't mean that it is in for another purpose.

24           MR. RUSSELL:   Could Your Honor --

25           THE COURT:   So if you get madam clerk the

1   transcript tomorrow she will send it down to the clerk's

2   office and someone will batch scan it and it will be done in

3   less than an hour and will be marked as an exhibit and

4   everything will be in.

5           MR. HUT:  Very well, thank you, Your Honor.

6           THE COURT: But you have -- I have got a lot of

7   transcripts in here.  I just got lost looking at them a few

8   minutes ago.

9           MR. RUSSELL:  I think they are all in there, Your

10  Honor.  I went through to check.

11          THE COURT: I think they are too.

12          MR. RUSSELL:  I want -- I don't know if this will

13  help but I -- generally I would ask the Court to take

14  judicial notice of it.  I don't know if that requires you

15  then to put it in as an exhibit.

16          THE COURT:  It is clear if it is an exhibit --

17          MR. RUSSELL: I agree with that.

18          THE COURT:  -- for all sides for appeal purposes.

19          MR. RUSSELL:  Okay.

20          THE COURT:  Okay.  And if you look at how it is

21  actually in, I don't know hopefully the monitors will come

22  on.  But if you look at how it is actually in, it is not in

23  what I would call a clean fashion, 28, 24, 23, 22, 17,

24  16,15,14, it is run pretty clean there but then you know,

25  here we are 2012, 9, 8 and we are back to --

lnc                                                                        233

1              MR. HUT:  Yes, we skip around --

2              THE COURT:  You see what I am saying?  That is why I

3    couldn't find what I wanted to the last time.  Because here

4    is the 17th but I don't even know where the 18th is.  It

5    should be here somewhere.  And it will go back to the 19th

6    and -- so if madam clerk has it and can give it to them, they

7    can scan it.  Then it goes from a docket entry here to an

8    exhibit over here. And then from the appeal purposes the

9    exhibits it is a whole lot cleaner, okay?  It is an internal

10   MDEC issue, it is like the issue I am having with the State's

11   Attorney's office with the way they draft their indictments.

12             MR. RUSSELL:  Mr. Ash will be here Your Honor if

13   you want to bring that up with him.

14             THE COURT:  There is a way to do it, so it is nice

15   and neat and clean.  See you all tomorrow.

16             MR. RUSSELL:  Thank you, Your Honor.

17             (Whereupon at 4:18 p.m. the hearing adjourns to

18   reconvene on April 19, 2017 at 9:00 a.m.)

19

20

21

22

23

24

25

lnc

234

## CERTIFICATE OF TRANSCRIBER

I hereby certify that the proceedings in the matter of State of Maryland versus Lee Edward Stephens, Criminal case number 02-K-08-000646, heard in the Circuit Court for Anne Arundel County, Maryland on April 18, 2017, were recorded by means of digital recording.

I further certify that, to the best of my knowledge and belief, page numbers 1 through 233 constitute a complete and accurate transcript of the proceedings as transcribed by me.

I further certify that I am neither a relative nor an employee of any attorney or party herein, and that I have no interest in the outcome of this case.

In witness whereof, I have affixed my signature of this 12th day of June, 2017.


By:

Lisa N. Contreras
Certified Transcriber
Certificate No. CET**D-474

**App. 349**

Appendix No. 6

Post-Conviction Hearing Transcript Day 2 (4/19/17)

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

```
- - - - - - - - - - - - - - x
                            :
STATE OF MARYLAND           :
                            :    Criminal No: 02-K-08-000646
     v.                     :
                            :
LEE EDWARD STEPHENS,        :
                            :
          Defendant.        :    Annapolis, Maryland
                            :
- - - - - - - - - - - - - - x    April 19, 2017
```

### POST CONVICTION TRIAL

WHEREUPON, proceedings in the above-entitled matter

commenced.

    BEFORE:   THE HONORABLE WILLIAM C. MULFORD, II, Judge

    APPEARANCES:

    FOR THE STATE:

    DAVID L. RUSSELL, Esq.
    Office of the State's Attorney
    8 Church Circle, Suite 800
    Annapolis, Maryland 21401

    FOR THE DEFENDANT:

    A. STEPHEN HUT, JR., Esq.
    6 Saint Paul Street
    Suite 1400
    Baltimore, Maryland 21202

    ISLEY M. GOSTIN, Esq.
    THAD EAGLES, Esq.
    1875 Pennsylvania Avenue, NW
    Washington, D.C. 20006

dmh                                                                      2

<u>I N D E X</u>

Page

Discussion – Court and Counsel
   Re:  Post-Conviction Hearing                                    4

| WITNESSES<br>For the Defendant: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
|---|---|---|---|---|---|
| Gary Proctor | 12(SH) | 78(DR) | 124(SH) | 130(DR) | -- |
| Geoffrey Loftus | 140(TE) | 160(DR) | 171(TE) | -- | 135(TE) |
| Lee Stephens | 176(SH) | 207(DR) | 217(SH) | -- | -- |
| Harry Trainor | 229(IG) | -- | -- | -- | 222(IG) |
|  | -- | -- | -- | -- | 226(DR) |

| EXHIBITS:<br>For the State: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 6 | 107 | -- |

| For the Defendant: | | |
|---|---|---|
| D | -- | 9 |
| K - R | -- | 133 |
| S | 139 | 139 |
| T | 141 | 142 |
| U | 148 | 160 |
| V-1 - V-5 | 150 | 160 |
| X | 223 | 223 |
| Y | 230 | 230 |
| Z | 232 | 235 |
| AA | 234 | 235 |
| BB | 246 | 246 |

dmh

Joint Exhibit:

    1                                             134                      134

KEYNOTE:  "---" indicates inaudible in the transcript.
               "*"   indicates phonetically spelled in transcript.

dmh

4

P R O C E E D I N G S

1

2          (Whereupon, at 9:05 a.m., the proceeding began.)

3          MR. HUT:  Thank you, Your Honor.  Calling the State

4     versus Lee Stephens, case No. 02-K-08-646.  David Russell,

5     R-u-s-s-e-l-l, on behalf of the State.

6          THE COURT:  Thank you.  Mr. Hut.

7          MR. HUT:  Good morning, Your Honor.  Stephen Hut for

8     the Petitioner.  It is H-u-t.

9          THE COURT:  Ms. Gostin.

10         MS. GOSTIN:  Good morning.  Isley Gostin for the

11    Petitioner.  That is I-s-l-e-y, G-o-s-t-i-n.

12         THE COURT:  Mr. Eagles.

13         MR. EAGLES:  Good morning.  Thad Eagles for the

14    Petitioner.  That is T-h-a-d, E-a-g-l-e-s.

15         THE COURT:  All right.  Yesterday there was a

16    discussion between the Court and the parties regarding the

17    transcript.  Ms. Gostin and Mr. Eagles and Mr. Russell were in

18    here.  I did talk to them about the transcript.

19         Madam Clerk is going to find some way to make sure

20    that the transcript is in and it is in as a Defense exhibit so

21    that for purposes of any record it is there and it is easily

22    accessible because in the MDEC system while transcripts have

23    been filed, I like to make sure that for purposes of this

24    hearing there is a complete transcript that is filed with this

25    hearing.

**App. 354**

dmh

1        So, counsel, would you acknowledge that when Mr. Hut

2    was not here but Mr. Stephens was here, that was a discussion

3    and there was really nothing else that we talked about.

4        MR. RUSSELL:  That is correct, Your Honor.

5        MS. GOSTIN:  That is correct, Your Honor.

6        THE COURT:  All right.  Yesterday there was some

7    discussion regarding the testimony of the audiologist, the

8    professor and Dr. May and the Court was jumping in and out of

9    Rule 5701, 5702, et cetera.

10       As so often happens to both lawyers and judges, you

11   think about something later and then you have to recalibrate.

12   What happened to me yesterday was I was thinking as I was

13   teaching my class on administrative law and discussing with my

14   students judicial review, how a judge has to wear different

15   hats and how in judicial review you do not, as the judge, make

16   initial fact findings but you defer to the findings of the

17   agency but there is no deference of law.

18       And it got me thinking about Dr. May's testimony and

19   I realized that I was wearing the wrong hat and I was

20   analyzing it completely inappropriately.

21       After some thought in reviewing it in my head, I

22   realized that what I should be doing, and my initial reaction

23   was to let the testimony in, is absolutely to let the

24   testimony in because the testimony comes in and it needs to be

25   considered in light of what a reasonable trial attorney should

1   have done in light of what that evidence would have been if

2   that evidence had been there at the time, et cetera.

3          And I think you understand where I am going,

4   Mr. Hut, because I was just analyzing it wrong and it is not a

5   question of this Court making an initial fact finding of

6   whether or not that testimony should admissible or not which

7   is what I do as a trial judge when I am hearing a trial.

8          It is a question of this is evidence that the

9   Defendant believes, the Petitioner believes a reasonable

10  attorney should have considered.  The Court will then have to

11  analyze it in the second stage of the proceeding and that is,

12  you know, from the perspective of the whole Strickland*

13  analysis.

14         Was it error not to consider it and then if it

15  should have been considered is there that substantial

16  probability the result would have been different.  So I was

17  wearing the wrong hat.  I was wearing a fact finder hat which

18  is the wrong hat to wear at the time I am listening to the

19  evidence.

20         I should have been wearing my post-conviction hat

21  and I have not sat in post-conviction in a while.  I have not

22  had that many in a while, so it is just a question of

23  considering it a little bit differently.

24         So, I just want the parties to know that.

25  Mr. Russell has asked me to exclude the evidence.  He has

dmh                                                                                 7

1   asked me to consider it as not reasonably generated by the

2   petition, that it does not comply with 5701, 5702, et cetera.

3   I do not think that is the proper way to analyze it.

4          The proper way to analyze it is to accept the

5   evidence, hear the evidence, review the evidence and then

6   consider it in light of what a reasonable attorney should have

7   done if that evidence was there.

8          So I hope I have articulated how I need to actually

9   review it which is completely opposite from what I was

10  thinking yesterday.

11         MR. HUT:  To this side of the courtroom, Your Honor,

12  that sounds precisely right and at a later time, certainly at

13  closing, we will be prepared to show you precisely why these

14  attorneys were --

15         THE COURT:  And, again, that is the different hat

16  you wear.  Again, so when I am sitting as reviewing an

17  administrative agency's decision, there is the deferential

18  review of the facts and then there is the no deference to law.

19  But here in the post-conviction, this is evidence that needs

20  to be considered in light of the attorney's performance.

21         So, I was just analyzing it wrong and I just wanted

22  to let you know.  I think I now have it in my head how to

23  properly analyze it.  All right, so --

24         MR. RUSSELL:  If I may, Your Honor?

25         THE COURT:  Yes.

**App. 357**

dmh                                                                        8

1          MR. RUSSELL:  I just will also say because I think

2    something similar is going to come up today.

3          THE COURT:  I know.

4          MR. RUSSELL:  I am going to object again for

5    purposes of the record.  I want to make sure that I am not

6    waiving anything should this go up on appeal.

7          THE COURT:  So I will just deny it up front?

8          MR. RUSSELL:  And that is fine but I just want to

9    make sure that the Court is aware of that.

10         THE COURT:  Okay.

11         MR. RUSSELL:  And I understand what the Court's

12   ruling is.  I just want to make sure that the Court is aware

13   when I do object to it, that is going to be the reason is to

14   make sure I am not waiving anything.

15         THE COURT:  So do not be surprised when I say

16   denied.

17         MR. RUSSELL:  Absolutely, Your Honor.

18         THE COURT:  Okay.  All right.  So we have --

19         MR. HUT:  Just a couple of pieces of housekeeping,

20   Your Honor.  If you are up to that?

21         THE COURT:  And we have Mr. Proctor back there.

22         MR. HUT:  I guess could you excuse yourself for a

23   moment while I go through this?

24         MR. PROCTOR:  Absolutely.

25         THE COURT:  It does not matter to me.

**App. 358**

dmh

9

1      MR. HUT:  I will be back to get you soon.  If it is

2   all right with you and Mr. Russell.  I do not think --

3      MR. RUSSELL:  I know what you are going to say but

4   as long as it is not something --

5      THE COURT:  He is frequently confused with

6   Mr. Lawlor so Mr. Lawlor is done testifying so.

7      MR. HUT:  Stay here.  One thing is that I neglected

8   as a matter of housekeeping yesterday to offer Defense Exhibit

9   D.

10      THE COURT:  Can I just tell you something?  I never

11   allow an attorney to close the case until they have reviewed

12   all the exhibits to make sure that they got in what they

13   wanted to get in and I asked Madam Clerk this morning if she

14   would give counsel an updated list.  We can just print it

15   right off the system of the exhibits.

16      MR. HUT:  And she did it for us yesterday and that

17   is why I am addressing that today.  So Exhibit D is offered.

18      THE COURT:  D will be admitted.

19      MR. RUSSELL:  No objection.

20      THE COURT:  Okay.

21                          (The document marked for

22                          identification as Petitioner's

23                          Exhibit D was received in

24                          evidence.)

25      MR. HUT:  Second, Your Honor, we prepared, and I was

dmh

1    probably remiss in not attending to this yesterday, and I will

2    provide a copy to Mr. Russell and hand one up and I have an

3    extra for Your Honor.  This is not so thick that it ---be

4    scanned.

5            What we have styled is a compilation of case law and

6    other authorities supporting Petitioner's claims with the view

7    that --

8            THE COURT:  That is fine.

9            MR. HUT:  -- it made references in opening to

10   certain cases.  We will as we go along --

11           THE COURT:  That is fine.

12           MR. HUT:  -- it may be of use and utility to the

13   Court.

14           THE COURT:  That is fine.

15           MR. HUT:  And, finally --

16           THE COURT:  I do not have it opened up but in my

17   Judge's bench book I have a compilation of the post-conviction

18   law and I also have my Criminal Trial Manual like Mr. Trainer

19   does.

20           THE CLERK:  You just want me to mark it as filed?

21           THE COURT:  Just mark it as filed.

22           THE CLERK:  Okay.

23           THE COURT:  That is fine.

24           MR. HUT:  Finally, this is a set of stipulated

25   facts.

1      THE COURT:  You said you were going to work on that.

2      MR. HUT:  We did and we have Mr. Russell's

3   concurrence and his --

4      MR. RUSSELL:  Well, wait.  Hold on one second if I

5   may.  One second.

6      THE COURT:  Why don't we do this?  We can get to

7   that.  Why don't we get Mr. Proctor going?

8      MR. HUT:  All right.

9      THE COURT:  So we can get the testimony going and I

10   can talk to you all about the stipulated facts later, okay?

11      MS. GOSTIN:  Oh, sorry, we handed in the wrong one.

12   Sorry.

13      MR. RUSSELL:  Okay.  That is okay.  The other one I

14   think we agreed on.

15      THE COURT:  Well, let's get Mr. --

16      MR. HUT:  If you are ready for us to call

17   Mr. Proctor, we will do so.

18      THE COURT:  Yes, let's get Mr. Proctor on the stand.

19      MR. HUT:  The Petitioner calls Gary Proctor.

20      THE COURT:  Sure.

21      THE CLERK:  Sir, please remain standing and raise

22   your right hand.

23   Whereupon,

24                          GARY PROCTOR

25   was called as a witness by the Defendant, having been first

dmh                                                                          12

1    duly sworn, was examined and testified as follows:

2              THE CLERK:  You may be seated.  And, sir, when you

3    are seated, would you please state your full name, your

4    occupation for the Court.

5              THE WITNESS:  Gary Proctor, attorney, G-a-r-y,

6    P-r-o-c-t-o-r.

7              THE CLERK:  Thank you.

8                         DIRECT EXAMINATION

9              BY MR. HUT:

10   Q    Mr. Proctor, are you engaged in the private practice

11   of law?

12   A    Yes, sir.

13   Q    What is the nature of your practice?

14   A    It's wholly criminal, mostly Federal with probably

15   80 percent Federal, 20 percent State.

16   Q    Approximately how many homicide and murder cases

17   have you had in which you have represented and defended?

18   A    Pre-trial, post-conviction or both?

19   Q    Both.

20   A    More than 50, less than 100 is the best I could

21   guess.

22   Q    How many, if any of those, have involved State's

23   efforts to seek the death penalty?

24   A    More than half of those probably so maybe 30.

25   Q    Have you ever represented the Petitioner in this

**App. 362**

dmh                                                                      13

1  proceeding of Lee Stephens?

2      A    Yes, I represented him from shortly after the crime.

3  I would say within a month of that until through sentencing.

4      Q    And were you appointed counsel?  How did you come to

5  represent Mr. Stephens?

6      A    Because the Public Defender's Office represented the

7  co-Defendant, they had to find outside counsel to represent

8  Mr. Stephens so my recollection is they called Mr. Lawlor, who

9  they knew better then and asked him to take it and asked him

10 to pick up a second chair and he asked me to do it and I said

11 yes.

12     Q    And do you recall the terms of your engagement with

13 the Public Defender?

14     A    Yes.

15     Q    Could you describe that briefly if you could?

16     A    You mean in terms of hourly rate?

17     Q    Yes.

18     A    Okay.  So it was $50 an hour, it still is today.

19 There was a cap of $20,000 although I know I billed a lot more

20 than that and they paid it so I think the cap was more

21 notional than --

22              THE COURT:  A cap of what?

23              THE WITNESS:  I'm sorry, Judge?

24              THE COURT:  What was the cap?

25              THE WITNESS:  $20,000 I think.

dmh                                                                    14

BY MR. HUT:

Q     Did you and Mr. Lawyer divide up responsibility for the case?

A     Well, not initially.  You know, you have to remember we represented Mr. Stephens for what, five and a half years? So, initially there was no clear demarcation.  When we got closer to trial, this is my witness, this is your witness.  We did at that point.

Q     Did you view the representation as embracing any efforts with respect to the conviction for which Mr. Stephens was serving time at the House of Corrections, one that had been for a charge of murder in Wicomico County?

A     The feeling was if he had a conflict in this case, he had a conflict in the post-conviction also so I want to say I called the Public Defender's Office and said give me the post-conviction case.  I want to do it too.

And, frankly, it was important to Mr. Stephens, you know, he was never getting out on that case either, that it be done right and the last thing we wanted was to have someone else going meeting with him from the same Department, the same office that was representing his co-defendant so we asked for it and we were appointed to that case also.

Q     And who had responsibility or principal responsibility as between you and Mr. Lawlor for the preparation, filing and prosecution of that petition?

**App. 364**

dmh                                                                    15

1       A    Well, I know I read the transcript and wrote the

2   summary and I know I wrote most -- I remember Michael

3   reviewing the post-conviction petition but I don't remember

4   him writing any part of it.  I think I wrote it.

5            MR. HUT:  The Court's indulgence.

6            BY MR. HUT:

7       Q    I am showing you what has been marked as Defendant's

8   Exhibit 10 or I am sorry, J.

9       A    Yes, sir.

10      Q    Do you recognize Exhibit K?

11      A    Yes, that is the post-conviction filed in Wicomico

12  that I can't say I wrote every word of it but I know I wrote

13  at least the majority of it.

14      Q    And directing your attention page 19 which is the

15  signature page.

16      A    Yes.

17      Q    Do you recognize either or both of the signatures?

18      A    Neither of them are Michael Lawlor's nor mine.  I

19  think the little squiggle after the stroke is Gwendolyn

20  Waters' who is Michael Lawlor's associate.

21           So my thought is we probably wrote it in Word and

22  e-mailed it to her because we were right up against a

23  deadline.  I don't remember what it was but it wasn't far

24  away.  So we probably e-mailed it to her to print out, sign

25  our names with our permission, of course, and send it.

**App. 365**

1    Q    Now, Mr. Proctor, did there come a time that you and

2    Mr. Lawlor filed a pre-trial motion to strike the notice of

3    death penalty based on what you perceived to be the Defense's

4    lack of funding?

5    A    Oh, yes, we did.

6    Q    Do you know approximately when that motion to strike

7    was filed?

8    A    I would guess 2007-2008 but I don't know.

9    Q    Do you recall what, if any, proceedings took place

10   in the courtroom with respect to that petition?

11   A    Yeah, there was a hearing.  Nancy Forster testified,

12   Katie O'Donnell I think testified.  There were, you know, we

13   called witnesses and Judge Hackner denied it.

14   Q    And who were Ms. Forster and Ms. O'Donnell?

15   A    Ms. Forster at the time was the Public Defender for

16   the State of Maryland. Katie O'Donnell was the head of the --

17   it might have been Aggravated Homicide then.  She was the

18   person responsible for all death penalty prosecution or

19   defense in the State.

20   Q    Was Ms. O'Donnell with the Public Defender's Office

21   at that time?

22   A    She was.

23   Q    And to your point of view how, if at all, did the

24   disparity of resources and funding between the State and the

25   Defense affect your ability as Defense counsel in the case?

dmh                                                                        17

1          A    It's a tough question in the hypothetical.  I would

2     say the main problem as I think about it today is the --- of

3     time, the length of time.  The crime happened July 2006 maybe.

4     The verdict was I think it was leap year day February 29th,

5     2012 sounds right which is an extraordinary amount of time.

6                You know, I tried a Federal capital case in 2009

7     that I got appointed to after Mr. Stephens and the reason for

8     that is, you know, I had resources federally, I was ready to

9     try it in a much more timely manner.

10               So to me the biggest problem, the biggest issue with

11    the funding was that we had to keep taking other cases.  I got

12    Mr. Stephens' case in 2006.  I tried a nine month case in

13    2007.  And the reason I tried that case was it kept the lights

14    on and representing Mr. Stephens and nothing but Mr. Stephens

15    wouldn't have.

16         Q    Did the disparity of resources and its effect on

17    timing that you just described affect your ability to

18    prosecute the post-conviction petition in Wicomico County?

19         A    You know, I've thought about this a lot.  Both you

20    and the State have talked to me about it.  It absolutely did.

21    You know, my view was that if I had an hour to spare, I wanted

22    to work on Mr. Stephens' pending capital case.  And so the

23    post-conviction got lost in the shuffle.

24         Q    Do you recall, Mr. Proctor, the filing of motions to

25    request for continuance in the Wicomico County post-conviction

dmh                                                                    18

1    case?

2         A    I recall filing a slew of them, yeah.

3         Q    Do you recall approximately how many?

4         A    Seven, 8, 9.

5         Q    I am handing you what has been marked as Defendant's

6    L.

7         A    The case summary docket sheet?

8         Q    Yes, and if you look through it perhaps trying to

9    shorten this, to my count it shows 13 requests for a

10   continuance.   Looking at Defendant's L do you have any reason

11   to dispute my arithmetic?

12        A    No, sir, that sounds entirely plausible to me.

13        Q    And for those 13 requests for a continuance, do you

14   recall how many were filed by the Defense as opposed to the

15   State?

16        A    I don't recall the State asking for a single one.

17   Might they have filed it as a courtesy to us because the

18   hearing was the next day, I think that's possible but I don't

19   recall them ever calling me and saying I want a postponement,

20   do you agree?   I recall me always calling them.

21        Q    Do you recall the name of the prosecutor in the

22   Wicomico County murder case?

23        A    Initially or on the post-conviction?

24        Q    Initially.

25        A    I recall the Defense counsel because I spoke to them

**App. 368**

1   and picked up their files.  I don't recall the name of the

2   prosecutor.

3        Q    Does the name Sam Vincent refresh your recollection?

4        A    Well, I know he was handling the post-conviction.  I

5   recall speaking to him several times early on in the post-

6   conviction.  I didn't know that -- I don't disbelieve you that

7   he tried it, I just don't remember.

8        Q    Do you recall that Sam Vincent sadly died in an

9   automobile accident in the summer of 2010?

10       A    I didn't recall exactly when but, yeah, he was

11   driving back from a State's Attorney's Conference maybe or

12   something like that?  I do remember that.

13       Q    Do you have -- was any continuance, as you

14   understood it in the case, occasioned or requested by virtue

15   of the death of Mr. Vincent?

16       A    I have no recollection of that.  I have no

17   recollection of anything other than me initiating a

18   continuance.

19       Q    Now, turning to the murder trial in Anne Arundel

20   County, Mr. Proctor.  From the State's evidence presented at

21   trial, how many assailants did the State contend there were

22   involved in the assault on Corporal David McGuinn?

23       A    I think they always believed there were two.

24       Q    And do you recall whether in light of the State's

25   theory that there were two assailants, whether the State ever

1    sought an aiding and abetting instruction when the case went

2    to the jury?

3        A    I don't remember one.

4        Q    You recall there was a substantive murder

5    conviction, correct?

6        A    Yep.

7        Q    And you recall that there was a conspiracy

8    conviction, correct?

9        A    I do.

10       Q    And the jury returned a verdict on both of those

11   unanimously?

12       A    They did.

13       Q    What was the verdict if you recall it on the

14   conspiracy count?

15       A    I don't recall.

16       Q    All right.  What was the verdict on the substantive

17   murder count?

18       A    Oh, that was guilty.

19            MR. HUT:  Court's indulgence.

20            BY MR. HUT:

21       Q    During the guilt-innocence phase of the trial,

22   Mr. Proctor, did the Defense consider aiding and abetting

23   counts?

24       A    I don't want to what is the word, shirk my

25   responsibility but you have to remember, as soon as the guilt

**App. 370**

dmh                                                                 21

1    phase was over, we were starting a penalty phase almost the

2    next day.  And if you look at the penalty phase transcript, I

3    called almost every witness and I did the closing argument.

4           So as we got towards the end of the trial,

5    Mr. Lawlor who did guilt opening and closing, was the one

6    preparing for it so if there was an aiding and abetting

7    decision made, I would be shocked if it was made by me.

8           THE COURT:  So you do not recall asking for it?

9           THE WITNESS:  I don't recall even giving it a

10   moment's consideration, Your Honor.

11          MR. HUT:  The Court's indulgence.

12          BY MR. HUT:

13   Q    I am showing you what has been marked as Defendant's

14   N, Mr. Proctor.

15   A    Yes, sir.

16   Q    Are you able to identify Defendant's N?

17   A    That is the Defendant's response to the State's

18   request for jury instructions, yes.

19   Q    Had the State, as you testified, not sought an

20   aiding and abetting instruction, would the Defendant's

21   response have been the opportunity for the Defendant to have

22   done so?

23   A    Absolutely, or we could have even requested it in

24   court orally.  Judge Hackner was always open to, "Judge, this

25   just came up."  It seemed like every morning of trial we

1   started off with, "Judge, this came up tonight and here's what

2   we want to talk about this morning."

3        Q    And do you see in Defendant's N any request for an

4   aiding and abetting instruction?

5        A    No, sir, I do not.

6        Q    Now, I supplied you with a document marked

7   Defendant's M.

8        A    Yeah.

9        Q    Do you recognize that document?

10       A    That is the Maryland Pattern Instructions.  I can't

11  say -- they changed these maybe last year so I don't know if

12  this was the one we had back in 2012 or whether this is the

13  up-to-date one.

14            THE COURT:  What is the number?

15            THE WITNESS:  Defendant's Exhibit M, Your Honor,

16  4-17, Homicide --

17            MR. HUT:  Instruction 4-17.

18            THE COURT:  I was just going to say they have

19  changed because I have got the new ones.

20            THE WITNESS:  I have the old ones in my computer.

21            THE COURT:  No, 4-17 is the murder instruction.  You

22  threw me off there.  I am sorry.

23            BY MR. HUT:

24       Q    Mr. Proctor, directing your attention to Pattern

25  Instruction 4-17 and --

dmh
23

1      THE COURT:  I do not think 4-17 changed.

2      MR. HUT:  That is my understanding as well.

3      THE COURT: I have the old and the new book here so.

4      MR. HUT:  That is my understanding as well, Your

5  Honor.

6      BY MR. HUT:

7      Q      Directing your attention to paragraph (a)(1), what,

8  if anything was the State required to prove regarding whether

9  Mr. Stephens had caused the death of David McGuinn?

10     A      Exactly that, that he caused the death and the

11 killing was willful, deliberate and premeditated.

12     Q      And would the causation element have borne the

13 beyond a reasonable doubt burden of proof imposed on the

14 State?

15     A      I'm sorry.  Can you ask that question again, sir?

16     Q      Yes.  Would the State have had to prove that he

17 caused the death beyond a reasonable doubt?

18     A      Absolutely.

19     Q      Did the Defense team consider seeking an instruction

20 during the guilt phase as to the meaning of caused the death

21 within the pattern instruction?

22     A      I really can't say one way or another.  I have no

23 recollection of myself considering it.  Whether anyone else

24 did, I don't know.

25     Q      Your not considering it, was that the result of any

**App. 373**

dmh

24

1   strategic thinking on your part or on the part of the Defense

2   team?

3        A    No, it was a result of the delineation of tasks

4   among the Defense team and those weren't mine.  If you look at

5   the Defendant's requested jury instructions, again, that is

6   Gwendolyn Waters' signature and I am 99 percent certain that

7   she drafted, wrote this and, you know, that was her and

8   Mr. Lawlor would have drafted it and written it.

9             MR. HUT:  Court's indulgence.

10            BY MR. HUT:

11       Q    If you would page, Mr. Proctor, to the notes to

12  pattern jury instruction 4-17.

13       A    Yes, sir.

14       Q    On page 2 of 5, are you there?

15       A    Yeah.

16       Q    Directing your attention to the last full paragraph

17  on the page beginning, "The third threshold issue."

18       A    Yeah, "Factual and legal are proximate cause?"

19       Q    Yes.  The second sentence reads, "The factual

20  causation requirement is satisfied if the Defendant's act or

21  omission was a substantial factor in bringing about the

22  death."  Did I read that accurately?

23       A    You did.

24       Q    Did you or the Defense team consider an instruction

25  to the jury that would have in substance communicated the text

**App. 374**

dmh

25

1    of the note that I just read or that portion of the note?

2        A    I can only tell you that I did not.

3        Q    And was your not considering such an instruction a

4    strategic choice on your part?

5        A    No.

6        Q    Now, were you aware in connection with the

7    substantial factor element -- well, let me withdraw that

8    question and ask you this question.  Did you or any member of

9    the Defense team undertake to do any legal research as to the

10   meaning of the substantial factor test set forth in the notes

11   that I just read?

12       A    As I sit here today, I have recollection of that

13   happening.

14       Q    And was not doing any research the result of any

15   strategic or tactical choice made by the Defense team?

16       A    No, sir.

17       Q    So, for example, did you ever consider an

18   instruction that would have in substance told the jury that

19   the substantial factor requirement for fact causation may be

20   satisfied only if the Defendant's act was alone sufficient to

21   have brought about the death of Corporal McGuinn?

22       A    I did not.

23       Q    Based on your recollection of the facts of the case,

24   do you think that such an instruction would have been

25   appropriate?

**App. 375**

dmh

1     A    Sure.

2     Q    As you recall the facts of the case, was the evidence such that the jury would have been able to find that Mr. Stephens had caused the victim's death beyond a reasonable doubt in the sense that it was a substantial factor in having brought about the death?

7     A    Well, the facts as I recall them, there was really only one witness, Mr. Freed, who was pivotal in determining Mr. Stephens fate.  And the injuries -- there were a lot of stab wounds but a lot of them weren't deep, weren't severe.

There were really only a couple that would cause Mr. McGuinn's rapid demise.  You know, it's been a while.  I could be wrong on this.  And the testimony of the witnesses was at best inconclusive of about who was standing where so I don't see why it couldn't have been argued that even if you believe Mr. Freed, the testimony is not consistent with that guy right there being the one that made those blow.

18    Q    Do you recall the name of the Assistant Medical Examiner who testified at the trial?

20    A    No, I don't.

21    Q    If I told you the name of Dr. Donna Vicenti would that refresh your memory?

23    A    That does ring a bell.

24    Q    You and Mr. Lawlor divided up responsibility for the briefing and defense of witnesses at the trial?

**App. 376**

dmh                                                                    27

1          A      We did.

2          Q      Who had the responsibility for the defense and

3     possible cross-examination of Dr. Vicenti?

4          A      I think that was me.

5          Q      Did you ever undertake to interview Dr. Vicenti

6     before she came to trial to testify?

7          A      No, I did not.

8          Q      She had prepared an autopsy report, correct?

9          A      Yeah.

10         Q      Do you know whether Dr. Vicenti had a practice of

11    being willing to talk to and being available for that purpose

12    to Defense counsel prior to trial in cases in which she had

13    performed the autopsy report?

14         A      Do I know it now?  Yes, I do, absolutely.  Did I

15    know it then?  I assumed erroneously that medical examiners

16    were like police officers and were unlikely to speak to you.

17         Q      You never called her?

18         A      Never called her.

19         Q      Her number was accessible to you if you had wanted

20    it?

21         A      Correct.

22         Q      Was the decision not to call her one that was

23    strategic or tactical on the part of yourself or the Defense

24    team?

25         A      No, sir.  There was no downside to meeting with her.

**App. 377**

dmh
28

1     Q    Did the Defense team hire and/or consult with a

2  medical examiner or a forensic pathologist to review Dr.

3  Vicenti's report --

4     A    I remember --

5     Q    -- to discuss the wounds and to advise you

6  generally?

7     A    I remember hiring -- it is Dr. Callery in Delaware?

8  He's a medical examiner or was a medical examiner in Delaware

9  and I remember asking Gwen, Ms. Waters, to send him the

10  autopsy report and whatever else we had, eyewitness

11  statements.

12     I remember at least one conference call with him and

13  then for whatever reason he just was not used after that.

14     Q    And do you have any recollection as to what the

15  substance of the one conference call you recall was?

16     A    The coroner's report, how legally signed was it.

17  How many weapons were there?  What can you say about that?

18  Things along those lines.

19     Q    When you say for whatever reason, for whatever

20  reason it was not followed up on I think was the gist of the

21  testimony, do you remember what the reason or any reasons

22  were?

23     A    Well, I do know that Dr. Callery was fired maybe?  I

24  don't think he was prosecuted and it wasn't because of his

25  competence.  It was because he like faked overtime slips or

dmh

29

1   something is what -- all I know is what was in the news.  I

2   never talked to him about it.

3            And I just don't remember when in the process that

4   was.  Whether that is why we ceased and desisted.  Whether

5   that was sometime later.  I just I'm sure the Judge could look

6   up a newspaper article or you already have but I just don't

7   remember when that was.

8        Q    Let me ask you this.  Was the decision not to

9   continue with Dr. Callery or some comparable medical examiner

10  a strategic one that was made as a strategic choice by the

11  Defense team?

12       A    I am sorry.  What was the question?

13       Q    Yes.  Was the decision not to continue with Callery

14  or to find somebody like him a strategic choice that was made

15  by the Defense team?

16       A    No, sir.

17            MR. HUT:  The Court's indulgence.  Mr. Proctor, I am

18  handing you what has previously been marked as Defendant's E

19  and ask you whether you have ever seen Defendant's E before?

20       A    That is the autopsy report by Dr. Vicenti on Officer

21  McGuinn.

22       Q    And as you page through the first several pages if

23  you can, does that in any way refresh your recollection as to

24  the number of stab wounds inflicted during the attack on

25  Corporal McGuinn?

**App. 379**

dmh

1    A    So it's 12 stab wounds and another 12 cuttings.

2    Q    For a total of 24?

3    A    Yes, sir.

4    Q    And of the 24 did you, Mr. Proctor, in the course of

5    your responsibility for Dr. Vicenti, ever acquire an

6    understanding as to whether there were certain wounds or a

7    certain wound that alone and independently would have caused

8    the death of Corporal McGuinn?

9    A    I don't think I ever dealt into that level of

10   details, sir.

11   Q    You never learned that from Dr. Callery, correct?

12   You did not learn that from Dr. Callery?

13   A    The only conversation I recall with Dr. Callery was

14   along the lines of what type of weapon could it have been, how

15   long was it, how wide was it?  I don't recall talking to him

16   about the severity of each and every stab wound, no.

17   Q    You did not undertake at trial to ask Dr. Vicenti

18   whether there was one or more wounds?

19   A    I don't think I asked her a single question.

20   Q    That was going to be my next question.  Was the

21   decision not to ask her a single question was that one that

22   was strategic or tactical on the part of yourself or the

23   Defense team?

24   A    Well, there's no -- typically, you know, all the

25   homicide trials I've had I bet if you added up all the

dmh

1   questions I've asked every coroner, you might get to five, you

2   know.  So the less time you spend talking about a horrific

3   death of a person the better.

4        That said, if I were armed with a contrary report

5   from a competent pathologist, I would have went there,

6   absolutely.  So was is it strategic?  I guess, yes, in the

7   sense of minimizing the amount of time that person spent on

8   the stand.  But, no, because I was armed with less than a full

9   knowledge of the injuries.

10       Q    And had you spoken prior to her testimony to the

11   doctor and learned that there were one or at most two of the

12   wounds that were alone sufficient to have caused the death,

13   would that have changed your decision whether to cross-examine

14   the doctor at trial?

15       A    I believe I would has asked very short focused

16   questions on that exact issue, yes.

17       Q    Conversely, did you ever learn from any expert or

18   anyone else that of the 24 stab wounds, there were no fewer

19   than 22 that if properly treated would not have killed David

20   McGuinn?

21       A    You know, the 12 that were listed as cutting wounds,

22   I, of course, knew that they were even if not properly treated

23   unlikely to be fatal.  But the 12 stab wounds I'm not sure I

24   ever had an understanding of how many of them were rapidly

25   fatal I think is the term the medical examiner uses and how

**App. 381**

dmh

32

1    many of them weren't.

2        Q    And, again, at trial since you did not undertake any

3    cross-examination of Dr. Vicenti, you did not ask her about

4    the number of wounds that if properly treated would not have

5    caused the death?

6        A    I didn't ask her anything.

7        Q    You mentioned the testimony of Jason Friend a few

8    moments ago.  Do you recall the tenor of what Friend testified

9    to as to where, which assailant was positioned in relation to

10   Corporal McGuinn at the time of the assault?

11       A    I recall his testimony that McGuinn was running

12   towards Cell 1, towards the control power, whatever it was.

13   And the reason he was running that way was because Juni*, that

14   is Mr. Harris, was behind him and Mr. Stephens was in front of

15   him I think.

16            It's been a while but that is my recollection of his

17   testimony and he might have been running in the other

18   direction but my recollection was they had him cornered with

19   Mr. Harris to his rear and Mr. Stephens in front of him.

20       Q    Do you recall the testimony from an inmate named

21   Cornelius Christie?

22       A    He was my witness, right?

23       Q    I do not remember.

24       A    I think he was my witness so, yes, I recall that

25   one.

**App. 382**

dmh                                                                          33

1        Q    Do you recall that Christie testified that he had

2    stabbed -- that Harris had stabbed Corporal McGuinn in the

3    upper part of his back?

4        A    I think Christie said Harris was the only one out

5    there or the only one he saw out there at least.  So, yeah,

6    and it wasn't Stephens.  Whoever he saw out there was not

7    Mr. Stephens.  I remember that testimony.

8        Q    As best you recall, Mr. Proctor, did the State offer

9    any evidence as to where the assailant, other than Harris,

10   might have landed blows on Corporal McGuinn, if he did?

11       A    No.  There was going to be testimony from a

12   Mr. McDonald who ended up not testifying.  So what was left I

13   don't think had that level of specificity.

14       Q    And did you have an understanding of whether as a

15   legal matter the State could have sought the death penalty in

16   connection with McGuinn's death if a conviction of Lee

17   Stephens had rested solely on an aiding and abetting theory?

18       A    The case was trifurcated.  I remember that argument.

19   So right after the verdict we got to the causation maybe?  I

20   forget what we called it.  Which was did Mr. Stephens

21   specifically bring about the death of Mr. McGuinn?  And if the

22   jury had answered that negative, we were done.  It was time to

23   go home.

24       Q    Well, let me take you back first to the guilt-

25   innocence phase.  Had the guilty verdict, had a guilty verdict

**App. 383**

dmh

34

1    in that case rested only on an aiding and abetting theory,

2    could the State have proceeded to seek the death penalty in

3    light of the principalship requirement?

4        A    I just don't know that the verdict form would have

5    been broken out that way.  So I don't know that I can answer

6    it.  Every verdict form I have ever seen has never seen do you

7    find him guilty as a principal?  Do you find him guilty as an

8    aider and abettor?  So I just don't know the verdict form

9    would have shed light on that question.

10       Q    Would there have been anything that would have

11   prevented you from asking for a verdict form if aiding and

12   abetting had been presented that would have called out the

13   substantive offense and the aiding and abetting offense?

14       A    Well, I asked for things every day of that trial,

15   sometimes several times a day and I would have had no

16   reservation about asking for the verdict form to if you find

17   him guilty of first degree murder, is it (a) as a principal,

18   (b) as an aider and abettor?

19            That would have been a perfectly fine thing to ask.

20   Whether I would have gotten it or not, I don't know.

21       Q    Did the Defense team ever argue to the jury during

22   the guilt phase that the State had failed to prove the

23   essential element of causation or that Stephens had caused the

24   fatal wounds beyond a reasonable doubt?

25       A    Well, Mr. Lawlor gave the closing argument and,

**App. 384**

dmh

35

1   again, my recollection is I was more concerned, more preparing

2   for the penalty phase that was likely to follow if we lost.

3   But I don't recall that specific argument.  I just recall the

4   argument of who the heck knows what happens because people

5   can't see what they saw, couldn't hear what they heard.

6        The witnesses are all over the place.  The DOC

7   contaminated the crime scene.  That was our argument.  I don't

8   know that we ever got into a causation argument.

9        Q    Was not getting to the causation issue as you recall

10  it a strategic or tactical choice by the Defense team?

11       A    If it was a tactical choice, it wasn't by me.

12       Q    Would in your opinion, Mr. Proctor, making such an

13  argument about lack of causation have been consistent with the

14  what I might describe as the principal defense theory as you

15  presented the case which you just described in the previous

16  answer?

17       A    Sure.  I mean I have argued that myself several

18  times.  He didn't do it.  He never left the cell but even if

19  you find he did, there's no evidence that he inflicted these

20  fatal blows and don't blame me, the State chose to charge it

21  this way.

22       Q    You mentioned a few moments ago the first phase of

23  the sentencing proceeding, was that the phase that was

24  directed at the question of principalship?

25       A    Yes.

**App. 385**

dmh

36

1    Q    And do you recall whether the Defense put on

2    additional evidence in phase one directed to that question?

3    A    I don't think so.  I think it was all argument.  It

4    started in the morning and it was done by mid-afternoon.

5    Q    Did the Defense team seek an aiding and abetting

6    instruction during that phase?

7    A    No, I don't think so.  That trifurcation was brand

8    new at the time and the jury instructions had just come out I

9    want to say because this had been added.  It was before they

10   abolished the death penalty they were forever tweaking the

11   statute and this had just been added.

12        And the instruction was brand new and it was just a

13   straight cut and paste from NICPAL* and I don't know that

14   anyone gave any thought to asking for additional instructions.

15   Q    Do you recall, Mr. Proctor, the tenor of what Judge

16   Hackner told the jury it had to find in order to find Lee

17   Stephens guilty in the first degree?

18   A    I recall the tenor and the letter was straight from

19   the model jury instruction.

20   Q    That involved a finding that Defendant committed the

21   murder by his own hand?

22   A    That sounds right.

23   Q    Do you recall what you argued, if anything, on that

24   point?

25   A    I know I was the one that gave that argument but

dmh                                                                          37

1    what I argued -- it would surprise me if I argued anything

2    with regard to that.

3        Q    Did you ever consider asking for an instruction as

4    to the meaning of "by his own hand?"

5        A    I don't think I ever did.

6        Q    Was the failure to seek such an instruction one that

7    was -- a decision that was strategic on the part of you or the

8    Defense team?

9        A    No, sir.

10       Q    Did you argue to the jury in phase one of sentencing

11   that the State had failed to prove that Stephens had landed

12   any blows on McGuinn?

13       A    I have no recollection one way or the other.  I'm

14   sure there is a transcript out there.

15       Q    If the transcript were to show that no such argument

16   was made, can you tell me whether the failure to make such an

17   argument was a strategic one, a strategic choice?

18       A    Can you remind me what the argument was again?

19       Q    The argument I believe was and the entirety of it

20   was something like "You found that Mr. Stephens played a role

21   in this and, again, we respect that but up to this point no

22   one asked you to say beyond a reasonable doubt what the State

23   proved that role was.  That's what we are getting at here.

24            You know, again, you know, are you sure it happened

25   with his own hand rather than he was aiding and abetting,

dmh                                                                      38

1    helping in some way."  That is from the transcript of February

2    the 13th, 2012 at page 79.  Does that refresh your

3    recollection?

4         A    And is what you're asking me if I should have sought

5    an additional instruction by his own hand?

6         Q    That the State had proved that any fatal wounds of

7    the 24 cuts had been struck by Lee Stephens.

8         A    That was not something that went into my calculus

9    and was not strategic.

10        Q    To your recollection, Mr. Proctor, did the State

11   ever offer evidence from which the jury could have concluded

12   beyond a reasonable doubt that Corporal McGuinn had received

13   wounds from two distinct weapons?

14        A    I remember that was part of the conversation with

15   Dr. Callery and I don't think they did.  I don't think they

16   could.  I think Judge Hackner even said they couldn't.  It was

17   too -- what's the word?  Up in the air, hypothetical, because

18   people moving in different directions, hands moving in

19   different directions, blades turning in different directions,

20   there is no way to say whether it was one, two, three or four

21   weapons.

22        Q    Do you remember that that was the basis for Judge

23   Hackner's ruling or was it in fact that the two weapon issue

24   had not been adequately disclosed in the doctor's expert

25   report.

**App. 388**

1   A     I don't have a recollection one way or the other.

2               MR. HUT:   In closing argument on February 1st, 2012,

3   this is at page 16, line 2 to page 17, line 2, Your Honor.

4               BY MR. HUT:

5               Ms. Howell for the State argued in substance.

6               (Portions of the State of Maryland versus Lee

7   Stephens transcript were read into the record.

8               "Dr. Vicenti told you and described for you

9               That there are two very different and

10              distinct wounds, the circular wounds and the

11              circular wounds.  That supports what Mr.

12              Freed tells you about seeing two people

13              stabbing Corporal McGuinn."

14              (The reading of the transcript was concluded.)

15   Q     Now, you were not responsible for the closing I

16   think you testified, right?

17   A     Correct.

18   Q     And, therefore, you were not responsible for

19   defending as to the State's closing if the State transgressed

20   appropriate limits on closing arguments, correct?

21   A     Correct.

22   Q     Nonetheless, sitting here today do you think that

23   that argument by Ms. Howell was objectionable and should have

24   been objected to?

25   A     Absolutely.

**App. 389**

dmh
40

1      Q      Did you have an understanding based on the

2   conversation you referenced earlier with Dr. Callery or

3   otherwise as to whether the same weapon could have produced

4   both linear and circular wounds?

5      A      My understand was always that it was incapable of

6   anyone saying either way.

7      Q      And am I right in thinking that just as you did not

8   talk to Dr. Vicenti about the lethality of the blows before

9   the trial, you did not talk to her on that subject either?

10     A      I don't think I talked to her at all about anything.

11     Q      And was not talking to her on that subject a

12  strategic choice by the Defense team?

13     A      It couldn't have been.

14     Q      Had you know that Dr. Vicenti had the same opinion

15  about the two weapons that you just testified to which is to

16  say you can't tell.  Had you known that, would you have sought

17  to bring that fact out on cross-examination of her as well?

18     A      Of course.

19     Q      Was not doing so the result of any strategic or

20  tactical choice by the Defense team?

21     A      No, sir.

22     Q      Now, you have testified on several occasions about a

23  man named Edward Jason Freed.

24     A      Correct.

25     Q      And I think you indicated in your testimony that he

dmh                                                                        41

1    was a witness for the State at trial, correct?

2         A     He was their main witness, yeah.

3         Q     And was the gist of his testimony?

4         A     That Mr. Stephens and Mr. Harris were both out there

5    with knives attacking Corporal McGuinn and he saw it from -- I

6    don't remember where his cell was, it was early, like maybe

7    10, 11, 12, something like that.

8              I'm sure you're about to tell me I'm wrong but it

9    was like early in the cell tier.

10        Q     Could it have been 16?

11        A     Yeah, there you go.  I was close.

12        Q     Fair.  And did he identify Harris as one of the

13   assailants?

14        A     He did.

15        Q     And did he identify Mr. Stephens as another?

16        A     Sure did.

17        Q     Did any other witness at the trial for the State or

18   otherwise ever identify Lee Stephens as one of the assailants?

19        A     I don't believe they did.

20        Q     Are you able to, and perhaps you have done it

21   already sufficiently, in characterizing the importance of

22   Jason Freed to the State's case?

23        A     Jason Freed was the State's case.  If he had had a

24   heart attack the morning of his testimony, the case wouldn't

25   even have gotten to a jury.

**App. 391**

dmh

1    Q    Did there come a time when you considered the

2  possibility of consulting and even calling audio and visual

3  experts or an audio/visual expert to undermine the credibility

4  of Freed's statements that he could see and hear the assault?

5    A    Freed -- can I give a bit of background?

6    Q    Surely.

7    A    So, we were appointed in July and we wanted to go

8  see the crime scene and, you know, the cut was closed,

9  announcements were made that it was closing down and so we

10 made arrangements to go view the CUT.  I wanted to see it.  I

11 wanted to hear it.  I wanted to be there as close to the

12 conditions.  I wanted to photograph it and as close to --

13 videotape it and as close to the conditions that Mr. Stephens

14 was in it.

15       And so it was still -- I remember it being really

16 hot so it must have been September, it wasn't that close to

17 the time but it must have been September.  And the DOC, for

18 reasons that I can't comment without swearing, said the only

19 time we have the manpower to let you in there is Saturday

20 night at 10 o'clock.

21       So, we all went on a Saturday night at 10 o'clock to

22 tour the cut.  I went, Ms. Widenfeld, the investigator over

23 there went, Mr. Lawlor went.  I remember Lorrie Tangs*, who

24 was our mitigation specialist went.  I remember Rob Johnson

25 who was our future dangerousness expert went and there were

1  probably someone else, maybe Ms. Waters and we all toured the

2  cut.  Someone even brought a mirror.  I think it was

3  Ms. Widenfeld but I could be wrong.

4       And we stood in those cells.  Right then Freed did

5  not exist right then which is why I wanted to give a little

6  bit of background.  He popped up when he got popped federally

7  several years later so we didn't know he was a factor.  He was

8  never -- at the time he said he didn't see or know anything.

9       So we weren't concentrating on Freed.  We were

10  concentrating on Carlton Gales, who was cell 2 I want to say.

11  He was 1 or 2.  He was right at the end because he was the

12  tier runner.  We were concentrating on Rassy Sat* McDonald who

13  was a couple from Mr. Stephens, maybe 36, 39, something like

14  that and, you know, what could you have seen?

15       And I remember holding the mirror and I remember

16  standing at the other end holding the mirror and, you know, we

17  quickly realized or at least I quickly realized that you could

18  not see what the witnesses say they saw.

19       And, again, not Mr. Freed in particular because he

20  wasn't on our radar screen at all.  You couldn't see what the

21  witnesses that we expected to testify saw.

22       So, at that point I decided, I think it was me,

23  that, you know, it's one thing us saying I looked and I

24  couldn't see and it's another having an expert with a Ph.D.

25  after his name saying -- and there were these huge fans.

1          So it wasn't just visually, it was audio because

2     people said they heard shouting, calling, whatever.  That we

3     needed some sort of an audio/visual expert and, yes, I

4     attempted to get an expert.

5          If we toured that place in September 2006, I am

6     betting it was within a month or so of that.

7     Q    I am showing you Defense's O, Mr. Proctor, and ask

8     you if you recognize Defense O?

9     A    I haven't seen this in years but, yes, I recognize

10    it.

11    Q    And what is it?

12    A    It is the resume of a Fawzi Bayan, B-a-y-a-n, who

13    was an expert that I wanted to hire.

14    Q    And the first name is Fawzi, F-a-w-z-i?

15    A    Correct.

16    Q    And this is a letter and a CV addressed to you, is

17    that right?

18    A    Yes.

19    Q    The letter is on page 2 of Defense's O?

20    A    Right, November 6th which makes sense if we toured

21    it in September.  I would have started my search for an

22    expert, a month or so later, here he comes.

23    Q    What happened with -- is Dr. Fawzi?

24    A    I don't know if he's a Dr.  He is a principal

25    engineer so Mr. Bayan, I guess.

dmh
45

1        So, after deciding I needed an expert, I want to say

2 for capital cases there are like --- and I wanted to say I put

3 a note out on a --- saying need an expert that can say you

4 can't hear or you can't see and getting zero responses.

5        So then as I thought about it more, who uses those

6 kinds of experts?  I decided personal injury lawyers use them,

7 right?  They use them to -- the car was going 60 miles an hour

8 because the skid mark is this long, you know, the witness had

9 said that the indicator wasn't on, you know, they are the kind

10 of experts that use these.

11        So, I called some personal injury lawyers of mine

12 and, actually, if you look at page 1 of his fax it says David

13 McGuinn versus Lee Stephens because he never worked on a

14 criminal case.  He was a civil guy.  He has no knowledge that

15 the case was State of Maryland versus.

16        So, I called one of them.  I want to say Jeff

17 Butschky, B-u-t-s-c-h-k-y, was the Plaintiff's lawyer that I

18 spoke to.  He was like, yeah, I just used this guy and he was

19 great.  I used him in my traffic accident case or whatever it

20 was.

21        So, I called Mr. Bayan and said, can we bring you

22 into a case?  Here's the scoop roughly and this is his letter

23 saying, yes, I am willing to be appointed.  Here's how it

24 works.

25     Q    And after you had that conversation, what then

**App. 395**

dmh                                                                    46

1   transpired?

2        A    His rate, it says right here on page 2, is $320 an

3   hour.  I called.  So the Public Defender's Office had four

4   people in their capital case unit, two of whom were assigned

5   to Juni's* case, Mr. Harris, and two of them were assigned to

6   ours.

7             And I called, I think it was Kay Behler.  The two

8   assigned were Kay Behler and Stephanie McArdle.  I think it

9   was Kay, it could have been Stephanie but I think it was Kay

10  and said we got this expert, we need him and here's his letter

11  can you please appoint him.  Because I can't hire anyone,

12  right?  I have to go through the Public Defender's Office.

13       Q    And just -- let me interrupt you.  Were McArdle and

14  Ms. Behler, that is M-c-A-r-d-l-e on McArdle and --

15       A    She got married at some point but I don't think she

16  was a Taylor then.

17       Q    And Ms. Behler, B-e-h-l-e-r.  Are they part of the

18  aggravated homicide division of the Office of Public

19  Defenders?

20       A    Aggravated homicide was what they changed their name

21  to I believe when the death penalty was abolished.  I think

22  back then they were Capital Case Unit, something like that.

23       Q    And what did Ms. Behler tell you or Ms. McArdle?

24       A    I think it was Ms. Behler and I think she told me

25  that $320 an hour was never going to fly and to go back to him

dmh                                                                    47

1    and see if he can reduce his rate.  We couldn't pay more than

2    X, whatever X was.  I don't remember what it was.

3        Q    And did you go back to him in fact?

4        A    I did and he was not a true believer in our cause

5    and was not interested in doing anything for a dime less than

6    what was quoted in that letter.

7        Q    Did you make any efforts following that to locate an

8    expert who might have performed services at a lower cost?

9        A    I know I called other personal injuries lawyers to

10   see if they knew someone who was more reasonable, for want of

11   a better term, or more in fitting with the pay structure of

12   the Public Defender's Office and it just petered out.  No one

13   was ever located.

14       Q    And as you proceeded closer to trial, did you ever

15   renew your efforts to find a less expensive expert in

16   audio/visual or either two of those disciplines?

17       A    Periodically it would come up like this is a good

18   idea, we should do it but I don't know it ever got past the

19   discussion point.

20       Q    And when it came up periodically, but never got past

21   the discussion point, was not retaining either and audio or

22   visual expert or a combined one a strategic decision on the

23   part of the Defense team?

24       A    No, it was --

25            THE COURT:  So really all you have to do to get a

**App. 397**

dmh                                                                    48

1   post-conviction is be hired by the Public Defender, ask the

2   Public Defender for services, have the Public Defender deny

3   the services, go to trial, lose, then have the Public Defender

4   hire an expert to come in and say, well, we would be an

5   expert?  Basically it is a strawman argument.

6           MR. HUT:  I do not think so, Your Honor.

7           THE COURT:  Oh, it is an absolute strawman argument

8   that I am telling you right now it is offensive.

9           MR. HUT:  If I may?

10          THE COURT:  Mr. Hut, I am telling you right now the

11  old saying "that dog won't hunt," it is the strawman argument

12  to the extreme.  I wanted an audio/visual expert but the

13  Public Defender would not hire me.

14          He has been convicted and now the Public Defender

15  has hired an expert to say we are the expert you should have

16  had in the first place that we would not pay for it.

17          Save it for argument but I am telling you right now

18  it is disingenuous, it is a strawman argument and that dog

19  won't hunt.  You better find a better way to approach this

20  because I find that offensive that an attorney would say I

21  asked the Public Defender to hire this expert, they said no

22  and now the Public Defender is turning around and saying, but

23  we would have hired this expert at the time.

24          You better bring someone in from the Capital Defense

25  Unit or whatever that unit is now to say we would have paid

**App. 398**

dmh

49

1    for it at the time.  I am telling you there is a lot of --

2              MR. HUT:  But the testimony --

3              THE COURT:  No.  Save it for argument.  Save it for

4    argument.  Back up to the podium.  Do not get that close,

5    okay?  You are in my space now.  That is your space, this is

6    mine.  I am telling you that I am shocked that this is what I

7    am hearing.

8              MR. HUT:  Well, I would like to reorient the dog.

9    Let me see if I can do it a bit with the testimony of

10   Mr. Proctor.

11             BY MR. HUT:

12        Q    Was there any indication by Ms. Behler that if she

13   denied your request to retain Dr. Bayan, maybe that would

14   result in a conviction for failure to have the proper expert

15   and then later down the road, that conviction could have been

16   upset through the strategy of them hiring different experts to

17   come in and say that the prior expert should have been hired

18   at that price?  Was that part of Ms. Behler's calculus?

19        A    No.  The Public Defender's Office --

20             MR. RUSSELL:  Objection, I do not know that he knows

21   what Ms. Behler thought.

22             THE COURT:  Sustained. There is no way that --

23             BY MR. HUT:

24        Q    On the basis of anything Ms. Behler told you, did

25   she tell you that that was her theory?

**App. 399**

dmh                                                                    50

1              MR. RUSSELL:  Objection.

2              THE COURT:  Sustained.  Calls for hearsay.

3              MR. HUT:  Is there a way that I can rephrase that

4    question, Your Honor, because I do not understand the basis

5    for the objection.  I want to know whether Behler said

6    anything like that.

7              THE COURT:  How about we go back to Evidence 101?

8    Is that an out of court statement that you want to get in for

9    the truth of the matter?

10             MR. HUT:  No.

11             THE COURT:  Is it the perception of another witness?

12   Is it the statement of another witness?  Is it the state of

13   mind of another witness?

14             MR. HUT:  Of course it is the statement of another

15   witness but it is offered for the fact that the statement was

16   made and heard by this witness.  It has nothing to do with the

17   truth of the matter.

18             THE COURT:  Well, sustained.

19             MR. HUT:  The truth of the matter is clearly not

20   true.

21             THE COURT:  Sustained.  You are upset, I am

22   irritated, move on.

23             MR HUT:  I am not.  I am not.

24             THE COURT:  There is just an incestuous relationship

25   here which is concerning when I hear something like what was

**App. 400**

dmh                                                                        51

1   just presented to me.

2        MR. HUT:  I think Your Honor has misperceived what

3   was presented.  That is what I am trying to show here.

4        THE COURT:  No, I think you have misperceived what I

5   have said.

6        MR. HUT:  All right.

7        BY MS. HUT:

8   Q    Did Ms. Behler ever tell you that if you had gone

9   out and tried to find an expert at a lower fee that the Public

10  Defender would not have authorized you to retain that expert

11  and presented the expert at trial?

12       MR. RUSSELL:  Objection.

13       THE COURT:  Sustained, calls for hearsay.

14       BY MR. HUT:

15  Q    Did you think that you were precluded from finding

16  another expert at a lower cost?

17  A    Never once in every State case I've had and panel

18  cases I've had 50 or more at least, probably closer to 100,

19  has the Public Defender's Office second-guessed my choice to

20  hire anyone, an investigator, a mitigation specialist, an

21  audio/visual expert, a psychologist.  Never once have they

22  said, no, you're not getting them.

23       What they have said on occasion is that doesn't

24  comport with our fee structure and I've called experts before,

25  psychologist springs to mind and said, we can't do it for that

**App. 401**

dmh

1  rate.  Can you do it for this rate?  So they have never

2  second-guessed who I want to hire and I guess they trust my

3  judgment to only hire people that are necessary.

4        The only reining in I've ever had from them is the

5  hourly rate.  They have never even fought me with the amount

6  of hours.  If I said it's going to take an investigator 100

7  hours to work this case, they never say you've got 80.  It's

8  only the rate.

9    Q    And was any objection made on the part of Ms. Behler

10  to Dr. Bayan on the grounds of his credentials or anything

11  about him other than his cost?

12    A    No.

13    Q    Was any effort made by the Defense team following up

14  on this to try to locate an expert at a lower cost?

15    A    As I said, I think I contacted some more civil

16  lawyers right after Mr. Bayan grinded to a halt but I don't

17  recall ever interviewing anyone else.  I don't recall ever

18  getting a letter proposing to work on it from anyone else.  I

19  don't have any recollection of anything that way.

20    Q    And was that a strategic choice on behalf or on the

21  part of the Defense team not to persist in efforts to locate

22  additional experts?

23    A    I don't believe it was.

24        THE COURT:  Can you go back to something before you

25  get away from it?  Did you video the cell area what you were

dmh                                                                            53

1   able to see that Saturday night or did you take picture?

2            THE WITNESS:  I know we I know we took picture.  I

3   want to say we videotaped it.  I remember there was a

4   Dr. Robert Johnson who was a future dangerousness expert.

5            THE COURT:  Right.

6            THE WITNESS:  I remember him having something with

7   the lens.  Whether that was a video or a camera and I remember

8   him putting it on a flashdrive afterwards and giving it to me.

9   So whether those were MP3s or whether they were just still

10  photos, as I sit here today I don't recall but he had the best

11  camera that night.  We didn't select him for his photographic

12  prowess.

13           THE COURT:  Right.  Okay.  And how long were you

14  there that night?

15           THE WITNESS:  Hours.  I want to say they said you

16  can get in at 10:00 and it was probably 1:00 a.m. by the time

17  we left.  I bet it was two plus hours.

18           THE COURT:  Were you given unfettered access to that

19  area?

20           THE WITNESS:  Unfettered, yes, sir.  They weren't

21  even -- I remember asking them not to even be on the floor

22  because I don't want them seeing that I'm looking right from

23  Gale's cell.

24           Then they feed that back to the State and all of

25  sudden the State knows where we're going with this.  So, they

**App. 403**

dmh
54

1   opened the doors and left.

2          THE COURT:  And the unit was no longer occupied at

3   that point?

4          THE WITNESS:  Correct, the whole -- there were four

5   floors or whatever.

6          THE COURT:  Right.

7          THE WITNESS:  There was not one person on that whole

8   floor, on all four, yes, sir.

9          THE COURT:  Okay.  And did you ever have to make

10   another visit back to the House of Correction or was that the

11   only one you were able to make?

12          THE WITNESS:  That was the only one we were able to

13   make.  It wasn't too long afterwards the House of Correction

14   didn't exist.

15          THE COURT:  Right, it got demolished.

16          THE WITNESS:  Or they started gutting it.

17          THE COURT:  Yes.  I know they saved the cell door.

18          THE WITNESS:  Correct, that was about it.

19          THE COURT:  Okay.  All right.  I am sorry.  I did

20   not want to lose my train of thought on that.  I did not know

21   how much time they spent there.  Go ahead.

22          MR. HUT:  By all means, Your Honor.

23          BY MR. HUT:

24     Q    Now, I believe you testified earlier but perhaps not

25   so let me ask you, did you recognize that a portion of the

**App. 404**

dmh

1    evidence that attended to inculpate or was certainly argued to

2    inculpate Mr. Stephens involved certain drops of blood of

3    Corporal McGuinn that was found on items of clothing of

4    Mr. Stephens?

5          A    I remember that being argued, yes.

6          Q    And did the Defense team have a strategy or an

7    approach about how to deal with that evidence?

8                THE COURT:  Did you say inculpate or exculpate?

9                MR. HUT:  I said inculpate.

10               THE COURT:  Inculpate, okay.

11               THE WITNESS:  Absolutely.  The crime scene was a

12   mess.  I remember having a knockdown drag-out with Judge

13   Hackner about we wanted missing evidence, failure to preserve

14   type of instruction at closing arguments because as best I

15   could tell, no one did anything they were supposed to in

16   there.

17               Everyone ran up, they went in, they went out, they

18   didn't log it.  They didn't have protective clothing on.  The

19   place was an absolute mess.

20               BY MR. HUT:

21         Q    Do you remember the items of clothing at least two

22   that assertedly bore the blood of Corporal McGuinn, a tank top

23   and boots, had been removed during the search of Mr. Stephens'

24   cell?

25         A    I remember there was a plastic bag in a sink and I

dmh

1    remember the boots, yeah.  I remember those.  There was --

2    probably a tank top sounds right but there was something in

3    the plastic bag.  Boxer shorts maybe with a spot right here.

4    He was still wearing those maybe?  Does that sound right?

5        Q    I do think I could -- it is proper for me to help

6    you out but you are circling around on it for sure.

7        A    I'm in the ballpark.

8        Q    Let me ask this.  How did you attempt to deal with

9    the boots and anything else that may have been in the bag and

10   later found to have the blood of Corporal McGuinn?

11       A    I remember during the Defense case we called several

12   inmates who were on that tier, Custos* was one of them I

13   remember.  The rest are gone as I sit here today.  You know,

14   they basically testified that they had McGuinn's blood too.

15       Q    And in your examination of the persons who performed

16   the search of the cell and transport of the item of evidence,

17   did you have any objectives with respect to those witnesses?

18       A    That they didn't do their job properly and that they

19   contaminated the entire scene.

20       Q    In failing to do their job properly, did you --

21   withdrawn.  Did there emerge an argument based on how the

22   items were transported away from the cell, that one item in

23   the plastic bag may have contaminated another in the bag?

24       A    Right.  Yep.

25       Q    Was there any suggestion that items as they were

**App. 406**

dmh

1  carried in the plastic bag away from the cell might have come

2  into contact with blood that was on the tier floor or on the

3  sides?

4      A    Right.  I mean when you look at the pictures,

5  unfortunately, Mr. McGuinn's blood is everywhere because he

6  ran up and down the tier, you know, with blood coming out of

7  his arteries so that was absolutely -- he could have brushed

8  against, could have set it down for a minute.  The bag could

9  have been moving items within it, you know, transfer of DNA.

10     Q    Do you remember whether -- or do you remember the

11  nature of the plastic bag?

12     A    Mesh.

13     Q    Was it was --

14     A    I remember only because I'm Irish and that was a

15  word I couldn't say so every time I asked a witness the

16  question mesh bag, they all looked at me like what did he just

17  say?

18     Q    And did there come a time when the parties through

19  counsel attempted to address the question where the Defense

20  was mounting any challenge to the handling of items of

21  evidence after they had left the cell and been transported

22  down to the central location which is called the Central Hall?

23     A    Once it got to Central Hall, Maryland State Police I

24  think by and large took over, John Branham* by and large and

25  there were a couple of others from his unit there.

**App. 407**

dmh

1          And our fight was wholly concerned with what

2  happened prior to getting to Central Hall and while in.  After

3  that, we had no reason to disbelieve that everything wasn't

4  handled properly.

5          THE COURT:  I hate to interrupt but is that why you

6  asked for the missing witness instruction about all the

7  evidence that you contended was destroyed or missing prior to

8  it getting to Central Hall?

9          THE WITNESS:  Yes.  Correct.  Missing evidence I

10 think rather than --

11         THE COURT:  Missing evidence instruction?

12         THE WITNESS:  Right.  That they failed to

13 preserve --

14         THE COURT:  Not witness, evidence, missing evidence

15 instruction?

16         THE WITNESS:  Yes, that they failed to preserve it.

17 There may have been evidence that was helpful to Mr. Stephens

18 because they had done such a --

19         THE COURT:  And I know that was the subject of the

20 Court of Special Appeals decision.

21         THE WITNESS:  Well, I didn't agree with them and I

22 don't agree with them now but, yes.

23         THE COURT:  I would not expect you to but I was just

24 trying to figure out exactly what the argument was as it

25 related to that issue.

**App. 408**

dmh

59

1     THE WITNESS: Yeah. That is exactly the argument

2 and one of the things Mr. Hut showed me was the jack jury

3 instructions and I think it's even in there.

4     We cite the case that says we should get this which

5 is the Cost case, Your Honor.

6     THE COURT: Cost, yes, that is what Judge Eyler

7 discussed.

8     THE WITNESS: Yes.

9     THE COURT: All right. Go ahead, Mr. Hut. I am

10 sorry.

11     BY MR. HUT:

12  Q While this next document I am about to show you is

13 being marked -- I will withdraw that. I will remember to head

14 back to something I admitted to ask you. I am showing you

15 what has been marked as Defendant's P.

16  A Yes, sir.

17  Q Do you recognize Defendant's P?

18  A It looks like the stipulations that were entered

19 into during trial, yes.

20  Q Do you remember whether any of the stipulations that

21 are reflected on this page, Defense P, were discussed before

22 they were entered or before they were agreed to and then

23 entered with Mr. Stephens?

24  A I don't think so. It would surprise me. In Federal

25 Court they make your client sign stipulations so I have to

1  discuss it with my client and I have to have him sign it.

2          In State Court I have always considered that

3  strategy, defense tactics and I don't know that if one of my

4  clients felt strongly that he didn't want to stipulate to

5  that, I would probably make the State prove it but by and

6  large that's my call not his.

7          So it is possible I showed it to him, yes, or he

8  read it while I was sitting, I sat next to Mr. Stephens,

9  absolutely, but it would surprise me if he and I had a

10  specific discussion about any of these stipulations.

11      Q    And I would like you to turn, Mr. Proctor, to

12  Paragraph 9 which is on the second page.

13      A    Yes, sir.

14      Q    Now, prior to entering this stipulation, was it your

15  intention to come to agreement with the State to be embodied

16  in the stipulation about what the transpired items of evidence

17  after they had got to Center Hall?

18      A    Well, as I look at this, what my intention was we

19  were absolutely fighting about every single item of evidence

20  that got to Center Hall which is page or sentence 1 of

21  Paragraph 9.

22          But we were, you know, the State in theory could

23  have had the call, I'm from the Maryland State Police, we took

24  this from Center Hall, we put it in evidence.  I'm the

25  evidence technician.  I logged it into evidence.  I'm the

dmh

61

1   evidence technician that took it out and handed it to John

2   Branham.  I'm John Branham.  I drove it to the DNA lab.  I'm a

3   DNA analysist.  I took it.

4          You know, we could have had weeks of testimony but

5   things were inconsequential so it was my intention to

6   stipulate that after Center Hall, everything happened the way

7   it should.

8      Q    And you intended no such stipulation with respect to

9   anything that had happened prior to Center Hall, is that

10  correct?

11     A    That was absolutely -- we were contesting every

12  millisecond of that time prior to Center Hall.

13     Q    The stipulation that is reflected in Paragraph 9

14  and, indeed, all of the other stipulations in Defense O were

15  entered in evidence, is that right?

16     A    I think they were entered in evidence.  It's

17  possible they were just read to the jury but my bet would be

18  this piece of paper went back.

19     Q    When you say went back, went back with the jury

20  during their deliberations?

21     A    Correct.

22     Q    And how long did the jury deliberate in this case if

23  you remember?

24     A    They were out a long time on phase one and phase

25  three.  Phase two was a couple of hours.  You know, my bet is

dmh

1   more than a week, it should be 5, 6, 7, 8 trial days.

2        Q    Did you intend at any point in Paragraph 9 or

3   otherwise, to agree that there had been no alteration of items

4   of evidence or any -- or no disturbance of items of evidence

5   before the items were delivered to Center Hall?

6        A    No.

7        Q    Did you intend to continue argue that one or more of

8   these items had been contaminated in the process of moving it

9   to Center Hall?

10       A    Yes.

11       Q    And do you recall whether Mr. Lawlor in fact made

12  such an argument during his closing?

13       A    I would say that was the principal focus of his

14  closing.

15       Q    As you read the stipulation and particularly the

16  last sentence in Paragraph 9, can you rule out that the jury

17  in their deliberations may have construed it to concede that

18  items of evidence had been properly handled at and before the

19  items were moved to Center Hall?

20            MR. RUSSELL:  Objection.

21            THE COURT:  Sustained.

22            BY MR. HUT:

23       Q    Do you think that the last sentence of Paragraph 9

24  is in any way susceptible to confusion on the part of the

25  jury?

1          MR. RUSSELL:   Objection.

2          THE COURT:   Sustained.

3          BY MR. HUT:

4     Q    Do you have any view as to the last sentence of

5  Paragraph 9 as you read it here today?

6     A    It's inartfully written.   Could have been written

7  better is my view.   I don't -- in context I know what I think

8  it means but I couldn't second guess what a jury thought it

9  meant.

10    Q    The decision to write the sentence and the

11 stipulation in this way, was that a strategic decision on the

12 part of the Defense team?

13    A    You know, I honestly, sir, can't say one way or

14 another.   I don't know whether I was the one that looked

15 through the stipulations or whether it was Mr. Lawlor or

16 whether it was both of us, you know, without seeing the

17 transcript.

18         I know that State drafted them and it would shock me

19 if we didn't send 25 suggested revisions because we sent 25

20 suggested revisions to just about anything they sent us.   But

21 beyond that, I don't know one way or the other.

22    Q    You mentioned in a number of prior answers you made

23 reference to Corporal John Branham?

24    A    Yeah.

25    Q    Who was Corporal Branham?

**App. 413**

dmh

64

1     A   He was -- I don't know if he was initially, but a

2  short -- within the first six months of the case he was it.

3  If you wanted to interview a witness that was like

4  Mr. McDonald that was secreted away and out of DOC population,

5  you call Branham.

6        You wanted to review evidence, you called Branham.

7  You couldn't find a report that you knew exists, you call

8  Branham.  He was the person running it from law enforcement.

9     Q   I will go back and pick up on something I neglected

10  to ask you earlier, I am showing you what has been marked as

11  State Exhibit 3.

12     A   Okay.

13     Q   Do you recognize State Exhibit's 3, Mr. Proctor?

14     A   It looks like a To Do list prepared by Gwendolyn

15  Waters six months before trial.  Yes.  And I'm sure she would

16  have sent it to me.

17     Q   Was there a practice that the Defense team made

18  about preparing To Do lists like that from time to time during

19  the course of trial preparation?

20     A   Yeah.  I think we put Gwen in charge of that so that

21  there would be one central repository.  It was back in the

22  days before a drop box and such.  And so if I thought of

23  something, I would e-mail Gwen.

24        THE COURT:  Back in the days before what?

25        THE WITNESS:  Before we had like everything on a

**App. 414**

dmh

1   cloud and everyone could simultaneously -- that sort of thing.

2          THE COURT:  All right.

3          THE WITNESS:  So, if something popped into my head,

4   I'd send it to Gwen.  If something popped into the

5   investigator's head, she would send it to Gwen and Gwen was

6   responsible for keeping, editing, updating, changing a To Do

7   list.

8          BY MR. HUT:

9      Q    While we here, had you and Mr. Lawlor worked

10  together on cases before?

11     A    Yes, we had.  At that point when we got appointed to

12  this case, there were two people on death row, Heath Birch out

13  of Prince George's and Anthony Grandison out of Baltimore

14  County and I was first chair and he was second on Grandison

15  and the other way around, he was first chair and I was second

16  on Birch.  So we had --

17         THE COURT:  Grandison for post-trial motions?

18         THE WITNESS:  That was post-conviction relief in

19  capital cases.

20         THE COURT:  Post-conviction relief.

21         THE WITNESS:  We had also we started a trial here --

22         THE COURT:  Because that goes back to Judge Levitz

23  when he was a prosecutor.

24         THE WITNESS:  Correct.  Yes, 1981 or something like

25  that.

**App. 415**

1          THE COURT:  Right, okay.

2          THE WITNESS:  But we didn't get it then.  We had

3   represented Wesley Baker who was executed by the State in

4   December 2005.  We jointly represented him.

5          THE COURT:  Was that Gary Christopher's client?

6          THE WITNESS:  It was Gary Christopher's client but

7   when an execution date was set, Gary Christopher took care of

8   like clemency petitions and that sort of thing and Mr. Lawlor

9   and I litigated lethal injection and litigated a Wiggins

10  motion for want of a better term.  So we took care of that.

11         And we, also, we started a trial here first degree

12  assault but we pled it like at some point during it so we've

13  had cases.  We knew each other.  We spoke even before

14  Mr. Stephens probably three times a week.

15         THE COURT:  Okay.  Go ahead.  I am sorry.  I just

16  did not know their relationship.

17         BY MR. HUT:

18  Q     Let me direct your attention to page 5, Mr. Proctor,

19  of State's 3.

20  A     Okay.

21  Q     The top of the page is marked III Trial Experts.

22  A     Yes, sir.

23  Q     And if you go down to Item D, do you see there that

24  it says audio/visual?

25  A     Yes, sir.

**App. 416**

dmh                                                                    67

1        Q     Do you recall whether the prospect of an

2   audio/visual expert was something that you were actively

3   considering at July of 2011?

4        A     I really don't think it was.  I suspect this was

5   just a carryover from the original To Do list in '06, '07.

6        Q     And just above that do you see Item C says Medical

7   Examiner, Dr. Callery?

8        A     Yeah.

9        Q     Does that refresh your recollection that at least as

10  of July 2011 it appears he had not been fired by the State of

11  Delaware?

12       A     Yeah, it appears so.

13       Q     Item C-1 it says call him and get him moving.  Did

14  that ever happen?

15       A     Not by me.  I don't see that it was assigned to

16  anyone.  I don't think it was me.

17       Q     Would it have been you to follow up with him given

18  your responsibility for Dr. Vicenti or did that latter

19  responsibility happen afterward?

20       A     I'm sure it was much closer to trial that we divided

21  the witnesses up.  I know, broadly speaking, we divided up

22  guilt and penalty as in I'm the penalty guy, you're the guilt

23  guy but beyond that, I don't know that we divided up

24  individual witnesses.

25             I suspect it was probably closer to Thanksgiving we

**App. 417**

dmh                                                                    68

1    did that.

2        Q    Did anyone in fact call him and get him moving?

3        A    Not to my knowledge.

4        Q    Was not calling him and getting him moving a

5    strategic or tactical choice by the Defense team?

6        A    Not on my part.

7        Q    Did Mr. Lawlor ever tell you in form or substance

8    that he had made a tactical choice not to pursue Dr. Callery?

9            MR. RUSSELL:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  He did not.

12           BY MR. HUT:

13       Q    Are you familiar, Mr. Proctor, with the ABA

14   Guidelines for the -- I think it is for the selection and

15   representation of defense counsel in capital cases?

16       A    I mean I can't quote them verbatim but, yeah, I read

17   them.  The original ones came out in 2001 maybe and then they

18   updated the mitigation maybe 10 years later I think it was,

19   2011, something like that so, yeah, I've read them.  I've seen

20   them.  I've certainly quoted them when I represented people on

21   death row myself.

22       Q    I misstated the title.  The title I believe is ABA

23   Guidelines for the Appointment and Performance of Defense

24   Counsel in Death Penalty Cases.

25       A    Yes, Hofstra Law Review is where you find it.

**App. 418**

dmh                                                                    69

1        Q    And are you familiar with Guideline 10.7 of those

2   guidelines on the subject of what trial counsel in a capital

3   case should or ought to do with respect to prior convictions?

4        A    I think it says gather up all the information, munt

5   any collateral changes.  I mean I can't quote it verbatim but

6   it's basically do what you can to remove it as an aggravating

7   factor.

8        Q    Did the directive in ABA Guideline 10.7 in any way

9   inform your decision to file a petition for post-conviction

10  relief in Wicomico County on behalf of Mr. Stephens?

11       A    Well, I suspect the answer to that is no, I would

12  have filed it regardless.

13       Q    Were you aware of the ABA Guideline at the time you

14  represented Mr. Stephens in connection with the Wicomico

15  County post-conviction proceeding?

16       A    Well, I'm sure I was generally aware of it.  I don't

17  know that I sat down and read it.

18       Q    Do you have any view as to whether having a death

19  qualified jury for the trial would have had an effect on the

20  likelihood of a conviction in the guilt/innocence phase of the

21  trial?

22       A    Well, it's not just my view.  I mean there's ample

23  studies and ample literature that something about, yeah, I

24  could kill that guy also means you're way more likely to find

25  someone guilty.

**App. 419**

dmh                                                                    70

1          I remember filing probably more than one motion to

2   say, Judge Hackner, we want you to decide punishment and the

3   reason we filed that was not because we believed in Judge

4   Hackner's benevolence.  It was because we didn't want a death

5   qualified jury for the guilt phase.

6      Q    In the petition for post-conviction relief that you

7   filed on Mr. Stephens' behalf in 2009 in Wicomico County which

8   I think is before you in one of the exhibits.

9      A    It is.

10     Q    Do you recall that you made a claim with respect to

11  a ballistics expert who had testified there for the State

12  named Joseph Kopera?

13     A    I do.

14     Q    And what was the tenor of the claim you made with

15  respect to Kopera?

16     A    I want to say I kept this pretty general because we

17  really didn't have enough information to go beyond that but

18  Kopera had by then committed suicide after basically

19  discovering that his qualifications were a fraud.

20          And so, you know, the evidence in this case was

21  there was a shooting outside The Pit, was the name of the

22  club, it was when the club was getting out, like 1:00 o'clock,

23  2 o'clock in the morning, something like that.

24          And there were 100 people and 100 of them saw

25  something completely different than the other 99.  It was all

**App. 420**

1    over the place.  And so the thrust of it was that Kopera said

2    that weapon, the one that Mr. -- like three weeks later some

3    Officer Elmer or something said he said Mr. Stephens throw a

4    gun behind a hedge and that gun was the one that Kopera

5    ballistically matched to the killing of whatever the name of

6    the victim was.

7              So without Kopera it was a winning post-conviction.

8    So the challenge was that his credentials, that his testimony

9    to the scientific expertise, to the --- that's what it was.

10        Q     Was there any challenge at that stage to the

11   substance of any conclusions that Kopera reached as opposed to

12   his expertise and his credentials and his part in perjury?

13        A     My recollection was we filed this, kept it real

14   general because we were up against a deadline and we worried

15   about getting our own expert supplement later.

16        Q     Was there any effort on the part of Mr. Stephens',

17   including you, to procure a retest of the ballistics that

18   Mr. Kopera had tested and on which he testified in Wicomico

19   County?

20        A     Not by me.

21        Q     Was the action or the inaction with respect to

22   obtaining a retest a strategic or tactical decision by you?

23        A     As I said, if I had an hour to spare, I wanted to

24   work on his pending capital case.  I did not want to -- well,

25   I had a valid post-conviction filed.  I had to get a hearing

**App. 421**

dmh                                                                                          72

1    on it at some point and so it was pushed to the background

2    perennially.  We just kicked it down the road and we never

3    really did anything other than file the post-conviction

4    petition.

5         Q    Did you ever have any discussion --

6              THE COURT:  I hate to interrupt but Kopera had been

7    bouncing around for a while?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  In terms of his qualifications, his

10   experience, the perjury.  It was well known for a long time.

11   Had anybody ever filed for Mr. Stephens prior to that date?

12   Because I think he fell before the rules changed.

13             THE WITNESS:  I don't think anything had been filed

14   after his direct appeal at all.  I think in '06 when we got

15   appointed, we undertook to do it and we gathered up everything

16   and filed the best post-conviction.

17             I don't think -- no, if you're asking like if the

18   forensics division of the Public Defender's had collateral --

19             THE COURT:  Right.  I did not know if anybody --

20             THE WITNESS:  No.

21             THE COURT:  Okay.

22             THE WITNESS:  We had a blank slate.

23             THE COURT:  Oh, okay.  Nothing had been filed at

24   that point?

25             THE WITNESS:  Nothing had been filed.  Mr. Stephens'

**App. 422**

dmh

73

1    first trial resulted in a mistrial and then there was a second

2    one so the case had been around for a long time.  The jury

3    deadlocked the first time around.

4             THE COURT:  Okay.  Thank you.

5             BY MR. HUT:

6        Q    In the Defense or did you ever have any conversation

7    with the State about the State's retesting any ---?

8        A    If they ever retested it, it wasn't known to me.

9        Q    Did there come a time when I told you that they had

10   retested them?

11       A    Last week or the week before was the first -- it

12   wasn't last week because I was away last week.  Two weeks ago

13   was the first I ever knew they retested.

14            MR. HUT:  Court's indulgence.

15            THE COURT:  Sure.

16            BY MR. HUT:

17       Q    When you earlier said, Mr. Proctor, that the jury

18   was out in the Anne Arundel County case for a week in phase

19   one, did you have reference to the guilt and innocence phase?

20       A    They were out a week on guilt/innocence and they

21   were out probably about the same on penalty too.

22       Q    Did you ever discuss with Mr. Stephens the question

23   whether he should take the stand and testify in his own

24   behalf?

25       A    Well, I'm sure I did.  I'm sure I've never had a

**App. 423**

dmh

74

1    trial when I didn't discuss it.  I don't have a specific

2    recollection of a lengthy conversation, no.  I don't recall

3    butting heads over that.

4        Q    In the course of that conversation to the extent you

5    recall, do you think that the question of possible impeachment

6    by his prior murder conviction would have been raised?

7        A    Absolutely.

8        Q    Would that have militated against his taking the

9    stand to testify?

10       A    Again, I don't have a specific recollection but if

11   Mr. Stephens had asked was it in his best interest, I would

12   have said once they hear you've already been convicted of

13   murder, it's game over.

14       Q    Had the vacator of the murder conviction in Wicomico

15   County been obtained at the time of the trial here, would that

16   have been of assistance to Mr. Stephens' case during the

17   sentencing part of the case?

18       A    Absolutely.

19       Q    In what way?

20       A    You know, I think we almost conceded at the penalty

21   phase that life without parole was the appropriate sentence.

22   And the reason for that is if he is already doing life,

23   another life sentence sure feels like a slap on the wrist.

24            So we had to offer up to the jury that they could

25   give him something in addition, extinguishment of his chance

**App. 424**

1  of his ever getting out of jail.  Had he not been serving

2  life, I could and would have said life's enough.

3      Q    Based on your experience in murder cases and capital

4  cases to which you have testified, how or what was your

5  opinion of the strength of the State's case against

6  Mr. Stephens in this case?

7      A    Once Mr. McDonald elected not to testify, it was the

8  weakest capital case I've ever had.

9           MR. HUT:  I have no more questions of Mr. Proctor,

10 Your Honor.

11          THE WITNESS:  Steve, I'm sorry, Mr. Hut, your --

12          THE COURT:  Does anyone need five minutes?

13          MR. HUT:  The Court's indulgence.

14          THE COURT:  Does anyone need a five minute break?

15          MR. RUSSELL:  I do not, Your Honor.

16          MR. HUT:  Ms. Gostin has suggested a possible

17 additional question.

18          THE COURT:  Sure, go right ahead.

19          MR. HUT:  So let me ask it.  This way -- if I may,

20 Your Honor?  Excuse me.

21          THE COURT:  Of course, you can.

22          BY MR. HUT:

23      Q    Had Mr. Stephens faced or had he been sentenced only

24 to time served in Wicomico County rather than facing a life

25 plus 15 sentence, would that have changed your view as to the

dmh

1  potential impact of the murder conviction from Wicomico County

2  had he chosen to testify?

3        THE COURT:  I am not -- as to which phase?  Guilt or

4  innocence?

5        MR. HUT:  Guilt or innocence.

6        THE COURT:  Guilt/innocence him possibly testifying

7  or the capital defense?

8        MR. HUT:  I appreciate the complication, Your Honor,

9  the guilt/innocence case.

10        THE WITNESS:  Would it have changed my advice?  Is

11  that what you are asking?

12        BY MR. HUT:

13      Q   Yes.  Could it have changed your advice?

14      A   So, if I can give a slightly longer answer than yes

15  or no?

16      Q   Please.

17      A   I've represented people in the past who have wanted

18  to testify and what I've done in the past is taken a tape

19  recorder in.  I do direct.  Mr. Stephens, what's your name?

20  How old are you?

21        Michael Lawlor or one other buddy of mine that owes

22  me a favor will come in and do cross and call him a murdering,

23  lying scumbag and we'll just see how he does.

24        I've done that many times and, you know, we'll play

25  it back and maybe you should answer this question differently

1    or, you know, is that true?  None of that happened in this

2    case because Mr. Stephens' murder conviction meant it was

3    never a realistic possibility for him to testify.

4            Had he not had that murder conviction, would we have

5    tried, would we have at least taken a run at it, absolutely.

6        Q    And let me just follow with a slight variation on

7    that?  Let us assume he had pleaded once again to the murder

8    charge, the sentence imposed was no longer life plus 15 but

9    time served, might that have changed?

10           MR. RUSSELL:  Objection.  I think he already asked

11   the same question.

12           THE COURT:  No, it is two separate --

13           THE WITNESS:  So the fact that he was convicted of

14   murder but was not serving a sentence?

15           BY MR. HUT:

16       Q    Yes.

17       A    Well, that certainly lessen the impact on the jury.

18   Beyond that I don't know that I can say.

19           MR. HUT:  I have no further questions to add, Your

20   Honor.  Thank you.

21           THE COURT:  But it certainly would have made a

22   difference in terms of death case?

23           THE WITNESS:  It would have made a difference for

24   all sorts of reasons, you know.

25           THE COURT:  In terms of the sentencing on --

**App. 427**

dmh

1    assuming you get past guilt or innocence, the sentencing on

2    the capital issue?

3            THE WITNESS:  And whether it even is a death case, I

4    would think I would have went back strongly to the State and

5    said, you know, why are we still seeking death?  He is not

6    serving any sentence now.  Isn't life without parole enough?

7    Why don't you withdraw your notice of intent to seek death?

8            Whether they would have agreed, I don't know but I

9    know I would have used it as leverage in this case.

10           THE COURT:  Okay.  All right.  Did you want to

11   follow up on that since I asked that question?

12           MR. HUT:  No, Your Honor, thank you.

13           THE COURT:  Okay.  All right.  Do you need five

14   minutes?

15           THE WITNESS:  If everyone else wants to keep going,

16   it's fine with me, Judge.

17           THE COURT:  Okay.

18           THE WITNESS:  But I have no objection to five

19   minutes either.  Whatever your preference is.

20           THE COURT: I am leaving it up to you.  You can

21   cross.

22           MR. RUSSELL:  I am ready.

23           THE COURT:  Okay, go ahead.

24           MR. RUSSELL:  Okay.

25                          CROSS EXAMINATION

**App. 428**

dmh

1      BY MR. RUSSELL:

2      Q    Mr. Proctor, first of all, I am going to apologize

3  beforehand because I am going to call you Mr. Lawlor a couple

4  of times ---.

5      A    I can untuck my shirt sleeves if you want.

6           THE COURT:  You are going to have to take your tie

7  off.

8           THE WITNESS:  Put a hole in my trousers.

9           THE COURT:  Yes.

10          BY MR. RUSSELL:

11     Q    So, Mr. Proctor, just to go back and talk about what

12  your experience was prior to this case.  You worked in

13  Louisiana before Maryland, is that correct?

14     A    My first Bar was in Louisiana in 2002 and even

15  before I was barred there, I was investigating capital cases,

16  mitigating, drafting motions in capital cases.

17          I, before Mr. Stephens, had worked in one form or

18  another in capital cases in Louisiana, Georgia, Mississippi,

19  Florida, yeah, those four.

20     Q    Okay.  And how many capital cases overall would you

21  say you had some involvement in?

22     A    Prior to representing Mr. Stephens?

23     Q    Prior to representing Mr. Stephens.

24     A    In Louisiana, a half dozen.  Not many in the other

25  places so let's one each, that's 10.  Before Mr. Stephens in

**App. 429**

1   Maryland there was Leslie Baker, there was Anthony Grandison,

2   there was Heath Birch, so we're in the teens.

3        Q    Okay.  And as you said, and I do not know if you are

4   counting this, you actually handled a Federal death penalty

5   case while this was pending, is that right?

6        A    Correct.  I was appointed to that case in late '07

7   and we tried it -- the jury came back July 1st on that.

8        Q    Okay.

9        A    For some reason I never forget the dates of

10  verdicts.  I don't know why.

11       Q    If you recall, so during this time were you

12  appointed to any other cases?

13       A    Oh, yeah.  Oh, yeah.  During the pendency of

14  Mr. Stephens' case?

15       Q    Right.

16       A    I was appointed to not state-side but federally two

17  in the District of Columbia and maybe three or four in

18  Maryland so another half dozen or so.

19       Q    Okay.  So how many death penalty cases would you say

20  you had been either first or second chair on before

21  Mr. Stephens?

22       A    Before his trial or before the appointment?

23       Q    Before his trial.

24       A    Twenty.

25       Q    Okay.

dmh

81

1      A    No, that sounds high actually, more like -- more

2  than 10.

3      Q    Okay.

4      A    Probably in the 12 to 15 range.

5      Q    Okay.  And what you were doing in Louisiana, that

6  was only capital cases, is that right?

7      A    From -- I got there in 2001.  From 2001 to 2003 it

8  was only capital cases.

9      Q    Okay.

10     A    From 2003 to 2005 more than half capital, more than

11  half regular felonies.

12     Q    Okay.  And in this case, Mr. Stephens' case, this

13  took five years, five and a half years, is that about right?

14     A    July '06 to February 2012, yeah.

15     Q    Okay.  And you and Mr. Proctor filed a lot of

16  pretrial motions, is that a fair statement?

17     A    Mr. Lawlor and I filed a panoply of pretrial

18  motions.

19     Q    That is a good word for it.  Do you recall

20  interviewing a lot of witnesses, a panoply of witnesses?

21     A    I recall -- so Mike Doyle is DOC's lawyer in the

22  Attorney General's Office and DOC was giving us a runaround.

23  Because after the CUT closed, all these witnesses are on this

24  tier went here, there and everywhere.

25         Some were in ECI, some were in Hagerstown, some were

dmh                                                                 82

1    in Cumberland and with some help I think from Judge Hackner

2    saying, "Mike, you really want me to say I can't try this case

3    because you won't make the witnesses available," and he called

4    DOC and said, "Hey, this is a capital case.  You got to make

5    the witnesses available."

6            And so they were all moved to North Branch.  Not for

7    long.  Made us popular as you can imagine.  And I remember the

8    warden, Bobby Sharon, maybe something like that was his name,

9    meeting us at the front door and walking us back and we walked

10   straight through the metal detector and we all beeped and we

11   kept going and I was thinking this is the greatest thing in

12   the world.

13           So we spoke to everybody that would speak to us.

14   There might have been a couple that wouldn't that were on that

15   tier.  And now we're only talking guilt, of course, mitigation

16   there were 25 more witnesses.

17       Q    Right.  So, to the best of your ability, you or

18   somebody on your team interviewed every person that was on

19   that tier?

20       A    Absolutely.

21       Q    And you interviewed, to the best of your ability,

22   everybody who testified, is that right?

23       A    Other than, as we have already discussed, the

24   medical examiner.  I don't know why we didn't interview them.

25       Q    Okay.  And you filed two interlocutory appeals

**App. 432**

1   during the course of this litigation, is that right?

2       A     That sounds right and I think I wrote them both.

3       Q     Okay.  And they were both pretrial, they were before

4   the trial occurred?

5       A     Yeah, neither of them got to first base.

6       Q     Okay.  Was there any way -- you talked a little bit

7   about this.  Was there any way that you felt like -- well, let

8   me ask you this.  The petitioner claims that you were

9   overwhelmed by the complexity of this case.  Would you say you

10  were overwhelmed by the complexity of this case?

11          MR. HUT:  Objection, mischaracterized the claims.

12          MR. RUSSELL:  I believe it is from their petition,

13  Your Honor.

14          THE COURT:  I thought I read that somewhere because

15  I know the same question was put to Mr. Lawlor.  Do you

16  remember where it is?

17          MR. RUSSELL:  I am going to look it up right now.

18          MR. HUT:  Well, I have no objection, Your Honor, to

19  him asking was he overwhelmed.  It was the preface.

20          THE COURT:  But I thought it was in here.

21          MR. RUSSELL:  But can I quote it, Your Honor?

22          THE COURT:  Sure.

23          MR. RUSSELL:  Paragraph 21, "Experienced trial

24  counsel in this case were overwhelmed by the complexity of the

25  case."

1          MR. HUT:  I withdraw the objection.

2          THE COURT:  All right.  I could not find it.  I

3   thought I had read it but I could not remember where it was.

4   All right.

5          BY MR. RUSSELL:

6     Q    So my question, again, Mr. Proctor, is were you in

7   fact overwhelmed by the complexity of this case?

8     A    The case was complex.  It took years to try in part

9   because of the complexity.  Whether I was overwhelmed or not,

10   frankly, is Judge Mulford's decision, not mine.

11          I did the best I could.  There was never once I

12   thought I'm going to can that issue so that it could come back

13   on post-conviction.  I represented Mr. Stephens to the best of

14   my ability.

15          I knocked on every door.  I worked nights.  I worked

16   weekends.  I gave up vacations that my family went on without

17   me.  I did the best I could.  Whether that was sufficient or

18   not is Judge Mulford's call, not mine.

19     Q    Okay.  And I believe you were asked if you were

20   familiar with the ABA Guidelines, is that right?

21     A    Yes, sir.

22     Q    Okay.  And are you familiar with the qualifications

23   that are required from the ABA Guidelines?

24     A    I am, yes.

25          MR. RUSSELL:  The Court's indulgence just for one

**App. 434**

dmh

1    second, Your Honor.

2              BY MR. RUSSELL:

3         Q    So, Mr. Proctor, the ABA Guidelines list some skills

4    that they believe that you should have in order to eligible to

5    handle death penalty cases.

6         A    As first chair or second?

7         Q    It says qualification of defense counsel.  It says

8    that the pool of defense attorneys as a whole.

9         A    Okay.

10        Q    It applies to both.

11        A    Okay.

12        Q    I am going to ask you if you had some of these

13   skills.  Substantial knowledge and understanding of the

14   relevant State, Federal and international law, both procedural

15   and substantive governing capital cases.  Would you say you

16   had that skill at that time?

17        A    I did.  I only went inactive on my Louisiana Bar

18   card in the year 2015.

19        Q    Okay.

20        A    So prior to 2015, I was required to get 15 hours of

21   continuing legal education as a condition of keeping my

22   Louisiana Bar card.  So from 2002 to 2015, I always got 15

23   hours in capital training.  So, you know, add that up alone

24   there's 200 hours.

25        Q    Okay.  Now, did you have skill in the management and

**App. 435**

dmh

1    conduct of complex negotiations of litigation?  Would you say

2    that you had that skill at the time?

3         A    That's kind of too esoteric.  I don't know.

4         Q    It is the guidelines though so.

5         A    I would hope to.  I feel like I met every one of

6    those qualifications that you are about to read.

7         Q    Okay.  I am still going to read them.

8         A    I would not have accepted the case had I not.

9         Q    Okay.  Would you say you had skill in legal

10   research, analysis and drafting of litigation documents?

11        A    I think the litigation documents in this case speak

12   for itself.

13        Q    Skill in oral advocacy.  Would you say you had that

14   skill?

15        A    I believe so.

16        Q    Skill in the use of expert witnesses and familiarity

17   with common areas of forensic investigation including

18   fingerprints, ballistics, forensic pathology and DNA evidence.

19   Would you say you had those skills?

20        A    Yes, sir.

21        Q    Okay.  Skill in the investigation, preparation and

22   presentation of evidence bearing upon mental status.  Would

23   you say that that is a skill you had at that time?

24        A    Yeah.

25        Q    Okay.  Skill in the investigation, preparation and

1   presentation of mitigation evidence?

2       A    Absolutely.

3       Q    Okay.  And skill in the elements of trial advocacy,

4   such as jury selection, cross examination of witnesses and

5   opening and closing statements?

6       A    Yes, sir.

7       Q    Okay.  And would you say that you had training in

8   those skills as you said prior to this trial?

9       A    I certainly did.  Yeah, as I said, I took 12-15

10  hours, sometimes more than that just because the seminar was

11  three days long.  I wasn't going to leave after day two

12  because I met my CLE requirement.

13      Q    Okay.  And the Guidelines also suggest what kind of

14  training you should be a part of.

15      A    Right.

16      Q    You should be trained on relevant statements of

17  Federal and international law.  And you said you had that

18  skill, is that right?

19      A    I had that training, yeah.  There were basically two

20  trainings put on every year.  One is by the National Legal Aid

21  Defender Association and the other one is by the National

22  Association of Criminal Defense Lawyers.

23           I remember going to one in Philly, one in Atlanta,

24  one in Chicago.  So, yeah, I went to the national trainings on

25  capital litigation.

dmh                                                                      88

1        Q     Okay.  And so they probably were tailoring their

2    trainings to make sure they fit the guidelines?  Would you

3    agree with that?

4        A     I know certain -- plenty of the people that did the

5    training wrote those guidelines so I would hope so.

6        Q     Right.  And they require that you have training in

7    pleading and motion practice.  Did you have that?

8        A     I hope so.

9        Q     Okay.  Pretrial investigation, preparation and

10   theory development regarding guilt and innocence of penalty?

11   You would have training in that?

12       A     Yes, sir.

13       Q     Training in jury selection?

14       A     Indeed.

15       Q     Okay.  Training in trial preparation and

16   presentation including use of experts?  You would have

17   training in that?

18       A     Yes, sir.

19       Q     Ethical considerations, particularly in a capital

20   defense representation?

21       A     The requirement of Louisiana was that I get an hour

22   every year of ethics and something else, I forget, ethics and

23   something.  So I always had an hour of ethics training every

24   year.  I had to.

25       Q     Okay.  Preservation of the record and of issues for

**App. 438**

dmh

1    post-conviction review.  Would you have training on that?

2        A    We were not shy about objecting.

3        Q    Okay.  Counsel's relationship with the client and

4    his family?  Did you have training on that?

5        A    Right.  I had training on that, yeah, you know.

6        Q    Post-conviction litigation in State and Federal

7    courts?

8        A    You know, I represented people on death row.  I have

9    plenty of experience in that.

10       Q    Okay.  The presentation and rebuttal of scientific

11   evidence and developments in mental health field and other

12   relevant areas of forensic and biological science?

13       A    I hope so.

14       Q    Okay.  And, finally, the unique issues relating to

15   the defense of those charged with committing capital offenses

16   when under the age of 18?

17       A    That was obviated by Roper v. Simmons, shortly

18   thereafter.

19       Q    Right.

20       A    So I'm not sure I ever had training on that because

21   it went away real fast.

22       Q    Okay.  So, we have clarified that you testified you

23   did everything that you felt you possibly could do in this

24   case, is that right?

25       A    I mean, you know, with hindsight there is always

dmh

1   more you could have done but I did what I could, as best I

2   could.

3       Q     But you did the best you could?

4       A     Yes.

5       Q     You would say there is not lack of effort, is that a

6   fair statement?

7       A     There was no lack of effort on my part and

8   Mr. Lawlor's part.

9       Q     Okay.  And there was no lack of training or

10  education as far as your ability to handle a case like this?

11      A     I would not have accepted the case did I not feel I

12  had the relevant expertise and training.

13      Q     Okay.  Did the restrictions with regard to how much

14  you were being paid impede you in any way from putting on your

15  case?

16      A     Putting it on?  The principle way I see impeded us,

17  it was, you know, we could not have worked on anything but

18  Mr. Stephens' case and kept the lights on.

19          So, we kept having to take a slew of other cases.

20  You know, I took Mr. Stephens' case in '06 and I tried a nine

21  month and 15 day trial in '07.  You know, I tried a Federal

22  capital case in '09.

23          Mr. Lawlor would, likewise, disappear for months at

24  a time trying other cases.  So it impeded the length of time

25  it took to get to trial and, you know, if the State had said,

dmh

1  yes, we'll appoint the Public Defender's Office and Mr. Bayan,

2  he's in, what Mr. Bayan's opinion would have been, whether it

3  would have helped, I don't know.

4      Q    All right.  So you do not have a report from him?

5      A    He was not willing to spend another minute on it

6  without someone signing a retention letter.

7      Q    Okay.  And now with regard to Mr. Bayan, did the

8  Public Defender's Office specifically tell you you cannot have

9  an expert on that?

10     A    No, they never told I can't have an expert on any

11 given issue.

12     Q    Okay.  And so what they told you was he has got to

13 come cheaper than that?

14     A    Correct.

15     Q    Okay.

16     A    I think at that time they paid their shrinks $150 an

17 hour.

18     Q    Right.

19     A    And there was no way they were paying someone who

20 doesn't even have a Doctorate twice that.

21     Q    Right.  And now correct me if I am wrong, I am going

22 to guess part of the -- I am going to assume part of the

23 reason that you contact him was because he is in Millersville,

24 is that right?

25     A    Because this was a field that was entirely --

**App. 441**

dmh                                                                          92

1              THE COURT:  Because he is a what?

2              MR. RUSSELL:  Because he is in Millersville, Your

3    Honor.

4              THE COURT:  Oh, Millersville.

5              THE WITNESS:  This is a field that's entirely

6    foreign to me and it just so happened one of my buddies said I

7    know a guy.  I had him testify.  It was because my pool of

8    people I know -- I know people nationwide that practice

9    capital defense but when you ask me for a civil lawyer, I got

10   like five options.

11             I've had one civil case and that was getting a guy

12   on death row a divorce.  So other than that, I got nothing.

13             BY MR. RUSSELL:

14   Q    Right.  Okay.  Would it be a fair statement that

15   generally the Public Defender's Office would prefer if you

16   could find somebody local to handle the expert testimony?

17   A    When it's run of the mill stuff, I need a social

18   worker, I need an investigator, they've used themselves people

19   100 times and you'll ask their advice.  "What do you think

20   about this case?  What do you think about that case?"

21             But when it's something I want to -- then they would

22   absolutely prefer you to find it because there's no chart,

23   there's no game plan, there's no here's what we did last time

24   and it worked out great.

25   Q    Right.  Now, with medical examiners that is one

1   where you would probably want somebody somewhat local, is that

2   right?  Or they might have somebody that they normally go to?

3       A    I know I've never worked with Dr. Callery before so

4   wherever the name came from, it wasn't one I generated.

5       Q    Okay.  Now, with regard to evidence as far as the

6   lighting on the night of the murder, you got in a lot of

7   evidence about that, is that right?

8       A    We called several inmate witnesses and, indeed, some

9   of the COs that were up there didn't really fight us on that

10  issue so there was the quality of it, what it was.

11          As I sit here today, I don't have much of a

12  recollection but, certainly, we attempted to exploit that it

13  was dark, it was.---, things were in disarray with every

14  single witness we could.

15      Q    Okay.  And the jury heard all of that?

16      A    I hope so.

17      Q    Okay.  Now, with regard to the medical examiner that

18  the State called, Dr. Vicenti.  And I believe you testified

19  that generally you do not ask questions of medical examiners,

20  is that right?

21      A    Medical examiners for me are kind of like the

22  victim's family.  Like the less time a jury spends hearing

23  about loss, suffering, pain, the better.  So, again, I'm sure

24  I've crossed medical examiners a dozen times at this point and

25  I bet I haven't asked them total a dozen questions.

**App. 443**

dmh                                                                    94

1              So, by and large it is my practice to get them on

2    and off as soon as possible.

3       Q    Okay.  Now, with regard to the causation instruction

4    that the petitioner is suggesting you should have asked --

5              THE COURT:  I am sorry.  Please allow me to

6    interrupt.  But if you had an issue involving cause and manner

7    of death was in dispute?  Death by strangulation, death by

8    shooting?

9              THE WITNESS:  Right.

10             THE COURT:  Suicide.

11             THE WITNESS:  Right.  And if you think of the

12   Freddie Gray case, we crossed that coroner for two or three

13   hours.

14             THE COURT:  Right.

15             THE WITNESS:  There are exceptions to the rule.

16             THE COURT:  Yes, that is what I was -- that is

17   actually what I was thinking.  Was it an accident or was it an

18   infliction of force?

19             THE WITNESS:  And I met with Dr. Caroline Allen, who

20   performed Mr. Gray's autopsy, I met with her twice so had I

21   known then what I know now, you know, I agree with Mr. Hut.

22             THE COURT:  Or if you see a report change?

23             THE WITNESS:  Correct.

24             THE COURT:  Like Dr. Allen's report changed?

25             THE WITNESS:  It did.  And, you know, so my point is

**App. 444**

dmh

1    I guess back then I erroneously assumed that the medical

2    examiner was off limits.  They wouldn't talk to us.

3              THE COURT:  But if you have a picture with a gunshot

4    wound to the head, residue, stippling, et cetera, et cetera,

5    you are not going to spend a whole lot of time with something

6    like that?

7              THE WITNESS:  Correct.  Or if there are seven bullet

8    wounds, I am unlikely to delve too deeply into the trajectory

9    and, you know, why did you label this one A and why did you

10   label this one B.

11             THE COURT:  Okay.  All right.  I think I understand

12   what you are saying.  Go ahead.

13             MR. RUSSELL:  Thank you.

14             BY MR. RUSSELL:

15        Q    Now, with regard to the causation instruction, was

16   that something that you were handling, the jury instructions,

17   or was that something that Mike Lawlor was handling?

18        A    That was within Mr. Lawlor's province.

19        Q    Okay.

20        A    I mean if he asked me what do you think about this,

21   you know, can you pay attention to this particular issue,

22   should we ask for -- can you do the research on that, of

23   course, I would have pitched in but it wasn't my focus.

24        Q    Okay.  And just to clarify what you had talked about

25   before, there was the second phase of the trifurcated -- the

1    trial involved causation, right?  It involved whether or not

2    he was a principal in the first degree, is that right?

3        A    Correct.  And that law probably changed in 2010.  It

4    wasn't long before trial.  It was brand new.  I don't think

5    anyone had had a causation phase before then.

6        Q    And you said the jury was not out for very long?

7        A    Two hours.

8        Q    Making that determination.  And it has been your

9    testimony -- I want to make sure that I am clarifying this,

10   one of the emphases of your case was that DOC had done a

11   terrible job with the crime scene.  Is that right?

12       A    Absolutely.

13       Q    Okay.  And, in fact, you wanted to put on evidence

14   that DOC had a history of planting evidence.  Is that right?

15       A    We did.  We had Bradford Matthews who was -- does

16   everyone know who he is or should I take a minute to explain?

17       Q    No, go ahead and explain.

18       A    Bradford Matthews was taken to Central Hall after

19   the assault by Mr. Stephens and he was mouthy, he was wordy,

20   he was why do you got to move me?  I didn't do nothing wrong.

21   I want to get my stuff together.

22            And so the two correctional officers assaulted him.

23   Beat the crap out of him.  And then they get to Center Hall

24   and they say this guy's got a black eye and a bloody nose.  We

25   got to justify our actions so they plant a shank on him and

**App. 446**

1    this is not controversial.  There's reports to it.

2         So the only problem being for the correctional

3    officers is that shank had been photographed before they

4    planted it on him somewhere else differently in the tier.

5         So we wanted to point out, you know, these are the

6    people that are saying they find it.  This is the institution

7    that's saying they did a stellar job of tidying up when

8    Mr. Matthews had a shank planted on him after getting the crap

9    beat out of him.

10        And, Judge, and we actually had -- Mr. Matthews I

11   remember meeting with him on the first floor of this building

12   in the cell block.  We had him here.  We had him ready to

13   testify but Judge Hackner though it was too far afield or

14   something and the testimony was not allowed.

15   Q    Okay.  But you argued for it?  You asked Judge

16   Hackner for it?

17   A    Absolutely.

18   Q    There was a hearing to determine whether you could

19   put it in.  He denied that, correct?

20   A    Correct.

21   Q    Went up on appeal?

22   A    I assume so.  I didn't write the appeal.

23   Q    Okay.  And the appeal was affirmed, is that right?

24   A    That I do know or we would not be here.

25   Q    Okay.  Right.  Now, with regard to Freed, you did

1   not do any of that cross-examination, is that right?

2       A    I did not.  I was there for it.  I remember arguing

3   one of the motions of like getting discovery because federally

4   everything was sealed so I want to say I argued a motion about

5   you got to unseal it.  You got to make them turn it over.  So

6   I did do that but cross at trial was Mr. Lawlor.

7       Q    Okay.  Did you ever discuss with yourself and

8   Mr. Lawlor, with anybody else on your team the idea of raising

9   the issue of alternate suspects?

10      A    Sure.  I mean we had that discussion long and often.

11  I always thought Carlton Gales played some sort of a role in

12  it.  You know, the fact that he is 10 minutes later saying I

13  know who did it and cut me a deal and I'm willing to say it

14  and he was the one that had free access because he was called

15  the tier runner if you needed water or whatever.

16          So I always thought in my representation of

17  Mr. Stephens that he was complicit.  But I have a hazy

18  recollection, I could be wrong, that we eventually decided why

19  take the onus on proving that someone else did it.  It is the

20  State's job to prove Mr. Stephens did it beyond a reasonable

21  doubt.  We took the position then and I still hold it now that

22  they failed to do that.

23      Q    Okay.  But you did consider Mr. Gales as a possible

24  suspect?

25      A    Sure.

**App. 448**

dmh
99

1    Q    Okay.  And do you recall having any interviews with

2    him where he suggested that he knew who did it and that it was

3    Mr. Stephens?

4    A    No, I don't recall that at all.

5    Q    Okay.

6    A    I recall he testified in the Grand Jury and because

7    he had a prior perjury conviction they had to reindict which

8    is why the case number here is whatever it is.  It will be

9    right here on one of these documents I'm sure.  That's 08.

10   You see the case number 08-646.  It was originally 06

11   something but that indictment was from a Grand Jury that

12   benefited from Mr. Gales' testimony so they had to reindict it

13   later.

14   Q    Right.  Now let me ask you a little bit about this

15   Wicomico County case that you filed post-conviction.

16   A    Sure.

17   Q    You wrote the post-conviction petition, is that

18   right?

19   A    So here's how I remember it worked.  I could be

20   wrong.  Mr. Lawlor and I when we wanted to work on mitigation

21   in Mr. Stephens' case, we would go stay at the Day's Inn in

22   Salisbury.  The Public Defender's Office would pay for it.  It

23   was the only hotel at the time.  There may be one now.

24        And it happened Ms. Elise, Mr. Stephens' mother who

25   is sitting back there, right around the corner from her house

**App. 449**

dmh

1    on Marine Avenue?  Does that sound right?

2             MS.        :  Close.

3             THE WITNESS:  Close.  So we would go there because

4    while you are at the office and e-mails are popping up and the

5    phone is ringing, nothing ever seemed to happen.

6             We'd go lock ourselves in the Day's Inn in

7    Salisbury, we got a bunch of stuff done.  So my recollection

8    is we had one of those crappy little portable printers and I

9    would write a section, I would print it out, I would go knock

10   on Lawler's door, I would say, here read this and I would go

11   write the next one and that's how we did it.

12            BY MR. RUSSELL:

13       Q    All right.  And you raised the issue with regard to

14   Joseph Kopera, is that right?

15       A    Sure did.

16       Q    Okay.  And do you still have Petitioner's K in front

17   of you?

18       A    I do.  I do right here.

19       Q    Okay.  And do you see the date of when you filed

20   that?

21       A    It looks like August 7th.

22       Q    Okay.  And if you look up into the body, and I think

23   you only have to go up three sentences, can you tell when it

24   was that Mr. Stephens had been sentenced in this case?

25       A    August 10th, 1999.  So we filed it three whole days

dmh

1   early.

2   Q   Right.  So you had three days left before it would

3   have been past the 10 year deadline.

4   A   Yes.

5   Q   And you took this case -- you were asked to take the

6   case from OPD, is that right?

7   A   I am 100 percent sure I did.

8   Q   Okay.  And that was because they were handling

9   Harris, the co-defendant's case and you did not want them to

10  have -- someone having the post-conviction -- the conflict.

11  That is the reason you took it, is that right?

12  A   I don't know about that.  I think I would have taken

13  it regardless.  It was important to Mr. Stephens that this

14  conviction not stand and when I got a client facing a death

15  penalty case, what is important to him is important to me too.

16  Q   Okay.  Okay.  And is it not true that your initial

17  review of this case was not necessarily that the Kopera issue

18  was the big issue but it was that Elmer Davis was the problem?

19  A   You know, because we were filing this in such a

20  hurried fashion, I don't know that I decided what the big

21  issue was.  When I heard he had been granted post-conviction

22  relief, and I forget who I heard it from, Ms. Widenfeld maybe,

23  I thought it was the Elmer Davis issue.

24      So at some point -- when I filed this, I just --

25  let's throw everything at the wall and we'll worry about what

**App. 451**

102

1   sticks later.  When I heard he had been granted it, at that

2   point my thinking is that the funnel had narrowed such that I

3   thought if we were going to win, he was going to win on Elmer

4   Davis.

5       Q    Okay.  And what was the Elmer Davis issue?

6       A    Elmer Davis was the police who three weeks later

7   said he saw Mr. Stephens throw this gun behind a hedge,

8   something like that.  I still remember when the subpoena for

9   his internal affairs file was handed over.

10          The clerk, bless her, in the Wicomico Sheriff's

11  Office, whatever it was, said, "normally I can these subpoenas

12  around in a few days, but his file is so thick it's going to

13  take me weeks."  At that point we knew we had an officer with

14  a very checkered past.

15      Q    Okay.  And now you said -- correct me if I am wrong,

16  the reason that this did not go anywhere at that time was

17  because if you had an hour to work on something, you were

18  going to work on the death penalty case, is that right?

19      A    Correct.

20      Q    Okay.  Because that is the case where, obviously, he

21  might be getting the death penalty so that has some priority.

22  Was that your thinking?

23      A    And, you know, Judge Hackner was going to set a

24  trial date that couldn't be moved at some point.  This could

25  always be moved.  No one ever batted an eyelid before agreeing

1    to a postponement.

2         Q    Okay.  Now, in the death penalty case the State had

3    to elect an aggravator, is that correct?

4         A    They chose two and I remember having a hearing with

5    Judge Hackner.  The statute had, you know, the usual list of

6    aggravators and there had to be one for it to be a capital

7    case.  They chose two, one of which was he was under a

8    sentence of life in prison and the other was the murder

9    happened at a correctional facility.

10             And I remember arguing with Judge Hackner like

11   that's double dipping.  And Judge Hackner basically agreeing

12   and saying State pick one.  And the one they picked was the

13   murder happened at a correctional facility.

14        Q    So the aggravator they picked was not that he was

15   serving life already?

16        A    I seem to recall the wording was at the time was

17   under a sentence of life imprisonment.

18        Q    Okay.  That is not the one they chose?

19        A    That is absolutely not the one they chose.

20        Q    Okay.

21             THE COURT:  They were still told about it.

22             MR. RUSSELL:  I understand that.  I am just making

23   sure that --

24             THE COURT:  Go ahead.

25             BY MR. RUSSELL:

**App. 453**

dmh                                                                    104

1      Q    Let me ask you if you know this with regard to the

2    guidelines and maybe you do, maybe you do not.  The guidelines

3    discuss overturning previous convictions and it specifically

4    aggravating convictions, does it not?

5      A    I don't doubt that it says that but I don't know one

6    way or the other.

7      Q    Okay.  And I think we clarified that you guys did

8    not handle the appeal, is that right?

9      A    Correct.

10     Q    Okay.

11          MR RUSSELL:   The Court's indulgence, Your Honor.  I

12   apologize.

13          BY MR. RUSSELL:

14     Q    So, Mr. Proctor, you had said, I believe your words

15   were that the post-conviction got lost in the shuffle.  Is

16   that what you testified to?

17     A    That sounds fair.

18     Q    Okay.  And that there was too much time, it took too

19   much time and that was the reason that this became a problem.

20   Is that right?

21     A    I'm not sure I understand.  What took too much time?

22     Q    Well, you said that the only problem that you had in

23   this case was that it had taken a long time.  Is that right?

24   That the only other thing that could have been done

25   differently is it could have been done faster.  Is that a fair

**App. 454**

dmh
105

1   statement?

2       A    I think I said the lack of funding is what resulted

3   in it taking so long.

4       Q    Okay.  And we established that you were aware that

5   Sam Vincent died in 2010, is that right?

6       A    Yeah, everyone in the defense community was aware of

7   that.

8       Q    Okay.  Do you recall how long it was before somebody

9   else was assigned to the post-conviction?

10      A    It was a couple of months.  It wasn't too long.  I

11  think someone was already in the office who was just moved to

12  that department.  Brian something?  Does that sound right?

13      Q    Was it Joel Todd maybe?

14      A    Yeah, Lawlor knew him.  So after that Lawlor took

15  care of calling and getting a postponement.  I knew Sam but I

16  never met Joel.  Mike for some reason knew Joel Todd so he

17  took care of the getting the postponements after that.

18      Q    Okay.  And so the trial in this case happened

19  January 2012?

20      A    Right.

21      Q    And Mr. Vincent died June 2010, is that right?

22      A    Sounds right.

23      Q    Okay.  And you do not know whether or not the State

24  asked for any postponements during that time period?

25      A    You know, as a courtesy to us, they may have filed

1   it.  They may have asked for it but my recollection is always

2   it was us initiating the postponements.  I never remember them

3   disagreeing or it was over anyone's objection.  I don't think

4   anyone was in a rush to have that hearing.

5       Q    Let me ask you a little bit more about the medical

6   examiner, Mr. Callery.  So, you did consult with him at some

7   point?

8       A    I remember having a conference call with him, yes,

9   so I talked to him at least once.

10      Q    Okay.  Do you recall when that conference call was?

11      A    Early on within the first year of representing

12  Mr. Stephens beyond that I really don't know.

13      Q    But he already had the report, is that right?

14      A    He had something.  I don't know that he had

15  everything he wanted in order to base his opinion but he

16  walked us through I assume a coroner's report.  My hazy

17  recollection is he had the coroner's report but he wanted

18  reports of people that saw something, heard something, did

19  something.

20          So we had to send him some investigate reports after

21  that.

22      Q    Okay.  And you say you do not recall when he was

23  dismissed as the medical examiner in Delaware?

24      A    I just know it happened at some point.  Before

25  trial, after trial, I got nothing.

**App. 456**

dmh                                                                           107

1              MR. RUSSELL:  If we could have this marked as -- I

2       think we are up to State's 7?

3              THE CLERK:  It is 6.

4                              (The document referred to was

5                               marked for identification as

6                               State's Exhibit 6.)

7              BY MR. RUSSELL:

8         Q    Mr. Proctor, if I should you an article about that

9       dismissal, would that refresh your recollection as to when it

10      was?

11        A    That is him.  I mean it was dismissed -- I am sorry.

12      Can you point me to the date?

13        Q    The date in the upper left hand corner of the --

14        A    Oh, July 2014, so it was after our trial.  As I

15      said, I didn't recall if it was before or after.

16        Q    Okay.

17        A    I don't know if he was under investigation for a

18      long period of time before that.  I honestly -- I remember he

19      wasn't accepting new cases for a while before he was fired but

20      when that was I don't know.

21        Q    Okay.  But you believe he had the report, isn't that

22      right, the coroner's report?

23        A    I know he had the coroner's right.  I think he asked

24      us for some other things and I know I didn't send it but I

25      have a recollection of Gwen agreeing to do it.

**App. 457**

1    Q    And he had asked for other things, is that right?

2    A    Sure.

3    Q    Okay.

4    A    I think we were -- at that point when we talked to

5    him it was early on.  The focus of our case was very much

6    Mr. McDonald who we expected to be the State's star witness.

7         And I think we were more interested in talking to

8    him about whether what Mr. McDonald said was consistent with

9    the autopsy.

10   Q    Okay.  What did Mr. McDonald say?

11   A    Mr. McDonald's testimony was similar to Mr. Freed's

12   but not identical.  Beyond that I don't recall.

13   Q    Okay.  And what happened to Mr. McDonald?

14   A    Mr. McDonald he was serving a huge sentence.  I

15   don't remember what it was but my understanding, you know, we

16   met with him a bunch, a whole bunch of times, he was always

17   happy to meet with us.

18        And he was willing to testify but the State's offer

19   was like we will reduce your sentence although he had a life

20   plus 99 I think and Mr. McDonald ultimately decided to take

21   the Fifth rather than testify, be labeled the rest of his life

22   as a snitch and still never get out of jail.

23   Q    Okay.

24        THE COURT:  It is not much of a reduction.

25        THE WITNESS:  That's what I thought, Judge, but he

**App. 458**

1    was doing like quadruple life without parole.

2           THE COURT:  Once you get passed two, it is pretty

3    much the same thing.

4           THE WITNESS:  Yes, sir.

5           BY MR. RUSSELL:

6       Q    Now, at any point did Dr. Callery say to you,

7    listen, some of these wounds would not have caused death?

8       A    I don't think he did.

9       Q    Okay.  And what you are testifying to now is that

10   you just forgot to follow up with him?

11      A    I know it was on our list because I've just seen our

12   list of things we have to do.  I assume, you know, the problem

13   I'm having is as we said, the coroner's cross-examination was

14   my job but as we said before that, the jobs, the tasks were a

15   lot of -- the witnesses were assigned, I'm betting it was

16   early December.

17          It was like a month before trial.  Before that, who

18   was doing what and when and with whom, it fluctuated every 10

19   minutes.  As I said, I tried a nine month trial in 2007 so

20   whether it was mitigation, guilt, jury selection, experts,

21   Lawlor did that because I was gone in a D.C. trial for nine

22   months.

23          And, likewise, Mr. Lawlor tried a case, Willie

24   Mitchell is the defendant's name that was 3-4 months long.  I

25   don't remember when, 2009, 2010 maybe so whatever it was, I

dmh

1    did it.

2              I did the client visits.  I did the mitigation

3    interviews because we would just disappear.  And one of the

4    reasons we got a postponement was his son was born, you know,

5    so then he disappeared for that.

6              So whether at this point when this list was written,

7    the coroner was my job to follow up with or Lawlor's, I can't

8    say.

9         Q    So you do not know whose job it was to follow up?

10        A    Do not.

11        Q    You do not know whether or not that was done?

12        A    I don't know whether it was done.  I know I didn't

13   do it.  Beyond that I don't know.

14        Q    Well, it is possible it was done?

15        A    It's possible Gwen did it, yeah, sure, Ms. Waters.

16             THE COURT:  How did Judge Hackner react to the

17   postponements?

18             THE WITNESS:  His first reaction was nonplussed.

19   But Judge Hackner is the same with everything.  Like his first

20   reaction was to shout at me and then 10 minutes later he would

21   agree.

22             THE COURT:  Yes.  Okay.  That is consistent with

23   what I know.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  How much more do you have for

1    Mr. Proctor?  I am not going to stop you.  I am just curious.

2              MR. RUSSELL:  I am going to guess a half an hour,

3    maybe a little longer.

4              THE COURT:  Just keep going until 12:00.

5              MR. RUSSELL:  Okay.

6              BY MR. RUSSELL:

7         Q    Now, Mr. Proctor, you saw State's 3.  You still have

8    that in front of you, is that right?

9         A    Remind me what it is and I'll tell you.

10        Q    It's the memo that has the To Do list.

11        A    Right here, yes.

12        Q    Okay.  So you have that.  I am going to show you, if

13   I may, State's 1.  Does this look familiar to you?

14        A    Yes, it's an earlier list.

15        Q    Okay.

16        A    It looks like more from the mitigation side of

17   things.  That would be Lorrie Tangs, our mitigation person,

18   prepared at least the start of it.  Those look like things she

19   would have written.  And we would have added towards the end

20   of it.

21        Q    Okay.

22        A    None of this, not one -- hold on a second.  If you

23   could just give me a second?

24        Q    Sure.

25        A    I want to make sure I'm right.  But, as you can see,

dmh

1   several of these pages have handwritten notes on it and I can

2   tell you that none of this is my handwriting.

3       Q    Okay.  I am going to point you to page 6.

4       A    Yes, sir.

5       Q    Where is says I Experts about half way down.

6       A    Yep.

7       Q    (a) Medical Examiner, Dr. Richard Callery.  That is

8   the doctor that we are talking about, is that right?

9       A    Yeah, has entire autopsy report including original

10  photos.

11      Q    Okay.  So he would have had them by 2009?

12      A    I believe my recollection is he had them by '07.

13      Q    Okay.  But obviously by 2009 he is still on the

14  list, right?

15      A    Yeah.

16      Q    Okay.  And he is still on the list for the 2011

17  list, his name is on there again, right?

18      A    He is.

19      Q    Okay.  And so it your testimony that you did not

20  follow up with him but you do not know if somebody else

21  followed up with him, is that right?

22      A    That's true.

23      Q    Okay.  Let's talk a little bit more, Mr. Proctor,

24  about the middle portion of the trifurcated trial.  Your

25  argument at that point, obviously, was he was not the

**App. 462**

1    principal.  The State had not proved that, is that right?

2         A    Yes.

3         Q    Okay.  And you said that hearing took half a day?

4         A    There was no evidence.  There were no witnesses

5    called.  It was just argument so it was the jury instruction

6    and there was an argument.  The whole hearing deliberation

7    probably started mid-morning and was done mid-afternoon.

8         Q    Okay.  So the jury was basing all of their

9    information evidence-wise was based on what they saw at trial,

10   right?

11        A    I want to say Judge Hackner told them you are to

12   assume everything you already heard and there will be no

13   additional, but don't forget what you already heard.  That was

14   part of the instruction I think.

15        Q    Okay.  And you said they were not out for very long?

16        A    A couple of hours.

17        Q    A couple of hours.  And they found, in fact, that he

18   was the principal?

19        A    They did.

20        Q    Okay.  Now, and I apologize that I am jumping

21   around.  It is just a matter of how I took notes.  Let me take

22   you back to Dr. Vicenti again.  Is it not true that there was

23   a ruling prior to her testifying that she could not say how

24   many weapons there were?  She could not testify to that, is

25   that right?

1       A       There was I think.

2       Q       Go ahead.  I am sorry.  I did not mean to cut you

3   off.

4       A       No, that sounds familiar.

5       Q       Okay.  And that was something that you were asking

6   for, right?

7       A       Absolutely.

8       Q       Okay.  So you did not want testimony about how many

9   weapons there might be?

10      A       Nope.

11      Q       Okay.  And correct me if I am wrong, you testified

12  you did talk to Dr. Callery about how many weapons there

13  potentially could be?  Am I wrong about that?

14      A       I don't want to mislead the Court.  I am 70 percent

15  certain that conversation happened but it sounds familiar but

16  I don't have a specific recollection of asking that question

17  and receiving that answer.

18      Q       Okay.  But it was your intention you did not want

19  testimony as to how many weapons were used, right?

20      A       Well, I certainly didn't want --

21      Q       From the medical examiner?

22      A       I'm sorry?

23      Q       From the medical examiner.  You did not want any

24  testimony as to how many?

25      A       I did not want testimony that there could have been

**App. 464**

1     more than one weapon.

2          Q     Okay.  Now, when Mr. Hut asked you about Mr. Freed's

3     testimony, you said Mr. Freed's testimony was the whole

4     State's case, is that right?

5          A     Pretty much.

6          Q     Okay.  But you do agree that there was a bloody t-

7     shirt found under Mr. Stephens' mattress.

8          A     Sure there was.

9          Q     There was blood found on the bottom of his boots in

10    his cell?

11         A     Correct.

12         Q     They found an apparatus to jam the locks of his

13    cell, is that right?

14         A     Yep.

15         Q     They found alleged blood on the door of his cell

16    that they said could not have been there unless it was opened,

17    is that right?

18         A     Yeah, like on the inside of the jam, yeah.

19         Q     Right.  And they also put on testimony from the

20    person in the cell next to him that that person heard him

21    opening and closing his cell door?

22         A     That rings a bell, yes.

23               MR. HUT:  Objection.  Without indication as to time.

24    The testimony was after the assault from the person next door.

25               THE COURT:  Well, the transcript is what it is.

**App. 465**

dmh

1        BY MR. RUSSELL:

2        Q     Okay.  So, Mr. Proctor, and, again, I apologize that

3    I am skipping all over the place.  It is just a matter of how

4    I took notes as we went.  You contacted Mr. Bayon as a

5    potential expert.

6        A     Right.

7        Q     And that was with regard to lighting?

8        A     It was lighting and audio.

9        Q     Lighting and audio?

10       A     Yeah.

11       Q     Okay.  Would it be fair to say that in asking

12   Mr. Bayon to testify you would expect him to do more than say,

13   for example, stab a piece of meat and record that to see how

14   loud it was?  That is not the sort of think you wanted, right?

15       A     You know, we never got remotely to that point.  What

16   I wanted him to do was to get retained and to go to the cut.

17   I am sure I had called him within a couple of weeks because I

18   knew it wasn't going to be there forever.

19       Q     Okay.

20       A     And I wanted him to document, you know, the decibel

21   level.  Until you've been there, it's really hard to

22   understand like how loud these fans were.

23             I remember like I was in the middle of the tier and

24   I wanted to show Lawlor something and he's like 15 cells up

25   and those cells are only six feet wide maybe and I'm hollering

**App. 466**

dmh                                                                117

1   at the top of my lungs, "Mike, come see this," and he can't

2   hear me.  So until you've been there, you know, so I wanted

3   him to say what the decibel level is.  What I will do with

4   that I'll worry about it later.

5          I wanted him to talk about the light conditions and

6   I know, you know, when you see cricket matches which means

7   nothing to you they have these light meters and they say it's

8   too dark, we can't keep playing.  So I know that light meters

9   exist.

10         I wanted him to document it and then maybe we can

11  come up with something like London during the fog of Jack the

12  Ripper.  We'll worry about analogies later.  Right then I just

13  wanted it chronicled.

14     Q    Okay.  And as you said until you have been there

15  though, you cannot really grasp it?  Is that fair to say?

16     A    I certainly I left that jail with a wholly and

17  different impression then when I walked in it.

18     Q    Okay.  And OPD told you $320 they were not going to

19  pay that?

20     A    Absolutely.

21     Q    Did you ask them for a "Government rate?"

22     A    I don't know that we ever got there.  They said go

23  back and see if you can get it lower.  I called him.  He was

24  not budging one iota.  He was -- I got the impression not a

25  fan of -- you know, a lot of times we can find experts because

1    it's a capital case.  People feel strongly.  They are morally

2    opposed to it or whatever.  He was in it to make money and

3    that was it.

4         Q    Okay.  And this was within the last 10 years, is

5    that fair to say?  When you had attempted to get him as an

6    expert.

7         A    The date of his letter is November '06 so it was --

8         Q    Eleven years.

9         A    Eleven years, 10 1/2.

10        Q    Okay.  Did you ever at any point file a motion with

11   Judge Hackner saying I want an expert but OPD will not let me

12   get one?

13        A    No.  We litigated the funding issue but I don't

14   think we ever got to specific experts.

15        Q    Okay.  Did you ever go back to OPD and say, listen,

16   I know you said you are not going to pay that guy but I cannot

17   find anybody else.  I still want you to pay him?

18        A    I don't think I did.

19        Q    Okay.  So what happened is you just forgot to keep

20   looking for one?  Is that what happened?

21        A    I exhausted the people I thought I could talk to

22   about this sort of stuff and so it just sat on the To Do list

23   of let's figure out a Plan B and I don't think Plan B was ever

24   looked into.

25        Q    Okay.  So, instead, you got in evidence through the

1    witnesses, is that right?

2         A    Well, I mean instead is probably not the right word

3    because I would have got that testimony in from the witnesses

4    regardless.  I got testimony in from witnesses as best I could

5    about the lighting and the noise and the conditions.

6    Absolutely, I did that.

7         Q    Okay.  Now, with regard to the stipulation that you

8    read.

9         A    Yes, sir.  I have it right here.

10        Q    Is it a correct statement to say part of why you

11   would want a stipulation is you do not want a parade of

12   Maryland State Police witnesses testifying about what a good

13   job they had done?  Is that fair?

14        A    Well, I mean not really.  If you just fight about

15   every single thing the jury thinks -- I mean I don't know what

16   a jury thinks but to me I've always thought that just looks

17   like desperate.

18             So in a trial like this you want to delineate here's

19   what our quarrel is and here's what it ain't.

20        Q    Okay.  And there was no quarrel with what the

21   Maryland State Police had done once they had come in?

22        A    From Center Hall on there was no quarrel.

23        Q    Okay.  And you put on a lot of evidence or at least

24   did a lot of cross-examination with regard to the problems

25   with the crime scene and what DOC had done, is that right?

dmh

120

1    A    That was certainly my intent, yes.

2    Q    Okay.  And that is the argument that was made at

3  closing to the jury, is that right?

4    A    Sure was.

5    Q    Okay.  And to your knowledge there was no note from

6  the jury saying we are confused because the stipulation says

7  one thing but your argument says something else?

8    A    I have no recollection of such a note.

9    Q    Okay.  And I think you testified that the

10  stipulations that you had were probably the result of at least

11  25 suggested revisions by you guys?

12    A    I would bet if you pull Sandy Hollow's e-mail you

13  would see a dozen versions of this going back and forth.

14    Q    Okay.  Going back to Wicomico County post-conviction

15  case, had you handled any other post-convictions that involved

16  Joseph Kopera?

17    A    No.

18    Q    Okay.  And is it a fair statement to say that you

19  could have -- let's assume that you lost this case and they

20  had given Mr. Stephens the death penalty, had sentenced him to

21  the death penalty, you could at that time continued to

22  litigate his post-conviction and if you were able to get him a

23  retrial, he is acquitted, you would be able to ask for a new

24  sentencing, is that right?

25    A    Well, the aggravator that he was in a Maryland

**App. 470**

1    facility would still have stood so I don't know how I would

2    have got a new sentencing.  This is the first time I ever

3    thought about this.

4            I think it would be more likely in a venue like this

5    where I would be saying, yes, I should have done that earlier

6    and, of course --

7            THE COURT:  But you still had the intervening act of

8    the Maryland legislature and Governor O'Malley.

9            THE WITNESS:  We do.

10           THE COURT:  So, it would have resulted --

11           THE WITNESS:  It would have set aside.

12           THE COURT:  What is that?

13           THE WITNESS:  The death sentence would have been set

14   aside.

15           THE COURT:  It would have been set aside.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  I mean the academic issue for -- I hate

18   to put it that way is those sentences with death without life

19   without parole, well, that one is sort of resolved but did the

20   Court of Appeals take that?

21           THE WITNESS:  I don't think they did.

22           THE COURT:  I cannot remember.  Do you know?

23           MR. RUSSELL:  I do not.  I am sorry.

24           MS. GOSTIN:  I was not able to hear your question,

25   Your Honor.

1          THE COURT:  The Court of Special Appeals ruled in

2    the death sentence case where it was set aside that Governor

3    O'Malley could give life without parole or Governor Hogan, I

4    cannot remember who did it.  I think it was O'Malley.

5          MR. HUT:  It was O'Malley.

6          THE COURT:  O'Malley.  But I do not know if the

7    Court of Appeals took cert after the Court of Special Appeals'

8    opinion.

9          MR. RUSSELL:  I do not believe they did.

10         THE COURT:  I do not think they did either.

11         MR. HUT:  I agree with you.

12         THE COURT:  All right.

13         MR. HUT:  Because back when Grandison and Evans were

14   sentenced, there was no life without parole so the argument

15   was you were giving them an illegal sentence.

16         THE COURT:  Right.

17         MR. HUT:  And I think that short scripted.

18         THE COURT:  The Court of Special Appeals said no to

19   that.

20         MR. HUT:  Yes.

21         THE COURT:  All right.  What else do you want to ask

22   him?  You have nine more minutes until we break for lunch.

23         MR. RUSSELL:  I think I will make it through by

24   then, Your Honor.

25         THE COURT:  What is that?

**App. 472**

dmh                                                                        123

1          MR. RUSSELL:  I will be done by then.

2          THE COURT:  Okay.

3          MR. HUT:  And, Judge, I am in a federal trial at the

4    moment.  The judge kindly gave us this morning off but I --

5          THE COURT:  We will see what we can do.

6          MR. HUT:  Yes, sir.

7          THE COURT:  Okay?  That is why I wanted him called

8    right away.  I thought he would be done by now but that is all

9    right.

10         BY MR. RUSSELL:

11    Q    Mr. Proctor, with regard to that post-conviction, do

12   you recall ever receiving any offer from the State to resolve

13   it?

14    A    No.  I don't recall ever getting one.

15    Q    Okay.  And do you recall whether or not the

16   ballistics had been tested?  You may have answered this

17   already.  They had not been tested by the time?

18    A    If they had been tested, it was not shared with me.

19    Q    Okay.  And it had not been tested by the time that

20   you got done with this case?  Is that fair to say?

21    A    Not to my knowledge.

22    Q    Not to your knowledge.  Okay.

23         MR. RUSSELL:  I believe that is all I have, Your

24   Honor.

25         THE COURT:  All right.  Redirect, please?  Redirect,

**App. 473**

dmh

1   please?

2          MR. HUT:  A few questions on redirect, Your Honor.

3   Thank you.

4          THE COURT:  Yes, go right ahead.

5                    REDIRECT EXAMINATION

6          BY MR. HUT:

7     Q    When you described to Mr. Russell your visit to the

8   tier shortly after you engaged in your inability to converse

9   with Mr. Lawlor under certain circumstances, were there any

10  inmates at the time you made that visit?

11    A    None.

12    Q    So no noise emanating from their cells like fans or

13  televisions or anything like that?

14    A    That's correct.  Just the fans were on.

15    Q    When you made reference to having obtained in the

16  Wicomico County proceeding the investigative file pertaining

17  to Officer Davis, did that occur while you were representing

18  Mr. Stephens or did that occur on the watch of subsequent

19  counsel?

20    A    I think -- I didn't get it.  You got it I think.  I

21  think someone just told me about it and that's why I assumed

22  that was the based upon which you prevailed.

23    Q    When you described the duration of the case from the

24  time you came onto it with Mr. Lawlor to the time it went to

25  trial, did that have any effect on your -- withdrawn.  Let me

dmh

1   try to state it another way.

2            During the 5 1/2 year run up to trial, there were

3   times when you -- were there times when you were working on a

4   case and then you stopped working on a case to do something

5   else and then got back onto it?

6        A    Numerous times, both Lawlor and I.

7        Q    And did that stopping and starting, if you will,

8   result in any inefficiencies on your part?

9        A    Well, I mean it had to, right?  I mean it doesn't

10  matter what it is.  I mean that's why, as I say, when we

11  wanted to write the post-conviction, we locked ourselves in a

12  Day's Inn.  It's just the nature of these things.

13           You know, if I was testifying in a post-conviction

14  in July 2012, I'm going to have a lot more accurate answers

15  for you than I am today.  It's just you got to reorient

16  yourself.

17       Q    And did you experience any problems about having

18  forgotten some of the facts and having to get back up to speed

19  on what the actual facts were pertaining to particular issues?

20       A    I mean that's just human nature, of course, I did.

21       Q    I am handing you Defense's R-Q, Mr. Proctor.

22       A    Thank you, sir.  Which one is R and which one is Q?

23       Q    I think that one is R.

24       A    Okay.

25       Q    Are you able to identify R and Q?  Let's take

**App. 475**

dmh

1    Defense's R first.

2        A    R looks like the judgment and commitment from

3    Mr. Stephens showing the sentence of life plus 15.  Q appears

4    to be what the State's attorney would send to DOC, you know,

5    the packet for want of a better terms so they can figure out

6    good time, what jail to put you in, that sort of thing.

7        Q    And directing your attention to the stamp on the

8    lower right hand corner of Defense Q, does it appear to you

9    that that was an exhibit, a State's exhibit at trial?

10       A    Yeah, both admitted into evidence and for

11   identification are ticked.  I don't know if it was an exhibit

12   at guilt or penalty.  I honestly don't know as I sit here

13   today.

14       Q    And as you look at the text pages that follow, there

15   look to be three of them, how would you describe the content

16   of the text?

17       A    It says State's versions of events.  So I am quite

18   sure it was culled from the State's closing argument.

19       Q    And turning your attention to Defense Q, do you see

20   in the middle of -- well, do you recognize Defense Q, first of

21   all?

22       A    I know what it is.  I don't know that I've read it

23   anytime recently.  Joe Kopera is in there though.

24       Q    Do you recall whether Defense Q was in fact also an

25   exhibit at the trial here, Defense Exhibit -- I am sorry,

1    State's Exhibit 65?  Let me withdraw that question and state

2    it so that it is more clearly.

3         Do you recall that what I have shown you as Defense

4    Q was in fact State's Exhibit 65 at the trial in Anne Arundel

5    County?

6    A    I don't.  I don't know if it was -- I would hope it

7    was only a penalty phase exhibit but as I sit here today, I

8    don't know.

9    Q    But, in any event, in one phase or the other do you

10   recall that it was an exhibit?

11   A    I'm sure it would have come in at penalty.  These

12   things typically do.

13             MR. HUT:  I have no further questions, Your Honor.

14             THE COURT:  Anything else for him?

15             MR. RUSSELL:  No, Your Honor.

16             THE COURT:  Mr. Proctor, do you have any idea of the

17   number of hours that you might have worked?  And I do not want

18   you to count in your head the, you know, you got up in the

19   morning and said I just need to see Mr. Stephens.

20             That is one-tenth of an hour but in terms of what

21   you might have submitted to the Public Defender for a bill?

22             THE WITNESS:  My recollection, Judge, is that I

23   added up how much in the way of bills I had sent the Public

24   Defender's Office at the end of the case.  And my recollection

25   is it was 1,200 hours.

**App. 477**

1   THE COURT:  Okay.  And was there any consideration

2   in terms of the sentencing phase with Judge Hackner?  You

3   mentioned the issue of avoiding the death qualified jury.

4   Because the jury here if it is a death qualified jury, you

5   have to have jurors who say, well, I could give death so.

6        THE WITNESS:  Right.

7        THE COURT:  As you expressed, they are more likely

8   to perhaps consider guilt.  So was there any discussion about

9   a court sentencing?

10        THE WITNESS:  So, yeah, we filed at least twice,

11  Judge, motions to waive a jury for penalty phase and said, we

12  want you to do penalty phase.  We don't want a death qualified

13  juror.  Please let us do it.  And that was twice denied by

14  Judge Hackner.

15        And what he said was, "You want a judge trial, you

16  got a judge trial, but I am not letting you do it ahead of

17  time."  You know, 2-3 months in advance.

18        We'll pick our jury.  If you don't like them, say

19  you want a judge trial then.

20        THE COURT:  So, he would not bifurcate the guilt or

21  innocence in the sentencing?

22        THE WITNESS:  With two different juries you mean?

23        THE COURT:  No.  I just had --- defendant,

24  Mr. Davis, asked me for a jury trial in an NCR case where it

25  was a bifurcated proceeding where the Court would hear the NCR

**App. 478**

1   issue and I allowed him to do that over the State's beyond

2   vociferous objections.  So you had said that and I was just

3   curious.

4             THE WITNESS:  Judge Hackner would have let us

5   absolutely pick a non-death qualified jury.  Absolutely he

6   would have let us done that and would have let us waive a jury

7   for sentencing.

8             THE COURT:  But it had to be done at the time?

9             THE WITNESS:  The morning of.  What he didn't want

10  to do is -- Mr. Stephens to say I want you to sentence me,

11  Judge.

12            THE COURT:  And change his mind?

13            THE WITNESS:  And change his mind.  And then you've

14  got jurors in and no one has filled in questionnaires and we

15  don't know the position on the death penalty.  And then when

16  we got the questionnaires, we kind of liked our jury polls.

17            So then we just never needed to proceed on that

18  basis.

19            THE COURT:  All right.  I understand that.  All

20  right.  And I will call it a moot court for lack of a better

21  word and I know what you are talking about where one attorney

22  poses as the prosecutor, the other poses as the Defense

23  attorney.  There is the direct and then there is the cross to

24  see how the client holds up.

25            You never got to that point?

dmh

1        THE WITNESS:  We never got to that point with

2   Mr. Stephens.  I'm sure we --

3        THE COURT:  If Mr. Stephens had at any point told

4   you I want to testify?

5        THE WITNESS:  My recollection is we were all lock

6   step, that it was not in his best interest to testify.

7        THE COURT:  Okay.  I do not believe I raised any

8   additional matters other than the hours but I think I just

9   asked him to expand upon two comments that he had made

10  earlier.

11       So, Mr. Hut, do you have any additional questions

12  for Mr. Proctor?

13       MR. HUT:  I do not.  Nothing based on the Court's

14  further examination, no.

15       MR. RUSSELL:  I just have one.

16                  RECROSS EXAMINATION

17       BY MR. RUSSELL:

18       Q    Mr. Proctor, to your recollection, did you bill for

19  every hour that you worked?

20       A    I mean no is the short answer and I also think the

21  hours I counted up were only for the Anne Arundel case.  There

22  would be more hours on the Wicomico case.

23       Q    Okay.

24       MR. RUSSELL:  Thank you.

25       THE COURT:  All right.  Let's break for lunch at

**App. 480**

1    this point.  Mr. Proctor, do you need me to call Judge Blake?

2            THE WITNESS:  No, she told the jury to be in by

3    2:00.  I'll be there by then but thank you.

4            THE COURT:  Well, you never know with Baltimore

5    traffic.

6            THE WITNESS:  There is that.

7            THE COURT:  All right.  I need the exhibits from

8    Mr. Proctor.

9            THE WITNESS:  Can I give them to Madam Clerk?

10           THE COURT:  Yes.  But I want to make sure because

11   Mr. Hut had some and Mr. Russell had some.  So make sure.

12           THE CLERK:  I will double check, Judge.

13           THE COURT:  All right.  Do you need Mr. Proctor to

14   remain?

15           MR. HUT:  We do not, Your Honor, no, sir.

16           THE COURT:  You dropped something, Mr. Hut.

17           MR. HUT:  Yes, I see that.  Thank you.

18           THE COURT:  Okay.

19           MR. RUSSELL:  No, Your Honor.

20           (Witness excused.)

21           THE COURT:  So let's start up again at 1:30.

22           MR. HUT:  Would it be at all possible, I just -- I

23   would ask the Court our next witness, Dr. Loftus, has booked a

24   plane back to Seattle in the 4:00 range now.  We can probably

25   be out of -- even if we start at 1:30, is there any

dmh

1    possibility of starting earlier than that?

2         THE COURT:  I have to go to a meeting.  I am very

3    sorry.  I have got a lot of things booked his week.  So we

4    will take him right at 1:30 and, hopefully, the cross will not

5    take too long and the direct will not take too long.  All

6    right?

7         Because I have already told you I am not going to

8    strike his testimony.

9         MR. HUT:  Right.

10        THE COURT:  So you save that objection for later.

11   But let me know if he does not get a lunch, okay?  But there

12   should be one for him.  All right?  So I will see you all at

13   1:30.  Thank you.

14        MR. HUT:  Thank you, Your Honor.

15        THE CLERK:  All rise.

16        (Whereupon, at 12:04 p.m, a luncheon recess was

17   taken.)

18

19

20

21

22

23

24

25

dmh                                                                         133

1                    A F T E R N O O N  S E S S I O N

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated everyone.  You can all

4    have a seat.  Please call the case.

5              MR. RUSSELL:  Thank you, Your Honor.  We will call

6    the State of Maryland versus Lee Stephens, Case No. 02-K-08-

7    646.  David Russell, R-u-s-s-e-l-l, on behalf of the State.

8              THE COURT:  Thank you.  Mr. Hut?

9              MR. HUT:  Stephen Hut for the Petitioner, H-u-t.

10             THE COURT:  Thank you.  Ms. Gostin?

11             MS. GOSTIN:  Isley, I-s-l-e-y, Gostin, G-o-s-t-i-n,

12   for the Petitioner.

13             THE COURT:  Thank you.  Mr. Eagles?

14             MR. EAGLES:  Thad Eagles, T-h-a-d, E-a-g-l-e-s, for

15   the Petitioner.

16             THE COURT:  All right.  You have your next witness?

17             MR. HUT:  We do, Your Honor.  Just one or two things

18   if I may before we call Dr. Loftus.  Allow me to offer in

19   evidence Defendant's K through R which were marked.

20             THE COURT:  I did not think there was any objection

21   those, was there?

22             MR. RUSSELL:  No objection, no.

23             THE COURT:  They will be admitted, Madam Clerk.

24                              (The documents marked for

25                              identification as Defendant's

**App. 483**

dmh                                                                    134

1                                  Exhibit K-R were received into

2                                  evidence.)

3          MR. HUT:  And may I ask Madam Clerk as I would

4   propose Joint Exhibit 1, but I am happy to --

5          THE COURT:  Is that the stipulation?

6          MR. HUT:  It is.

7          THE COURT:  You finally got it all nailed down?

8          MR.  HUT:  We did.

9          THE COURT:  Okay.  You can call it -- it is just a

10  stipulation.  I do not think it goes in as an exhibit, does

11  it, Madam Clerk?

12         THE CLERK:  It is however you prefer, Your Honor.

13  It can be ---.

14         THE COURT:  Call it joint.

15         THE CLERK:  Joint, okay.

16                                  (The document referred to was

17                                  marked for identification and

18                                  was received as Joint

19                                  Exhibit 1.)

20         THE COURT:  And I know that the gentleman has a

21  flight that he is worried about.  So let's see if we can get

22  him in the stand.  Okay?  Come on up, sir.

23         MR. HUT:  The Petitioner calls Dr. Geoffrey Loftus.

24         MR. RUSSELL:  Your Honor, just for the record, I

25  will re-put in my objection but I know that the Court is not

**App. 484**

dmh

 1 | going to hear that at this point.

 2 |         THE COURT:  Denied.

 3 |         MR. RUSSELL:  Thank you.

 4 |         THE CLERK:  Sir, would you please raise your right

 5 | hand?

 6 | Whereupon,

 7 |                 DR. GEOFFREY LOFTUS

 8 | was called as a witness by the Defendant, having been first

 9 | duly sworn, was examined and testified as follows:

10 |         THE CLERK:  You may be seated.

11 |         THE WITNESS:  Thank you.

12 |         MR. EAGLES:  Thank you, Dr. Loftus.  Good afternoon.

13 |         THE COURT:  Well, Madam Clerk has to finish.

14 |         THE CLERK:  Sir, would you please state your full

15 | name, occupation and ---?

16 |         THE WITNESS:  My name is Geoffrey Loftus.  I'm a

17 | professor in the Department of Psychology at the University of

18 | Washington in Seattle.  My first name is spelled

19 | G-e-o-f-f-r-e-y.  My last name is spelled L-o-f-t-u-s.

20 |         THE CLERK:  Thank you.

21 |                 *VOIR DIRE*

22 |         BY MR. EAGLES:

23 |    Q    Thank you, Dr. Loftus.  Sorry for jumping the gun

24 | there.  Could you just repeat for the Court where you are

25 | currently employed?

**App. 485**

dmh

1     A    I am a professor in the Department of Psychology at

2 the University of Washington out in Seattle.

3     Q    And how long have you been employed at the

4 University of Washington?

5     A    Since 1972.

6     Q    And what is your current position there?

7     A    I'm a professor.

8     Q    And what are you a professor of?

9     A    Psychology.

10     Q    Could you please provide your educational

11 background?

12     A    Sure.  I got a Bachelor of Arts degree in

13 Experimental Psychology from Brown University.  Then I got a

14 Ph.D. also in Experimental Psychology from Stanford.  Then I

15 went to New York for a year of post-doctoral work at New York

16 University and went to the University of Washington as a

17 faculty member in 1972 as I said.

18     And except for a year I spent in the mid-nineties

19 teaching at MIT, I have pretty much been at the University of

20 Washington ever since.

21     Q    Do you do research as a professor at the University

22 of Washington?

23     A    I do, yes.

24     Q    And what is the focus of your research?

25     A    So, the main kind of research that I do takes up

**App. 486**

dmh                                                                    137

1    about 80 percent of my time has to do with human perception,

2    the means by which you get information into your brain from

3    the world via your sense organs and the associated study of

4    human memory.  How information once stored in the brain

5    resides there, is transformed in various ways and then is used

6    later on to carry out any task that requires memory.

7           I also have a secondary interest that takes up maybe

8    20 percent of my time and that has to do with applications of

9    mathematics and statistics to science in general and to

10   psychology in particular.

11      Q    Have you published any books or articles about human

12   perception?

13      A    I have.  I have authored and co-authored I believe

14   eight books and probably 110 or so journal articles and book

15   chapters.  Again, about 80 percent of those have to do with my

16   main research area of human perception and memory.

17          The other 20 percent have to do with my secondary

18   research area of applications of mathematics and statistics.

19      Q    Have you edited any journals related to the science

20   of human perception?

21      A    I have.  I was principal editor of one of the major

22   journals in our field.  This journal is called Memory and

23   Cognition.

24          For a period of four years I was an associate editor

25   for about 35 years of another major journal in our field

**App. 487**

dmh                                                                    138

1   called Cognitive Psychology and over the years I have been on

2   various other editorial boards.

3       Q    Have you previously qualified as an expert witness

4   in human perception and memory?

5       A    Yes.

6       Q    How many times?

7       A    Roughly 410.

8       Q    And where have you testified?

9       A    Well, I've testified in Superior Courts in various

10  counties in I believe 15 states.  I have testified in Federal

11  Court in I believe 11 different cities.  I have testified in

12  Military Court at a U.S. Naval court martial in Sicily and

13  I've testified in Canadian Court in Winnipeg Manitoba.

14      Q    And have you ever testified or worked as an expert

15  witness on behalf of the prosecution in a criminal case?

16      A    I have.  I've been called by the prosecution four

17  times.  Three of the cases disappeared before I had a chance

18  to really do anything on them.

19           The fourth case which was a murder case in

20  Anchorage, Alaska, two years ago, is one in which I actually

21  did go up to Anchorage and testify for the State at trial.

22      Q    Have you ever testified on behalf of police

23  officers?

24      A    I have.  I have testified in various places on

25  behalf of police officers in both civil and criminal matters.

dmh

1    Q    I am handing you what has been marked as

2    Petitioner's Exhibit S.  Do you recognize what that is?

3    A    I do.  It's my CV updated about three months ago.

4    Q    And does this accurately reflect your education,

5    training and expertise in the field of human perception?

6    A    Yes.

7    Q    Turning to pages 2 and 3, does this accurately

8    reflect the professional organizations of which you are and

9    were a member?

10   A    Yes.

11   Q    Turning to pages 3 through 8, does this accurately

12   reflect your publications and the years in which they were

13   published?

14   A    Yes.

15        MR. EAGLES:  Petitioner offers Exhibit S.

16        THE COURT:  It will be accepted.

17                              (The document referred to was

18                               marked for identification as

19                               Defendant's Exhibit S and was

20                               received in evidence.)

21        MR. EAGLES:  The Court's indulgence.  My apologies.

22        MR. RUSSELL:  Thank you.

23        MR. EAGLES:  And Petitioner offers Dr. Loftus as an

24   expert in the field of human perception and sight.

25        THE COURT:  Well, as I said earlier, I do not know

dmh

1   that that is the issue before me today.  The issue is whether

2   or not this witness could have been available and whether or

3   not Proctor/Lawlor should have called the witness.  So I do

4   not know if it is appropriate for me to make a finding and

5   that is what I struggled with yesterday and that is what I put

6   on the record this morning.

7        MR. EAGLES:  Very well, Your Honor.  We will move

8   along.

9        THE COURT:  So this is an issue of what the

10  testimony you believe Proctor and Lawlor may have or should

11  have produced at trial.  It is not necessarily whether I find

12  this witness today to be an expert because it is not

13  necessarily the issue before me.

14       MR. EAGLES:  Yes, Your Honor.

15       THE COURT:  So, I am not going to make a finding in

16  that area even though it certainly sounds like he has

17  expertise.  So we will just go from there and see where it

18  goes.

19       MR. EAGLES:  Thank you, Your Honor.

20                  DIRECT EXAMINATION

21       BY MR. EAGLES:

22   Q    Dr. Loftus, were you retained by Petitioner's

23  counsel in connection with this post-conviction proceeding?

24   A    I was.

25   Q    What were you asked to do?

1        A     I was asked to read over various documents to get a

2   sense of what this case was all about and then provide

3   information that is relevant to a witness's ability to

4   perceive in particular an individual's appearance under

5   certain conditions that were specified to me by you and that

6   were inferable from reading the discovery.

7        Q     And did you draft a report in connection with this

8   case?

9        A     Yes.

10       Q     I am handing you what has been marked as

11  Petitioner's Exhibit T.   Do you recognize what that is?

12       A     Yes.   That is the report.

13                                      (The document referred to was

14                                      marked for identification as

15                                      Defendant's Exhibit T.)

16            BY MR. EAGLES:

17       Q     Turning to page 6 of the report which is the last

18  page.   Is the description of the kind of lighting there

19  accurate?

20       A     There are two terms that are reversed.   The upper

21  row should read PHOTOPIC sufficient illumination.   The bottom

22  row should read low illumination SCOTOPIC vision but apart

23  from that -- in other words, the term SCOTOPIC and PHOTOPIC

24  are reversed but apart from that it is accurate.

25       Q     Thank you.   Petitioner offers Exhibit T.

**App. 491**

dmh

142

1    MR. RUSSELL:  No objection.

2    THE COURT:  All right.  It will be admitted.

3          (The document marked for

4          identification as Defendant's

5          Exhibit T was received in

6          evidence.)

7    BY MR. EAGLES:

8    Q  Dr. Loftus, does lighting affect a witness's ability

9 to accurately perceive what he or she is looking at?

10    A  Yes.

11    Q  How?

12    A  So, the reason for that can be understood at the

13 physiological level.  It comes from the fact that normal human

14 beings are equipped with two visual systems that are

15 physiologically distinct and that operate in parallel.

16    One of the visual systems called the PHOTOPIC visual

17 system is the visual system that people use under conditions

18 of normal everyday illumination.  Being outside during the day

19 let's say or being inside in a well-lit room like this one.

20    The PHOTOPIC system is the one that kicks in under

21 conditions of low illumination so if you are outside seeing by

22 the light of a half moon or if you're inside seeing with only

23 poor illumination of one sort or another, you see the world

24 using SCOTOPIC visual system.

25    The SCOTOPIC system, the dark system, has the

**App. 492**

1   ability to detect an extremely small amount of light.  That

2   is, essentially, the reason for its existence.

3          But it achieves this ability at a cost, or actually

4   two costs.  The first is that the SCOTOPIC, the nighttime

5   vision system isn't able to perceive color.  It sees the world

6   in shades of gray and, second, the SCOTOPIC visual system

7   isn't able to detect fine detail and there's a specific

8   definition of fine detail but for the moment I will just leave

9   it at that.

10         So, in other words, seeing the world using your

11  SCOTOPIC visual system, is like taking a normal picture of

12  scene, putting it into PhotoShop, making it grade scale and

13  then blurring it to a suitable degree.

14     Q    If a viewer were to stay in darkness for an hour or

15  two hours or four hours, would these down sides to the

16  SCOTOPIC system be reduced?

17     A    No.  Not the particular downsides that I mentioned.

18  When a person is first introduced into darkness, for example,

19  if you are walking into a movie theatre out of a bright day,

20  clearly, your vision within the movie theatre begins to

21  improve and then after about a half hour it's improved to the

22  point where it is as good as it's ever going to be.

23         But that isn't the SCOTOPIC system acquiring the

24  ability to do what the PHOTOCOPIC system can do, namely,

25  perceiving color and perceiving fine detail.  It's only an

**App. 493**

dmh                                                                          144

1  improvement in the SCOTOPIC system reaching the best of its

2  abilities.

3      Q     How dark must it be before a normal person's eyes

4  switch from the PHOTOPIC to the SCOTOPIC system?

5      A     There's a technical answer to that.  It has to do

6  with a unit of measurement that most people are not familiar

7  with, Candela per meter$^2$ and there is a range of a particular

8  Candela per meter$^2$ is I recall is between 10-3 and 10-5 if I

9  remember correctly below which PHOTOPIC vision shuts down and

10 SCOTOPIC vision kicks in.

11     Q     Can you provide an example of that level of lighting

12 that would result in use of SCOTOPIC?

13     A     Sure.  As I said earlier, it might be outside at

14 night seeing with a distant street light or with a quarter

15 moon or something light.

16         In other words, a situation where you can see well

17 enough to get around but it's not a situation that you would

18 want to read nor is it a situation where you would be very

19 good at accurately making out defined details of a person's

20 face that collectively constitutes the person's facial

21 appearance.

22     Q     And if a viewer is outside while the sun sets, for

23 example, does the change between PHOTOPIC and SCOTOPIC happen

24 all at once or gradually?

25     A     It happens gradually.  There is actually an

**App. 494**

1    intermediate range during which both the PHOTOPIC and the

2    SCOTOPIC system are operating.  It has a name.  It is called

3    the MESOPIC system and it is within that range that the

4    PROTOPIC system is providing less information to the brain and

5    the SCOTOPIC system gradually provides more information to the

6    brain.

7        Q    Are there any other ways that having only a few

8    sources of light as opposed to the more diffused light of day

9    might affect one's ability to perceive accurately?

10       A    I'm not sure quite what you're asking but generally

11   speaking if you are in a dark environment where you have

12   relatively few sources of light, in the extreme if you only

13   have one source of light that is suboptimal in terms of

14   viewing, it is better than no light at light, but if you only

15   have one or a few sources of light, particularly if the light

16   comes from a source in a particular location, it means that

17   half of what you're looking at is going to be illuminated

18   perhaps to a degree to where you can see PHOTOPIC vision,

19   perhaps not.

20            But the other half of what you're looking at will be

21   in shadows.  It is not even illuminated by whatever light

22   source there is.

23       Q    And this phenomenon of single or fewer light sources

24   casting some parts of the subject into shadow, does that occur

25   both under the PHOTOPIC and the SCOTOPIC systems?

1      A    Sure.  I mean you can have an extremely bright

2    spotlight, let's say a Klieg light, like the kind that is used

3    for making movies and if you shown that on a person, it would

4    illuminate half the person, the other half would be in shadow,

5    making certain assumptions about what the environment is

6    around the person being illuminated.

7      Q    What affects, if any, does distance have on a

8    person's ability to see someone's appearance?

9      A    So there is research that I've published with a co-

10   worker, Aaron Harley, in 2005 I believe that is quite explicit

11   about the answer to the answer to that question.

12          So the answer is that you can simulate the loss of

13   information associated with any particular distance by

14   blurring a photograph of whatever it is that you're looking at

15   to a suitable degree.

16          I am being a little vague here in terms of what

17   exactly I'm talking about.  The logic that we wrote about

18   applies to seeing anything in the visual scene.  Most

19   typically people are interested in it insofar as it affects a

20   witness's ability to accurately perceive the appearance of

21   another person and that's what we focused our research on.

22          So going backwards just a step or two, what this

23   means is that if we want to depict let's say to a trier of

24   fact the information loss associated with a particular

25   distance, say 100 feet, I can take a picture of an individual

dmh

1    and I can blur that picture by an amount that demonstrates or

2    is equivalent to the information loss associated with the

3    particular distance, 100 feet, in my example.

4          Part of what we did in the research that we

5    published is to provide the calibration that is necessary to

6    understand how much blurring corresponds to the loss of

7    information associated with any given distance.

8          And in the course of doing all that, I also wrote

9    the computer programs that allow me to create such blurred

10   pictures corresponding to information loss for any given

11   distance.

12       Q    So just to unpack that a little bit or to clarify,

13   you can take an image at a given distance.  I assume any

14   distance?

15       A    Any distance.

16       Q    And you can run it through your program and let's

17   say it is 5 feet and what would the program do?

18       A    It would say 5 feet away, how much should I blur it,

19   answer, not very much, to represent information loss

20   associated with 5 feet and out would come an image that is

21   blurred by that amount.

22       Q    And the point there is that someone looking at the

23   blurred picture would be able to get the same amount of

24   information from that picture as someone looking at the same

25   subject 5 feet away would be able to get?

dmh

1    A    Exactly, yes.

2    Q    And the same thing if it were 100 yards?

3    A    Correct.

4    Q    And is this methodology you developed generally

5    accepted by other experts in the study of human perception?

6    A    Yes, it's generally accepted by all scientists in

7    the world to the best of my knowledge who study vision.

8    Q    I am handing you a copy of what has been marked as

9    Petitioner's Exhibit U.  Do you recognize what that is?

10    A    Yes.  This is the paper I referred to which

11    describes the research that I just tried to articulate.

12                                    (The document referred to was

13                                    marked for identification as

14                                    Defendant's Exhibit U.)

15    Q    And was this article peer reviewed?

16    A    Yes.

17    Q    We have talked about distance and we have talked

18    about light but combining the two is the effect of distance on

19    the ability to accurately perceive different at night than it

20    is during the day?

21    A    Yes.

22    Q    And what is that difference?

23    A    Very simply put seeing something at night has a

24    multiplicative effect on distance where the multiplicative

25    factor is approximately three.

1          What I mean by that, again, to use an example is

2     that seeing something -- the effect of distance associated

3     with seeing a person let's say from a distance of 100 feet

4     during the day, or sorry, at night, would be equivalent to the

5     effect of seeing the same person from a distance of 300 feet

6     away during the day.

7          Q    And if the person were 110 feet away at night, how

8     far away would he be during the day to perceive the same

9     amount of information?

10         A    Yeah, more generally, if the person were 110 feet

11    away and being viewed under conditions of SCOTOPIC viewing,

12    nighttime viewing, that would be equivalent to seeing the

13    person from a distance of 330 feet during the day, about the

14    length of a football field.

15         Q    Dr. Loftus, did you prepare any demonstrations in

16    aid of your testimony?

17         A    Yes.

18              MR. EAGLES:  The Court's indulgence just one second.

19              BY MR. EAGLES:

20         Q    I am handing you what has been marked Petitioner's

21    V-1 through 5 and the stickers are on the back for

22    identification purposes.

23         A    Okay.

24              MR. RUSSELL:  What have these been marked, I am

25    sorry?

dmh                                                                                    150

1              MR. EAGLES:  V-1 through 5.

2              MR. RUSSELL:  V-1 through 5, yes.

3              BY MR. EAGLES:

4         Q    And, generally, what do these pictures show?

5         A    They show -- they're better versions of the example

6    images that I provided on the last page of my report, page 6.

7    They show loss of visual information associated with 110 feet

8    distance during the day.  That's U-1.  Is this U or V?  V-1.

9    140 feet during the day, that's V-2.  110 feet at night,

10   that's V-3 and 140 feet at night, that's V-4.  And, finally,

11   V-5 is an image, the image that I started with, the clear view

12   of the individual who I used as a basis for these

13   demonstrations.

14                              (The pictures referred to were

15                               marked for identification as

16                               Defendant's Exhibit V-1 through

17                               V-5.)

18             BY MR. EAGLES:

19        Q    And why did you use distances of 110 and 140 feet?

20        A    I'm sorry, what?

21        Q    Why did you use distances of 110 and 140 feet?

22        A    Because my understanding was that they were

23   distances that were relevant in the case at hand here.

24        Q    Did counsel ask you to assume those distances?

25        A    Counsel asked me to assume those distances and I

**App. 500**

1  inferred also from reading the discovery, some of the trial

2  transcripts that those distances were appropriate in terms of

3  bracketing the distance that was at issue.

4      Q    Which of the four altered pictures V-1 through V-4,

5  which reflects the amount of information available to a viewer

6  under the best viewing conditions of the four?

7      A    That would be V-1.  That depicts a person -- the

8  loss of information corresponding to 110 feet under PHOTOPIC

9  conditions.

10     Q    Are those under otherwise ideal viewing conditions?

11     A    Yeah.  All these -- these representations all

12  presuppose that everything else that could affect the

13  witness's ability to perceive and memorize an individual's

14  face are optimal.

15         That they have an indefinite amount of time, that

16  their attention is directly focused on the appearance of the

17  individual whose appearance they are going to memorize or not.

18  That stress level is optimal.  In other words, that everything

19  else that could potentially affect their visual and cognitive

20  processing is optimal.

21     Q    And if the subject were moving would that be another

22  variable that would affect the amount of information

23  available?

24     A    Yeah, that would reduce the optimality of viewing

25  below what I have depicted here.

dmh

1    Q    What about seeing the subject through a small or

2  otherwise poor quality mirror?

3    A    Well, it depends on exactly what's going on with the

4  mirror.  How small it is.  What the witness is doing with it

5  and how poor quality it is.  But there isn't anything I can

6  imagine about the situation that you've described that would

7  improve -- there isn't anything that could improve the

8  witness's ability to see the person that they were looking at

9  beyond what I've shown in these images.

10        And there are a number of things that I can think of

11  that could potentially detract from the witness's ability to

12  accurately perceive.  They would include, for example, jiggle

13  or other movement of the mirror, the size of the mirror, not

14  being large enough to reflect back the entire scene that the

15  witness is looking at so requiring it to be moved around in

16  order to see.

17        The poor quality of the mirror distorts in ways that

18  are unique to the nature of the poor quality and so on.

19    Q    And to clarify, Exhibit V-1 takes none of those

20  variables into account?

21    A    That's correct.  V-1 is the best you can do with all

22  other aspects of the viewing situation and the witness's

23  cognitive processing being optimal.

24    Q    Does the photo reflect diffuse light or light as we

25  discussed earlier from one or a few distinct specific sources?

dmh                                                                    153

1      A      The photos represent diffuse light in the sense that

2  everything that you can see that I've depicted here is

3  illuminated.  No significant part of the face is in the

4  shadow.

5      Q      Do any of these exhibits, V-1 through 5, or,

6  specifically V-1 through 4, reflect a loss of information as a

7  result of any of these variables apart from distance and the

8  difference between PHOTOPIC and SCOTOPIC systems?

9      A      No.

10     Q      Compared to these other pictures, Exhibits V-1

11  through 4, how much information would be available to someone

12  between 110 and 140 feet away who is using the MESOPIC system

13  of vision that you mentioned earlier?

14     A      It would be somewhere in between the four versions

15  that I've provided.  Incidentally, I don't know whether I said

16  this explicitly, but the two versions that correspond to

17  nighttime vision or SCOTOPIC vision are in gray scale

18  reflecting the loss of color information that's associated

19  with SCOTOPIC viewing.

20            But if you take these four images as a collection,

21  the way they're done on page 6 of the report, Exhibit -- it

22  looks like T, maybe, then the uncertainty that I think you've

23  just alluded to would imply that the appropriate amount of

24  visual information available to the witness would be bracketed

25  by the images that I've provided here.

dmh

1    Q    So speaking of these two demonstrations using the

2    SCOTOPIC system, why are these two photos in black and white

3    rather than color?

4    A    Oh, as I just mentioned, they're in gray scale to

5    reflect loss of color information that is associated with

6    viewing using the SCOTOPIC system.

7    Q    And do we actually see in black and white under

8    conditions of low illumination?

9    A    The way I would put it is you don't have color

10    information available to you which I guess would be equivalent

11    to saying that you see in black and white using the SCOTOPIC

12    visual system.

13    Q    Why is that?

14    A    Why?  Well, because the PHOTOPIC visual system

15    involves three types of visual receptors called cones that

16    have different what we call spectral sensitivity functions and

17    the nature of the way in which these three types of visual

18    receptors, these three types of cones, are differentially

19    sensitive to different wave lengths of light allow us

20    collectively to see color.

21    There aren't three types of cones.  There's only one

22    type of cone which means essentially that there isn't any way

23    of combining the different wave lengths in order to make a

24    determination about what color it is.  I said that probably in

25    a not very clear way because I was trying to say it sort of in

1   a nutshell.

2          A complete explanation of what that's all about

3   would probably require about two weeks which I'm sure you

4   don't want me to do.

5       Q    I don't know if Judge Mulford has that kind of time.

6   Of these four pictures, which reflects the conditions that

7   would result in the least amount of information available to

8   the viewer?

9       A    That would be V-4, SCOTOPIC vision at 140 feet.

10      Q    And, again, does this picture take into account any

11  of the other variables that could reduce the amount of

12  information available which we discussed earlier, movement,

13  stress, uneven lighting, a mirror, anything like that?

14      A    No.

15      Q    These are optimal viewing conditions with an optimal

16  viewer?

17      A    The way I put it is that it is the optimal amount of

18  information available to a viewer whose cognitive processing

19  is optimal in all other respects.

20      Q    And turning to V-5, could you describe what Exhibit

21  V-5 is?

22      A    To make these images you have to start with a basic

23  image and V-5 is the basic image I started with.  It's a

24  picture of actor Jamie Foxx with a beard and wearing a hat.

25      Q    And does this unaltered photo assume that Mr. Foxx

dmh
156

1   is at a certain distance and under certain lighting

2   conditions?

3       A    It assumes that Mr. Foxx is being seen under

4   PHOTOPIC vision within 5 or 10 feet away, in other words, at a

5   distance where distance essentially wouldn't result in

6   significant information, visual information loss.

7       Q    What effect does familiarity with the person or the

8   subject that you are looking at have on one's ability to

9   identify the subject?

10      A    It's a complicated question.  If you -- the simple

11  answer to which is that it doesn't affect the kind of visual

12  information loss that I have depicted in these images at all.

13          The visual information loss would be -- is just

14  purely physical.  It's calculated on purely optical and

15  mathematical bases.  It doesn't have anything to do with

16  knowledge on the part of the person who is doing the looking.

17          The person's familiarity or supposed believed

18  familiarity with the individual that they think they're

19  looking at does have an effect on what they believe they're

20  seeing but the nature of this effect is quite outside the

21  scope of what I wrote about in my report.

22      Q    Have you ever studied the effect of familiarity with

23  the subject?

24      A    Yes.

25      Q    And please describe those studies.

**App. 506**

dmh                                                                         157

1          A    Well, what the effect of familiarity does is to

2     induce the witness to believe that they are seeing whoever it

3     is they're looking at more clearly than is warranted by the

4     visual information available to them.

5               This is good from the standpoint of cognitive

6     functioning in that usually it helps you to identify somebody

7     who you believe you're interacting with even under suboptimal

8     conditions but it can hurt if you are looking at a person who

9     is different from the person you believe you're looking at.

10         Q    Dr. Loftus, do you have an opinion formed to a

11    reasonable professional and scientific certainty concerning

12    whether someone with normal good vision could accurately see

13    someone else's face from 110 feet away in conditions of low

14    illumination but under otherwise optimal viewing conditions?

15         A    I mean it depends on what kinds of information you

16    are -- is relevant.  So if the relevant information is

17    information that will serve to distinguish a particular

18    individual from another collection of sort of candidate

19    individuals who look more or less like him, same race, same

20    general age and so on, then no.

21              I mean what -- then my scientific opinion is that

22    you would not be able to get that much information from a

23    person being viewed under SCOTOPIC conditions from however far

24    away you said, 110 feet.

25         Q    And your opinion aside, the exhibits -- Exhibits

**App. 507**

dmh

158

1   V-1, 2, 3 and 4, reflect the amount of information available

2   at these distances under these conditions for anyone to look

3   at?

4        A     That is correct.

5        Q     And do you have a similar opinion formed to a

6   reasonable professional and scientific certainty concerning

7   whether someone at 140 feet away observing under conditions of

8   low illumination but otherwise optimal viewing conditions

9   would be able to accurately identify someone at that distance?

10       A     Yeah.   That kind of question is best addressed by

11  actually looking at the image and looking at the image I would

12  say no, you can't.   And that's consistent with the data I got,

13  I collected that's reported in this paper on people's

14  probabilities of being able to recognize an individual at

15  various distances.

16       Q     And if there were other variables such as movement,

17  other people kind of in the way in a confined space, the

18  viewer using a mirror, stress, what affect would that have?

19       A     That would reduce the ability of the witness to

20  accurately perceive who he or she was looking at below what is

21  represented in these images.

22       Q     Dr. Loftus, had counsel to Mr. Stephens retained

23  you, would you have been able to testify at the trial in this

24  case in 2012?

25       A     Yes.

**App. 508**

1       Q     Is there any reason that you would not have been

2  able to serve as an expert witness on human perception for the

3  defense of the trial?

4       A     No.

5       Q     And had defense counsel at the trial in 2012 asked

6  you the same questions that I asked you here today, would you

7  have provided the same answers?

8       A     Yes, I would have used the same computer programs to

9  produce the identical images and my answers would have been

10 the same.

11      Q     Thank you.

12            MR. EAGLES:  Thank you, Your Honor.

13            THE COURT:  Cross?

14            MR. EAGLES:  Oh, I am sorry.  While I am up here,

15 Petitioner submits Exhibits U, V-1 through 5.

16            THE COURT:  They will be accepted.

17            MR. RUSSELL:  No objection.

18            MR. EAGLES:  S and T if I have not already.

19            THE CLERK:  They are in.

20            MR. EAGLES:  Thank you.

21            MR. RUSSELL:  No objection.

22                              (The documents marked for

23                              identification as Defendant's U

24                              and V-1 - 5 were received in

25                              evidence.)

**App. 509**

dmh                                                              160

1          THE COURT:  All right.  Go ahead.

2          MR. RUSSELL:  Thank you, Your Honor.

3                      CROSS EXAMINATION

4          BY MR. RUSSELL:

5     Q    Good afternoon, Dr. Loftus.

6     A    Good afternoon.

7     Q    So essentially what you are saying is things are

8  hard to see that are far away?

9     A    Yeah.  That's like saying if you drop something, it

10 will fall.

11    Q    And things are hard to see the darker it gets?

12    A    Right, same thing.  If you drop something, it will

13 fall.  Completely obvious.

14    Q    Got you.  And you came from Seattle, Washington, is

15 that right?

16    A    I did.

17    Q    Okay.  I assume you took a plane here, is that fair?

18    A    I did, yes.

19    Q    Did you come in today?

20    A    Last night.

21    Q    Last night.  So you stayed in a hotel last night?

22    A    I did.

23    Q    Okay.  And all of that was paid for not by you but

24 by somebody else, is that right?

25    A    Yes, by the State of Maryland I assume.

dmh

161

1      Q    Okay.  You charge an hourly rate to work on this, is
2  that right?

3      A    I do.

4      Q    And what was your hourly rate?

5      A    $250 an hour.

6      Q    Okay.

7            THE COURT:  I am sorry, how much?

8            THE WITNESS:  $250 an hour, Your Honor.

9            BY MR. RUSSELL:

10      Q    Okay.  And is that your normal rate?

11      A    No, that is $50 or $100 less than my normal rate.

12      Q    Okay.  So what is your normal rate, $300?

13      A    $300 to $350 an hour.

14      Q    Okay.  And you answered this a little bit but who is
15  paying you that money?

16      A    I believe the State of Maryland will be.

17      Q    The State of Maryland, okay.  And you said you have
18  testified in 410 cases?

19      A    Roughly, yeah.

20      Q    Roughly.  Okay.  Have you ever testified in Maryland
21  before?

22      A    No.

23      Q    No.  Have you ever attempted to testify in Maryland
24  before?

25      A    No.

**App. 511**

1    Q    No.   Okay.   Are you familiar with U.S. v. Carter,

2    410 F.3d 942?   Does that case sound familiar to you?

3    A    No.

4    Q    Okay.   Do you recall being disallowed to testify in

5    a case in U.S. District Court?

6    A    Which one?

7    Q    U.S. v. Carter.

8    A    Well, where was the district court?   I remember

9    places by where they are rather than by case name.

10   Q    Northern District of Illinois.

11   A    Yeah, although I have actually testified in the

12   Northern District of Illinois in Federal Court in Chicago.

13   Now I recognize that case.   That was a case in which

14   apparently a lawyer wanted to use me, never consulted me, said

15   that I was going to say something and the judge didn't allow

16   my testimony.   But I was completely out of the loop on it so I

17   was a little taken aback when I learned the result of that

18   case.

19   Q    Okay.   And you talked about this intermediate

20   MESOPIC?

21   A    Yes.

22   Q    Of vision?

23   A    Yes.

24   Q    But you did not include any photos of that, is that

25   right?

**App. 512**

1        A     No.    What I did, as I said, was to include photos

2   that bracketed what I considered to be the information loss

3   associated with the two different distances and the two

4   different visual systems.

5            So MESOPIC vision would be if you look at either

6   distance either 110 feet or 140 feet, you can think of the

7   loss of information in the MESOPIC range as being in between

8   the SCOTOPIC and PROTOPIC images in the blurred department and

9   would include some degree of color but the color would be

10  washed out compared to how it's depicted in the PHOTOPIC

11  versions that I provided.

12       Q     Okay.    And you created a computer program, is what

13  you are saying that shows us how it blurs a picture depending

14  on how far away somebody would be, is that what you are

15  saying?

16       A     Correct.

17       Q     Could I just not take the picture and move it that

18  far away?

19       A     Yes, you could.    That's a very good point.    Would

20  you like to know why I don't recommend that as a solution?

21       Q     Not really.

22       A     Okay.

23       Q     So you have gone through the transcripts in this

24  case, right?

25       A     Yes.

dmh

1    Q    Okay.  And you make note of which parts of the

2  transcripts that you went through, is that right?

3    A    I made note?  What do you mean?

4    Q    In your report, sorry.

5    A    I believe so, yes.

6    Q    Okay.  And so you went through the opening arguments

7  and trial testimony of Amanda Rushton, Sharon James, trial

8  testimony of Edward Jason Freed, the testimony of Cornelius

9  Christie, James Anthony Mayfield, Christina Ames Packer,

10  Michael Grant, Raymond Hinton, Philip Custos, Anthony

11  Mitchell, Johnny Evans, Michael Tobias Cantie, Terrance Baker,

12  Kenneth Lee Spencer and closing arguments and photographs that

13  were taken?  Is that correct?

14    A    Yes.

15    Q    Okay.  And all of those people testified in this

16  case?

17    A    Yes.

18    Q    Okay.  What do you believe was the luminance level,

19  if I am using that term correctly, at the Maryland House of

20  Corrections on the night of the murder?  And I am not asking

21  you to estimate.  I am asking you if you know what it was?

22    A    I do not.

23    Q    You do not know.  And you never did any testing at

24  the Maryland House of Corrections, is that right?

25    A    That's correct.

**App. 514**

dmh

1     Q    You have never been to the Maryland House of

2  Corrections?

3     A    I have not.

4     Q    Okay.  Can you tell us where were the windows

5  located in the Maryland House of Corrections on that tier?

6     A    I don't remember as I sit here.

7     Q    Okay.

8     A    I mean if that information was available to me, I

9  incorporated it when I read the discovery six or eight months

10  ago.

11     Q    But that is assuming that you had that information?

12     A    If it was in the discovery, then I had it, yeah.

13     Q    And you are aware that prisons have a lot of outdoor

14  lighting, right?

15     A    That's my general understanding of prisons.  I'm not

16  intimately familiar with prisons.

17     Q    Have you ever been to a prison at night?

18     A    No.

19     Q    Okay.  Can you tell us where on the tier were the

20  lights that night?

21     A    Not really.  There seemed to be a lot of conflicting

22  information about which lights were there, which lights were

23  broken, which lights were obscured by blankets and so on.  It

24  was because of the uncertainty on my part about what the exact

25  nature of the illumination was that I did these two in a sense

**App. 515**

dmh

1    extreme demonstrations.

2              One assuming perfecting lighting and one assuming

3    lighting that was low enough so that it would allow only

4    vision by the SCOTOPIC system.

5      Q    Okay.  According to your report, you went over the

6    testimony of Lieutenant Mayfield, is that right?

7      A    Yes.

8      Q    Okay.  And in your report in paragraph 11, poor

9    lighting conditions, you list parts of the transcript where

10   the lighting was described.  Is that right?

11     A    Yes.

12     Q    Okay.  And is it safe to assume that that is your

13   understanding of what the lights were that night?  Those were

14   the lights that existed what you have listed?

15     A    Yeah.  And as I said, what it boiled down to is that

16   my knowledge of the lighting was uncertain.

17     Q    Okay.  Now, I am going to ask you about something in

18   the transcript of January 18, 2012, it is on page 173,

19   beginning at line 4.

20            THE COURT:  January 18th?

21            MR. RUSSELL:  January 18th, page 173.  I apologize.

22   I know they are hard to get to this stuff.

23            THE COURT:  All right.  Just go ahead and ask him.

24            MR. RUSSELL:  What was that, Your Honor?  I am

25   sorry.

**App. 516**

1         THE COURT:  Just go ahead and ask him.

2         MR. RUSSELL:  Okay.

3         BY MR. RUSSELL:

4    Q    And this is the testimony of Lieutenant Mayfield.

5         (Portions of the State v. Stephens transcript were

6    read into the record.)

7         "Q    Let's take those one at a time.

8         Gloomy means the light on the fourth

9         floor isn't great, is it?

10        A    At all.

11        Q    Because the main lights are on the

12        ground level, right?

13        A    Well, they have lights coming up.

14        Q    Right, but they are at the ground

15        level pointed up?

16        A    No, sir, they're facing downward.

17        Q    The lights that are on the roof?

18        A    No.  You got lights going up on

19        each tier that face down.  I mean it's

20        like the lamppost light outside.

21        It's just the light shines down."

22        (The reading of the transcript was concluded.)

23   Q    Now, I do not see anywhere in your report where you

24   talk about those lights.

25        A    Probably not.

1    Q    Okay.  Were you aware of those lights?

2    A    If they were in the -- if that information was part

3    of the transcript that I read, then yes.

4    Q    Okay.  But you did not include it in your report on

5    lighting conditions?

6    A    No.  If I could just be a little clearer here than I

7    perhaps have been already.  I was uncertain about the lighting

8    in general for that reason.

9         MR. RUSSELL:  I do not think there is a question,

10   Your Honor.

11        THE COURT:  Just counsel will follow up on that

12   okay?

13        THE WITNESS:  Okay, sure.

14        MR. RUSSELL:  Thank you.

15        BY MR. RUSSELL:

16   Q    Now, do you know yourself where the stabbing took

17   place on that tier?

18   A    Well, my recollection is that there was a range of

19   cell numbers in front of which the stabbing took place and if

20   you did the calculations having to do with the distance

21   between the closest cell to one of the main witnesses and the

22   furthest possible cell, that was where that range of 110 to

23   140 feet came from.

24   Q    Well, that all assumes that you believe the

25   witnesses, correct?

**App. 518**

dmh

1    A    I'm sorry?

2    Q    All that information came from witnesses and that

3 assumes you believe the witnesses?

4    A    It did.  And it also came as I recall from closing

5 argument by the State's attorney.

6    Q    Okay.  But you do not actually know where it took

7 place, right?

8    A    I do not.  When I make these images, I have to have

9 numbers and that's where the numbers came from.

10    Q    Right.  Okay.  And so actually data from what

11 happened, you do not actually have any data from that, right?

12    A    That's correct.

13    Q    Okay.  Let me ask you this.  What if Mr. Stephens

14 was wearing a mask when this happened and the whole question

15 of the lighting really kind of goes out the window, is that

16 right?

17    A    Yes.

18    Q    Okay.  Did you read the part of the transcript where

19 four people testified that the assailants were wearing masks?

20    A    I don't remember but if it was in the transcripts

21 that I listed, then, yes, I did.

22    Q    Okay.  Well, let me ask you this, if I were so --

23 you have a Ph.D. is that right?

24    A    Yes.

25    Q    Okay.  Now, if I were an engineer, would I be able

1  to testify to the same things that you are testifying to?

2       A    Well, assuming that you had read my paper and that

3  you understood the math and the optics which if you were the

4  right of engineer, you probably would, and you were willing to

5  sit down and write the relevant computer programs and had

6  access to libraries of things like --- and transforms and

7  stuff like that, which engineers probably would, then, yes, an

8  engineer probably could testify to the same thing.

9       Q    Now, I am going to show you what has been marked as

10 State's 8.  Do you recognize that?

11      A    Yes.

12      Q    Okay.  And what is it?

13      A    It is a paper based on Aaron Harley's Ph.D.

14 dissertation on visual hindsight finds.

15      Q    Okay.  And you are one of the authors on that paper?

16      A    Yes.

17      Q    Okay.  And, similarly, you wrote another -- the one

18 that is in as Petitioner's U, that is also with Mr. Harley, is

19 that right?

20      A    Yes.

21      Q    Okay.  I am going to ask you to flip over to page

22 966.

23      A    All right.

24      Q    There is a section there called legal implications,

25 is there not?

dmh                                                                                                       171

1       A      Yes.

2       Q      Is that normal for you to write papers, scientific

3    papers that have discussion of what the legal implications of

4    the scientific factors to be?

5       A      Yes.

6       Q      Okay.

7              MR. RUSSELL:  I have nothing further.

8              THE COURT:  Redirect, Mr. Hut?

9              MR. EAGLES:  Your Honor, just a few questions.

10                       REDIRECT EXAMINATION

11             BY MR. EAGLES:

12      Q      Dr. Loftus, why do you not recommend just taking a

13   picture and moving it further back as a solution to the

14   problem of identifying how much information is available to a

15   viewer at a certain distance?

16      A      Because, first of all, you have to make the distance

17   suitable for whoever it is that is looking at it which means

18   that you have to arrange the physical configuration such that

19   if you're showing it to a jury let's say, all jurors are

20   situated at the exact correct distance from a single picture.

21   Just from a practical point of view, that is difficult to do

22   in a normal trial situation.

23             Second, if you do that and you show, let's say again

24   the trier of fact jurors, the picture close up and then move

25   it back, they'll be subject to a difficult phenomenon, the

**App. 521**

1    hindsight bias phenomenon, that I described in the other paper

2    that Mr. Russell dug up.

3          So those would be two problems.  The first one is by

4    far the most serious.  It's just impractical to do it normally

5    particularly if distances are long, you know, say 150 feet and

6    the courtroom itself is only maybe 25 or 50 feet long.

7    Q    And the other times you have provided similar

8    testimony to what you have provided here today, were you there

9    to witness the original events at issue in the trial?

10   A    No.

11   Q    Did you need to read the transcript to do your

12   calculations and create these exhibits regarding how much

13   information is available to a viewer and a viewer with normal

14   human viewing under the PHOTOPIC viewing system at 110 feet?

15   A    What I needed were distances to assume, to put into

16   my program in order to produce these images.  So the question

17   is where am I going to get the numbers?

18         I can simply be asked by somebody like you to assume

19   them to be true.  I can read the trial transcript and do the

20   math for myself to figure out where the numbers came from or I

21   can do both which is in fact what I did.

22   Q    So would it have affected your demonstratives,

23   Exhibits V-1 through 4 if you never read the transcript and

24   simply been asked to assume the distances and to assume

25   conditions of PHOTOPIC viewing systems and conditions under

1    which someone use the SCOTOPIC viewing system?

2        A    It wouldn't have made any difference.  The pictures

3    that emerged would have been identical.

4        Q    Would it have made any differences if you had

5    visited the tier to your calculations to make those

6    demonstratives under those assumptions?

7        A    Well, unless my visit to the tier somehow was able

8    to convince me without question that the lighting was either

9    PHOTOPIC or SCOTOPIC, it wouldn't have affected anything.

10           I inferred from reading the discovery that since

11   nobody who was intimately involved in the case seemed to be

12   able to make a clear determination about the overall nature of

13   the lighting, I wouldn't be able to either.

14       Q    So just to clarify, Exhibit V-1 and V-2 are under

15   what system of vision?

16       A    PHOTOPIC.

17       Q    And what condition of light would lead to someone to

18   use that system of vision?

19       A    Great light.  I mean today here in this courtroom we

20   are all using our PHOTOPIC system.  We walk outside within the

21   next six or eight hours, we will see the outside world using

22   our PHOTOPIC system.

23       Q    Dr. Loftus, do you ever provide expert testimony at

24   reduced rates even further than say what you have done for us

25   today?

dmh

1      A    Sure, I've testified pro bono on occasion.

2      Q    And would you be more likely to work at a reduced

3  rate or pro bono where the Defendant faces the death penalty

4  and said that it could not afford your normal rate?

5      A    Yeah, I mean in general my sort of philosophy is

6  that I don't feel comfortable telling somebody that I won't

7  work for them because there's not enough money so when there's

8  an issue of money, I negotiate sometimes ending at zero.

9          MR. EAGLES:  Nothing further from the Petitioner.

10  Thank you, Dr. Loftus.

11          THE COURT:  Anything else for the gentlemen?

12          MR. RUSSELL:  No, Your Honor.

13          THE COURT:  All right.  Thank you, sir.  Please have

14  a very nice flight back.  I hope it goes well for you at the

15  airport.  Okay?

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  And make sure you leave any exhibits

18  here.

19          THE WITNESS:  These exhibits are yours, right?

20          THE COURT:  Right.  Make sure you do not take them.

21          (Witness excused.)

22          THE COURT:  Who will be next?

23          MR. HUT:  The Petitioner calls Lee Stephens.

24          THE COURT:  Okay.  Wait until the doctor has exited,

25  please.  Do you need a minute to talk to him beforehand?

**App. 524**

1          MR. HUT:  I do not believe so, Your Honor.

2          THE COURT:  Okay.

3          THE CLERK:  Please raise your right hand.

4    Whereupon,

5                    LEE STEPHENS

6    was called as the Defendant, having been first duly sworn, was

7    examined and testified as follows:

8          THE CLERK:  You may be seated.  Sir, would you

9    please state your full name, address and spell your name for

10   our court reporters?

11         THE WITNESS:  Lee Stephens.  My address is 14100

12   McMullen Highway, Cumberland, Maryland.

13         THE COURT:  I am having trouble picking you up.  I

14   know you are shackled.

15         So, Officer, is it possible for you to help move the

16   chair forward without creating an issue?  And, Mr. Hut, would

17   you please be so kind -- thank you, Officer, for adjusting the

18   microphone.  All right, go ahead.  Restate your name.

19         THE WITNESS:  Lee Stephens.

20         THE COURT:  That is much better.

21         MR. HUT:  May I address the witness --- courtroom,

22   Your Honor?

23         THE COURT:  That is fine.  He has to put in his

24   address.

25         THE WITNESS:  My address is 14100 McMullen Highway,

**App. 525**

1    Cumberland, Maryland.  And that's L-e-e, S-t-e-p-h-e-n-s.

2               THE CLERK:  Thank you.

3                       DIRECT EXAMINATION

4          BY MR. HUT:

5          Q    Mr. Stephens, were you incarcerated in the State of

6    Maryland in July of 2006?

7          A    Yes.

8          Q    Where?

9          A    At the Maryland House of Corrections Annex.

10         Q    When did you move into the Maryland House of

11   Corrections?

12         A    Maybe 1999.

13         Q    All right.  And did there come a time when you moved

14   from your annex to the CUT?

15         A    Yes.

16         Q    And when was that?

17         A    February 2006.

18         Q    What was the reason for your move from the annex to

19   the CUT?

20         A    I sustained an injury playing basketball which led

21   to my jaw being wired so I had to sit in the infirmary at the

22   adjacent facility which was the CUT.

23         Q    So when you first moved to the CUT, were you housed

24   in the general population or somewhere else?

25         A    I was housed in the infirmary.

dmh

1    Q    And while in the infirmary, did you have any

2  interaction with the general population of the prison?

3    A    No.

4    Q    Did you have any interaction with the usual guards

5  in the prison?

6    A    No.

7    Q    When did you move out of the infirmary to a

8  different unit in the prison?

9    A    Sometime around late May.

10    Q    And the year would be?

11    A    2006.

12    Q    Where did they move you?

13    A    They moved me to a tier on the west wing, E-4.

14    Q    Do you recall the cell to which you were confined in

15  the E-4 tier?

16    A    Yes.

17    Q    Which one?

18    A    E-4-38.

19    Q    Were the inmates on your E-4 tier able to leave

20  their cells at night and go out on the tier?

21    A    Yes.

22    Q    How did that get accomplished if you know?

23    A    The doors would be rigged.

24    Q    How were they rigged?

25    A    They were rigged with keys.

dmh

1  Q    What were keys?

2  A    Keys were fashion made keys to rig the doors.

3  Q    Did you yourself have a key?

4  A    Yes.

5  Q    Did you sometimes use the key to leave your cell?

6  A    Yes.

7  Q    Did inmates on the tier leave their cells

8  frequently?

9  A    Yes.

10  Q    Can you quantify how frequently?  On any given night

11  would there be inmates who had left their cell?

12  A    Yes.

13  Q    Why would people leave their cells?  Well, let me

14  ask you this question.  For what reasons did people leave

15  their cells?

16       MR. RUSSELL:  Objection.

17       THE COURT:  Overruled.

18       THE WITNESS:  To indulge in illegal activity.

19       BY MR. HUT:

20  Q    What kind?

21  A    I don't know per se.

22  Q    Were any drugs consumed out on the tier?

23       MR. RUSSELL:  Objection.

24       THE COURT:  Overruled.

25       THE WITNESS:  Yes.

**App. 528**

dmh                                                                 179

1              BY MR. HUT:

2        Q     Did people talk on the phones on the tier?

3        A     Yes.

4        Q     Why would they do that on the tier as opposed to in

5   their cells if they were engaging in an illegal activity?

6        A     I don't know.  I don't know.

7        Q     Do you recall if there came a time prior to July 25,

8   2006 when the prison was on lockdown?

9        A     Yes.

10       Q     During the time that it was on lockdown, were their

11  inmates on the E-4 tier who left their cells to engage in this

12  illegal activity?

13       A     Yes.

14       Q     Mr. Stephens, did you know Corporal David McGuinn?

15       A     I did not.

16       Q     Did you learn who he was within one or two days

17  before his death?

18       A     Yes.

19       Q     So at the time of his death on July 25th, 2006, you

20  knew who he was, correct?

21       A     Yes.

22       Q     Had you had any interaction with Corporal McGuinn?

23       A     No.

24       Q     How did you learn who he was?

25       A     Just from guys on the tier.

**App. 529**

dmh                                                                  180

1      Q      Did they talk about Corporal McGuinn?  Did they

2   point him out?

3      A      Yes.

4      Q      What did they say about him?

5      A      Well, he was a super cop.  That was the term.

6      Q      Was the identification of Corporal McGuinn as a

7   super cop in the nature of complaining about him being a

8   strict guy?

9      A      Yes.

10     Q      Did Corporal McGuinn ever write you up,

11   Mr. Stephens, for any infractions?

12     A      No.

13     Q      Did he take any of your contraband at any time?

14     A      No.

15     Q      Did he ever yell at you?

16     A      No.

17     Q      Did you have friends on the tier?

18     A      Associates, yes.

19     Q      Did he yell at any of your associates that you know

20   of?

21     A      No.

22     Q      In the course of any conversations or any talking

23   that you heard about McGuinn, did anyone ever ask you to

24   attack him?

25     A      No.

dmh

1    Q    Did you ever agree to attack Corporal McGuinn?

2    A    Absolutely not, no.

3    Q    On the night of July 25th, 2006 did you ever leave

4    your cell and go out on the tier?

5    A    No.

6    Q    On the night of July 25th, 2006 did you ever

7    attacked Corporal David McGuinn?

8    A    I did not.

9    Q    Did you in any way on that evening or at any other

10   time cause him harm?

11   A    No.

12   Q    Now, were you in your cell on the night of July

13   25th, 2006, Mr. Stephens?

14   A    Yes.

15   Q    Could you describe the lighting conditions that

16   prevailed on the tier on the night in question?

17   A    Well, the only lighting was from maybe from 1 to 4

18   you could see really well, from 4 all the way to 44, 45 it's

19   just like really dark.

20   Q    And when you say 1 to 4, 44 or 45, you are talking

21   about cell numbers, is that correct?

22   A    Yes.

23   Q    So 1 generally is described as being a front of the

24   tier and 45 the back?

25   A    46, 47, 48 and 49 to the back of the tier, yes.

**App. 531**

1      Q      Is 49 the last cell on the tier as far as you

2    recall?

3      A      Yes.

4      Q      Were there, on the night in question, blankets or

5    anything else hanging out on the railings --

6            THE COURT:  Mr. Hut, the court reporter is unable to

7    pick up your question.  They need you closer to a microphone.

8            MR. HUT:  All right.

9            THE COURT:  So you have to either be near that one

10   or that one.

11           MR. HUT:  I will try to stay here.

12           THE COURT:  I just got a note it is not picking up

13   as well as they need it.

14           MR. HUT:  Okay.  Do you know at any point in

15   particular where I need to over and repeat the questions?

16           THE COURT:  I do not know.

17           THE CLERK:  She just said any microphone.  As long

18   as you are close to one.  Just specifically that you are not

19   close enough.

20           MR. HUT:  I was just worried about anything that

21   might have been missed.  Hopefully, it is close enough.  But

22   let me make sure.  There was a line of questions that I would

23   like to repeat, Your Honor, just to make sure that it was

24   covered.  So let me ask these questions again.

25           THE COURT:  Sure.

dmh

BY MR. HUT:

Q     Mr. Stephens, with apologies.

A     That's okay.

Q     During any conversation you had with anyone on the tier, did anyone ask you to attack Corporal David McGuinn?

A     No.

Q     Did you ever agree to attack Corporal McGuinn?

A     No.

Q     Did you ever leave your cell on the night of July 25th, 2006?

A     No.

Q     On that night did you ever attack Corporal David McGuinn?

A     No.

Q     On that night did you ever in any way cause McGuinn any harm?

A     No.

Q     All right.  Now, on the evening in question, do you know whether there were blankets hung from the rails on the tier in any way?

A     Yes.

Q     How would you describe the noise level on the tier?

A     Very loud.

Q     And what caused the noise level to be loud?

A     With the combination of four tiers stacked on top of

dmh

1    each other, numerous TVs, radios, the industrial fans running,

2    everyone's electronics are pretty much turned up loud or

3    blowing at a very high level.  It was very loud.

4         Q    TVs and electronics were those used in individual

5    cells by some of the inmates?

6         A    Yes.

7         Q    Was there performed on the night of July 25th at or

8    around 10 o'clock something called a count?

9         A    Yes.

10        Q    All right.  And what were you doing at or around

11   10:00 p.m. that evening?

12        A    I don't know.  I had the TV on.

13        Q    You were watching the television?

14        A    Just watching TV.

15        Q    Were you using headphones?

16        A    Yes.

17        Q    Could you see out of your cell?

18        A    Just waist down, yes.

19        Q    And why only from the waist down?  What prevented

20   you from seeing anything from the waist up?

21        A    I had my curtain up.

22        Q    And what was your curtain made of?

23        A    It was just a plain sheet and an extra blanket.

24        Q    It was a blanket and a sheet?  And did it cover the

25   entirety of the door to your cell?

**App. 534**

1      A     Just the south part.  The bottom part waist down you
2   could see out.

3      Q     But it covered the entirety across?

4      A     Yes.

5      Q     Did the officer who was doing the count that evening
6   get to your cell?

7      A     Yes.

8      Q     Did he move your curtain to one side to look in?

9      A     Yes.

10      Q     Did you look at him?  Did you see who was performing
11  the count?

12      A     I did, yes.

13      Q     Who was it?

14      A     Officer McGuinn.

15      Q     And you had just recently come to know who he was,
16  is that correct?

17      A     Yes.

18      Q     And what happened next?

19      A     He continued on with his count.

20      Q     Sorry?

21      A     He continued with his count.

22      Q     And what happened after that?

23      A     I just heard scuffling.

24      Q     And from what point did you hear the scuffling?

25      A     I'm not sure.  Maybe between 40, there around 40.

dmh
                                                                    186

1      Q    Did the sound of the scuffling move at any point up

2   or down the tier?

3      A    Yes.

4      Q    Do you recall the direction or directions in which

5   it moved the sounds?

6      A    Yes.

7      Q    Can you describe that for the Court?

8      A    The direction was from 39 to 40 to all the higher

9   cells the noise got really loud and then it got really kind of

10  quiet a little bit.  Then all you could hear was really like

11  feet squeaking.

12     Q    And when you heard feet squeaking, did you associate

13  the squeaking to feet?  Did you see any shoes from the bottom

14  portion under the curtain that you could use to see out?

15     A    Not right away, no.

16     Q    Did there come a time when you did?

17     A    Yes.

18     Q    Describe that.

19     A    Well, I saw white tennis shoes and black shoes.

20     Q    And did you believe that the shoes that you saw were

21  part of the scuffle that you heard?

22     A    I don't know.  I can't say.

23     Q    Did you see who attacked Corporal McGuinn that

24  night?

25     A    No.

**App. 536**

dmh                                                                      187

1      Q    What was your state of mind at the time that you

2   heard what you describe as scuffling and saw these white and

3   black shoes?

4      A    Just a little worried, you know.  It always when

5   something goes down, right, you always -- you remember some

6   sounds.  If it's somebody coming for you or something, right?

7   So, yeah, I was a little worried.

8      Q    Were you stressed out?

9      A    I don't know about stressed out but worried, yes.

10     Q    What did you do after you saw the feet go by and

11  heard -- well, let me withdraw that and ask this.  Did there

12  come a point in time at which you heard a door to the tier

13  open and close?

14     A    You mean the grill or an actual door, cell door?

15     Q    No, not a cell door.  A door to the tier or from the

16  tier.

17     A    The grill.  So you mean the grill, right?

18     Q    Perhaps that is what I mean.  Do you describe the

19  grill as a door through which, for example, a correction's

20  officer would have access?

21     A    Yes.

22     Q    Did you hear a door at some point after you heard

23  the scuffling?

24     A    Yes.

25     Q    And what did you do then?

dmh

188

1     A    I really sat down.  I mean I had already -- I sat

2 down maybe.

3     Q    Well, did there come after you heard the door close,

4 the grill door close, where you pulled your curtain back a

5 little and tried to get a look outside?

6     A    Yeah, that was way before that though.  That was way

7 before hearing the grill actually open from the front.

8     Q    At some point you pulled the curtain back?

9     A    Yes.

10     Q    And did you try to get a look outside?

11     A    Yes.

12     Q    And how did you do that?

13     A    Through a mirror.

14     Q    And the time that you pulled the curtain back and

15 tried to get a look through the mirror, was that after you had

16 heard the scuffle?

17     A    After I seen shoes go by, I pulled my mirror out.

18     Q    And was that before or after you heard the grill

19 door close?

20     A    It was before.

21     Q    When you pulled your sheet back to get a look using

22 your mirror, did you notice anything on the sheet?

23     A    Specks of blood.

24     Q    When you say specks, can you be more specific --

25 about how many specks?

**App. 538**

1     A    I don't know, maybe two.

2     Q    What did you do after you saw the specks of blood?

3     A    I retrieved my ice bag.

4     Q    And describe what is your ice bag?

5     A    Well, my ice bag is a homemade cooler around small

6 enough to fit through the grill to get ice in a fashion made

7 with just --- stitched together over the top of like the denim

8 part.  Plastic stuck on the other side and the outside of it,

9 right.

10    Q    And when you say small enough to fit through one of

11 the -- through the door to your cell?

12    A    Yes.

13    Q    And so approximately 5-6 inches?

14    A    Yes.

15    Q    And how did the ice bag get to your cell door?

16    A    ---.

17    Q    Sorry?

18    A    ---.

19    Q    Still do not catch it.

20    A    You asked me how the ice bag got to my door on my

21 door?

22    Q    Yes.  Did somebody deliver it to you?

23    A    I'm sorry, I didn't understand the question.

24    Q    So was there an individual who resided on the tier

25 who was the tier runner?

**App. 539**

1    A    Yes.

2    Q    Did the tier runner deliver the ice bag to your

3  door?

4    A    Yes.

5    Q    Did he also deliver ice bags to others?

6    A    Not ice bags, just ice.

7    Q    Okay.  Were you the only one who had an ice bag?

8    A    No.

9    Q    So how did the others get their ice?

10   A    The same way.

11   Q    All right.  In an ice bag?

12   A    In an ice bag or in a cup, something they made to

13  put their ice in.  Bowls.

14   Q    And why did you at that point in the evening want to

15  bring the ice bag into your cell?

16   A    Well, I noticed the blood on the sheet and so I

17  pulled my ice bag in because I didn't want it to -- I wanted

18  to see if there was anything in it, right.

19   Q    What do you mean anything in it?

20   A    Anything in it or on it, blood in it or on it.

21   Q    Did you see any blood on the ice bag?

22   A    On the outside of it, yes.

23   Q    How much blood on the ice bag?

24   A    I just seen a spot.

25   Q    What did you do with the ice bag once you pulled it

**App. 540**

dmh

1  inside?

2      A      Took it immediately to the sink, dumped it out,

3  removed the plastic from it, put the plastic in the sink, put

4  everything else on the side, turned the water on, let the

5  water run on the ice and left it there.

6      Q      Why did you turn the water to run on the ice?

7              THE COURT:  Can I have one second?  All right.  So

8  you dumped it out and you said you ran water on it?

9              THE WITNESS:  Yes.

10             THE COURT:  Go ahead.

11             BY MR. HUT:

12     Q      And why did you want to do that?  Why did you do

13  that, run the water?

14     A      To make sure that there was no blood on it or could

15  be seen anyway, right, because I mean they would come around

16  and anything that has blood on it they will immediately think

17  that you're involved, right.

18     Q      Did you ever see any blood on the bars of your cell

19  or on the door to your cell?

20     A      No.

21     Q      When you pulled your curtain, did that also involve

22  pulling the blanket that was part of the curtain along with

23  the sheet?

24     A      No.

25     Q      Your blanket was still hanging up?

**App. 541**

dmh
192

1      A    The blanket was hanging up because it wasn't a part

2  of the entryway.  It was only just the portion where the bed

3  is, right.

4      Q    Do you know whether you got any blood onto you from

5  the blanket that was hanging up?

6      A    I don't know.

7      Q    What were you wearing, Mr. Stephens, when you slid

8  the blanket over and pulled in the ice, if you remember?

9      A    Two pair of boxers, a tank top, socks, shower shoes.

10      Q    Why do you wear two pair of boxers?

11      A    It's just a style.

12      Q    Did you do that prior to the time you were

13  incarcerated?

14      A    Yes.

15      Q    Did you see any other inmates wear two pair of

16  boxers?

17      A    Yes.

18      Q    Did you continue to keep those items, the couple of

19  pair of boxers, the tank top, the socks on after this point in

20  time?

21      A    No.  I removed my tank top.

22      Q    What did you do with it?

23      A    Just threw it on the bed.

24      Q    Did you ever put the tank top under the mattress?

25      A    No.

**App. 542**

1     Q     Did you attempt to wash the tank top?

2     A     No.

3     Q     Did you ever attempt to wash any items other than

4  the ice that you put in the sink?

5     A     No.

6     Q     Do you know how the tank top came to get any blood

7  on it?

8     A     I don't know.

9     Q     Do you know how your boxers came to get a spot of

10  blood on the band?

11    A     I don't know.

12    Q     Did you have any boots in your cell?

13    A     Yes.

14    Q     Do you remember where they were?

15    A     Yes.

16    Q     Where?

17    A     Underneath the foot of my bed.

18    Q     The foot on your bed toward the front of the cell or

19  away from the front of the cell?

20    A     The front of the cell.

21    Q     Do you know how blood could have gotten on your

22  boots?

23    A     No.

24    Q     After Corporal McGuinn left the tier, did you hear

25  any unusual noises?

**App. 543**

dmh                                                                    194

1        A     Water running, toilets flushing.

2        Q     You said water running and toilets flushing?

3        A     Yes.  Keys coming from the back wall.

4        Q     And by keys you mean devices to unlock the cell

5    door?

6        A     No -- yeah.  Keys, you know, from the correctional

7    officers.

8        Q     Were you able to detect any particular doors opening

9    or did you know whose doors were opening?

10       A     No.

11       Q     Did there come a time when the guards came up to the

12   tier to perform --

13       A     Yes.

14       Q     -- an investigation?  And do you recall how many

15   there were?

16       A     A lot.

17       Q     And when did they come up?

18       A     Really fast.

19       Q     And what did they do when they got there?

20       A     They started from 49 and they slid everybody

21   curtains.  Slid curtains, looking at everybody, flashlight on

22   them.  They did that to everybody until they got down there to

23   maybe the lower part of the thirties, right.  And then they

24   stopped.

25       Q     Well, did you hear or see or could you tell whether

1    any inmates were being taken off of the tier?

2         A    Yes.

3         Q    And how many?

4         A    At that time it was only one.

5         Q    And do you recall what cell that one person

6    occupied?

7         A    Yes.

8         Q    Which one?

9         A    32.

10        Q    How could you tell it was 32?

11        A    Correctional officer screaming out.

12        Q    What did he scream out?

13        A    Open 32.

14        Q    Did you recognize the voice that screamed out open

15   32?

16        A    Yes.

17        Q    Now, after taking 32 off the tier, was anyone else

18   taken off the tier that you recall?

19        A    Yes.

20        Q    Who was that?

21        A    44, I believe.

22        Q    Do you remember the name of the individual who

23   occupied 44?

24        A    Yes.

25        Q    Who was that?

**App. 545**

dmh

1    A    Cornelius Christie.

2    Q    And by the way, I do not think I asked you, do you

3    recall the name of the individual who occupied 32?

4    A    Yes.

5    Q    Who was that?

6    A    Lamar Harris.

7    Q    After the two were taken off the tier, did officers

8    come to your cell?

9    A    Yes.

10   Q    Who?

11   A    Lieutenant Mayfield.

12   Q    And what did he do when he got there?

13   A    Well, he kind of was like take that cover off your

14   light, right.

15   Q    He asked you?

16   A    He asked me to take the cover off my light.  I had a

17   dim light.  So I took the cover off and he was like -- he

18   looked at me and said, cuff up.

19   Q    Did he indicate to you why he was telling you to

20   cuff up?

21   A    No.

22   Q    Did he open the door to your cell before he asked

23   you to cuff up?

24   A    No.

25   Q    What he did do after you cuffed up?

**App. 546**

dmh

1      A    Well, took me out of the cell.  I got padded down

2  and then he walked me off the tier.

3      Q    And did he indicate to you why he was taking you

4  away and walking you off the tier?

5      A    No.

6      Q    I may have asked you this but let me ask you again.

7      A    Sure.

8      Q    Between the time earlier that evening when you were

9  locked into your cell and the point when Sargent Mayfield came

10  in and opened the door to your cell, was your cell door ever

11  opened?

12      A    No.

13      Q    After you were cuffed and the officers began to walk

14  you off the tier, what happened then?

15      A    I was taken in Center Hall.

16      Q    When you were taken to Center Hall, did you have any

17  interaction at that point with any officer?

18      A    Not at that point.

19      Q    Who is Officer Palmer?

20      A    I guess he was the guy that was in charge of Center

21  Hall.

22      Q    Did there come a time after you were taken to Center

23  Hall when you had an interaction with Officer Palmer?

24      A    Yes.

25      Q    What happened?

**App. 547**

1     A    Well, I was chained to the bench, had my feet

2  chained, had my arms chained and he came over there and said I

3  know what they found in your sink and then he put his arm

4  around my neck and tried to choke me.

5     Q    Did somebody stop him?

6     A    Yeah, there was about three more of them, they

7  grabbed him and then they grabbed me.

8     Q    How long did he have you choked?

9     A    Maybe a few seconds.

10     Q    Did you own one or more pairs of sweatshirts or

11  sweatpants?

12     A    Yes.

13     Q    Can you describe them for me?

14     A    Medium gray, dull gray, not dull but just a little

15  under medium gray.

16     Q    Were these DOC issued?

17     A    Yes.

18     Q    At any point that evening did you put any of the

19  sweats on?

20     A    Yes.

21     Q    At what point?

22     A    After Lieutenant Mayfield told me to cuff up.

23          MR. HUT:  The Court's indulgence.

24          BY MR. HUT:

25     Q    I am showing you what has been marked Defendant's C,

**App. 548**

dmh                                                                    199

1    Mr. Stephens.

2         A    Yes.

3         Q    Would you have a look at what I believe is the last

4    page of Defendant's C?

5         A    Yes, I recognize it.

6         Q    What is that a picture?

7         A    These are a picture of my cell, the foot where the

8    door is.

9         Q    And do you see a picture of items of clothing?

10        A    Yes.

11        Q    Well, actually, may be looking at the wrong page.

12   So, I would like you to look at the last page.  And let me ask

13   you again, can you tell or do you know what the last page of

14   Defendant's C is a picture of?

15        A    Yes, I do know.  It's a picture of my locker where I

16   use to store my clothes.

17        Q    And does that appear to be a picture of your sweats?

18        A    Yes.

19        Q    And when you say your locker, that was a locker that

20   was maintained by you in your cell, is that right?

21        A    Yes.

22        Q    Now, let's look at the first page.  I want to make

23   sure.

24             MR. HUT:  If I can approach the witness, Your Honor,

25   to make sure we are on the same page?

**App. 549**

1          THE COURT:  Of course.

2          BY MR. HUT:

3     Q    Do you know what that is a picture of?

4     A    Yes.

5     Q    What is it?

6     A    This is a picture of my cell, the front part where

7  the entryway is off to the left where the bump is on the wall.

8     Q    And do you see about two-thirds of the way across

9  the photograph there is a blue item?

10    A    Yes.

11    Q    Do you know what that blue item is?

12    A    Yes.

13    Q    And what is it?

14    A    Pants.

15    Q    Do you see directly to the right of the blue item,

16 somewhat underneath?

17    A    Yes.

18    Q    There appears to be another item of clothing that is

19 gray.  Do you see that?  You need to say yes.

20    A    Yes.

21    Q    Do you know what that is?

22    A    I do.

23    Q    What is it?

24    A    It's a pair of my sweatpants.

25    Q    In addition to the sweatpants that you put on after,

1  or at around the time that Lieutenant -- is it Lieutenant or

2  Sargent Mayfield?

3      A    At the time his name was -- I thought he was a

4  lieutenant.

5      Q    All right.  Lieutenant Mayfield told you to cuff up.

6      A    Yes.

7      Q    You put on a pair of sweatpants?

8      A    Yes.

9      Q    In addition to the sweatpants you put on your body,

10  were there still in your cell a sweatshirt and another

11  sweatshirt and a pair of sweatpants?

12      A    Yes.

13      Q    You testified that the occupant of cell 32,

14  Mr. Stephens, was a man named Lamar Harris.  Did you know him?

15      A    Yes.

16      Q    Can you describe your relationship with Lamar Harris

17  around July 25th, 2006?

18      A    There's no relationship.  I just know him from being

19  in two different jails with him.

20      Q    When you say two different jails, had he also

21  been -- had he occupied a cell near yours at the annex?

22      A    No.

23      Q    Well, before you got to the CUT and you occupied the

24  same tier, what other jail did you occupy along with Lamar

25  Harris?

1     A     Just the annex.

2     Q     Okay.  Was he a member of a gang to your knowledge?

3     A     To my knowledge, yes.

4     Q     What gang?

5     A     The Black Guerilla Family.

6     Q     And what is the basis for your saying that to your

7  knowledge he was a member of the Black Guerilla Family?

8     A     The gentlemen that he associated with that's who

9  they all were.

10    Q     Were you in a gang as of July 2006?

11    A     No.

12    Q     Were you in a gang at any time?

13    A     No.

14    Q     Did you know Jason Freed in July 2006?

15    A     Yes.

16    Q     When did you first meet him?

17    A     He slept on Tier E-4.

18    Q     What, if any, relationship did you have with Jason

19  Freed?

20    A     It was just business.

21    Q     By just business what do you mean?

22    A     Well, he wanted something that I had.

23    Q     And what was that?

24    A     Marijuana.

25    Q     Did you provide marijuana to him from time to time?

1      A    Yes.

2      Q    Did you know Officer Mayfield, Lieutenant Mayfield

3  in July 2006?

4      A    Yes.

5      Q    And can you describe your relationship with

6  Lieutenant Mayfield?

7      A    It's not good.

8      Q    If you had testified, chosen to testify at your

9  trial in this courtroom in January 2012 and had been asked the

10  questions I have asked you today, would you have given the

11  same answers?

12      A    Yes.

13      Q    Did you want to testify in your trial in January

14  2012?

15      A    Yes.

16      Q    Why did you not?

17      A    I was outnumbered.

18      Q    And by that what do you mean?

19      A    I was just outnumbered by my counsel.  They gave

20  some really great points.

21      Q    And when you say great points, do you remember what

22  they said?

23      A    Yes.

24      Q    What?

25      A    That if you testify, then the previous conviction

1    would be known so the jury would really, I don't know, really

2    look at you like, well, he's already a murderer and he's

3    locked up for murder anyway, right.

4        Q    And by the previous conviction do you mean the

5    felonious homicide conviction that you suffered in 1999 in

6    Wicomico County?

7        A    Yes.

8        Q    With respect to that Wicomico County conviction,

9    Mr. Stephens, what was the original sentence that you

10   received?

11       A    Life plus 15 years, first five years no parole.

12       Q    And was that the conviction for which you were

13   imprisoned at the time of Officer McGuinn's death in July

14   2006?

15       A    Yes.

16       Q    Was that conviction later vacated?

17       A    It was.

18       Q    And after the conviction was vacated, did you plead

19   guilty to the crime charged?

20       A    I did.

21       Q    And do you recall the sentence that you received

22   upon the plea?

23       A    Yes.

24       Q    And what was that?

25       A    All suspended, time served, one year of probation.

dmh

1    Q    When you pleaded guilty to the crime charged after

2    the vacator of the conviction, did you plead guilty because

3    you were guilty?

4    A    No.

5    Q    Why did you plead guilty?

6    A    I pleaded guilty because he offered time served.

7    Q    Did you discuss the matter of pleading guilty with

8    your counsel at the time?

9    A    I did.

10   Q    Who was that?

11   A    Mr. Hut.

12   Q    Would you have agreed to plead guilty had there been

13   a talk of or a proposal for a different and longer sentence?

14   A    No.

15   Q    Why not?

16   A    If he wasn't going to offer me time served, then I

17   would not have taken a plea.

18   Q    Did you have your own personal view of the strength

19   of the evidence in the Wicomico County case?

20   A    Yes.

21   Q    What was that?

22   A    Very weak.

23   Q    Why?

24   A    It's just really weak.  I still wonder sometimes how

25   I got convicted.

**App. 555**

dmh                                                                    206

1       Q     Do you recall an issue raised with respect to the

2   ballistic evidence in that trial?

3       A     Yes.

4       Q     Was that in part a basis for your assessment that

5   the case was weak?

6       A     A big portion of it, yes.

7       Q     Would you have testified in 2012 in this courtroom

8   if your sentence had already been vacated and you had only

9   been sentenced to time served?

10      A     Yes.

11      Q     At the time the plea deal was offered, the plea and

12  time served deal, was your appeal in this case still pending?

13      A     Yes.

14      Q     And after the conviction was vacated and during your

15  appeal, did your appellate lawyer or any other lawyer ever

16  bring up and discuss with you your right to testify in your

17  own defense?

18      A     Yes.

19      Q     What do you remember about that?

20      A     Just I had a right to testify in my own defense.

21  That's all I remember.

22      Q     But was that -- was there ever a discussion of that

23  issue being raised in your appeal that you recall?

24      A     I don't recall.

25            MR. HUT:   The Court's indulgence.

**App. 556**

1               THE COURT:  Okay.

2               MR. HUT:  That concludes my examination of

3    Mr. Stephens, Your Honor.

4               THE COURT:  All right.  Cross?

5               MR. RUSSELL:  Thank you, Your Honor.

6                         CROSS EXAMINATION

7               BY MR. RUSSELL:

8        Q    Good afternoon, Mr. Stephens.  How are you doing?

9        A    Good afternoon, Mr. Russell.

10       Q    Mr. Stephens, you have been -- you currently have

11   two convictions for murder, is that right?

12       A    Yes.

13       Q    Okay.  And you wanted to testify in this case, is

14   that right?

15       A    Yes.

16       Q    Okay.  And who did you tell I want to testify?

17       A    All three of my counsel.

18       Q    Okay.  And they said you are not allowed?

19       A    Not in those words.

20       Q    Well, what words did they use?

21       A    Well, it was just really pointing out factors.

22       Q    So they explained to you why it might be a bad idea?

23   Is that what they did?

24       A    Yes.

25       Q    Okay.  And then based on that, you said, I agree, I

**App. 557**

1   am not going to testify?  Is that how it happened?

2        A    Not like that.

3        Q    Not like that?

4        A    No.

5        Q    How did it happen?

6        A    Kind of prolonged a little bit.

7        Q    So it took a little longer but eventually you gave

8   in and said, "You guys are right, I'm not going to testify."

9   Is that what happened?

10       A    Eventually it just started to make sense, yes.

11       Q    Okay.  I just want to be clear on what you are

12  saying today.  You would have wanted to testify if your

13  Wicomico County case had been overturned?

14       A    Yes.

15       Q    If your Wicomico County case was not overturned,

16  then you would not have wanted to testify?  Is that right?

17       A    No.

18       Q    That is not right or that is right?

19       A    It's not right.

20       Q    That is not right.  So, you would have wanted to

21  testify even if your Wicomico case was not overturned?

22       A    Yes.

23       Q    Okay.  So did you tell your attorneys what you

24  wanted to testify to?

25       A    I don't recall.

dmh

1    Q    Okay.  So this first murder case that you have in

2  Wicomico County, you did not do it, right?

3    A    No.

4    Q    Okay.  But the police and the investigators they

5  said you did?

6    A    Yes.

7    Q    Okay.  So they set you up, right?

8    A    You said that.

9    Q    Okay, okay.  Why you?  Why did they set you up?

10        MR. HUT:  Objection.

11        THE COURT:  Overruled.

12        MR. HUT:  Calls for speculation.

13        THE COURT:  Overruled.

14        THE WITNESS:  I can't answer it.

15  BY MR. RUSSELL:

16    Q    What?

17    A    I don't know.

18    Q    You do not know?  Okay.  So out of 100 people that

19  were in the parking lot that night, they picked you?

20    A    Yes.

21    Q    It did not have anything to do with the fact that

22  there were shell casings on the ground that matched a gun they

23  got off of you later?

24    A    When was this?

25    Q    You do not think that this had anything to do with

dmh

1    it?

2         A    No, you said something about a gun that they got off

3    of me.   When was this?

4         Q    Well, let me ask you this.   This case also not you,

5    right?

6         A    No.

7         Q    Okay.   The investigators set you up again, right?

8         A    I don't know.

9         Q    You do not know?   You think they planted the

10   evidence in your cell?

11        A    I don't know.

12        Q    So you think it was the investigators that convinced

13   the guy in the cell next to you to say he heard your door open

14   and close?

15        A    I don't know.

16        Q    Do you think it was the investigators who put blood

17   on the door where it could not have gotten unless your door

18   was open?

19             MR. HUT:   Objection.   The blood was never tested.

20             MR. RUSSELL:   Alleged blood.

21             THE COURT:   Alleged blood.   Overruled.

22             THE WITNESS:   Can you repeat the question, please?

23             BY MR. RUSSELL:

24        Q    Do you think it was the investigators who put that

25   alleged blood on your door?

**App. 560**

dmh

1      A     Alleged blood?

2      Q     Yes.

3          MR. HUT: Objection. Now the question is in

4 compound.

5          THE WITNESS: I don't even know anything about this.

6          BY MR. RUSSELL:

7      Q     Okay.

8          THE COURT: Overruled.

9          THE WITNESS: Alleged blood.

10         BY MR. RUSSELL:

11     Q     It means the same investigators who forgot to test

12 some of the blood in your cell, right?

13     A     From what I read, yes.

14     Q     Okay. Now, what about the attack on the guard that

15 you had at North Branch, was that you?

16     A     Yes.

17     Q     That one was you?

18     A     Yes.

19     Q     That one was on video, right?

20     A     Yes.

21     Q     So that one got to be, yes. They did not set you up

22 for that one, is that right?

23     A     No.

24         MR. HUT: Objection. Argumentative.

25         MR. RUSSELL: I will withdraw it.

**App. 561**

dmh

1          THE COURT:  Sustained.  Sustained.

2          BY MR. RUSSELL:

3    Q    So you testified you were able to leave your cell

4  because you had an apparatus to jam up the cell door, right?

5    A    Yes.

6    Q    And you would tell the jury that?

7    A    Yes.

8    Q    And you would tell them that you could and sometimes

9  did leave your cell?

10    A    Yes.

11    Q    When the door was supposed to be locked?

12    A    Yes.

13    Q    You were here when Mr. Proctor talked about what the

14  Court described as mock trialing, right?  Like going over the

15  testimony with you beforehand?

16    A    Yes.

17    Q    Did you do that?

18    A    What?

19    Q    Have you do a mock trial type of thing?  Somebody

20  would ask you the questions and somebody else would cross-

21  examine you?

22    A    Today?

23    Q    No, I mean with Mr. Proctor.

24    A    No.

25    Q    No?  Have you done it sense then?

dmh                                                                    213

1           MR. HUT:  Objection.

2           THE COURT:  I am sorry, what was the question?

3           MR. RUSSELL:  Whether he has done any mock trialing

4   of this?

5           THE COURT:  Overruled.

6           THE WITNESS:  Yes.

7           BY MR. RUSSELL:

8       Q   Okay.  And it is your testimony you have never been

9   in a gang?

10      A   Yes.

11      Q   Okay.  And that is what you would tell the jury?

12      A   Absolutely.

13      Q   Okay.  So anybody who came in and testified

14  otherwise they would not be telling the truth, right?

15      A   They would not be telling the truth.

16      Q   Okay.  And you described Corporal McGuinn as a super

17  cop, right?  That is how he was described?

18      A   That's how he was described, yes.

19      Q   Right.   He was strict?

20      A   Yes.

21      Q   Okay.  Some people might just say he was good at his

22  job, right?

23      A   Yes.

24      Q   Okay.  And you testified you do not know how a

25  bloody t-shirt got under your mattress, right?

**App. 563**

1     A    I don't know.

2     Q    And you do not know how it got on your boots?

3     A    I don't know.

4     Q    You were just watching TV, right?

5     A    Yes.

6     Q    What were you watching?

7     A    I can't recall.

8     Q    Okay.  You had headphones on?

9     A    I just had them out.

10    Q    Had them out or had them on?

11    A    I had them out.

12    Q    Were you wearing headphones?

13    A    I was not wearing the headphones during the time of

14 the incident.

15    Q    Okay.  So you were not wearing headphones.  And you

16 said you saw feet go by, right?

17    A    Yes.

18    Q    Did you see blood come into your cell?

19    A    No.

20    Q    Okay.  Did you see blood hit your boots?

21    A    I don't know.

22    Q    Oh, okay.  You said at one point you could hear feet

23 squeaking, right?  It got quiet and you could hear feet

24 squeaking?

25    A    Yes.

**App. 564**

dmh

1    Q    Did they turn those fans off?

2    A    No.

3    Q    But now you could hear feet squeaking?

4    A    Yes.

5    Q    Okay.  So now it's loud or it is quiet now at this

6 point after the murder happened?

7    A    Still loud.

8    Q    It is still loud.  Okay.  Did you hear any

9 screaming?

10    A    I did not.

11    Q    And when the lieutenants came up, did you say to

12 them, "Hey, here's what I saw.  Here's what I heard?"

13    A    I did not.

14    Q    Okay.  But you did say you looked outside with a

15 mirror, right?

16    A    Yes.

17    Q    That was the normal thing that people would do,

18 right?  You have got a mirror, you hold them out and look?

19    A    No.  I don't know if that was the normal thing to

20 do.  I know what I did.

21    Q    Okay.  But you had a mirror to take a look outside,

22 right?

23    A    Yes.

24    Q    Okay.  Could you see anything?

25    A    I did.

dmh

1   Q    Okay.  How did the blood get on the toilet paper in

2   your room, in your cell?

3   A    What toilet paper?

4   Q    You got blood on the ice bag is what you said, is

5   that right?  There was blood on the ice bag?

6   A    Yes.

7   Q    The ice bag was outside your cell?

8   A    Yes.

9   Q    And your concern was you do not want to have blood

10  on your stuff because that might implicate you, right?

11  A    Yes.

12  Q    And so you brought it into your cell, the bloody

13  bag?  Is that what you did?

14  A    Yes.

15  Q    Okay.  Did you tell that to the folks from DOC?

16  A    No.

17  Q    Did you tell that to anybody from the Maryland State

18  Police?

19  A    No.

20  Q    And that ice bag, that put the blood on your boxers?

21  A    I don't know.

22  Q    Okay.  When Lieutenant Mayfield came to cuff you up,

23  did you tell him what you saw?

24  A    No.

25  Q    Did you send a letter to Mr. Freed during this

1   trial?

2       A    Yes.

3       Q    Okay.  Told him not to testify, right?

4       A    No.

5       Q    Well, what did your letter say?

6       A    You don't have a copy of it?

7       Q    Oh, I have a copy of it.  I am asking you what did

8   you write him a letter about?

9       A    Well, keep my name out of it.  I don't have anything

10  to do with it.

11      Q    Okay.  And you testified here you sold pot to

12  Mr. Freed, right?

13      A    Yes.

14      Q    Okay.  And you are okay with the jury hearing that

15  too, right?

16      A    Yes.

17      Q    Okay.

18           MR. RUSSELL:  I do not have anything further, Your

19  Honor.

20           THE COURT:  All right.  Any redirect?

21           MR. HUT:  The Court's indulgence.

22                     REDIRECT EXAMINATION

23           BY MR. HUT:

24      Q    Did you ever threaten Mr. Freed in a letter or

25  otherwise, Mr. Stephens?

1      A     I did use threatening language, yes.

2      Q     With respect to Mr. Russell's question whether you

3   thought people set you up in connection with the charge of the

4   murder of David McGuinn, do you know whether individuals set

5   you up or whether the conclusion that you were guilty was

6   simply the result of sloppiness?

7      A     The second.  I would say the sloppy.

8      Q     But you do not know one way or the other, do you?

9      A     No, not really.

10      Q     Mr. Russell made reference to the weapon that shot

11   380 bullets that was recovered in Wicomico County.  Was that

12   weapon ever found on your person?

13      A     No.

14      Q     Mr. Russell asked you whether you made statements to

15   various law enforcement individuals concerning matters about

16   which you testified this afternoon.  Did you ever give any

17   statement to any law enforcement officials at all?

18      A     No.

19      Q     With respect to your decision whether or not to

20   testify in this court, had you been able to tell the jury that

21   heard your case that your sentence for the crime was life

22   served, sorry, time served, as opposed to life without parole,

23   do you think that that would have made a difference to the

24   jury?

25           THE COURT:  Life plus 15.

**App. 568**

dmh

1        MR. HUT:  No, I am talking about -- yes, I am sorry,

2  Your Honor.  Your Honor is exactly right.

3        BY MR. HUT:

4      Q   Let me restate the question.

5      A   Okay.

6      Q   Because Judge Mulford has saved me from error.  Had

7  you been able to tell the jury that your sentence on the

8  Wicomico County homicide was time served rather than life plus

9  15, do you think that would have made a difference to the

10  jury?

11      A   I think it would have.

12      Q   And would that have affected your decision whether

13  to give testimony?

14      A   It would have.

15        MR. HUT:  The Court's indulgence.

16        BY MR. HUT:

17      Q   Mr. Russell asked you a question at the beginning of

18  his cross-examination about whether when you discussed whether

19  to testify or not with Mr. Proctor and Mr. Lawlor, you told

20  them what it was you wanted to testify to.  Do you recall that

21  question?

22      A   I recall it, yes.

23      Q   Well, apart from what you may have said when you

24  were discussing whether or not to testify, did you tell them

25  throughout their representation that you were innocent?

**App. 569**

dmh

1      A      Yes.

2      Q      Was there ever a time when you told them anything

3   except that you were innocent?

4      A      No.

5            MR. HUT:  I have no more questions of Mr. Stephens.

6            THE COURT:  Anything further?

7            MR. RUSSELL:  Nothing further.

8            THE COURT:  All right.  Mr. Stephens, you can step

9   down.

10           (Witness excused.)

11           THE COURT:  Who will be the next witness?

12           MS. GOSTIN:  I am sorry?

13           THE COURT:  Who will be next?

14           MS. GOSTIN:  The Petitioner calls Harry Trainor as

15  our next witness.

16           THE COURT:  All right.  Do you want a five minute

17  break before you call Mr. Trainor?

18           MS. GOSTIN:  That would be much appreciated.  Thank

19  you.

20           THE COURT:  Sure.  All right.  We will take five

21  minutes and then Mr. Trainor can testify.

22           THE CLERK:  All rise.

23           (Whereupon, at 3:21 p.m., a recess was taken and at

24  3:33 p.m., the proceeding was recalled.

25           THE CLERK:  All rise.

**App. 570**

dmh                                                                                     221

1          THE COURT:  Please be seated.  Please recall the

2     case, Mr. Russell.

3          MR. RUSSELL:  Thank you, Your Honor.  It is State v.

4     Lee Stephens, case No. 02-K-08-646.  David Russell,

5     R-u-s-s-e-l-l, on behalf of the State.

6          MR. HUT:  Stephen Hut, H-u-t, for Petitioner,

7     Mr. Stephens.

8          THE COURT:  Thank you.

9          MS. GOSTIN:  Isley Gostin, I-s-l-e-y, G-o-s-t-i-n,

10    for the Petitioner.

11         THE COURT:  Thank you.

12         MR. EAGLES:  Thad Eagles, T-h-a-d, E-a-g-l-e-s, for

13    the Petitioner.

14         THE COURT:  All right.  You can swear Mr. Trainor.

15         THE CLERK:  Please raise your right hand.

16    Whereupon,

17                         HARRY TRAINOR

18    was called as a witness by the Defendant, having been first

19    duly sworn, was examined and testified as follows:

20         THE CLERK:  You may be seated.  And would you please

21    state your full name, your occupation and spell both first and

22    last?

23         THE WITNESS:  My name is Harry Trainor.  I am an

24    attorney.  My name is spelled H-a-r-r-y, T-r-a-i-n-o-r.

25         THE CLERK:  Thank you.

**App. 571**

dmh

*VOIR DIRE*

BY MS. GOSTIN:

Q   Mr. Trainor, where are you currently employed?

A   I'm an attorney in private practice with an office here in Annapolis.

Q   And how long have you been practicing law?

A   38 years.

Q   And what is your educational background?

A   I have a Bachelor's Degree from the University of Maryland and a Juris Doctor from The Catholic University Law School in Washington, D.C.

Q   And are you a member of the Maryland Bar?

A   I am.

Q   And when were you admitted to the Maryland Bar?

A   1979.

Q   In what area of law do you practice?

A   Exclusively in criminal defense, Federal and State.

Q   Have you been involved in any capital cases?

A   Yes.

Q   And approximately how many?

A   Capital cases, well, I can't give you an exact number because I'm not counting anymore but I've pretty much always had murder cases since I started out and I have been involved I think with more than 20 State cases in Maryland and by now I think pretty close to that number of death eligible

1    cases in Federal Court.

2              Have been to trial in State capital cases six or

3    seven times.  And in Federal cases in Federal capital cases I

4    think we've probably completed four or five trials.

5        Q    And you may have covered this in your last answer,

6    but have you been involved in other non-capital murder cases?

7        A    Oh, yes.

8        Q    And can you give an approximate number?

9        A    I would say about 100.

10       Q    So I have just handed you what has been as Defense

11   Exhibit X.  Can you identify what that document is?

12       A    That's a CV that is probably fairly recent within

13   the last year.

14       Q    And does that reflect your education, training and

15   experience in the field of criminal defense?

16       A    Yes.

17            MS. GOSTIN:  Petitioner offers Exhibit X.

18            THE COURT:  Any objection to Exhibit X?

19            MR. RUSSELL:  No objection.

20            THE COURT:  It will be admitted.

21                                (The document referred to was

22                                 marked for identification as

23                                 Defendant's Exhibit X and was

24                                 received in evidence.)

25            BY MS. GOSTIN:

dmh                                                                    224

1      Q    Have you received any awards or recognition for your

2  work as a criminal defense attorney?

3      A    Well, I got the John Adams Award from the Criminal

4  Justice Act Panel in 1999 after the Anthony Jones which I

5  think was the first modern era Federal death penalty case in

6  Maryland.

7      Q    And turning to the bottom of Exhibit X, does that

8  accurately reflect recognitions that you have received for

9  your work in the area of criminal defense?

10     A    Yes, it does.

11     Q    Have you testified before as an expert witness in

12  the area of criminal defense?

13     A    I have.

14     Q    And have you testified before in Maryland.

15     A    Oh, yes.

16          THE COURT:  Were you an expert or was it a post-

17  conviction last time you testified in front of me?

18          THE WITNESS:  I have testified as an expert in this

19  courtroom and I'm trying to remember whether it was before

20  you.

21          THE COURT:  I cannot remember if you were an expert

22  or you and Carroll McCabe had something.

23          THE WITNESS:  You know, that was --

24          THE COURT:  I think you just testified as an expert

25  then.  No, I think you testified --

**App. 574**

1          THE WITNESS:  Kenneth Aband*.

2          THE COURT:  Aband, that is right.  I think you

3    testified as a witness.

4          THE WITNESS:  I was a witness in that case.

5          THE COURT:  Sorry.

6          THE WITNESS:  But in this courthouse I have

7    testified in Jeff O'Toole's case before Judge North as an

8    expert.

9          THE COURT:  I think it was just a witness in front

10   of me not an as expert.  I think you were a fact witness in

11   that case because you were the defense attorney>

12         THE WITNESS:  I was.

13         THE COURT:  Okay.  I could not remember.

14         BY MS. GOSTIN:

15    Q    And have you testified as an expert witness before

16   in post-conviction proceedings?

17    A    Yes.

18    Q    And just in general terms, what was the subject of

19   the expert testimony you provided?

20    A    Well, I've testified as to the standard of care for

21   criminal defense attorneys generally in criminal trials and

22   I've also done the same in capital cases.  I believe that was

23   in Prince George's County some time back.

24         MS. GOSTIN:  Petitioner offers Mr. Harry Trainor as

25   an expert in the field of criminal defense.

dmh

226

1        MR. RUSSELL:  May I *voir dire* very briefly, Your

2   Honor?

3        THE COURT:  Sure.

4        MR. RUSSELL:  Okay.

5        BY MR. RUSSELL:

6    Q    Mr. Trainor, according to your report, I do not know

7   if we have it in yet, but your basis for your testimony is

8   going to involve the American Bar Association Guidelines for

9   the appointment and performance of defense counsel in death

10  penalty cases, is that right?

11   A    That's not the basis but that is one of the sources

12  of information.

13   Q    Okay.  And also one of the sources will be the

14  American Bar Association Standards for the defense function,

15  is that right?

16   A    Well, the ABA Guidelines for the appointment and

17  performance of defense counsel in death penalty cases and I've

18  also mentioned the ABA Standards for Criminal Justice 4th

19  Edition from 2015.

20   Q    Okay.  And those are readily available, is that

21  right?

22   A    They are available.

23   Q    Okay.

24        MR. RUSSELL:  Your Honor, my only objection is under

25  5-702, and it is completely up to the Court.  If the Court

**App. 576**

dmh
227

1   determines this will assist the trier of fact, which is Your

2   Honor, to understand the evidence and to determine the fact in

3   issue, my only question does the Court need an expert in this

4   area and I would just suggest I do not think the Court does.

5   THE COURT:  Well, here is why I am going to allow

6   him.  I was supposed to handle two death cases as a prosecutor

7   but I get elected and went into county council and left the

8   State's Attorney's Office and became a private attorney.

9   And then I was supposed to get a death case from OPD

10  but I was just in their regular capital cases and I had done a

11  couple and then I got appointed to the Bench.  So I never did

12  one as a prosecutor or defense attorney and I had applied to

13  get them.  I had talked to them at the PD's but it never came

14  to anything because there were not any right at that time.

15  I do not even remember who I talked to.  Keith Gross

16  was the PD at the time or Alan Friedman.  I said something to

17  one of them.

18  And then as a judge, I took the death class and I

19  got certified as a death judge but I never had any death

20  cases.  So is the first one.  I do not think Abend was --

21  maybe it is the second one.  I think in Abend they filed for

22  death.

23  THE WITNESS:  Yes, Abend was at least at one point a

24  death case.

25  THE COURT:  Sorry, I am off talking to him -- it was

dmh

1   a death case but it did not -- it was like this.  It was a

2   death case but it became life without parole after a trial I

3   think.

4           THE WITNESS:  That is right.

5           THE COURT:  Yes.

6           THE WITNESS:  He is doing life without parole.

7           THE COURT:  So I have never actually had one.

8           MR. RUSSELL:  Actually, you and I have had a death

9   penalty post-conviction before.

10          THE COURT:  We did.  Who?

11          MR. RUSSELL:  But it was a plea -- I do not remember

12  the name.  I have actually been trying to think of it.

13          THE COURT:  So I think I would be happy to listen to

14  Mr. Trainor.

15          MR. RUSSELL:  That is fine, Your Honor.  That is

16  fine.

17          THE COURT:  I have no problem accepting him and I

18  think he can give me insight into how to view it from the

19  defense view and how and why so.

20          MR. RUSSELL:  Thank you, Your Honor.

21          THE COURT:  So if that shows my bias that I was

22  willing to prosecute, defend and judge the cases, I guess --

23          THE WITNESS:  It sounds pretty balanced.

24          THE COURT:  I try to be.

25          THE WITNESS:  Fear and balance.

**App. 578**

1          THE COURT:   I get accused of a lot of things but I

2    do try and be balanced.   So go ahead.

3          MS. GOSTIN:   Thank you, Your Honor.

4                    DIRECT EXAMINATION

5          BY MS. GOSTIN:

6          Q    Mr. Trainor, excuse me, were you retained by

7    Petitioner's counsel in this post-conviction proceeding?

8          A    Yes, the Office of the Public Defender.

9          Q    And what were you asked to do?

10         A    I was asked to review certain aspects of the case,

11   the transcript and materials and to sit the hearing and to

12   render an opinion on the standard of care for defense counsels

13   in a capital case, in this capital case.

14         Q    And did you provide an expert report in connection

15   with your work on this matter?

16         A    I did.

17         Q    I am showing you Defense Exhibit Y.

18         A    Thank you.

19         Q    And is that the expert report you prepared in this

20   matter?

21         A    That appears to be a copy of the expert disclosure

22   that I submitted in this case.

23         Q    And can you please turn to pages 2 to 3, paragraph

24   5.

25         A    Paragraph 5.

1     Q     And does that accurately list the materials you

2     reviewed in connection with your assignment?

3     A     Yes.

4     Q     And did you subsequent to drafting this report, did

5     you also sit through the testimony at this hearing?

6     A     I did.

7           MS. GOSTIN:  Petitioner offers Exhibit Y.

8           MR. RUSSELL:  No objection.

9           THE COURT:  All right.  It will be admitted.

10                                  (The document referred to was

11                                   marked for identification as

12                                   Defendant's Exhibit Y and was

13                                   received in evidence.)

14          BY MS. GOSTIN:

15    Q     Mr. Trainor, are you familiar with the professional

16    standards of care applicable to defense lawyers in Maryland

17    defending murder charges?

18    A     Yes, I think I am.

19    Q     And what is the basis of your understanding of those

20    standards?

21    A     The basis of my understanding is that there are

22    well-defined norms in the ABA Guidelines for the appointment

23    and performance of defense counsel in death penalty cases that

24    have been accepted and recognized by the Supreme Court as

25    guides to what is reasonable.

**App. 580**

1          And also recognized, I think importantly, in the

2   Maryland Commission on Capital Punishment's Final Report to

3   the General Assembly in 2008, the guidelines were -- I'm

4   quoting from that, "Effective representation in a capital case

5   will be measured according to the ABA's guidelines for the

6   appointment and performance of defense counsel in death

7   penalty cases."

8          So that was recognized by the Commission that was

9   composed of defense attorneys, prosecutors, retired Court of

10  Appeals Judge, members of the legislature, both the House of

11  Delegates and the Senate as well as members of the community.

12       Q    So is your understanding of the standards applicable

13  to criminal defense attorneys based only on reading the

14  various standards of the ABA or is it also informed by

15  experience?

16       A    It's informed by experience.  My understanding is

17  the ABA Guidelines represent the minimum standard of care for

18  death penalty litigation.

19       Q    Are you familiar with the American Bar Association

20  Standards for the Defense Function?

21       A    Yes, I am, generally.

22       Q    And are they well recognized in the field of

23  criminal defense as guides for the standards applicable for

24  that work?

25       A    Yes, they are.

1      Q      I am showing you Defense Exhibit Z.

2             THE COURT:   Z?

3             MS. GOSTIN:   Z, yes.

4             BY MS. GOSTIN:

5      Q      And can you identify what the document I just handed

6   you is?

7      A      This appears to be the ABA Standards for Criminal

8   Justice, 3rd Edition.  I think there is a 4th Edition which is

9   2015 which is what I have in front of me.  This is the -- Z is

10  actually the copyright 1993 case.

11            I will say the 4th Edition is available easily on

12  the Internet through the American Bar Association website.

13                                  (The document referred to was

14                                   marked for identification as

15                                   Defendant's Exhibit Z.)

16     Q      And do you know when the 4th Edition came out?

17     A      It was 2015.  I mean that's what I was looking at

18  1993 would have covered the time of the trial which -- I don't

19  think there is a huge difference but I reviewed the more

20  current one.  But Z is a copy of the 3rd Edition.

21     Q      And what is your basis of your understanding of the

22  standards applicable in capital cases?

23     A      What is the basis of my understanding?  I'm not sure

24  I understand the question.

25     Q      Sure.  I think you referred to guides that deal with

dmh

1    the minimum standards.

2         A    Yes.

3         Q    I think my original question was for murder cases

4    generally so now I was asking you the same question with

5    regard capital cases.

6         A    Well, I mean the standards for capital cases are

7    different because the Supreme Court has recognized that in

8    capital cases, you know, the maxim death is different.  There

9    is a heightened standard of liability in the fact finding

10   process.  More is expected of counsel in a capital case.

11            THE COURT:  You said it is on the website?

12            THE WITNESS:  I am sorry, Your Honor?

13            THE COURT:  You just told me to look at the website.

14   I have 2003, 1989.

15            THE WITNESS:  I've got a copy here I can hand up I

16   think what I was referring to.  I have it marked, however.

17            THE COURT:  All right.  Go ahead.  What is Z?  Z is

18   what year?

19            MS. GOSTIN:  1993, Your Honor.

20            THE COURT:  1993?

21            MS. GOSTIN:  Yes.

22            THE COURT:  Okay.  All right.  Go ahead.

23            BY MS. GOSTIN:

24        Q    And I handed you what has been --

25            THE COURT:  I thought there was a supplemental that

**App. 583**

1   came along in 2008?  That is mitigation.  Okay.  All right.

2          BY MS. GOSTIN:

3      Q    I have handed you what has been marked as Defense

4   Exhibit AA.  Can you identify what that is?

5      A    All right.  I've just sort of buried it.  This is

6   the February 2003 revised edition of the American Bar

7   Association Guidelines for the Appointment and Performed of

8   Defense Counsel in Death Penalty Cases.

9                              (The document referred to was

10                              marked for identification as

11                              Defendant's Exhibit AA.)

12     Q    And is that the most recent edition?

13     A    That is.

14     Q    And can you explain in general terms what that

15   document is?

16     A    Well, it is a series of guidelines with commentary,

17   authoritative commentary that constitute what the Supreme

18   Court has recognized as the well-defined norms and guides to

19   what is reasonable in the representation of defendants in

20   death penalty cases.

21          And I think it really sets a national standard of

22   care for the defense effort in death penalty cases.

23          MS. GOSTIN:  Petitioner offers Exhibit Z and AA.

24          THE COURT:  I think I already said I would accept Z.

25   AA will be admitted.

dmh

235

1        MS. GOSTIN:   AA will be admitted.

2                                    (The documents marked for

3                                    identification as Defendant's

4                                    Exhibit ZZ and A were received

5                                    in evidence.)

6        BY MS. GOSTIN:

7        Q    And are the ABA Guidelines that are Exhibit AA are

8    those well recognized in the field of criminal defense?

9        A    Yes.

10       Q    Do the professional standards of care that apply to

11   defense counsel depend at all upon the resources that are

12   available to counsel?

13       A    Well, no.   The guidelines recommend that adequate

14   resources be provided but the performance of defense counsel

15   is not in any way tied to what resources are available.

16       Q    So the standard of care is not lower if the

17   defendant is represented by a public defender as opposed to

18   paid counsel?

19       A    No, the duties of the attorneys would be exactly the

20   same regardless of resources.

21       Q    And I think I asked you this before but you observed

22   the testimony of the witnesses in this post-conviction

23   proceeding, is that right?

24       A    I did.

25       Q    And do you have an opinion as to whether defense

**App. 585**

dmh

1   counsel's performance in the underlying case met the

2   prevailing standard of care for an effective criminal defense

3   attorney in a first degree murder case?

4       A    Well, I have an opinion, yes.

5       Q    And what is that opinion?

6       A    Well, the opinion is that in some areas the

7   performance was deficient.

8       Q    And can you identify those areas?

9       A    Let me see if I can focus on all of it.  Well, first

10  of all, I mean what struck me really first and foremost,

11  perhaps, is in the prior conviction down in Wicomico County,

12  counsel was employed, retained in 2006 shortly after the

13  incident occurred and didn't pursue the post-conviction in

14  that case promptly but did file it in 2009, a post-conviction

15  petition.  And then did not pursue it really at all until

16  after the conviction in the case in this courthouse.

17          That I think was a deficient performance in that,

18  well, one, it was continued I think 13 times I heard and no

19  strategic reason was given for that.

20          You know, in the Standards for Criminal Justice --

21  let me if I can -- strike that.  It's under the ABA Guidelines

22  10.7 I think it is.  Let me see if I can turn to that.  The

23  Court's indulgence, please.

24          The commentary after 10.7 which is the investigation

25  function and requires counsel to make thorough investigation

dmh

1    indicates, and I read, "Counsel must always investigate prior

2    convictions, adjudications or adjudicated offenses that could

3    be used as aggravating circumstances or otherwise come into

4    evidence.

5         If a prior conviction is legally flawed, counsel

6    should seek to have it set aside.  Counsel may also find

7    extenuating circumstances that can be offered to lessen the

8    weight of a conviction, adjudication or unadjudicated

9    offense."

10        So we take a look at the conviction in Wicomico

11   County for which Mr. Stephens was doing a sentence of life

12   plus 15 years I believe at the time of the alleged offense

13   conduct in this case.

14        We see that counsel was appointed in this case that

15   the issue with witness, Joseph Kopera, was at least very clear

16   in 2007 when he committed suicide and I believe the Office of

17   the Public Defender instituted a system-wide investigation of

18   prior convictions in which Mr. Kopera had been involved.

19        So that was sort of out there as a flaw, a flag.

20   They did file the post-conviction years before the trial in

21   this case but never followed through on it.  And that is a

22   deficiency that can have a major impact on the case.

23   Q    Is the only purpose of seeking to vacate or review

24   prior convictions with respect to if they can be used as

25   aggregating factors in sentencing or are there other reasons

**App. 587**

dmh

1   that one might seek to review prior convictions?

2       A    Well, you have to look at whatever the Government or

3   the State could use against your client's sentencing.   What's

4   most dangerous about a case in which a defendant has allegedly

5   killed someone while he is serving a life sentence is that

6   there is that argument, you know, you must give him an

7   aggravated sentence either death or life without parole or

8   this is just a free homicide.   You know, that is a sentencing

9   argument.

10      So, it is significant in a lot of ways but that's

11  one major way that it's significant other than the aggravating

12  nature of the prior conviction and sentence.

13      Q    And could it also be relevant for the guilt phase

14  other than sentencing?

15      A    Yes, I mean it can be relevant for that phase.   You

16  know, I listened to the testimony regarding trying to keep it

17  out and, obviously, nobody wants their jury to know, you know,

18  that their client has been convicted of murder.

19      But there is -- in a case like this unless your

20  client is acquitted in the first phase which is statistically

21  improbable, it doesn't happen that often in one of these

22  cases, you are going to have to deal with this.

23      And it's a good idea to get it out but what I get

24  concerned about is, you know, I've heard this testimony

25  regarding the impact that the Wicomico County case had on the

1   Defendant's decision to testify or not to testify in his trial

2   and to the extent that the prior conviction and the failure to

3   deal with it earlier impaired his decision, you know, his

4   right to --

5           MR. RUSSELL:  I am going to object, Your Honor.  I

6   apologize to cut you off, Mr. Trainor, but my recollection of

7   the testimony of Mr. Stephens was he wanted to testify

8   regardless of whether or not that had been thrown out.

9           THE COURT:  You can cross-examine him on that.

10          THE WITNESS:  My understanding of the testimony is

11  that he wanted to testify initially, his attorneys reasoned

12  with him and convinced him not to testify because of the prior

13  conviction.

14          That he still wanted to later on and that he would

15  have been more likely to exercise his right to testify had the

16  Wicomico County conviction been dealt with.

17          And to the extent that the error of counsel,

18  counsel's deficiency in just delaying that proceeding impaired

19  his decision to testify or not to testify.  That is a

20  fundamental right that is based in the 5th and 14th Amendment

21  to the Constitution, his right to a fair trial, his right to

22  present a defense.

23          And the Supreme Court has recognized that these

24  fundamental rights are, you know, sufficiently really to, you

25  know, if they're violated, it's sufficient right there I think

dmh

1   to require a reversal.

2           Now, I don't know if it went that far but it

3   certainly impaired a fundamental right in my opinion.

4       Q    Mr. Trainor, have you ever been involved in a case

5   in which you or co-counsel took to seeking to vacate a prior

6   conviction of your client?

7       A    Yes.

8       Q    And can you given an example of one of those cases?

9       A    Well, what comes to mind is this is a case that was

10  finally decided in 2015 but I had been involved in a Federal

11  case in the Northern District of West Virginia where a Federal

12  prison sits, U.S.P. Hazelton and my client was charged with a

13  homicide in U.S.P. Hazelton and my client was serving two life

14  sentences out of D.C. Superior Court.

15          And those were going to be aggravating circumstances

16  and circumstances we were going to have to defend against in

17  trying to save his life.

18          There were also barriers to find any negotiation

19  with the Government for a lesser sentence or a disposition

20  other than death.

21          What we did in that case is we went to the Federal

22  judge and asked for resources to hire counsel in the District

23  of Columbia to represent our client in post-conviction

24  proceedings and we were turned down.  They denied us

25  resources.

**App. 590**

1            So I wrote to the judge in D.C. Superior Court who

2     oversaw the two convictions and asked her if she would appoint

3     counsel so that these convictions could be challenged in a

4     post-conviction proceeding.

5            And one of the judges in -- one of the Superior

6     Court judges helped us to get pro bono counsel.  We had a

7     major law firm Skadden Arps who filed the post-conviction

8     proceedings that allowed us to actually bring the Government

9     into the negotiating table and negotiate after eight years

10    away from the death penalty to a disposition that just added

11    another life sentence to our client's case.

12           So, it's something -- there is a way to do it.  You

13    don't -- I mean we didn't undertake to do the post-convictions

14    ourselves because it's really too much for defense counsel to

15    do to be involved in those two proceedings at one time.

16           The guidelines and the standards require that we

17    regulate our practice when we have one of these cases so that

18    we don't get overloaded and we don't get to the point -- I

19    mean the language in the commentary is you don't let yourself

20    get to the point where you have to muddle through.

21           THE COURT:  So why would the PD allow it?

22           THE WITNESS:  Why did they allow it?

23           THE COURT:  Why did the PD in this case allow it?

24           THE WITNESS:  I don't know why.

25           THE COURT:  You see that is why --

dmh

1          THE WITNESS:  I haven't been told that.

2          THE COURT:  I am always uncomfortable with that and

3   I expressed it before to Mr. Hut.

4          THE WITNESS:  Right.

5          THE COURT:  And I hear exactly what you are saying.

6   I know exactly what you are saying and I know exactly why you

7   are saying it.  But it raises the issue of why would they

8   allow it?

9          THE WITNESS:  Yeah.  I can tell the Court --

10         THE COURT:  And maybe that is not the issue for

11  today.

12         THE WITNESS:  I can tell the Court what I would have

13  done.  I would have asked that outside counsel be appointed --

14         THE COURT:  Right.

15         THE WITNESS:  -- for purposes of the post-

16  conviction.  Somebody independent of, you know, so you

17  wouldn't have to worry about any conflict in the Public

18  Defender's Office.

19         I know from dealing with the Office of Public

20  Defender at some level.  I've done some cases with Steve

21  Mercer up there that there are -- I don't know whether it's

22  Steve or other people -- Steve Mercer or other people within

23  the Public Defender's Office who have big law firms that help

24  them.

25         Recently I did a case in Montgomery County in which

dmh

1    I did essentially the post-conviction work on it but Williams

2    & Connelly came in afterward pro bono and did the trial.

3    You've got to go for resources like that and I didn't hear

4    that anything like that was done in this case.  I think it

5    should have been done.

6             THE COURT:  Let's move on.  We have only got another

7    20 minutes for this afternoon and if Mr. Todd is going to be

8    here tomorrow, I am going to have him testify out of order

9    because Mr. Trainor is in Annapolis, Mr. Ash is in Annapolis.

10   Who else did you say?

11            MR. HUT:  That is it, just Todd.

12            THE COURT:  Okay.  And Howle is in Annapolis so.

13            MR. HUT:  And I do not think she is going to be

14   called.

15            THE COURT:  Okay.  All right.  All right.  So go

16   ahead another 20 minutes.  So let's see where we go.

17            MS. GOSTIN:  Sure.  Thank you, Your Honor.

18            BY MS. GOSTIN:

19       Q    Switching gears, did you hear the testimony today of

20   Mr. Proctor that he never interviewed Dr. Vicenti, the medical

21   examiner?

22       A    Yes.

23       Q    And yesterday did you hear Mr. Lawlor also testify

24   that he did not reach out to interview the medical examiner?

25       A    Yes, I mean that is clearly a deficiency in my view.

1   I think that's under 10.7 of the ABA Guidelines.  I can say

2   with certainty that I don't think I've ever taken a homicide

3   case to trial without interviewing the medical examiner at the

4   Office of the Chief Medical Examiner.

5           Mr. Proctor, I believe, testified today that he

6   erroneously assumed the medical examiner is off limits.  I

7   don't think any reasonable lawyer would conclude that.  My

8   experience is that we can.

9           You know, I make an appointment to see the medical

10  examiner.  I am greeted with courtesy, treated well and get

11  cooperation.  In fact, I've always thought that they're

12  thankful to have some human company, some live human company

13  there.

14          Really, you know, we get a tour of the place and I

15  haven't found any medical examiner that holds back.  I think

16  they have been very cooperative.  So you learn something every

17  time.

18          So the failure to interview and contact the medical

19  examiner who would be testifying is clearly deficient under

20  the ABA Guidelines.

21      Q   And did you hear yesterday the testimony of

22  Mr. Lawlor that he never considered whether to seek an

23  instruction on the meaning on causation and never considered

24  arguing that issue to the jury?

25      A   I heard that.  I heard that and that too -- I mean

**App. 594**

1    that can be a deficiency under 10.8, the duty to assert all

2    legal claims.  If the instruction is a correct statement of

3    the law and is generated by the evidence and not otherwise

4    covered by other instructions, it would be error not to seek

5    it in writing, get a ruling on it at a minimum and if it is

6    denied, to preserve the issue.

7        Q    Mr. Trainor, did you ask counsel for Mr. Stephens in

8    this proceeding to draft for your review a form of jury

9    instruction on causation that might have been requested in the

10   case to have the jury focus on the issue?

11       A    I suggested that that would be a good idea.

12       Q    And did counsel do so?

13       A    Yes.

14            THE COURT:  Can I see that before you scan it?  Oh,

15   you have not scanned it?

16            THE CLERK:  No.

17            THE COURT:  All right.  Go ahead.

18            MS. GOSTIN:  I have another copy.

19            THE COURT:  If you have another copy, I would like

20   to see it.

21            MS. GOSTIN:  Sure.

22            BY MS. GOSTIN:

23       Q    I am showing you what has been marked as Defense

24   Exhibit BB.  Is this the instruction on causation that you

25   just described that was prepared on your advice?

**App. 595**

dmh
246

1       A    This is the instruction you prepared, yes, your

2   proposed instruction.

3            MS. GOSTIN:   Petitioner offers Exhibit BB.

4            MR. RUSSELL:   No objection.

5            THE COURT:   All right.   It will be admitted.

6                              (The document referred to was

7                              marked for identification as

8                              Defendant's Exhibit BB and was

9                              received in evidence.)

10           BY MS. GOSTIN:

11      Q    Do you have an opinion whether defense counsel's

12  performance was deficient for failure to seeking -- excuse me,

13  for failure to seek an instruction similar in substance to the

14  one in Exhibit BB?

15      A    Well, I think it was deficient in that I didn't hear

16  any tactical reason for not seeking the instruction.   That it

17  appears to be an accurate statement of the law, you know, that

18  is well researched and it is an instruction that would be

19  helpful to the defense in a capital case.

20      Q    From your experience in death penalty cases, do you

21  have an opinion as to whether counsel would have obtained such

22  an instruction had it been requested?

23      A    Whether it would -- well, that's up the judge.   I

24  think the deficiency is in not asking for it and as I said, if

25  it is found to be an accurate statement of the law that's

**App. 596**

dmh

1    generated by the facts and not covered, you have a strong

2    argument for getting it before the jury.

3            I think it was particularly important in a case like

4    this where aiding and abetting was not out there.  The jury

5    would have to discern at some point whether the client was a

6    principal in the first degree or not and you've raised all

7    these arguments that I've witnessed in the last couple of days

8    about whether or not the blow allegedly struck by Mr. Stephens

9    was a fatal blow.

10           And if you're going to present a theory like that,

11   it has to be supported by an instruction.

12   Q     And do you have an opinion whether defense counsel

13   failed to meet the minimum standards by failing to argue to

14   the jury the absence of any evidence that Mr. Stephens caused

15   the death of the victim?

16   A     If that is the case, then it was deficient

17   performance.  The performance was deficient.

18   Q     And would such an argument have been consistent with

19   defense counsel's theory at trial?

20   A     Well, it wouldn't have been inconsistent.  It would

21   be an alternative argument that could be made.

22   Q     We spoke a few questions ago about Dr. Vicenti, the

23   medical examiner.  Do you have an opinion as to whether

24   defense counsel should have asked Dr. Vicenti or their own

25   medical expert which of the wounds suffered by the victim were

dmh

1    independently sufficient to have caused death?

2        A    Well, counsel did not do that and I suspect that

3    part of that was due -- I mean part of that failure to do that

4    was based on the failure to interview her in the first place

5    which I think is the root cause of the deficiency there and we

6    saw the testimony of Dr. Vicenti and if she would have been

7    candid with defense counsel during an interview, as I expect

8    she would, it would have formed a basis for him to ask that

9    question, yes.

10       Q    And do you have an opinion as to whether had defense

11   counsel learned that only stab wounds (a) and (e) were

12   independently sufficient to have caused the death of Corporal

13   McGuinn, counsel should have elicited that either through

14   Dr. Vicenti or their own expert at trial?

15       A    Well, if Dr. Vicenti was prepared to testify to that

16   at the trial and through counsel's negligence it was not

17   brought out, certainly, that is a deficiency.

18       Q    And did you also hear the testimony of Dr. Vicenti

19   and Dr. Spitz that the use of only a single -- excuse me, that

20   the use of a single weapon could not have been ruled out?

21       A    I heard that.

22       Q    And do you have an opinion as to whether defense

23   counsel should have elicited that at trial?

24       A    I thought I heard that there was a ruling at trial

25   that she could not testify to that.  If that's the case, I

**App. 598**

dmh

1    don't know but that's what I heard.

2         MS. GOSTIN:  So I am planning to move on to another

3    issue.  I do not know -- are you fine with my continuing the

4    questioning?

5         THE COURT:  Which issue?

6         MS. GOSTIN:  The issue of the cross-examination of

7    Mr. Freed.

8         THE COURT:  That is going to take some time I would

9    suspect.  How much time do you reasonably anticipate asking --

10   reasonably anticipate Mr. Trainor is going to testify?

11        MS. GOSTIN:  Probably just 15 more minutes.

12        THE COURT:  Assuming I do not interrupt.

13        MS. GOSTIN:  15 or 20 minutes.

14        THE COURT:  Okay.  I would rather you present it all

15   coherently as opposed to chop it up.  It is easier for me to

16   track it.  Okay?  So let's do that tomorrow because we have

17   gone pretty solid today and yesterday.

18        Do you think we will finish tomorrow with the

19   evidentiary portion by noon?

20        MR. RUSSELL:  I think evidentiary, yes.  I think we

21   will make it.

22        MR. HUT:  I think we have a fighting chance.  I do

23   not know about noon but I certainly think if it is possible to

24   push back the lunch hour by a half hour or 40 minutes, I

25   suspect that we can.

**App. 599**

1       THE COURT:  No, because do you see all these nice

2   binders over there?

3       MR. HUT:  That is your Socks*.

4       THE COURT:  That is my Socks case.  So, trust me, I

5   would jump right out of the frying pan into the fire.

6       MR. HUT:  Well, I think with best efforts, and I

7   know Mr. Russell will give those as will we, I think we can

8   finish.

9       THE COURT:  I am not restricting your time, okay?

10  All right?

11      MR. HUT:  And would it be your intention, Your

12  Honor --

13      THE COURT:  As Mr. Proctor said, with Judge Hackner,

14  usually there is fussing and then things calm down.

15  Mr. Trainor is trying not to laugh because he has been in my

16  courtroom when I fuss and then I calm down.

17      I am giving you the time you need.  I want to hear

18  from both sides and I do not want you to give me a five minute

19  closing argument.  I would like you to sum it up but I mean I

20  have got a lot of briefs so I do not know that I am going to

21  need findings of fact or conclusions.  I mean everything is

22  pretty well briefed.

23      So let's start tomorrow at 9:00 and see where we go

24  and then we will just see where we wind up tomorrow.

25      MR. HUT:  And would it be your expectation if we get

dmh                                                                    251

1    through the evidentiary portion but not sufficient time for

2    closings, to set a date for closing some time in the future?

3            THE COURT:  Yes, but not too far.  I do not want to

4    lose track of it and I do not want to switch over from one

5    clerk to the next.  It is not fair to the clerks which tells

6    you that -- well, you will get an opinion before this clerk

7    leaves.

8            So, she writes, I edit and we go from there.

9    Everyone knows how that works.  So let's start tomorrow at 9

10   o'clock and, hopefully, I can space my decongestants so the

11   day lasts a little bit longer tomorrow than they did today.  I

12   am trying to avoid the ones that make you sleep.

13           So, we will break for today.  We will start

14   tomorrow.  How did you do on scanning exhibits?

15           THE CLERK:  So the only one that I have left to scan

16   is --- and then the transcripts I've got them all marked and

17   entered and then they are downstairs being scanned now so they

18   will be scanned by tomorrow.

19           THE COURT:  Okay.

20           MS. GOSTIN:  We have no need for them until whenever

21   the Court is finished with them.

22           THE COURT:  All right.  So we will start tomorrow at

23   9:00 and we are moving right along.  We will see where we go

24   from there.

25           Correctional officers, any problem with 9 o'clock

**App. 601**

dmh

1    again tomorrow?

2            MR.          :  No, Your Honor.

3            THE COURT:  And, again, just like you did the last

4    two days, you can bring Mr. Stephens straight to the courtroom

5    because I know my deputy is going to be here before 9:00.  So

6    once the deputy has opened up the courtroom, you are allowed

7    to bring him right up assuming counsel is here, okay?

8            So you can leave all of your items again.  What is

9    in the bag, the orange bag?  No, no, no, on your table?  Is

10   that pens?

11           MR. HUT:  Highlighters and stuff.

12           MS. GOSTIN:  Pens and post-its.

13           THE COURT:  No, because the Clerk and I have a

14   constant -- at least this Clerk knows my fondness towards

15   post-its so I know you were not taking mine.

16           MS. GOSTIN:  No.

17           MR. HUT:  We brought our own post-its.

18           THE COURT:  Okay.

19           MR. HUT:  A plethora of post-its.  It is a great

20   mystery.

21           THE COURT:  Oh, I go through more post-its than any

22   other -- than all the other 12 judges I think over here.

23           Do you come from D.C. in the morning?

24           MR. HUT:  I did not.  Last evening I stayed in

25   Annapolis.  Tomorrow I plan to come from D.C.

dmh

 1          THE COURT:  Okay.  How about you two?

 2          MS. GOSTIN:  We will be staying in Annapolis.

 3          THE COURT:  You have been staying.  All right.  That

 4  is fine.  Okay.  Because traffic can really bog things down.

 5          MR. HUT:  I try to get an early start.

 6          THE COURT:   I thought you were in Baltimore?

 7          MR. HUT:  I have an office in Baltimore but I live

 8  in Montgomery County.

 9          THE COURT:  Oh, I thought you were in Baltimore.

10  Are you coming over from Montgomery every morning?

11          MR. HUT:  Yes.  Well, I did not this morning but I

12  did yesterday and I will tomorrow.

13          THE COURT:  Okay.  Well, get Catherine Wooley's

14  phone number because when she calls to tell us she is running

15  late, she holds the phone I think out the window so we can

16  hear the sirens and the traffic when she is stuck on the

17  Beltway.

18          THE CLERK:  All rise.

19          THE COURT:  See you all tomorrow morning.

20          MS. GOSTIN:  Good night.

21          MR. RUSSELL:  Thank you, Your Honor.

22          MR. HUT:  Thank you, Your Honor.

23          (Whereupon, at 4:23 p.m., the trial adjourned to

24  reconvene at 9:00 a.m., April 20, 2017.)

25

dmh

254

## CERTIFICATE OF TRANSCRIBER

I hereby certify that the proceedings in State of Maryland versus Lee Edward Stephens, Case No. 02-K-08-000646 heard in the Circuit Court for Anne Arundel County, Maryland, on April 19, 2017, were recorded by means of digital recordings.

I further certify that to the best of my knowledge and belief, pages 1 through 253 constitute a complete and accurate transcript of the proceedings as transcribed by me.

I further certify that I am neither a relative to nor an employee of any attorney or party herein, and that I have no interest in the outcome of this case.

In witness whereof, I have affixed my signature this 11th day of June 2017.

Doreen M. Hodder
Transcriber, CompuScribe

**App. 604**

Appendix No. 7

Post-Conviction Hearing Transcript Day 3 (4/20/17)

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

```
- - - - - - - - - - - - - - - x
                              :
STATE OF MARYLAND             :
                              :   Criminal No. 02-K-08-000646
     v.                       :
                              :
LEE EDWARDS STEPHENS,         :
                              :
         Defendant.           :   Annapolis, Maryland
                              :
- - - - - - - - - - - - - - - x   April 20, 2017
```

**POST CONVICTION HEARING**

WHEREUPON, proceedings in the above-entitled matter

commenced.

    BEFORE:   THE HONORABLE WILLIAM C. MULFORD, II, Judge

    APPEARANCES:

    <u>FOR THE STATE:</u>

    DAVID RUSSELL, Esq.
    Office of the State's Attorney
    8 Church Circle
    Annapolis, Maryland 21401

    <u>FOR THE DEFENDANT:</u>

    A. STEPHEN HUT, JR., Esq.
    6 Saint Paul Street
    Suite 1400
    Baltimore, Maryland 21202

    ISLEY M. GOSTIN, Esq.
    THAD EAGLES, Esq.
    1875 Pennsylvania Avenue, NW
    Washington, DC 20006

nm

2

I N D E X

Page

Preliminary Discussions                                                3

| WITNESS<br>For the State: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Joel Todd | 6 | 19 | 48 | -- |
| For the Defendant: | | | | |
| Harry Trainor | 52 | 73 | -- | -- |

| EXIBITS<br>Joint Exhibits: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1 | -- | 4 |
| 2 | -- | 5 |
| For the Defendant: | | |
| W1-W33 | -- | 4 |
| CC | 23 | 46 |
| DD | 25 | 46 |
| EE | 45 | 46 |
| FF | 45 | 46 |
| GG | 45 | 46 |
| HH | 95 | 95 |

KEYNOTE:   "---" indicates inaudible in the transcript.
              "*" indicates phonetically spelled in transcript.

**App. 607**

nm

3

1                     P R O C E E D I N G S

2              (Whereupon, at 9:02 a.m., the proceeding began.)

3         THE COURT:  If you could, Mr. Russell?

4         MR. RUSSELL:  Your Honor, we call State versus Lee

5    Stephens, case number 02-K-08-646.  David Russell, R-u-s-s-e-

6    l-l, on behalf of the State.

7         THE COURT:  Thank you.

8         MR. HUT:  Good morning, Your Honor.  Stephen Hut,

9    H-u-t, for Petitioner.

10        THE COURT:  All right.  Ms. Gostin?

11        MS. GOSTIN:  Good morning.  Isley Gostin, I-s-l-e-y

12    G-o-s-t-i-n for the Petioner.

13        THE COURT:  Mr. Eagles?

14        MR. EAGLES:  Thad Eagles, T-h-a-d E-a-g-l-e-s, for

15    the Petitioner.

16        THE COURT:  All right.  Did Mr. Todd how up?

17        MR. RUSSELL:  He is here.

18        THE COURT:  Do you want to take his testimony

19    because it is sort of out of order, but that way he -- where

20    is he?  Montana?

21        MR. RUSSELL:  Arizona.

22        THE COURT:  Same thing.  Just a thousand miles

23    south.

24        MR. HUT:  We have no objection to that, Your Honor.

25        THE COURT:  Okay.  All right.

**App. 608**

1    MR. RUSSELL:  But we would call Mr. --

2    MR. HUT:  We do have a couple of housekeeping

3  matters if I may, Your Honor, before we get to Mr. Todd.

4    THE COURT:  Okay.  Can we -- I really prefer to take

5  care of testimony, but what is the housekeeping matter?

6    MR. HUT:  Well, I just --

7    THE COURT:  You can get him, Ms. Prowell*.  You can

8  get Mr. Todd.

9    MS. PROWELL:  Should I get him?

10    THE COURT:  Yes.

11    MR. HUT:  I wanted, while it is on my mind, to offer

12  into evidence the first stipulation, which was marked

13  yesterday as Joint Exhibit 1.

14    THE COURT:  Yes.  I haven't read that yet, but that

15  is fine.

16    MR. HUT:  And the transcript, which is marked

17  Defendant's W1 through 33.

18    THE COURT:  That is fine.

19    MR. RUSSELL:  No objection.

20    THE COURT:  Both of those will be accepted.

21                              (The documents marked for

22                               identification as Joint Exhibit

23                               1 and Defendant's Exhibits W1

24                               through W33 were received in

25                               evidence.)

nm

5

1          MR. HUT:  I also wanted to offer Joint Exhibit 2,

2   which is a second set of stipulations to which the parties

3   have agreed.  I believe Mr. Russell has some observations he

4   wants to make about it, but agrees to its admissibility.

5          MR. RUSSELL:  Agreed, Your Honor.  So that

6   stipulation is about documents that were filed in the Wicomico

7   County case.  I don't disagree that those documents were

8   filed.  I am later going to argue that I don't think the Court

9   should consider anything within those documents, but I don't

10  disagree that they have been filed.

11         THE COURT:  Okay.  That is fine.

12         MR. HUT:  And I told Mr. Russell that from our

13  perspective, we don't think we are going to make use of the

14  arguments in them as opposed to arguments that may be made on

15  the basis of them.  But I understand his position.

16         THE COURT:  All right.  That is fine.

17                            (The document marked for

18                            identification as Joint Exhibit

19                            2 was received in evidence.)

20         THE COURT:  Do you have Stipulation 1?

21         THE CLERK:  Okay.

22         THE COURT:  This is 2.

23         All right.  Could you swear the gentleman?

24         THE CLERK:  Sir, if you could please raise your

25  right hand.

**App. 610**

nm                                                                          6

1   Whereupon,

2                           JOEL TODD

3   was called as a witness by the State, having been first duly

4   sworn, was examined and testified as followed:

5           THE CLERK:  You may be seated.  And, sir, when you

6   are seated, if you could please state your name, your

7   occupation, and then spell your name for our court reporters.

8           THE WITNESS:  And what?

9           THE CLERK:  And spell your name for our court

10  reporters.

11          THE WITNESS:  Okay.  My name is Joel Todd.  I am

12  retired and my name is spelled J-o-e-l T-o-d-d.  I am

13  currently working part-time as an associate magistrate for the

14  Lake Havasu City Consolidated Court, Lake Havasu City,

15  Arizona.

16          THE COURT:  Okay.  Go ahead.

17          MR. RUSSELL:  Thank you, Your Honor.

18                     DIRECT EXAMINATION

19          BY MR. RUSSELL:

20      Q   Mr. Todd, could you tell us about your employment

21  prior to becoming a magistrate?

22      A   Yes.  From January -- the first Monday in January,

23  2011 through mid- -- no.  Through the end of June of 2016, I

24  was an Assistant State's Attorney, Wicomico County, Maryland.

25      Q   And prior to that?

**App. 611**

nm                                                                              7

1          A     Prior to that I had worked for 26 years -- well, the

2    previous 16 years as State's Attorney for Worcester County and

3    the nine years before that as Deputy State's Attorney for

4    Worcester County.

5          Q     Okay.  And did there a come a time that you handled

6    a post-conviction involving Mr. Lee Stephens?

7          A     Yes.  When I as an Assistant State's Attorney in

8    Wicomico County.

9          Q     I am going to show you a couple of documents.  I am

10   going to start by showing you what has been marked as State's

11   10 and tell me if you can identify that.

12         A     Yes, I can.  That is a memorandum that I wrote in

13   opposition to Petitioner Lee Edward Stephens' petition for

14   post-conviction relief.  It was filed on or about July 8th of

15   2012 with the Circuit Court for Wicomico County.

16         Q     Thank you.

17               THE COURT:  I am sorry, Mr. Todd.  I was writing

18   quickly.  When did you file it approximately?

19               THE WITNESS:  Approximately, July 8th, 2012.  That

20   is the date of my certificate of service.  And generally, I

21   would file a document the same day as the certificate of

22   service.

23               THE COURT:  That is fine.

24               BY MR. RUSSELL:

25         Q     I am going to show you what has been marked as

**App. 612**

nm                                                                    8

1   State's 11.  Can you identify that document?

2        A    Yes.  This is a response to an amendment that

3   Petitioner filed to his petition for post-conviction relief

4   that was drafted by me and filed with the Circuit Court for

5   Wicomico County on or about April 16th of 2013.

6        Q    Okay.  And just to clarify, both of those were

7   oppositions, is that correct?

8        A    That is correct, yes.

9        Q    Okay.  And can you tell us, what was the end result

10  of the Lee Stephens post-conviction in Wicomico County?

11       A    In the end, the State agreed to the granting of the

12  petition for post-conviction relief on the condition that the

13  Defendant would immediately thereafter enter a plea of guilty

14  to the charge of first degree murder.  And then we had a

15  binding plea agreement that he would be sentenced to life

16  imprisonment with all but time served suspended.

17       Q    Okay.  And did that all occur in one hearing?

18       A    That is my recollection, yes.

19       Q    Okay.  And you recall what judge that was in front

20  of?

21       A    I believe it was Judge Jackson.  Judge W. Newton

22  Jackson, III.

23       Q    Yes.  And if you recall, why did the State agree to

24  that resolution?

25       A    Well, there were -- there were certainly an arguable

**App. 613**

nm

9

1    issue that had been raised by Petitioner and -- as to the

2    issues with the ballistics expert.  And let me explain that,

3    if I can.

4        Q    Absolutely.

5        A    When I was first assigned the petition for post-

6    conviction relief and read that one of the issues was that

7    Mr. Kopera, who had served 30 years as a ballistic expert in

8    the State of Maryland, had lied about his credentials, I knew

9    there was a case -- I believe it was Kulbicki -- if memory

10   serves me correct -- that held that that wasn't grounds for

11   granting a new trial.

12       But I thought to be completely safe, we would just

13   re-analyze the ballistics exhibits with a current ballistics

14   expert, and we would probably end up with the same result and

15   no harm, no foul.  There was no harm done if the opinion was

16   the same.

17       Well, that is what I directed and we had it sent off

18   to the State police crime lab.  And the next examiner, whose

19   last name was Suber*, I believe --

20       THE COURT:  Toran Suber?

21       THE WITNESS:  Pardon?

22       THE COURT:  Toran Suber?

23       THE WITNESS:  Yes.  Yes, Your Honor.

24       His opinion -- his opinion was that the bullet that

25   was extracted from the body of the homicide victim was, in

**App. 614**

1   fact, fired from the weapon that was recovered when the

2   Defendant was arrested.  But some of the shell casings that

3   were recovered from the scene were fired by the same weapon,

4   but there are -- I believe, it two of them that were fired by

5   a different weapon.

6          That, of course, complicated the State's case at

7   that point.  But I was aware that Petitioner had later been

8   convicted of another homicide in Ann Arundel County and that

9   he was serving life without the possibility of parole.  And

10  rather than fight the case on the merits knowing he was going

11  to be locked up for the rest of his life, we decided to go

12  ahead with that offer to the Petitioner, which was then

13  accepted.

14          BY MR. RUSSELL:

15      Q    And what, if any, role did the Ann Arundel County

16  case play in your decision making?

17      A    Well, it played a big role because had this case not

18  been -- had the Ann Arundel County case not happened, had

19  Petitioner not been convicted of another homicide and then

20  sentenced to serve the sentence that he was sentenced to

21  serve, we would have -- the State would have fought this

22  petition on the merits.  And if we lost the case on the

23  merits, we would have retried Petitioner for the Wicomico

24  County homicide.

25      Q    And what was your assessment of your ability to

1    retry him, should that happen?

2         A    Well, I have prosecuted numerous homicides in my

3    career.  I have prosecuted some a whole lot stronger than this

4    one, but I have prosecuted ones that were weaker than this one

5    too.  I have won some that were weaker than this.  I have lost

6    some that were stronger than this.  You know, a lot of it

7    depends on what happens in court on the particular day that

8    the case is tried.

9         Q    While you were in Wicomico County, were there other

10   cases involving Joseph Kopera that you were involved in?

11        A    There was at least one other one involving Joe

12   Kopera that I was involved in that reached us on a petition

13   for post-conviction relief.  And we successfully defended

14   against that.  I can't remember the name of the Petitioner in

15   that case, but I cited the Kulbicki case in my memorandum in

16   that case and the petition for post-conviction relief was

17   denied.

18        Q    Okay.  And during the time that you were in Wicomico

19   County did your office handle any of the cases that have come

20   back on the Unger decision?

21        A    Yes.  And I handled virtually all of the cases that

22   came back on the Unger decision.  And those were -- we had one

23   -- a number of those at the trial level and then lost them all

24   when they reached the Court of Appeals.  We had one -- the

25   most -- the last one that I handled was a homicide that

nm                                                                    12

1   occurred in 1982.  And when that came back on appeal, that

2   case was retried.  It actually didn't get retried until I left

3   there, but it was retried and he was convicted again.

4        Q    Okay.  And, Mr. Todd, I believe you have already

5   testified to this, when did you join the Wicomico County

6   office?

7        A    It was the first Monday in January, 2011.

8        Q    Okay.  And do you recall --

9        A    Unless that was January 1st, in which case it would

10  have been January 2nd.  I don't remember whether it was a

11  Monday or Tuesday.  But I know the new State's Attorney always

12  takes office the first Monday in January, unless that is the

13  first, and since that is a holiday, it would then be the next

14  business day, whatever the next business day is.

15       Q    Okay.  And do you recall who was handling this post-

16  conviction prior to you receiving it?

17       A    Yes.  It was Deputy State's Attorney Sampson

18  Vincent, an honorable man who lost his life in a car accident.

19       Q    And do you recall when he passed away?

20       A    Yes.  He was killed in a car accident in June of

21  2010.

22       Q    Okay.  And, if you know -- and you may not -- was

23  there anybody assigned to this case in between the time that

24  he passed and the time that you came into the office?

25       A    I don't think so.  My recollection -- and I don't

**App. 617**

nm                                                                    13

1   have the file anymore because it is in Wicomico County -- but

2   my recollection is the last paperwork in the file before I got

3   it had been signed by Sam Vincent.  And then I was the next

4   person assigned to the case.

5        Q    Okay.  And if you think you can answer this -- maybe

6   you can't -- how long do you think it would have taken you

7   from the time that you started in January to the point that

8   you would have been able to get up to speed and actually have

9   a hearing on this case if it had been requested?

10            MR. HUT:  Objection.  Speculative.

11            THE COURT:  Well, I am going to overrule because I

12  think that Mr. Todd being assigned to the case would have had

13  a good idea of what he would need to do in order to handle

14  both aspects of it, A, the post-conviction, and then, B, the

15  possible retrial, especially since he was involved in those

16  cases and would know from his time as a State's Attorney how

17  long it would take.  I think he could tell me.  If he can't,

18  he will say so.  But I think that is well within his knowledge

19  in terms of how long it would take him to actually litigate

20  the post-conviction, get up to speed on it, and then actually

21  retry the case.

22            So ahead.  You can answer that.

23            THE WITNESS:  We had -- in Wicomico County they have

24  a pretty fast -- they have a pretty fast hearing schedule

25  there.  They don't delay much.  My recollection is there was

**App. 618**

nm

14

1   some complications getting this one scheduled because the

2   Petitioner was incarcerated somewhere out of state and it was

3   a little difficult scheduling court and coordinating that with

4   whatever correctional center he was being held in.

5          THE COURT:  Was Judge Beckstead the --

6          THE WITNESS:  She is the administrative judge at

7   that --

8          THE COURT:  Was she the administrative judge then?

9          THE WITNESS:  She was then, yes, Your Honor.

10          THE COURT:  Okay.  I couldn't remember if she was

11   then or --

12          THE WITNESS:  Judge Simpson was before her.

13          THE COURT:  -- Judge Simpson.

14          THE WITNESS:  Judge Simpson had retired before I

15   started working there in 2011.

16          THE COURT:  Okay.

17          THE WITNESS:  So she was the administrative judge at

18   the time of this.

19          THE COURT:  Is she still?

20          THE WITNESS:  She is not.  No.  I am not -- and I am

21   not sure who it is.  I think it is Judge Sarbanes now.

22          MR. EAGLES:  I believe that is correct.

23          THE COURT:  Okay.  All right.  I didn't know what

24   their timing schedule was, so --

25          THE WITNESS:  It is normally prompt, but as I say,

**App. 619**

1  it was complicated because of where the Petitioner in this

2  case was being held.  I can't really answer the case any more

3  than that.

4          As far as how much time it was going to take me, it

5  didn't matter where the Petitioner was incarcerated.  I write

6  a memorandum in -- I would write memoranda in virtually all of

7  the post-conviction cases that were assigned to me no matter

8  how complicated, just because it helped me organize my

9  thoughts better.  And I think I felt like it was also helpful

10 to the court.  And I don't remember when I started on this

11 one.  But, anyway, I know when it was filed.  But I don't

12 know, I can't -- I am rambling.  I am sorry.

13          BY MR. RUSSELL:

14      Q    And when was it filed against?

15      A    The original memorandum was filed July 8th, 2012.  I

16 think Mr. Vincent had already filed an answer.  But it was

17 just -- you know, just a perfunctory broiler plate type answer

18 that he had filed.  And this would have been assigned to me

19 once it was scheduled.  So I don't know what the hearing date

20 was, but it was at least scheduled when the case was assigned

21 to me.  And I would have had this filed generally a week or

22 two before the scheduled hearing date.  I actually have a copy

23 of the docket entries.  I would look that up if you want.  But

24 just going from memory, I am assuming that the hearing date

25 was probably sometime in July of 2012.  And then for whatever

**App. 620**

nm                                                                    16

1    reason, that got postponed.

2        Q    Okay.  Can you tell us, what was the process that

3    you would have to go through internally in your office with

4    regard to resolving a case like this?

5        A    Normally, I would just make the decisions myself.

6    But for a homicide case, even though I wasn't required to,

7    having been a politician longer than I wanted to be a

8    politician, I knew that for a homicide case there was often

9    repercussions in the press and so forth.

10            So for this case before I made the plea offer that I

11   made in this case, I went to the Deputy State's Attorney, who

12   was my immediate supervisor, explained the case to her and

13   told her what my idea was.  And then after speaking with her I

14   made the offer to Mr. Hut.

15       Q    And to what extent was the Ann Arundel County

16   conviction a part of your explanation to the State's Attorney?

17       A    Oh, it was front and center in there.  This offer

18   would not have been made -- I wouldn't have even suggested it

19   to the Deputy State's Attorney had this life -- had the Ann

20   Arundel County sentence not been in place.

21       Q    And you said that this -- the agreement happened on

22   the record in front of Judge Jackson?

23       A    Correct.

24       Q    Do you recall if Judge Jackson would have been the

25   judge that this post-conviction was assigned to --

**App. 621**

1    A    Yes.

2    Q    -- had it gone to a hearing?

3    A    Yes.

4    Q    Okay.  And, again, this is a -- if you know, having

5    done post-convictions with Judge Jackson, how long do you

6    think it would usually -- in his practice, usually take him to

7    answer -- once you had a hearing, how long would it take to

8    get a decision?

9    A    He was faster than the other two judges.  He

10   probably would have had an opinion out within 60 days.

11        THE COURT:  He will kill me for saying this, but he

12   might have even written the opinion beforehand.

13        THE WITNESS:  I don't know.

14        MR. RUSSELL:  I will leave it as just that you said,

15   Your Honor.

16        THE COURT:  Oh, no.  I am going to tell him the next

17   time I see him also.  He is not shy in telling you his

18   opinions.

19        MR. RUSSELL:  No, he is not.

20        THE COURT:  If you have ever met Judge Jackson --

21   actually, he just had to retire.

22        THE WITNESS:  Yes.

23        MR. RUSSELL:  Oh, I didn't realize that.

24        THE WITNESS:  He reached the age of constitutional

25   senility, Your Honor.

**App. 622**

nm                                                                           18

1              THE COURT:  Yes, he and Judge Harrell went to law

2     school together.  And Judge Jackson was delighted in telling

3     Judge Harrell that Judge Harrell was going to become

4     constitutionally senile before he would.  And it was a

5     function of the time he spent in the Court of Appeals

6     destroying his mind.  So I had to listen to that on a couple

7     of occasions.  So Mr. Todd probably knows Judge Jackson a lot

8     better than I do, but he knows what I am saying is something

9     that would come right out of his mouth.  You don't have to

10    comment.

11             THE WITNESS:  Far be it for me to argue with the

12    Court, Your Honor.

13             THE COURT:  Mr. Hut, you might know him too, so you

14    know -- if you know Judge Jackson you know he wouldn't

15    hesitate to say that.

16             MR. HUT:  That was my one experience, Your Honor.

17             BY MR. RUSSELL:

18    Q    Mr. Todd, the last thing I want to ask you about is

19    postponements in this case.  Do you recall the State's

20    position with regard to any postponements that may have been

21    requested?

22    A    I do not recall.

23    Q    Okay.  Do you recall if at any point the State made

24    any requests for postponement?

25    A    I do not recall.

**App. 623**

1      Q      Okay.

2             MR. RUSSELL:  I have nothing further, Your Honor.

3             THE COURT:  All right.  Mr. Hut or whoever.  I

4      wasn't sure.

5                         CROSS EXAMINATION

6             BY MR. HUT:

7      Q      Good morning, Mr. Todd.

8      A      Good morning.

9      Q      How are you?

10     A      Okay.  Thank you.

11     Q      Prior to your testimony here this morning, did you

12     have one or more conversations with Mr. Russell about your

13     appearance here?

14     A      I spoke with Mr. Russell maybe six months ago.  And

15     then I did not speak with him again until -- I think it was

16     Monday of this week.

17     Q      About how long on Monday this week did you talk to

18     him?

19     A      Maybe five, six minutes.

20     Q      Did you receive over the course of the last,

21     perhaps, three weeks any telephone messages from me?

22     A      I received two from you.  Yes, sir.

23     Q      And did you return them?

24     A      I did not.

25     Q      And was that because you were disinclined to speak

1   with Counsel for the Petitioner in the matter?

2        A     That is correct.

3              If I could answer that on -- more fully.  You had

4   called me and left a message on my voice mail and it had been,

5   as I said, six months since I had spoken with Counsel for the

6   State.  And I wasn't, at that time, as fresh on why I was

7   being called.  I assumed that you wanted to know why I was

8   being called and I wasn't sure why I was being called at that

9   time.  And so it would have been -- it wouldn't have been

10  helpful for either of us for me to call you to say, I don't

11  know why I am being called.

12             And then when I spoke with him on Monday I just

13  decided I would talk to you in court as opposed to returning

14  the phone call.

15       Q     When you spoke to him on Monday did you discuss

16  whether you should return my call and speak to me before the

17  court appearance?

18       A     I did express that you had left two messages for me.

19  But the counselor for the State did not tell me whether to

20  return the calls or whether not to return the phone calls.

21       Q     Did he --

22       A     That was a decision I made myself.

23       Q     Did he tell you that the two lawyers for

24  Mr. Stephens at the Ann Arundel County trial had spoken with

25  him in anticipation of their testimony here?

**App. 625**

nm

1        A     No, he did not.

2              THE COURT:  Two lawyers from the Defense or two

3     lawyers from the State?

4              MR. HUT:  Two lawyers from the Defense.

5              THE COURT:  Okay.  Because you said two lawyers from

6     the Ann Arundel County trial, so that could imply --

7              MR. HUT:  Sure.

8              THE COURT:  -- Howell, Ash or Proctor, Lawlor --

9     Lawlor, Proctor.

10             MR. HUT:  It sure could.  And I appreciate the

11    clarification, Your Honor.  Thank you.

12             THE COURT:  So which ones were you talking about?

13             MR. HUT:  I was talking the Defense.

14             THE COURT:  Proctor, Lawlor.  Okay.

15             MR. HUT:  Yes.  And that is --

16             THE WITNESS:  No, we didn't talk about that.  We

17    basically talked about my travel plans.  And then we talked a

18    little about the case, but not a lot.

19             BY MR. HUT:

20        Q     Now, in response to a question from Mr. Russell on

21    direct examination you made reference talking about the

22    ballistics in the Wicomico County trial of Mr. Stephens to the

23    380 that was extracted from the body of the victim, Dwayne

24    Holbrook.  Do you recall that testimony?

25        A     Yes.

**App. 626**

nm

1      Q      Now, that 380 that was extracted from the body was

2  determined not to have been a fatal shot, isn't that correct?

3      A      I am not sure that that is correct.  I think there

4  was testimony that it might have been.  But in all honesty,

5  that is hearsay as to me because I didn't try the case

6  originally.  I read that in a transcript.  I read that in

7  other pleadings, but I wasn't at the trial so I don't have

8  firsthand knowledge of that.

9      Q      I appreciate that clarification.  You also testified

10 about another Wicomico County case in which Joe Kopera had

11 testified, and -- but you kept the conviction intact in that

12 case, if I understood your testimony; correct?

13     A      That is my recollection, yes, sir.

14     Q      And had the ballistics in that case, where the

15 conviction stood, ever been retested by the State?

16     A      No.

17     Q      Was there any other case that you had in Wicomico

18 County where the ballistics had been retested and the retest

19 had found results at variance with the results that were

20 reported at the trial?

21     A      No.

22     Q      This was the only one, wasn't it?

23     A      That is correct.

24     Q      And that --

25     A      It is the first time I asked in a post-conviction

1   case to get the ballistics retested.

2        Q    And you made a reference to receiving the results --

3   Mr. Suber -- I am attempting to locate his written report.  Do

4   you recall receiving or reviewing his written report?

5        A    Yes.  In fact, after -- as soon as I got that I

6   forwarded that on to you.

7        Q    I am showing you what has been marked Defendant's

8   CC, Mr. Todd.  Do you recognize Defendant's CC?

9                                    (The document referred to was

10                                    marked for identification as

11                                    Defendant's Exhibit CC.)

12       A    Yes, I do.

13       Q    Is that the report of Toran Suber to which you just

14  made reference?

15       A    It is.

16       Q    Now, at the trial there had been six 380 casings

17  located at the crime scene, is that correct?

18            MR. RUSSELL:  Objection.  He wasn't at the trial.

19            BY MR. HUT:

20       Q    Well, based on your review of the transcript.

21       A    That --

22       Q    Your understanding at the time that you were

23  contemplating the petition for post-conviction relief directed

24  to the ballistics issue?  Your understanding was that there

25  were six 380 casings found at the crime scene?

1  A  There was six 380 casings found at the crime scene

2 within a ten-foot radius.  All of them.

3  Q  And the six 380 casings had all been determined by

4 Mr. Kopera to have resulted from -- or to have been fired from

5 a Beretta handgun later determined to have been found in the

6 vicinity of Lee Stephens, isn't that right?

7  A  That is correct.  Yes, sir.

8  Q  And that fact was argued by Mr. Vincent to be strong

9 evidence linking the Defendant, Mr. Stephens, to the murder of

10 Dwayne Holbrook, isn't that true?

11  A  Yes.

12  Q  In fact, do you recall reading the closing argument

13 present by Mr. Vincent --

14  A  Yes.

15  Q  -- at the trial?

16  A  Yes.

17  Q  And by the way, there were two trials in this case,

18 wasn't there?

19  A  That is correct.

20  Q  There was a --

21  A  First one ended in a hung jury, mistrial.  And then

22 the second one ended in a verdict for the State by the jury.

23  Q  And in fact, with respect to Mr. Vincent's closing

24 -- excuse me -- the six 380 casings -- the only casings from a

25 380 -- all ascribed to Mr. Stephens' weapon -- or a weapon

nm

25

1   found near him -- was the first fact point argued in

2   Mr. Vincent's closing argument to the jury in the Wicomico

3   County case both times, wasn't it?

4        A    That may be.  I don't recall the chronology of his

5   argument.  But I know he did emphasize that.

6        Q    I am showing you what has been marked Defendant's DD

7   and asking you to turn to page 201.

8                               (The document referred to was

9                               marked for identification as

10                              Defendant's Exhibit DD.)

11             MR. HUT:  And by the way, Your Honor, this Exhibit

12  DD is one of the attachments to the stipulation just marked

13  this morning, Joint Exhibit 2 and admitted in evidence.

14             THE COURT:  Okay.

15             BY MR. HUT:

16       Q    So you are at page 201, Mr. Todd?

17       A    I am there.  Yes.

18       Q    And if you actually turn to the previous pages, 199

19  and 200, which marked the beginning of Mr. Vincent's closing

20  argument, if you read that, I think it is fair to say that --

21       A    Right.  The --

22       Q    -- that is just a standard thanking the jury for

23  their service and emphasizing the value of what they do.  At

24  page 201 at line nine, does this appear to you to be the

25  beginning of Mr. Vincent's closing on the substantive merits

**App. 630**

1    of the case -- the evidence?

2         A    I think that is fair to say, yes, sir.

3         Q    And at line 11, the very first thing he says is

4    that, "It is uncontested that the six 380 caliber shell

5    casings found at the crime scene -- the one bullet fired and

6    found at the scene and both recovered from the leg of Dwayne

7    Holbrook was fired by this 380 semi-automatic handgun."  Isn't

8    that what he told the jury?

9         A    That is correct.  And that is the information he

10   had, so it is not like he was deliberately misleading the

11   court -- the jury even though the knowledge of Mr. Kopera was

12   imputed to him, he didn't really have actual knowledge.

13        Q    To be sure.  Now, when Mr. Suber retested the

14   ballistics and found that only four of the 380 casings at the

15   crime scene were ascribable to the black Beretta, that

16   certainly left open the possibility of more than one 380, 380

17   having been used the evening of the crime, to shoot in the

18   direction of the victim, Mr. Holbrook, isn't that right?

19        A    Correct.

20        Q    It could have been one additional 380.  It could

21   have been two additional 380s; correct?

22        A    I think if you read that more carefully -- and I

23   remember in my memorandum I argued that we didn't know how

24   many it was, but I reviewed this report yesterday.  Let me see

25   something here.  In -- on the back page of Defense Exhibit

1  CC --

2       Q    Yes, sir.

3       A    -- the last sentence of the first -- or the second

4  paragraph on that page it says, "As a result of microscopic

5  examination, it was concluded that items two, four, five, and

6  six were identified as having been fired in item one," which

7  was -- item one was the weapon recovered near the Defendant at

8  the time of -- the Petitioner at the time of his arrest.  And

9  then it says, "Items three and seven were identified as having

10 been fired from a second firearm."

11       So I think by using the word "second firearm" that

12 would indicate that items three and seven were both fired from

13 the same weapon.

14      Q    All right.  But at least one additional 380 --

15      A    Correct.

16      Q    -- was present that night?

17      A    Yes.

18      Q    And fired?

19      A    Correct.

20      Q    And you recall the contention of the Defense at

21 trial that that only began to state the universe of weapons

22 that were in use that night outside the Pit nightclub;

23 correct?

24      A    I am not sure that I understand that question.  As I

25 recall, from all the eyewitnesses there, there were only two

**App. 632**

1    people seen firing weapons.  One of them was firing a 45 into

2    the air, and that was some distance away from the Petitioner

3    in this case.  The second person that was seen shooting a

4    firearm was the Petitioner.  And then all of these bullet

5    casings were found in a ten-foot radius where he had been

6    standing.

7        Q    You don't recall that there was additional testimony

8    about other firearms, at least, being in the possession of

9    various people who has been to the nightclub?

10             MR. RUSSELL:  Objection.  I think he has already

11   answered it.

12             MR. HUT:  Just --

13             THE COURT:  Overruled.  He you remember, Mr. Todd.

14             THE WITNESS:  I know that something was transferred

15   from a person in a car to Petitioner in this case.  Presumably

16   the firearm -- a firearm.  I believe there was some indication

17   that other people had firearms, but there was not a single

18   witness interviewed by the police or testifying at court that

19   indicated anyone other than the person with the 45 and the

20   Petitioner in this case had fired a firearm.

21             BY MR. HUT:

22        Q    And the person with the 45 was a man named Tray

23   Jackson.  He went by other names as well.

24        A    Correct.

25        Q    And the Defense argued -- one of its theories was

**App. 633**

nm

1    that it was the 45 that had actually been the fatal shot and

2    that Mr. Jackson was, in fact, the murderer who hit Holbrook;

3    right?

4         A    Right.  But that wasn't the finding of the jury.

5         Q    Correct.  And the Defense contested the testimony

6    that you just made reference to about the passing of a -- I

7    think it was a bag containing a weapon from somebody to the

8    Defendant in the case; correct?

9         A    Right.

10        Q    Now, you testified in response to questions from

11   Mr. Russell that but for the sentence imposed as a result of

12   the Ann Arundel County conviction, you would not have

13   recommended the resolution that became the basis for the

14   court's orders in the case, is that correct?

15        A    That is correct.

16        Q    And do you recall, Mr. Todd, that you and I back in

17   the spring and/or summer of 2013 had a number of telephone

18   calls of varying lengths leading up to the -- our appearances

19   in court before Judge Jackson?

20        A    Right.

21        Q    And then on the day in question, which I think

22   occurred in July, 2013 -- but I may be wrong about that -- we

23   met and discussed the matter again in the courthouse -- maybe

24   even in the courtroom or just outside it, is that right?

25        A    That is correct.

1    Q    During those conversations with me, you never told

2    me, did you, that the only reason that your office was willing

3    to do the deal that was under discussion was because of the

4    existence of the Ann Arundel County sentence, did you?

5    A    No, I didn't.

6    Q    And you never told -- withdrawn.

7         At some point during -- I believe it was the

8    morning, but it could have extended to the early after of our

9    day at the courthouse when the resolution was arrived at -- we

10   met in chambers with Judge Jackson, do you recall that?

11   A    Yes.

12   Q    And we each presented our view of the case, I

13   believe, and our view that there was a resolution that both

14   sides were willing to recommend to those we represented who

15   had to make the ultimate decision, do you remember that?

16   A    Correct.

17   Q    You never told Judge Jackson, did you, that the only

18   reason your office was willing to enter into this arrangement

19   was because of the existence of the sentence in Ann Arundel

20   County, did you?

21   A    No, I believe I told him that the State felt as

22   though this was in the best interest of justice.  I did not

23   explain what those best interests were.

24   Q    And you knew at the time that the sentence and

25   conviction imposed in Ann Arundel County was the subject of a

1    direct appeal of right to the Court of Special Appeals, didn't

2    you?

3        A    I believe you had shared that with me, yes.

4        Q    And that appeal --

5            THE COURT:  Hold on.  How is that possible?  There

6    is no direct appeal of right to the Court of Appeals --

7            MR. HUT:  For the Special Appeals was the --

8            THE COURT:  Oh, Court of Special Appeals.

9            MR. HUT:  -- in my question, I think, Your Honor.

10           THE COURT:  I thought you said Court of Appeals.

11           MR. HUT:  If I --

12           MR. RUSSELL:  Could you repeat the question?

13   Because now I am a little confused.  I just want to make sure

14   I understand what you are saying.

15           MR. HUT:  Well, I -- my question --

16           THE COURT:  Because there is a direct appeal to the

17   Court of Appeals if the death sentence is imposed.  But there

18   was no death sentence, so --

19           MR. HUT:  That is why I said Special Appeals.  At

20   least -- and I intended to.

21           THE COURT:  Okay.

22           MR. HUT:  Let me ask -- I will ask the question

23   again.

24           THE COURT:  I was writing fast so maybe I didn't

25   hear you correctly.  Go ahead.

**App. 636**

1              THE WITNESS:  Can -- may I interrupt just a minute?

2  Is there possibly some water up here?

3              THE COURT:  Some water?

4              THE WITNESS:  Yes, please.

5              THE COURT:  Oh, you have no idea what you have

6  wandered into.

7              (Laughter.)

8              THE WITNESS:  All right.  Never mind, then.  I will

9  go ahead.  I am sorry.  It is okay.  Go ahead.

10             THE COURT:  No.  No.  No.  No.  My clerk will get

11  you water.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  We had -- I can't tell you how many

14  emails about water, water pitchers, pitchers in the courtroom,

15  who fills them, whether you use tap water, who washes the

16  water bottles, --

17             THE WITNESS:  Oh, my goodness.

18             THE COURT:  -- whether you can use the water bottles

19  that are delivered to people in the courtroom, or whether that

20  is just the judiciary and the judiciary staff, whether the

21  clerks and Sheriffs get to use our water.  You have no --

22             BY MR. HUT:  Mr. Russell and I were just reminiscing

23  that I think one of the tricks the judges and their law clerks

24  play on lawyers is that they have these thermoses which then

25  get clogged with crushed ice and the crushed ice is in the

**App. 637**

1   mouth of the thermos and you pour it upside down because you

2   can't get water out of it --

3            THE COURT:  No.

4            MR. HUT:  -- and it is only then when the whole

5   things comes down on your most important document.

6            THE COURT:  Well, we don't have icemakers.

7            Oh, Mr. Todd, you have no idea what you just

8   wandered into.

9            (Laughter.)

10           THE WITNESS:  Thank you.

11           THE COURT:  An email came out recently from the

12  administrative judge that if you wish to provide water in your

13  courtroom -- I don't even know what happened to our water

14  pitchers --

15           THE CLERK:  They are gone.

16           THE COURT:  Right.  They are gone.  That the clerks

17  shall -- our law clerks and staff shall distribute the -- you

18  have no idea what you have wandered into.

19           MR. RUSSELL:  If I may --

20           THE COURT:  I even got in trouble because I wrote a

21  directive that attorneys in my -- I will call it my socks

22  case, were showing up this afternoon with a $600,000 attorney

23  fee claim, were allowed to bring their own case of water,

24  which caused tremendous angst in the Sheriffs' Department.  I

25  see my deputy back there nodding because of all the security

1   implications with a case of water coming through.  So --

2             MR. RUSSELL:  If I may add also, Your Honor, Judge

3   Duden offered me water when I was having a coughing fit not

4   too long ago and it was as if I was going to have to fill out

5   a lot of paperwork to have received that water from -- that

6   bottle of water from him.

7             THE COURT:  Oh, Mr. Todd.  You got your water.

8             THE WITNESS:  Thank you.

9             THE COURT:  All right.  Go ahead.

10            BY MR. HUT:

11      Q    Are you ready to go ahead, Mr. Todd?

12      A    Yes.

13            THE COURT:  So your question dealt with the direct

14   appeal to the --

15            MR. HUT:  Yes.

16            THE COURT:  -- Court of Special Appeals?

17            BY MR. HUT:

18      Q    And the question is, were you aware that at the time

19   of the vacator of the conviction and plea and the sentence of

20   time served in Ann Arundel -- I am sorry -- in Wicomico County

21   that the appeal from the conviction in Ann Arundel County was

22   pending in the Court of Special Appeals?

23      A    Yes.

24      Q    And it had not been decided?

25      A    It had not.  But --

nm

35

1      Q    So that the sentence and conviction itself was

2  potentially subject to being reversed or vacated, correct?

3      A    Correct.

4      Q    And did you ask anybody, consult with anyone at the

5  Office of the Attorney General as to their views of the merits

6  of the appeal?

7      A    I did.  It was either the Office of the Attorney

8  General or someone in the State's Attorney's Office in Ann

9  Arundel County.  I cannot remember which, but I did talk to

10  someone involved in the case about the likelihood of the -- of

11  Petitioner's case being reversed on appeal -- the Ann Arundel

12  County case being reversed on appeal, and was advised that

13  that was not likely to happen.

14      Q    And you don't remember the person who told you that?

15      A    I do not, no.  I am sorry.

16      Q    Or which office he or she worked?

17      A    No.  It was either -- as I said, either someone in

18  the AG's office or someone in the Ann Arundel County State's

19  Attorney's Office.

20      Q    You agree -- going back to the question of

21  ballistics in light of the Suber report -- that there was no

22  evidence presented by the State in the second Wicomico County

23  trial from which a reasonable jury could conclude beyond a

24  reasonable doubt which 380 weapon had fired the shots that

25  resulted in the casings found at the crime scene?

**App. 640**

nm

36

1          MR. RUSSELL:  Objection.  I don't believe he can

2    make that determination.

3          BY MR. HUT:

4      Q    Based on --

5          THE COURT:  I don't know how -- I think the only way

6    he can answer that would deal with his ethical responsibility

7    as a prosecutor to only present a case he believes could be

8    proven beyond a reasonable doubt.  So it sort of begs the

9    question -- it is almost -- you almost have to ask it in a

10   different way, but would you have presented that case --

11   because you are speculating on what a reasonable jury would do

12   as opposed to whether a reasonable prosecutor would present

13   the case.  And they are two different issues.

14         So I am going to sustain the objection.  I think

15   there is a -- I think you could -- well, I think you could ask

16   him as a prosecutor, knowing rules, and responsibilities, the

17   code, especially for prosecutors, whether he would have

18   presented that.  But that is a different -- that is a

19   different issue, so I am going to sustain the objection.

20         MR. HUT:  All right.  I will move on, Your Honor.

21         BY MR. HUT:

22     Q    Now, in addition to the ballistics issue, about

23   which you just testified and about which you answered some

24   question in direct, Mr. Todd, there were other issues raised

25   by the Petitioner for post-conviction relief, weren't there?

**App. 641**

1      A     There --

2            MR. RUSSELL:  Objection.  It is going to be beyond

3   the scope.

4            THE COURT:  Overruled.

5            THE WITNESS:  There were, but I was not concerned

6   with any of the other issues that were raised.

7            BY MR. HUT:

8      Q     Well, do you recall there was an issue whether there

9   had been a violation of Brady v. Maryland?

10     A     In -- in --

11           MR. RUSSELL:  I am going to object again, Your

12  Honor.

13           THE COURT:  Overruled.

14           THE WITNESS:  There had been as relating to

15  Mr. Kopera's testimony, as I recall.

16           BY MR. HUT:

17     Q     And, in fact, was there also not an amendment that

18  brought before the court the question whether there was a

19  Brady violation and a failure to disclose culpatory

20  information about a key State witness, Officer Davis?

21     A     Oh, yes.  Yes.  Yes.

22           MR. RUSSELL:  I am going to objection again, Your

23  Honor.  This is beyond scope.

24           THE COURT:  No, overruled.  Because it came up in

25  the testimony of Gary Proctor and Mr. Todd may be in a

**App. 642**

1   position to comment about that because Mr. Proctor raised some

2   very distinct thoughts regarding Mr. Elmer Davis.   If you

3   recall, the clerk, the boxes, et cetera.

4          BY MR. HUT:

5      Q    And that Brady violation had been the subject of an

6   issue or -- an antecedent issue whether under what

7   circumstances an internal police file of Officer Davis could

8   be disclosed to the Petitioner; correct?

9      A    That is correct.   Yes.

10     Q    And there came a time when the Petitioner's counsel

11  and you in turn reviewed the content of the internal file,

12  isn't that right?

13     A    That is correct.   As I recall, we filed a -- or I

14  filed, after talking with you, a petition -- or a motion for

15  the police department to turn those records over, subject to a

16  protective order on how we could use that information.   It was

17  granted by the court and we reviewed those records.   And --

18          THE COURT:   Not an in-camera review, but you

19  actually both reviewed them?

20          THE WITNESS:   I think what I asked for was an in-

21  camera, but the court decided -- he granted the motion, but

22  then his -- the court's idea of the in-camera review was for

23  Mr. --

24          THE COURT:   The parties to review it?

25          THE WITNESS:   -- Hut and I to review it and decide

**App. 643**

1    -- to come to an agreement as to what was --

2              THE COURT:  Okay.

3              THE WITNESS:  -- to be given.

4              BY MR. HUT:

5        Q    And that review disclosed, didn't it, a substantial

6    amount of derogatory information about Officer Davis?

7        A    That is correct.

8        Q    And you agreed that the substantial amount of

9    derogatory material about Officer Davis could have been used

10   at trial to cast doubt on his credibility?

11       A    Yes.  And Mr. Davis was an important witness --

12   impeaching Mr. Davis would have been very important for the

13   Defense in the case concededly because he is the one who found

14   the gun, and he is the one that testified that he said, "What

15   is this?"  And before Petitioner even turned around to look at

16   what "this" was, said, "That's not my gun."

17       Q    Your recollection -- I think I am refreshed -- is a

18   whole lot better than mine, but let me see if I can refresh it

19   and get it a little more precise.

20              There was -- there came a time when in a particular

21   district of Salisbury, at night, two officers, Officers

22   Claborwiden and Davis, spotted the Petitioner and fought.  And

23   when he spotted them, he began to run; correct?

24       A    Yes.

25       Q    And they engaged in pursuit.  The upshot was that

1  Petitioner stopped and started, according to testimony.   They

2  apprehended him.   One of the officers held him with his hands

3  on the hood of the vehicle; correct?

4       A     That is correct.   Yes.

5       Q     And that officer is Officer Davis; correct?

6       A     I don't remember which.

7       Q     And the other officer --

8       A     I guess that is right.   Claborwiden is the one that

9  found the gun and Davis -- I am not certain, but I think that

10  is right.

11       Q     I think that is correct as well.   Officer

12  Claborwiden, having found the gun, returns the gun -- returns

13  to the vehicle with the gun in his hand and says, "Look what I

14  found."   Isn't that right?

15       A     Correct.

16       Q     And then, according to the testimony of Officer

17  Davis, without looking around, or up, or at Officer

18  Claborwiden, because he couldn't, the Petitioner says, "That's

19  not my gun."

20       A     Correct.

21       Q     Is that right?   And you testified earlier that you

22  considered that testimony by Officer Davis to be very

23  important testimony at the trial; right?

24       A     It was, yes.

25       Q     And so the opportunity to impeach his credibility

**App. 645**

1   with derogatory material from his internal file would have

2   been important?

3       A    Correct.

4       Q    Do you recall there came a time when you and I

5   discussed with Judge Jackson his view of Brady and whether

6   material that went to the credibility of a State witness came

7   within the ambit of Brady v. Maryland?

8           MR. RUSSELL:  Objection.

9           BY MR. HUT:

10      Q    He wasn't certain and we represented, I think

11  jointly, that that was the law.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, we agreed that that was the law.

14  That that was something that the State had a responsibility to

15  turn over to the Defense.

16          BY MR. HUT:

17      Q    And all that came up in a conversation with Judge

18  Jackson because you thought and told the judge that this was

19  also an important and a colorable argument made by the

20  Petitioner, isn't that right?

21      A    Yes.  That is correct.

22      Q    In fact, didn't you think it was a better argument

23  than the ballistics?

24      A    No, I thought the ballistics was the best argument.

25  But certainly the Elmer Davis issue -- the Elmer Davis issue

1   was important.  There is no question about it.

2       Q    And just to round out this recreation, perhaps for

3   the benefit of Judge Mulford, of the testimony concerning the

4   discovery of the gun, at trial Officer Claborwiden, who was

5   returning to the vehicle with the gun, testified that he

6   didn't hear the Petitioner say, "That's not my gun."

7       A    That is right.  But then he wasn't nearly as close

8   to Petitioner as Officer Davis was.

9       Q    But Davis was the only one who heard the

10  incriminating statement?

11      A    That is correct.

12           MR. HUT:  Court's indulgence.

13           May I extract, Madame Clerk, Defendant's L?

14           THE CLERK:  Yes.  They are all on a pile right

15  there.

16           MR. HUT:  Thank you.  I bet they are even

17  alphabetized.

18           THE CLERK:  They are, indeed.

19           BY MR. HUT:

20      Q    I show you, Mr. Todd, what has been previously

21  marked and admitted as Defense L.  Have you ever seen Defense

22  L before?

23      A    Are these the docket entries?  Yes.  I have seen

24  them in a different -- this is a different format than the way

25  I have seen them before, but yes.

**App. 647**

nm                                                                    43

1        Q      You have seen them electronically other than printed

2   out?

3        A      I have seen the printed originals as opposed -- it

4   is just not the same format.  But, yes, this is the docket

5   entries from the case that I handled on petition for post-

6   conviction relief and writ of actual innocence.

7        Q      Let me ask you to turn to page eight of Defense L,

8   please, Mr. Todd.

9        A      Okay.

10        Q      Directing your attention to the third entry on April

11   23rd, 2010.

12        A      April 23rd, 2010.  Yes, I got it.

13        Q      You see that that was a resolution of a request to

14   continue or postpone?

15        A      Correct.  Defense Counsel schedule conflict.

16        Q      The resolution was granted because of the defense

17   counsel's conflict; correct?

18        A      Correct.

19        Q      And then you testified, I think, that Mr. Vincent

20   sadly died in an automobile accident in June 2010; correct?

21        A      Yes.

22        Q      And you see -- is the next postponement in the case

23   reflected in an entry on July 13th, 2010?

24              THE COURT:  May 13th.

25              THE WITNESS:  There is one May 13th, 2010.  That is

**App. 648**

1  another one, defense counsel schedule conflict.

2      BY MR. HUT:

3      Q    Thank you.  And -- but that predates the death of

4  Mr. Vincent?

5      A    Right.

6      Q    The July postponement because of defense counsel

7  conflict postdates the death of Mr. Vincent, isn't that right?

8      A    Correct.

9      Q    But the postponement seems to have resulted from a

10  conflict by defense counsel; correct?

11      A    The one in July.

12      Q    Yes.

13      A    Yes.

14      Q    And then the next reflected continuance or

15  postponement in the case occurs on the top of -- or it is

16  reflected as having occurred on the top of page nine on

17  October 22nd, 2010.  Do you see that?

18      A    Yes.

19      Q    And the reason, once again, is defense counsel

20  conflict, isn't that right?

21      A    Correct.

22      Q    And no postponement or continuance is reflect there

23  as attributed to the death of Mr. Vincent or any need of the

24  State?

25      A    Right.

1    Q    Correct?

2         MR. HUT:  Court's indulgence.

3         (Pause.)

4         BY MR. HUT:

5    Q    I am showing you, Mr. Todd, a series of documents

6    that are marked for identification as Defendant's EE, FF, and

7    GG, and ask if you had a chance to look at them, whether you

8    have ever seen those before?

9                                    (The documents referred to were

10                                   marked for identification as

11                                   Defendant's Exhibits EE, FF,

12                                   and GG.)

13   A    I have, yes.

14   Q    What is EE?

15   A    EE is your petition for writ of actual innocence.

16   FF is my reply.  I am sorry, that is not true.  That is your

17   reply to my answer for petition for a writ of actual

18   innocence.  And GG is the order of court.

19        MR. HUT:  We would offer Defendant's EE, FF, and GG.

20        MR. RUSSELL:  No, objection.

21        THE COURT:  All right.

22        MR. HUT:  And we offer as well DD and CC if that has

23   already not been offered.

24        MR. RUSSELL:  No objection.

25        THE COURT:  All right.  They will be admitted.

**App. 650**

nm                                                                    46

1                              (The documents marked for

2                              identification as Defendant's

3                              Exhibits EE, FF, GG, DD, and

4                              CC were received in evidence.)

5          BY MR. HUT:

6          Q    And your expectation, Mr. Todd, is -- I did not

7     include there your response, which I believe was in the nature

8     of an opposition, isn't that right?

9          A    Correct.

10         Q    And you opposed it on, is it fair to say,

11    substantive and procedural grounds called out by the statute

12    that prescribes -- or authorizes the filing of petitions for

13    those writs?

14         A    Right.  I believe that I argued that the newly

15    discovered evidence you alleged in Exhibit EE did not

16    constitute newly discovered evidence under the -- as defined

17    by the statute.  And then I argued substantively it should be

18    denied.  And pretty much cut and pasted some of the arguments

19    from the memorandum you already had me -- I guess, the State

20    already asked me about.

21         Q    And do you recall that the first order that we

22    received, I believe, signed not by Judge Beckstead, but by

23    Judge Jackson had dismissed the writ for -- writ of actual

24    innocence -- the petition for writ of actual innocence on the

25    ground of the plea entered by the Petitioner in July, 2013,

**App. 651**

1    and that we then agreed to correct that, and as a result of

2    the correction there was the order issued by Judge Beckstead,

3    that is Defense GG?  Is that your recollection?

4         A    Actually, the -- GG is an order signed by Judge

5    Beckstead dated July 18th and that -- it is that order that we

6    filed a joint motion to revise that order.  And then she

7    granted that by order dated August 23rd of 2010.

8              MR. HUT:  I accept that correction Mr. Todd makes.

9    That concludes my cross-examination of Mr. Todd, Your Honor,

10   with this need for some guidance from the Court, and that is

11   the Court has received Joint Exhibit 2, which is a stipulation

12   providing for the admissibility of a number of documents that

13   are attachments.  And my question is whether I need to have

14   those separately admitted as Defense Exhibits or are they in

15   evidence subject to whatever limitations Mr. Russell chooses

16   to argue.

17             THE COURT:  They will be in evidence.

18             MR. HUT:  Okay.

19             THE COURT:  Because the stipulation incorporates the

20   exhibits.  So the exhibits are admitted pursuant to the

21   stipulation.

22             MR. HUT:  That is what I thought.  But before we

23   rested I wanted to make sure.

24             THE COURT:  Now, they don't come in directly.  They

25   come in through the stipulation.  All right?

nm                                                                    48

1              All right, any redirect for Mr. Todd?

2              MR. RUSSELL:  Briefly, Your Honor.

3                        REDIRECT EXMAINATION

4              BY MR. TODD:

5         Q    Mr. Todd, do you recall when the first time you and

6    I spoke was?  Well, actually, let me withdraw that and ask you

7    a different question.

8              Do you recall when the first time I contacted you

9    was?

10        A    It was sometime before October.  It was sometime

11   before October of 2013, because that was when I moved to Lake

12   Havasu City.  And when I -- you contacted me the first time, I

13   was living in Sedona, Arizona.  So I don't remember exactly

14   when it was, but I know it was before October of 2013.  Not

15   '13, but '16.

16        Q    Okay.  And how did I contact you, do you recall?

17        A    I believe you telephoned me.  I can't remember.

18   Maybe you emailed me and I called you back or something.  I

19   don't remember.

20        Q    Okay.  And at any point during our conversations, or

21   emailings, or anything along those lines, have I or anyone

22   from the State ever told you not to talk to Mr. Hut or anybody

23   else?

24        A    Oh, absolutely not.

25        Q    Okay.  Mr. Hut asked you a number of questions about

**App. 653**

nm

1  Officer Smith.  Am I giving that name -- Davis.  I apologize.

2      A    Davis.  Okay.  Yes.

3      Q    Officer Davis.

4      A    Yes.

5      Q    Were the issues involving Officer Davis -- you were

6  aware -- what, if at all, did those issues -- what role, if at

7  all, did they play in your decision as to whether or not to

8  resolve this case?

9      A    Well, it certainly -- it certainly was an important

10 issue.  I can't deny that.  But in my mind, the more important

11 issue was the problem with the ballistics.  I would have made

12 the same offer to the Petitioner through Mr. Hut even if the

13 Officer Davis information wasn't there.

14     Q    Okay.  And, again, would you have --

15     A    It --

16     Q    Go ahead.  I am sorry.  I didn't mean to cut you

17 off.

18     A    I don't mean to sound insensitive or anything, but,

19 you know, to a large extent it was a matter of resources.  You

20 know?  Wicomico County State's Attorney's Office is a fairly

21 small office.  And we had, unfortunately, a very high serious

22 and violent crime case load.  So in my mind, you know, we

23 could use our resources to fight tooth and nail on this case

24 for someone who is already serving a sentence of life without

25 parole, or we could make this offer and use those resources to

**App. 654**

1  handle some of the other cases where we were going to be

2  dealing with people who didn't have -- already have a tough

3  sentence ahead of them.

4         So, you know -- now, obviously, if there wasn't an

5  issue there, I wouldn't just sweep a homicide under the table.

6  But since we already had this sentence, why not conserve our

7  resources and use them somewhere where it would make better

8  sense?

9         MR. RUSSELL:  I have nothing further.

10         THE COURT:  Anything else for him?

11         MR. HUT:  Nothing further for Mr. Todd, Your Honor.

12         THE COURT:  Mr. Todd, I have a vague recollection of

13  a gentleman in your office, Deputy State Attorney Collins.

14         THE WITNESS:  Yes.  Yes.

15         THE COURT:  Okay.

16         THE WITNESS:  E. Scott Collins.  When I was in

17  Worcester County.

18         THE COURT:  I also have a vague recollection of you

19  not returning my phones calls, but being very gracious when I

20  showed up as a defense attorney.  But also, you had triplets?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.

23         THE WITNESS:  They are now -- they will be 33 years

24  old in August.

25         THE COURT:  So my memory is somewhat accurate?

**App. 655**

 1                THE WITNESS:  Yes, sir.  Yes, Your Honor.

 2                THE COURT:  All right.  Thank you very much.

 3                THE WITNESS:  Thank you, Your Honor.  Will I be

 4     needed anymore?

 5                MR. RUSSELL:  We do not need him anymore.

 6                MR. HUT:  Nor does the Petitioner.

 7                THE COURT:  What is that?

 8                MR. HUT:  Nor does the Petitioner.

 9                THE COURT:  All right.  You are excused.

10                THE WITNESS:  Thank you, Your Honor.

11                (Witness excused.)

12                THE COURT:  All right.  So let's go back to the

13     Defense case, okay?  Mr. Trainor.

14                MR. RUSSELL:  Thank you, Mr. Todd.

15                MS. GOSTIN:  Your Honor, may we resume Mr. Trainor's

16     testimony?

17                THE COURT:  Yes.

18                THE CLERK:  Please remain standing and raise your

19     right hand.

20     Whereupon,

21                          HARRY TRAINOR

22     was recalled as a witness by the Defense, having been

23     previously duly sworn, resumed the stand, was examined and

24     testified further as follows:

25                THE CLERK:  You may be seated.  And please state

1   your name, occupation, and then spell your name for our court

2   reporter.

3          THE WITNESS:  My name is Harry Trainor, H-a-r-r-y T-

4   r-a-i-n-o-r, and I am an attorney here in Annapolis.

5          THE CLERK:  Thank you.

6          THE COURT:  Go ahead, Ms. Gostin.

7                  DIRECT EXAMINATION (Resumed)

8          BY MS. GOSTIN:

9    Q    Mr. Trainor, yesterday we discussed in your

10  testimony that Defense Counsel in this case failed to seek a

11  resolution of Mr. Stephens' post-conviction proceeding in

12  Wicomico County before proceeding to trial in this case.  Do

13  you recall that?

14   A    I do.

15   Q    And I believe you testified that in a case you had

16  in West Virginia you had sought to delay the trial in that

17  case to allow your client's post-conviction proceedings to go

18  forward before the trial, is that right?

19   A    I did.  Yes.

20   Q    And I think you testified that in that case seeking

21  post-conviction relief was also helpful in your negotiations

22  with the State, is that correct?

23   A    Well, it was.  That is another duty under the ABA

24  Guidelines to -- at all stages, seek a resolution -- an agreed

25  resolution in the case.  There is an explicit guideline on

nm

53

1   that.

2       Q    And is that another reason that Mr. -- excuse me --

3   Mr. Stephens' counsel in this case should have been more

4   diligent in pressing the adjudication of the Wicomico County

5   post-conviction?

6       A    Well, that is.  I mean, to put it sort of in a

7   nutshell, the very clear reason for this duty to investigate

8   the prior convictions and to seek to have it set ahead if it

9   appears to be flawed, is for use in the trial you are facing.

10  The only reason I see that Mr. Proctor and Mr. Lawlor got

11  involved in the post-conviction case was to lessen the impact

12  that case would have on the capital case that was pending in

13  this courthouse.

14       And what I see is that several years after they

15  became involved they filed a petition.  But it doesn't appear

16  that they followed through on it at all.

17      Q    And so -- sorry, go ahead.

18      A    And what I heard today in the testimony that -- was

19  that the post-conviction proceedings with Mr. Todd were

20  handled, I believe, after the capital trial in this courthouse

21  was completed and not handled by original counsel, but handled

22  by Mr. Hut.

23      Q    And, specifically, do you have an opinion as to

24  whether counsel's failure to secure adjudication of the

25  Wicomico post-conviction proceeding met the minimum

54

1    professional standards required of them?

2        A    Yes, I do have an opinion.  And my opinion is that

3    it was deficient.  It was below -- their follow through on

4    that was below prevailing profession norms.  It is clear that

5    there was -- even in Mr. Todd's view, as a prosecutor, he -- I

6    think he said today that certainly there was an arguable

7    issue.  And that is a pretty big concession by a prosecutor.

8        And as it turned out, in the testimony I just heard,

9    there were several strong issues.  There was a Brady

10   violation, there were Kopera issues.  And it wasn't just

11   Kopera's testimony on false testimony, I believe, on

12   credentials, it was also the problem with the substance of his

13   testimony on the casings that was just laid out in Mr. Todd's

14   testimony.

15       Q    Switching gears a bit, I think you testified that

16   you reviewed the trial transcripts from this case?

17       A    I did.  It has been some time.

18       Q    And did you read the direct and cross examination of

19   Edward Jason Freed?

20       A    I did.  But, frankly, I am not sure I retained the

21   full substance of it.  So maybe you could refresh my memory.

22       Q    Sure.  And based on what you remember from what you

23   reviewed and the testimony you have heard over the past few

24   days, what is your understanding of who Jason Freed was as a

25   witness in this case?

**App. 659**

1        A    Well, my recollection is that Jason Freed was an

2   inmate who was incarcerated on the tier where the victim was

3   killed.   And that he claimed to have been a percipient witness

4   through hearing and through observation with a mirror that he

5   had somehow configured to look down the tier.

6        Q    And did you hear testimony from both Mr. Lawlor and

7   Mr. Proctor that in substance Mr. Freed -- they both

8   considered Mr. Freed to be central to the State's case?

9        A    I did.

10       Q    And I believe Mr. Proctor said that Mr. Freed was

11  the State's case.  Do you recall that testimony?

12       A    I do recall that.  Yes.

13       Q    And did you hear testimony from Mr. Lawlor that one

14  of his strategies in cross-examining Mr. Freed was to attempt

15  to show that Mr. Freed was receiving benefits in exchange for

16  his testimony against the Petitioner?

17       A    I heard that.

18       Q    And did you also hear testimony about Judge

19  Hackner's ruling that in part cut off a portion of that cross-

20  examination?

21       A    I remember that.  And I remember Mr. Lawlor saying

22  that at that point he -- I think in his words, "Lost his

23  legs."

24       Q    And did you also hear testimony from Mr. Lawlor that

25  notwithstanding Judge Hackner's ruling, he could have asked

**App. 660**

nm
56

1    other questions to establish that even if Mr. Freed was not

2    aware of an actual agreement between his counsel and the

3    State, he nevertheless, expected to receive benefits from the

4    State on the State charges?

5        A    Yes.  That he had an expectation of improving his

6    position as a result of his testimony.

7        Q    And did you also hear testimony about a letter that

8    Freed wrote to -- I believe, it is Sergeant Branum* that had

9    -- from 2009 that the State had produced to defense counsel?

10       A    I heard testimony regarding him.  Yes.  I don't

11   believe I read the letter.

12       Q    I am showing you what is in evidence as Defense

13   Exhibit D.

14       A    This appears to be a multi-page letter, which I

15   haven't read.  It is addressed to Michael Lawlor and Gary

16   Proctor from David P. Ash, Assistant State's Attorney with

17   what appears to be exhibits attached to it.  It is a total of

18   9, 10, 11 pages, which I haven't yet read.

19       Q    Understood.  If you could turn to the page that

20   looks like this.  I apologize.  I don't think -- it looks like

21   a handwritten letter.

22       A    Dated February 23rd.  I can't read the year.

23       Q    Yes.  I -- and if you look towards the bottom of the

24   first page of the handwritten letter, there is a paragraph

25   that begins, "Also."

1      A     I see that.

2      Q     And I believe it says, "Also, I remember someone

3  saying you all can help me out with my state issues.  Well, I

4  got my VOP in Hartford County.  I had to get it postponed on

5  January 5th because they was going to give me more time not

6  knowing I was going to be helping out in this case."  Do you

7  see that?

8      A     Yes.

9      Q     And did you hear testimony yesterday -- I guess,

10  Tuesday, from Mr. Lawlor that his failure to ask in substance

11  whether Mr. Freed expected help from the State on his state

12  charges and his failure to use this letter in cross-

13  examination with Mr. Freed was not a strategic decision?

14      A     Well, yes, I did.  And what I understand this to be

15  is a copy of a letter that Mr. Freed sent on February 23rd --

16  I am not sure what year, again -- to a Maryland State Police

17  homicide detective named Branum -- or Barnum -- Branum, I

18  believe.  In this letter, he clearly underscores his

19  expectation or hope that the State is going to be helping out

20  with improving his situation based upon his cooperation in

21  this case.  That is my understanding of the substance of it.

22          And, certainly it would have been something that any

23  defense attorney cross-examining a witness on his credibility,

24  or his bias, or his motivation for testifying, could have used

25  effectively in cross-examination.

nm

58

1    Q    And that was also Mr. Lawlor's understanding of the

2  letter upon reviewing it during his testimony, is that right?

3    A    I think that is the understanding that he expressed.

4    Q    And do you have an opinion whether the cross-

5  examination of Mr. Freed met the minimum professional

6  standards?

7    A    Well, certainly you have to -- I mean, there is a

8  duty of defense counsel to review the record, to investigate.

9  I assume that this letter was readily available to him or he

10  had it in his possession.  It sounds as if he overlooked it.

11  And if that is the case, that would be a deficient cross-

12  examination.

13    Q    Did you also hear testimony from Dr. Loftus and Dr.

14  May?

15    A    I heard it.

16    Q    And did you also hear testimony from Mr. Proctor

17  that he wanted to retain audio and visual experts so that he

18  could bring them into the crime scene, to the prison, so that

19  they could assess the ability to hear and to see on the tier?

20    A    I heard that.

21    Q    And did you hear testimony from Mr. Proctor that the

22  Office of Public Defender would not pay the rates of the first

23  expert he attempted to hire, who I believe is an engineer that

24  did accident reconstruction?

25    A    I did hear that, yes.

**App. 663**

1        Q     And did you hear testimony that Mr. Proctor did not

2   attempt to hire any other experts, even though he believed

3   that the Office of the Public Defender would have permitted

4   him to do so had he found someone at a lower rate or perhaps

5   with different qualifications?

6        A     Yes, I heard that.

7        Q     With counsel's failure to retain experts in hearing

8   and vision that could have either assisted in preparing for

9   cross-examination or served as a witness for the defense,

10  deficient?

11       A     Well, to be honest, it is hard to say precisely.  It

12  certainly could be deficient.  But in sitting here and

13  listening to the testimony, I can't honestly say that it is

14  100% deficient.  But it is something that certainly could be.

15            THE COURT:  So to put it another way, do you think

16  any trial judge in the State of Maryland is going to allow an

17  expert to testify that he stabbed a piece of meat in a

18  controlled setting and therefore he can render an opinion to a

19  reasonable degree of scientific certainty that it would

20  replicate the same or similar conditions in a prison cell?

21  The answer speaks for itself.

22            THE WITNESS:  Judge Mulford, I am not sure I would

23  say any trial judge, --

24            THE COURT:  Well, --

25            THE WITNESS:  -- but I would say -- I would say it

**App. 664**

1    would be --

2            THE COURT:  Highly unlikely?

3            THE WITNESS:  That is probably a fair statement.

4    Honestly.  I understand the Court's view on that.

5            THE COURT:  Yes, it is just -- I mean, I had a case

6    that involved a naval academy where the gym burned up.  And

7    the insurance company was arguing it was a spontaneous

8    combustion.  So they took all the chemicals that were used to

9    strip and clean a floor and put them into a box and heated the

10   box up to like 200 degrees to see if it would spontaneously

11   combust.  They didn't go to 200.  They went to about 150.

12           And it is the same type of thing.  You need -- so --

13   all right.

14           THE WITNESS:  I understand the Court's position on

15   that.  I actually think the -- a far more important issue was

16   the failure to interview the medical examiner and to deal with

17   that issue effectively.

18           BY MS. GOSTIN:

19      Q    Would you have had a different view had they been

20   retained in time to allow them to have viewed the crime scene

21   and also to allow them to assist in preparing defense counsel

22   for cross-examination?

23      A    I mean, certainly those things are all things that

24   we should do as defense counsel.  We should be able to get our

25   experts together, get them in early, ideally, to put them --

1  you know, to have them with you when you do the walk through

2  of the prison tier.  Those things are hard to schedule and it

3  would be good to have your experts with you so that you can

4  affectively use experts, and to get their opinions, at least,

5  in helping you prepare your case, to get them from facts that

6  they actually see at the scene.

7          So I think it would be much more affective if that

8  is done early in the case.  Whether or not it could be used in

9  the courtroom, I don't know.  But it certainly would be

10  something that would be helpful to defense counsel in

11  preparing the case.  And in that sense, using experts to help

12  you build your understanding of the case is important.

13      Q    And it is your understanding that Mr. Proctor failed

14  to hire an expert to do that work before the prison was torn

15  down?

16      A    That certainly is what he said, yes.

17      Q    Did you also hear testimony from Mr. Proctor about a

18  stipulation of facts that defense counsel agreed to with the

19  State?

20      A    I did.

21      Q    I am showing you what has been marked as Exhibit P.

22  I believe ---.

23          THE COURT:  I am sorry.  Which one was that,

24  Ms. Gostin?

25          MS. GOSTIN:  "P" as in penny.

**App. 666**

nm
62

1     THE COURT:  Yes, that is what I thought it was.

2 Okay.

3     THE WITNESS:  Yes.  Defendant's Exhibit P appears to

4 be a list of 11 stipulations that Counsel agreed to.

5     BY MS. GOSTIN:

6   Q And did you hear Mr. Proctor testify that he

7 believed that the stipulation was in artfully drafted?  I

8 believe those were his words.

9   A I heard that.

10     THE COURT:  As to paragraph nine?

11     MS. GOSTIN:  Yes.  My apologies.  Thank you, Your

12 Honor.

13     BY MS. GOSTIN:

14   Q As to, I believe, specifically the last sentence of

15 paragraph nine.

16   A I heard that, yes.

17   Q And did you also hear Mr. Proctor testify that he

18 wouldn't have shown these stipulations to Mr. Stephens before

19 he had entered into them with the State?

20   A I heard that too.

21   Q And do you have an opinion as to the propriety of

22 that?

23   A Well, that is not something I would do.  My view of

24 the stipulations, particularly in a capital case where a

25 heightened standard of reliability is required and -- you

**App. 667**

1  know, the Supreme Court has said that death is different and

2  we have to be much more careful.

3          THE COURT:  I am going to have to -- I want to ask

4  something about that.  It is not a capital case anymore.

5          THE WITNESS:  It was then.

6          THE COURT:  It was then.  But even the Court of

7  Appeals and the Maryland Legislature have said when it is no

8  longer a capital case you don't get the same level of scrutiny

9  that you would on the direct appeal.  So they have eliminated

10  the direct appeal to the Court of Appeals.

11          So I do want to inquire and I want Counsel to talk

12  to me about this when it comes to closing, what is the level

13  scrutiny that the Court applies in terms of ABA standards, et

14  cetera?  Because I understand what you are saying, but the

15  Court of Appeals, the State of Maryland, has drawn a very

16  clear line in terms of you lose your direct appeal.  So they

17  have made it very clear that once it is no longer a capital

18  case, it is no longer a capital case.

19          So I am --

20          THE WITNESS:  Well, --

21          THE COURT:  Especially on direct appeal because they

22  take away the direct appeal.  So they -- the Court of Appeals

23  has basically said, we don't treat it as a capital case

24  anymore for appellate issues.  So I am just not aware of any

25  distinction in the post-conviction realm, but I -- I wasn't

1   aware of any.  Maybe Mr. Hut, or Ms. Gostin, or someone knows,

2   but I wasn't aware of anything.  So --

3           THE WITNESS:  The way I have viewed it as is that it

4   was tried as a capital case.  These decisions were made in the

5   context of the capital case.  And --

6           THE COURT:  But when it is no longer a capital case

7   what standards do you apply?  Because you take away the direct

8   appeal of the Court of Appeals, so they no longer treat it as

9   a capital case.  I don't know of any case law that has

10  actually addressed this, and I am just curious because, you

11  know, what might start out as a million dollar law suit if you

12  file it in District Court for under 5,000, now the small

13  claims rules apply.

14          On the other hand, you sue for a million dollars and

15  you get five, the small claims rules don't apply on appeal.

16  So it is a -- you see what I am saying?

17          THE WITNESS:  Well, I see what you are saying.  I

18  would --

19          THE COURT:  I am just -- again, I am --

20          THE WITNESS:  But I am sure I agree with you.

21          THE COURT:  I don't -- I am not saying I agree

22  with --

23          THE WITNESS:  Yes.

24          THE COURT:  I am just saying it is a question that I

25  have in terms of the standards that are used.  And I --

**App. 669**

1  Proctor has an opinion that it is his decision on stipulations

2  for certain trial matters, et cetera.

3            I understand you have a difference of opinion.

4            THE WITNESS:  I do.

5            THE COURT:  And I respect that.  I mean, I have made

6  note of that, but I am just -- let's save it and Mr. Russell,

7  and Mr. Hut, and Ms. Gostin, can address that later because I

8  don't think there is any definitive case on point which says

9  that you apply or you don't apply certain levels or reviews.

10 It is a post-conviction with what is the proper level of

11 attorney representation.  I think that is the question, so --

12            THE WITNESS:  If that is directed at me, or I am not

13 sure this --

14            THE COURT:  I don't know.  We will save it.  It

15 is --

16            THE WITNESS:  But --

17            THE COURT:  We are going to run out time today

18 because I got a -- at 12 o'clock I have got to prepare for

19 something else, but --

20            THE WITNESS:  I would just ask rhetorically how else

21 would -- I mean, we are here to talk about the --

22            THE COURT:  I don't -- I am not disagreeing with

23 you.  I am not disagreeing with you.

24            THE WITNESS:  -- the duty of the attorney and the

25 context of this case.

**App. 670**

nm

66

1        THE COURT:  Of the case that was tried at the time.

2        THE WITNESS:  And that ended in life without parole

3    where something less than that was a punishment that was

4    available.

5        THE COURT:  Yes.  No, it is an interesting --

6        THE WITNESS:  And, you know, when I think about it

7    -- I mean, I am going back to the first question I was asked

8    when I sat down, but I am thinking that Mr. Proctor testified

9    that they were put in a position of basically advocating for

10   the life without parole, which certainly --

11       THE COURT:  It happens a lot.

12       THE WITNESS:  It does.  But if the post-conviction

13   proceeding had been pursued, they may not have been in that

14   position.  And that --

15       THE COURT:  Still would be an inmate serving a

16   sentence.

17       THE WITNESS:  Well, the inmate --

18       THE COURT:  But then he wouldn't have been in front

19   of a jury, he would have been in front of Judge Hackner --

20       THE WITNESS:  It might --

21       THE COURT:  -- because Judge Hackner was not one of

22   the judges who believed that you get a jury sentencing in life

23   without parole cases, which the Court of Appeals -- Court of

24   Special Appeals now clarified.  So --

25       THE WITNESS:  But we can't forget that what happened

**App. 671**

1    here -- the way that conviction impacted on the Defendant, in

2    my view, is that it became an issue for him in making his

3    decision whether or not to testify.

4              THE COURT:  I understand that.  And that is an

5    issue.

6              THE WITNESS:  And that is a fundamental right.

7              THE COURT:  Yes.  I got off track.  These are

8    just --

9              THE WITNESS:  I am sorry.  So did I.

10             THE COURT:  No, it is -- it is the kinds of things

11   that the Court of Special Appeals and the Court of Appeals

12   judges wrestle with and get eight months to resolve -- six

13   months.  So I get 30 to 60 days.

14             MS. GOSTIN:  And we would be happy to address that

15   issue, Your Honor.

16             THE COURT:  So go back to the stipulation.  Do you

17   think Proctor should have shared the stipulation?  Not

18   necessarily whether it was written artfully.  You have already

19   addressed.  But whether it should have been shared with

20   Mr. Stephens.

21             THE WITNESS:  Well, I do.  And I think it should

22   have been shared because -- well, under the guidelines you

23   have a duty of candor to your client, you have a duty to keep

24   the client informed.  That is regardless of whether it is a

25   capital case or a non-capital case.  You have an overriding

**App. 672**

1    duty, regardless of your -- whether you keep the client

2    informed to make certain any stipulation, which is a waiver of

3    proof, is absolutely accurate and in no way misleading.

4            So you not only have, in my view, a duty to keep

5    your client informed -- my practice is always if the client

6    doesn't -- is not in a position to sign off on a stipulation,

7    to at least put something on the record that my client has

8    been advised and agrees to the stipulation.  And to be very

9    reluctant in a capital case to enter into stipulations that

10   are not helpful to the client.

11           BY MS. GOSTIN:

12       Q    Do you recall that Mr. Lawlor testified that

13   Mr. Freed and other eye witnesses testified that both

14   assailants were wearing grey sweats?

15       A    I heard that.

16       Q    And do you recall Mr. Lawlor was shown photos of

17   Mr. Stephens' cell that were admitted into evidence at trial

18   that purported to show grey sweats in his cell?

19       A    Yes.

20       Q    I am showing you what is in evidence as Defense

21   Exhibit C.

22       A    And my understanding is that these are photographs

23   of property of Mr. Stephens from his cell on the date of the

24   offense.

25       Q    And do you remember that when Mr. Stephens testified

**App. 673**

nm

1   yesterday he confirmed in substance that he had two pairs of

2   sweats.  One pair he put on when he was asked by Officer

3   Mayfield to puff up.  And then the other pair remained in his

4   cell and are in those photographs?

5        A    I think I do see sweats in these photographs.

6        Q    And do you have an opinion as to whether -- and I --

7   and do you have an opinion as to whether counsel's failure to

8   highlight the sweatpants in those photos for the jury so as to

9   demonstrate that Mr. Stephens did, in fact, have sweatpants

10  that were put away and had no blood on them -- me the minimum

11  professional standard?

12       A    Well, it could have been helpful.  I can say that

13  much.  You know, I don't know that that made or broke the

14  trial one way or the other.  But it is certainly something

15  that was negligent in not seeing that.  If it was readily

16  available to him, if it was in the discovery, it is something

17  that he could have affectively used I think.

18       Q    And I believe Mr. Lawlor testified that those had

19  been admitted into evidence.  Do you recall that?

20       A    I didn't recall that it was admitted into evidence.

21  But if it was -- if it was before the jury, frankly, you know,

22  one assumes that they had that information.  But I don't know

23  if it was made clear to the jury that this was, in fact,

24  Mr. Stephens' sweatpants.  I don't recall that.

25       Q    And I believe -- do you recall that Mr. Lawlor

**App. 674**

nm

1    testified that it was admitted into evidence by the State as

2    opposed to by the defense counsel?

3         A    I will accept that.  I don't clearly remember.

4         Q    I believe in your testimony you mentioned a number

5    of duties.  I think one of them was the duty to investigate.

6    Is that right?

7         A    Yes.

8         Q    And is another one the duty to pursue legal claims?

9         A    Yes, 10.7 is the investigation duty which includes

10   what we have been talking about with the prior conviction.

11   That -- you know, there is a very concise paragraph in the

12   commentary that would go directly to the prior conviction.

13   And I would also call the Court's attention to the Supreme

14   Court case Rompilla versus Beard, a 2005 case which dealt with

15   the failure to -- of counsel to look into a prior conviction

16   that was available -- information of which was available to

17   him and he didn't pursue it.

18        Q    And is there -- I believe you also discussed a duty

19   to keep the client informed.  Is that also a duty that you

20   mentioned in your testimony?

21        A    That is.  That is in the guidelines.  Yes, it is a

22   black letter rule.  I don't remember the number off the top of

23   my head.

24        Q    And do those duties -- the duties to investigate, to

25   pursue legal claims, and to keep the client informed, do those

**App. 675**

1    also apply to counsel in non-capital cases?

2        A    Oh, yes.

3        Q    And had this not been a death penalty case, would

4    your opinion that defense counsel was deficient in its

5    representation be any different?

6        A    No.  I would just add one thing.  I mean, there was

7    discussion -- I go back to this Wicomico case because I think

8    that is a very important issue.

9            MR. RUSSELL:  I am going to object because I don't

10   think there is a question.

11           THE COURT:  Sustained.  It really is not in response

12   to the question.

13           BY MS. GOSTIN:

14       Q    Why would your opinion have -- why would you have

15   had the same opinion had this not been a death penalty case?

16       A    Well, the Wicomico -- was the question regarding the

17   Wicomico post-conviction?

18       Q    My question was about counsel's deficiencies in

19   general.

20       A    Oh, there are additional duties that I think are

21   important to know.  And one of them has to do with work load.

22   I heard counsel for the Defendant indicate that -- or suggest

23   that one of the reasons that they didn't pursue the post-

24   conviction was that they were busy and had to work other

25   cases.  They weren't -- in order to keep the office open, et

1    cetera.

2           And they had asked the Public Defender to assign

3    this post-conviction case to them.  And that impacts on two

4    guidelines that are important that have to do with the

5    workload.  If we look at 10.3, which has to do the workload --

6    the duty of the individual attorney involved, they are

7    required to control their own workload so as -- that it

8    doesn't interfere with quality representation.  A quote from

9    the commentary is, in short, an attorney whose workload

10   threatens to cause a breach of his obligations under the

11   guidelines has a duty to take corrective action.  Counsel may

12   not simply muddle through.

13          And it sounds to me that on the post-conviction that

14   is sort of what they did.  They muddled through and left it

15   hanging beyond the effective use of it in the capital case.

16          There is also a duty, frankly, of the Office of the

17   Public Defender not to allow this to happen, that they have to

18   have methods in place.  And that is under, I believe, 16.1.

19   So I wanted to make sure that was mentioned.  The Office of

20   the Public Defender must implement effectual mechanisms to

21   limit the workload on attorneys appointed in capital cases.

22          MS. GOSTIN:  No more questions.  Thank you, Your

23   Honor.

24          THE COURT:  Okay.

25          Mr. Russell?

**App. 677**

1       MR. RUSSELL:  Absolutely, Your Honor.  Thank you.

2                       CROSS-EXAMINATION

3       BY MR. RUSSELL:

4       Q    Good morning, Mr. Trainor.  How are you?

5       A    Good morning, Mr. Russell.

6       Q    And, Mr. Trainor, you are located here in Annapolis,

7  is that right?

8       A    Just around the corner.

9       Q    Okay.  And are you being paid for your involvement

10  in this case?

11      A    I hope so.

12      Q    And are -- what is the -- are you being paid hourly?

13      A    Yes.  The agreement I have with the Office of the

14  Public Defenders is that I would be paid at $200 an hour.

15      Q    Okay.  And is that your normal rate for this kind of

16  work?

17      A    I don't know if -- it is probably below what I would

18  charge if they were a private client.

19      Q    Okay.  Let me start with this, Mr. Trainor, you are

20  aware, I assume, of the case of Wiggins v. Smith; right?

21      A    Say that again?

22      Q    Wiggins v. Smith.

23      A    Yes.

24      Q    Okay.  Is it your contention that Wiggins -- the

25  holding in Wiggins is that the ABA guidelines are mandatory on

**App. 678**

1   attorneys?

2        A     They are well-defined norms that are used as guides

3   to what is reasonable.  And that is how they are to be used,

4   as guides to what is reasonable.

5        Q     Okay.  And you described -- correct me if I am

6   wrong, you described them as -- you believe that they are the

7   minimum standard, is that correct?

8        A     I -- that is correct.

9        Q     Okay.

10       A     And I would cite to -- I believe that is what

11  Rompilla versus Beard says, 125 Supreme Court, 2456.

12             MR. RUSSELL:  Okay.  Court's indulgence for one

13  second.  I apologize.  I just had a document in front of me.

14  It has disappeared.

15             (Pause.)

16             Madame Clerk, I am going to ask if it is okay to

17  remark number 11?

18             THE CLERK:  I have it.

19             MR. RUSSELL:  Oh, you have it?

20             THE CLERK:  I have 11.

21             MR. RUSSELL:  That is why I can't find it.  Can I

22  take a look -- I apologize, Your Honor.

23             THE CLERK:  No, that is 10.

24             MR. RUSSELL:  That is 10.  I see 9.

25             THE CLERK:  9 you have.

nm

1    MR. RUSSELL:  9 I have.  I have 12.

2    THE CLERK:  You have 9 and 12.  Yes.

3    MR. RUSSELL:  Let me check and see what I have.

4    THE CLERK:  Okay.

5    MR. RUSSELL:  I am sorry.  I apologize, Your Honor.

6    THE COURT:  It is okay.

7    MR. RUSSELL:  Oh, yes, I do have it.  I apologize.

8    BY MR. RUSSELL:

9    Q    So if I may back up, Mr. Trainor.  So we established

10   that it is your contention that the ABA guidelines are the

11   minimal standards, is that right?

12   A    I think that is an accurate statement.

13   Q    Okay.  And you testified in 2008 before the Maryland

14   Death Penalty Study Commission, is that right?

15   A    I did.

16   Q    Okay.  I am going to show you what has been marked

17   as State's 9.

18   MR. RUSSELL:  Did I give you guys a copy?

19   MS. GOSTIN:  Yes.  Thank you.

20   MR. HUT:  No.

21   MS. GOSTIN:  Oh, I have -- give an extra.

22   MR. RUSSELL:  I will give you another one.

23   MR. HUT:  Oh, thanks.

24   BY MR. RUSSELL:

25   Q    And taking a look at this, Mr. Trainor, does this

nm                                                                    76

1    appear to be an accurate copy of your testimony in that

2    proceeding?

3        A    I have no idea.  This is not a transcript, I don't

4    think.

5        Q    Well, it is the closest thing I could get to one.

6    So I am going to ask you very specially about something in it.

7    And you can certainly -- welcome to say, yes, I said that or I

8    don't think I said that.

9        A    Do you know who prepared this?

10       Q    There was a website that this came off of.  As I

11   said, that was the closest I could find of an actual

12   transcript of it.

13       A    All right.

14       Q    I am going to ask you to flip to the next to last

15   page of this document.  And the first full unnumbered

16   paragraph that begins with the words "The requirements."

17       A    Okay.

18       Q    And that says, "The requirements put on defense

19   counsel by the ABA guidelines and endorsed the Supreme Court

20   in Wiggins is guides to determining what is reasonable demand

21   near perfection."  Is that something that you said, do you

22   think?

23       A    I wouldn't be surprised that the minimum -- I think

24   that the standard is very high.  Particularly high in a

25   capital case.

**App. 681**

1          We, as attorneys, try to do the right thing all the

2    time.

3          Q    Absolutely.

4          A    And I think in a capital case that standard is

5    heightened.  I don't know that that is what I said, but I

6    don't disagree with that.

7          Q    Okay.  Thank you.

8          A    I say -- I mean, I am reading that paragraph now

9    that -- if I said it, I think it is -- you know, even with

10   high standards applied to dedicated lawyers doing extremely

11   difficult work, there will always be an error rate.  And that

12   is, I think, what we are looking at here.

13         Q    I don't disagree with you.

14              Is it your contention that failing to meet the

15   standards in the guidelines is, per say, ineffective

16   assistance?

17         A    No.  I am sure there is situations in which the

18   breach of -- a minor breach of a duty might not be

19   prejudicial.  There might be something like that.  But these

20   are the guides to what is reasonable.  So there has to be some

21   judgment applied to them.

22              But, again, the Supreme Court sees them as well-

23   defined norms.  So they are not to be taken lightly.     .

24         Q    Okay.  And that question of well-defined norms, that

25   goes to deficiency; correct?

nm                                                                    78

1        A    I am not sure I understand what you are saying.

2        Q    Well, I guess what I am asking is <u>Strickland</u>

3   requires two different things.  It requires deficiency and it

4   also required prejudice.  So what you are testifying about

5   deficiency; correct?

6        A    That is what I have been asked about.

7        Q    Right.  I just wanted to make sure we were clear.

8             Now, what -- I think we went over for a good bit

9   over your experience.  And I don't think anybody has any

10  question about your experience, but what experience do you

11  have in handling post-conviction cases in Maryland?

12       A    Well, I did a post-conviction in -- I don't seek out

13  post-conviction cases.  But I did -- I actually did the last

14  post-conviction, 2254, of Mr. Bennett who handled the post --

15  I post-convicted the post-convictor.  That was denied.

16            I recently did a post-conviction in a motion -- in

17  the format of a motion for a new trial -- of trail counsel in

18  Montgomery County.  We had a six-day hearing.  And we won

19  that.

20       Q    What percentage of your criminal caseload throughout

21  your experience has been post-conviction work?

22       A    I couldn't give you a number, but frankly, it is not

23  something I seek out.  It is not something I like to do.  And

24  -- but I have done it.

25       Q    Okay.  Could you give us an estimate as to how many

**App. 683**

1   you think you have handled in Maryland?

2        A    A few.  A handful.

3        Q    Okay.  And now, yesterday, I think that you had

4   testified about the final report that was done by the Maryland

5   Death Penalty Study Commission in 2008.

6        A    Yes.

7        Q    And you had talked about that that -- there is a

8   point in there where they talk about the guidelines being the

9   standard for attorneys handling death penalty cases, is that

10  right?

11       A    Well, I believe the Commission, in my recollection,

12  is -- and I have to look back at it, but that the Commission

13  recognized the ABA Guidelines for the effective representation

14  in capital cases as the minimum standard of care.

15       Q    As a matter of fact, they actually cite to you in

16  making that statement.  Do you know that?

17       A    I didn't know that.

18       Q    You were the footnote of that statement.

19            Is it your contention now that that report carries

20  the weight of law in Maryland?

21       A    No.  But I think it is persuasive authority.  It is

22  the report of a commission that was assembled by the authority

23  of the General Assembly where a thorough study was done of the

24  death penalty in Maryland, testimony was taken from just about

25  every point of view on that.  And the members of the

1  commission came from a wide variety of interests, including

2  the bench, including the prosecution, the defense, the

3  citizens, victims, families, and even victims of wrongful

4  convictions.

5     Q    Is it your contention that the comments in the

6  guidelines hold the same weight as the individual guidelines

7  themselves?

8     A    You know, I am -- I don't know that you read the

9  guidelines like a statute -- like we read a statute.  They are

10  guides to what is reasonable.  The comments are the support.

11  My understanding is the commentary is the support for the

12  guidelines.  The commentary that we have referred to in my

13  testimony regarding 10.7 and the duty to investigate flawed

14  convictions -- prior convictions, I think is authoritative.

15     Q    Okay.  And do you think that only that portion of

16  the commentary is or do you think all of the commentary in the

17  entire guidelines is authoritative?

18     A    I can't attest to all of the commentary in the

19  entire guidelines.

20     Q    Are you aware, with regard to that portion of the

21  commentary, of the citation that the ABA Guidelines uses?  So

22  they cite to a case in the footnote, do you -- are you aware

23  of what case that is?

24     A    There are -- not off the top of my head.

25     Q    Okay.

nm

81

1      A    They cite a couple of cases, as I recall.

2      Q    Okay.  I recall one.  But I just wanted to see -- if

3  you don't remember, then it is not -- we will pass on it for

4  now.

5          Is it your position that in a capital case it is,

6  per say, ineffective assistance of counsel to not review a

7  medical examiner?

8      A    No.  I wouldn't say it is per say.  I would say

9  certainly it is -- it would be something I would do.  I think

10  under the circumstance of this case it was below the standard

11  of care that is required of counsel on the facts of this case.

12      Q    So it is a fact by fact -- a case by case situation?

13      A    Well, I mean, what is really disturbing is there was

14  no reason for it.  Counsel was confused.  He said he really

15  believed that it was off limits.  And that is simply not true.

16          And what disturbed me about that was that not only

17  did he not interview the medical examiner who, I am sure,

18  would have been available, but also he didn't cross-examine

19  the medical examiner on issues related to the direction of the

20  wounds, the number of wounds that -- the issue of whether or

21  not more than one weapon could have been involved.  And he

22  overlooked the fatality factor that has been testified --

23          THE COURT:  He overlooked the what factor?

24          THE WITNESS:  Which wounds were --

25          THE COURT:  I didn't hear which word you -- oh,

**App. 686**

 1   lethality.

 2          THE WITNESS:  Fatality.

 3          THE COURT:  Fatality.

 4          THE WITNESS:  Fatality.

 5          THE COURT:  I didn't know if you said lethality or

 6   fatality.

 7          THE WITNESS:  I said fatality, in that there was

 8   some testimony here in the last few days, at least, that two

 9   of the wounds --

10          THE COURT:  No.  No.  I understand the issue.  I

11   just didn't know what word you used.

12          THE WITNESS:  What word.  All right.

13          THE COURT:  I didn't know if you said with --

14          THE WITNESS:  That is because we don't have any

15   water here, Your Honor.  My mouth is just dry.

16          (Laughter.)

17          THE COURT:  If you had -- you go down to see Judge

18   Harris for your water.  He will --

19          BY MR. RUSSELL:

20     Q    Just step back for one second, Mr. Trainor.  You

21   said you assumed that the --

22          THE COURT:  The Court of Appeals doesn't give you

23   water.

24          THE WITNESS:  I guess not.

25          THE COURT:  They have glass goblets with ice, but

1   they don't give you water.

2           THE WITNESS:  That is another place I try not to go.

3           THE COURT:  But they only make you -- they only let

4   you stand up for 20 minutes, so --

5           THE WITNESS:  Yes.

6           THE COURT:  All right.  What is the next question?

7           MR. RUSSELL:  Thank you, Your Honor.

8           BY MR. RUSSELL:

9       Q   Mr. Trainor, going back just very briefly to

10  something you had just said, you said you assumed that he

11  would be able to talk to the medical examiner.  But we don't

12  actually know if that is true, is that right?

13      A   Well, in my experience I have never been denied a

14  visit with the medical examiner.  I have always felt welcomed

15  there and I always found the people there are willing to

16  cooperate very open.  In fact, giving me tours of the place.

17      Q   Thank you.

18      A   They welcome a live body.

19      Q   I don't disagree with that.  I have had similar

20  experiences.

21          But you say it is specifically the fact that

22  Mr. Proctor believed that he couldn't interview her.  That was

23  the part that jumped out at you as part of the reason why --

24      A   It is troubling because it is just not a fact.  And

25  I don't know where he got that false belief.

**App. 688**

nm

84

1   Q    Okay.  Let me give you a hypothetical:  Let's say he

2   is -- I am trying a capital case.  I don't interview the

3   medical examiner just for that reason.  I don't think that I

4   can.  But I hire five expert medical examiners from nearby

5   states.  I effectively cross-examine the State's medical

6   examiner.  Is that still a deficient act?

7   A    I don't know that that would be.  You know, you

8   should interview witnesses, particularly witnesses like that

9   who are available and important, particularly if cause of

10  death and manner of death are at issue in your case.

11       But hiring someone to help you cross-examine, to

12  help prepare you is a good thing to do.  I don't know that any

13  medical examiner witness was called in the defense case.  I

14  haven't heard that.

15  Q    Now again, your testimony is that the guidelines

16  themselves should be considered minimal standards?

17  A    I think so.

18  Q    And the guidelines -- I am going to use the word

19  prohibit.  That may be a too strong of a word.  But they purge

20  against flat rates -- is that right? -- for paying someone who

21  is handling a death penalty case.  Is that right?

22  A    And that is a part of the guidelines that I haven't

23  paid attention to.  When you are saying "flat rates" you mean

24  like a flat fee?

25  Q    Yes.  As opposed to hourly.

**App. 689**

nm                                                                      85

1       A     I mean, I wouldn't be surprised if that is a fact.

2    That is not something that affects me directly normally, so

3    that is not something that I am focused on.  But I wouldn't

4    argue with you that it might be in there.

5       Q     Okay.  But would you be saying that in states where

6    that happens that they are, from the jump, giving ineffective

7    assistance of counsel?

8       A     Well, here is where --

9             MS. GOSTIN:  Objection.

10            THE WITNESS:  Here is how that --

11            THE COURT:  Sustained.  It is applied to the facts

12   of this case.  Sustained.

13            BY MR. RUSSELL:

14      Q     Is it your position, Mr. Trainor, that failure to

15   post-convict every prior conviction of the defendant in a

16   death eligible case is, per say, ineffective assistance of

17   counsel?

18      A     No.

19      Q     No.

20      A     No.  It would only apply to flawed convictions.  I

21   mean, you have got to look at them.  You have to investigate

22   -- that is Rompilla versus Beard.  You have to investigate the

23   prior convictions.

24            But if -- you can investigate and find, you know,

25   there is nothing I can do.  This is a perfectly valid

**App. 690**

1   conviction that I can't -- there is nothing I can do to help

2   my client by challenging this conviction.  I think that is the

3   case in -- I mean, in many times.

4           I have had clients ask me to do a *coram nobis* and

5   there is no *coram nobis* relief available.  And I tell them

6   that.  I just don't file it.

7       Q    Right.  Right.  But your position is that they

8   should at least investigate every conviction?

9       A    Well, my position is in this case that they should

10  have done a better job in pursuing the post-conviction.  That

11  this is a case where the prior conviction and life sentence

12  appeared to be seriously flawed.

13          What they did was file a petition and apparently not

14  follow through on it in a timely manner.  And I haven't heard

15  any reason for that other than we didn't have time.

16      Q    Okay.  My question to you is, is it your position

17  that defense counsel in a death penalty case is per say

18  deficient if they don't investigate every conviction that

19  their client has?

20          MS. GOSTIN:  Objection.  Asked and answered.

21          THE COURT:  Sustained.  He did indicate it only

22  applied to flawed convictions.  So he has asked and answered

23  that.

24          MR. RUSSELL:  No, if I respectfully may respond,

25  Your Honor.  I think that he responded to whether or not it

1    would be challenged.  And he said only the flawed ones.  I am

2    asking about whether they have to be investigated.

3              THE COURT:  All right.  You can answer that.

4              THE WITNESS:  Well, here is what is required, I

5    think.  That if the conviction has potential to be used as an

6    aggravating factor or could otherwise come into evidence, then

7    there is a requirement that you investigate it.  If you find

8    what appear to be flaws, that is when you have to challenge

9    it.

10        Q    Okay.

11        A    That is my understanding.

12        Q    And when you say come into evidence that includes at

13   the sentencing portion, is that correct?

14        A    Well, it includes coming into evidence -- for

15   example, in this case if Mr. Stephens elected to testify,

16   there is a reasonable chance that his conviction would come

17   into evidence in the guilt phase of the trial.  So that is

18   what I mean.

19        Q    Okay.

20        A    It could be used against him in some way.

21        Q    I just want to clarify so my question is, you are

22   saying trial counsel should investigate every conviction that

23   could come in.  And I am asking does that include convictions

24   that would only come in at sentencing?

25        A    It includes that.

**App. 692**

nm

1    Q    Okay.  Let me give you a hypothetical question.

2    Let's say the State says -- I am representing someone in a

3    death penalty case.  State says my client has 20 violent

4    convictions on his record.  They plan to introduce all of them

5    at sentencing.  The judge has said they are all admissible in

6    sentencing.  I must attempt to investigate all 20 of those, is

7    that what you are saying?

8    A    I don't see why not.

9    Q    Okay.  And I have to do them all prior to -- at

10   minimum, to sentencing, is that correct?

11   A    That is one of the reasons the death penalty is

12   unjust in many cases because a lot is required of defense

13   counsel.  You know, it is a very high standard.  And that is

14   one of the reasons.  It is a huge thing when the Government

15   seeks to take a client's life.

16   Q    Let me change the hypothetical just a little bit.

17   What if all 20 of those convictions are from different states

18   and not the state that I am trying it in.

19   A    That would make it more difficult, but your duty

20   would still be there.  I mean, how can you ignore something

21   because it is from Alaska?

22   Q    I agree.

23   A    I can tell you that we -- in the federal system

24   there is more money available for funding.  I mean, we have

25   had cases -- one case comes to mind in which we spent -- they

1    sent us all over the world, to Africa, to -- all over Europe

2    finding witnesses in a capital case.  I am not sure the

3    funding would allow that in a Maryland case.  But still the

4    duty persist regardless of the funding.

5        Q    That was actually my next question -- was to move us

6    into the international realm, but I think you have answered

7    what I was going to ask.

8             Now, let's talk about something that you had

9    previously mentioned, which was in a case of your own what you

10   had done is ultimately had a large firm come in and handle it

11   pro bono.  Is that right?

12       A    Yes.

13       Q    A post-conviction, is that correct?

14       A    Yes.

15       Q    Okay.  Now, would you agree that that is a bit of

16   tenuous policy for the Office of the Public Defender to rely

17   on some big firm that is going to come in and handle it pro

18   bono, is that right?

19       A    A tenuous policy.  What do you mean by that?

20       Q    I mean, that is -- it may not happen is what I mean.

21   Would you agree?

22       A    It is one of the options, but there are other

23   options.  There are panel attorneys available.  You know, the

24   force of a phone call.  It is hard for a lot of us to turn

25   down someone.

**App. 694**

1          In the case that I cited to you, my experience it

2    was a judge in Superior Court who happened to see that this

3    was a serious issue and that we needed help and that we didn't

4    have funding for it and he made a phone call for us.  And he

5    got one of the top law firms in the country to help us.

6          Q    Okay.  And we agree, though, that Washington, DC is

7    going to have a larger group of large law firms than

8    Salisbury, which we heard has one hotel?

9          A    I don't know if it has one hotel.  Maybe it did

10   then.

11         Q    I don't think it does anymore.

12         A    But Washington DC has more lawyers per square inch

13   than Salisbury, I am sure.

14         Q    Okay.  So it would have, in your eyes, been a better

15   decision by Mr. Proctor and Mr. Lawlor to contact some other

16   attorney to help with the post-conviction?

17         A    Well, they have a duty under the guidelines that if

18   they are doing the post-conviction themselves interferes with

19   their ability to give affective representation in the capital

20   trial, they have got to take measures.  They have got to

21   either, decline that and ask that someone else be appointed or

22   find other attorneys to do it.

23         Q    Okay.  If you were to find out that they actually

24   brought in Marta Kahn Baltimore City to work on it, would that

25   make any difference?

**App. 695**

nm

1      THE COURT:  Brought in who?

2      MR. RUSSELL:  Marta Kahn.

3      THE WITNESS:  Marta Kahn is somebody who is

4  available to help lawyers in cases like that.

5      BY MR. RUSSELL:

6      Q    Okay.  And if you were to know that they -- that she

7  worked on that post-conviction would that make any difference

8  to you?

9      A    Not really.  She does mostly out of court work.  I

10  am -- as far as I know.

11     Q    Okay.

12     A    I don't know that she ever appeared in court in that

13  case.  I didn't see.

14     Q    She did not.  No.

15          Now, you heard testimony that Mr. Proctor filed this

16  post-conviction three days before the ten-year deadline.  Is

17  that right?

18     A    Uh-huh.

19     Q    Okay.  And you are aware that it is not unusual for

20  post-conviction attorneys to have to come into a case right

21  before the deadline is about to kick and to file something

22  right before the deadline goes off?

23     A    Perhaps, but in this case they were in the case in

24  2006.  And certainly I assume that they knew about the prior

25  conviction almost immediately.  And they were aware that the

**App. 696**

1    death penalty was at issue here.  And therefore, they were

2    aware that they had a duty to examine these -- this flawed

3    conviction.  And as I understand it, the Kopera issue arose as

4    early as 2007 after his suicide.  So therefore, there is that

5    two-year gap before they even filed.

6         So they waited until the last minute.  I won't say

7    that that is necessarily deficient, but it is -- they lost a

8    lot of time in doing that.

9         Q    But we would agree that they are free to supplement

10   that petition going forward?

11        A    I think so.  Yes.

12        Q    Okay.  And there is no <u>Hicks</u> or speedy trial as far

13   as a post-conviction proceeding goes?

14        A    But that is not even the issue.  The issue is that

15   the purpose for filing the -- for the collateral attack on the

16   conviction and the sentence is for use in the capital case.

17   So the timetable for pursuing it is really dictated by the

18   timetable in the capital case, so you have to start early.

19   And if necessary, seek postponements of the capital case in

20   order to accommodate the pursuit of the collateral attack.

21        Q    Let me ask you this, Mr. Trainor:  Let's assume in

22   the case that you had, the pro-bono -- the law firm that came

23   in and represented the defendant pro-bono on the post-

24   conviction, if they failed to give him effective assistance of

25   counsel, how does that affect his death penalty case?

**App. 697**

1        A    Well, that would be an interesting issue, but I am

2   sure it could be raised.  I mean, I don't know the answer to

3   that, but the duty is applied to the capital case, actually.

4   I mean, there could be ineffective assistance of post-

5   conviction counsel that didn't prejudice the capital case, I

6   suppose.  But the duty of counsel arises in the context of the

7   capital case, so --

8        Q    Okay.  Well, let me ask you hypothetically this way:

9   Let's say Mr. Proctor did find a large law firm to handle the

10  Wicomico County case pro-bono.

11       A    ---.

12       Q    And they did the exact same thing he did.  Would

13  there be ineffective assistance of counsel in the case we are

14  in here for today?

15            MS. GOSTIN:  Objection.  Relevance?

16            THE COURT:  Sustained.  It also assumes facts not in

17  evidence and it is very speculative.

18            MR. RUSSELL:  I have nothing further, Your Honor.

19            THE COURT:  All right.  Anything else for

20  Mr. Trainor on redirect, Ms. Gostin?

21            MS. GOSTIN:  Nothing from the Petitioner.  Thank

22  you, Your Honor.

23            THE COURT:  All right.  You can step down,

24  Mr. Trainor.

25            THE WITNESS:  Thank you, Your Honor.

nm                                                                      94

1                    (Witness excused.)

2                    THE COURT:  All right.  Next witness.  Is that --

3                    MR. RUSSELL:  I have Mr. Ash.

4                    THE COURT:  No.  I am looking at Mr. Hut.

5                    MR. HUT:  There is nothing further from --

6                    THE COURT:  You can check all of your exhibits

7   though.

8                    MR. HUT:  Well, yes.  If Madame Clerk would just

9   make sure that everything that we have marked is in evidence.

10  And while she is doing that, perhaps, Your Honor, I can

11  address this:  There is the matter of proffer as to what, had

12  I been called and permitted to testify by the Court, I would

13  have testified.

14                   THE COURT:  You can put that on the record.

15                   MR. HUT:  Well, that is -- it is -- effectively it

16  is rebuttal from Mr. Todd.  It is part of our rebuttal case, I

17  think.  It would not be part of our case in chief.  But since

18  he has testified out of order, perhaps I can do that now.

19                   We have prepared a several-page proffer.  Can I

20  proceed that way or would you like me to read into the record?

21                   THE COURT:  It would be better if it was read into

22  the record.  Then you can also file it.  That way you have

23  preserved it.

24                   MR. HUT:  All right.  Thank you.          .

25                   THE COURT:  And Madame Clerk can accept this as a

**App. 699**

nm

1    Defense Exhibit whatever we are up.  I can't remember.

2              THE CLERK:  We are up to, I think, it is double H.

3              THE COURT:  H?  Madame Clerk thinks it is HH.  So we

4    will have that marked as HH.

5                                    (The document referred to was

6                                     marked for identification and

7                                     received as Defense Exhibit

8                                     HH.)

9              THE COURT:  And I will let you move it in.  I think

10   it is better if you read it into the record.

11             MR. HUT:  It is somewhat lengthy as I have

12   indicated.

13             THE COURT:  That is fine.  Judge Wax and I were just

14   discussing yesterday about jury instructions being moved into

15   the record versus being read into the record when the defense

16   is objecting to voir dire given by the court and jury

17   instructions given by the court.  Does the defense have to

18   read them in or is the filing enough?  I said I think the

19   filing is enough.  He wasn't sure so he said he would let the

20   attorney do both.

21             MR. HUT:  All right.  Well, let me proceed.

22             THE COURT:  So I am going to let you do both.

23             MR. HUT:  Had -- and I will speak of myself from

24   time to time here in the first person -- or third person and

25   the first person.

nm                                                                          96

1           Had Mr. Hut testified at the post-conviction hearing

2   in this case, he would have offered the following testimony:

3           I, A. Stephen Hut, Jr., and over the age of 21 and

4   am competent to testimony to the matters and effects set forth

5   herein, all of which are within my personal knowledge.  I am

6   an Assistant Public Defender in the Maryland Office of the

7   Public Defender and serve as its general counsel.

8           In December, 1998, the Petitioner, Lee E. Stephens,

9   was tried for murder in Wicomico County, Maryland, for the

10  death of Dwayne Holbrook, which occurred in Salisbury,

11  Maryland in April, 1997.  The jury was unable to reach a

12  unanimous verdict following that trial.

13          Mr. Stephens was retried in Wicomico County in June,

14  1999 for the death of Dwayne Holbrook and was convicted of

15  first degree murder.  In August, 1999 he was sentenced to life

16  plus 15 years on that conviction.

17          In August, 2009 trial counsel for Mr. Stephens in

18  this case filed a petition for post-conviction relief from his

19  Wicomico County conviction in the Circuit Court for Wicomico

20  County alleging, among other things, that Joseph Kopera, the

21  State's ballistics expert in that case, had testified falsely

22  about his credentials.

23          I first came to represent Mr. Stephens as a partner

24  in the Washington DC law firm Wilmer Cutler Pickering Hale and

25  Dorr, LLP in an interlocutory appeal from a ruling in the

**App. 701**

1   trial that is the subject of this proceeding.   In that appeal

2   Mr. Stephens argued that the then recent amendments to the

3   Maryland death penalty regime entitled him to a hearing

4   whether any of the predicates for application of the death

5   penalty had been met.

6          The Court of Appeals which heard the case directly

7   because it involved the death penalty dismissed the appeal for

8   want of appellate jurisdiction in 2011.

9          Beginning in late 2012 I came to represent

10  Mr. Stephens in seeking post-conviction relief from his

11  Wicomico County conviction.   In the trial in the Wicomico

12  County case, charging Mr. Stephens with first degree murder,

13  the State's ballistics expert, Joseph Kopera, had testified

14  that all six of the 380 shell casings recovered at the crime

15  scene were fired by the same handgun identified as a black

16  Berretta recovered months later in a neighborhood where

17  Mr. Stephens had been observed.

18         In March, 2013, the State retested the ballistics

19  evidence from the Wicomico County case and provided a new

20  expert opinion to counsel for Mr. Stephens into the Wicomico

21  County State's Attorney Office.   That opinion, by Toran Suber,

22  determined that only four of six 380 shell casings had been

23  fired by the black Berretta that Wicomico County law

24  enforcement had claimed to have recovered from Mr. Stephens,

25  and that the two other 280 casings -- sorry, the two other 380

1    casings recovered outside of the crime scene had been fired

2    from one or two different handguns.

3          There was no evidence presented at trial in the

4    Wicomico County case from which a trier of fact could have

5    determined which 380, if any, fired the shot that killed the

6    victim.

7          On March 29, 2013, I filed on behalf of Mr. Stephens

8    an amendment to the original petition for post-conviction

9    relief that had been filed in August, 2009.  The amended

10   petition alleged the facts that I have just recited.

11         On April 10, 2013 I filed on behalf of Mr. Stephens

12   a petition for a writ of actual innocence.  In the petition

13   for writ of actual innocence also alleged the facts that I

14   have just recited.

15         In closing argument at that trial, the State

16   asserted at the very outset, "In this case you need to look

17   primarily first at the physical evidence found at the scene.

18   It is uncontested that the six 380 caliber shell casings found

19   at the scene, the one bullet fired and found at the scene, and

20   the bullet removed from the leg -- left leg of Dwayne Holbrook

21   was fired by this 380 semiautomatic handgun."

22         One of the State's other witnesses at the Wicomico

23   County trail was Police Officer Elmer Davis.  Lieutenant Davis

24   testified that Mr. Stephens had placed "something in his

25   pants" and then "took off running."  He further testified that

**App. 703**

1   he then pursued Mr. Stephens while another officer encountered

2   the black Berretta later found to match a bullet and casings

3   recovered from the crime scene.

4          Lieutenant Davis further testified that upon

5   apprehending Mr. Stephens, Mr. Stephens said, "It's not my

6   gun," even though at the time Mr. Stephens was not aware that

7   the other officer had found a gun.

8          Sharon Weidenfeld, an investigator hired to assist

9   Mr. Stephens obtained the internal departmental file for

10  Officer Davis.  It showed a number of serious infractions of

11  department rules and regulations.  That material, as the State

12  also agreed, constituted material improperly not disclosed

13  from the Defendant -- or to the defense under Brady versus

14  Maryland.  In light of these claims, which counsel of the

15  State acknowledged were strong, the State agreed to the

16  vacator of Mr. Stephens' conviction in the Wicomico County

17  case.

18         As part of this agreement, Mr. Stephens agreed to

19  plead guilty to the Wicomico County murder charge after the

20  conviction for that charge was vacated, but he did so only

21  because the State had also agreed that the sentence to be

22  imposed after such plea was to be time served.

23         In the post-conviction proceeding in Wicomico County

24  the State was represented by Assistant State's Attorney Joel

25  Todd.  I had many conversations with Mr. Todd on behalf of

**App. 704**

1   Mr. Stephens regarding the petition for post-conviction relief

2   and the State's offer to Mr. Stephens of time served in

3   exchange for a guilty plea, both on the day that the agreement

4   was entered into, and before and after.

5          In a number of these conversations Mr. Todd

6   expressed his view that the Brady claim and the ballistics

7   claim were strong.  And that there was a substantial and close

8   question which party would prevail were the claims litigated

9   before the court.

10          Mr. Todd also represented this assessment of the

11   claims to the judge appointed to hear the petition, the

12   Honorable W. Newton Jackson, Jr., as justification for the

13   State's wish to enter the agreement just described.

14          In our conversations, Mr. Todd never suggested to me

15   that a reason that the State was willing to agree to a

16   sentence of time served was that Mr. Stephens already had a

17   life sentence as a result of his Anne Arundel County

18   conviction.  He did describe to Judge Jackson that

19   Mr. Stephens was incarcerated for life without parole, but

20   only by way of describing the full facts.

21          The Circuit Court for Wicomico County held a hearing

22   on the petition for post-conviction relief.  At the hearing,

23   the court implemented the agreement just described.  It

24   vacated the murder conviction and the life plus 15 years

25   sentence.  Pursuant to his agreement with the State,

nm                                                                    101

1   Mr. Stephens thereafter pleaded guilty to a count charging

2   first degree murder and was sentenced to time served on that

3   plea.

4          At that hearing, Mr. Todd did not tell the court

5   that a reason the State was willing to agree to a sentence of

6   time served was that Mr. Stephens already had a life sentence

7   as a result of his Anne Arundel County conviction.

8          The Circuit Court for Wicomico County denied the

9   petition for a writ of actual innocence as moot.  Following

10  his conviction in this case, Mr. Stephens appeals to the Court

11  of Special Appeals.  As of July 13th, 2013, the direct appeal

12  of Mr. Stephens' conviction in this case was still pending in

13  the Court of Special Appeals.  That Court did not decide the

14  appeal affirming the conviction until December 10th, 2013.

15  Mr. Stephens' petition for a writ of *certiorari* to the

16  Maryland Court of Appeals was denied on March 24th, 2014.

17         And then I attach to the written version of this a

18  true and accurate copy of the ballistics report of Toran Suber

19  provided to me by the State in March, 2013.  And that report,

20  as Your Honor is aware, has already been received in evidence.

21         I should say that we prepared this, of course,

22  before the testimony of Mr. Todd today and the cross

23  examination.  Candidly, I think, had that cross-examination

24  and direct-examination ensued and we knew about its contents,

25  this probably would have been unnecessary.  As I was reading

**App. 706**

1  it, I think that almost all of the representations I would

2  have made are in.

3          THE COURT:  I don't know that Mr. Todd testified any

4  differently from what you just proffered.

5          MR. HUT:  That is what I believe as well.

6          THE COURT:  Right.

7          MR. HUT:  But we had no way to foresee that, of

8  course.

9          THE COURT:  I know.  I mean, he was very candid and

10  you didn't bring it up.

11          Okay.  All right.  Let's -- so that will be the

12  Petitioner's case.

13          I know you have Mr. Ash.  How long is he

14  realistically going to testify?

15          MR. RUSSELL:  I think we are going to be tough to

16  get him in by noon, but we can give it a shot.

17          THE COURT:  I know we are not going to be done by

18  noon.

19          MR. RUSSELL:  Okay.

20          THE COURT:  Plus, I need to give each side

21  sufficient opportunity to make arguments and the Petitioner

22  might wish to put on rebuttal testimony.  I don't know.

23          MR. RUSSELL:  I will say with regard to -- if we are

24  going to do argument today, that I --

25          THE COURT:  No, we are not doing argument today.

1          MR. RUSSELL:  Okay.  Okay.  Just making sure that is

2     clear.

3          MR. HUT:  At this stage I can tell the Court that

4     the Petitioner does not anticipate rebuttal evidence.  And I

5     wouldn't anticipate anything as a result of Mr. Ash's

6     testimony, but I don't want to completely commit to that.

7          THE COURT:  I am already into one entire legal pad

8     and I am about to go through another one, so -- you all

9     anticipated two and a half days, including argument, so that

10    is not going to happen.  And I literally need to switch gears

11    because I need to move from criminal into business and

12    technology.

13         So I am trying to think whether it would be useful

14    -- because Mr. Ash is here.  I could get 20 minutes out of

15    him, but then it becomes sort of choppy and I am just

16    wondering if our time would be better spent if perhaps we

17    could speak to my administrative assistant about seeing how

18    soon we could get a day that I could put you in, Mr. Ash can

19    testify, you can cross-examine him.  Then we could have

20    argument or rebuttal if necessary.  So -- and it is --

21         MR. HUT:  Subject to different views of the Court,

22    and Mr. Russell, I would not think we would need more than

23    half a day for that, Your Honor.

24         THE COURT:  I know.  But again, I still need to

25    budge accordingly because I have run up against clocks.

**App. 708**

1              MR. RUSSELL:  Also, Your Honor, we have to get

2      Mr. Stephens back here, so that would be an issue.

3              THE COURT:  I know.  And I don't know what my

4      schedule is like and I don't know what -- juggling four -- or

5      if Mr. Trainor is going to stay, five.  Mr. Ash is easier to

6      get in.  I can get him a lot easier.

7              Let me take a short break, go see my assistant, see

8      what my schedule looks like, and we can go from -- I will be

9      back out in a few minutes, okay?

10             MR. RUSSELL:  Thank you, Your Honor.

11             THE CLERK:  All rise.

12             THE COURT:  If he needs to use the bathroom, he can

13     go now.

14             (Whereupon, at 11:35 a.m., a brief recess was taken

15     and the case was recalled at 11:46 a.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Please be seated, everyone.  You think

18     he knows I am back?  Probably not.

19             MR. RUSSELL:  I would be happy to step out if you

20     would like, Your Honor.

21             (Asides.)

22             MR. HUT:  Madame Clerk, other than HH that was just

23     marked, was there anything marked and not offered by Defense

24     Counsel?

25             THE CLERK:  The Judge had me admit HH.

**App. 709**

1          MR. HUT:  Oh, it is already admitted?

2          THE CLERK:  Yes.

3          MR. HUT:  Nothing else?

4          THE CLERK:  So all of the Defense exhibits are in.

5          MR. HUT:  Thanks.

6          THE COURT:  Mr. Russell?

7          MR. RUSSELL:  Your Honor, the only issue that I

8   have --

9          THE COURT:  You need to call the case.

10          MR. RUSSELL:  Oh, I am sorry.  Calling State versus

11   Lee Stephens, case number 02-K-08-646.  David Russell, R-u-s-

12   s-e-l-l on behalf of the State.

13          MR. HUT:  Stephen Hut for Petitioner.

14          THE COURT:  All right.  It is noon and we have not

15   finished the State's case and I have asked the parties to see

16   if you will be available the next week -- available next week.

17          Mr. Russell, I know you went out to speak to

18   Mr. Ash.

19          MR. RUSSELL:  I did not catch him.  And I will -- I

20   can run and find him real quick if the Court wants me to.

21          THE COURT:  All right.  I --

22          MR. RUSSELL:  I apologize.  It slipped my mind that

23   I needed to make sure he is.  He is almost always here, so it

24   is --

25          THE COURT:  Okay.

**App. 710**

1              MR. RUSSELL:  I don't want to assume he will be, but

2    generally he is here every day.

3              THE COURT:  Well, let's book today right now.  And

4    then see if there is an issue, you can contact Counsel and all

5    of that, okay?

6              MR. RUSSELL:  Absolutely, Your Honor.

7              THE COURT:  All right.  Madame Clerk, we are going

8    to continue this case and it will be on April -- I just forgot

9    what Wednesday.  Is that the 26th?

10             THE CLERK:  Yes, Your Honor.

11             THE COURT:  April 26, 2017.  We will start at 9:00

12   a.m.

13             The officers who are here from the department, I am

14   asking Madame Clerk to prepare an order from me which will

15   indicate that criminal is to issue a new writ to allow the

16   Defendant to be brought back as this case has not been

17   concluded.

18             I understand that for the officers who are here, you

19   are not the ultimate decision makers and I would ask you to

20   leave with Mr. Russell a phone number of someone so that if

21   you get back and one of your superiors say that can't be done,

22   he has to go back to federal custody, the writ was only for

23   this many days or something, you can communicate with

24   Mr. Russell so that he can make an appropriate call to whoever

25   is in the chain of command higher than you.

**App. 711**

1           And I don't want to put you in a position where I am

2      putting you in a position where you are going to run a foul

3      with your superiors.  Let me, let the State's attorney deal

4      with that.  You just be the messenger; okay?

5           So, again, if it creates an issue, then we will deal

6      with it from a different perspective.  But all you need to

7      know is when you get back if someone says, no, that won't

8      work, you communicate to Mr. Russell so that either he or I

9      can make the phone calls.  It will not be your job.  You are

10     simply to be the messenger, say, the judge says this is the

11     next hearing, wants him here.  If someone says, no, tell

12     Mr. Russell and we will go from there, okay?

13          I really thank you and I appreciate you cooperating

14     with that.  All right?

15          So with that, I would suggest Counsel that everyone

16     keep your items with you because if you decide to leave them

17     here between now and next Wednesday, A, Ms. Gostin is going to

18     lose all of her highlighters and Post-it notes.  And I can

19     guarantee those binders are going to be repurposed by someone

20     in the courthouse.  All right?  Not stolen, repurposed.  There

21     is a big difference.

22          All right.  I will see you all next week on

23     Wednesday.

24          Mr. Russell, you call me asap.

25          MR. RUSSELL:  We have discussed that.  Yes.

1        THE COURT:  And I have also -- Terry Kokolis, the

2   head of the detention center, is very active in terms of

3   working with the division of correction because of the, you

4   know -- that he is very active in that -- the organization.

5   So if you could -- I mean, I will do what I can, all right?

6        MR. RUSSELL:  Yes, I will as well.  And I will let

7   them know if anything comes up, they let me know, I will let

8   you know, and we will do everything we can.

9        THE COURT:  All right.

10       (Asides.)

11       THE COURT:  Mr. Russell, Mr. Hut -- Counsel?

12       MR. RUSSELL:  Yes.

13       THE COURT:  I am asking Madame Clerk to call the

14  criminal department and ask them to actually issue another

15  writ right now, asap, so that we can have that in the hands of

16  the officers because I know Mr. Stephens is transported

17  separately, and he is not with the normal group that we get

18  that comes over in the transport vans, et cetera.  So I don't

19  want to delay them unnecessarily, so she is going to call down

20  there and speak to them personally and try to take care of

21  that for me right now.  Okay?

22       MR. HUT:  Okay.

23       MS. GOSTIN:  Much appreciated.

24       THE COURT:  All right.  With that, the Court will

25  stand in recess.  And I will see all parties next week on the

**App. 713**

nm

1    26th.

2              MR. RUSSELL:  Thank you, Your Honor.

3              THE CLERK:  All rise.

4              (Whereupon, at 11:52 a.m., the proceeding

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

nm

110

## CERTIFICATE OF TRANSCRIBER

I hereby certify that the proceedings in the matter of State of Maryland versus Lee Edward Stephens, Case No. 02-K-08-000646, heard in the Circuit Court for Anne Arundel County, Maryland, on April 20, 2017, were recorded by means of digital recording.

I further certify that, to the best of my knowledge and belief, page number 1 through 109 constitute a complete and accurate transcript of the proceedings as transcribed by me.

I further certify that I am neither a relative to nor an employee of any attorney or party herein, and that I have no interest in the outcome of this case.

In witness whereof, I have affixed my signature this 9th day of June, 2017.

By:

Noemy Martinez
Transcriber, CompuScribe

Appendix No. 8

Post-Conviction Hearing Transcript Day 4 (4/26/17)

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

```
- - - - - - - - - - - - - - x
                            :
STATE OF MARYLAND           :
                            :    Criminal No. 02-K-08-000646
     v.                     :
                            :
LEE EDWARD STEPHENS,        :
                            :
          Defendant.        :    Annapolis, Maryland
                            :
- - - - - - - - - - - - - - x    April 26, 2017
```

**POST CONVICTION HEARING**

WHEREUPON, proceedings in the above-entitled matter

commenced.


     BEFORE:   THE HONORABLE WILLIAM C. MULFORD, II, Judge

     APPEARANCES:

     FOR THE STATE:

     DAVID RUSSELL, Esq.
     Office of the State's Attorney
     8 Church Circle
     Annapolis, Maryland 21401

     FOR THE DEFENDANT:

     A. STEPHEN HUT, JR., Esq.
     6 Saint Paul Street
     Suite 1400
     Baltimore, Maryland 21202

     ISLEY M. GOSTIN, Esq.
     THAD EAGLES, Esq.
     1875 Pennsylvania Avenue, NW
     Washington, DC 20006

cch                                                                      2

I N D E X

Page

Preliminary Discussions                                                  3

| WITNESS<br>For the State: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Ash | 5 | 11(SH)<br>54(Ct) | 56 | -- |

Page

Closing Arguments:

Isley Gostin, Esq.
On Behalf of the Defendant                                              66

Stephen Hut, Esq.
On Behalf of the Defendant                                             102

David Russell, Esq.
On Behalf of the State                                                 120

Rebuttal - Stephen Hut, Esq.                                           176

| EXHIBITS:<br>For the State: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 12 | -- | 5 |
| 8 | -- | 59 |
| 10 & 11 | -- | 60 |

KEYNOTE:  "---" indicates inaudible in the transcript.
          "*"  indicates phonetically spelled.

cch                                                                           3

1                         P R O C E E D I N G S

2              (Whereupon, at 9:16 a.m., the proceeding began.)

3              MR. RUSSELL:  Call State versus Lee Stephens.  Case

4    No. 02-K-08-646, David Russell, R-u-s-s-e-l-l, on behalf of

5    the State.

6              THE COURT:  Counsel just restate your name, you

7    don't have to spell it.

8              MR. HUT:  Stephen Hut for the Petitioner.

9              MS. GOSTIN:  Isley Gostin for the Petitioner.

10             MR. EAGLES:  Thad Eagles for the Petitioner.

11             THE COURT:  Madam Clerk, please remind the witness.

12   Whereupon,

13                         DAVID ASH

14   was call as a witness by the State, having been first duly

15   sworn, was examined and testified as follows:

16             THE CLERK:  Sir, I remind you, you are still under

17   oath.  Would you state your name for the record?

18             MR. RUSSELL:  May I approach, Your Honor?

19             THE COURT:  Yes, watch out Mr. Hut set up a trip

20   mechanism to try and catch you and Mr. Ash.  So, I am

21   providing you with notice and warning.  And you are not going

22   to succeed in your lawsuit against the State or Mr. Hut since

23   you will be contributorily negligent in your assuming the

24   risk.

25             MR. RUSSELL:  Noted, Your Honor, thank you.

**App. 719**

cch

4

1          THE COURT:  That is how we have not dealt with

2   family law, civil, and criminal all in one straight stretch.

3   And if you are interested, you can all come back in a couple

4   of weeks and discuss whether or not Rule 2-705 and 2-702 have

5   by implication destroyed Judge Moylan's opinion in Oishi,

6   which deals with fee shifting and contractual cases and the

7   requirements of Rule 1.5.  So, if you are really interested in

8   that you can come back in a couple of weeks.

9          I have got a couple sets of civil attorneys that in

10   a company that teeters on bankruptcy with five to ten thousand

11   dollars in the account have now spent a million dollars in

12   attorney's fees fighting over a shareholder action.

13          You have got to establish your priorities sometimes.

14   All right, go ahead.

15          MR. RUSSELL:  Thank you, Your Honor.  First, I am

16   going to ask move State's 12 into evidence.

17          THE COURT:  All right, and that would be the letter

18   which was sent to Lawlor and Proctor, which has a 4/19 -- 17

19   date but was really created on 10/13/11?

20          MR. RUSSELL:  That is correct, Your Honor.

21          THE COURT:  All right.  Did you get that Mr. Hut or

22   Ms. Gostin and Mr. Eagles?  Any objections?

23          MS. GOSTIN:  Mr. Russell explained that to us prior

24   to the hearing.

25          MR. HUT:  No objection.

**App. 720**

cch                                                                    5

1            THE COURT:  Okay.  All right, I will accept that.

2            MR. RUSSELL:  Thank you, Your Honor.

3            THE COURT:  Give it to the Clerk.

4                              (The document marked for

5                              identification as State's

6                              Exhibit 12 was received

7                              in evidence.)

8                       DIRECT EXAMINATION

9            BY MR. RUSSELL:

10      Q    Mr. Ash, I am going to show you what has been marked

11   as Defendant's B.  Do you recall this document?

12      A    I do, yes.

13      Q    And, for the Court's record, this is the letter from

14   Mr. Freed to Detective Braunum.  Mr. Ash, to your knowledge,

15   what if anything did the State do in response to this letter?

16      A    The State did nothing as far as Mr. Freed is

17   concerned.  We advise, I guess, it was Sergeant Braunum at the

18   time.  I don't know if he might have been still corporal, I'm

19   not sure.  That there was going to no deals for Mr. Freed from

20   the State.

21      Q    Okay.  Other than what has been discussed in the

22   letter of State's 12, did you have any other contact with

23   Hartford County regarding Mr. Freed's cases?

24      A    No.

25      Q    And are you aware of what happened to the Hartford

**App. 721**

cch
6

1  County violation of probation charges?

2      A    I am aware based on what you showed me.  I have some

3  --- notes from Hartford County.  The first I had seen those

4  was a couple of weeks ago.  When you had mentioned it, I saw

5  them yesterday.  But I think I had ran into --- who had gone

6  from the Federal Public Defender's Office into the private

7  sector.  I might have run into her at some District Court and

8  she may have mentioned.  I think she mentioned at that point

9  in time.  I had asked her what happened to Freed and she said

10  they dismissed the VOPs.

11          THE COURT:  I couldn't hear you.

12          THE WITNESS:  I had run into Paula --- at some

13  point.  I don't recall how long after the trial.

14          THE COURT:  No, I missed the last part.

15          THE WITNESS:  I am sorry?

16          THE COURT:  She said they what the VOP?

17          THE WITNESS:  They dismissed the VOPs up in Hartford

18  County.

19          THE COURT:  Okay.

20          THE WITNESS:  So, that is how I originally learned

21  about it.

22          BY MR. RUSSELL:

23      Q    And that process didn't involve yourself as the

24  State's Attorney's office --

25      A    No, nothing from

**App. 722**

cch                                                                              7

1      Q      -- Anne Arundel County in anyway?

2      A      Absolutely nothing.

3      Q      Okay.  And was there a reason, Mr. Ash, why the

4    State would avoid making a deal regarding those Hartford

5    County violations of probation?

6      A      Yes, he was, Mr. Freed was not -- well, he came

7    damaged I guess is the best way to describe it, because we

8    found out about him through the Debbie Dwyer, DAUSA, in

9    Baltimore indicating that he has some information with regard

10   to the murder of Mr. McGuinn.  That information came before I

11   got involved in the case.  But he had already cut a deal with

12   the Feds so he was already damaged goods.

13          Plus, his original interview with State Police, he

14   indicated he could not identify the assailants.  He was

15   accurate in the fact that there were two assailants but he

16   could not identify who they were.  At least that is what he

17   told the initial investigators.

18          So, he was already damaged goods, so, we were not

19   going to make any worse by offering any deals.

20     Q      Okay.  And, Mr. Ash, what is your assessment of the

21   impact of Mr. Freed's testimony on the strength of the State's

22   case?

23     A      Well, ultimately, it had no impact on it as it

24   turned out.

25     Q      Okay, and why do you think that?

**App. 723**

cch                                                                    8

1          A    Because the jury said they didn't believe him.

2          Q    Okay.  And what would you say was your assessment of

3     the State's case as a whole?

4          A    Very solid.  We felt our strongest evidence was the

5     direct evidence of the clothing.  In Mr. Stephen's cell, he

6     had the white tee shirt that had Dave McGuinn's blood all on

7     it.  And it had apparently been washed.  It was still wet

8     underneath his mattress.  I believe there was blood in the

9     sink.

10              There was certainly the blood on his boots which

11    were back by his sink, underneath his sink, I believe.  Had

12    blood on the treads, in the treads as well as on the side of

13    the boots.

14              But most telling was there was a blood smear on the

15    side of the cell door and as the doors closed it goes into

16    like a jam.  There was blood on part of the jam that would be

17    enclosed if the door was closed.  So, the only way that blood

18    could have gotten there was if the door was opened at the

19    time.

20              That and there was circumstantial evidence I think

21    the cell next to him, I think the inmate testified that he

22    heard the cell door opened and heard running water and

23    Mr. Stephens' cell right in conjunction with when the murder

24    was taken place.

25              So, that was our strongest evidence, as well as

**App. 724**

1   other evidence that ultimately didn't come into trial, but

2   that was the best evidence in the case.

3       Q    And, I think you alluded to this, did there come a

4   time when you interviewed the jurors after the trial?

5       A    We did.

6       Q    Okay, and what did you learn from that, those

7   interviews?

8       A    We didn't interview all of them.

9            MR. HUT:  Objection, hearsay.

10           THE COURT:  Sustained.  I think there is also a rule

11  on point.

12           BY MR. RUSSELL:

13      Q    Let me move onto sentencing, Mr. Ash.  What was the

14  aggravating factor used by the State at sentencing when asking

15  for the death penalty?

16      A    The one we used, Judge Hackner limited us to one.

17  So, we picked the one that he was serving a sentence in DOC.

18      Q    Okay, and why was that selected?

19      A    At the time the murder was convicted.

20      Q    And why was that the one that you selected?

21      A    It was the easiest one to prove nobody was debating

22  the fact that he was serving a sentence in DOC so it proved

23  itself basically.

24      Q    Let me move onto potential testimony of

25  Mr. Stephens.  Was the State prepared to cross Mr. Stephens if

1   he testified?

2       A    Yes.

3       Q    And what areas would the State have crossed him on

4   had he testified?

5       A    Prior convictions, obviously, he had the murder in

6   Wicomico County and his -- he never gave any statements to the

7   investigators but he did make statements to one of the State's

8   witnesses indicating his culpability and the planning and

9   intent to murder David McGuinn.

10          MR. HUT:  Objection, hearsay, move to strike.

11          THE COURT:  Overruled because it is not necessarily

12  is being offered for the truth it is being offered for what he

13  would have asked Mr. Stephens about had he testified.  So, the

14  Court is not going to accept it for the truth but just what

15  his theory of cross or his cross examination would have been.

16          MR. RUSSELL:  You can continue.

17          THE WITNESS:  Well, that is the primary areas of

18  cross and so I mean we felt that that would have kind of made

19  our case without having to call the other witness.

20          MR. RUSSELL:  Okay.

21          BY MR. RUSSELL:

22      Q    And am I correct in my assumption that the jury in

23  this case was not allowed to be aware of what it was that

24  Mr. Stephens was being incarcerated for, is that correct?

25      A    That's correct.

**App. 726**

cch                                                                        11

1        Q    The guilt portion of the proceeding, is that

2   correct?

3        A    I believe so, yes.

4             MR. RUSSELL:  I have nothing further, Your Honor.

5             THE COURT:  Mr. Hut, I know you and Ms. Gostin were

6   talking for a minute.  You want to talk her -- did you want to

7   finish your conversation?

8             MR. HUT:  No, thank you, Your Honor.

9             THE COURT:  Okay.  All right.

10                       CROSS EXAMINATION

11             BY MR. HUT:

12        Q    Good morning Mr. Ash.

13        A    Good morning.

14        Q    In response to questions put to you by Mr. Russell

15   at the end of the direct examination, you made reference to

16   some of what you described as the strengths you believed of

17   the prosecution case.  You mentioned that there was blood in

18   the sink, correct?

19        A    Yes, sir.  I think there was blood droppings in the

20   sink.

21        Q    That blood was never tested, was it?

22        A    That is correct.

23        Q    So, there was no way to identify that blood to

24   Corporal McGuinn?

25        A    That is correct.

**App. 727**

cch                                                                12

1       Q      You mentioned that there was blood, you thought this

2  was quite telling, on the inside of the cell door, didn't you?

3       A      Correct.

4       Q      That blood was never tested either, was it?

5       A      It was not.

6       Q      Did you have any state personnel familiar with

7  blood, have a look at the blood on the inside -- the spots on

8  the inside of the cell door, which the State contended was

9  blood?  Did anybody look at that, any hematologist or somebody

10 familiar with blood?

11      A      My recollection is that it was preserved by the

12 technician.

13      Q      But had the technician ever looked at it in the

14 first place, any technician?

15      A      He photographed it.

16      Q      And other than photographing --

17      A      But nobody tested it.

18      Q      -- other than photographing, he -- and was it a he?

19      A      It think it was a he, yes.

20      Q      Never told you one way or the other, whether he

21 thought it was blood or some other substance such as rust?

22      A      No, he thought it was blood.

23      Q      You made reference to a testimony by the inmate of

24 the cell next to Mr. Stephens.  They heard the cell door open

25 and close?

**App. 728**

cch

1    A    Correct.

2    Q    And that was a man named Garrison Thomas, wasn't it?

3    A    Correct.

4    Q    Garrison Thomas, however, testified that he heard

5    the cell door open and close after the assault on Corporal

6    McGuinn, isn't that true?

7    A    Well, I defer to the record, I --

8    Q    You don't know one way or the other.

9    A    Well, I did at the time, I don't know as I sit here

10   today.

11   Q    I understand.  You made reference to -- well, let me

12   ask this question instead.  You indicated that the aggravating

13   fact you selected for presentation to the jury at sentencing,

14   was the fact that Mr. Stephens was serving a life plus 15

15   sentencing at the House of Correction, correct?

16   A    Yes.

17   Q    And was incarcerated there?

18   A    He was incarcerated, yes.  I think it was a

19   stipulation if I recall.

20   Q    Initially, you had selected more than one

21   aggravating factors, isn't that true?

22   A    Yes.

23   Q    And one of the aggravating factors was the

24   commission of first-degree murder, correct?

25   A    Correct.

cch                                                                            14

1       Q     And although that was not the aggravating factor

2  subsequently presented to the jury at sentencing, you did

3  present in some detail the facts as the State understood them,

4  of the Wicomico County homicide, didn't you?

5       A     I don't recall going into the facts.

6             (Long pause.)

7             BY MR. HUT:

8       Q     I am showing what has been marked as Defendant's Q,

9  Mr. Ash.

10            MR. HUT:   Your Honor, may I look over Mr. Ash's

11 shoulder --

12            THE COURT:   Did you say Q?

13            MR. HUT:   Q.

14            THE COURT:   Q.  Of course, you can.

15            MR. HUT:   Ms. Gostin has made it unnecessary for me

16 to do.

17            THE COURT:   Okay.

18            BY MR. HUT.

19      Q     Directing your attention to Exhibit Q, does that

20 appear to be State's version of the crime committed in

21 Wicomico County on or about April 19, 1997?

22      A     It does appear to be that, yes.

23      Q     Have you seen it is marked as State's Exhibit 66,

24 correct?  Down on the first page, bottom right-hand corner.

25      A     Okay.  Actually, it is Defendant's Exhibit.

**App. 730**

1      Q     No, --

2      A     Oh, that is your Q, I am sorry.  Oh, okay, in the

3   above.  Okay, yes.

4      Q     And so we agree that it was the State's exhibit?

5      A     We agree.

6      Q     And the prosecution in which you assisted in the

7   Anne Arundel County?

8      A     Okay.

9      Q     It was admitted into evidence February 15, 2012,

10  correct?

11     A     That is what this says, yes.

12     Q     Does that refresh your recollection that this was,

13  in fact, admitted into evidence in the sentencing proceeding?

14     A     I honestly don't recall but if the record says it

15  was, it was.

16     Q     You made reference to juror interviews and without

17  getting to the substance of those to which I objected, you

18  didn't interview all of the jurors, did you?

19     A     No.

20     Q     About three, two?

21     A     Well, we spoke with all of the alternates, which I

22  think were six.  And, frankly, it's been so long I can't

23  remember -- I think it was, they left it up to the jurors if

24  they wanted to speak with to the attorneys.  So, I know some

25  of them did.  I can't remember how many.

**App. 731**

Q     But fewer than the majority?

A     Oh, absolutely.  It was not the whole panel.

Q     And fewer than half?

A     I don't know if that's true.

Q     And you testified that there came a time when you heard from a Debbie Dwyer?

A     I never heard from her.  She had already contacted --

THE COURT:  She is an AUSA?

THE WITNESS:  She's an AUSA up in Baltimore City.

BY MR. HUT:

Q     And by you, I actually meant the prosecution team. I didn't distinguish between you and Ms. Howell and --

A     I think it was MSP that contacted Ms. Howell first, indicating -- because my understanding of how it went was Ms. Dwyer had contacted MSP, Mr. Braunum, who was the one that was investigating the case, said, hey, I have a witness that may have information regarding the thing.  And then Sergeant Braunum contacted our office.

Q     And, at some point, was Mr. Freed's attorney put in touch with or did she contact your office?

A     Yes.

Q     And that attorney was Paula Xinis, is that right?

A     Yes.

THE COURT:  The last name?

1          THE WITNESS:  Xinis.

2          MR. HUT:  Xinis, it is, X-i-n-i-s.

3          BY MR. HUT:

4     Q     And Ms. Xinis was then a Federal Public Defender,

5  true?

6     A     Correct.

7     Q     Ms. Xinis is now, in fact, a Federal District Judge

8  at Greenbelt, correct?

9     A     I didn't know that but I assume if you say so.

10     Q     And the Federal charge that became the subject or in

11  connection with which Ms. Dwyer called Mr. Braunum, was a gun

12  charge, correct, a charge relating to a gun possession?

13     A     I believe so.

14     Q     Now, when Ms. Xinis contacted your office, do you

15  approximately recall when that was?

16     A     I don't.

17     Q     Okay.  Who did she call?

18     A     I don't know that either.  I think that was all done

19  prior to my involvement.

20     Q     Did you ever speak with her?

21     A     Yes.

22     Q     What was the first time that you spoke with

23  Ms. Xinis about Mr. Freed?

24     A     I have no idea.

25     Q     Ms. Xinis, how would you describe her advocacy?

1    Would you say that it was zealous --

2        A     Zealous.

3        Q     -- on behalf of Mr. Freed?

4        A     Sure.

5        Q     And during his testimony, Ms. Xinis actually sat on

6    the front row of the courtroom?

7        A     I believe she was present, yes.

8        Q     Do you recall what the tenor of your conversation

9    with Ms. Xinis was the first conversation you had with her?

10       A     I don't.

11       Q     How many conversations did you have with Ms. Xinis?

12       A     Probably less than a handful at most.  I know -- it

13   usually involved us meeting with Mr. Freed.

14       Q     And how many is less than a handful?

15       A     Less than five.

16       Q     And after meeting with Mr. Freed, there came a time

17   when you contacted State's Attorney -- sorry, United States

18   Attorney's Office in Baltimore, correct?

19       A     Say that again?

20       Q     At some time after or during the handful of

21   conversations that you had with Ms. Xinis and Mr. Freed, there

22   came a time when you contacted the United States Attorney's

23   Office in Baltimore, correct?

24       A     I don't believe I ever initiated contact -- the only

25   contact I had with Ms. Dwyer I think was when we were having

1   trouble getting Mr. Freed transported.  So, I was asking for

2   her assistance.

3        Q    And there did come a time, however, when in exchange

4   for truthful testimony, you recommended in the prosecution in

5   the Federal case a recommended and that is a truthful

6   testimony in this case, the prosecution recommended that that

7   testimony factor into Judge Bennett's sentence, isn't that

8   right?

9        A    No.  I never had that conversation.

10            THE COURT:  Okay, I --

11            BY MR. HUT:

12       Q    Did anybody under the prosecution team --

13            THE COURT:  I think you have to clarify because

14   there is a Federal prosecution team, which was involved in the

15   Federal case; a State prosecution team, involved in this case;

16   and then a State prosecution team involved in the Hartford

17   County VOP.  So, when you make the broad any Federal

18   prosecution or any prosecution leaves -- it doesn't clarify

19   the question.

20            MR. HUT:  Thank you, Your Honor, appreciate that,

21   your clarification.

22            BY MR. HUT:

23       Q    So, I was --

24            THE COURT:  Your question to him was did the

25   prosecution recommend in the Federal case exchange for

**App. 735**

1   truthful testimony for Judge Bennett basically the reduction

2   in sentence?  But Mr. Ash's answer was he did not.  So, --

3          THE WITNESS:  Nor, to my knowledge anybody in our

4   office.  I can't fathom that conversation taken place.

5          MR. HUT:  But there was --

6          THE WITNESS:  That deal was already in place before

7   we even got to Freed.

8          BY MR. HUT:

9     Q    And so is it your recollection and testimony that

10  that deal was engineered entirely by the Federal

11  prosecutors --

12    A    That is my understanding.

13    Q    -- and not your office?

14    A    That is correct.

15    Q    Now, you made reference to taking some action to

16  facilitate the transfer of Mr. Freed, is that right?

17    A    Yes.

18    Q    And by that that you mean the transfer to federal

19  custody?

20    A    Yes.

21    Q    And why was it necessary to facilitate that

22  transfer?

23    A    To keep him local to be able to communicate with him

24  to get him transported.  The Feds had facilitated I guess MSP

25  to allow them to transfer him back and forth so -- and quite

1   frankly allowed Mr. Proctor and Mr. Lawlor to interview him if

2   they so chose.

3       Q    But they could interfere him while he was in the

4   custody of DOC just as readily, could they not?

5       A    Where that is the problem, he was leaving the

6   custody of DOC.  Had he stayed in DOC, we never would have

7   done anything.

8       Q    He was leaving the custody of DOC to go into federal

9   custody?

10      A    No, there were warrants that were detainers, as I

11  understand it, for Freed while he was serving his DOC

12  sentence, Maryland DOC sentence.  That DOC sentence was

13  expiring he was going to be released.  So, then the detainer

14  would have taken him up to Hartford County.  So, we asked that

15  they hold those warrants, reinstate him after the Feds took

16  him on their detainer.

17      Q    Couldn't the Hartford County prosecution have simply

18  told the federal prosecutors that they were not going to act

19  on the detainers and allow him to be transferred directly to

20  federal custody without recalling the FTA warrants?

21      A    I don't know what they could have done.

22      Q    Is there any impediment to doing that?

23           THE COURT:  Have you ever tried?

24           MR. HUT:  If I were a Hartford County prosecutor,

25  Your Honor, I would expect I could easily say I am not ---,

**App. 737**

cch

1    Your Honor, Administrative Judge, please don't go forward.

2            THE COURT:  I will never forget the day when Judge

3    Bruce Williams ordered the FBI to do something and the reply

4    came back, no.  So, let me just tell you.

5            I have been sitting here for over 11 years, the

6    worse thing in the world is to try and get the Federal

7    Government to transport someone to Court.  I mean when they

8    want to do it, they will do it.  When they don't want to, they

9    are more obnoxious than anything that you can imagine.

10           MR. HUT:  To be clear, Your Honor, this is the

11   opposite of that.

12           THE COURT:  No.

13           MR. HUT:  I believe what Mr. --

14           THE COURT:  I am telling you when they pop somebody,

15   I refused to lift detainers, refused to lift bench warrants as

16   a Judge, refused to set bonds, just because of the mere fact

17   that once the detainer kicks into place and once the Federal

18   Government gets their hands on, you can't get them.

19           MR. HUT:  These were State detainers, Your Honor.

20           THE COURT:  I am just telling you.

21           MR. HUT:  And my --

22           THE COURT:  You ought to sit here sometime and try

23   to get somebody from another jurisdiction.  Mr. Russell did,

24   he has done the arraignment dockets for me a couple of times.

25   I hadn't had it like in 10 years and I drew it twice in the

1    last two months.

2            And to get people here other jurisdictions it is

3    just -- Judge Hackner used to get so mad, he had the personal

4    number of wardens and majors in DOC that he could call

5    personally to try and get someone here.  It is a nightmare.  I

6    am just telling you.  It is not as easy as you make it seem to

7    get people here.

8            MR. HUT:  Well, I wasn't necessarily saying it was

9    easy but I continue not to understand the purpose of recalling

10   the warrant.  Now, there could have been this purpose.  When

11   the FTA Warrant was recalled, that actually advantaged Jason

12   Freed in terms of serving custody in the federal systems,

13   didn't it, Mr. Ash?

14           THE WITNESS:  I have no idea what the advantage was

15   to Freed.  Our concern was losing him to Hartford County and

16   not being able to interview him and we had trial coming up in

17   a month and a half.

18           BY MR. HUT:

19       Q   Well, let's focus on the advantage to Freed for just

20   a minute.  Without the federal warrant -- sorry, the Hartford

21   County FTA Warrant, Mr. Freed's security evaluation became

22   more favorable, didn't it?

23       A   I have no idea.

24       Q   You don't know that in the federal system the

25   pendency of a FTA Warrant counts against an inmate in

**App. 739**

1 | calculating his or her security risks?

2 |     A    I did not know that.

3 |     Q    Do you know that with an FTA Warrant it becomes more

4 | difficult in the federal system to qualify for drug treatment

5 | programs.

6 |     MR. RUSSELL:  Objection.  He said he didn't know.

7 |     MR. HUT:  He didn't say he didn't know that.

8 |     THE COURT:  Hold on.  He didn't know about the

9 | security situation.  I don't know if he knows about --

10 |     THE WITNESS:  These are not -- we are not quashing

11 | these warrants, we are asking them and to reinstate them.  So,

12 | the warrants were back in place.  So, whatever advantage you

13 | are referring to, which I am not familiar with, there wouldn't

14 | be an advantage, the warrants are still there.

15 |     BY MR. HUT:

16 |     Q    The warrants were recalled, weren't they?

17 |     A    I believe they were.

18 |     Q    And to you that means they stay in place and are not

19 | quashed?  You distinguish between quashing and recalling?

20 |     A    Our request to Hartford -- I don't know procedurally

21 | what they did.  My request to Hartford County State's

22 | Attorney's Office was to either withdraw or hold the warrants,

23 | don't serve them until he can be transferred to the federal

24 | system and then reinstate the warrants.

25 |     Q    In any event, do you know whether recalling the

1   warrant advantaged Mr. Freed in making him eligible for

2   federal drug treatment whereas he would not have been eligible

3   if the warrants had been in place?

4       A    My understanding -- well, I don't know what his

5   eligibility for programs in the federal system would have

6   been, I will defer to you or the Judge, but the warrants

7   weren't quashed.  They were reinstated.  So, whatever

8   advantage you are referring to, if there is an advantage,

9   would have been for however long it took to reinstate the

10  warrant.

11      Q    Do you remember when the warrants were recalled at

12  the request of the State's Attorney's Office in Hartford

13  County?

14      A    I don't.

15      Q    Would it refresh your recollection to tell you --

16  well, let me see if I can --

17      A    Well, I don't think I ever knew.

18      Q    Let me see if I can --- the document.

19          MR. RUSSELL:  I am going to object, Your Honor, he

20  says he doesn't think he ever knew.

21          THE COURT:  If he knows, he can testify.  If he

22  doesn't, then just tell me you don't know.

23          (Long pause.)

24          MR. HUT:  May I approach the witness, Your Honor,

25  and look over his shoulder?

**App. 741**

cch                                                                    26

1          THE COURT:  Certainly.

2          BY MR. HUT:

3      Q    I am showing you what has been marked as Defendant's

4    II, Mr. Ash.

5      A    Uh-huh.

6      Q    The first page is simply a certification from the

7    archives obtained yesterday as to the genuineness of the

8    materials that follow.  Directing your attention to the third

9    page --

10     A    Uh-huh.

11     Q    The third page, you are on the second?

12     A    Oh.

13     Q    Does that appear to be a letter to Judge Carr from

14   Elizabeth Bowen?

15     A    It does appear to be that, yes.

16     Q    Did you ever see this before?

17     A    No.

18     Q    And does that anyway refresh your recollection about

19   steps taken by Hartford County prosecutors with respect to the

20   then outstanding FTA Warrants?

21     A    No.

22     Q    Did you ever have a single conversation, Mr. Ash, or

23   Ms. Howell, or is it Ms. Reilly or Mr. Reilly?

24     A    Ms. Howell is the one I -- we prosecuted with.

25     Q    Right.  And the name of the prosecutor, I am sorry,

cch                                                                    27

1    who you succeeded was?

2         A    It would be Judge Eileen Reilly.

3         Q    Ms. Reilly.  Any of you have a single conversation

4    with Ms. Xinis about Mr. Freed's Hartford County violations of

5    probation?

6         A    Did either of them or --

7         Q    You.

8         A    -- any of us?

9         Q    Yes.

10        A    Other than that we couldn't make any promises.

11        Q    How many sets of conversation did you have?

12        A    Me, personally, maybe it is twice.  I am sure it

13   came up every time we interviewed Freed.  So, I think that was

14   two times prior to trial.

15        Q    And you knew from his letter to Mr. Brown that he

16   was expecting assistance from the State with respect to his

17   Hartford County violations of probation, didn't you?

18        A    I don't know what he expected.

19        Q    Did you have conversations with Mr. Brown?

20        A    Yes.

21        Q    What did Mr. Brown tell you, if anything, about

22   Mr. Freed's expectations?

23        A    He didn't tell me anything about Freed's

24   expectations.  We told him that there were no promises.

25        Q    Did he tell you anything about conversations he had

1    had with Mr. Freed?

2         A    No.

3         Q    Did you discuss with Ms. Xinis, that you, the

4    prosecution team, did not want to enter into any agreement

5    with Mr. Freed so that when he testified he would not testify

6    as to the existence of any such agreement?

7         A    I am sorry?

8         Q    Did you and Ms. Xinis discuss the fact that if there

9    were no agreement between Mr. Freed and the Anne Arundel

10   County Prosecutors at the time Mr. Freed took the stand, then

11   he would not have to testify with respect to any such

12   agreement?

13        A    We did not have that conversation.

14        Q    What kind of conversation did you have?

15        A    The conversation would be we cannot promise to make

16   any promises to Mr. Freed because his testimony is already

17   tainted.

18        Q    Did you tell Ms. Xinis, that after he testified, you

19   would sit down and discuss the matter again?  The matter being

20   Mr. Freed's VOPs in Hartford County?

21        A    No.

22        Q    Did any of your colleagues have a conversation with

23   Ms. Xinis, along those lines?

24        A    Not that I am aware of.

25        Q    Do you happen to know when the entry on the Hartford

**App. 744**

1     County dockets of a letter from Ms. Bowen that I just showed

2     you was made?

3         A    I didn't really -- are you talking about the

4     warrants?

5         Q    The letter from Ms. Bowen to Judge Carr asking that

6     the warrants be recalled?

7         A    I have no idea -- I had no idea of that letter until

8     you just showed it to me.

9         Q    Did there come a time when you learned that that

10    letter was not entered on the docket until two years later --

11            MR. RUSSELL:  Objection.

12            THE WITNESS:  I didn't know about the letter --

13            MR. HUT:  -- in 2012?

14            THE COURT:  Sustained.  He has indicated he has no

15    knowledge of the letter at all.  So, he has indicated he has

16    no knowledge of the docket entries.

17            MR. HUT:  Okay, I thought they were a different

18    question, but I will move on to something else, Your Honor.

19            BY MR. HUT:

20        Q    Now, with respect to Mr. Freed, you knew prior to

21    his testimony the location of his cell on the night of

22    July 25th, 2006, didn't you?

23        A    Yes.

24        Q    And you recall the cell number?

25        A    16, I think.

cch

1     Q    Your recollection in that is terrific.  And you knew

2  the approximate location of the assault in terms of cell

3  numbers, didn't you?

4     A    Yes.

5     Q    And, indeed, Ms. Howell I believe argued in closing

6  that the distance was 140 feet from Mr. Freed's cell to the

7  site of the assault, do you recall that?

8     A    I don't specifically recall it but I am sure the

9  record reflects that.

10     Q    Now, at the time you joined the case, had the

11  Maryland House of Corrections been raised?

12     A    Uh-uh, I am sorry, no.  I apologize.

13     Q    Sorry?

14     A    I had a mouth full of water so uh-uh wasn't a proper

15  response.

16     Q    Did the facility still exist?

17     A    Yes.

18     Q    And did you go and examine the tier of the E4 tier

19  in the west wing?

20     A    Yes.

21     Q    And did you make an examination under conditions

22  that you understood to have prevailed on the evening of July

23  25th?

24     A    No.

25     Q    So, you had no way to measure the -- or to test the

**App. 746**

1   likelihood that Jason Freed could actually see what he claimed

2   in his testimony to have seen, did you?

3        A     Well, we attempted a reenactment within our office.

4   We measured off the estimated distance and killed the lights

5   and tried to establish it, but, no, we never went out to the

6   house at night.

7        Q     Did you consult with any expert in human vision to

8   determine whether what Freed claimed to have seen was actually

9   visible?

10       A     No.

11             MR. RUSSELL:  I am going to object this is beyond

12   the scope.

13             THE COURT:  I mean if they had, it might have been a

14   Brady violation but since they didn't do it, I don't know

15   what -- how it helps or hurts either party.  So, overruled.

16             BY MR. HUT:

17       Q     You didn't have or consult an expert in human

18   audiology to see if what Mr. Freed claimed to have heard was,

19   actually, audible, did you?

20       A     No.

21       Q     You testified on direct with respect to

22   Dr. Vincenti.  Let me ask you a question or two on that

23   subject.  You knew that there were only one or at most two

24   wounds that had been lethal, didn't you?

25       A     I don't know.

**App. 747**

1       Q     You don't know what you knew or you don't remember?

2       A     I don't recall.

3       Q     Do you recall that with the exception of an

4   identifiable number of wounds, none of the other cutting or

5   stab wounds would have been lethal if properly addressed in

6   medical terms?

7       A     I don't know that.

8       Q     Did you speak with Dr. Vincenti in advance of her

9   testimony at trial?

10      A     I know we met with her, that was Sandy's witness,

11  so, I know we met with her.

12      Q     But you don't recall whether you asked the question

13  what wounds killed Corporal McGuinn?

14      A     I don't recall.

15      Q     If you had learned that fewer than all wounds, in

16  fact, one or most two, would have been lethal, that would have

17  raised the question whether one or both of the assailants had

18  caused the death of the corporal, wouldn't it?

19            MR. RUSSELL:  Objection.

20            THE COURT:  Overruled.  If you can answer it, you

21  can answer it.  If you can't, tell me.

22            THE WITNESS:  I don't know the answer to that.

23            BY MR. HUT:

24      Q     Mr. Russell asked you about, and you testified

25  about, the possible seeking of an aiding and abetting

cch

1    instruction.  Do you remember that?

2        A    I remember him asking me that.

3        Q    And your answer was phrased in terms of

4    principalship.  Do you remember that?

5        A    Yes.

6        Q    Now, did you understand him to be asking about the

7    sentencing phase and particularly phase one of sentencing, or

8    the innocent's portion of the trial?

9        A    Well, I can kind of viewed them in the same.

10       Q    And so had the verdict rested, that is to say the

11   guilty verdict -- a guilty verdict, had it rested on a theory

12   of aiding and abetting, the State would not have been able to

13   seek the death penalty in the case, correct?

14       A    That is correct.

15       Q    And you very much wanted the death penalty in the

16   case, didn't you?

17       A    I thought it was deserved.

18       Q    And so the State would have been at the very least

19   reluctant to have had to seek an aiding and abetting

20   instruction, correct?

21       A    We honestly did not consider the aiding and

22   abetting.

23       Q    And you didn't seek it because there was no issue

24   that had been raised about causation and whether one or two

25   assailants had caused the death of the corporal, correct?

1    A    I don't think it was ours to raise at that point.

2    Q    I can say it was.  There was just no issue had been

3  raised by defense?

4    A    Not to my knowledge.

5    Q    Exactly.  And you were aware, were you not, of the

6  fact that there were 12-circular and 12 linear wounds.  I

7  believe you testified to some extent about that on direct

8  examination?

9    A    No, I didn't testify to --

10    Q    Well, let me ask this question.  You did talk about

11  the issue whether there were -- had been one or two assailants

12  and whether Dr. Vincenti would have been permitted to testify

13  as to any basis for such an argument, didn't you?

14    A    No.  I testified she was limited to testifying as to

15  the number of weapons, not the number of assailants.

16    Q    All right, I stand corrected, thank you for the

17  clarification.  And she was limited at the request of the

18  defense, correct?

19    A    Correct.

20    Q    And the defense made -- sought the limitation

21  because the question of the number of weapons had not been

22  disclosed in the reports submitted by Dr. Vincenti or the

23  subject matter identified for her in discovery?

24    A    I don't know the answer to that.

25         (Long pause.)

1          MR. HUT:  Court's indulgence?

2          (Pause.)

3          BY MR. HUT:

4     Q    Did you ever ask Dr. Vincenti or Ms. Howell whether

5  in her view the medical evidence supported as a medical matter

6  to a matter certainty the proposition that two weapons had

7  been used?

8     A    I honestly don't remember.

9     Q    So, you don't remember her saying that that was a

10 legitimate inference from the forensic evidence?

11    A    At trial?

12    Q    No, in advance of trial.

13    A    I don't remember.

14    Q    At trial she was precluded from testifying to that.

15 Nevertheless, do you remember that Ms. Howell testified -- not

16 testified, she argued in closing that the two shapes -- the

17 two different shapes of the wound meant that there were two

18 weapons and therefore two assailants, do you recall that?

19    A    If that is what the record indicates.

20    Q    But do you recall independently?

21    A    I recall that is what we believed was the case.  I

22 don't independently remember her closing argument.

23    Q    Do you have any recollection during the closing

24 argument you were surprised at the absence of an objection

25 from defense counsel to that very assertion argument?

**App. 751**

1       A     No.

2       Q     You talked about what you believed to be the

3    strengths of the case.  Let me ask you about aspects that may

4    not have been so strong.  You recall that the prosecution team

5    never put any evidence on about any motive that Mr. Stephens

6    might have had to inflict harm on Corporal McGuinn?

7       A     Is that a question?

8       Q     It is a question.

9       A     We weren't required to.

10      Q     I understand that and you didn't?

11      A     We didn't.

12      Q     You can if you have it, if you have good evidence on

13   motive, you would have introduced that, wouldn't you?

14      A     We tried.

15      Q     And you knew that Mr. Stephens had been new to the

16   tier, didn't you?

17      A     I don't know what I knew about when he came in.

18      Q     And you knew that he barely knew Corporal McGuinn,

19   didn't you?

20      A     I don't know what he knew.

21      Q     You didn't ask other inmates on the tier whether

22   they had seen Mr. Stephens talking to or having any

23   interactions with Corporal McGuinn one way or the other?

24      A     I didn't ask other any inmates that, no.

25      Q     And you knew he never had any interactions with

1    Corporal McGuinn didn't you?

2         A    I didn't know that.

3         Q    And you knew that Corporal McGuinn had never taken

4    any disciplinary action with respect to Mr. Stephens?

5         A    I didn't know that either.

6         Q    And you testified to the existence of a wet tank

7    top, do you recall that --

8         A    Yes.

9         Q    -- on direct examination?  Do you remember who

10   discovered the wet tank top or supposedly discovered the wet

11   tank top under the mattress of Mr. Stephens's cell?

12        A    I think there were three officers there.  I think it

13   was Mayfield and a female officer, I can't remember her name.

14        Q    It would have been Nakia Johnson?

15        A    Yes.

16        Q    And --

17        A    And the third officer.

18        Q    And Nakia Johnson she is not the world's greatest

19   crime scene technician, is that fair to say?

20             MR. RUSSELL:  Objection.

21             THE WITNESS:  She is a correctional officer.

22             BY MR. HUT:

23        Q    Correct.  And she had --

24             THE COURT:  Overruled.

25             BY MR. HUT:

**App. 753**

1      Q      -- among other things in the course of the

2   investigation, picked up a so-called key that she found on the

3   floor of the tier, do you remember that?

4      A      She may have.

5      Q      And put it in her pocket, do you remember that?

6      A      I don't remember that.

7      Q      You testified three officers were in the cell when

8   they performed the search of the cell?

9      A      Well, I think one officer -- I think Mayfield was

10  first on the scene and then the other two officers did the

11  search under his supervision.

12      Q      And one of the officers was Officer Palmer, is that

13  right?

14      A      Yes.

15      Q      And, Officer Palmer was the only State witness who

16  testified that this tank top was wet, isn't that right?

17      A      I don't recall.

18      Q      No other witness, including the State Crime

19  Technicians, testified that the shirt was wet or logged the

20  shirt in as wet, do you recall that?

21      A      The record would speak for itself.

22      Q      The State technicians who logged in Mr. Harris's

23  shirt logged that in as wet but not Mr. Stephens's shirt,

24  isn't that right?

25      A      Whatever the record indicates.

**App. 754**

cch

1      Q   And Officer Palmer, the sole officer who testified

2  to the shirt having been wet was the same officer who had gone

3  so far as to choke Lee Stephens at Center Hall, isn't that

4  right on the night of the crime?

5      A   I believe there was an incident between those two.

6      Q   So, this officer who choked the Defendant was the

7  only one to testify about this inculpatory piece of evidence

8  or at least one attribute of it, namely that it was wet.  Do

9  you remember that?

10     A   Right.  I think there are multiple witnesses

11  testified to the existence of the shirt.

12     Q   Multiple meaning two?

13     A   Whatever the record indicates.

14     Q   You remember that Jason Freed testified that both

15  assailants were wearing sweats?

16     A   I don't recall specifically what the testimony was.

17     Q   Do you recall that, in fact, no bloody sweat

18  clothes, neither sweatshirt not sweatpants belonging to

19  Mr. Stephens was ever found?

20     A   I believe that is correct.

21     Q   Do you recall that, in fact, there was photographic

22  evidence that would have established that the sweat clothes

23  owned by Mr. Stephens, with the exception of the one that he

24  wore to Center Hall, were neatly folded and tucked into his

25  locker, in his cell?

cch

1      A    I honestly don't have the full recollection, I did

2    not read the transcript.

3      Q    Did the State, itself, actually offer photographs

4    that I just described?

5      A    I don't recall.  My recollection of the clothing was

6    that there was a blood drop on his underwear, on his shoes,

7    and the tee shirt underneath his mattress.

8      Q    But not on any sweat clothes?

9      A    I don't recall.  I recall a sweatshirt but I think

10   that was Harris's.

11     Q    He committed this crime immaculately without any

12   blood getting on his --

13          MR. RUSSELL:  Objection.

14          MR. HUT:  -- outer clothes?  Withdrawn.

15          THE COURT:  Sustained.

16          BY MR. HUT:

17     Q    You testified some about the conviction that

18   Mr. Stephens had sustained in Wicomico County.  In fact, the

19   existence of that first-degree murder conviction was an

20   important factor in the State's decision to notice its intent

21   to seek the death penalty, wasn't it?

22     A    It was a factor not the primary factor.

23     Q    And do you recall now the salient facts of the

24   Wicomico County prosecution?

25     A    Just vaguely.

**App. 756**

cch                                                                    41

1           MR. HUT:  If I can approach the witness and --

2           (Pause.)

3           BY MR. HUT:

4      Q    Directing your attention back to Defendant's Q,

5  which had been State's 66 at the trial offered during the

6  sentencing, do you recall the description in the Statement of

7  the Facts as presented by the State during sentencing and its

8  focus on the ballistics, directing your attention to the

9  bottom of the page that I believe you are looking at?

10     A    I am sorry, your question again?

11     Q    The question is do you recall the significance in

12 the Wicomico County prosecution of the ballistics examination

13 performed in that case by a State expert named Joseph Kopera?

14     A    I mean at the time I don't know that I gave it any

15 greater significance other than whatever evidence was provided

16 at trial.

17     Q    But it is highlighted, is it not, or certainly

18 mentioned in what was State's 66 at the trial and is now

19 Defendant's Q?

20     A    It is mentioned, yes.

21     Q    And do you also recall making mention in Defendant's

22 Q and showing the jury information about statements overheard

23 by Officer Elmer Davis that inculpated Mr. Stephens or were

24 alleged to have done so.?

25     A    In the Wicomico County case?

cch                                                                                    42

1       Q       Yes.

2       A       No, I don't remember any of that.

3       Q       Would you dispute that that inculpatory statement

4    was described in Defendant's Q that was State's 66?

5       A       If you could --

6       Q       You want me to try and find it?

7       A       Okay.

8       Q       Let me direct your attention to it.

9               (Pause.)

10              BY MR. HUT:

11      Q       So, directing your attention to what is the fourth

12   page of Defendant's Q and is the second page of the State's

13   version of the fact, in the middle of the first full paragraph

14   on that page the sentence reads, "Officer Claborwaden you came

15   back out towards the street and said look what I found?"  The

16   Defendant with his back to the officer now turning around to

17   see what he had found, "Said it's not my gun."  When asked by

18   Lieutenant Davis, "How did you know it was a gun?"  The

19   Defendant did not respond.  Do you see that?

20      A       I do.

21      Q       You highlighted that in the presentation of the

22   description of the facts of the Wicomico County case to the

23   jury in Anne Arundel County?

24      A       I don't recall anything.  I just recall presenting

25   their version of the Statement of Facts.

**App. 758**

cch

43

1    Q    Well, that is a three or so page version of the

2  facts and necessarily a summary --

3    A    Right.

4    Q    -- of what you thought were the most salient facts,

5  isn't it?

6    A    It's not what I thought, it's what Wicomico County

7  sent us.

8    Q    And you then took the Wicomico County document and

9  offered it to the jury in this Court, correct?

10    A    If that's what the record indicates.  Honestly, I

11  didn't have a recollection of it.  But if we did, we did.

12    Q    Now you also know there came a time in July 2013

13  when the murder conviction in Wicomico County suffered by

14  Mr. Stephens was vacated by the Wicomico County Circuit Court,

15  correct?

16    A    I was advised, yes.

17    Q    And if the Wicomico County conviction had been

18  vacated prior to the trial in this Court in early 2012, would

19  you and the prosecution team have been opened to revisiting

20  the question of noticing the death penalty?

21        MR. RUSSELL:  Objection, calls for speculation.

22        THE COURT:  Well, it is also not an actual factual

23  statement because the conviction was vacated but then he

24  promptly pled.

25        MR. HUT:  I was about to get to that, Your Honor.

**App. 759**

cch

44

1        THE COURT:  So, it is not an accurate question.  It

2   doesn't actually state the factual circumstances.  So, I am

3   going to sustain it for being an inaccurate summary of facts

4   upon which to create a hypothetical situation.

5        I am reserving on whether or not if you accurately

6   state the facts, I will let you asks the hypothetical but at

7   this point but at this point in time, the hypothetical is not

8   even remotely factually accurate.

9        So, I am going to sustain the objection.  I am not

10  going to tell you what I will do if you make an accurate

11  factual.

12       MR. HUT:  All right, let me ask the question to

13  conform with Your Honor's ruling and then circle back and tell

14  you why I think the question I also asked was relevant.

15       BY MR. HUT:

16  Q    Had the conviction been vacated Mr. Stephens pleaded

17  to the crime as charged in return for a sentence that was

18  reduced from life plus 15 to time served, would that have been

19  taken into account by your prosecution team on the question

20  whether to continue to seek the death penalty?

21       MR. RUSSELL:  I am going to object, again, Your

22  Honor.  For one, it is not time severed.  It is life suspend

23  all but time served.  And secondly, again, as to speculation.

24       THE COURT:  It still puts us back where I don't have

25  an answer to this question.  The Court of Appeals has

**App. 760**

1    definitively stated, despite by some misgivings by a number of

2    trial Judges, that there is no right to a jury sentencing in a

3    life without parole case.

4         And it still begs the question of even if it had

5    been vacated, he was still serving a sentence in prison at the

6    time, but he would have faced, if it wasn't a capital case,

7    life without parole.  And I just can't envision how you are

8    going to be able to show that the result would have been

9    different.

10        And I mean I am trying to think of the argument that

11   you make as a reasonable attorney to the jury.  Ladies and

12   gentlemen of the jury, you found my client -- excuse me, you

13   make to the Court.  Dear, Judge, the jury found my client

14   guilty now we are for sentencing.  And you can just let him

15   walk today because he has walked in Wicomico County or you can

16   give him life, or you can give him life without parole.

17        I don't know how you reached the result would have

18   been a different stage.  I am perplexed by this.  But having

19   said that --

20        MR. HUT:  Well, --

21        THE COURT:  -- that is a question for you to argue

22   to me how in some way the result may have different.

23        MR. HUT:  And we intend to do so actually during the

24   closing, Your Honor, right up front.

25        THE COURT:  But you still can't change the fact that

cch

1   life without parole is a valid sentence and you have no way of

2   knowing what Judge Hackner might have done if he had been

3   proceeding on a life without parole period.

4        MR. HUT:  But our submission, Your Honor, goes to

5   principally the deficiencies in counsel's performance.  And

6   that --

7        THE COURT:  You are ignoring the second prong.  You

8   are completely ignoring the second prong.

9        MR. HUT:  It would have led -- I don't think I am,

10  Your Honor.  I think the prejudice is that the jury -- there

11  is no way to determine --

12       THE COURT:  You are missing completely what I am

13  saying.  If it wasn't a death case, it would have been a life

14  without parole case.  And instead of a death sentencing, he

15  would have had a Court sentencing and I don't know how you are

16  ever going to be able to show that Judge Hackner would have

17  sentenced differently on a life without parole sentencing than

18  the jury wound doing in a death case.

19       MR. HUT:  But, Your Honor, our submission

20  principally is you don't need to --

21       THE COURT:  You have asked for a new sentencing

22  hearing?

23       MR. HUT:  We have but we have also asked for a

24  vacation of the conviction.  That is our principal submission.

25       THE COURT:  I understand, I understand.

cch

1          MR. HUT:  Our principal submission, Judge Mulford,

2    is that --

3          THE COURT:  You are missing my point --

4          MR. HUT:  -- the jury, the jury, there is a

5    significant possibility of a jury acquittal that is our

6    principal submission.  You don't need to get to the question

7    whether Judge Hackner would have --

8          THE COURT:  You are missing -- you are asking a

9    question of whether or not a guilty plea with life, suspend

10   all but time served and probation to follow.  If done prior to

11   trial, would have precluded the State from proceeding with the

12   dealt penalty.

13         MR. HUT:  Not precluded.  Would have counsel the

14   State in quashing the death notice.  It was a discretionary

15   matter.  And our submission is that the failure to do that.

16   The failure of counsel to --

17         THE COURT:  I understand your argument.

18         MR. HUT:  So, there --

19         THE COURT:  I understand your argument.

20         MR. HUT:  -- are grave consequences, Judge Mulford,

21   in a trial that proceeds with the dealt penalty in place.

22         THE COURT:  Do you remember the movie A Few Good

23   Men?

24         MR. HUT:  Sure.

25         THE COURT:  Grave consequences.

cch                                                                    48

1              MR. HUT:  I don't remember that part of it, I would

2    have to say.  I remember code red.

3              THE COURT:  I know.  Tom Cruise made it very

4    clearly.  Grave consequences, could there be any other?  So,

5    you don't have to qualify things in front of me.  I am not a

6    jury, okay.

7              I am not understanding the focus of your question.

8    I think that is my problem because I am not understanding

9    whether you are talking about the sentencing issue or whether

10   you are talking about the trial issue because they are two

11   separate issues and you have already -- you have raised that

12   and perhaps I am focused on more on the sentencing part and

13   your question goes to the trial part.

14             MR. HUT:  It does.

15             THE COURT:  Okay.  That is where I am not

16   comprehending your question.  Rephrase it but rephrase it with

17   the focus on the trial component as opposed to the sentence

18   component.

19             MR. HUT:  Right.

20             THE COURT:  Do you understand what I am saying?

21   That is where I am getting lost in the argument -- in the

22   questions.

23             MR. HUT:  Well, what I am trying to ask Mr. Ash is

24   this.  Let me start --

25             THE COURT:  Try it again.

1              MR. HUT:  Try it again.

2              THE COURT:  Again, I have to separate in my mind,

3    counsel's performance at the trial versus counsel's

4    performance at sentencing and right now I am wrapped up in, I

5    thought the question dealt more with counsel's performance at

6    sentencing, what you are asking --

7              MR. HUT:  Well, of course, the Wicomico --

8              THE COURT:  -- in terms of -- okay, I think I

9    understand.

10             MR. HUT:  The Wicomico issue, indeed, addresses

11   counsel's performance as Mr. Trainor, said, counsel's

12   performance --

13             THE COURT:  I know.

14             MR. HUT:  -- at pretrial --

15             THE COURT:  Yes, it was.

16             MR. HUT:  So, we are looking at pretrial at a

17   decision that the State made --

18             THE COURT:  Okay, go ahead, rephrase it so I can

19   understand the question and get it back in focus.  I want to

20   focus on the question.

21             MR. HUT:  Let's try to conform with Judge Mulford's

22   ruling and Mr. Russell's qualification.

23             BY MR. HUT:

24   Q    Assume that at some point prior to trial, the State

25   is faced with a vacate tour of the conviction of Wicomico

**App. 765**

1   County, followed by a plea by the Petitioner here,

2   Mr. Stephens, to a first-degree murder charge in Wicomico

3   County, followed by the imposition of a sentence of life

4   suspend all but time served.  My question to you is would that

5   have affected the State's -- might it have affected the

6   State's decision whether to keep the death penalty on the

7   table with the facts so changed?

8          MR. RUSSELL:  Again, I am going to object --

9          THE COURT:  No, I am going to overrule that because

10  that is the premise of the post-conviction and I understand it

11  now in terms of the question.  And just so I understand the

12  question, Mr. Hut, I want to make sure I understand it.  If

13  the State believes that the murder was committed by the

14  Defendant while serving a sentence in the Division of

15  Correction but post-murder, the life plus 15-sentence is

16  vacated and there is now a guilty plea with life suspend all

17  but time served and probation.  Would the State have proceeded

18  as it did?  Is that --

19         MR. HUT:  I think that is it.  That is a fair --

20         THE COURT:  Okay, I am going to allow --

21         MR. HUT:  -- formulation.

22         THE COURT:  -- him to answer that because both

23  Proctor and Lawlor and Trainor have all expressed their

24  thoughts on that matter.  So, I think it is a legitimate

25  question to pose now that I understand where you are going

**App. 766**

1   with the question.  It is now clear in my mind.  So, do you

2   understand the question?

3           THE WITNESS:  I understand the question.

4           THE COURT:  Okay.  There are so many permutations to

5   this that you are not aware of Mr. Ash and I am trying to

6   juggle them all.  So, can you answer that?  If you can,

7   please.  If you can't, tell us why you can't.

8           THE WITNESS:  The reason why I couldn't answer that

9   is because it was not our decision whether or not to proceed

10  on the death penalty.  So, that answer would have to come from

11  my boss at the time, Mr. Wethersby*, who if, unfortunately, is

12  not with us.

13          So, that information would have been provided to

14  him, of course, and he would have to make the decision based

15  on that new information.

16          BY MR. HUT:

17      Q    Does it come with a recommendation from the

18  prosecution team, the trial team?

19      A    If you are asking me personally based on that

20  hypothetical?

21      Q    Sure.

22      A    As far as based on that hypothetical, he still pled

23  guilty to the same facts.  So, he still --

24      Q    With a much reduced sentence --

25      A    The sentence would have nothing to do with it.

cch

52

1    Q    -- indicating some mitigating circumstances?

2    A    Right, but my understanding as to why that offer and

3    I could be wrong, but why that sentence was offered was

4    because he was convicted in this case.

5    Q    And on the subject of that conviction, you testified

6    in direct examination about what might have ensued had

7    Mr. Stephens taken the stand at the trial you prosecuted, do

8    you remember that?

9    A    I testified as to what the areas of cross

10   examination would have been.

11   Q    Correct.  And one of the things you said was that

12   you would have and expected to be able to impeach him with the

13   prior conviction.  Do you recall testifying to that?

14   A    Yes.

15   Q    And you had no doubt that you would be able to do

16   that, use that in conviction for impeachment, did you?

17   A    We had a certified copy of it.

18   Q    And it met all the other requirements of Rule 509 in

19   terms of timeliness and probable affect outweighing prejudice

20   and infamous crime?

21   A    We felt it was proper cross examination.

22        (Pause.)

23        MR. HUT:  Court's indulgence?

24        THE COURT:  Certainly.

25        (Pause.)

**App. 768**

1          BY MR. HUT:

2          Q      You testified earlier I think in direct examination

3     that you did not think that Mr. Freed played an especially

4     important role in the trial, do you recall that?

5          A      Not at the time that we called him.  Otherwise, we

6     wouldn't have called him.

7          Q      At the time you called him, you thought he was very

8     important, didn't you?

9          A      Well, I wouldn't say very.  He was damaged goods as

10    I mentioned.

11         Q      Well, wasn't it the case that in her closing,

12    Ms. Howell began her argument with the testimony that had been

13    elicited from Jason Freed?

14         A      If that's what the record indicates, yes.

15         Q      Isn't it the case that the whole argument was based

16    on the support that some of the forensic examination gave to

17    the eyewitness identification or the purported one by Jason

18    Freed?

19         A      I can't tell you what importance was placed on it by

20    the jury.  Well, I could --

21         Q      I am not asking you to.  I am not asking you to read

22    the mind of the jurors or even relate what they may or may not

23    have told you.  I am asking for the prosecution team you

24    thought at the time you offered his testimony and in closing

25    that he was central to your case, didn't you?

cch
54

1    A    He was part of the case, I wouldn't say central.

2    Q    During the investigation following the murder of

3    Corporal McGuinn, other cells were examined, weren't they?

4    A    I think all the cells were examined.

5    Q    And blood was found in other cells, isn't that true?

6    A    Yes.

7    Q    And it was never tested though, was it?

8    A    I don't know.

9    Q    So, you tested only blood found in or near the cells

10   of Stephens and Harris but not the blood found in the cells of

11   other inmates, isn't that correct?

12   A    I don't know the answer to that?

13   Q    At the time that the State offered to the jury in

14   the Anne Arundel County prosecution what is Defendant's Q and

15   what was State's 66, which we have now looked at a couple of

16   times, you knew about Joseph Kopera, didn't you?

17   A    Yes.

18   Q    And you knew that he had repeatedly perjured himself

19   in trial, after trial, after trial in this case, didn't you?

20   A    We did.

21        MR. HUT:  No further questions, Your Honor.

22        THE COURT:  Before you do that.  Was there a

23   division of labor by the State's Attorneys in turns of you had

24   some witnesses, Ms. Howell had some Witnesses?

25        THE WITNESS:  Yes, we split up the witnesses.  We

**App. 770**

cch

55

1   kind of prepared all of them together.  I think I did most of

2   the defense witnesses.

3          THE COURT:  And in terms of dealing with Mr. Proctor

4   or Mr. Lawlor and Ms. Waters, would you and Ms. Howell have

5   spoken to them always at the same time, at different times?

6   Were there run ins here in the hallway?

7          THE WITNESS:  All of the above.

8          THE COURT:  All of the above?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.

11          THE WITNESS:  But certainly if it was anything of

12   important to the trial, we would have consulted each other.

13   If there was a one-on-one with -- say I ran into Mr. Proctor

14   or Mr. Lawlor on another matter and something came up with the

15   Stephens' case, I would certainly consult Sandy or let her

16   know that, hey, we had this discussion.

17          THE COURT:  And I can't recall but did the Attorney

18   General handle the interlocutory appeals?

19          THE WITNESS:  He did, Mr. Williams.

20          THE COURT:  But you didn't -- the State's Attorneys

21   didn't go up with that?

22          THE WITNESS:  We went to watch it but we didn't --

23   we had no participation in it.

24          THE COURT:  All right.

25          THE WITNESS:  And that was I think the Harris

1    appeals.

2              THE COURT:  The Harris appeal?

3              THE WITNESS:  Yes.

4              THE COURT:  I know there were interlocutory appeals.

5              THE WITNESS:  That was with the Harris case.  It

6    related here I supposed because of the DOC records I think was

7              THE COURT:  I think this was raised at some point,

8    is Harris still deemed incompetent?

9              THE WITNESS:  He is not restorable.  Incompetent and

10   not --

11             THE COURT:  Incompetent and not restorable?

12             THE WITNESS:  -- restorable.

13             THE COURT:  But dangerous?

14             THE WITNESS:  I think he is serving triple life

15   anyway.

16             THE COURT:  Okay, all right.  Okay, you can redirect

17   and I will certainly allow any party to ask additional

18   questions based upon what I asked but I don't think I raised

19   any really new areas.  So, go ahead.

20             MR. RUSSELL:  Thank you, Your Honor.

21                       REDIRECT EXAMINATION

22             BY MR. RUSSELL:

23      Q     Mr. Ash, just clarify, what did you tell Sergeant

24   Branum* with regard to any deal with Mr. Freed with regard to

25   his Hartford County cases?

**App. 772**

1        A    We couldn't offer any deals.

2        Q    Okay.  And Mr. Hut asked you some questions about

3    information relating to the search of the cell.  What if any

4    of that information was put in front of the jury?

5        A    I am not sure I follow the question.

6        Q    So, he had asked you specifically about who did the

7    search of the cell, who found what item, those kinds of

8    questions?

9        A    I think that was all put in front of the jury.

10       Q    Okay.  And, finally, Mr. Ash, can you -- Mr. Hut

11   asked you about some evidence that was not -- blood evidence

12   that not tested in Mr. Stephens' cell.  Can you tell us what,

13   if any, blood evidence was tested and that DNA connected that

14   blood to Officer McGuinn that was found in his cell?

15       A    I believe that the shirt and the blood on the boots

16   and -- I'm not sure what else may have been tested.

17       Q    Okay.

18            MR. RUSSELL:  Nothing further, Your Honor.

19            THE COURT:  And just before you.  So, if I remember

20   correctly from reading, DOC did all the initial work dealing

21   with the scene, witnesses, et cetera, and then the State

22   police got in later?

23            THE WITNESS:  That is correct.

24            THE COURT:  Okay.

25            THE WITENSS:  Later that night.

**App. 773**

1          THE COURT:  Later that night.

2          THE WITNESS:  Morning.

3          THE COURT:  Okay, all right.  I just couldn't

4   remember the exact sequence because we had center hall, we had

5   the items moved to center hall and then we had the tier and

6   all of that.  Okay.  Mr. Hut, what else would you like to ask

7   Mr. Ash, if anything?

8          MR. HUT:  I have no further questions either based

9   on Your Honor's questions or Mr. Russell's redirect.

10          THE COURT:  Okay.

11          MR. HUT:  If you concluded?

12          MR. RUSSELL:  I have, yes.

13          THE COURT:  All right.  Thank you, Mr. Ash, please

14   don't discuss your testimony with anyone until the trial is

15   concluded, okay?

16          THE WITNESS:  Yes, Your Honor.

17          (Witness excused.)

18          THE COURT:  All right, Mr. Russell?

19          MR. RUSSELL:  The only thing I left, Your Honor, is

20   I believe we have not moved in State's 6, 8, 10 and 11 into

21   evidence.  I would ask to do that at this point?

22          THE COURT:  Do you remember what those were?

23          MR. RUSSELL:  I do.  6 is a letter from one of the

24   experts.  And that may have already gone in through -- yes,

25   through defense.  I wasn't certain of that so I just --

cch

59

1        THE COURT:  6 is in?

2        THE CLERK:  It is in as a defense exhibit.  They

3 marked and admitted the same exhibit.

4        MR. RUSSELL:  Well, then in that case, I won't put

5 it in, Your Honor, I apologize.

6        THE COURT:  Okay, what about 8?

7        MR. RUSSELL:  8 --

8        THE COURT:  I don't know why I can't 8.  Here is 8.

9 Document --- publication, what is that one?

10        MR. RUSSELL:  Correct, Your Honor, that is the --

11        THE COURT:

12        MR. RUSSELL:  Yes, I believe that is the document

13 that was written by Mr. -- one of the experts.  I am trying to

14 remember his name.

15        THE COURT:  Mr. Loftus?

16        MR. RUSSELL:  Yes.

17        THE COURT:  Any objection to that?

18        MR. HUT:  No objection.

19        THE COURT:  All right, that will be admitted.  That

20 was used in cross.

21                     (The document marked for

22                     identification as State's

23                     Exhibit No. 8 was received in

24                     evidence.)

25        THE COURT:  Okay, what was the next one?

**App. 775**

1              MR. RUSSELL:  And 10 and 11 are both documents that

2     came in through Mr. Todd, the State's filings in Wicomico

3     County case.

4              THE COURT:  That was 10 was the State's memorandum

5     and opposition to post-conviction relief?

6              MR. RUSSELL:  Correct.  And I believe 11 was, I want

7     to say it was the response to an amended petition --

8              THE COURT:  Response to amendment.  Any objection to

9     those?

10             MR. HUT:  No objection but subject, Your Honor, to

11    the same -- you may recall that with respect to pleadings that

12    the defense offered in Wicomico case, I think Mr. Russell

13    asked that they be received for the fact that they were --

14             THE COURT:  Pleadings filed --

15             MR. HUT:  -- pleadings made but not the truth of

16    anything asserted.  I think these should be the same.

17             THE COURT:  I think you are absolutely right.

18             MR. RUSSELL:  I agree with that, Your Honor.  I

19    would stick to the same requirements that I asked --

20             THE COURT:  All right, 10 and 11 are admitted.

21    Okay.

22             MR. RUSSELL:  Thank you, Your Honor.

23                              (The documents marked for

24                               identification as State's

25                               Exhibit Nos. 10 and 11 were

cch                                                                    61

1                                    received in evidence.)

2              MR. RUSSELL:  And that would be the State's case.

3              THE COURT:  All right.  Are there any rebuttal

4    witnesses?

5              MR. HUT:  No, Your Honor.

6              THE COURT:  Then, why don't we take about 10/15

7    minutes and then I would like to hear your thoughts on the

8    issues in terms of closing.  That should be enough time if you

9    would like to use the bathroom, 15 minutes be enough for

10   everyone.

11             MR. HUT:  Sure.

12             MR. RUSSELL:  Absolutely, Your Honor.  Before we do,

13   Your Honor, can we talk about scheduling just for a moment?

14   Because I may actually run down to talk to Judge McCormick

15   courtroom.  I have a 1:30 with her that I was hoping to be

16   able to go to.

17             THE COURT:  You should be gone.  I mean I have a 12

18   o'clock appointment that I have to attend.  But the briefs are

19   extensive so this is not -- and I just ran a --- in my mind, I

20   have to -- I literally have to sit down and parse out the

21   different allegations as they relate to trial and sentencing

22   because it is a different analysis even though some of the

23   evidence might be the same.  So, I just have to parse it out

24   in my head.

25             So, let's come back here at about 15 minutes and I

**App. 777**

cch

62

1  hear from Mr. Hut.  And then depending upon our schedule, we

2  will go from there.

3        MR. HUT:  To that point, Your Honor, we had hoped to

4  divide up our argument in closing.

5        THE COURT:  Of course.

6        MR. HUT:  So, Ms. Gostin will begin and present the

7  arguments with respect to why Mr. Stephens is entitled to a

8  new trial.  And I will speak to the resentencing issue at the

9  end.

10        THE COURT:  Absolutely, there is no problem with

11  that.

12        MR. HUT:  One other point and I hope we are not

13  already in violation of the Court rules with respect to water

14  bottles but for the closing can we have --

15        THE COURT:  No, you are okay.

16        MR. HUT:  -- can we have them?

17        THE COURT:  You are all right.

18        MR. HUT:  Thank you.

19        THE COURT:  Mr. Ash had it, you can have it.  So,

20  let's take 15 minutes.  Are you using a PowerPoint?  So, you

21  want to switch my computer over so that we can have the

22  PowerPoint.

23        MR. EAGLES:  We are also printing out some ---

24        THE COURT:  Okay.  And you did use -- you left it on

25  the computer last time.  So, in the middle of one of my

**App. 778**

1    hearings over the past week, it popped up.

2              MR. EAGLES:  I apologize.  I won't do that ---

3              THE COURT:  I don't know if I was dealing with ---

4    at that point.  All right, let's take about 15 minutes.

5    Officers, can be brought down just in case he wants to use the

6    bathroom.  We are going to go till 12 o'clock.  And then we

7    will break and then we will come back at 1:30, and we will go

8    from there.  If you need to see Judge McCormick for a minutes,

9    I understand but she is one of the people I have to meet with

10   at 12:00, so, I will tell her where we are at that time.

11             MR. RUSSELL:  Okay. That is perfect, thank you.

12             MR. HUT:  Thank you, Your Honor.

13             THE COURT:  All right, short recess.

14             THE CLERK:  All rise.

15             (Whereupon, at 10:39 a.m., a brief recess was taken

16   and at 10:52 a.m., the proceeding was recalled.)

17             THE CLERK:  All rise.

18             THE COURT:  Please be seated everyone.  You want to

19   check and see where he is?

20             (Pause.)

21             THE COURT:  Did you see if we opened it up the last

22   time, that you still have one in there?

23             MR. EAGLES: I am sorry?

24             THE COURT:  Did you see you still had the last

25   PowerPoint in there?

**App. 779**

cch

64

1        MS. GOSTIN:  We are actually using our computer now.

2        THE COURT:  Oh, okay.  You are not using that one?

3        MR. EAGLES:  Yes.

4        THE COURT:  You can call it, we will just put on the

5  record when he comes in.

6        MR. RUSSELL:  Thank you, Your Honor.  I will call

7  State versus Lee Stephens, Case No. 02-K-08646. David Russell,

8  R-u-s-s-1-1, on behalf of the State.

9        MR. HUT:  Stephen Hut for the Petitioner.

10       MS. GOSTIN:  Isley Gostin, I-s-l-e-y G-o-s-t-i-n,

11  for the Petitioner.

12       MR. EAGLES:  Thad Eagles, T-h-a-d E-a-g-l-e-s for

13  the Petitioner.

14       THE COURT:  All right, we will wait until he gets

15  here.  Did you print the PowerPoint?

16       MS. GOSTIN:  We did, Your Honor.

17       THE COURT:  Thank you.  Did you want to file that?

18       MR. HUT:  We would, Your Honor, have it made part of

19  the record, yes, please.

20       THE COURT:  Of Course.

21       MR. EAGLES:  It did unfortunately print such that

22  you have to a little --

23       THE COURT:  We will figure it out.  That is all

24  right, we will figure it out.

25       MR. EAGLES:  Thank you.

cch                                                                              65

1              (Pause.)

2              THE COURT:  It will be scanned as PowerPoint file

3      document defense closing argument.  Okay?

4              THE CLERK:  Okay, I can do that.

5              THE COURT:  And I just want a copy when you get it

6      done.

7              MR. RUSSELL:  And, Your Honor, may I confirm that

8      Mr. Ash maybe in the courtroom now?

9              THE COURT:  Who?

10             MR. RUSSELL:  David Ash.

11             MR. HUT:  No objection here.

12             THE COURT:  Oh, Mr. Ash?

13             MR. RUSSELL:  Yes.

14             THE COURT:  You know, Mr. Ash and Mr. Lawlor learned

15     to tie their ties in the same place.  And I got absolutely

16     nowhere when I told Mr. Lawlor to pull his tie up.  So, I

17     didn't think I was going to get anywhere with Mr. Ash, so I

18     didn't even bother.  But if you think I didn't notice it, I

19     noticed both of them.  Defendant is in the room,

20     Petitioner/Defendant, Mr. Stephens, is in the room.

21             All right, Mr. Ash, can certainly remain in the

22     room.  At this point in time, I have asked the Clerk to scan

23     into and file not necessarily as an exhibit but to file for

24     the record the PowerPoint that is going to be presented.

25             So, you can start if you want and I will be glad to

**App. 781**

66

1   listen to you.

2          MS. GOSTIN:  May it please the Court, Petitioner

3   here is entitled to a new trial for two independent reasons.

4   First, he was denied effective assistance of counsel and

5   second, he was denied the right to testify.

6          And as Mr. Hut will address, in the alternative,

7   Petitioner is entitled to a resentencing because his sentence

8   was imposed in violation of due process and he was again

9   denied effective assistance of counsel and sentencing.

10          Turning to the first claims for ineffective

11   assistance of counsel.  As Mr. Hut explained in the opening

12   statement, Mr. Lawlor and Mr. Proctor are fine lawyers.  But

13   to quote Mr. Lawlor, the task and challenges in this case were

14   "massive," they were out resourced by the State.  They

15   continually had to take other cases, substantial cases, to

16   keep the lights on, which meant diverting their attention from

17   Mr. Stephens' case often for months at a time.

18          Notwithstanding their best efforts, counsel was

19   deficient in multiple respects.

20          Under the Court of Appeals case in Bowers, these

21   errors need not be independently deficient or prejudicial to

22   justify a new trial.  We certainly think that they were.  But

23   at the very least, counsel's errors taken cumulatively fell

24   below the prevalent standards and adequate representation may

25   well have produced a different result especially here where

1   the State offered absolutely no motive and the jury

2   deliberated for six days before finding Mr. Stephens guilty.

3           The standard for prejudice is lower than a

4   preponderance of the evidence.  It is whether there is a

5   "substantial or significant possibility that the outcome would

6   have been different."  Upon that showing, Mr. Stephens is

7   entitled to a new trial.

8           I want to address up front a question the Court

9   raised last week, which is whether in light of the fact that

10  Mr. Stephens did not receive the death penalty in this case,

11  we should be evaluating counsel's performance based on the

12  standards that would be applicable in a nondeath penalty case.

13          THE COURT:  I don't know if there is any different.

14  The standard is whether counsel was effective so you look at

15  whether they are effective in terms of the overall case as a

16  whole.  It was more of a rhetorical question.  But, go ahead.

17          MS. GOSTIN:  And we certainly agree with that

18  position and we think first of all under Strickland the task

19  is to evaluate conduct counsel from --

20          THE COURT:  Sort of what -- sort of what I just

21  said.

22          MS. GOSTIN:  Exactly at the time.

23          THE COURT:  Okay.

24          MS. GOSTIN:  And, of course, this was a death

25  penalty case anyway until the jury rendered its verdict.

**App. 783**

1          THE COURT:  It is still a murder case.  It is life

2    without parole.  It is still a sentence where he is not

3    leaving.

4          MS. GOSTIN:  And as you will recall, we asked

5    Mr. Trainor in his testimony whether had this not been a death

6    penalty case and simply been a first-degree murder case, his

7    opinion that counsel was deficient here would have been any

8    different?  And he testified that it would not have been any

9    different and that counsel's performance was still deficient

10   even if the State had not been seeking the death penalty here.

11         And we also, we refer the Court to State v. Johnson,

12   143 Md. App 173, from 2002, which we also think makes this

13   point.

14         THE COURT:  Don't wait for him to turn the pages.

15   He can push buttons faster than you can talk, but go ahead.

16         MS. GOSTIN:  My apologies, Your Honor, I was turning

17   my own pages.

18         THE COURT:  Okay.

19         MS. GOSTIN:  And so now turning to counsel's

20   deficiencies.  First, Mr. Stephens was denied effective

21   assistance of counsel because counsel failed to require the

22   State to prove an element of the offense, causation, beyond a

23   reasonable doubt.

24         At trial, the State tried the first-degree murder

25   charge against Mr. Stephens on the theory that Mr. Stephens

1    had "caused the death of Corporal McGuinn."

2              The evidence adduced at trial on causation was at

3    best incomplete and misled the jury.  In her report,

4    Dr. Vincenti opined that Officer McGuinn died from multiple

5    sharp force injury including all 24 wounds.  And that the

6    injury occurred because the victim was stabbed and cut.

7              The jury was told by Dr. Vincenti and again at

8    closing that all of the wounds caused some blood loss and that

9    it was the totality of the blood loss that caused McGuinn's

10   death.

11             The jury was instructed that the State had to prove

12   beyond a reasonable doubt that Mr. Stephens had caused the

13   death of Corporal McGuinn as Pattern Jury Instruction 417

14   prescribes.

15             But the Court did not instruct the jury as to the

16   meaning of cause of the death.  As a matter of law,

17   Mr. Stephens could only have caused the death of Corporal

18   McGuinn if his acts had been a but-for cause or had been

19   independently sufficient to have caused death.

20             The notes to Maryland Pattern Jury Instructions 417

21   provide that factual causation requirement is satisfied if the

22   Defendant's acts or omission were a substantial cause --

23   excuse me, substantial factor in bringing about the death.

24   And in support, it cites to Professor LaFave's Criminal A

25   Treatise.

**App. 785**

1          LaFave's Treatise explains that the substantial

2   factor test applies where two causes each alone sufficient to

3   bring about the harmful result operate to cause it.  And as

4   shown in our slide other leading treatises say the same thing.

5          Indeed, the substantial factor test even as used in

6   a criminal context comes from the restatement of torts and the

7   third restatement clarifies that the purpose of the

8   substantial factor test was to permit the fact finder to

9   decide that factual cause existed when there were multiple

10  sufficient causes each sufficient to bring about the

11  Plaintiff's harm.

12          Likewise, under Maryland Tort Law, the substantial

13  factor test is satisfied if either cause standing alone would

14  have generated the harm.  Courts elsewhere including the

15  Supreme Court agree.

16          As the State correctly noted in its answer, the

17  Supreme Court's decision in Burrage involving the

18  interpretation of a Federal Statute and was decided not until

19  2014.  But in Burrage, the Supreme Court surveyed well

20  established State law and concluded that as a matter of common

21  law to be a substantial factor either but-for causation or

22  independent sufficiency is required.

23          And in its answer the State cited no authority to

24  the contrary of this point.

25          Reasonable investigation by counsel here would have

**App. 786**

cch                                                                    71

1   shown that the State could not prove beyond a reasonable doubt

2   that Mr. Stephens caused the death.

3          As counsel should have discovered, at most, only two

4   wounds could have caused Officer McGuinn's death and likely

5   only one.

6          Dr. Vincenti testified last week that had McGuinn

7   not received stab wounds A & E, he would have survived his

8   injury if given normal medical treatment, which he did

9   undisputedly receive here.

10          And Dr. Vincenti would have provided the same

11   testimony had she been asked by defense counsel in 2012.   Had

12   trial counsel contacted Dr. Vincenti or another medical

13   examiner like Dr. Spitz, they would have learned the same

14   thing.

15          As you will recall Dr. Spitz testified that stab

16   wound A was the fatal wound.   He testified that stab wound E

17   most likely would not have been fatal with proper medical

18   treatment, which Corporal McGuinn received.   And he testified

19   that the other 22 wounds together would not have been fatal.

20          While only one or possibly two wounds were fatal,

21   there was no evidence, none, offered by the State connecting

22   those two wounds to any assailant other than Mr. Harris.

23          In fact, the evidence from the State's own

24   eyewitness, Jason Freed, tended to show that it was Lamar

25   Harris and not the second assailant who struck the fatal

1  blows.

2          Stab wounds A and E as you recall from Dr. Spitz and

3  Dr. Vincenti testimony were struck to the back of Corporal

4  McGuinn's body.

5          At trial, Mr. Freed described Lamar Harris as

6  striking McGuinn in the back.  So, too did Cornelius Christy

7  another State's witness who, in fact identified only Lamar

8  Harris and didn't even ever see a second assailant.

9          The location of Mr. Harris and Mr. Stephens' cells,

10  including the path that Corporal McGuinn walked on the tier

11  that night are consistent with this.

12          And no evidence was ever presented that any

13  assailant other than Lamar Harris struck Corporal McGuinn from

14  the back.  But this point was never argued to the jury because

15  counsel failed to appreciate its significance to the causation

16  issue.

17          Counsel's failure to investigate the pathology

18  evidence was not strategic and was deficient.  Mr. Lawlor at

19  this hearing testified that it was the responsibility of

20  Mr. Proctor.  And Mr. Proctor admitted this.

21          Mr. Proctor testified that he never contacted

22  Dr. Vincenti because at the time he was operating under the

23  misimpression that medical examiners did not speak with

24  defense counsel.  But both he and Mr. Trainor dispelled that

25  incorrect notion.

1    Mr. Proctor further testified that he had originally
2    hired a medical examiner, Dr. Callery, but then dropped the
3    ball when Dr. Callery fail through.

4    And even with Dr. Callery, Mr. Proctor testified
5    that he never thought to ask which wounds were and were not
6    fatal.

7    Because counsel never inquired about the fatality
8    of the wounds, the jury never learned that one, possibly two,
9    of the wounds were fatal.

10   Mr. Proctor testified that had he appreciated that
11   fact and the causation issue, he would have asked Dr. Vincenti
12   on cross, short focus questions to elicit that very point.

13   Mr. Trainor testified that counsel was clearly
14   deficient for never speaking with Dr. Vincenti, as no
15   reasonable lawyer would have assumed the medical examiner
16   refused to talk to counsel.

17   In fact, Mr. Trainor testified that he always speaks
18   with Maryland Medical Examiners in homicide cases and that
19   they always cooperate.  And he testified that counsel was
20   particularly derelict here where the specific legal cause of
21   death was at issue or would have been at issue had counsel not
22   overlooked this fatality factor.

23   Likewise, counsel's failure to raise the legal issue
24   and focused the jury on causation was not strategic and was
25   deficient.  Counsel should have brought this fundamental flaw

**App. 789**

cch

1   in the State's case to the State ahead of trial.

2          The ABA Guidelines require that defense counsel do

3   so especially where there are legal bases to strike the death

4   notice.

5          Furthermore, counsel should have brought the

6   causation issue to the jury's attention by seeking an

7   instruction that the State was required to prove beyond a

8   reasonable doubt that Mr. Stephens' acts were independently

9   sufficient to have caused Corporal McGuinn's death.  And

10  should have argued to the jury that there was absolutely no

11  evidence to that effect.

12         Under Maryland Law, a jury instruction should be

13  given as long as it is generated by the evidence, a correct

14  statement of the law and not fairly covered by the

15  instructions already given.

16         The State effectively admitted in its answer, as it

17  must, that this instruction was generated by the evidence

18  here.  An instruction clarifying that causation requires

19  independent sufficiency was, as we have shown, a correct

20  statement of the law.

21         And it was not fairly covered by the Pattern Jury

22  Instructions read to the jury.  Those instructions defined the

23  terms willful, deliberate and premeditated, but did not define

24  the remaining element of the crime, causation.

25         At bottom, counsel permitted the jury to be

1    instructed on an offense for which there was no evidence to

2    convict their client without ever arguing as much to the jury.

3         Both Mr. Lawlor and Mr. Proctor said that their

4    failure to bring this issue to the jury was not strategic.

5    Mr. Proctor testified that he doesn't recall giving it a

6    moment's consideration and that the jury instructions were

7    Mr. Lawlor's job.  And Mr. Lawlor testified that he never

8    contemplated the instruction at all.

9         They also testified that they never researched the

10   legal meaning of causation and never considered making this

11   argument.

12        Counsel's failures here fall below the standard of

13   care.  Mr. Trainor testified that given the facts of this case

14   and the State's decision not to proceed on an aiding and

15   abetting theory, trial counsel was deficient in not asking for

16   this instruction to at least preserve the issue for appeal.

17        Defense counsel could have argued to the jury

18   whoever the other assailant was other than Mr. Harris, whether

19   it was Mr. Stephens or someone else that was simply no

20   evidence that this second person caused the death of Corporal

21   McGuinn.

22        Mr. Trainor testified that making such an argument

23   would not have been inconsistent with counsel's theory at

24   trial that Mr. Stephens had not been involved at all.  And

25   that, therefore, counsel's failure to argue it to the jury was

1    deficient.

2            Mr. Lawlor and Mr. Proctor said the same thing.  Had

3    they appreciated the issue, they would have presented it to

4    the jury.

5            This case at best is entirely distinguishable from

6    State v Latham, which the State cites in its answer. In which

7    the Defendant claimed that his counsel should have argued both

8    that he was simply a bystander and also that he acted in self-

9    defense.

10           Of course, self-defense would have required the

11   Defendant to admit that he was, in fact, the shooter and would

12   have required the defense to put on evidence as to the

13   Defendant's mental state.  And, thus, would have made that

14   theory entirely factually inconsistent with the theory that he

15   was simply a bystander.

16           Had counsel here researched the elements of the

17   offense with which their client was charged it would have led

18   them to ask the right questions of a medical examiner.

19   Conversely, had counsel appropriately investigated by talking

20   to a medical examiner it would have led them to appreciate the

21   legal issue of causation.

22           But counsel failed below the standard of care in

23   both respects and the State was thus unconstitutional relieved

24   of its burden on this element.

25           These deficiencies were prejudicial.  As a

**App. 792**

77

1   preliminary matter, had counsel been appropriately informed

2   and told the State that there was no evidence to prove that

3   Mr. Stephens had caused the death of Corporal McGuinn within

4   the meaning of the law, the death penalty may have been taken

5   off the table from the outset.

6          They may have avoided a death qualified jury, which

7   for the reasons Mr. Proctor noted in his testimony, could have

8   been a game changer in the guilt phase especially where the

9   jury there deliberated for six days.

10          And counsel could have focused more on the guilt

11   innocence phase and Mr. Stephens' Wicomico County conviction

12   rather than on litigation.

13          Moreover, given the case that the State actually put

14   forward here, but-for counsel's failures, Mr. Stephen's would

15   have been acquitted.

16          The State offered no evidence from which a

17   reasonable jury could have found beyond a reasonable doubt

18   that the acts of Mr. Stephens were independently sufficient to

19   have caused Corporal McGuinn's death.

20          The State has pointed to the fact that in phase one

21   of sentencing the jury found that Mr. Stephens was the

22   principal in the first-degree.  But that fact only underscores

23   counsel's failures here.  In phase one of sentencing, the

24   Court defined principal --- first-degree as whether the

25   Defendant had committed the murder by his own hand.

**App. 793**

cch

1         The jury indeed found Mr. Stephens to be a first-

2    degree principal.  But in making that decision, the jury was

3    still laboring in ignorance of the law on causation.  And

4    ignorant of the fact that only one or two wounds here were

5    fatal.

6         Had they been properly informed by counsel no

7    reasonable jury could have found Mr. Stephens to be a first-

8    degree principal.

9         And it is too late now for the State to rely on a

10   theory of aiding and abetting.  The Supreme Court and Maryland

11   Court of Appeals decisions, which we cited in the case

12   compilation, had made it clear that a review in Court cannot

13   permit a conviction to stand on the basis of a theory that was

14   never presented to the jury.

15        Hardy v. Chappell case from the Ninth Circuit is

16   instructive here.  The California -- in that case, the

17   California Supreme Court held the defense counsel is deficient

18   for failing to investigate that another person actually

19   stabbed the victims.  The Court found that there was

20   overwhelming evidence that the Defendant had participated in

21   the conspiracy.

22        But it held that there was no prejudice at the guilt

23   phase only because the State had argued conspiracy and aiding

24   and abetting at closing argument.  The jury had been

25   instructed on those offensives including aiding and abetting

1   and there was ample evidence to convict under those theories.

2   In fact, the jury there convicted the Defendant of conspiracy.

3         After the Defendant in that case was sentenced to

4   life without the possibility -- excuse me resentenced from

5   death to life without the possibility of parole, the Defendant

6   brought a habeas claim.  The Ninth Circuit disagreed with the

7   California Supreme Court and held the counsel's error was

8   prejudicial at the guilt phase.

9         The fact that the State had got an instruction on

10   aiding and abetting and secured a conspiracy conviction did

11   not matter.  The Ninth Circuit pointed to the fact that the

12   State's consistent theory at trial was that the Defendant did

13   the stabbing.

14         The discussion aiding and abetting in closing really

15   was really to the other perpetrators and the conspiracy

16   conviction was based on a finding that the Defendant was the

17   stabber.

18         The Court explained an aid and abet theory is wholly

19   distinct from an actual killer theory.  And the we only

20   envision what counsel should have presented in Hardy's defense

21   and determine how that would have altered the trial.

22         In doing so, we may not invent arguments the

23   prosecution could have made had it known that its theory would

24   be disproved.

25         Under either the California Supreme Court's or the

**App. 795**

1    Ninth Circuit analysis, it is simply too late in the day for

2    the State to argue no prejudice because it believes it could

3    have obtained an aiding and abetting instruction.

4            Counsel's failure to put on evidence and request a

5    jury instruction regarding causation was prejudicial.

6            Second, counsel failed to prosecute Mr. Stephens

7    post-conviction proceeding in Wicomico County before

8    proceeding to trial in this case.  That failure prevented

9    Mr. Stephens testifying in his own defense.

10           Mr. Stephens would have testified but-for his prior

11   conviction and sentence.  In colloquy with the Court at trial

12   regarding his decision to testify, Mr. Stephens was told on

13   the record by the State that the State would use his prior

14   conviction and sentence in Wicomico County to impeach him had

15   he testified.

16           And Mr. Stephens stated on the record that he

17   discussed the issue with counsel and that he was electing not

18   to testify.

19           At the hearing last week, Mr. Stephens explained

20   that he had wanted to testify in his own defense.  He

21   consistently denied his guilt to his lawyers.  He was

22   ultimately convinced not to testify because he came to

23   realize, on the advice of counsel, that his prior murder

24   conviction and prior life sentence of life plus -- excuse me,

25   prior sentence of life plus 15 years would have been highly

1  prejudicial.  Game over as Mr. Proctor put it.

2          Mr. Hut asked Mr. Stephens directly whether his

3  decision not to testify would have been different, had he only

4  had a sentence of time served rather than life plus 15 years.

5  He was unequivocal, yes.

6          Reasonable investigation would have revealed fatal

7  flaws in Mr. Stephens' Wicomico County conviction.  In the

8  Wicomico County trial, the State relied on two -- heavily on

9  two witnesses.  First Joseph Kopera, the ballistic expert who

10  testified that all 380 casings found at the crime scene had

11  come from the weapon that was attributed to Mr. Stephens.

12          Second, Officer Elmer Davis.  Officers Davis and

13  Claborwaden* testified that they saw Mr. Stephens with whom

14  they had had prior run ins by the side of the road at night in

15  a high crime area.

16          Davis testified that Mr. Stephens placed something

17  in his pants and then took off running.  As Mr. Todd

18  explained, Officer Davis and only Officer Davis testified that

19  after Mr. Stephens was stopped and had his hands on the hood

20  of the car facing the windshield, Mr. Stephens said, "it's not

21  my gun."

22          Davis claimed that Mr. Stephens made this statement

23  even though at the time he hadn't seen that Officer

24  Claborwaden had a gun, that Officer Claborwaden had supposedly

25  found in an alley nearby.

**App. 797**

cch                                                                    82

1            As Mr. Todd acknowledged, Davis's testimony was the

2    only convincing evidence connecting Mr. Stephens to the gun.

3    They were in a high crime neighborhood.  The gun was not found

4    on or near Mr. Stephens and Officer Claborwaden could not and

5    did not corroborate Mr. Stephens' allegedly inculpatory

6    statement that this is not my gun.

7            Indeed, the officers did not even arrest

8    Mr. Stephens that night for possession of a handgun.  And his

9    fingerprints were not on it.

10           Both Mr. Lawlor and Mr. Proctor testified that they

11   viewed Mr. Stephens' post-conviction in Wicomico County as

12   part of their representation of Mr. Stephens in this case.

13           Indeed, they were on notice years before the trial

14   here of a serious problem in the State's Wicomico County case

15   against Mr. Stephens.

16           Specifically, that Mr. Kopera, the ballistic expert

17   had provided false testimony regarding his credentials.

18   Defense filed a petition for post-conviction relief in 2009 on

19   that very basis.  But then they let it slip.

20           As the docket from this case shows and as

21   Mr. Proctor testified here, the proceeding in Wicomico County

22   was continued 13 times all at the request of the defense.  And

23   despite knowing that Mr. Kopera had committed perjury, they

24   did not ask the State to retest the ballistics nor did they

25   have their own expert retest the ballistics.

**App. 798**

cch

1          Contrary to Mr. Kopera's testimony, of course, not

2     all off of the 380 shell casings recovered from the crime

3     scene came from the weapon ascribed to Mr. Stephens.

4          The State's retest of the ballistic revealed that

5     there were two 380s that discharged bullets at the crime

6     scene.  It was, therefore, no longer possible for any jury to

7     have concluded beyond a reasonable doubt that Mr. Stephens had

8     fired the fatal bullet.

9          And this evidence was consistent with the defense's

10    theory of a chaotic crime scene -- a chaotic scene -- excuse

11    me, with multiple shooters.

12         Minimal diligence would have revealed that

13    ballistics were not the only problem in the State's Wicomico

14    County case.

15         As subsequent counsel discovered, the State had

16    never disclosed to the defense boxes of internal reports on

17    ethic violations by Officer Davis.  Mr. Todd testified that he

18    told Judge Jackson that this was indeed Brady material usable

19    to impeach Officer Davis.

20         Thus, as the evidence at the hearing demonstrated,

21    Mr. Stephens' Wicomico County conviction was constitutionally

22    --- in at least three respects.

23         First, Mr. Stephens' conviction was obtained in

24    violation of due process because Mr. Kopera, an agent of the

25    State, gave knowingly false testimony.

**App. 799**

cch                                                                84

1          Second, trial counsel and Mr. Stephens' Wicomico

2    County case was ineffective in failing to retest the

3    ballistics.

4          Third, the State failed to turn over material

5    exculpatory evidence about Officer Davis in violation of

6    Brady v. Maryland and Mr. Davis testified that Officer Davis

7    was critical to the defense -- excuse me, was critical to

8    State's case there because he was the State's key witness

9    connecting Mr. Stephens to the gun.

10         Multiple times Mr. Todd characterized this Brady

11   evidence as very important.  And Mr. Todd testified that he

12   felt the Kopera ballistic issue was an even stronger basis for

13   the Brady violation for overturning Mr. Stephens' conviction

14   in Wicomico County.

15         Counsel's failures to investigate here was not

16   strategic and was deficient.  Mr. Proctor and Mr. Lawlor

17   testified both that they simply dropped the ball.

18         Mr. Trainor testified that counsel had a clear duty

19   to seek to have the prior conviction set aside and that

20   failing to do so was deficient beyond prevailing professional

21   norms.

22         This is especially true given that since at least

23   2009, trial counsel had notice of a red flag on Mr. Stephens'

24   conviction, Mr. Kopera's malfeasant.

25         Again, I asked Mr. Trainor whether his opinion that

**App. 800**

cch

1   counsel was deficient would have been any different if this

2   had not been a capital case?  He said that it would not.

3   Regardless of the potential sentence, any reasonable attorney

4   would have investigated this obviously vulnerable conviction.

5           Mr. Trainor directed the Court's attention to ABA

6   Guideline 10.7, which directs counsel to review and if

7   appropriate seek to set aside prior convictions that could

8   come into evidence.

9           As Mr. Trainor testified, this duty serves multiple

10  purposes.  First, as notes to ABA Guideline 10.2 explain,

11  uncovering information about prior convictions can improve the

12  Defendant's negotiating position pretrial vis-a-vis the State.

13          Indeed, Mr. Proctor testified that if Mr. Stephens

14  had not already had a life sentence, he would have sought

15  pretrial to have the State take the death penalty off of the

16  table.

17          That, Mr. Proctor testified, would have had the

18  ancillary benefit of eliminating a death qualified jury a goal

19  counsel here had sought to achieve in their pretrial motions

20  for judicial sentencing.

21          Second, reviewing and vacating prior convictions

22  particularly for murder, becomes critical for sentencing both

23  where prior convictions can be used as statutory aggravators

24  and where they can otherwise come into evidence.

25          Third, prior convictions that may be used to impeach

cch

1   can and here did affect the Defendant's decision to testify.

2   The right to testify is (a) if not, the most fundamental

3   right.

4          Mr. Trainor testified that impairing the client's

5   decision is ineffective assistance and that counsel's failure

6   to investigate this conviction that was so obviously flawed

7   undoubtedly and obviously impaired Mr. Stephens' decision

8   here.

9          Counsel's deficiency was prejudicial.  Had the

10  Wicomico County post-conviction proceeding occurred as it

11  should have before Mr. Stephens went to trial in this case,

12  his decision whether to take the stand in his own defense

13  would have been very different.

14         We don't know what would have happened had counsel

15  properly moved forward with the petition that was eventually

16  prosecuted in 2013.  The State claims that it would not have

17  offered Mr. Stephens a deal of -- a plea of guilty in exchange

18  for time served.  And that it did so only because Mr. Stephens

19  already had a life sentence from his Anne Arundel County

20  conviction.

21         That contention, however, is undermined by a number

22  of facts.  First, Mr. Todd's testimony candidly admitting the

23  critical flaws in the State's case against Mr. Stephens in

24  Wicomico County.

25         Second, the fact that the Court of Special Appeals

cch

1   had not yet rendered its decision on direct appeal of what

2   Mr. Stephens' Anne Arundel County conviction.  And, thus, it

3   was still subject to being overturned on direct appeal.

4           Third, the fact that Mr. Todd by his own admission

5   never told the Wicomico County Court or Mr. Hut that the

6   State's decision and plea offer was in any way based on

7   Mr. Stephens' life sentence from his Anne Arundel County

8   conviction.

9           Furthermore, had counsel timely pursued to challenge

10  the Wicomico County conviction, Mr. Stephens may have not pled

11  at all.  Had the Anne Arundel County capital trial in which a

12  prior murder conviction could have been used as an aggravator

13  and certainly would have come in at sentencing, been upcoming

14  instead of in the past, Mr. Stephens may not have pled guilty

15  at all even in exchange for a sentence of time served.

16          He may have instead elected to litigate the petition

17  and proceed to a retrial.  This is especially so given the

18  fundamental flaws in the State's case and the fact that in the

19  first trial in Wicomico County even with the testimony of

20  Officer Davis and Mr. Kopera, the trial resulted in a hung

21  jury.

22          Certainly, in the absence of any prior impeachable

23  convictions, Mr. Stephens would have elected to take the stand

24  in the Anne Arundel County case.

25          But even if we assume that Mr. Stephens would have

**App. 803**

cch

1    pled guilty in exchange for time served, he still would have

2    elected to testify on his own behalf in this case.  That was

3    absolutely clear from his testimony.

4         While the conviction on plea would have been usable

5    by the State to impeach, Mr. Stephens would have been able to

6    offer the fact that the sentence on that conviction was only

7    time served.

8         The jury here already knew that Mr. Stephens was

9    incarcerated in a maximum-security prison.  And they knew

10   about the serious felony convictions that other inmates on the

11   tier had.

12        So, the jury probably already assumed that

13   Mr. Stephens was in the Maryland House of Corrections on this

14   tier that he probably had a serious felony conviction.  So,

15   the additional fact, that he did, in fact, have the conviction

16   could have been substantially mitigated by the fact that the

17   sentence on that conviction was only time served.

18        Because of counsel's dereliction of duty, the jury

19   never got to hear Mr. Stephens take an oath, look them in the

20   eye and say that he did not kill Corporal McGuinn as this

21   Court did.

22        They did not hear him explain about how the blood

23   got on the bag in his sink as this Court did.  They did not

24   hear him identify the clean sweats that were in his cell and

25   on his person as this Court did.

**App. 804**

1        They did not hear him say that he was brand new to

2  the tier and that had no interaction with Corporal McGuinn,

3  let alone any reason to murder him.

4        They did not hear him say that Officer Mayfield told

5  him to cuff up before he had ever even opened the door to

6  Mr. Stephens cell as this Court did.

7        The jury in the trial waived the credibility of

8  Mr. Stephens' story against the credibility of Mr. Freed's

9  without ever having heard Mr. Stephens's story.   The

10  importance of this testimony as simple as it is, cannot be

11  overstated.

12        Separate from the claim that counsel was ineffective

13  for failing to vacate the Wicomico County conviction, that

14  unlawful conviction and sentence deprived Mr. Stephens of his

15  constitutional right to testify.

16        Where Defendant's decision not to testify is based

17  on an unlawful prior conviction, the Defendant is denied his

18  constitutional right and is entitled to a new trial.

19        The evidence from this hearing shows that the

20  conviction that prevented Mr. Stephens to testify was

21  constitutionally invalid.

22        It was based on knowingly false testimony and was

23  obtained without the State having ever disclosed impeachment

24  evidence that Mr. Todd admitted was Brady material.

25        The harmless error test cannot apply to

**App. 805**

1   constitutional depravations of this magnitude.  The right to

2   testimony is a fundamental right personal to the Defendant and

3   has independent value apart from its effect on the outcome of

4   trial, like the right to self-representation or to a trial by

5   jury.

6           Applying the harmless error test to this analysis --

7   excuse me.  Applying the harmless error analysis to these

8   violations would mean affirming decisions of fact finders who

9   because of the State's own malfeasants, never heard the

10  Defendant's voice or his story.  The constitution simply does

11  not allow that.

12          But even if the harmless error test does apply, it

13  is certainly satisfied here.  Under the harmless error test,

14  the conviction must be vacated unless the State can show --

15  unless the State can show beyond a reasonable doubt that the

16  error in no way influenced the verdict.

17          I would direct Your Honor to Diana v. State, 436 Md.

18  97, for the Court of Appeals recent explanation of the

19  harmless error standard.

20          The question here is not whether Your Honor sitting

21  here today thinks that the jury would have ruled the same way

22  if Mr. Stephens had testified, only the jury can weigh the

23  evidence.

24          Rather, the question for Your Honor under the

25  harmless error analysis is whether the jury would have even

1   considered the testimony from Mr. Stephens?  In other words,

2   whether it would have contributed to the verdict at all?

3          Courts have held that it is near impossible to hold

4   an error harmless where that error prevented Defendant from

5   testifying and for good reason.

6          Mr. Stephens' testimony under oath that he did not

7   commit this murder unquestionably would have played a role in

8   the jury's deliberations.  That is all that is required.

9   Indeed in --- the error issue was the improper exclusion of

10  impeachment evidence of the State's key witness.

11         If that error was not harmless as the Court there

12  found, then certainly the improper exclusion of the

13  Defendant's own testimony is not harmless either.

14         Furthermore, there is good reason to believe that

15  Mr. Stephens' testimony would have led to a different result.

16  In ---, the Court of Appeals made clear that the length of

17  jury deliberations is a relevant consideration in the harmless

18  error analysis.

19         As in ---, the jury here deliberated for six days.

20  Had Mr. Stephens taken the stand in his own defense, perhaps

21  it would have come out the other way.  For that reason, Mr.

22  Stephens is entitled to a new trial.

23         Turning back now to counsel's deficiencies.  Third,

24  counsel's only efforts at undermining the testimony --

25  counsel's efforts at undermining the testimony of the State's

1    star witness and the only witness that identified Mr. Stephens

2    was certainly deficient and prejudicial.

3           Counsel's failures here were threefold.  First,

4    counsel was ineffective in failing to establish the benefits

5    Mr. Freed expected to receive from the State in exchange for

6    his testimony against Mr. Stephens.

7           Mr. Freed, again, was the sole eyewitness that

8    identified Mr. Stephens.  Mr. Lawlor set out to show that

9    Mr. Freed was receiving substantial benefits in exchange for

10   his testimony.

11          During cross, however, the Court sustained a number

12   of objections by the State and Judge Hackner ruled that

13   Mr. Lawlor could not ask about an expressed agreement between

14   the State and Mr. Freed after Mr. Freed denied knowing about

15   any such expressed agreement.

16          Mr. Lawlor and Mr. Proctor both testified here that

17   Mr. Freed was central to the State's case.  Indeed, I believe

18   Mr. Proctor testified that Mr. Freed was the State's case.

19          As a result of the State's objections and Judge

20   Hackner's ruling, as Mr. Lawlor testified, he lost his legs

21   and threw him off his game.  And he failed to appreciate that

22   even if Mr. Freed did not have a formal agreement with the

23   State as to the State charges, if Mr. Freed even had an

24   expectation of benefits in exchange for his testimony, that

25   was an equally persuasive basis to impeach his credibility.

1          It was arguably and even stronger basis, in fact as

2     the benefits might have depended on his performance on the

3     stand.

4          Mr. Lawlor acknowledged that there were other

5     questions he could have asked on cross to establish that

6     Mr. Freed had an expectation of benefits and expected that the

7     State would help him out on the seven years of backup time

8     that he was facing in Hartford County in exchange for his

9     testimony against Mr. Stephens.

10         Mr. Lawlor acknowledged that he could and should

11    have asked Mr. Freed these questions.  In addition, defense

12    counsel had in its possession a letter Mr. Freed had sent to

13    the State staying I remember someone saying, "Y'all can help

14    me out with my State issues.  Well, I got my VOP in Hartford

15    County.  I had to get it postponed on January 5th because they

16    were going to give me more time not knowing I was going to be

17    helping out in this case."

18         That letter, which counsel admitted that they

19    completely overlooked is crystal clear.  Mr. Freed expected

20    help from the State on his Hartford County charges in exchange

21    for his testimony against Mr. Stephens.  In fact, his State

22    case had already been postponed on expectations of those

23    benefits.

24         Mr. Lawlor testified that it never occurred to him

25    to use this letter but had it occurred to him, he would have

**App. 809**

1    had Mr. Freed read it into the record during cross

2    examination.

3           Mr. Trainor testified that it is the duty of defense

4    counsel to review the evidence and any competent attorney

5    could have effectively used this letter on cross examination

6    to undercut the credibility of the witness.

7           Mr. Lawlor should have asked Mr. Freed other

8    questions to test his expectations of benefits from the State.

9    And had Mr. Freed denied those benefits or the expectations of

10   benefits, he could have been impeached with this letter.

11          Adding favorable treatment on his State backup time

12   to the mix of benefits that Mr. Freed was being paid in

13   exchange for his testimony, would have considerably sweetened

14   the benefit package that he was receiving and was vital

15   evidence.

16          Counsel's failure to do so was deficient.  It was

17   especially prejudicial given the importance of Mr. Freed's

18   testimony to this case.

19          Indeed in Hash v. Johnson, 845 F.Supp 2d 711, the

20   District Court in Virginia held that counsel was ineffective

21   in failing to investigate a snitch's federal file and to

22   introduce into evidence letters from that file that the snitch

23   had written to State officials reflecting his expectation of a

24   sentence reduction.

25          Hash also emphasizes the quality difference between

**App. 810**

1   impeachment by cross examination and impeachment using a

2   letter in the witness's own handwriting.

3       Second, counsel failed to highlight for the jury

4   exculpatory evidence that would have further discredited

5   Mr. Freed's testimony.

6       At trial, Mr. Freed testified that both assailants

7   were wearing gray sweats.  Some of the other inmates who

8   testified also described the assailants as wearing sweats.

9   But no such sweats of Mr. Stephens' were ever offered into

10  evidence and the investigators testified that except for the

11  boots and tank top, nothing of evidentiary value was ever

12  found in Mr. Stephens' cell.

13      Mr. Lawlor argued this point in closing in a single

14  sentence.  Where, he asked, were the sweats?  But who knows

15  how the jury answered this question.  They may have thought

16  that like the shanks, they had simply been disposed of.

17      In fact, however, there was tangible exculpatory

18  evidence that would have proven that Mr. Stephens' sweats were

19  blood free and put away in his cell.

20      Photographs of his cell taken shortly after Stephens

21  was removed from it clearly showed sweats.  Mr. Stephens

22  confirmed this in his testimony and had he been asked by

23  defense counsel would have confirmed it for them as well.

24      He had two pairs of sweatpants.  One of which he put

25  on when Mayfield told him to cuff us.  And the other which is

1  shown in these photos.  And these photos also show two gray

2  sweatshirts.

3          The probative value of these photographs went

4  entirely unnoticed by the defense teams and was thus

5  unmentioned to the jury in closing.

6          Mr. Lawlor testified that he would have loved

7  nothing more than to be able to wave these photographs to the

8  jury in closing argument but he simply overlooked that and

9  failed to do so.  And that is exactly what an effective

10  defense counsel would have done.

11         Third, counsel was deficient in failing to

12  demonstrate the scientific and possibility of Freed's

13  testimony by what he heard and saw.  And I would like to

14  briefly respond to the Court's skepticism on this point.

15         THE COURT:  My skepticism relates to someone being

16  allowed to testify that they stabbed meat and therefore you

17  can replicate that and offer an opinion.  Again, I asked Mr.

18  Hut the question and he was very candid.  He didn't say there

19  was no Judge -- I think maybe it was Mr. Trainor, Mr. Trainor

20  he --

21         MS. GOSTIN:  I believe it was Mr. Trainor.

22         THE COURT:  -- he didn't say there was no Judge who

23  would accept it.  I am not aware of any.  But just like a

24  Judge granted a motion for judgment of acquittal after a

25  mistrial was declared in Baltimore City and the Court of

**App. 812**

1  Appeals reversed that today and pointed out how once you lose

2  jurisdiction, you lose jurisdiction.

3      Judges do things that they shouldn't do.  So, I

4  don't know any Judge that would allow stabbing meat to form

5  the basis of an opinion and a person could hear or not hear

6  something.  But that is a different issue.  Now, you are

7  better off --

8      MS. GOSTIN:  Sure and I --

9      THE COURT:  -- arguing the eyewitness stuff because

10  you won't get too far with the meat stuff, okay?

11      MS. GOSTIN:  Sure and I will certainly just address

12  it very briefly --

13      THE COURT:  I have great skepticism on the audio

14  issue.  I am opened to listening on the visual issue.

15      MS. GOSTIN:  Sure.

16      THE COURT:  And you even heard Mr. Ash today say

17  that they tried to replicate it and couldn't.  All right, go

18  ahead.  Which Lawlor and Proctor could have done by going into

19  a room 140 feet long, so go ahead.  I am more opened to

20  listening on that than I am on stabbing meat.

21      MS. GOSTIN:  Sure, I will take into mind --

22      THE COURT:  Not saying you can't argue it.  I am not

23  saying you can't argue it.  I am just saying I am not as

24  receptive to the argument.

25      MS. GOSTIN:  Much appreciated.

**App. 813**

cch

1          THE COURT: Okay.

2          MS. GOSTIN: So, at trial, as you will recall, the

3 undisputed distance between Mr. Freed and the attack was 140

4 feet. And Mr. Freed testified that he could see and recognize

5 Mr. Stephens at that distance even though -- Mr. Freed

6 testified that he could see and recognize Mr. Stephens at that

7 distance even though both assailants, according to Mr. Freed,

8 were wearing hats, and even though there were 32 other African

9 American males with beards on that tier.

10          And Mr. Freed also testified that he could hear the

11 sound of each stab and distinguish the sounds of the blows

12 landed by Mr. Harris and Mr. Stephens.

13          As you will recall Dr. Loftus demonstrated the

14 amount of visual information available to a viewer at that

15 distance even under conditions of bright sunlight and even

16 assuming all other variables were idea.

17          We believe that no juror armed with the photos from

18 Professor Loftus would have thought that Mr. Freed could have

19 recognized at that distance while the assailant was wearing a

20 hat, one of 33 African American men with beards on the tier,

21 which is again another fact that counsel never elicited at

22 trial.

23          And, again, these photos -- the photo in the top

24 left-hand corner assumes all conditions for viewing are idea

25 except for the distance of 140 feet or 110 feet depending on

1  which of the two photos at the top you are looking at.  But

2  they otherwise assume that all other conditions for viewing

3  information are idea.

4          And just to clarify with respect to Mr. May.

5  Dr. May testified that a 110 feet it would be impossible for

6  an idealist -- for ideal listener to hear the sound of a stab

7  even if aside from distance the hearing conditions had

8  otherwise been optimal.

9          And had Mr. May -- Dr. May presented that testimony

10  as to his estimation of the sound of the stab wound,

11  certainly, the prosecution could have on cross examination

12  tested the reliability of his estimation of the sound of a

13  stab wound and defense in redirect could have established how

14  background noise would have affected it.  So, we think that

15  that would have been fair game on cross examination.

16          The decision not to retain audio and visual experts

17  was not strategic.  Mr. Proctor testified that he believed he

18  could have hired a better qualified or cheaper expert but he

19  simply forgot to.

20          And, of course, Dr. Loftus and Dr. May did not have

21  the ability to visit the tier and conduct tests at the prison

22  because the prison has -- no longer exists.

23          So, for these three reasons we believe that counsel

24  was deficient in undermining Mr. Freed's testimony.  The

25  testimony of the State's key witness and that that deficiency

1   prejudiced Mr. Stephens.

2          Fourth, the stipulation to which counsel agreed

3   without Mr. Stephens' consent undermines their theory of the

4   case.   During the cross examination of the State's witness,

5   counsel suggested entirely reasonably that blood may have been

6   spattered from the tier as investigators walked from the tier

7   to Mr. Stephens' cell.

8          The clothing --- from the cell had not been

9   separated but were all thrown together in a single bag and

10  thus blood from one item may have been transferred to another.

11         In addition, the bag containing these items, which

12  was made of mesh, may have inadvertently come into contact

13  with blood as it was transported from Mr. Stephens' cell to

14  central hall.

15         Counsel for both sides agreed to stipulate

16  concerning the handling of items of evidence once they had

17  been brought to central hall.   Counsel agreed that from that

18  point on, meaning from and after the point they arrived at

19  center hall there was no challenge the way the evidence had

20  been handled.

21         But the stipulation had the effect or at least could

22  have had the effect to the jury of waiving a key argument of

23  the defense.   This stipulation was red to the jury and

24  provided to the jury and they had it during the entire course

25  of their six days of deliberations.

**App. 816**

1          Mr. Proctor made clear that the defense's intent was

2    only to make concessions with respect to the handling of

3    evidence items after they arrived at center hall.  But the

4    stipulation with the State he conceded was at the very least

5    in artfully drafted.

6          Mr. Proctor testified that in Federal Court a

7    client's signature is required before the defense can enter

8    into stipulations of facts but that no such signature is

9    required in State Court.  And, therefore, he would never have

10   shown this -- he would have shown the stipulation to

11   Mr. Stephens before agreeing to it with the State.

12          Even though no signature is legally required,

13   Mr. Trainor explained that it is a lawyer's duty in such high

14   stake case to consult with the client before making any

15   agreement that surrenders any point that State is required to

16   prove.

17          This grossly negligent oversight undermined the

18   groundwork that the defense had laid to challenge the

19   integrity of the investigation and the search.  And

20   Mr. Stephens was gravely prejudiced as a result.

21          Individually and certainly together, counsel's

22   errors were prejudicial.  But-for these errors, there is at

23   least a substantial or significant possibility that

24   Mr. Stephens would have been acquitted of first-degree murder.

25          I will now turn the podium to Mr. Hut who will

**App. 817**

1    address the arguments for resentencing.

2            THE COURT:  Are you going to be more than 15

3    minutes?

4            MR. HUT:  I don't think so, Your Honor.

5            THE COURT:  Okay.

6            MR. HUT:  And I hope not.  I think much of what --

7            THE COURT:  Because I do have to run -- there is an

8    overlap and that is what confused me in your question to

9    Mr. Ash and once I figured out where you were going it was

10   clarified in my mind proper question based upon things but

11   there is an overlap so, go ahead.

12           MR. HUT:  And indeed for precisely that reason, I

13   hope to not have to fully recapitulate the factual evidence

14   developed at the hearing that Ms. Gostin has summarized and so

15   perhaps somewhat more lightly over that.

16           But as she demonstrated because he was denied the

17   effective assistance of counsel and the right to testify, we

18   ask for and we believe we have demonstrated entitlement to

19   vacation of the conviction and a new trial.

20           But even if Your Honor were to disagree in the

21   alternative, Mr. Stephens is entitled to resentencing on two

22   discreet grounds.  The first is that there was in the

23   sentencing proceeding a violation of due process and the

24   second is that he was the victim of ineffective assistance of

25   counsel.

**App. 818**

cch

1        Now, first turning to the due process laws.  He is

2   entitled to resentencing on this ground because he was

3   sentenced to life without parole based on an unlawful

4   conviction that was later vacated.  He was sentenced based on

5   evidence introduced by the State that was provably incorrect

6   and false.  And he was sentenced based on a prior life

7   sentence that incontrovertibly no longer exists.

8        As the slide before Your Honor shows and as I

9   discussed this morning with Mr. Ash, Defendant's Q was

10  introduced at trial as State's Exhibit 66.

11       State's Exhibit 66 was the State's version of the

12  Wicomico County case.  And it reported, as a fact, that

13  Mr. Kopera, the firearm's expert, had determined that all six

14  380 casing were fired the Beretta recovered in the vicinity of

15  Mr. Stephens and it reported as a fact the assertively

16  inculpatory testimony by Officer --

17       THE COURT:  And I was surprised to hear Mr. Todd say

18  that he wanted that to be retested.  And then the results were

19  different because most of the Kopera's cases I have seen or

20  read, the evidence have -- a lot of the evidence has not been

21  retested but simply been an examination as to --

22       MR. HUT:  Well, this is a striking --

23       THE COURT:  -- his testimony was perjurious as to

24  his credentials but no one was able to say he his testimony

25  was for perjurious as to the examination.  So. Here we

**App. 819**

cch

1  actually have one with the two components, which is different

2  from a number of the other cases.

3           MR. HUT:  This is the only one of which I know, Your

4  Honor --

5           THE COURT:  It is the only one I am aware of.

6           MR. HUT:  Not -- the findings -- the ballistics

7  findings were retested in some cases and you are quite right,

8  not all.

9           THE COURT:  The ones that have been retested in the

10  other cases have not shown any --

11          MR. HUT:  They all proved up.

12          THE COURT:  -- perjury in terms of the analysis as

13  to whether there was a -- you are not supposed to say it is

14  identical to a scientific probability it was fired from the

15  same gun.  You know what I am saying?

16          MR. HUT:  Yes.  You know, I should --

17          THE COURT:  And this is the first one I have heard

18  where it was perjurious as to both the credentials as well as

19  the ballistics.

20          MR. HUT:  Yes.  And, you know, I want to follow up,

21  Your Honor, you descried perjurious several times.  I --

22          THE COURT:  Perjurious mistaken --

23          MR. HUT:  -- have a reason to think that he may have

24  known it was false, but I can't -- no one can now --

25          THE COURT:  It was certainly --

**App. 820**

cch

1    MR. HUT:  -- can prove it.

2    THE COURT:  It was certainly perjurious as to the

3    credentials.  Whether it was perjurious as to the analysis, or

4    it was a mistaken analysis, the result, I don't know.  But

5    this --

6    MR. HUT:  It is certainly false.

7    THE COURT:  It is certainly not accurate.

8    MR. HUT:  Untrue.

9    THE COURT:  Yes.

10    MR. HUT:  That is exactly right and that is what

11    makes this case and the prior conviction now vacated I think

12    so striking.

13    The sentencing jury was also told, as a fact, that

14    Mr. Stephens who was serving a sentence of life plus 15 years

15    for a prior first-degree murder.

16    Now, let me turn for a moment to the law on due

17    process.  And it is fairly clear as Townson v. Burk, among

18    others, makes clear that sentencing a Defendant on the basis

19    of assumptions concerning his criminal record, which were

20    materially untrue is inconsistent with due process of law.

21    Importantly, a case called United States v. Tucker,

22    stands for the proposition that due process requires a new

23    sentencing proceeding if the sentence in a second case might

24    have been different if the sentencing Judge or jury had known

25    that a prior conviction was invalid.

**App. 821**

cch

1              So, Tucker, I think speaks to the question you put,

2    Your Honor, about if the sentence had been presented to a

3    sentencing Judge only, even so, the question is, at least on

4    this prong of our request for a new sentence or new sentencing

5    proceeding, whether it might have been different?

6              And I think that is determined by reference to an

7    objective, judicial fact finder with respect to sentence.  And

8    I suggest that the answer here is clear, it might have been

9    different.

10             If we supposed that a jury would have considered the

11   sentence at the time, even a jury choosing might --

12             THE COURT:  But if it is --

13             MR. HUT:  -- without possibility of parole --

14             THE COURT:  But if it is a resentencing, it goes to

15   a Court not a jury.

16             MR. HUT:  Yes, but I think there, Your Honor, if

17   that is what you meant and I was thinking about this as I was

18   sitting at counsel table --

19             THE COURT:  Did you understand?

20             MR. HUT:  Yes, I do.  But I think that is the --

21             THE COURT:  Because I was --

22             MR. HUT:  -- wrong question.

23             THE COURT:  I am not saying that is -- again, the

24   question you asked sometimes get you the answer you want.  I

25   agree with you there.  But if there was a new sentencing, a

**App. 822**

1    new sentencing would go to a Judge but not a jury.

2            MR. HUT:  It would.  But I don't think that that is

3    the question --

4            THE COURT:  That is not the question, I agree with

5    you.

6            MR. HUT:  That is not the prejudice issue or the

7    might have been different issue.

8            THE COURT:  And, again, that was speaking out loud

9    thoughts not necessarily -- but I need to look at Tucker

10   because I don't recall reading that.  So, I need to look at

11   that.  I am not saying I agree or not agree with you.  But I

12   understand how you have focused the issue now.

13           It is much clearer in my mind what the issue that

14   you have focused.  So, I have got what you are arguing now.  I

15   understand it now.  I didn't before and I was caught up in --

16   let's just say that I was musing about the practicalities of

17   what would happen if there was a resentencing?  That was more

18   my thought process.

19           MR. HUT:  Understood.

20           THE COURT:  And I am not --

21           MR. HUT:  And I appreciate the Court's

22   clarification.

23           THE COURT:  Yes, it is -- again, I have got to look

24   at Tucker, I don't have these issues resolved in my mind.  But

25   it certainly doesn't go back to a death sentencing.  It can't,

cch

108

1    he didn't get death.  But it doesn't go back to a jury either.

2        MR. HUT:  No question, but I think that perspective

3    look is not, and I think we have now been through this and I

4    understand what the Court is say, that is not the prejudice

5    inquiry or the might have been different inquiry.

6        THE COURT:  I understand, I understand that.

7        MR. HUT:  Okay.  So --

8        THE COURT:  You are going to prejudice is based upon

9    what was erroneously or improperly presented to the jury based

10   upon what we eventually know and had they acted diligently

11   then that information may not have been presented to the jury

12   in the fashion that it was.

13       MR. HUT:  Correct.

14       THE COURT:  Okay.

15       MR. HUT:  And I think the evidence is clear and I am

16   just going to touch this briefly because Ms. Gostin addressed

17   it extensively that the conviction in Wicomico was

18   constitutionally flawed.  We have been over the Kopera issue

19   and we have had colloquy about that.

20       On the Officer Davis issue, I think the Court can

21   have considerable confidence that this was strong impeaching

22   Brady material although candidly we have not put that material

23   before the Court.  But you had Mr. Todd --

24       THE COURT:  Joe Todd admitted it.

25       MR. HUT:  That is exactly my point.

**App. 824**

1          THE COURT:  And I just had to laugh -- I had to

2    laugh when you said he didn't return your phone call.  He was

3    beyond polite and gracious.  I remember one case he wouldn't

4    return my phone calls to save my life.  And I got down there

5    and he was incredibly kind and gracious and presented a most

6    unreasonable plea agreement, which thank God --

7          MR. HUT:  To you client's benefit.

8          THE COURT:  -- Judge Grodin saw the case slightly

9    differently but it was absolutely hilarious.  It was a trip

10   down memory road to think of when you said, and you didn't

11   return my call.  I was like, he didn't return my calls either.

12         MR. HUT:  Well, he didn't my calls to be clear and I

13   think I was in a run up of this hearing.  He was, I agree, as

14   gracious as could be at the --

15         THE COURT:  It was just funny and it is just amusing

16   also to me, and it has nothing to do with anything, how many

17   players in this case now have different jobs, like the Federal

18   Public Defender gets to wear one of these.  And the original

19   prosecutor gets to wear one of these and you mentioned

20   Elizabeth Bowen, now wears one of the black robes.  I don't

21   know if you knew her father.

22         MR. HUT:  Did not, Your Honor.

23         THE COURT:  Judge Perry Bowen.

24         MR. HUT:  I think I know him representationally,

25   sure.

**App. 825**

cch

1    THE COURT:  If you do any post-conviction work, you

2    would know that.  All right, so --

3    MR. HUT:  So, --

4    THE COURT:  -- sum up and then I have to go to my

5    meeting.  And if you want to reserve a few things after lunch,

6    you can.

7    MR. HUT:  Yes, perhaps I can do that.  I just -- let

8    me sum up on this prong.  This is the due process prong it is

9    distinct from the ineffective assistance prong, which I will

10   turn to perhaps after lunch.

11   I think there is no doubt also that the issue or the

12   result, the sentence might have been different.  He had

13   already been given life plus 15 and that was probably the most

14   critical new fact to the jury in sentencing.

15   The jury was, therefore, probably disinclined given

16   that he had life plus 15, to give him a lighter sentence for

17   the second offense.  But it seems likely that one juror would

18   have given him the possibility of parole if he had not already

19   had a life sentence.

20   And even with a prior conviction and a sentence of

21   time served, we sort of necessarily have to assess the mind of

22   a reasonable juror but I think that is a fair assessment --

23   THE COURT:  And I don't -- again, I don't recall,

24   did a life without parole sentence have to be unanimous?

25   MR. HUT:  It did.  So, all he needed was one juror.

**App. 826**

cch                                                                          111

1              THE COURT:  In a death case?

2              MR. HUT:  I believe so.  I am getting a signal, yes,

3    from --

4              THE COURT:  I thought it did but I couldn't

5    remember, which was--

6              MR. HUT:  So, I have been through Tucker and I have

7    highlighted that and with respectively refer the Court to it.

8              THE COURT:  Let me go to my meeting and --

9              MR. HUT:  That concludes my remarks on the due

10   process point and I can will resume and be very brief --

11             THE COURT:  -- save it to the ineffectiveness

12   assistance and then I will hear from the State, okay?

13             MR. HUT:  Thank you, Your Honor.

14             THE COURT:  All right.  You can leave everything

15   there.  I don't have anything else, do I?

16             THE CLERK:  No.

17             THE COURT:  I am so glad I booked today instead of a

18   half a day.

19             THE CLERK:  I know.

20             THE COURT:  All right, you can leave everything

21   there.  And we will start up after -- it should be around

22   1:30, sometimes the meetings with 13 Judges run a little bit

23   late.  So, maybe, 1:45.  I will try not to stay any longer

24   than that, okay?

25             MR. HUT:  Thank you, Your Honor.

**App. 827**

cch

112

1          THE COURT:  All right, will see you all then.

2          MR. RUSSELL:  Your Honor, if I may?  I just wanted

3    to tell you Judge McCormick is in a jury trial, so, I am

4    guessing she --

5          THE COURT:  She is probably not going to want to

6    talk to you anyway.

7          MR. RUSSELL:  Right, exactly.

8          THE COURT:  Okay.

9          THE CLERK:  All rise.

10          (Whereupon, at 11:58 a.m., the luncheon recess was

11    taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**App. 828**

cch

1               A F T E R N O O N   S E S S I O N

2         (Whereupon, at 1:39 p.m., the proceeding was

3 recalled.)

4         THE CLERK:  All rise.

5         THE COURT:  Please be seated, everyone.  Would have

6 been here four minutes ago but I had to deal with an emergency

7 postponement on the family law side.  So, go right ahead.

8 Call the case.

9         MR. RUSSELL:  Your Honor, will call State versus Lee

10 Stephens, Case No. 02-K-08464, David Russell, R-u-s-s-e-l-l,

11 on behalf of the State.

12         THE COURT:  Okay, Mr. Hut.

13         MR. HUT:  Stephen Hut, H-u-t, for Petitioner

14 Mr. Stephens.

15         THE COURT:  Ms. Gostin.

16         MS. GOSTIN:  Isley Gostin, I-s-l-e-y G-o-s-t-i-n,

17 for the Petitioner.

18         THE COURT:  Mr. Eagles.

19         MR. EAGLES:  Thad Eagles, T-h-a-d E-a-g-l-e-s, for

20 the Petitioner.

21         THE COURT:  All right.  Why won't you talk to me

22 about the ineffective assistance of counsel in terms of

23 sentencing and then we will hear from Mr. Russell.

24         MR. HUT:  Your Honor, the lead case on this point or

25 a lead case certainly is one to which Mr. Trainor made

cch

1    reference in his testimony.  It is Rompilla v. Beard, where

2    the Supreme Court, it is at 545 US 374 from 2005, and there

3    the Supreme Court held that counsel was deficient at the

4    sentencing phase for failing to examine the file detailing

5    facts and circumstances surrounding his client, the

6    Defendant's, prior conviction for rape and assault.

7         It pertains here because it suggests that counsel

8    has an obligation to look into prior convictions as

9    Mr. Trainor so eloquently testified, that is particularly true

10   in a capital case.

11        And to upon such investigation extract such facts

12   and circumstances that are material and would serve to

13   mitigate his client's culpability and vulnerability to a

14   strict sentence.

15        The failure to that in this case, Your Honor, was

16   plainly prejudicial.  Before the break, you inquired whether

17   sentencing where life without the possibility of parole is

18   alternative?  It is required to be unanimous.  And I believe

19   that the Criminal Article Section 2-304 does make clear that

20   it is required.

21        And, so, we have the case here where if one juror

22   had decided that Mr. Stephens deserved possibility of parole

23   whether than life without that possibility, then he would be

24   entitled to a new sentencing and we need show that only,

25   again, under Strickland and Bowers, by a test that imposes the

**App. 830**

1    requirement that we do so by a substantial or significant

2    possibility of such an outcome.

3           And it is important to look back and remind

4    ourselves where this case was or would have been if counsel

5    had done what we believe they should have done with respect to

6    the Wicomico County conviction.

7           We simply don't know with the Anne Arundel County

8    prosecution in the future, rather than having to look at it

9    through the back windshield, what would have happened.

10          It is certainly possible, we think probably likely,

11   that facing that conviction or facing that prosecution,

12   Mr. Stephens would not have pleaded guilty as he did with

13   under the agreement reached in Wicomico County but would have

14   exercised his right, assuming the litigation of the petition

15   would have been successful to be retried, but even if he would

16   have accepted a guilty plea, as he subsequently did in 2013,

17   the facts would have been critically different.

18          Those critically different facts could and should

19   have been presented to the sentencing authority.

20          I mentioned shortly before the break but I think it

21   warrants emphasis again that had the life plus 15-sentence,

22   which we shared with the jury not been sharable, had it been

23   off the table, then I think there is every reason to think

24   that this jury which selected a lesser penalty with death on

25   the table, would have selected the lesser penalty that would

1   then have been available, which is to say life with

2   possibility of parole and, therefore, Mr. Stephens is entitled

3   to a new sentencing.

4           Moreover, apart from the sentence, which the

5   sentence had, again the facts pertinent to the Wicomico

6   prosecution, were highly material and the fact that they were

7   admitted essentially on the State's version without any

8   correction by counsel, prejudiced Mr. Stephens.

9           For example, in the closing argument at sentencing,

10  the State said that Mr. Stephens was surrounded by violence,

11  that it was his choice to put the gun in his hand to go down

12  to the Pit, which was the nightclub in question, and put

13  bullets into Dwyane Holbrook.

14          That the State said is what landed him in the

15  Maryland House of Corrections in the Annex.  That was his

16  choice it said, nobody else's.  That is from the February

17  22nd, transcript at 100, lines 12 to 20.

18          But that, really, we know now, was not what landed

19  him in the House of Corrections.  What landed in the House of

20  Corrections, was false ballistic testimony that connected the

21  shell casings to his gun and only to his gun, that was wrong.

22  And the failure by the State to disclose the material that Mr.

23  Todd acknowledges would have been important in impeaching the

24  credibility of Officer Davis who supplied the critical

25  testimony that convicted Mr. Stephens.

1          That is what landed him in the Maryland House of

2     Corrections and because the sentencing jury here simply had

3     the story wrong, decisively wrong, willfully wrong, he is

4     entitled to relief.

5          And finally -- and here let me just recapitulate

6     quickly, had counsel done their job and vacated or had

7     causation been properly argued and the ballistic testimony

8     properly argued in phase one of the sentencing proceeding,

9     then, two, a jury could not have found Mr. Stephens to have

10    been a principal in the first-degree and in that event death

11    would have been off the table at phase two, life without

12    possibility of parole would have been the maximum sentence and

13    the jury could well have decided, could have opted for the

14    lesser sentence in those circumstances.

15         THE COURT:  Wait a minute, if -- I thought it turned

16    into a Court sentencing?

17         MR. HUT:  It --

18         THE COURT:  If the jury doesn't -- so remember --

19         MR. HUT:  It would, Your Honor.

20         THE COURT:  Remember the law changed, I think it

21    was ---, he got some change made, the DNA, and you had to be

22    the -- it had to be his hand.

23         MR. HUT:  Yes.

24         THE COURT:  So, if they did not find by his hand, it

25    doesn't go to a capital sentencing.

**App. 833**

118

1          MR. HUT:  But what I don't know and I am looking for

2    assistance whether that takes it out of the hand of the jury?

3    Does it?

4          THE COURT:  It takes it out of the hands of the jury

5    at that point but it becomes a Court sentencing.

6          MR. HUT:  Even so, even with that proviso and I

7    don't know the answer but assuming Your Honor is correct --

8          THE COURT:  Because I remember -- I was in a case

9    that addresses these precise issues.

10          MR. HUT:  But let's assume Your Honor is correct,

11    even then it seems to me the sentencing authority, the Court,

12    would have had the opportunity of choosing a lesser sentence.

13    It might well have opted for that because Mr. Stephens's

14    noninvolvement of the affliction in the lethal blows might

15    have been one factor and that it seems to me could have

16    persuaded a reasonable sentence or --

17          THE COURT:  Okay.

18          MR. HUT:  -- that life with possibility of parole

19    was the right sentence.  Finally, counsel had a similar

20    opportunity to argue strenuously to the prosecution and to

21    seek to strike the death notice even before the trial had

22    begun either because the absence of evidence on causation or

23    by virtue of successfully seeking the vacatur of the prior

24    life sentence.

25          Mr. Trainor explained why they were deficient in

1    failing to do that and in the event that they had pursued

2    either of those alternatives, which we think they must have,

3    the sentencing authority could well have concluded that life

4    with was the appropriate sentence rather than life without.

5            As, Your Honor, now has observed and is clearly the

6    case, Lee Stephens was not given the death penalty but he was

7    sentenced to life without the possibility of parole, now the

8    most severe sentence that can be imposed under our State's

9    law.

10           He is serving that sentence at the death row of the

11   Oklahoma State Penitentiary.

12           THE COURT:  Is that where he is?

13           MR. HUT:  That is where he is.

14           THE COURT:  Okay.

15           MR. HUT:  Before such a conviction could be obtained

16   and such a sentence could be imposed, Mr. Stephens was

17   constitutional to the effective assistance of counsel.

18   Mr. Stephens was entitled to take the stand in his own defense

19   and Mr. Stephens was entitled to a sentencing based on a

20   record that not tainted by constitutional deprivations.  He

21   was denied those rights and accordingly is entitled to the

22   release sought by the Petitioner.

23           Before I conclude and sit down, Your Honor, I would

24   be remiss if I did not thank the Court for your patience and

25   your attention over the last three and a half days.  I am well

1   aware that this proceeding has involved the necessity of

2   essentially condensing two murder-one trials into three and a

3   half days, there are lots of facts there, complex.  There is

4   law that is extensive and we really do appreciate, I can say

5   on behalf of Mr. Stephens and on behalf of Mr. Eagles and

6   Ms. Gostin and myself, the Court's attention.  So, thank you

7   very much.

8          THE COURT:  All right, and I will tell you, I am not

9   aware of any cases, I am going to ask Mr. Russell, that have

10  dealt with sort of the issue on point where you have had the

11  new statute sentencing, no sentence of death, what happens,

12  you know, and where it would go?

13         It really -- and you have seen the subsequent

14  litigation even since then where the Court of Appeals had to

15  address the issue of who do you get to sentence you in a

16  murder case?  So, it is fascinating.  So, we will go through

17  it and I will take a look.  Let me hear what Mr. Russell has

18  to say and go from there.  All right, Mr. Russell, what do you

19  want to tell me.

20         MR. RUSSELL:  Thank you.  Your Honor, first let me

21  give, if I may, a quick road map of where I am going to go so

22  the Court has an idea of what it is I am doing.

23         There are a couple of preliminary issues including

24  sort of what you were just talking about that I want to touch

25  on before we get into the specific issues.

**App. 836**

1          Once I get through those, then I will go through

2    each individual claim.  I will do my best not to repeat

3    everything that I filed.  I know that the Court has that

4    already.  I will try and keep it as concise as I possibly can.

5          There are also some issues that were raised that I

6    responded to that I seem like they are maybe abandoned at this

7    point, I will keep those short to the extent that I respond to

8    them, but I think that there are some that I need to respond

9    to.  And from there, I will just wrap it all up.

10          THE COURT:  You know, I told my law clerk this

11    morning, she was asking me about issues that might be in the

12    petition where there was no testimony, I said those are the

13    easy ones.  You just say that they are ball allegations upon

14    which relief cannot be granted, because she was asking me

15    about post-convictions in general.

16          So, if they haven't been raised, well, they are the

17    easy ones.  But to be honest there are really some tough

18    issues in this case.

19          MR. RUSSELL:  There are, absolutely, Your Honor, I

20    don't deny that.

21          THE COURT:  So, go ahead.

22          MR. RUSSELL:  So, first thing that I wanted to talk

23    about, Your Honor, is the question that the Court had brought

24    up and think we kind of dismissed it a little bit in

25    Petitioner's closing but I think it is something that is worth

cch                                                                                                122

 1    discussing and if the Court doesn't agree, certainly, let me

 2    know.  But the question of whether or not the ABA guidelines

 3    where death penalty cases in this case?

 4             Obviously, my contention is going to be that they

 5    don't.  This is no longer a death penalty case and, therefore,

 6    they should not apply.

 7             The guidelines specifically say and I am quoting

 8    from the guidelines, page 921, 922; "These guidelines,

 9    therefore, apply in any circumstances in which a detainee of

10    the Government may face a possible death sentence regardless

11    of whether formal legal proceedings have been commenced or the

12    prosecution has affirmatively indicated that death penalty

13    will be sought, the case remains subject to these guidelines

14    until the imposition of the death penalty is no longer a legal

15    possibility."

16             So, I would argue there is no longer the possibility

17    of the death penalty and they, therefore, should not be

18    applied.

19             I do think that what the Court had mentioned with

20    regard to I think the case was --

21             THE COURT:  What page was that?

22             MR. RUSSELL:  It is page 921 and 922.

23             THE COURT:  Okay, go ahead.

24             MR. RUSSELL:  And I know that the Court, I believe

25    have been making mention of Balore, I believe is the way that

cch

123

1  the case is pronounced, the most recent Court Of Appeals case

2  that just came out with regards to whether or not you have a

3  right to a jury in a nondeath penalty case and a life without

4  parole case.

5         So, that decision, the most recent decision just

6  came out in March.  And the citation I have for that is only a

7  Westlaw number, which is 217 Westlaw 1193257.

8         And not only does Balore talk about the fact that

9  you don't have a right to a jury but it talks about why you

10  don't have a right to a jury in that kind of a sentencing and

11  it talks about the differences between death cases and any

12  other case.

13         And they quote extensively from largely from the

14  Supreme Court but throughout the opinion talking about the

15  expressed fundamental distinction between the death penalty

16  and other sentences.

17         But the penalty of death differs from all other

18  forms of criminal punishment not in degree but in time.  And

19  it is unique and it is total irrevocability.

20         What that eventually gets me to, Your Honor, is why

21  do we have guidelines for death penalty cases that are

22  different from guidelines for every other penalty -- in any

23  other case?

24         And the reason is as the Supreme Court has said over

25  and over again, death is different.  And we don't disagree

**App. 839**

1    with that, death is different.

2          The only reason we have special guidelines for death

3    penalty cases is because of that.  It is because of the threat

4    of death is different than incarceration.

5          THE COURT:  I understand that.  But Mr. Hut and

6    Ms. Gostin's argument has focused upon decisions that were

7    made which put counsel in a position to argue in certain

8    fashions.  And the theoretical issue before the Court will be

9    if the Court grants a new trial, how is it tried?  If the

10   Court grants a new sentencing hearing, who hears the

11   sentencing hearing?

12         But the concrete issue, not the theoretical issue

13   that is put before the Court is the decisions or

14   nondecisions made by Proctor/Lawlor, constitutionally

15   sufficient?  And were the decisions/nondecisions that were

16   made such that they put counsel in a position where they did

17   not argue for things that they should have argued or argued

18   for things that they should not have argued

19         And it is an interesting case because some of the

20   relief which comes came post-trial, which normally I could

21   make sure ---.  Because if Mr. Stephens had proceeded and had

22   this case tried and then subsequent to this case he launched

23   his post-conviction, and then the post-conviction challenge

24   was successful, well, I really wouldn't give a whole lot of

25   attention to that because at the time it was tried that was

1    the law, that is the way things were.

2            But here since we have attorneys who were entered

3    for him in that post-conviction who didn't aggressively pursue

4    it, how does it affect things?  So, it is -- you know the

5    whole life without parole discussion, Court sentencing, jury

6    sentencing, how would the result be different, that sort of

7    distracts from the issue.  And, again, the question you ask

8    sometimes gives you the answer you want.

9            But the decisions that were made or the decisions

10   that were not made, were they appropriate decisions in terms

11   of putting counsel in the best position to argue, (a) for

12   guilt or innocence; or (b) at the sentencing hearing, the way

13   they did?

14           And it is, like I said, if 10 years had gone by and

15   he got the Wicomico County case stricken, I wouldn't pay any

16   attention to it to be really honest because at the time

17   everything was fine and they weren't his attorneys in that

18   case.

19           But, since they were, so, I don't know.  That is the

20   framework and I hope I am understanding it correctly.

21           MR. RUSSELL:  And I agree with that, Your Honor.  I

22   just want to make sure it is clear for the record that there

23   was some indication, at least some argument at some point was

24   made that these guidelines are what should be followed at

25   death penalty cases.

**App. 841**

1          THE COURT:  I know.  Mr. Trainor believes that and

2     that is fine.

3          MR. RUSSELL:  That is right and I want to rebut that

4     to some degree.

5          THE COURT:  That is fine, go right ahead.

6          MR. RUSSELL:  As well as I said, Your Honor, if you

7     take away the basis --

8          THE COURT:  Like I said, I have got attorneys

9     arguing in front me yesterday in terms of the proper analysis

10    of a fee shifting provision in a contract case and both of

11    them are relying on case law and in 2016, the Court of Appeals

12    adopted rules.  So, like you guys spend a whole lot of time

13    talking about that, what about the Court of Appeals rules?

14    And they spent more time talking about that.

15         So, again, the answer you get depends upon how you

16    ask the question.

17         MR. RUSSELL:  I agree with that, Your Honor.  I

18    agree.  Like I said my only point is the reason we have these

19    guidelines is because death is different.  You take death out

20    of the equation and the guidelines doesn't make sense to apply

21    them anymore.

22         And I would also point out that ABA keeps track of

23    every one of the cases, I believe reported and unreported,

24    that cites to the ABA guidelines with regard to death penalty

25    cases and as far as I could find and now granted it is like

**App. 842**

1   197 pages worth of cases, I went through as many of them as I

2   could possibly could and I couldn't find one where they were

3   applying them to a case where someone did not receive the

4   death penalty.

5          They don't apply now to Appellate Counsel, because

6   Appellate Counsel wouldn't be under those guidelines.  They

7   don't apply now to post-conviction counsel here today.  And I

8   would ask the Court, I understand in some ways it doesn't

9   really make a difference, but it does.

10          I mean if you consider the kind of representation

11   that they received in this case were it not a death penalty

12   case, it is almost astounding.  I mean to consider that

13   they -- you get three attorneys, they subpoena 27 boxes of

14   things from DOC, they filed dozens, literally dozens of

15   pretrial motions, they interviewed every single person on the

16   tier of the cell -- of the facility despite the fact they have

17   all be moved somewhere else.  They hire to two mitigations

18   specialist as Gary Proctor said, we did everything we could

19   do.

20          If this was a noncapital case, I think we would be

21   very impressed by the amount of work that the attorneys did.

22          In the end though, the guidelines whether they apply

23   or they don't apply, and, again, I would suggest they don't

24   apply.  They still only apply to the first prong Strickland.

25   They apply to whether or not there was a deficiency.  They

**App. 843**

cch

128

1  don't apply to whether or not there was prejudice and that is

2  really the question?

3       And so that, first of all, I want to -- like I said,

4  I want to challenge some of the things that Mr. Trainor

5  testified to which is with regard to, for example, Wiggins v.

6  Smith, and Your Honor, you don't have to take my word for it.

7  You don't have to take Mr. Trainor's word for it and I have

8  great respect for Mr. Trainor but I don't believe that Wiggins

9  makes these guidelines mandatory, and Wiggins is 539 US 510.

10       I don't agree with his assertion of what Rompilla v.

11  Beard says, and that is 545 US 374.  Here is what Rompilla

12  says, you have attorneys who are representing a death penalty

13  client, the aggravating factors that are being used are three

14  convictions that that Defendant has.

15       Within those convictions, if they had taken a look,

16  was mitigation that they could have used in this case.  But

17  they didn't review those cases and so they missed out on that

18  mitigation that they could have then used in the death penalty

19  case.

20       That is a far cry though from saying that they have

21  to then go and -- then an attorney is required to file a post-

22  conviction and win it in all of the cases that might come up

23  in mitigation.

24       It is a far stretch.  And there is not a case that

25  says that.  That is the bottom line.  If the Court wants to

**App. 844**

1    agree with that and we have the first case where that is the

2    standard, then the Court certainly can do that.

3           I think that is probably for the Appellate Court to

4    decide but there isn't a case law, there isn't a case that

5    anybody can point to that says there is a requirement of these

6    attorneys to file a post-conviction and follow through with it

7    successfully on a case that is going to be used in mitigation

8    at trial, a different case.  That case does not exist.

9           So, that is my contention with Mr. Trainor's

10   testimony.  He is not a post-conviction expert, which I think

11   is clear.  I don't mean that in an assaulting way but

12   eventually what we are getting to here is post-conviction

13   issues, which is not what Mr. Trainor does.

14          And so the challenge that I am raising with regard

15   to these guidelines because they do impose certain things that

16   I don't think otherwise we would suggest are reasonable

17   impositions.

18          You wouldn't say that an attorney in a theft case

19   needs to post-convict every single -- or at least -- or even

20   review for potential constitutional violations, every

21   potential case that his client has ever been convicted of that

22   might be used in mitigation.

23          And if we are outside of the death penalty arena,

24   then the question is where does that slippery slope go to?  Is

25   it just in murder cases that we are required to do that or it

**App. 845**

1    in any case that could give you a life sentence, so, maybe a

2    rape case?  What if it is a fourth-time crime of violence case

3    where you would get the life sentence?  And we could go all

4    the way down to District Court.  It is not a reasonable

5    requirement.

6              So, my point in all of this, Your Honor, is that

7    this all goes to deficiency.  And I will remind the Court of

8    what the Court of Appeals said in Yoswick, which is 347 Md.

9    228.  Then they are quoting Strickland, they are quoting

10   themselves in ---.

11             "That in evaluating the claim of an ineffective

12   assistance of counsel, the Supreme Court opine that the object

13   of an effectiveness claim is not to grade counsel's

14   performance.  If it is easier to dispose of an ineffectiveness

15   claim on the ground of lack of sufficient prejudice, which we

16   expect will often be so, that course should be followed."

17             That is why I would suggest the Court should do

18   here.  These claims are going to fail on prejudice. It is easy

19   to nitpick attorneys and second guess the decisions that they

20   make.  You are going to be able to find deficiencies, that is

21   not unlikely.

22             The question is, are those deficiencies prejudicial?

23   And the majority of these issues, that is going to be where

24   this is going to turn, is that there are not prejudice in

25   these cases.

**App. 846**

1          The second thing that I want to address with regard

2   to overall the issues that are raised is the waiver of an

3   ineffective assistance of counsel claims.

4          If this isn't raised as an ineffective assistance of

5   counsel claim then I believe it is subject to waiver.  The

6   post-convictions statute specifically says anything that could

7   have been raised but was not is presumed to be waived.  It is

8   a rebuttable presumption of a knowing and intelligent waiver.

9          And even a fundamental right can be waived if it is

10  knowing and intelligently done.  There has been no evidence

11  presented rebutting the presumption of waiver.  There has been

12  no evidence presented of special circumstances.

13          THE COURT:  On which specific issues?

14          MR. RUSSELL:  I would say with regard the claim that

15  he was denied his right to testify.

16          THE COURT:  How do you raise that on direct to

17  appeal?

18          MR. RUSSELL:  Well, -- and we may need to actually

19  get into the issue.

20          THE COURT:  Absence a record, how do you raise that

21  on direct appeal?

22          MR. RUSSELL:  Well, I would differentiate it in this

23  respect, Your Honor, his testimony, I asked him very

24  specifically, are you saying that you would have testified if

25  they had gotten rid of your conviction in Wicomico County?

**App. 847**

1    And he said, no.  He wanted to testify anyway.

2            So, this -- that doesn't make any difference whether

3    or not he had that conviction.

4            THE COURT:  I can -- I am not sure I agree with you

5    there.  I am just going to say that because if it is something

6    that could have raised on direct appeal but was not, well, I

7    am not reading that the same.  Tell me what else you think

8    might have been waived?

9            MR. RUSSELL:  The claim -- I apologize, Your Honor,

10   I am going through my head.  The only other issue I would say

11   is the due process claim with regard to the sentencing but I

12   am working that through my head as I think about it now.

13           THE COURT:  See that is the problem because the

14   post-conviction relief didn't come until (a) post-sentencing

15   and (b) when the case was up on appeal.  So, it is --

16           MR. RUSSELL:  I agree with that, Your Honor, I will

17   say this, it came before the Appellate decision.

18           THE COURT:  I mean usually, you know, like the jury

19   instruction issue, it could have been raised on direct appeal

20   that was not raised where it would be clearly erroneous

21   instruction as the law or something like that.

22           Those are the cases we usually see.  Again, I am --

23   I can't, I am trying to have a hard time to see where there

24   could be a colorable claim of waiver on an issue, especially

25   the testimony issue.  I don't see how that could have been

**App. 848**

1   raised on direct appeal and, therefore, will be waived.

2          MR. RUSSELL:  Well, at minimum, Your Honor, I would

3   suggest that his -- the claim that has been raised.

4          THE COURT:  I can see a way to frame the issue.  If

5   I was a defense attorney and I said to my client do you want

6   to testify and he said, yes, and then you say, okay, well I

7   want you to take the stand.

8          And the person said, I am not going to testify

9   because I have a Wicomico County case where I have been

10  convicted of murder and my attorneys have filed a post-

11  conviction and that case hasn't been stricken, it was an

12  unconstitutional conviction and it is keeping me from

13  testifying.  And then on direct appeal you don't raise it.

14         You know it is -- as the Appellate Courts often

15  point out, and I think that is what Mr. Hut was very concerned

16  about before, what is the proffer that goes with when the

17  Court rules against someone.  So, Joel Todd alleviated the

18  need for your proffer but that was a different matter.

19         But, again, I mean I could see where the issue could

20  have been raised down below.  There is a book called the

21  Benefit of Hindsight but -- the sort of the armchair quarter

22  back.  Why didn't we even think about taking Ryan Leaf instead

23  of Peyton Manning.  So, that is always there.  But I am having

24  trouble envisioning the scenario of where there is a waiver

25  issue especially on the right to testify.

1          I don't think -- if you have something that you

2     think would be waived, you can tell me, but I just don't see

3     where that might come into play.

4          MR. RUSSELL:  As I said, Your Honor, at minimum

5     though, I want to make sure it is clear as I understood the

6     issue and maybe if I said that his is a bit of a moving target

7     as to what the moving issues are.

8          Mr. Stephens testimony was that he wanted to testify

9     regardless of that conviction.  And so to the extent that

10    there is an issue that he didn't get the opportunity to

11    testify even knowing that that conviction was in place, I

12    would say that issue has been waived because he was aware that

13    he did not testify.  It could have been raised on appeal that

14    he was denied his opportunity to testify and it has not been.

15         THE COURT:  Okay.  All right, go ahead.

16         MR. RUSSELL:  Okay.  I am going to move into the

17    actual issues, Your Honor.  With regard to the first issue of

18    whether trial counsel was deficient for not requesting a jury

19    instruction on causation?

20         With regard to jury instructions, obviously, there

21    are three criteria, whether the instructions were generated by

22    the evidence, whether it is a correct statement of law, and

23    whether it otherwise was fairly covered by the instructions.

24         The instructions given is the Patten Jury

25    Instruction.  I have said from the beginning in my response, I

1   continue to say, I don't believe that the instruction that was

2   requested and the Petition that was filed is a correct

3   statement of law.

4        I don't think that there is any grounds for asking

5   for the instructions that they suggest they should have gotten

6   and I don't think that they would have received that

7   instruction.

8        The comments of Pattern Jury Instruction 417 is the

9   correct Statement of Law, which is substantial factor.  If

10  they wanted instructional substantial factor, they could have

11  gotten that instruction.

12       The problem is I think that is a worse instruction

13  than cause.  It is a lower standard.  The dictionary

14  definition of cause is to bring about a result.  That seems to

15  me to be a higher standard on its face in plain language than

16  is a substantial factor.

17       So, it doesn't make sense that they would ask for a

18  jury instruction that essentially lowered the standard.

19       And with regard to what has been cited to, I mean,

20  respectfully, you have got citations to the restatement of

21  torts, to civil ruling, certainly, none of that is going to go

22  to the jury.

23       And I don't think most Judges would agree to give an

24  instruction that gets to the instruction that they originally

25  asked.  I don't think any Judge is going to give that

1   instruction.

2         Again, Your Honor, I will reiterate that their

3   reliance on Burrage is a case that is completely different

4   than what we are talking about.  That is a case where someone

5   overdoses on multiple drugs.  There is a statute in place in

6   that jurisdiction where the drug dealer can be convicted of

7   murder for that overdose.

8         And the question is whether or not the person

9   overdosed from that drug based on multiple other drugs in

10  their system?  It is a far cry from two people stabbing

11  somebody with shanks in a prison.

12        The Petitioner also cites to the Rule of Lenity.  It

13  is completely wrong analysis of the Rule of Lenity.  The Rule

14  of Lenity is for when there is an ambiguity; and there is no

15  ambiguity here.  The word cause is clear.

16        And even then, it is only when we can't figure out

17  what the legislative intent is.  That is when go to the Rule

18  of Lenity.  And that is not what we have here.

19        So, the idea that the Rule of Lenity somehow comes

20  in, the analysis hasn't done at all and it is not correct.

21        There just simply no case law supporting the

22  instruction that they talk about.  Now, this document that we

23  talked about this morning, this compilation of case law that

24  they submitted, if you look at the fourth page of it, in the

25  middle, they give you four cases and the first three are

1   Maryland cases.

2         But the one that really would make a difference,

3   People v. Jennings.  That is a California case.  That is not a

4   Maryland case that suggests you should give this instruction.

5         I will also continue to make argument that I made

6   despite the fact that Mr. Lawlor and Mr. Proctor and

7   Mr. Trainor all disagree with me, that this isn't consistent

8   with the theory of defense.

9         I understand you can say it is not inconsistent,

10  which is what everyone seems to say.  But I would suggest and

11  I will go on record as being apparently the only person who

12  thinks it is a terrible idea to bring this up to a jury,

13  particularly to argue this point.  Because jurors don't know

14  the --- of consistent and not consistent arguments.

15        They are going to hear testimony from medical

16  examiners about whether or not this stab wound killed the

17  person or the stab wound didn't.  And that is probably not the

18  information that you want in their ears.

19        What you want is here are the problems with all of

20  the investigations.  That is what you want to focus on.  And

21  as Mr. Proctor originally said he thought of the medical

22  examiner like the victim's family.  Just don't want to hear

23  anything from them that is not going to help.  And that is the

24  case.

25        And so they said, can you legally suggest that it is

1  not inconsistent?  Probably.  Does that make it a good idea to

2  argue it to a jury?  No, I think that would be a terrible

3  idea.  And I think a jury would not be particularly able to

4  differentiate it the way that attorneys can.

5  And Mike Lawlor was clear they were trying to win it

6  at the guilt phase.  He said that specifically.  And their

7  best chance to win it was not to suggest -- well he may have

8  been involved in the stabbing but his part didn't actually

9  kill Corporal McGuinn.

10  Now as I said, Your Honor, these issues are all

11  going to turn.  At least most of them are going to turn on

12  prejudice.  And the Defendant in this case cannot demonstrate

13  that but-for this jury instruction that is a substantial

14  possibility that the jury's verdict would have been different.

15  The jury didn't have an issue with causation.  They

16  had a hearing on whether he was a principal in the first-

17  degree and the deliberation didn't take very long.  They

18  decided that he was.

19  This what I believe is the obvious conclusion based

20  on the record that we have from the jurors.  I don't believe

21  that they believed any of the eyewitnesses.  That is why he

22  was acquitted of the conspiracy charge.

23  No one who testified who said they saw this happen,

24  is particularly believable.  They are all inmates in the

25  Maryland House of Corrections.

**App. 854**

1          But what the jury could believe and what I believe

2    the jury did believe is there is a lot of blood in your cell.

3    There is a bloody shirt underneath your mattress.  There is

4    blood, alleged blood on the door to your cell that couldn't

5    possibly be there unless the door was opened.  There is an

6    apparatus to open the door.

7          The person next to the cell says they heard you open

8    and close the door.  There is the victim's blood in in the

9    treads of your boots.  That is what the jury took and said we

10   believe that Mr. Stephens committed this murder.

11         It wasn't a causation issue.  I don't think they

12   thought there were even two people, or if they knew one way or

13   the other whether it was two.  But they knew that Mr. Stephens

14   did it.  And I think that, in the end, there is no prejudice.

15   You think that is where they really ended up.

16         I also think that it is important to reiterate the

17   issue of aiding and abetting.  I am not suggesting that the

18   Court uphold a conviction on aiding and abetting that didn't

19   occur.  That is not the point here.

20         The point is you can't make post-conviction

21   arguments in a vacuum.  You can't say one side does X, Y and Z

22   and the other side doesn't respond to it.

23         If, in fact, you put on a really good causation

24   argument, which Petitioner suggests they could do, the State

25   has the option at the end of the evidence, during the jury

1  instructions, to say, you know what?  I think they might have

2  a good case, maybe we switch to aiding abetting at this point

3  and we get that instruction.

4          Now whether he is going to be convicted or not, I

5  don't know.  But it doesn't happen in a vacuum.  The decisions

6  that occur at trial occur at --

7          THE COURT:  But what does that do to the death?

8          MR. RUSSELL:  Well, it takes death penalty off the

9  table.

10          THE COURT:  Right.

11          MR. RUSSELL:  And admittedly that is true.  But he

12  didn't get the death penalty.  And so what is the prejudice at

13  that point?  You can make this causation argument but where

14  does it get you as far as prejudice goes?  It gets you the

15  same --

16          THE COURT:  But that is what Mr. Hut was arguing.

17  At that point, at least he raised, I am pretty sure in his

18  opening, Proctor's arguing for life without parole as opposed

19  to arguing for life because he doesn't want to bet against

20  himself.

21          MR. RUSSELL:  And maybe that is where we get to down

22  the road but I think at this point, you know, we are just

23  speculating as to what would happen.

24          And as I say, maybe the State doesn't make that

25  decision.  But we can't assume that the State can't make that

1   pivot.  We also then can't assume what the jury would do or

2   what a sentencing Judge --

3          THE COURT:  And the State -- or the State can't

4   pivot into phase two ask for the aiding and abetting

5   instruction in phase one and then phase two ask if it was

6   aiding and abetting or by his hand and then in phase -- well,

7   okay, -- all right, go ahead.

8          MR. RUSSELL:  Well, my point is, Your Honor, for

9   every decision that somebody at a trial makes, somebody else

10  makes a different decision.

11         THE COURT:  Yes.

12         MR. RUSSELL:  So, you can't do it in a vacuum.  You

13  can't say, well, we raised this defense.

14         THE COURT:  Which is why I am confident that

15  whatever decision I make, a panel of three is going to look at

16  it and maybe a panel of seven is going to look at it, and who

17  knows who is going to look at again.  I don't know -- you

18  know, I am just a speedbump sometimes on the way to the Court

19  of Special Appeals and the Court of Appeals because I

20  guarantee Mr. Hut is already trying to figure out what

21  Ms. Gostin and Mr. Eagles, you know, no matter what I do, is

22  this an argument that they want to take upstairs because that

23  is what he should be doing.

24         MR. RUSSELL:  No, I completely with that.

25         THE COURT:  And I guarantee you have already drafted

**App. 857**

142

1    in your mind your application for leave to appeal depending

2    upon on what I do.  So, there is no doubt in my mind both of

3    you have your backup plans.

4               MR. RUSSELL:  Absolutely, Your Honor.  And --

5               THE COURT:  Like I said, I am a speedbump on the way

6    to the Court of Special Appeals and the Court of Appeals

7    sometimes.

8               MR. RUSSELL:  And as I said, Your Honor, in some of

9    these situations, I think they probably are decisions for the

10   Appellate Court to make.  Not saying that Your Honor shouldn't

11   make them first.

12              THE COURT:  No, no.  But as -- you see you ought to

13   be here in an election year when there are constitutional

14   issues that go onto the ballot and people come in and complain

15   like slot machines in and gambling and all that, and then they

16   just come right down here.

17              And they are very polite.  I mean the Attorney

18   General and the other people, they are very polite.  And you

19   already can tell that they are not paying any attention to

20   what we say.  They are just waiting for me to hurry up, sign

21   an order, saying go upstairs.  I think 2018 is are next shot

22   for that.

23              MR. RUSSELL:  I will be ready.

24              THE COURT:  You won't have to worry about it but I

25   will.  Judge Silkworth and I bear the brunt of those right

**App. 858**

1    now.  All right, go ahead.

2              MR. RUSSELL:  Thank you, Your Honor, I am going to

3    move onto whether trial counsel was deficient for failing to

4    call the expert medical examiner.

5              First of all, it is clear from the record, trial

6    counsel wanted to keep out any testimony about any many

7    weapons --

8              THE COURT:  It failed to call as in phone call but

9    not fail to call as in audio visual not call experts.

10             MR. RUSSELL:  I apologize.  I may not have said

11   medical examiner expert.

12             THE COURT:  Yes, failed to -- failure to call as in

13   make a phone call or failure to call their own.

14             MR. RUSSELL:  Failure to call their own.

15             THE COURT:  Okay.

16             MR. RUSSELL:  I will later get into the failure to

17   call.  I apologize.

18             THE COURT:  Okay, go ahead.

19             MR. RUSSELL:  Those are obviously very similar

20   sounding issues.  So, first of all, defense counsel was clear

21   that they wanted to keep out any testimony about how many --

22   by the number of weapons.  The medical examiner, Ms. Vincenti,

23   was -- Dr. Vincenti was limited, she was not allowed to talk

24   about it.

25             If you bring in a medical examiner to start talking

1   about the possibility of how many weapons it is, well then you

2   have defeated that whole idea of keeping her from talking

3   about it.

4         And to which there is no reason for it anyway.  Both

5   medical examiners that we heard from in this post-conviction

6   said they couldn't tell you how many weapons were used.  They

7   both also said it could be one, it could be two, it could be

8   as many as 24.

9         That means that the State is free then to make the

10  deduction and the argument to the jury as to how many weapons

11  there were.  And the State made a reasonable argument that

12  there were two weapons used.  That was the State's theory.

13  There is nothing wrong with that argument.

14        The testimony about whether there are two fatal stab

15  wounds versus multiple fatal stab wounds is not particular

16  helpful either.  Everyone agreed that what Dr. Vincenti said

17  wasn't actually wrong.

18        She said that he -- that there were multiple stab

19  wounds and they also contributed to the loss of blood.  And

20  they did.

21        And all of this is sort of bootstrapped on the idea

22  that you are going to get this causation instruction at the

23  end.  So, you are going to put on a medical examiner to get

24  into which wounds killed Corporal McGuinn all on the hope that

25  you are going to get this instruction at the end that you may

1   not get.   That I was say you probably are not going to get.

2            So, then you are just stuck with this -- all this

3   testimony about the stab wounds of the victim.   All in a case

4   where really what you are arguing is my client didn't do it.

5            So, what you are doing is essentially just turning

6   this into a war of medical examiners with no real benefit to

7   yourself except for this hope that you are going to get this

8   instruction.   There is no guarantee you are get it.

9            And let's also be clear they consulted a medical

10  examiner.   It shouldn't just be swept aside that they did

11  that.

12           They had a medical examiner from Delaware who they

13  contacted, who they talked to.   And that is generally how

14  Office of Defender's budget you have to operate.   You have to

15  find somebody in the State next to you, not in Detroit.

16           Yes, you have to ask them to give you a lower price.

17  A lot of times you use the same person over and over again

18  because maybe they will give you a discount.   That is the way,

19  unfortunately, the Office of the Public Defender has to

20  operate in order to make sure that they have the resources

21  they need.

22           They did what they would normally do.   They called

23  the person that you would call.   He was still a medical

24  examiner, in fact, the reason he stopped being a medical

25  examiner was that he spent too much doing cases outside of

1    Delaware.

2           They talked to him, they didn't use him.  I find it

3    incredible to borrow the term the Petitioners used with regard

4    to testimony, I find it incredible Mr. Proctor's testimony and

5    I have great respect for Mr. Proctor.  But I find it

6    incredible that he simply forgot to talk to his own medical

7    examiner expert after that first phone call.

8           And maybe the Court believes that, I don't know.

9    Ethically, I don't think I can comment on the veracity of his

10   testimony beyond simply that I don't think it is credible

11   testimony.  That someone with his background, with five years

12   of working on this case, would just simply forget.

13          I mean the Court has seen their documents just

14   simply demonstrating all of the things that they were doing

15   and tracking.  The idea that they would just simply forget to

16   talk to the medical examiner just simply doesn't hold water as

17   far as I can tell.

18          And the prejudice in this situation is the same as

19   it was with regard to the jury instruction.  As I said it is

20   call predicated on the idea that you are going to get this

21   jury instruction.

22          The jury believed that he was the principal on the

23   first.  It took them no time to make that decision.  And so

24   the Petitioner has not carry the burden to show that there is

25   prejudice in this case.

**App. 862**

1        Now with regard to trial counsel's alleged

2   deficiency for failing to undermine the search of the cell.

3   The defense team, as a whole, largely through cross

4   examination elicited that crime scene technicians had failed

5   to test the suspected blood on the door of Mr. Stephens' cell,

6   in his sink.   That the murder weapon had been lost.   That one

7   of the correctional officers involved in the investigation had

8   an altercation with Mr. Stephens immediately after the murder.

9        All of these things came out to the jury.   As a

10  matter of fact, everything that was asked of Mr. Ash today,

11  all came out to the jury.   The jury heard all of this.

12       Undermine the search of the cell is the thing that

13  Mr. Lawlor and Mr. Proctor did best.   The transcript is in

14  some ways a masterpiece of tearing up the DOC.   Not the

15  Maryland State Police but the DOC and their ability to

16  maintain the crime scene and collect evidence.

17       And that went to the jury.   And the jury still

18  convicted him.

19       And I also point out that the Petitioner suggests

20  that there is a problem with Lieutenant Mayfield being

21  involved in the scheduling of Corporal McGuinn.   I assume that

22  is ball allegation that has been abandoned at this point.

23       The Petitioner also suggest that there is some

24  problem with the location of the boots in the cell.   That is

25  an issue I haven't heard anything with regard to that.   I am

cch

1   assuming that has been abandoned as well.  But, again, these

2   tend to be moving targets.

3           But as I said, Your Honor, with regard to the search

4   of the cell, and undermining it, the jury just didn't buy it.

5   The physical evidence was strong.  And how do you overcome --

6   what theory will you overcome that physical evidence that it

7   is being planted.  Well, if it is being planted, if he is

8   being set up, this is terrible job of setting it up.

9           Why would you put blood in his cell and the forget

10  to test it?  It doesn't make any sense.  Why would you put

11  blood on the door and then forget to test the blood?  Why

12  would you lose the alleged shank?  All of these things don't

13  make any sense.  And then I don't think the jury bought it.

14          You can suggest, as they did, that DOC just botched

15  the entire thing and it caused contamination.  But it still

16  doesn't really explain some of the problems that I imagine the

17  jury found with the evidence.

18          It doesn't explain why there is blood on the door

19  that couldn't possibly get there in any other way but for the

20  door to be opened.  It doesn't explain how the person in the

21  cell next door hears him opening and closing the door.  It

22  doesn't explain why his shirt has the blood on it is wet and

23  is underneath of his mattress.

24          Blood is not just coming in through cell door and

25  going under his mattress.  It doesn't explain why it is on the

**App. 864**

1  bottom of his boots.  It doesn't explain why it is on his

2  boxer shorts.

3          And that is why there is no prejudice here.  The

4  jury heard the issues with the search, but they didn't buy it.

5          They accepted the physical evidence, which was

6  strong and that is why they convicted him.

7          With regard to trial counsel's alleged deficiency

8  for failing to improperly enter a stipulation.  First of all,

9  I don't believe the stipulation in question is ambiguous in

10 that it defines a specific point in time.  If you read the

11 last sentence of the stipulation, without reading the first

12 two, then certainly it doesn't say what you wanted it to say

13 but it is read in context.

14         It is a three-sentence stipulation and when you read

15 the first two sentences along with the third sentence, it is

16 clear what those sentences mean.  To read it otherwise assumes

17 that the first two lines don't have meaning.

18         And trial counsel testified it was the result of

19 significant rewrites and objections from the defense.

20         And again, Your Honor, this is -- so many of these

21 are going to turn on prejudice.  Are we to assume that these

22 three sentences completely turned this case?  I don't think

23 that is reasonable to assume.  The jury sent out multiple

24 notes in this case.

25         At no point did they say, we are confused by the

1  stipulation because we saw evidence about how the evidence was

2  handled but now we got this stipulation saying that nothing

3  happened to it.

4         They heard the argument after the stipulation was

5  given.  So, it would be clear within context what the

6  stipulation means.  And if it was confusing, as I said, the

7  jury could have sent out a note.  But that didn't happen.

8         So, we are making this assumption that the jury is

9  confused by a stipulation that I don't think is particularly

10  confusing that would be completely contrary to the defense

11  arguments that they just heard.

12         So, I think it is clear within the context of the

13  trial, the jury understood the stipulation.

14         And as I said, Your Honor, to suggest that the

15  outcome of this case turned on that stipulation I just don't

16  think there is any substantial possibility that Court could

17  get to as far as that goes.

18         With regard to counsel's alleged deficiency for

19  failing to effectively cross examine Mr. Freed on his Hartford

20  County case, the trial counsel cross examined Mr. Freed at

21  great length regarding pending charges and agreements that he

22  was aware of that would lead to benefits in exchange for his

23  testimony.  That happened on January 17, 2012, in the

24  transcript from pages 148 to 176.

25         At some point, trial counsel, defense counsel, has

**App. 866**

1   to be allowed to cut bait, and say this isn't working.  He

2   can't keep hammering this person on issues that I don't even

3   know that they exist.

4          He has already testified that there wasn't a deal

5   for his Hartford County cases.  Now the suggestion that you

6   want to then ask him more questions about what his

7   expectations were when there is no indication that he has

8   expectation beyond that.

9          Mr. Freed didn't come in here and testify and say I

10  had expectations.  We don't know what Mr. Freed would have

11  answered.  And, in fact, if you look at the evidence that we

12  have heard, particular from Mr. Ash, there is no reason why he

13  would have had expectations.

14         So, if we are going to make it an assumption about

15  what his answers are going to be, the assumption ought to be

16  that he would say, I don't have any expectation as to what is

17  going to happen with those Hartford County cases because that

18  was made clear to him.

19         And as Mr. Ash testified, there was no deal for the

20  Hartford County violation of probation cases.  There couldn't

21  be a deal for those cases.  It would ruin the entire testimony

22  because they weren't the ones that brought the deal to him in

23  the first place.

24         And the transcripts contained a complete discussion

25  of this.  It was done at the bench.  So, obviously, the Court

cch

152

1  can review that and see exactly what Mr. Lawlor knew, what

2  Mr. Ash was saying, what everybody was aware of.

3          But, again, there is no basis, no evidentiary basis

4  that we have heard in this case in the last week for assuming

5  that Mr. Freed had any other expectation.

6          Now, Mr. Lawlor said he probably had a desire, which

7  is probably true.  I am sure he had a desire for those cases

8  to go away.  I think probably every criminal Defendant has a

9  desire for their cases to go away.  But that is different than

10  an expectation.  An expectation has to be based on something.

11          The only thing to hang the Petitioner's hat on is

12  this letter to Detective Branum but as Mr. Ash testified to

13  they were clear Mr. Branum, they were clear with Mr. Freed,

14  there wouldn't be any deals with regard to those Hartford

15  County cases.

16          And as Mr. Ash said, he had no further contact after

17  that with Hartford County with regard to those cases because

18  here was deal on them.

19          Now, again, Your Honor, this is an area where

20  prejudice is a problem because what you really getting is

21  If -- let's assume in arguendo that he says, yes, I thought

22  maybe this would help me out some.

23          I mean it is only changes the fact that he has

24  already got a deal in a different case and he is getting a

25  little more incentive from another one.  He has already

**App. 868**

cch

1   admitted that he is testifying based on a reduction of a

2   sentence.

3           The damage has already been done as far as that

4   goes.  So, to think that the jury I suddenly going to say,

5   well, when you were only getting a deal in the Federal case, I

6   believed you.

7           But now that you also got a deal in the Hartford

8   County case, well, that is too much for us.  We can't believe

9   you from thereon.

10          I don't think that that -- there is a reasonable or

11  substantial possibility of that.  And more importantly I think

12  in the end as I argued before, I don't think the jury believed

13  him in the first place.  They believed the physical evidence.

14          So, you can impeach Mr. Freed until the cows come

15  home but it is not going to make any difference if the jury

16  didn't believe him in the first place.

17          Again, I think that maybe this was waived by

18  probably the issue of whether trial counsel was deficient to

19  failing to investigate alternate suspects, didn't hear any

20  argument on that.  But again, that was clearly trial strategy

21  at minimum.  Everyone -- Mr. Proctor and Mr. Lawlor I believe

22  both testified that they didn't want the burden having to try

23  and prove that someone else did it.  And putting that burden

24  on their defense.

25          And the evidence showed the investigation that they

1  did.  Clearly, if there was a suspect as Petitioner had

2  suggested, that was Mr. Gales.  They did the investigation of

3  Mr. Gales and they made the decision not to go that route.

4  And I think that it was probably the right decision.

5          Now with regard to whether or not trial counsel was

6  deficient in failing to overcome the Wicomico County murder

7  conviction, I think we started talking about this a little bit

8  but I want to make sure we cover all of it.

9          Again, Your Honor, I will say definitely I believe,

10  there is no case law that says it is ineffectiveness

11  assistance of counsel for trial counsel to not post-convict an

12  underlying mitigating case in a different jurisdiction.

13          Rompilla doesn't say that and there is no case that

14  I am aware of that says that.  As I said before if the

15  Appellate Courts want to suggest that there is where we have

16  to go, they will have the opportunity but I don't think there

17  is basis in law that the Court can hang his hat on at this

18  point to say that is a requirement.

19          I agree that the guidelines the ABA guidelines in

20  death penalty cases suggest that that is what should be done.

21  But they cite to a case that also does not say that.  And they

22  are not law.  I also think that if the Court is going to

23  consider this the Court also has to consider the

24  jurisdictional issue of it.

25          What is being suggested is that Your Honor find that

1   there is a deficient act that occurred in a case in a

2   different county, in a different hearing, not in this case but

3   created prejudice in this case.

4          And that is different than what we are talking about

5   in Rompilla.  Rompilla, we are talking about well you should

6   have investigated the underlying cases that are being used as

7   aggravators and if you had, you would have noticed some

8   mitigation that would be helpful to you.

9          That is different than saying you failed in a case

10  in Wicomico County and therefore I am going to find that you

11  were ineffective in the case here.

12         I think it presents a lot of jurisdictional

13  problems, it presents a lot of logistic problems.  And I think

14  it could open a huge can of worms if this became the

15  prevailing norm.

16         And, again, we are outside the death penalty realm.

17  So, at minimum, we are talking about every murder case this

18  has to be done.  And I would assume it has to be done on every

19  conviction --

20         THE COURT:  But not every murder case has Joseph

21  Kopera and what was known at the time about Joseph Kopera.

22  That is -- you know look up in Baltimore City right now.  I

23  don't know those officers who have been indicted.  I don't

24  know anything about those officers who have been indicted.

25         But I can reasonably believe that a competent

1    criminal defense attorney who has a client, who has been

2    arrested by and was prosecuted by a jurisdiction where there

3    officers were there and is facing new charges that they would

4    want to go back and look at what those officers did in that

5    case.

6            Meaning, when you talk about enhancement of

7    sentences in gun cases, when you talk about felons and

8    possessions -- so, if right now, God forbid someone decides to

9    take a shank and take the life of a correctional officer, but

10   they are serving a sentence and that sentence is 20 years, the

11   first five without parole for possession on a handgun in the

12   street of Baltimore City used in the crime of violence, and

13   the crime of violence is a first-degree assault, and it was

14   one of those officers that is under indictment, it would be

15   hard for me to believe that that attorney would not be

16   investigating that.

17           So, here -- and every case is different.  But here

18   we have the Kopera issue.  And what I can think is, I mean

19   thank goodness, you know, people are proactively investigating

20   those cases with those officers and I have the utmost respect

21   for what the police do but in this case an employee of the

22   State Police (a) perjured his testimony regarding his

23   credentials, which was known at the time Proctor/Lawlor filed

24   the post-conviction, and (b) as Mr. Huts admits, and I can

25   only say this anecdotally from reading the paper and reading

**App. 872**

1    whatever case law I can find, I wasn't aware that there were

2    any where he had testified falsely, incorrectly, perjuriously,

3    inaccurately; substitute any word you want.

4              But this was one, so, I am wrestling with what role

5    had not in terms of whether the post-conviction would have

6    been successful or not, I don't know.   I still have to back

7    and review Mr. Todd's testimony.

8              But the lack of due diligence in prosecuting it,

9    knowing that, that was what kept Stephens in prison.   That is

10   what Stephens was in prison for because if -- if there is any

11   attorney who is representing anyone in Baltimore City right

12   now, who winds up representing anyone in the division, who was

13   in prison or is facing charges because of those officers in

14   that gun unit, it is hard for me to believe that they would

15   not be actively investigating the underlying conviction.

16             Now, would the result that have been different, was

17   there prejudice?  I don't know.  I am not there yet.  I am not

18   even at the first stage yet.  I am just thinking out loud and

19   that is what I want you to -- because I have grasped Mr. Hut's

20   argument, I think, and Ms. Gostin's argument, I think.   They

21   are going to tell if I don't but that is what I am wrestling

22   with in terms of the Wicomico County.

23             And, again, I know there is no case law that seems

24   to say you are ineffective for not pursuing a post-conviction

25   in another case, that is ineffective assistance.

**App. 873**

1          But under these circumstances, with what was known

2     about Kopera at the time, and they did have Proctor's comment

3     that when he did deliver the subpoena to try and get the --

4     subpoena duces tecum to try and get the internal affairs

5     records for the Lieutenant, I mean, usually, the first

6     response you always get is (a) the records don't exist but (b)

7     even if they did exist they don't contain anything exculpatory

8     because it is all personal and confidential and (c) even if

9     they don't exist, they don't contain anything personal or

10    confidential.

11         You are not entitled to them because it is a fishing

12    expedition and then the next line comes but, oh, by the way

13    just in case something does exist, you have to review it in-

14    camera judge and don't tell anybody else.

15         That is not what Proctor's reaction was.  His

16    reaction was he filed it and they said, on, it is going to

17    take you a little while to get this because there are a lot of

18    boxes.

19         I have sat here and I have watched the county

20    attorneys and the State Police fight the personnel record

21    issue and I have yet to have one where they just willingly

22    said, yep, here you go, turn them over, take a good look at

23    them.

24         MR. RUSSELL:  Well, I will say, Your Honor, my

25    recollection was it wasn't Mr. Proctor who did that, it was

**App. 874**

cch

1  Mr. Hut.

2          THE COURT:  Maybe it was Mr. Hut, I don't know.

3          MR. RUSSELL:  I may be wrong about that.

4          THE COURT:  No, I thought Proctor told me he went

5  down and --

6          MR. RUSSELL:  I believe Mr. Proctor was telling you

7  the story that he had heard from Mr. Hut.

8          THE COURT:  Oh, maybe it is, I don't know.  And I

9  have to go back to my notes again and try things over a couple

10  of days.

11          MR. RUSSELL:  But if I may comment on what you just

12  said, Your Honor?

13          THE COURT:  But, again, I am not disagreeing with

14  you in terms of case law and that is why new cases come up

15  constantly, -- let me see what he did say.  (Reading.)

16          (Pause.)

17          THE COURT:  I don't know. I don't remember when he

18  testified to that.  But, again, I am not trying to argue with

19  you.  I am asking you to discuss this with me.

20          MR. RUSSELL:  Absolutely, Your Honor.  And, if I

21  may, I think I can make a distinction for you that based on

22  what you just said.  So, the Court's example of the Baltimore

23  City cases, any attorney worth their salt is going to be

24  investigating any convictions that their clients have from

25  those officers.

**App. 875**

cch                                                                    160

1          THE COURT:  Right.

2          MR. RUSSELL:  This is one pillow and I agree with

3     that.

4          THE COURT:  And so the record is clear, I think

5     those of us who know what I am talking about, know that I am

6     talking about the Baltimore City Gun Squad where they all just

7     been indicted Federally and it has been in the news.  I don't

8     know any of them personally.

9          I really don't know anything about the case other

10    than what I read in the paper but that was the example I was

11    giving just so you could understand the context in which I am

12    considering.

13         MR. RUSSELL:  Absolutely, Your Honor.  I think that,

14    what the Court has suggested is Rompilla.  They should be

15    investigating that just as Mr. Lawlor and Mr. Proctor were

16    investigating this case.

17         There is a step though that now is being taken

18    beyond you should be investigating those things to you should

19    have affirmatively be overturning those convictions.

20         And that is the question is one of those attorneys

21    in Baltimore City do they have an affirmative duty then to

22    litigate the post-conviction of another one of those cases?

23         That is the question.  Are they ineffective then if

24    they don't go and litigate those cases?  And then, again, it

25    is an assumption as to whether or not they are going to win.

**App. 876**

1          I agree the investigation part of it, that is what

2    Rompilla says, yes, you should be investigating the

3    convictions particularly in Rompilla, they are aggravators.

4    You should be aware of the information from that.

5          But I said, Your Honor, what I am suggesting is

6    there is no case law to take the next step to say that you

7    then have an affirmative duty to go out and overturn that

8    conviction.

9          THE COURT:  Because you are suggesting that, this is

10   basically post-conviction within a post-conviction that they

11   are seeking to post-convict the attorneys for their lack of

12   diligence in pursuing the post-conviction case.

13         MR. RUSSELL:  Correct, Your Honor.

14         THE COURT:  But I think the argument on the other

15   side was it is not an issue of post-convicting them for their

16   lack of due diligence in following up.  It is a post-

17   conviction because by not doing that, here is the effect it

18   had here.

19         MR. RUSSELL:  Correct, Your Honor, so maybe you can

20   get --- but you need both prongs.  So, can you pull a

21   deficiency from another case, in another county and is there

22   an obligation?  Is that the standard?  Is that a reasonable --

23   is that the norm that we have now professionally?

24         THE COURT:  Well, if I accept Joel Todd that he only

25   did this but-for, then maybe my answer is easy.  If I don't

1  accept Joel Todd, they the answer is not as easy.

2         MR. RUSSELL:  That is true, Your Honor, and as I

3  said I think it is a slippery slope.  Because right now, this

4  is a murder case.  But I can tell you from having done post-

5  convictions for a decade the minute that opinion comes out,

6  that says, yes, you should have gone and post-convicted it, I

7  am using that on single post-conviction that I can find to say

8  you didn't go and review your client's second-degree assault

9  when he had this theft conviction.

10         THE COURT:  Look --

11         MR. RUSSELL:  And it is going to turn into everyone

12  going from county to county --

13         THE COURT:  I know.  But the Court of Appeals today

14  clarified the issue of an acquittal following a mistrial.  So,

15  I guarantee every defense attorney as you said worth their

16  salt is going to ask for the acquittal before they ask for the

17  mistrial.  If you read the opinion, you know what I am talking

18  about.  All right, so, on I --

19         MR. RUSSELL:  Okay, I think I have made my point

20  with regard to that, Your Honor.  But I will say this with

21  regard to the prejudice in that case.  I understand the

22  Court -- to compare an issue is an issue that needs to be

23  considered.

24         The Brady violation is an issue that needs to be

25  considered.  But I don't think that is the way to do it.  The

1  Court isn't hearing testimony other than from the State's

2  Attorney that handled it.

3      THE COURT:  That is pretty good evidence when the

4  State's Attorney comes in and says in a murder case that I was

5  assigned for post-conviction I acknowledge, (a) my witness was

6  wrong and (b) there was Brady information that was not turned

7  over.

8      MR. RUSSELL:  But, Your Honor, that doesn't

9  guarantee --

10     THE COURT:  I wouldn't rely -- I could rely on that

11 a lot more than I could Proctor/Lawlor, the defense attorneys

12 coming in and telling me we believe that there was, because

13 one is an allegation of what they believe.  The other is a

14 statement of fact.  But the State believes what the State says

15 they have.  So, you don't see that too often either.

16     I am saying they are --

17     MR. RUSSELL:  I agree with that, Your Honor.  But

18 that doesn't necessarily --

19     THE COURT:  Trust me, I see a lot of things in this

20 case that I haven't seen before in post-convictions.

21     MR. RUSSELL:  I think the Court also have to

22 acknowledge it doesn't guarantee that they were going to win a

23 post-conviction.

24     THE COURT:  Again, that is where I get back to

25 rereading Joel Todd and thinking about what he said and would

**App. 879**

1   the result had been different and is there a but-for factor

2   here?  I don't now know, I am not there yet.  I am just trying

3   to -- I am still trying to frame the issues.  Because the

4   answers you get, as I said, depends upon the question you ask.

5           MR. RUSSELL:  Absolutely, Your Honor.  I will say

6   this though because as Mr. Todd said they would have retried

7   him and at minimum if I recall correctly, both ballistic

8   experts, Mr. Kopera and then Mr. Suber, I may be getting that

9   wrong.

10          THE COURT:  Torrance Suber, nickname Zack.

11          MR. RUSSELL:  Both of them agreed that there was a

12  bullet from the gun that was recovered from Mr. Stephens in

13  the corps of the person who was murdered.  That is pretty

14  difficult testimony.  That is pretty difficult to get passed.

15  So, it is not to say this was a -- he is suddenly going to be

16  exonerated.  That is not what happened.

17          And we won't know because he took he deal.  I think

18  that is part of the problem is, yes, there could have been a

19  post-conviction, maybe he would have won it, we don't know,

20  because once you take the deal, taking the deal is not the

21  same as overturning the conviction.

22          THE COURT:  All right.  Well, see if we kind of get

23  to the end of this.

24          MR RUSELL:  Absolutely, Your Honor.  I do want the

25  Court to also consider this.  There is a reasonable way to

1   also that Mr. Proctor and Mr. Lawlor could have handled this

2   post-conviction issue in Wicomico County.

3          They could had this case here in Anne Arundel County

4   and once it was done, they could have attacked the post-

5   conviction in Wicomico County.

6          Now has the ship sailed a little bit?  Yes.  But, if

7   you look at Tucker, the case that the Petitioners talked about

8   if they could have then done the post-conviction and

9   overturned that conviction, they could have made the argument,

10  he should come back and get a new sentencing.  It was still

11  there to do it that way.

12         THE COURT:  But that is what they are arguing right

13  now.

14         MR. RUSSELL:  But it is different because they

15  didn't overturn the conviction.

16         THE COURT:  Oh, okay.

17         MR. RUSSELL:  I am saying they it to an actual

18  hearing, they win the hearing --

19         THE COURT:  Okay, got you.

20         MR. RUSSELL:  -- the conviction is thrown out.  Now

21  granted, he might still be retried so that is another issue.

22  But let's assume he gets through all of that and he is

23  acquitted.  He no longer has that conviction, he definitely

24  can come back and ask for the new sentencing. So there still a

25  way that it come have been done.

1          THE COURT:  Okay, I am sorry, I didn't understand

2    what you were saying.

3          MR. RUSSELL:  Okay, I just wanted to make sure.

4    That still is a viable way of doing it.  Maybe that is the

5    best way but given the constraints of what they were working

6    on, which was a death penalty case, --

7          THE COURT:  Right.

8          MR. RUSSELL:  -- may be the only way to go about

9    doing it.  And we will never know because he didn't get the

10   death penalty.  So, they didn't need to then go back and __.

11         Again, we have not heard any testimony or anything

12   with regard to Appellate counsel being deficient for failing

13   to argue the 5-404(b) evidence that was kept out with regard

14   to DOC and potentially planting evidence.

15         To the extent that is still an issue, I would answer

16   the Petition, I think that it is covered there.

17         With regard to obviously cumulative effect, as I

18   argued in the petition, --- says, 20 times nothing still

19   equals nothing.  If you don't have prejudice in any of these

20   issues, adding them up doesn't get you any closer.

21         The jury in the end believed the physical evidence

22   that was there.  Nothing that we have seen in the last week

23   has changed any of that.  Not even combining all these issues

24   together, I don't believe, would change the fact the jury

25   believed that physical evidence was reliable and it

**App. 882**

1    demonstrated beyond a reasonable doubt that Mr. Stephens

2    committed the murder.

3           With regard to his right to testify, what was done

4    in open Court was not only sufficient, it wasn't even

5    necessary under case law but it was done and he waived the

6    opportunity to testify knowingly and intelligently.

7           Again, and I understand that the Court rejected my

8    consideration but I don't believe -- I believe what he says

9    was he would have testified one way or the other so I think

10   the Wicomico County part of it really should be discounted but

11   I understand that the Court didn't agree with that.

12           But what he testified to was he --

13           THE COURT:  I have already forgotten if I agreed or

14   disagreed with you.

15           MR. RUSSELL:  At the time, you disagreed in my

16   argument that because he didn't care he wanted to testify one

17   way or the other.

18           THE COURT:  Oh, okay.  Yes, I rejected that part.

19           MR. RUSSELL:  Okay.  But what he did testify to here

20   was that he said he wanted to testify but that his attorneys

21   made some great points when he talked to them.  So, he didn't

22   fight it.

23           And trial counsels certainly were not deficient in

24   advising him not to testify.  I think they would have been

25   deficient if they hadn't advised him not to testify in a case

**App. 883**

1   where he has a murder conviction that they trying to keep out

2   of the guilt phase.

3          Because as Mr. Proctor said, once they have heard

4   you are convicted of murder, it is over.  So, I think they

5   would be deficient if they hadn't done it.

6          And Mr. Proctor said they were all in locked steps

7   regarding his testimony.  And it was a big advantage for the

8   jury not to know what his conviction was for.

9          The idea that just because he was in a maximum-

10  security prison -- one of the inmates who testified was

11  serving a sentence on a violation of probation from a second-

12  degree assault.

13         That is not that bad and the chance of one and 12

14  people knowing that, that is -- hey I might know somebody who

15  has a second-degree assault.  They very well may not be

16  assuming you are a murderer just because you are in the

17  Maryland House of Corrections.  At minimum, they know maybe a

18  second-degree assault will get you there.

19         But beyond that, Mr. Lawlor talked about he would

20  try and keep out the conviction even if he wanted to testify.

21  How he would make the argument of prejudice.  Mr. Proctor

22  talked about how they would mock trial it if it was going to

23  happen.

24         None of those things happened.  And it didn't happen

25  because Mr. Stephens didn't say that he wanted to testify.

cch                                                                    169

1    They were in locked step as far as Mr. Proctor said they all

2    didn't understand that he didn't want to testify.

3         They advised him properly and he chose not to

4    testify.   That is effective representation.   That is what

5    lawyers are supposed to be doing.

6         With regard to this an ineffective assistance of

7    counsel claim, one of the things I would suggest the Court to

8    consider is, again, going back to Yoswick, in Yoswick, the

9    Court may remember is a case stands for the proposition that

10   defense attorney isn't deficient for failing to advise with

11   regard to parole eligibility.

12        But what is important from Yoswick is that the Court

13   is that Court of Appeals said when we talk about prejudice in

14   these cases, we are not talking about subjective prejudice, we

15   are not talking about whether you would have taken a plea,

16   Mr. Yoswick, we are talking about whether a reasonable person

17   in your position would have taken a plea.

18        And I would suggest that should be the same standard

19   here if we are talking about ineffective assistance of counsel

20   claim is not whether Mr. Stephens would have testified but

21   whether a reasonable person in Mr. Stephens situation would

22   have testified.

23        Now with regard to whether or not he is entitled to

24   a new sentencing based on the Wicomico County case?  And I

25   think the Court talked about Tucker, which is a 1972 case that

**App. 885**

1   the Petitioners had brought up.

2          In Tucker, it is very different than what we are

3   talking about here.

4          THE COURT:  I said I had to look at Tucker.

5          MR. RUSSELL:  Well, I just wanted to give the Court

6   a quick synopsis of what it is and why it is different than

7   what we are talking about.  Tucker is a case where a Federal

8   Judge specifically enumerated Mr. Tucker's, what he had been

9   convicted of his convictions at sentencing.

10         And he said well -- and then after that, two of

11  those cases were overturned based on Gideon.  Gideon being

12  used retroactively.  One of these cases went back to the '30s.

13  And he hadn't had counsel, he hadn't been advised that he

14  could have counsel.  So, Gideon hadn't been addressed in those

15  cases.  So, they were thrown out.

16         And the Court said, yes, in those situations you get

17  to come back and have a new sentencing.

18         And I would agree if that were the situation here

19  where the person couldn't be retried, the convictions have

20  been completely thrown out on constitutional grounds, and,

21  yes, he would be entitled to a new sentencing.

22         Gideon is an easier way to deal with it because you

23  can just look back at the records and see whether or not he

24  had an attorney.  It is a little bit more difficult to figure

25  out if somebody was going win a post-conviction on a compare

1   issue or on a Brady issue.

2           People have strong post-conviction issues all the

3   time.  I can say this from experience.  And you don't always

4   win.  There is more to it than simply you have something

5   there.  And in this case, again, I think it is just too far

6   for the Court to assume that he would have won that post-

7   conviction, therefore, he gets a new sentencing.

8           What we actually have is he still has the same

9   conviction.  The sentence has changed but the conviction is

10  still there.  There was never a point where this was

11  overturned, he didn't have this conviction but-for the five

12  minutes in the middle of that hearing where he hadn't yet

13  pled.

14           I do want to very quickly address the expert

15  witnesses.  Obviously, the gentleman who testified with regard

16  to the sound I don't would have been admissible or even a good

17  idea to put on even if he was admissible.

18           But this idea that Mr. Proctor, again, had five

19  years, researched an expert and then just forgot to follow up

20  with it.  Just doesn't seem plausible to me.  It is also

21  peculiar that Mr. Proctor and Mr. Lawlor filed a motion on

22  anything that happened, something happened they filed a

23  motion.  They filed a motion for every single thing they

24  possibly could but nobody filed a motion saying we wanted an

25  expert on this and OPD won't pay for it.

cch                                                                    172

1          That seems very peculiar to me because that seems

2    like something that they would have filed a motion about it.

3    Particular considering they filed a motion from the beginning

4    saying the OPD wouldn't pay for a certain -- they didn't have

5    enough resources based on what OPD was paying them.

6          I would again argue that neither of the experts

7    would have been admissible.  They weren't told that they

8    couldn't an expert, first of all.  As I said, with the Public

9    Defender Office, you have to be a little thrifty in the way

10   that you obtain experts.

11         But as Mr. Proctor said nobody had ever told him he

12   couldn't have any experts and that included the one he wanted

13   in this case, they just told him to see if you could get the

14   rate ---.

15         But even the expert that came in here from Seattle,

16   I don't think that there is any basis for his opinion and eve

17   if he had been able to go into the House of Corrections, he

18   would not have been able to go there while there still people

19   in it.

20         At that point, it was not being used as a facility

21   any more.  And there is an assumption that he wouldn't be

22   allowed in the first place but nonetheless he wouldn't have

23   ever been there the night of the murder and so there no basis

24   for his opinion.

25         He is not helpful to the trier of fact.  He

1   testifies specifically.  I said, you know, what you are saying

2   is that what is far away is hard to see, it is dark, it is

3   hard to see?  He said that when you drop the pen it is going

4   to hit the ground, it is obvious.

5        So, why is he testifying then?  He is admitting that

6   what he is saying is obvious to the jurors.  The jurors don't

7   need him.  And he is addressing the credibility of another

8   witness which he can't do.

9        Now what Mr. -- my notes say Lawlor but my

10  recollection was Mr. Proctor, so I apologize if I am getting

11  this wrong, said was you couldn't describe that environment

12  until you have been there.

13       And I would suggest that is why they use witnesses

14  instead of experts to describe the environment that night.  It

15  was more effective.  They got from a lot of witnesses

16  including State witness to describe the lighting and to

17  describe the sound.  And then they used that.

18       So, there is no prejudice.  It wouldn't have been

19  admitted in the first place, it added nothing to the jury's

20  understanding.  The jury already knew it is hard to see in the

21  dark and know it is hard to see it from far away.

22       And as I said it all goes to whether or not you

23  believe Mr. Freed, which I don't believe the jury did in the

24  end anyway.  So, I don't believe there is any prejudice there.

25       With regard to the sweat clothes that are in the

**App. 889**

1   cell in the picture, they had this picture, it assumes that

2   those are sweat clothes.  I mean obviously Mr. Stephens can

3   testify to that.  But it is not as if having another pair of

4   sweat clothes in your cell suddenly exonerates you from

5   committing this crime.

6          They didn't find the shank, but having a shank in

7   your cell, it doesn't have any blood on it wouldn't necessary

8   exonerate you either.

9          But, again, it goes back to prejudice, Your Honor,

10  it all goes back to prejudice, which is assuming that the jury

11  believed these eye witnesses, which in the end, I don't

12  believe they did.

13         With regard to as we made allusion to this earlier,

14  the failure to call on the phone, the medical examiner.  First

15  of all, there is quite the assumption that she would have

16  talked them.  I am not saying she wouldn't but I am saying

17  nobody ever actually asked her if she would have.

18         Mr. Trainor certainly seemed to think that she

19  would.  But I don't know if we actually know that answer.

20         But we heard her testimony, again, they had a

21  medical examiner to talk to.  They had her report, they had

22  the photographs, they gave it to their medical examiner, it is

23  really not anything more they need from her.  She couldn't say

24  how many weapons were used.  She wasn't allowed to.  They

25  didn't want her to.

1    And as to how many wounds were fatal or weren't,

2    they could have brought in their own expert but they consulted

3    with their expert, they decided that wasn't the way to go.

4    Because as I said, in the end, the theory is Mr. Stephens

5    didn't do it.  So, why present to the jury which wounds he did

6    and which wounds he didn't if theory is he didn't do it?

7    And in the end the jury found the physical evidence

8    in his cell to be convincing.  He found him to be the

9    principal in the first-degree based on the alleged blood on

10   his cell door, the blood on the bottom of his boots, the blood

11   on a wet tank top under his mattress, the blood on his boxers,

12   the apparatus that he had to open his cell door.

13   THE COURT:  You are now repeating yourself.

14   MR. RUSSELL:  I am. I apologize, Your Honor, this is

15   the end.  And that his neighbor could hear him opening and

16   closing the door.  His attorneys did as they said everything

17   they could.  They had already done three other death penalty

18   cases together.  They skipped family vacations, they paid

19   their own associates, they didn't bill for all their time,

20   they still bill for well over 2,000 hours of work.

21   They had experience, they put in the effort and in

22   the end, they won.  They kept someone who was already

23   convicted of a murder who has now been found guilty of killing

24   a correctional officer while serving that sentence from the

25   death penalty in front of a jury that was qualified to give

cch

176

1    them the death penalty.  That would have given to them.  That

2    is a huge win.

3         And as I said in the opening, I understand why

4    Mr. Stephens is here but he shouldn't be criticizing his

5    attorneys he should be thanking them.

6         This trial was fair.  Mr. Stephens received more

7    than adequate counsel.  He received superior counsel.  And

8    that is the only question for the Court.  This trial was fair,

9    the result was just.  It provided justice.  And we would ask

10   the Court to deny the Petition and allow that justice the

11   same.  Thank you.

12        THE COURT:  All right.  I will give you a few

13   minutes if it is true rebuttal.

14        MR. HUT:  Thank you, Your Honor.

15        THE COURT:  Please don't go over everything again.

16        MR. HUT:  I will take the Court's admonition to

17   heart.  With respect to the vulnerability of the Wicomico

18   County conviction to post-conviction relief and to attack to

19   which Mr. Russel made reference towards the end of his

20   argument.  I need not remind the Court that the evidence that

21   principally speaks to that vulnerability was provided by a

22   witness called by the State in this hearing, Mr. Todd.

23        THE COURT:  I think I remarked on that.

24        MR. HUT:  It was a case that was weak enough so that

25   there was a mistrial declared due to a hung jury the first

**App. 892**

1    time the case was tried in 1998.

2              And that mistrial was reached even though the false

3    or untruthful testimony from Mr. Kopera was before the jury in

4    that case.

5              There was much discussion by Mr. Russel about the

6    Rompilla v. Beard case.  And we --- have a different view of

7    that case.  To me Rompilla seems unmistakably to hold that

8    there is imposed upon counsel an obligation at least to try,

9    at least not to overlook obvious leads, obviously available

10   evidence but rather to shift carefully through that evidence

11   and to use that evidence to undertake reasonable

12   investigations that may come to your client's advantage.

13             On the basis of those investigations then, it may be

14   incumbent upon counsel in a post-conviction proceeding to seek

15   to knock that conviction out for all kinds of reasons.

16             For here because it stood as the principal

17   impediment to Mr. Stephens's right to take the stand and

18   testify in his own behalf.

19             But you have got to look, you have got to try, you

20   have got to investigate, you have got to follow where your

21   nose and the evidence leads you.

22             Now, whether it was Mr. Proctor who was told by the

23   MPD or the Salisbury Police Department about Officer Davis or

24   whether he learned it from me, really, I think does not

25   matter.  He had to ask and his failure to do was among the

1   many derelictions that able counsel, who tried hard, who had

2   massive tasks that they had to address failed simply to do to

3   his client's grave detriment.

4           There really is no serious jurisdictional issue I

5   submit, Your Honor.  On the facts here because on the facts

6   here, counsel undertook as part of their engagement in this

7   Court to undertake the necessary post-conviction investigation

8   in Wicomico County and they simply failed to do it.

9           So to further the Rompilla point, once your

10   investigation has taken you to a vulnerable conviction, then,

11   it seems to me you do have to get it overturned but I don't

12   that the Court need go further than that in this case --

13           THE COURT:  Get it overturned or it takes steps --

14           MR. HUT:  Well, even --

15           THE COURT:  -- to get to wherever you go?

16           MR. HUT:  At least get to the point we got in 2013.

17   But it may have been that prior to the prosecution here, that

18   might have been back to actually litigating the post-

19   conviction and retrying the case, which I think would have

20   been the result of the post-conviction.

21           We simply don't know and Mr. Russell was, I think it

22   pains to acknowledge as we do, there is much hypothesizing

23   that one has to do on various scenarios but it certainly could

24   have been the case that Mr. Stephens facing the prosecution

25   here would not have taken the plea that he ultimately did.

1   And would have gone to trial.

2              And the outcome of that I think it would have been a

3   clear case for acquittal.  I am not sure based on what we

4   would have told the Wicomico County prosecution that they

5   would have tried the case.

6              Mr. Todd says they would have, I think.  We simply

7   don't know.

8              THE COURT:  He said what all attorneys say.  I tried

9   but I thought what were better cases and lost and I tried what

10  I thought were weaker cases and won.  So, you try enough cases

11  and -- I still don't believe anybody who tells me they have

12  never lost a case.

13             MR. HUT:  I agree but to point also to bear in mind

14  the prejudice that were suffered with respect to the right to

15  testify --

16             THE COURT:  And you have gone over all that.  So,

17  you have gone over that in terms of the prejudice in

18  testifying prejudice at sentencing.

19             MR. HUT:  And prejudice with respect to having to

20  endure a trial with a death qualified jury where the jury that

21  knew about the imposition of a life plus 15-sentence.  Those

22  are reasons, those clear detriments to even getting to verdict

23  why the ABA guidelines should clearly apply in this case even

24  though viewed retrospectively we are no longer looking at a

25  capital conviction or in a capital case.

**App. 895**

1      I do want to say a word about Mr. Freed.  With

2  respect to Mr. Lawlor's failure to examine him on his

3  expectation, I think that was a clear deficiency in counsel's

4  performance.  Mr. Lawlor, himself, acknowledges that he lost

5  his legs.  He acknowledges that there was essentially no

6  downside in examining him about expectations of favorable

7  treatment in Hartford County.

8      The failure to lose the letter and to -- excuse me,

9  the letter in which Mr. Freed, himself, reminded Mr. Branum

10  that they had talked about assistance to Mr. Freed in Hartford

11  County I this is dramatic.

12      And with respect to the prejudice that Mr. Russel

13  seemed to denigrate.  He said, well, it would have just have

14  been a little more because there was already evidence about

15  benefits that Mr. Freed expected in his Federal case.

16      A little more benefit could have tipped one juror,

17  which was all it took, one of 12 jurors, who together

18  deliberated for six days.  We can't know whether the jury

19  believed Freed or not.

20      We do know that the prosecution so far from

21  regarding Jason Freed as damaged goods pitched their entire

22  closing argument to jury around the eyewitness testimony of

23  Jason Freed.

24      So far from using Mr. Freed to corroborate what they

25  said the physical evidence showed, Ms. Howell, did exactly the

1   opposite.  She started with Jason Freed and then she said

2   look, the physical evidence corroborates what Mr. Freed had to

3   say.

4          So, I think given that approach, any upside that

5   might have been achieved with Mr. Freed was a failure to try

6   to achieve some upside was deficient conduct and plainly

7   prejudicial.

8          He was not so damaged goods that the State did not

9   call him.  And he was not such damaged goods that the State

10  did not pitch their case around him.

11         I am not going to spend much time on the stipulation

12  except to remind the Court that the -- you don't again need

13  under --- and similar cases a lot of prejudice with respect to

14  any one dereliction.  They are to be viewed cumulatively and I

15  don't think we can say that the jury paid no attention to it

16  because after all they sent no note.

17         Indeed, the absence of a note is part of the

18  problem.  Had they asked about, there may have been an

19  opportunity to cure the harm that we submit it caused.  But

20  they didn't and so, again, we can only speculate on what they

21  might or might not have done.  But I think that speculation

22  inevitably takes -- should take you, respectfully, Your Honor,

23  to the conclusion that this may have cumulatively added to the

24  conviction that there is a substantial or significant

25  possibility of a different outcome in this case.

**App. 897**

1         Mr. Russell mentioned in passing the piece of

2    evidence in the trial about which much has been made, which

3    was that there was blood on the inside of Mr. Stephens's cell

4    door.  No stop --- say, wait a minute that matter, which was

5    there was testimony here and at trial some people thought was

6    blood was never tested.

7         That was a critical failure by the State to be sure

8    counsel did make note of that.  Took note of it.  Did make

9    something of it in closing argument.  But with respect to the

10   strength of the case there, please don't be under any

11   misconception about the so-called blood.  We don't know

12   whether it was blood or not.

13       With respect to the medical examiner, Dr. Vincenti,

14   I want to try to clarify two things.  The question about

15   whether there were two weapons is not an issue that goes to

16   causation in the case.

17       The question of whether two weapons was, I believe,

18   a failure by counsel or involves a failure by counsel having

19   kept the two-weapon testimony out of the case.  Then to sit

20   idlily by during the closing argument when Ms. Howell said two

21   weapons in this case, two assailants.  That should have been

22   objected and at a minimum should have been stricken and the

23   jury admonished not to give it any heat.

24       The causation argument goes to the --- of at most

25   one, I am sorry, at most two and all likelihood according to

1   Dr. Spitz one of the wounds.

2          And the failure on the basis of that essentially

3   uncontrovertibly medical fact to develop that through

4   Dr. Vincenti and on the basis of the facts developed or

5   through an independent expert and on that basis then to seek

6   an instruction on causation.

7          Mr. Russell confesses his disbelief about

8   Mr. Proctor's testimony that he never asked her and

9   essentially, I believe that she was off limits and dropped the

10  ball on score.

11         I really don't understand the basis for that

12  disbelief.  Mr. Proctor and Mr. Lawlor both were at pains to

13  underscore for the Court just how overwhelm they were.

14         The fact that this was a capital case imposed two or

15  three times the burden normally imposed on counsel in a

16  homicide prosecution because of the need to address sentencing

17  at the same as they had to address guilt and innocence;

18  because of the need to find mitigation evidence because of the

19  need to consult with social workers and psychiatrist and all

20  of the things that Mr. Russell correctly identifies to the

21  Court as having been accomplished by these lawyers are the

22  very things that took them off of, forced them to take their

23  eyes off of the main chance.

24         The main chance here was causation. The main chance

25  was making sure that Lee Stephens had an opportunity to sit

1  and look the jury in the eye as Ms. Gostin said on incumbered

2  by the faulty -- the constitutionally faulty conviction in

3  Wicomico County and to make the jury find as an alternative

4  argument that he or the second person didn't wheel the lethal

5  blow that killed David McGuinn.

6          He had that right, and he didn't get it through his

7  counsel who were as they said overwhelmed.

8          Mr. Russell told you that while he essentially

9  concedes that those -- that the arguments that is to say

10  Mr. Stephens wasn't out on the tier that night, but the second

11  person whoever it was didn't kill David McGuinn in any event.

12  But those two while not impermissibly inconsistent, well, he

13  said it wouldn't have been idea.

14          I think it would have been a fine idea.  But the

15  problem he has and I think the reason why we are entitled to

16  relief is that neither Michael Lawlor nor Gary Proctor nor

17  those fine men together put their heads together and said,

18  whom, let's see we have got causation related facts and we

19  have got causation related law and we could argue the absence

20  of it.  Is it a good idea?  They didn't do that.

21          They simply failed to either investigate the law and

22  so appreciate the facts or investigate the facts and so

23  developed the law.  And in that respect they rendered an

24  effective assistance of counsel to Mr. Stephens.

25          Mr. Russell, mentioned as Mr. Ash had mentioned this

1   morning, --

2           THE COURT:  Would you give me one minute?

3           MR. HUT:  Sure.

4           THE COURT:  I have to address some family law

5   emergencies soon.  I am going to let you finish and then I

6   have to break for the day and deal with that.

7           (Pause.)

8           THE COURT:  All right, go ahead.

9           MR. HUT:  Thank you, Your Honor.  Mr. Ash this

10  morning and Mr. Russell during his closing mentioned the

11  availability of an aiding and abetting defense and suggested

12  that because that would have been available had causation been

13  preserved and argued that that undercuts any ability we may

14  have to show prejudice.

15          I think and I commend the Court to the Hardy v.

16  Chappell cases, one Ms. Gostin mentioned this morning.  It is

17  a Ninth Circuit case the other she also alluded is a

18  California Supreme Court case.

19          That case is quite similar to this in a number of

20  respects.  But one respect is that the same argument was made.

21  Well, counsel was derelict in their inability or failure to

22  focus the jury on the real killer.

23          But, nonetheless, the argument was made by the State

24  of California you can go ahead and preserve the conviction

25  because the evidence could have supported convictions on a

cch

1    conspiracy or an aiding and abetting theory.

2           Conspiracy and aiding and abetting in that case were

3    both charged to the jury and so that is one crucial respect in

4    which our case differs, aiding and abetting was not charged.

5           Conspiracy was charged here as in Hardy, but in

6    Hardy, the jury actually returned a guilty verdict on

7    conspiracy and the Court held no that is not enough and the

8    availability of aiding and abetting is not enough.  The whole

9    central point of the way the State argued the case was on the

10   premise that Mr. Hardy was the killer.

11          And so to conclude that the jury might have returned

12   a verdict of guilty on aiding and abetting is simply

13   speculation which at this point in the proceedings we cannot

14   indulge it.  I commend that to the Court.

15          Mr. Russell also had a number of comments about the

16   causation instruction that we maintained counsel needed to

17   have sought and should have sought.

18          He said that the jury didn't have the issue of

19   causation.  Well, we agree it didn't have the issue of

20   causation that is precisely the problem.  The issue was not

21   drawn to its attention.

22          The instruction that we think was proper, which is

23   framed in Defendant's Exhibit BB, I believe and commend to the

24   Court is a precisely correct statement of the law and I did

25   not hear Mr. Russell disagree with that.

cch                                                                    187

1           It was warranted by the evidence and I am firmly

2   convinced even though he is not, but I think you heard

3   Mr. Trainor who is more experienced, I suspect, than either of

4   us in capital matters, certainly much more than I, say that

5   the instruction would and should have be given if the evidence

6   generated its utility.  I think in a capital case, there is no

7   doubt that it would have been given by the able trial Judge.

8           Mr. Russell took some issue with some of the case

9   law that we supplied to you, Your Honor, that would support,

10  we believe, that does support that instruction.  Before I get

11  to the cases, I remind the Court that instruction as to the

12  meaning of substantial factor is base in substantial part on

13  Professor LaFave's Treatise.  And LaFave's Treatise is called

14  out not only as support in Maryland Pattern Jury Instruction

15  417, but I believe throughout the criminal law pattern jury

16  instructions.

17          The case law for Maryland and elsewhere that we

18  cite, which explain the concept of substantial concept of

19  substantial factor comes from the restatement on torts and the

20  case is recognized that the substantial factor concept has

21  been taken from the tort area and applied or made applicable

22  in the criminal lawyer area.

23          So, those cases I believe and respectfully submit

24  are directly on point that is a correct statement of the law

25  and I believe we would have gotten the instructions.

**App. 903**

cch

1            Mr. Russell also asserted at the outset of his

2    argument that there was a waiver issue at least with respect

3    to Mr. Stephens's claim that he was deprived as a result of

4    the Kopera's ballistics deception and --

5            THE COURT:  I think I have already orally rejected

6    that.

7            MR. HUT:  All right.  Then I will --

8            THE COURT:  I don't see how you get -- it wasn't

9    something that even could been raised on direct appeal.  It

10   was no record developed that would have allowed you to raise

11   that so --

12           MR. HUT:  Couldn't have been knowing and intelligent

13   because nobody knew anything about those facts.

14           THE COURT:  Again, I think you -- if he had

15   testified, purely, hypothetically, I really want to testify

16   but I can't because of this conviction and I have not been

17   able to get it aside and I wish it was set aside, something

18   like that, and then never raised it again on appeal then maybe

19   you could make that argument.  But we don't have anything like

20   that.

21           MR. HUT:  Well, I certainly don't to preach to the

22   choir, Your Honor, so let me --

23           THE COURT:  No, I just don't see any -- it is not

24   something that could have ever been raised and wasn't, which

25   is essentially the waiver.  You didn't see Mr. Russell's face

**App. 904**

cch                                                                      189

1    but the wheels were certainly turning a lot when he was

2    challenged on the waiver issue and then I think he moved

3    along.  So, good try but I don't think it goes anywhere.  All

4    right, anything else?

5             MR. HUT:  I think not, Your Honor, that concludes

6    the -- thank you so much.

7             THE COURT:  The Clerk would like to know if the

8    exhibits should be returned?  I don't have any problems

9    returning the exhibits and I do have a courtesy copy of the

10   compilation case law but I only have the one copy, which was

11   file of the PowerPoint so if you don't want the hardcopy

12   returned, I will just keep it, if you don't mind that.

13            But everything else, I mean, Madam Clerk has scanned

14   everything in.  So, we normally give all of our copies back

15   once everything is scanned in.

16            MR. HUT:  I will be happy to take them back and

17   unclutter Madam Clerk's desk.

18            THE COURT:  Yes, that is what we do.  Once it is in,

19   I have a record now.  We used to have a vault downstairs and

20   in the vault were -- you know, you had to get marijuana from

21   cases 15 years ago, we don't have anything like that anymore.

22   Oh, we still do.

23            MR. RUSSELL:  Yes, I have been in the vault, there

24   is a lot of stuff in there.

25            MR. HUT:  How about the transcript, Your Honor, we

**App. 905**

1 would be happy to give you a courtesy copy of that unless

2 someone else wants to take it home.

3          THE COURT:  I don't think I need it.  It is all

4 scanned in.  I am looking at my Clerk.  I don't think I need

5 it.

6          MS. GOSTIN:  We would be happy to do whatever Your

7 Honor would prefer.

8          THE COURT:  No, I have got everything scanned now.

9 Yes, the attorneys the other day were arguing that one side

10 was arguing in Anne Arundel County is so parochial and

11 backwards that we don't really need to have the $500/$600 an

12 hour attorneys coming over from Montgomery County and

13 Baltimore City to try cases here.  And the other attorney

14 said, oh, my God, you are in the most sophisticated Court in

15 the State, just look at your index system.  And it is not like

16 you have got --- attorneys coming in at $1,100/$1,200 an hour.

17 --- talking to commercial litigation, they weren't talking

18 about doing Governmental relations.

19          All right.  You are going to get a written opinion.

20 I am not going to give you an opinion today.  It is going to

21 take me a little while to work through everything.  You can

22 have the transcript back.  When my Clerk has it done, it will

23 be electronically filed.

24          If I have at least two attorneys emails, two,

25 then -- do you want more than two?  Two attorneys' emails,

cch                                                                   191

1    then my Clerk will send an email to the State and the defense

2    with a courtesy copy of the opinion.  However, for any

3    Appellate purposes, it is when the official docketing is done

4    in the --- system.  So, if you get a courtesy copy, that is

5    not docketing, alright?

6              And I will let whoever once to be the one on the

7    defense side to disseminate it/Petitioner.  Okay?  Officers,

8    you can bring him back.  Okay?  You can take Mr. Stephens back,

9    thank you for your courtesy in bringing him over here.  I

10   appreciate that.  Deputy, if you could call down and let them

11   know.

12             Mr. Hut, --

13             MR. HUT:  Yes, sir.

14             THE COURT:  You or Ms. Gostin, I think last time

15   there was an issue where -- did you go down and to them or am

16   I confusing it with another case.

17             MR. HUT:  No, you got that right and I just made the

18   request to do so.  And I believe that the officers are

19   agreeable to that.

20             THE COURT:  Deputy, last time, they weren't sure if

21   two or three attorneys were allowed in the room.  Can you tell

22   me how many were allowed in?

23             MR. EAGLES:  It has been no problem, we have gone

24   in.

25             MR. HUT:  It can be three and actually even more.

1    Not everybody gets a seat but everybody can be in the room.

2            THE COURT:  Well, if you can call down, tell them to

3    put them in.  What do you want A or B?  Whatever room you

4    pick, okay?  What room you pick, he can be put in that room.

5    And then, officers, you will do whatever you need to do,

6    security wise, once he is downstairs.  I don't know if you

7    change the security protocols for the handcuffs, okay?

8            All right, Mr. Stephens you can go with the

9    correctional officers.  All right.  And exhibits can be

10   returned.  Counsel, it is going to take you a few minute to

11   clean your exhibit up, so, I would prefer for Madam Clerk that

12   you did have them cleaned up before you go downstairs, okay?

13           MR. HUT:  We will do that.

14           THE COURT:  All right, so come get your exhibits,

15   sign for them.  All right, Court is in recess.

16           THE CLERK:  All rise.

17           (Whereupon, at 3:45 p.m., the hearing was

18   adjourned.)

19

20

21

22

23

24

25

**App. 908**

cch

## CERTIFICATE OF TRANSCRIBER

I hereby certify that the proceedings in the matter of State of Maryland v. Lee Edward Stephens, Criminal No. 02-K-08-000646, heard in the Circuit Court for Anne Arundel County, Maryland, on April 26, 2017, were recorded by means of digital recording.

I further certify that, to the best of my knowledge and belief, page numbers 1 through 192 constitutes a complete and accurate transcript of the proceedings as transcribed by me.

I further certify that I am neither a relative to nor an employee of any attorney or party herein, and that I have no interest in the outcome of this case.

In the witness whereof, I have affixed my signature this 12th day of June 2017.

_Cora C. Holliday_
Cora C. Holliday
Transcriber