## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LEE E. STEPHENS, JR.,                    *

Petitioner                               *

v                                        *        Civil Action No. RDB-18-493

STEPHEN T. MOYER,                        *
DAYENA M. CORCORAN,
TERRY ROYAL,                             *
MIKE CARPENTER, and
THE ATTORNEY GENERAL OF THE              *
STATE OF MARYLAND
                                         *
Respondents

                                     ***

## MEMORANDUM OPINION

Petitioner Lee E. Stephens, Jr., who is represented by counsel, filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his 2012 conviction for first degree murder in the Circuit Court for Anne Arundel County, Maryland.  ECF No. 1.  Respondents filed an Answer asserting that Stephens's claims do not merit federal habeas relief under the applicable standards.  ECF No. 15.  Stephens filed a Reply disputing Respondents' assertion.  ECF No. 20.

No hearing is necessary to resolve the matters pending before this Court.[1]  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016);  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons stated below, the Petition for Writ of Habeas Corpus shall be denied and a certificate of appealability shall not issue.

### Background

### I.      Wicomico County Conviction

---

[1] As such, Stephens's request for oral argument (ECF No. 21), which Respondents opposed (ECF No. 23), is denied.

In 1999, a jury sitting in the Circuit Court for Wicomico County, Maryland found Stephens guilty of felonious homicide, first-degree assault, use of a handgun in the commission of a felony, and carrying a handgun.  *See Stephens v. State*, No. 1639, Sept. Term 1999, Slip Op. at 1 (Md. Ct. Spec. App. Aug. 11, 2000), ECF No. 15-1 at 106.  At the trial in that case,[2]

> Officer Mark White of the Salisbury City Police Department testified that, on April 19, 1997, he received a call at 3:37 a.m. to respond to an incident at a nightclub known as "the Pit."  Upon arriving at the Pit, Officer White saw Duane Holbrook on the ground with two gunshot wounds to his chest.  Officer Jason Yankalunas and Detective Todd McGill also arrived at the scene and noticed bullet casings from 9mm, .380 caliber, and .45 caliber firearms.

> Opal Camper testified that she was at the Pit during the early hours of April 19, 1997, and, as she left the establishment, she saw Lamont Mitchell, a/k/a Lance, and Carlos Mills a/k/a Stuff, involved in a confrontation with a man named Lance Martin.  Camper was with Holbrook and told him to "come on," but he refused to leave the Pit.  Camper moved away from the group and then heard a single gunshot, which prompted her to run behind the Pit.  Camper then heard several more shots and, when she returned to the front of the Pit, she saw Holbrook on the ground.  According to Camper, before Holbrook was shot, she was dancing with Stephens in the Pit and Holbrook tried to pull her away from Stephens.

> At a pretrial investigation, Jovonne Chandler stated that she was at the Pit until approximately 3:30 a.m. on April 19, 1997.  Chandler stated that she went into the parking lot, where she observed a group of men from Salisbury's East Side arguing with men from Salisbury's West Side, with whom Holbrook was affiliated.  Chandler noticed that Holbrook was getting ready to fight someone, but she did not know who the other person was.  On her way to her car, she saw a man named "Alpo" retrieve a small handgun from a car that was parked near hers and hand the gun to Stephens, who then walked towards the confrontation between the two groups.  Chandler continued to walk to her car, when less than a minute later, she heard numerous gunshots from different guns.  She jumped into her car and drove to the Super Giant, where she placed a 911 call.  Upon returning to the Pit, she saw Holbrook lying on the ground with a group of people standing over him.

> Nearly four months later, on August 12, 1997, Lieutenant Elmer Davis was on street patrol with Officer Jay Klaverweiden, when he saw Stephens on the street.  Lieutenant Davis saw Stephens place something in his pants, and then run away

---

[2] Stephens does not challenge his 1999 conviction in this Petition.  Therefore, the Court adopts the facts as summarized by the Court of Special Appeals of Maryland when it affirmed Stephens's 1999 conviction on direct appeal.

when he saw Lt. Davis looking at him.[3]   After a brief footchase, Ofc. Klaverweiden caught Stephens and then searched the area that Stephens had run through.  Soon thereafter, Ofc. Klaverweiden said, "Look what I found," to which Stephens responded with his back facing Ofc. Klaverweiden, "It's not my gun."

*Id.* at 106-08.

According to Stephens's own appellate brief on direct appeal, the State's evidence also revealed the following:

Kenny Cox was an inmate at the Wicomico County Detention Center in September and October of 1997.  During that time period he was the cellmate of the Appellant. Appellant told him that he was at the Pit the night of the shooting, and that he was shooting his gun in the direction of the victim.  Prior to the shooting he had seen Appellant with a black .380 Berretta with a brown handle.  He identified the gun seized by Lt. Davis as the gun he seen [sic] in the possession of Appellant. Appellant told him how they got the gun from him when he ran and that he through [sic] the gun near a fence.  That gun was the same gun from the shooting.  On cross-examination he admitted that the Appellant and he did not get along.  Earlier he told an investigator from the Public Defender that he didn't know anything about the case.

Joseph Kopera, a ballistics expert, determined that the .380 cartridges from the scene and the .380 spent bullet from the Medical Examiner were matched to the weapon seized by Lt. Davis.

Stephens's Appellate Brief, ECF No. 15-1 at 98.

After a jury found Stephens guilty of the murder of Holbrook, the circuit court sentenced Stephens to life imprisonment for homicide and 15 years for use of a handgun in the commission of a felony, to run consecutively.  *Id.* at 108.  For sentencing purposes, the court merged the charges of first-degree assault and carrying a handgun.  *Id.*

In 2006, while Stephens was serving his life sentence at the Maryland House of Corrections ("MHC") for the 1999 conviction, he and another inmate, Lamar Harris, were charged with first-degree murder and conspiracy to commit murder of Correctional Officer David McGuinn.  *See*

---

[3] Officer Davis did not write a report to that effect until later, at a date uncertain.  June 28, 1999 Trial Transcript, ECF No. 2-5 at 98.

Anne Arundel Cty. Case Summary, ECF No. 15-1 at 3.  The charges were severed and proceedings in Harris's case were stalled due to issues arising out of Harris's court-ordered competency evaluation.  *See Harris v. State*, 22 A.3d 886 (Md. 2011).  Stephens was subsequently determined to be entitled to representation by the Office of Public Defender, and his case was assigned to panel attorneys Gary E. Proctor and Michael E. Lawlor.  ECF No. 15-1 at 3.  On August 12, 2008, the State noted its intent to seek the death penalty.  *Id.* at 7.

In August 2009, Proctor and Lawlor filed a petition for postconviction relief from Stephens's 1999 conviction in the Circuit Court for Wicomico County.  Wicomico County Case Summary, ECF No. 2-5 at 257.  Counsel argued, in part, that Stephens's conviction was unconstitutional because Kopera, the State's witness who testified at trial that he had a mechanical engineering degree from the University of Maryland and an engineering degree from the Rochester Institute of Technology, had falsified his credentials.[4]  Wicomico Cty. Postconviction Petition, ECF No. 2-5 at 220-21; June 29, 1999 Trial Transcript, ECF No. 2-5 at 120.  Thereafter, Proctor and Lawlor focused on Stephens's pending capital case in Anne Arundel County, and a new attorney took over Stephens's postconviction case in Wicomico County.  Anne Arundel Cty. Postconviction Transcript, ECF No. 2 at 424-25.

During the postconviction proceedings in Wicomico County, Assistant State's Attorney Joel Todd testified that he worked with Stephens's new postconviction counsel to obtain the internal files for Officer Davis, which were never provided to defense counsel during trial.  Wicomico Cty. Postconviction Transcript, ECF No. 2 at 646.  Todd agreed that those files were

---

[4] Kopera, who testified as an expert in hundreds of criminal trials in and around Maryland, was discovered to have falsified his educational credentials.  *See Kulbicki v. State*, 53 A.3d 361, 371 (Md. App. 2012) (noting that parties stipulated that Kopera had lied about his credentials as he had not earned degrees in engineering as he alleged and had never been accepted to University of Maryland or Rochester Institute of Technology), *rev'd*, 99 A.3d 730 (Md. 2014), *cert. granted, judgment rev'd*, 577 U.S. 1 (2015), and *aff'd*, 128 A.3d 29 (Md. 2015).  After his fraud was discovered, Kopera committed suicide.  *Id.* at n.9.

material and disclosable under *Brady v. Maryland*, 373 U.S. 83 (1963), and contained a "substantial amount of derogatory material about Officer Davis [that] could have been used at trial to cast doubt on his credibility." *Id.* at 647.  Todd also acknowledged that "Mr. Davis was an important witness—impeaching Mr. Davis would have been very important for the Defense in the case concededly." *Id.*

Furthermore, Todd explained that when Kopera's false credentials were raised in Stephens's Wicomico postconviction petition, he decided to have the ballistics evidence retested. *Id.* at 617.  Torin Suber, an examiner for the State of Maryland, analyzed the same casings using the same method as Kopera and concluded, unlike Kopera, that two of the six .380 casings were fired from a different gun.  Laboratory Report, ECF No. 2-5 at 249-50.

In July 2013, the Wicomico postconviction court found that "there exists grounds to grant Post Conviction Relief for a new trial."  ECF No. 2-5 at 265.  The parties reached a plea agreement wherein Stephens knowingly and voluntarily waived a jury trial in exchange for a sentence of time served, and the State agreed to a vacatur of the Wicomico County convictions and sentences in exchange for an *Alford* guilty plea[5] as to the first-degree murder charge and a nolle pros of the remaining charges.  *Id.* at 265-66.

## II.    Anne Arundel County Trial and Conviction

As previously stated, in 2006, while Stephens was serving his life sentence at MHC for the Wicomico County conviction, he was charged in the Circuit Court for Anne Arundel County with first-degree murder and conspiracy to commit the murder of Correctional Officer David McGuinn.

---

[5] The plea permits a criminal defendant to enter the equivalent of a guilty plea by admitting there is enough evidence to convict him at trial, while maintaining his innocence.  *See North Carolina v. Alford*, 400 U.S. 25 (1970).

ECF No. 15-1 at 3.  Stephens was tried by a jury in February of 2012.  The facts underlying the

crime were recounted by the Court of Special Appeals of Maryland as follows:[6]

> In July of 2006, Corporal David McGuinn was employed by the Department of
> Corrections ("DOC") as a correctional officer ("CO").  He had held that position
> for approximately 18 months, during which he was assigned to MHC.  Cpl.
> McGuinn quickly earned a reputation as a CO who was "by the book."  Inmates
> and other COs described him as strict, but fair.  They nicknamed him "Homeland
> Security" or "Homeland" for short.
>
> At that time, the appellant was incarcerated at MHC.  He was housed in Cell 38 on
> the E4 tier in the West Wing of MHC.  The West Wing housed inmates on the
> second, third, and fourth floors.  The first floor, at ground level, was the segregation
> unit or "lock-up."  Each housing tier on the West Wing had an "E" side and an "F"
> side.  E4 was the "E" side of the fourth tier.  It housed up to 49 inmates in adjacent,
> single-occupant cells running in a straight line.  The cells were numbered 1 through
> 49.  Harris, who, as mentioned, also was charged with Cpl. McGuinn's murder, was
> housed in Cell 32.
>
> Each cell on E4 was approximately 40 square feet in size and was enclosed on three
> sides with concrete walls and on the fourth side with steel bars, a portion of which
> formed a sliding door.  Each cell contained a single bed attached to a side wall, a
> toilet and desk attached to the opposite wall, a sink attached to the back wall, and a
> fluorescent ceiling light.
>
> A walkway approximately four feet wide ran adjacent to the fronts of the cells.
> Beyond the walkway was a steel railing ending about halfway up the height of the
> tier and, beyond the railing, a floor to ceiling mesh fence.  Beyond the mesh fence
> was a straight drop down to the ground level, known as the "flats."  The walkway
> could be accessed at entrances at the "front end" by Cell 1 and at the "back end" by
> Cell 49.  The entrances had locking steel grilles.
>
> During much of the day, the cells on E4 were unlocked and inmates were allowed
> freedom of movement within the tier.  During the four daily institutional count
> times, however, the inmates had to "lock in" to be counted.  They also were
> supposed to be locked in overnight, from the 10 p.m. count until the morning count.
>
> When locked, each cell was designed to be controlled by an electronic switch on a
> control panel located outside the tier.  The control panel had lights indicating
> whether the cell was locked.  When the light was green, it was supposed to mean
> that the cell door was fully locked.  By flipping a switch on the control panel, a CO
> could unlock the cell, causing the sliding door to pop open slightly.  The inmate or
> a CO then could manually open the door the rest of the way.

---

[6] The Court adopts the facts as summarized by the Court of Special Appeals of Maryland when it
affirmed Stephens's conviction on direct appeal.

In reality, however, many of the cell doors on the tiers in the West Wing, including E4, easily could be jammed by inmates to prevent the locking mechanism from functioning properly.[7] The inmates fashioned what were known as "keys" out of the handle ends of disposable razor blades or cardboard. A "key" could be inserted into the locking mechanism of the cell door from the inside while the cell was unlocked. When the door was manually closed at lock-in times, it would appear to be securely locked and would trigger the green light on the control panel. The key prevented the lock from fully engaging, however, which meant the inmate could open the door from the inside of his cell after lock-in.

On July 25, 2006, Cpl. McGuinn was working the 4 p.m. to midnight shift and was assigned to the E4 tier. At 10 p.m., the traffic officer called out over the radio, "it's count time." Cpl. McGuinn entered the front end of the walkway on E4, next to Cell 1, and began checking each cell to make sure the inmate assigned to the cell was present. He also checked that the cell door was locked by pulling against it. Cpl. McGuinn was wearing a dress uniform, with long sleeves and pants, work boots, and a "shank-proof vest" that covered his chest and back.

After Cpl. McGuinn passed Cell 32, where Harris was housed, but before he reached Cell 44, where an inmate by the name of Cornelius Christy was housed, he was attacked. Other inmates on the tier described seeing two inmates hitting Cpl. McGuinn, one from the front and one from the back. Cpl. McGuinn ran back and forth along the back end of the tier, trying to escape his attackers. Eventually, he managed to get to the front end of the tier, unlock the door, escape through the grille door, and stumble down the staircase. He called for help over his radio.

Officers throughout MHC reported hearing a very faint, barely audible radio call shortly after 10 p.m. of "help me, help me." Officers came running from all directions. Sergeant Sharon James and Sergeant Gerald Lane were the first to encounter Cpl. McGuinn. He was standing on the landing at the bottom of the West Wing. He appeared calm, but was covered in blood. He was holding his hand to the right side of his neck. He could not speak.

Sgts. James and Lane grabbed Cpl. McGuinn under his arms and carried him to the infirmary. Glenn Palmer, a CO assigned to the infirmary, called 911. The two nurses on duty in the infirmary placed Cpl. McGuinn on a stretcher, cut off his clothes, and tried to stanch the bleeding. They observed multiple stab wounds to Cpl. McGuinn's upper back, the right side of his neck, his right and left chest above the clavicle, and his lower back. He was bleeding profusely, particularly from his neck wound. The nurses attempted to start an intravenous line, but Cpl. McGuinn's veins were collapsed due to massive blood loss.

---

[7] In his Petition, Stephens points to testimony that 20 of the 49 cell doors on the tier had locks that inmates could so rig. ECF No. 1 at 23 (citing Jan. 17, 2012 Trial Transcript, ECF No. 1-2 at 53).

Paramedics from the Anne Arundel County Fire Department responded to MHC. At 10:38 p.m., Cpl. McGuinn was transported by ambulance to the Baltimore-Washington Medical Center. He arrived at the hospital at 10:53 p.m. He was pronounced dead less than twenty minutes later.

Meanwhile, at MHC, the correctional staff was trying to secure the prison and determine who had stabbed Cpl. McGuinn. CO James Lampson was the first to respond to E4. He discovered the grille door at the front end of the tier sitting open. He did not see any inmates out on the walkway. He stayed at the door and awaited further instruction.

Lieutenant James Mayfield, the officer in charge of the entire prison during the 4:00 p.m. to midnight shift, arrived shortly thereafter. He instructed CO Lampson to monitor E4 from outside the grille door and to make sure no one entered or exited the tier without permission. He instructed CO Amanda Rushton to retrieve a Polaroid camera and begin photographing the scene. She took fifty photographs, all of which were introduced into evidence at trial. She began in the infirmary and worked her way up to the E4 tier, where she photographed large quantities of blood along the walkway, particularly in the vicinity of Cells 40 through 46. In that area, the walkway was covered with blood and was smeared. Partial boot prints were visible. In contrast, the blood closer to the front of the tier was a trail of droplets.

At the same time, Lt. Mayfield along with Sergeant Howard Barksdale and multiple other COs, including Palmer, Nickea Johnson, and Robin Collick, entered the tier. Sgt. Barksdale followed the blood trail along the walkway, pulling up inmate's "curtains" [DOC-issued wool blankets hung by inmates] as he walked. When he reached Cell 32, where Harris was housed, he saw a "blue piece of razor handle" lying on the walkway outside the cell and heard "a whole lot of flushing" inside the cell. He pulled the curtain up and saw Harris washing "bloody clothes" in his toilet. He ordered Harris to hold out his hands to be cuffed. Harris complied. Harris was wearing a white T-shirt and gray sweatpants. There was what appeared to be blood visible on his shirt and socks. Sgt. Barksdale escorted him off the tier and down to Center Hall, which was the central administrative area at MHC. Sgt. Rodney Sampson searched Harris's cell and placed the items he collected, including a pair of tennis shoes, a sweatshirt, sweatpants, and a T-shirt, into a clean, unused trash bag also taken from Harris's cell. All of the items were wet. Sgt. Sampson took the trash bag to Center Hall and waited there with it.

Lt. Mayfield also traversed the walkway, "[l]ooking for signs of a struggle." He noticed a bloody yellow apron on the walkway in the vicinity of Cell 44, which, as mentioned, was Christy's cell. He pulled back the curtain and observed Christy, who was "quiet" and appeared "[k]ind of [shaken] up." He cuffed Christy, took him to Center Hall and spoke to him briefly.

Based upon his conversation with Christy, Lt. Mayfield came to believe that Cpl. McGuinn may have been attacked by two inmates. He returned to E4. As he

walked along the tier, he observed what appeared to be blood on the door of Cell 38, which, as mentioned, was the appellant's cell. The blood was on "the front of the grill that hits up against the part where it locks." He pulled up the appellant's curtain and observed the appellant lying in bed. Lt. Mayfield ordered the appellant removed from his cell and taken to Center Hall.

CO Palmer searched the appellant's cell while CO Johnson and Lt. Mayfield watched. CO Palmer lifted up the appellant's mattress and found a "wet[,] balled up" white sleeveless T-shirt with what was suspected to be blood on it. A pair of tan colored state-issued work boots were found sitting underneath the appellant's sink with what appeared to be blood on the toes, insteps, outsteps, and in the treads on the soles. CO Palmer placed these items in a mesh laundry bag taken from the appellant's cell, along with a roll of toilet paper that also appeared to have blood on it. CO Johnson took the laundry bag downstairs to Center Hall and turned it over to Sgt. Sampson, who maintained control of the evidence until he turned it over to crime scene technicians ("CST") with the Maryland State Police ("MSP").

Around 1:00 a.m., MSP investigators and investigators from the Internal Investigative Unit ("IIU") of the Department of Public Safety and Correctional Services ("DPSCS") arrived at MHC. After being briefed, officers with both divisions began conducting interviews, taking photographs, and searching the E4 tier.

Katherine Amspacker, a CST with the MSP, was briefed by MHC administrators and then proceeded to photograph blood on the E4 walkway, the railings, clothing and other items hanging over the railing, and cell doors. She unsuccessfully attempted to collect fingerprints from both the railing and cell doors.

One MSP investigator, Sergeant Michael Grant, initially responded to the E4 tier around 5:00 a.m. He was directed to search a "pipe chase" that ran behind the cells between the E and F sides of the fourth tier. The pipe chase was sometimes a repository for contraband, as inmates could push small items through a plumbing access grate on the back wall of each cell. On the catwalk in the pipe chase, Sgt. Grant discovered a homemade shank around the area of the back of Cell 24 or 25. It had a "small red stain" on it. While photographing it, he accidentally kicked it off the catwalk and it fell down to the ground level. A CO took him downstairs to find it inside a utility area. The lighting in that area was very poor, however, and Sgt. Grant decided to return to photograph and collect the shank after he had completed his other investigatory responsibilities. He was advised that the area would be locked until he could return.

After 6:00 a.m., Sgt. Grant went to Central Hall to assist in photographing inmates from E4, beginning with Christy, the appellant, and Harris. CST Amspacker also was present. The appellant was wearing a pair of pants over two pairs of boxer shorts and a white T-shirt. Sgt. Grant photographed each layer of the appellant's

9

clothing.  The innermost pair of boxer shorts had a "suspect red substance" on them.  All of the appellant's clothing was collected for processing by the MSP crime lab.

Forty more inmates from the E4 tier also were photographed.[8]  One of them, Carlton Gayles, had a red stain on his T-shirt.  Gayles's T-shirt was collected and sent to the crime lab.  Testing revealed that the stain was not blood.

By the time Sgt. Grant completed photographing the inmates, more than twelve hours had elapsed since the stabbing.  He then returned to the utility area to photograph and bag the homemade shank.  When he got there, the shank was gone.  More than two days later, the same shank was confiscated from an inmate at MHC and turned over to the MSP.  It was processed for blood evidence, but none was found.

Meanwhile, on the morning of July 26, 2006, IIU officers were dispatched to search every cell on the E4 tier except Cells 32, 38, and 44.  Those three cells were taped off, awaiting crime scene processing.  Before each cell was searched, the inmate was removed, patted down, and taken downstairs.  The search team did not find any contraband or other items of "evidentiary value" in any of the cells.  An officer with the IIU testified that this was not surprising given that the inmates on the tier had had more than 12 hours before the search to flush contraband down their toilets or throw it off the tier.

That night, around 8:00 p.m., James Mayo, the supervising CST for the MSP's Forensic Sciences Division, and CST Andrea Kalathas, processed Cells 32 (Harris), 38 (the appellant), and 44 (Christy).  CST Mayo observed a smudge of suspected blood on the sliding portion of the door to Cell 38 at a location that would not be exposed when the door was in the closed position.  He also observed what he suspected was blood in the appellant's toilet and sink.  Photographs of the suspected blood were introduced into evidence.  Samples were not taken from any of these locations for further testing, however.  CST Mayo testified that he simply "forgot" to swab the suspected blood from inside the appellant's toilet and sink.  He did not explain why the suspected blood on the door to the cell was not swabbed.

CST Mayo also collected several items of evidence from the appellant's cell: two clear plastic bags found inside the appellant's sink, one small piece of tightly folded cardboard found on the floor, and one small piece of plastic also found on the floor.  The latter two items were suspected to be "keys."

---

[8] Forty-three of the forty-six inmates housed on E4 were photographed, and Sgt. Grant testified that he did not know why the other three inmates, including Edward Jason Freed, the State's lead eyewitness, were not photographed.  *See Stephens v. State*, No. 722, Sept. Term 2012, Slip Op. at 9 n.7 (Md. Ct. Spec. App. Dec. 10. 2013), ECF No. 15-1 at 122.  The Court of Special Appeals noted, however, that Freed was removed from his cell later that day and placed on a bus for a pre-scheduled transfer to another correctional facility.  *Id.* at 125.

CSTs Mayo and Kalathas processed Cell 44, which, as mentioned, was where Christy was incarcerated. A pair of white tennis shoes with what was suspected to be blood on them was recovered from the cell. Suspected blood also was observed on a newspaper and a yellow apron inside the cell.

After they finished processing the three cells, CSTs Mayo and Kalathas returned to Center Hall. There, CST Kalathas received from Sgt. Sampson the items of clothing that previously had been removed from the appellant's and Harris's cells. She rebagged the items in separate evidence bags, and later turned them over to CST Amspacker.

Damon Burman and Bruce Heidebrecht, both MSP forensic scientists, testified at trial. Burman explained that he tested numerous items of evidence for the presence of blood. The sleeveless T-shirt found under the appellant's mattress and the boots recovered from beneath his sink both tested positive for blood on multiple locations, as did the plastic bags recovered from his sink. Blood also was found on the boxer shorts the appellant was wearing when he was removed from his cell shortly after the attack on Cpl. McGuinn. Cuttings of the clothing and the plastic bags and a swab taken from the tread of the sole of one of the boots were sent for DNA analysis.

Heidebrecht testified that the blood on the appellant's boxer shorts, T-shirt, and one of the plastic bags found in his sink was consistent with Cpl. McGuinn's DNA. The swab taken from the sole of the appellant's boot showed the presence of two types of DNA, with the "major component" of the sample being consistent with Cpl. McGuinn's DNA and the "minor component" being unidentified. The statistical probability of anyone other than Cpl. McGuinn having the same DNA profile was 1 in 340 quadrillion within the Caucasian population and 1 in 8.5 quadrillion within the African-American population. The population of the earth is 6 billion.

Donna Vincenti, an assistant medical examiner with the Office of the Chief Medical Examiner, testified that Cpl. McGuinn sustained twelve stab wounds and twelve cutting wounds. The majority of the stab wounds were front to back in direction, with a few being back to front in direction. The stab wound to Cpl. McGuinn's neck hit his right internal carotid artery and his right jugular vein and was so deep that it nicked his cervical spine.

Three inmates with information about the murder testified for the State: Christy, Freed, and one Garrison Thomas. As noted, Christy had been incarcerated at MHC, in Cell 44 on E4, on the day of the murder. He was serving a sentence for violating parole on an underlying conviction for second degree assault. He worked in the kitchen as a dishwasher and had worked the 11:00 a.m. to 7:00 p.m. shift on the day Cpl. McGuinn was killed. His work clothes consisted of a yellow kitchen apron, rubber gloves, and black boots.

That night, Christy returned to the tier around 7:30 p.m.  As was his usual practice, he removed his clothes, which were wet from washing dishes, put on dry clothes, and hung his wet clothes to dry outside his cell on the railing on the far side of the walkway.  At 10 p.m., when Cpl. McGuinn entered the tier to do the count, Christy was asleep in his cell.  He had a curtain up, blocking more than half of the front of his cell.  He woke up to a noise "like somebody was pacing."  He looked up and saw "an officer running back and forth" and a "guy stabbing the officer."  The assailant was wearing a gray sweatsuit, with the hood down.  He identified Harris as the inmate he saw stabbing Cpl. McGuinn.  Christy saw Cpl. McGuinn run toward the back end of the tier, but then turn back towards the front of the tier.  He did not see a second assailant.

The second eyewitness called by the State was Edward Jason Freed.  At the time of the murder, Freed had been serving a sentence for robbery with a deadly weapon and was housed in Cell 16 on the E4 tier, Freed knew the appellant as "Shy" and knew Harris as "Junebug."

At 10:00 p.m. on July 25, 2006, Freed was in his cell waiting for Cpl. McGuinn to appear.  He explained that the inmate in Cell 2 (who was Gayles, but was known to Freed only as "G") had told him earlier in the day that something was going to happen during the count.  That word spread, and many inmates on the E4 tier put up curtains to darken the walkway and make it more difficult for Cpl. McGuinn to see.  After Cpl. McGuinn passed Freed's cell, he (Freed) put out his "peeper," a mirror about the size of a piece of notebook paper.  This allowed him to see all the way down the tier.  He saw other inmates on the tier put out their peepers too, "like a domino effect."

After Cpl. McGuinn passed Cell 32, Freed saw Harris let himself out of his cell and attack Cpl. McGuinn from behind.  Harris was wearing a gray sweatsuit and tennis shoes.  He then saw the appellant come out of his cell and begin attacking Cpl. McGuinn as well.  According to Freed, the appellant also was clothed in a gray sweatsuit and was wearing tan and brown boots.  After Cpl. McGuinn managed to escape, Freed heard the "clank" of metal objects being dropped through the mesh fence onto the flats and then saw Harris and the appellant reenter their cells.  After that, the tier was "super quiet."  A few minutes later, COs appeared at both ends of the tier.

The next day, Freed was removed from his cell and placed on a bus for a pre-scheduled transfer to another correctional facility.  He was not transported to that facility, however, but instead was returned to MHC to be interviewed by MSP investigators.  At that time, he told the detectives he had seen "two individuals out on the tier" but did not know who they were.  He explained at trial that he was a member of the Bloods gang and that he knew that the consequence of "snitch[ing]" on another inmate was "basically death."

About a year after Cpl. McGuinn was murdered, Freed was released from prison on parole. Just a few months later, he was stopped by the police and found to be in possession of a handgun. Ultimately, in September of 2008, Freed was indicted federally for unlawful possession of a handgun. Because he had three prior felony convictions, Freed was alleged to be an "armed career criminal" within the meaning of 18 U.S.C. § 924(e). That statute imposes a mandatory minimum sentence of 15 years.

In October 2008, Freed reached a deal with the government under which he agreed to plead guilty in his federal case and provide information about Cpl. McGuinn's murder. In exchange for Freed's testifying truthfully in the murder prosecution, the federal prosecutor would recommend a reduction in his offense level, thus allowing his defense attorney to argue that he should be sentenced to a term of between zero and ten years.

Thereafter, Freed told "the whole truth," as he put it, identifying the appellant and Harris as the two men he had seen attacking Cpl. McGuinn.[9] He also revealed that the appellant had shown him a weapon on the day Cpl. McGuinn was killed and had offered to give it to him. Freed had not taken the weapon, however.

Garrison Thomas testified that, on the day of the murder, he was housed in Cell 37 on the E4 tier, next to the appellant. He was serving a sentence for murder. Thomas did not witness the attack on Cpl. McGuinn because he was trying to sleep and was wearing earplugs. He thought he heard the sound of keys jingling near his cell door and someone "running." Immediately thereafter, a female CO shined a flashlight into his cell. The CO then left the tier and Garrison heard the appellant's cell door open and shut very quickly. Garrison knew the appellant had a key because he often saw the appellant out of his cell after count. After Garrison heard the appellant's cell door open and close, he heard the water running in the appellant's sink for two to three minutes.

In his defense, the appellant called seven inmates housed on E4 on July 25, 2006. The first, Raymond Hinton, was not in his cell when Cpl. McGuinn was stabbed. He was working in the infirmary, where he was on "blood spill detail." He testified that he did not return to the tier until July 27, 2006, around 2 a.m. He was assigned to clean the tier. He saw "blood everywhere," particularly in the vicinity of cells 20 through 46. The blood was on the walkway, the cell bars, the cell doors, and inside the cells in that area of the tier.

Four inmates, Phillip Custis (Cell 25), Johnny Evans (Cell 41), Michael Canty (Cell 48), and Terrence Baker (Cell 43), described having seen two inmates, both wearing

---

[9] Stephens notes that "Freed's testimony was the sum total of the direct evidence incriminating Stephens" and "[t]he State built its entire closing argument on the credibility of his testimony." ECF No. 1 at 23 (citing Feb. 1, 2012 Trial Transcript, ECF No. 2-5 at 526-548).

gray sweat suits and masks, attacking Cpl. McGuinn.[10]  Canty explained that the
masks appeared to be DOC issued "skull caps" with slits cut in them for eye holes.
None of the four could identify the masked assailants, but Custis, Evans, and Canty
testified that the assailants were taller than the appellant and one of them also was
stockier than the appellant.

Several of the appellant's witnesses also testified that they had had time to clean up
blood, dispose of contraband, and dispose of bloody clothing in their cells before
their cells were searched.  Baker testified that, after the attack ended, he quickly
cleaned up his cell with ammonia because he did not want to be linked to the crime.
Custis testified that, after the attack, he threw a knife and cell phone through the
mesh fence beyond the walkway railing.  Finally, one Kenneth Lee Spencer (Cell
29) testified that he washed his face and hands after the attack and flushed bloody
clothing and a cell phone down his toilet.

*See Stephens v. State*, No. 722, Sept. Term 2012, Slip Op. at 2-17 (Md. Ct. Spec. App. Dec. 10.

2013), ECF No. 15-1 at 115-130 (footnotes omitted).

On February 9, 2012, after six days of deliberation, the jury found Stephens guilty of first-

degree murder and acquitted him of conspiracy to commit first-degree murder.  ECF No. 15-1 at

50.  Following the penalty phase of the trial, the jury rejected the death penalty and instead

sentenced Stephens to life in prison without the possibility of parole.  *Id.* at 57.  The court imposed

the sentence on June 15, 2012.  *Id.* at 58.

## III.   Appeal and Postconviction

On June 20, 2012, Stephens timely appealed to the Court of Special Appeals, presenting

the following questions:

1.   Did the trial court abuse its discretion by not giving a non-pattern jury
     instruction about the State's destruction of evidence?

2.   Did the trial court err by giving the pattern concealment or destruction of
     evidence instruction?

3.   Did the trial court violate the appellant's confrontation rights under the Sixth
     Amendment to the United States Constitution and Article 21 of the Maryland

---

[10] Stephens notes that these inmates were in cells located closer to the assault, which took place
near cell 44, than Freed who was in cell 16.  ECF No. 1 at 27.

Declaration of Rights by permitting a witness to read from the chain of custody forms?

4.  Did the trial court improperly limit the appellant's counsel's cross examination of a key witness?

*See* ECF No. 15-1 at 114.  On December 10, 2013, the Court of Special Appeals affirmed the trial court's judgment.  *Id.* at 113-14.  Stephens did not seek further review in the United States Supreme Court.  Form Information for Petition, ECF No. 1-2 at 2.

On May 12, 2015, Stephens filed a petition for postconviction relief in the Circuit Court for Anne Arundel County in connection with the McGuinn murder judgment.  Anne Arundel Cty. Postconviction Petition, ECF No. 2 at 42-76.  He asserted the following:

1.  Trial counsel were constitutionally ineffective by failing "to request an instruction that the State was required to prove beyond a reasonable doubt that some felonious blow by Petitioner was independently sufficient to cause—or, at a minimum, a 'substantial cause' of—the death of Corporal David McGuinn." *Id.* at 63.  Stephens added that "in failing to argue the absence of such proof to the jury, and/or in failing to undermine the testimony of Mr. Freed[] and/or Assistant Medical Examiner Vicenti through cross-examination or by expert testimony, counsel's representation of Petitioner was deficient." *Id.* at 64.

2.  Trial counsel were constitutionally ineffective by failing "to undermine the search of Mr. Stephens's cell and stipulat[ing] that critical physical evidence against Petitioner was maintained properly despite mounting evidence that such evidence could have been contaminated . . . ." *Id.* at 65-66.

3.  Trial counsel were constitutionally ineffective by failing "to effectively cross-examine the only State witness who identified Stephens as a participant, Jason Freed, on benefits he would receive in exchange for his testimony." *Id.* at 67.

4.  Trial counsel were constitutionally ineffective by failing "to reasonably investigate and identify at trial alternative suspects for the murder." *Id.* at 68.

5.  Appellate counsel was constitutionally ineffective by failing "to appeal the trial court's ruling barring testimony regarding the planting of evidence on inmates . . . by officers at the Maryland House of Corrections." *Id.* at 69.

15

6. The cumulative effect of the preceding five assignments of error denied Stephens his constitutional right to the effective assistance of counsel. *Id.* at 70.

7. A new trial was required because Stephens's "decision not to exercise his fundamental right to testify in his own defense at trial was based on the State's ability to use, for impeachment purposes, Mr. Stephens's prior murder conviction and life sentence therefor, which was later shown to be illegally obtained and vacated." *Id.* at 71. In advancing this argument, Stephens acknowledged that he did eventually plead guilty to that murder charge in exchange for a sentence of time served. *Id.*

8. A new sentencing hearing was required because "the life-plus-15-year sentence he received for his previous illegally obtained conviction that was later vacated was a material factor considered by the jury in his sentencing." *Id.* at 73.

On October 5, 2016, Stephens supplemented the postconviction petition to add a ninth allegation:

9. Trial counsel were constitutionally ineffective by failing "to secure a vacatur of Petitioner's Wicomico County conviction and life sentence before proceeding to trial" in Anne Arundel County. Amendment to Petition, ECF No. 2 at 75-77.

In April 2017, the postconviction court conducted a four-day evidentiary hearing on the petition. ECF No. 15-1 at 65. Stephens took the stand to testify on his own behalf and stated that he did not attack Cpl. McGuinn. ECF No. 2 at 534. Stephens claimed that he stayed in his cell until Cpl. McGuinn fled the tier, at which time Stephens pulled aside the blanket he was using as a curtain, grabbed a bag of ice that was hanging outside of his cell, on which he saw blood from the attack, and dumped it out into his sink. *Id.* at 542-45.

Stephens also testified that he was moved to MHC in February 2006 to receive medical treatment and was initially housed at the infirmary where he did not interact with the rest of the prison population or the guards. *Id.* at 529-30. He remained in the infirmary until late May and did not have any meaningful interactions with Cpl. McGuinn during that time. *Id.* at 533.

In addition, Stephens testified that he decided not to take the stand at the Anne Arundel County trial in 2012 based on advice from counsel because he would have been impeached with

16

his Wicomico murder conviction. *Id.* at 556-57. Stephens stated that after the Wicomico County conviction was vacated, he only took an *Alford* guilty plea because the State offered him a sentence of time served and not because he was actually guilty; he viewed the State's case against him as "very weak." *Id.* at 558.

Dr. Donna Vincenti, the medical examiner who performed Cpl. McGuinn's autopsy and testified for the State at the 2012 trial, stated during the postconviction hearing that only two of the wounds suffered by Cpl. McGuinn would have been independently fatal. *Id.* at 275-76. Those wounds were located on the right side of the back of his neck, injuring the carotid artery and jugular vein, and on the left upper back, injuring the left upper lung lobe. *Id.* at 274-75. Dr. Vincenti testified that the rest of the wounds combined could have resulted in death, but they also "could have been managed" if "there was medical treatment." *Id.*

Stephens's expert witness, Dr. Daniel Spitz, a Chief Medical Examiner from Michigan, reviewed Dr. Vincenti's autopsy report and testified at the postconviction hearing. *Id.* at 287-88. According to Dr. Spitz, Cpl. McGuinn would not have died even if he had he received every wound identified in Dr. Vincenti's report apart from the two fatal stab wounds. *Id.* at 294-95. Dr. Spitz opined that the wound on the left upper back, even if combined with all of the other wounds apart from the wound to the back of the neck, also would not have been fatal with prompt medical attention. *Id.*

On June 30, 2017, the Anne Arundel County postconviction court issued a Statement of Reasons and Order denying the petition. Statement and Order, ECF No. 2 at 6-40.

On July 28, 2017, Stephens filed an application for leave to appeal to the Court of Special Appeals. Application, ECF No. 15-1 at 156-231. He argued:

1. The postconviction court erred in finding that trial counsel's failure to require the State to prove that Stephens "caused" Cpl. McGuinn's death was not ineffective.

2. The postconviction court erred when it denied Stephens's requests for a new trial because the waiver of his right to testify in his own defense was neither knowing nor voluntary and resulted from ineffective performance by his counsel.  Stephens claimed "both (1) that the actions by the State produced an unconstitutional conviction in Wicomico County and the State therefore deprived Stephens of the right to testify in his own behalf, and (2) that counsel's failure diligently to attack the Wicomico County conviction before proceeding to trial in Anne Arundel constituted ineffective assistance of counsel, with the same result."

3. The postconviction court erred when it denied the claim that Stephens was entitled to resentencing because the "prior murder conviction and life sentence unquestionably affected the jury's sentencing decision," and its admission "violate[d] due process, and counsel was ineffective in failing to challenge the unlawful conviction before the Anne Arundel trial (and sentencing)."

4. The postconviction court erred in ruling that trial counsel was not ineffective in the guilt phase although counsel failed to discredit Freed and stipulated that evidence in the form of Stephens's bloody boot and shirt were properly handled by investigators.  Stephens also claimed that the cumulative effect of these errors prejudiced him.

*Id.*

In a summary order dated January 12, 2018, the Court of Special Appeals declined to intervene in Stephens's case, thus concluding all available state review.[11]  *Stephens v. State*, No. 1027, Sept. Term 2017 (Md. Ct. Spec. App. Jan. 12, 2018), ECF No. 15-1 at 232-33; *see also* Md. Code Ann., Cts. & Jud. Proc. § 12-202(1) (2013); *Stachowski v. State*, 6 A.3d 907, 913-17 (Md. 2010) (explaining that the Court of Appeals of Maryland does not have jurisdiction to issue a certiorari writ in a case where the Court of Special Appeals summarily denied an application for leave to appeal).

**IV.    Claims in this Court**

---

[11] On February 9, 2018, Stephens filed a motion for reconsideration, which the Court of Special Appeals denied on March 15, 2018.  *See* ECF Nos. 3, 10, 20-1.

In his Petition for Writ of Habeas Corpus filed with this Court, Stephens claims that:

1. He is entitled to a new trial because he was unconstitutionally denied the right to testify in his own defense and the denial was not harmless.

2. He is entitled to a new trial because he was denied effective assistance of counsel.  Specifically, Stephens claims that trial counsel were ineffective by: (a) failing to vacate the 1999 Wicomico County murder judgment before trial in Anne Arundel County; (b) failing to investigate and argue the question of causation; (c) failing to investigate and present exculpatory evidence; (d) failing to impeach Freed with evidence and expert testimony; (e) stipulating too broadly to the chain-of-custody regarding physical evidence; and (f) making all these errors collectively.

3. He is entitled to a new sentencing hearing because his sentence in the Anne Arundel County case was based on unconstitutional convictions and sentences in Wicomico County.

4. All of these alleged errors combine to warrant habeas relief.

ECF No. 1.

In their Answer, Respondents preliminarily assert that Stephens's Petition does not afford an opportunity for plenary review.  Answer, ECF No. 15 at 35-52.  With regard to five of his claims, which Stephens asserts were "ignored" by the postconviction court, Respondents argue that this court "'must presume that [each] federal claim was adjudicated on the merits'" although the state court may have denied relief "'without expressly addressing  that claim.'"  *Id.* at 41 (quoting *Johnson v. Williams*, 568 U.S. 289, 301 (2013)).  Alternatively, Respondents contend that "[t]o the extent that a merits adjudication is questionable, Stephens's failure to present his claims fairly is the cause" and thus, those claims are unexhausted and procedurally defaulted.  *Id.* at 49-52.  Respondents also argue that, in any event, all of Stephens's claims lack merit.  *Id.* at 53-90.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28

U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement")).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S 766, 773 (2010).

## Analysis

### I.   Right to Testify

Stephens claims that he would have testified on his own behalf during the Anne Arundel County trial "had he not faced certain impeachment with his prior murder conviction in Wicomico County." ECF No. 1 at 36. Primarily relying on the Second Circuit case *Biller v. Lopes*, 834 F.2d 41 (2d Cir. 1987), he asserts that "[b]ecause his Wicomico County conviction was unconstitutional and prevented him from testifying in his Anne Arundel trial, Stephens was denied his constitutional right to testify." *Id.* at 39. The postconviction court rejected this claim, stating:

> The decision of the Petition[er] not to testify during his trial was based on the fact that counsel and the Petitioner anticipated the State would impeach him by using his prior murder conviction from Wicomico County against him. Trial counsel advised the Petitioner that his previous murder conviction could be used to impeach him if he testified, but it was Petitioner's decision whether to testify. During the postconviction hearing, the Petitioner maintained that he wanted to testify at trial and tell the jury that he was not involved in the murder. However, he explained that after consulting with his attorneys, he decided to waive his right to testify so as to not to be impeached on cross-examination with his prior conviction.
>
> Petitioner also asserts that if his prior conviction post conviction had been aggressively prosecuted by counsel, and his conviction was vacated, he would have testified and the result in the Case would have been different. We now know that the Wicomico County murder conviction was vacated on July 12, 2013 due in part

to a State's ballistic expert witness, Joseph Kopera, falsifying his expert credentials and offering faulty ballistics testimony. Petitioner's counsel for this case also represented the Petitioner in his Petition for Post Conviction Relief in the Wicomico County trial. The Kopera issue, along with other issues, led to an eventual reexamination and retest of the ballistics. It was found that Mr. Kopera lied about his credentials, and his conclusions on the ballistics were wrong. After the re-examination, the State offered to vacate Petitioner's murder conviction only if Mr. Stephens plead guilty to murder in exchange for a sentence of life, suspend all but time served. The vacatur and plea occurred after the Petitioner was found guilty of the Anne Arundel County murder and sentenced to life imprisonment without the possibility of parole.

Every defendant has a constitutional right to remain silent, but can also waive the right and testify in his own defense. Petitioner argues that "but for" the Wicomico County conviction, he would have testified on his own behalf. He argues the jury here would have excused his prior conviction for murder, since he received only a "time served" sentence.

This argument, however, is misguided. Even if the Wicomico County murder conviction was vacated prior to the termination of the Anne Arundel County trial, and the defendant still plead[ed] guilty to that murder for time-served (as he did), the jury still would have been made aware of the defendant's murder plea through the State's cross examination of the defendant. As Mr. Proctor stated, once the jury learned of the prior conviction it was "game over." To quote from the State's Response to the Petition for Post-Conviction, "The fatal flaw of the Petitioner's claim regarding his right to testify lies in his premise that his conviction for murder from Wicomico County could have been removed from his record . . . The Petitioner daftly suggests that a jury would understand that his subsequent plea of guilty to the Wicomico murder would be received as something less than an admission of guilt. Such testimony would not only alert the jury to his murder conviction, it would open the door to the State inquiring about, and potentially presenting evidence on, the facts of the Wicomico County murder."

In order to get to this argument, we must work backwards in determining whether defense counsel was deficient in not pursuing the Wicomico County post conviction in a timely manner. Petitioner's argument summarized is, "If, at the time of trial for the death of Corporal McGuinn, Mr. Stephens's prior illegal murder conviction had already been vacated and Mr. Stephens had already plead[ed] guilty in exchange for a sentence of time served, he would have decided to testify in his own defense." If Petitioner's counsel at the time was deficient in not following through with the Wicomico County post conviction, then we can move on to the next step in the process, which is, the prejudice aspect of this decision of counsel.

As noted above in the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] analysis, "prejudice" means: a "substantial or significant possibility that the verdict of the trier of fact would have been affected," *Bowers* [*v. State*], 320 Md. 416, 426 (1990)

(citing *Yorke v. State*, 315 Md. 578, 588 (1989)). Additionally, the Bowers Court noted that the term "substantial possibility" was used synonymously with, "may well have produced a different result." *Id.* at 427.

In order to agree with Petitioner, however, this line of thinking assumes one crucial point: that the defendant would have been successful in his Wicomico County post conviction hearing and obtain a *vacatur* of the conviction *prior* to the trial in this case (emphasis added). We know that defense counsel submitted a Petition for Post Conviction in Wicomico County. We also know that the Wicomico County post conviction proceeding was continued or postponed about thirteen (13) times by defense counsel because their main concerns focused on the capital trial in Anne Arundel County. Gary Proctor testified during the hearing that the main reason the post conviction process in Wicomico County took so long was that the capital trial in Anne Arundel County consumed their workload. When pressed on cross-examination by the State, Mr. Proctor explained that if he had extra time during those five (5) years it took to go to trial, that he wanted to spend it on the capital case in lieu of the post-conviction.

Harry Trainor opined that the failure by defense counsel to pursue the post conviction first in Wicomico County was "below prevailing professional norms." He focused his analysis on how this failure impeded the defendant's decision to testify and that an attorney has a duty, under the ABA guidelines, to investigate prior convictions. Mr. Trainor argued that if a conviction can be used as an aggravating factor or will otherwise come into evidence during the trial, then there is a duty to investigate that prior conviction and possibly get it set aside.

To counter these arguments, the State called Mr. Joel Todd, Esq., the prosecutor who handled the Wicomico County post conviction case. Mr. Todd was an experienced prosecutor and explained that the fact that the Petitioner had been found guilty of murder as a result of the Anne Arundel County trial was behind his decision to vacate the Wicomico County murder conviction. He explained that he agreed to the post conviction and the subsequent guilty plea solely due to the conviction and sentence in this case. Mr. Todd testified that if the Petitioner had not been convicted in Anne Arundel County, then the Wicomico County State's Attorney's office would have re-tried the Wicomico County case and fought it on the merits. The Court finds Mr. Todd's testimony credible and finds that but for the Anne Arundel County murder conviction he would not have agreed to the vacatur of the Wicomico County murder conviction.

While the Court finds that trial counsel's lack of due diligence in pursuing the Wicomico County Post Conviction was a deficient act, there can be no prejudice to the Petitioner. Prejudice, as noted by the *Bowers* court means the deficient act, "may well have produced a different result." *Bowers*, 320 Md. 416, 427 (1990) (citing *Yorke v. State*, 315 Md. 578). In this case, the Court would have to assume that first, the defendant would have been successful in the Wicomico County post conviction, and second, that the outcome of the Anne Arundel County case would

have been different as a result of that post conviction.  Here, the connection between the Wicomico County case and the outcome of this trial is too tenuous to give any prejudicial weight.

Further, having heard the Petitioner[] testify as to the facts surrounding the murder of Corporal McGuinn, the Court must comment on his testimony.  The Court finds the Petitioner was not credible and he has no credible explanation for his actions that night.  His testimony would not, in the Court's opinion, have helped him at trial, but would have hurt him.  He had no credible explanation for the bloody clothing, and was not believable in any regard.  Further, he testified to using the same mirror system Freed did to see what was going on in the tier.  This would have given credibility to Freed's ability to see and hear what he testified to. Additionally, upon hearing of his conviction in Wicomico County, the Court cannot find that a jury would excuse the conviction as the Petitioner argues.  Therefore, the post conviction relief requested for this allegation is hereby **DENIED**.

ECF No. 2 at 33-37 (footnotes omitted).

The postconviction court's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Moreover, it was not based on an unreasonable determination of the facts in light of the evidence presented. The postconviction court correctly found that "[e]ven if the Wicomico County murder conviction was vacated prior to the termination of the Anne Arundel County trial, and the defendant still plead[ed] guilty to that murder for time-served (as he did), the jury still would have been made aware of the defendant's murder plea through the State's cross examination of the defendant."  The fact that Stephens remained convicted of the Wicomico County murder undercuts Stephens's contention that but for the Wicomico County conviction, he would have testified on his own behalf at the Anne Arundel County trial.[12]

In both his Petition and Reply, Stephens cites *Loper v. Beto*, 405 U.S. 473 (1972), to argue that he has a due process right not to be impeached by an unconstitutional conviction, even where

---

[12] In addition, Stephens testified during the postconviction proceedings that even if his Wicomico County case was not overturned, he still would have wanted to testify. ECF No. 2 at 561.  Thus, it is unclear whether the Wicomico County conviction had any bearing on Stephens's decision, although the postconviction court found that it was of no consequence.  *Id.* at 851.

the unconstitutionality of the prior conviction only becomes apparent after the trial and regardless of the defendant's guilt of the impeachable offense. *Loper*, however, is inapplicable to this case because Stephens made an informed decision not to testify and, therefore, there was no need for the State to attempt to impeach him. Stated differently, this Court cannot invalidate Stephens's Anne Arundel County conviction based on an allegedly improper impeachment that never took place.

To be clear, the postconviction court did not employ harmless error analysis, as Stephens seems to indicate. *See* ECF No. 1 at 40 (noting in the Petition that "harmless error analysis does not apply to deprivation of a defendant's right to testify"). Rather, the court found that no error occurred at all with regard to Stephens's due process right to testify on his own behalf.

Stephens also argues that he is entitled to *de novo* review because the postconviction court did not address his due process claim but instead "addresse[d] only the separate and distinct claim that Stephens was denied effective assistance of counsel." ECF No. 1 at 45. From the transcript of the postconviction proceedings, it is clear that the court was aware of the due process claim. *See* ECF No. 2 at 851-52 (engaging in colloquy with counsel for the State regarding the "due process claim"). In its statement of reasons, the postconviction court acknowledged the due process issue raised by Stephens, noting that "[e]very defendant has a constitutional right to remain silent, but can also waive the right and testify in his own defense." ECF No. 2 at 34. Thus, this Court "must presume that the federal claim was adjudicated on the merits" although the state court may have rejected it "without expressly addressing that claim." *Johnson*, 568 U.S. at 301. Stephens has not rebutted that presumption. *See id.* at 303 ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."). In any

25

event, because this Court agrees with the postconviction court's conclusion, Stephens would not be entitled to habeas relief on this ground even if he were entitled to *de novo* review.

## II.     Ineffective Assistance of Counsel

As previously stated, Stephens argues that his trial counsel rendered constitutionally ineffective representation by: (a) failing to vacate the 1999 Wicomico County murder judgment before trial in Anne Arundel County; (b) failing to investigate and argue the question of causation; (c) failing to investigate and present exculpatory evidence; (d) failing to impeach Freed with evidence and expert testimony; (e) stipulating too broadly to the chain-of-custody regarding physical evidence; and (f) making all these errors collectively.

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland*, 466 U.S. at 686; *see also Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 775 (2017). To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88. *See Williams*, 529 U.S. at 390. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775.

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688; *see Harrington*, 562 U.S. at 104. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690). The Supreme Court recently reiterated that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775. Notably, a "lawyer has discharged his constitutional responsibility so long as his

decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (citation omitted). The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 669.

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Id.* at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal

to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### A.  *Failure to Vacate the Wicomico County Judgment before Trial*

Stephens first argues that counsel's failure to investigate and obtain vacatur of the Wicomico County conviction before proceeding to trial in Anne Arundel County was constitutionally ineffective. ECF No. 1 at 52-57. Agreeing with the postconviction court's finding that counsel's actions were deficient, Stephens takes issue with the court's conclusion that there was no prejudice. *Id.* at 54. Specifically, Stephens claims that he was prevented from denying any involvement in Cpl. McGuinn's death and offering an alternative explanation for the State's evidence. *Id.*

Here, the postconviction court found that the connection between the Wicomico County case and the outcome of the Anne Arundel County trial was too tenuous to give any prejudicial weight. ECF No. 2 at 37. In addition, the court found that Stephens was not credible or believable, and he had no credible explanation for his actions or for his bloody clothing on the night of Cpl. McGuinn's murder. *Id.* In sum, the postconviction court found that Stephens was not entitled to relief as the record established that it was "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis*, 560 U.S. at 390. This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington*, 562 U.S. at 103. Thus, this issue presents no basis for relief.

### B.  *Failure to Investigate and Argue Causation*

Next, Stephens argues that counsel's failure to investigate and argue causation was constitutionally ineffective. ECF No. 1 at 58-81. According to Stephens, had counsel investigated

the law and facts related to causation, the State could not show that Stephens "caused" the death of Cpl. McGuinn.  *Id.* at 58.  In particular, Stephens claims that counsel: (1) failed to investigate a plausible defense; (2) failed to interview important witnesses or investigate the State's forensic evidence; and (3) failed to request a jury instruction that would support an available defense or define an element of the crime.  *Id.* at 60-61.  Stephens also asserts that although the postconviction court addressed the latter two issues in its statement of reasons, it did not address counsel's alleged failure to investigate the law and facts related to causation, as well as the deficiency prong of the jury instruction claim.  *Id.* at 67.

With regard to this claim, the postconviction court found:

In the Petition for Post Conviction Relief, Petitioner argues that he was entitled to a jury instruction that would require the jury to find that Petitioner only caused the death of Corporal McGuinn if his conduct was a "substantial factor" that resulted in the Corporal's death.  Petitioner bas[es] this argument on the State's main witness, inmate Jason Freed, who was serving a sentence for robbery with a deadly weapon on the same cell block and who, according to him, could not have witnessed Corporal McGuinn's murder at the hands of Lee Stephens and Lamar Harris on the night in question.  Freed testified that he was housed in the same tier (row of single prison cells) as the Petitioner and Mr. Harris, the original co-defendant.  Freed explained how the inmate in Cell 2 (Gales, known to Freed as "G"), told him earlier that day that something was going to happen during the "count" that night.

Mr. Freed recounted the night of Corporal McGuinn's murder and described how he used a "looking out" mirror to see down the rows and out into the hallway of the tier.  T. 1/17/12 p. 111.  Freed stated, "... as soon as Junie [Lamar Harris' nickname] came out and started stabbing, Shy [Lee Stephens' nickname] came out of his cell and started stabbing too."  *Id.* at p. 114.  When prompted about whether he saw a weapon in the Petitioner's hands, Freed responded with, "Just the—I didn't see the actual weapon *per se*, but I seen something in his hand."  *Id.* at p. 117.  Freed described Corporal McGuinn as physically being trapped between two figures as he was trying to protect himself from the stabbing.  *Id.* at p. 118.  After explaining the assault, Freed mentioned that he heard something metal drop as one of the men involved ran away from the scene and towards his cell.  *Id.* at p. 119.

Petitioner argues that Freed could not distinguish which individual was stabbing Corporal McGuinn, nor was it possible to differentiate between Harris' and Stephens' separate strikes or swinging arm motions.  Petitioner highlights how defense counsel never addressed the issue of causation at trial, and how during

cross-examination, counsel failed to undermine Freed's testimony with the use of expert testimony on vision capabilities.  There were twenty four (24) wounds inflicted on Corporal McGuinn: twelve (12) stab wounds and twelve (12) cutting wounds--both "circular" and "linear."  The Assistant Medical Examiner's Report shows that four (4) of the wounds were potentially lethal.

Petitioner argues, "When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called proximate cause) of the result." *Burrage v. United States*, 134 S. Ct, 881, 887 (2014) (internal quotation marks omitted).  Accordingly, Petitioner contends that the State has to prove beyond a reasonable doubt that the defendant's conduct was an "independently sufficient" cause of the victim's death.

Petitioner argues that defense counsel was ineffective in failing to request a jury instruction on substantial causation, failing to argue to the jury the lack of proof that defendant caused the death of Corporal McGuinn, and failing to undermine the testimony of Freed and/or the Assistant Medical Examiner Dr. Vincenti.

### Analysis

### i.  Causation Instruction

As is noted in the State's Response, "In order for the trial court to give a requested jury instruction, the instruction must be appropriate based on three criteria: 1) whether the instruction was generated by the evidence, 2) whether it is a correct statement of law; and 3) whether it otherwise was fairly covered by the instructions actually given."  *See Gimble v. State*, 198 Md. App. 610, 627, *cert. denied*, 421 Md. 193 (2011) (internal citations omitted).  Using this standard, the Court need not consider whether the instruction was generated by the evidence as it is clear that causation is an element of a first degree murder charge.  The second prong of this analysis requires that the proposed instruction be an accurate statement of the law. *Id.*  Here, Petitioner claims that an instruction stating, "...the State was required to prove beyond a reasonable doubt that some felonious blow struck by Petitioner was independently sufficient to cause—or at minimum, a 'substantial cause—of the death of Corporal David McGuinn" would have been appropriate.  The instruction that Judge Hackner gave at the close of the trial was as follows:

> First degree murder is the intentional killing of another person with willfulness, deliberation and premeditation.  In order to convict the Defendant of first degree murder, the State must prove, one, **that the conduct of the Defendant caused the death of David McGuinn**.  And two, that the killing was willful, deliberate and premeditated.

> Willful means that the Defendant actually intended to kill the victim. Deliberate means that the Defendant was conscious of the intent to kill and premeditated means that the Defendant thought about the killing and that there was enough time before the killing, though it may only have been brief, for the Defendant to consider a decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

As the comments supporting this instruction cite, "The third threshold issue is the requirement of both factual and legal or proximate causation between the act or omission of the defendant and the death of the victim. The factual causation requirement is satisfied if the defendant's act or omission was a substantial factor in bringing about the death." *See generally* CLARK & MARSHALL, *supra*, § 10.01, at 603-16; LAFAVE, *supra*, § 6.4-6.4(c), at 350-57; PERKINS & BOYCE, *supra*, at 769-824. It is this "substantial factor" language that the Petitioner claims trial counsel failed to request from the trial judge in this case.

As explained above, deficient acts of trial counsel are, "assessed based on a comparison to 'prevailing professional norms' and counsel's actions must be presumed reasonable until proven otherwise." *Smith v. State*, 394 Md. 184, 207 (2006) and *Premo v. Moore*, 562 U.S. 115 (2011). "In ruling on a claim of ineffective assistance of counsel, a hearing judge must give substantial deference to counsel's judgment." *Id.* "There is a strong presumption that counsel's representation is within the wide range of reasonable professional assistance." *Id.*; citing *Harrington v. Richter*, 562 U.S. 86, 110 (2011).

However, in the opinion of this Court, the defense was not prejudiced by the omission of the Petitioner's requested language on causation. As the State points out, the use of Maryland Criminal Pattern Jury Instruction 4:17 was proper in this case. It is clear to the Court that the decision of trial counsel not to request any further causation instruction was not improper as the instruction given covered the area in question. The instruction that was given by the trial judge was proper and appropriate for the case at hand, and the Court can find no error in this regard.

Furthermore, on February 13, 2012, during Phase I of the sentencing portion of the trial, Judge Hackner instructed the jury on "principalship" and stated:

> The State also alleges and must prove that the Defendant is a principal in the first-degree to the act of murder. A principal in the first-degree means that the Defendant committed the murder by his own hand. The Defendant's conviction of first-degree murder does not by itself establish that either of these allegations has been proven. You must make a separate independent finding based on the evidence for each allegation. The State must persuade you beyond a reasonable doubt that these allegations which are in Part 1

of the sentencing form have been proven.  And the Defendant is not
required to persuade you that the allegations have not been proven.
T. 2/13/12 p. 60, lines 3-14.

Later that same day, the jury found that Mr. Stephens to be a principal in the first
degree in the murder of Corporal McGuinn, further emphasizing that there was no
confusion as to the causation element of the crime.

It is clear to this Court that there was enough direct evidence (the eyewitness
testimony of Jason Freed, the blood on the bottom of Petitioner's shoes, the bloody
tank top underneath of Petitioner's mattress, the drop of blood on Petitioner's
underwear) as well as circumstantial evidence (Petitioner's neighbor hearing
watering running during/after the time of the event, the discovery of a "key" in
Petitioner's cell with which to open the cell  door, and more) upon which the jury
based its conclusion.  As is articulated in the State's Supplemental Response to the
Petition for Post Conviction Relief, "Defendant [Petitioner] cannot demonstrate
that, but for this jury instruction, there is a reasonable possibility that the jury's
verdict would have been different."

Therefore, this Court finds Petitioner failed to establish that counsel were
ineffective under the standards required under *Strickland*, its progeny and Maryland
case law.  Accordingly, Petitioner's request for post conviction relief based on this
allegation is **DENIED**.

### ii.  Failure to Interview Medical Examiner

Petitioner argues that the decision of trial counsel not speak with Dr. Vincenti prior
to the trial, thereby not learning which cuts and stabs inflicted the most harm to
Corporal McGuinn, was deficient.  During the post conviction hearing, Dr. Vincenti
testified as an expert witness and described the wounds that were inflicted to
Corporal McGuinn.  Although she could not testify as to how many weapons were
used to inflict the wounds, she did provide information that it was possible for
Corporal McGuinn to have lived but for the two most lethal wounds (Wounds 'A'
and 'E,' respectively).

Petitioner called Dr. Daniel Spitz, the Chief Medical Examiner from Macomb
County, Michigan, to further describe the wounds and the cause of death of
Corporal McGuinn.  Dr. Spitz agreed with Dr. Vincenti that Corporal McGuinn
died from the totality of the loss of blood that he suffered due to the wounds.
However, he indicated that some wounds bleed more profusely than others and
made the connection that Wound 'A' was fatal regardless of the other wounds
existing.  His testimony was similar to Dr. Vincenti's in that he could not definitely
say the number of weapons that caused such wounds.

When asked during the post conviction hearing why he did not reach out to Dr.
Vincenti before the trial, Mr. Proctor, indicated that it was not a strategic or tactical

decision.   Mr. Proctor did explain that he reached out to their own Medical Examiner in Delaware, a Dr. Richard Callery.  Counsel indicated that he sent Dr. Callery the autopsy report of Corporal McGuinn but that no further meetings or follow up occurred with him or his office.  He also explained that this was not a tactical decision on his or Mr. Lawlor's parts.

In the course of his testimony, Mr. Proctor explained his rationale behind not asking many questions of Dr. Vincenti on the witness stand.  He said he may not have asked her one single question.  He explained that it is possible if he had known about any conflicting reports as to the cause of death of Corporal McGuinn that he could have explored the distinctiveness of the injuries and the number of weapons issue further.  However, during cross-examination, he elaborated that he usually does not delve into detailed testimony with medical examiners because the less that the jury hears from them the better.  He explained that he prefers to get them off the stand as soon as possible, so as to not focus too much on the graphic details of the victim's injuries.  He admitted to have "erroneously believed" that the Medical Examiner was off limits in this way.

Mr. Harry Trainor, Esq., an attorney with substantial criminal experience, was called by the Petitioner to testify on this and other issues.  Mr. Trainor was accepted as an expert in death penalty litigation and was permitted to offer opinions in this case.  In his opinion, Mr. Lawlor and Mr. Proctor's failure to interview Dr. Vincenti was clearly deficient.  He cited to *ABA Guideline* Rule 10.7 and Rule 10.8.  During cross-examination, Mr. Trainor conceded that it was not per se ineffective assistance to not interview Dr. Vincenti, but that in this case it is something that he definitely would have done.  Mr. Trainor indicated that this was a particularly troubling choice of action as there seemed to be no reason for not interviewing the Doctor, particularly if cause of death or manner of death was at issue.

The Court finds that it was not deficient of trial counsel to not speak with Dr. Vincenti prior to trial.  Despite his assertion, that it was not a tactical decision to not speak to Dr. Vincenti, Mr. Proctor gave tactical reasons for not speaking to her that have previously been outlined above, including wanting to limit the amount of graphic details that the jury would hear about the killing.  Even if counsel's performance was deficient, Petitioner has failed to prove the prejudice prong of *Strickland*.  "The Supreme Court has noted that while it is possible that an isolated error (defective act) can constitute ineffective assistance, it is difficult to establish ineffective assistance based on a single act where counsel's overall performance reflects active and capable advocacy."  *Harrington v. Richter*, 562 U.S. 86, 111 (2011).  Here, if counsel's failure to talk to the Medical Examiner before the trial was deficient, that act did not so influence the trial as to prejudice the Defendant.  Given the Court's original causation instruction, which was properly given, and the limited difference in opinions of the wounds suffered, the Court cannot find that the result would have been different.  Accordingly, Petitioner's request for post conviction relief based on this allegation is **DENIED**.

(ECF No. 2 at 14-22) (footnotes omitted).

At the outset, this Court rejects Stephens's claim that he is entitled to *de novo* review regarding this issue. Especially given the postconviction court's lengthy and well-reasoned discussion, this Court "must presume that the federal claim was adjudicated on the merits" although the state court may have rejected it "without expressly addressing that claim." *Johnson*, 568 U.S. at 301. Moreover, although the postconviction court did not address the deficiency prong of the jury instruction claim, the law is clear that a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," *Strickland*, 466 U.S. at 697, nor must a court address both components if one is dispositive, *Jones*, 783 F.3d at 991.

With regard to Stephens's claim that trial counsel failed to interview Dr. Vincenti or to investigate the State's forensic evidence, the postconviction court noted that Stephens's own expert acknowledged that such failure was not per se ineffective assistance. The court further noted that although Proctor may have asked Dr. Vincenti more questions during cross-examination if he had known about any conflicting reports as to the cause of death of Cpl. McGuinn, Proctor indicated that he usually does not delve into detailed testimony with medical examiners in order to limit the amount of graphic details that the jury would hear about the killing. Thus, the postconviction court found that counsel's decision was ultimately tactical and not deficient nor prejudicial.[13]

---

[13] Indeed, Proctor testified that he did not seek to interview Dr. Vincenti because he mistakenly believed that in her capacity as medical examiner, she was not available to speak with defense counsel. ECF No. 2 at 447-48. Proctor also testified, however, that he and Lawlor "took the position" that it was the State's job to prove Stephens's involvement in the attack on Cpl. McGuinn. *Id.* at 451. As a result, they "eventually decided why take the onus on proving that someone else did it." *Id.* This testimony supports the postconviction court's finding that counsel's decision not to pursue the causation issue was ultimately tactical. Likewise, it indicates that counsel were not deficient, as Stephens alleges, for failing "to investigate the law and facts related to causation." It was reasonable for counsel to focus on establishing reasonable doubt that Stephens participated in the attack at all rather than whether he landed part of the 24 stab wounds, though not the two that may have been responsible for Cpl. McGuinn's death.

As to Stephens's claim that trial counsel rendered ineffective assistance by failing to request a jury instruction that would support an available defense or define an element of the crime, the postconviction court similarly found that Stephens failed to satisfy the standards required under *Strickland*.  The court found that the decision of trial counsel not to request any further causation instruction was not improper as the instruction given covered the area in question.  Moreover, the postconviction court noted that during the first phase of sentencing, the state circuit court instructed the jury on "principalship," meaning that the jury made a separate independent finding that Stephens committed the murder by his own hand.

On this record, the postconviction court's ruling was not contrary to, nor an unreasonable application of, *Strickland*.  No basis for relief under 28 U.S.C. § 2254(d) has been stated.

### C. Failing to Investigate and Present Exculpatory Evidence

Stephens next argues that counsel failed to investigate and present evidence, through photographs, that the clothes he allegedly wore during the attack on Cpl. McGuinn were not covered in blood.  ECF No. 1 at 81-84.  In the "Facts" section of his postconviction petition, Stephens stated the following regarding this issue:

> In their efforts to demonstrate the shoddiness of the investigation, however, counsel were ineffective in a number of respects.  Witnesses that allegedly searched Stephens's cell in the hours after McGuinn's death provided testimony regarding, among other things, the discovery and collection of Stephens's boots and other pieces of evidence allegedly found in Stephens's cell.  Their testimony on those issues—most notably with respect to who was actually in the cell and where the boots were found—was inconsistent, but defense counsel failed to clearly elicit those inconsistencies during cross-examination or lay them out for the jury in closing argument.  In addition, the testimony of these witnesses was seemingly contradicted by photographs of Stephens's cell produced in discovery, but defense counsel failed to use those photographs in any capacity at trial.

ECF No. 2 at 54.

Stephens did not include this issue in the section of his postconviction petition titled "Claims for Relief."  *See id.* at 61-74; ECF No. 1-2 at 2-3.  During postconviction proceedings, counsel for Stephens stated during his opening statement that photographs of Stephens's cell from the night of the attack "show what appeared clearly to be sweats that were stored in the cell . . . [that] had no blood on them."  ECF No. 2. at 159-60.

This Court agrees with Respondents that based on Stephens's unclear presentation of the "sweats" issue during postconviction proceedings, the state court broadly understood Stephens's contention to be that "defense counsel failed to clearly demonstrate the inconsistencies surrounding the searching of the prison cell and collection of purportedly incriminating pieces of clothing."  ECF No. 2 at 22.  That claim is addressed *infra*, Section II(E).[14]

### D.  Failing to Impeach Key Witness with Evidence and Expert Testimony

Stephens claims that trial counsel were ineffective for failing to investigate and present evidence to impeach Jason Freed.  ECF No. 1 at 84-97.  Stephens notes that Freed came forward years after he initially denied knowing anything about the assault, and only after he was charged with a federal weapons offense.  *Id.* at 84.  Moreover, Stephens contends that Freed's ability to perceive the events he testified to, including his identification of the assailants, was readily impeachable.  *Id.*

---

[14] Even if this Court were to find that Stephens's claim regarding the photograph of his clothes had been properly presented, exhausted, and inadvertently overlooked in state court, it would not suffice to show ineffective assistance on the part of trial counsel pursuant to *Strickland*.  During the postconviction proceedings, counsel for Stephens testified that he asked the jury "where were the sweats?" but could not recall why the photograph was not highlighted.  ECF No. 2 at 209-10.  During closing arguments, counsel for the State argued that "it is not as if having another pair of sweat clothes in your cell suddenly exonerates you."  *Id.* at 893.  From this record, this Court cannot find that Stephens's counsel were deficient simply because they did not use photographs to argue, as they did, that bloody sweats were never found in Stephens's possession.  As previously stated, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.

In denying this claim, the postconviction court found:

Petitioner argues that defense counsel did not effectively cross-examine the State's principal eye-witness, Jason Freed, and failed to fully expose the Federal and State benefits that Freed was to receive in exchange for his testimony. Petitioner concedes that defense counsel was "successful to some extent" in demonstrating the Federal deal that Freed was a part of, but that the real problem was in the failure to show what benefits the State had offered Freed in exchange for his testimony.

According to Petitioner, approximately two weeks after being indicted with a federal firearms charge in 2007 (before Defendant's trial) Mr. Freed decided to come forward with information and meet with prosecutors to describe what he witnessed as to the assault of Corporal McGuinn. At trial, defense counsel was precluded from asking Freed about bargains between him and the State in connection with reduced jail time after Freed denied knowing whether his lawyer had spoken with the State about such deals. However, Petitioner argues that there were other ways in which defense counsel could have challenged Freed's motives, including a letter that Freed had written to Maryland State Police Corporal John Branham on February 23, 2007. The letter, which was never utilized by defense counsel at trial, stated in part, "I remember someone sayin' ya'll can help me out with my state issues." Petitioner contends that there were multiple ways in which defense counsel could have brought this issue to light, resulting in Freed's credibility being questioned by the jury.

Michael Lawlor testified that he had certain goals in mind when he cross-examined Mr. Freed during the trial. He explained that the cross-examination of Freed was multi-faceted and that he wanted to show three things: 1) Freed was biased and he came forward very late in the investigation, 2) Freed's ability to perceive the events of the night was not realistic (all the way down the hallway, small mirror, etc.), and, 3) He only came forward when he was charged federally, further[] illustrating the unreliability of his testimony. Mr. Lawlor believed his cross-examination was not as successful as he wanted it to be, that he "stumbled out of the gate" and "lost his legs" during the examination. Mr. Lawlor indicated it was important to show that Freed had a federal deal and he tried to "hammer" the point home during closing argument at trial. As for not using the letter that Freed sent to Corporal Branham, Mr. Lawlor did not recall if that was a strategic decision or not.

Harry Trainor, Petitioner's expert witness, testified that Mr. Freed likely had a hope or expectation that the State would help him if he testified, and that this could have been explored further by defense counsel. Mr. Trainor also opined that if the letter from Freed to Corporal Braham had been overlooked then that would have been a deficient act on the part of defense counsel.

Mr. David P. Ash, Assistant State's Attorney, testified regarding this issue. Mr. Ash was one of the trial prosecutors in the case. Mr. Ash testified that there was no agreement between Mr. Freed and the State connected to his state charges in

Howard County.  When questioned about the letter sent from Freed to Corporal Braham, Mr. Ash answered that he advised Corporal Braham that there were no deals with Freed.  Mr. Ash explained that at the time that Mr. Freed was to testify as a State's witness, he had already made the federal deal and thus he was "damaged goods" according to the State.  On cross-examination he elaborated that the deal was made by the federal prosecutor's office and was not originated by the Anne Arundel County State's Attorney.  Mr. Ash explained that Mr. Freed had no impact on the State's case and that the best evidence the State presented was the overwhelming physical evidence.

It is well-settled State law that, the State must disclose any bargain or benefit it offers to any of its witnesses.  *Wilson v. State*, 363 Md. 333 (2001).  During the Petitioner's trial and the post conviction hearing, no evidence was presented to support a State-level deal in exchange for Freed's testimony.  The jury was aware of Freed's Federal charges, potential sentence, and related deal.  As the State phrased it, "in the end, the jury was aware that Mr. Freed was testifying based on a deal from the Federal government and the jurors either believed his testimony despite the deal or they disregarded his testimony and convicted the Defendant because of the overwhelming physical evidence presented by the State."

While Mr. Lawlor had concerns over the feeling that he "lost his legs" during cross-examination, that admission does not automatically qualify as a deficient act by trial counsel.  With no State deal in place, there could be no cross-examination as to a deal that did not exist, Mr. Lawlor had a clear strategy in cross-examining Mr. Freed—his intentions were to show his bias, the inability for him to perceive what he thought he saw, and the fact that he waited a long time to come forward with his information.  Even though according to counsel the cross-examination did not go "as planned," that does not mean that he was ineffective in conducting the examination in that way.  *Harrington v. Richter*, 562 U.S. 86 (2011).

Mr. Lawlor wanted the jury to understand that Freed's visual perception of the murder could not have been as clear as he indicated that it was to the jury.  He wanted to highlight the problems with the lighting on the tier and to show that conditions were far from ideal to observe what Freed claimed that he saw.  The attack on Corporal McGuinn was described as having occurred more than one hundred (100) feet away from Freed's cell (number 16).  Petitioner contends that defense counsel should have presented the environmental problems more clearly to the jury, including, but not limited to: the lack of lighting in the tier, the loud noise coming from the large ceiling fans above, and the resulting ability to perceive such a scene from a far distance (not to mention only viewing the scene from a small handheld mirror).

During the post conviction hearing, Petitioner argued that defense counsel could have called expert witnesses in the fields of human perception and audiology in order to demonstrate the near impossibility of Freed to actually see what he claimed to have seen that night.  To bolster their argument, Petitioner called Dr. Bradford

May to testify as an expert on hearing and deafness. He described his qualifications and how the audibility of sound is measured. He formed an opinion that an individual one hundred (100) feet away would not be able to hear the sound of a stab, as Mr. Freed claimed he heard the night of the attack. In support of his opinion, Dr. May conducted an experiment with a laboratory sound quality machine and measured the decibel level of the sound of stabbing a piece of meat with a sharp object. He equated this to the potential sound of a human being getting stabbed by a sharp object and the similar sound that such action would make. He testified that the sounds of stabbing the meat were hardly detectable and that even a slight change in environmental background noise would greatly change the outcome and as a result one could not hear what Mr. Freed claimed he heard.

On cross-examination, Dr. May admitted that he did not know exactly how far away Freed was from the crime. He also testified that he had never visited the Maryland House of Corrections and did not know the noise level that existed at that evening. He also did not consider the difference between stabbing a piece of meat in a controlled setting versus stabbing a live human [] wearing a shank proof vest during a violent fight with two (2) individuals.

Petitioner also called Dr. Geoffrey Loftus as an expert on human perception and sight. Dr. Loftus testified that a person's ability to see under certain conditions is different due to "scotopic" (dark) and "photopic" (light) environments. Dr. Loftus explained that even in the most ideal lighting and distance situations, it is very unlikely that an individual would have been able to see and identify the Petitioner from such a distance. On cross-examination, Dr. Loftus admitted to not knowing the level of "luminance" on the tier that night, and that he had no actual data from the night in question to use to support his opinions.

> Pursuant to Maryland Rule 5-702:
>
> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether *a sufficient factual basis exists to support the expert testimony*. (Emphasis added)

In this case, although qualified in their respective fields, both Drs. May and Loftus based their testimony on unknown environmental conditions. Neither individual knew the exact lighting, background noise, or positions of the parties during the night of Corporal McGuinn's murder and admitted to such during their testimony. Although their testimony was admitted at the post conviction hearing, the Court would not have allowed the experts to testify at trial. Neither expert had a

"sufficient factual basis" upon which to base their opinions and their testimony would not have helped the trier of fact in this case.  Further, the Court of Appeals has not accepted the use of expert testimony to challenge the perception of an eye-witness, "We again shall decline to adopt a new standard regarding the admissibility of an extrajudicial eyewitness identification, or for incorporating expert testimony into challenges of an eyewitness identification, because our jurisprudence already provides suitable means to assay an eyewitness identification." *Smiley v. State*, 442 Md. 168, 185 (2015).

For the reasons stated above, the relief sought in this allegation is hereby **DENIED** as the testimony of the witnesses do not prove that counsel's performance was ineffective.

ECF No. 2 at 25-30 (footnotes omitted).

This Court cannot identify any aspect of the postconviction court's reasoning that is contrary to or an unreasonable application of clearly established federal law, or that is based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).   Citing *Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003), Stephens alleges that it was necessary for trial counsel to have presented the additional evidence and expert testimony in order to impeach Freed.  In *Tucker*, however, the Fourth Circuit affirmed the federal district court's denial of habeas corpus relief after it found that the case was not one "where trial counsel made no effort to investigate and pursue avenues of impeachment; rather, trial counsel simply failed to uncover the precise impeachment evidence" that was at issue on postconviction.  *Id.* at 445.

Likewise, here, counsel testified during the postconviction proceeding that he had goals of showing that: 1) Freed was biased and came forward very late in the investigation; 2) Freed's ability to perceive the events of the night was not realistic; and 3) Freed only came forward when he was charged federally, further illustrating the unreliability of his testimony.  As the Court of Special Appeals recognized on Stephens's direct appeal:

appellant's counsel was afforded wide latitude to question Freed about his criminal background; his federal plea agreement; and any other agreement reached with regard to his testimony and his pending VOP case.  It was plain from Freed's

testimony that he stood to gain a reduction in his federal sentence from testifying and that he might also receive a benefit in his then pending VOP case.

ECF No. 15-1 at 151.  It is clear that trial counsel made efforts to investigate and pursue avenues of impeachment although he may not have used the precise impeachment evidence at issue here.

Thus, Stephens is not entitled to habeas relief on this claim.

### E.  Stipulating Too Broadly about Handling of Physical Evidence

Stephens next asserts that trial counsel were ineffective for stipulating that the State properly handled physical evidence.  ECF No. 1 at 97-98.  The postconviction court rejected this claim, stating:

> Petitioner argues that counsel failed to demonstrate the inadequate investigatory techniques of the correctional officers who responded to the crime scene and E4 tier immediately after the incident.  Petitioner's concerns include the "shoddy" collection of evidence, tampering of the crime scene by officers that were untrained in crime scene preservation, and an improper chain of custody of certain pieces of evidence.  The main issue, according to Petitioner, is that defense counsel failed to clearly demonstrate the inconsistencies surrounding the searching of the prison cell and collection of purportedly incriminating pieces of clothing.

> The stipulation entered into by both sides of trial counsel is as follows:

> 9.  Both parties stipulate that on July 25, 2006, at 10:25 pm, CO Winslow Veney relieved CO Rodney Sampson as Officer in Charge of Center Hall at the Maryland House of Corrections. Officer Veney maintained proper chain of custody of State's Exhibit #34 (tank top t-shirt), State's Exhibit #35 (pair of tan boots), and State's Exhibit #36 (mesh laundry bag).  These items were not disturbed or altered in any way prior to their being collected by Crime Scene Technician Annie Kalathis on July 26, 2006 at 10:23 am.

> 10. Both parties stipulate that on July 26, 2006, at 10:23 am, Crime Scene Technician Anne Kalathis took custody of State's Exhibit #34 (tank top t-shirt), State's Exhibit #35 (pair of tan boots), and State's Exhibit #36 (mesh laundry bag).  These items were sealed in separate evidence bags and turned over to Crime Scene Technician Kristine Amspacker on July 26, 2006, at 12:00 pm.

> 11. Both parties stipulate that proper chain of custody was
> maintained throughout for all physical items of evidence
> collected by MSP Crime Scene Technicians at the Maryland
> House of Corrections on July 25, 2006 and July 26, 2006."

Petitioner argues that paragraph number nine (9) is poorly written and may have
confused the jury.  Petitioner argues that the stipulation makes it seem as though
defense counsel is not challenging the transportation of evidence during the entire
collection process after the incident on tier E4.  At the post conviction hearing, Mr.
Proctor made it clear that without a doubt he and Mr. Lawlor wanted to challenge
the chain of custody and evidence before it arrived at the Center Hall location.  He
stated that he usually considers stipulations to be "defense tactics" but was unsure
as to whether this one in particular was discussed with Mr. Stephens.  When pressed
by Petitioner's counsel, Mr. Proctor responded that he was unsure of whether this
particular language in the stipulation was "strategically written."

On cross-examination, Mr. Proctor agreed that there were twelve (12) versions of
the stipulation that were exchanged between the State and defense trial counsel until
one final version was decided on for use at trial.  The State argues that the
stipulation is accurate and that it is not confusing or misleading.  The State further
points out that this stipulation, regardless of whether it was deficient, fails to satisfy
the prejudice prong of the *Strickland* analysis.  The jury never sent a note during
deliberations indicating that they were confused by the wording of the stipulation,
the State never argued contrary to the stipulation, and the defense argued consistent
with their position.  As such, it would not have changed the outcome of the case if
it were written differently.

On cross-examination, both Mr. Lawlor and Mr. Proctor stated the crime scene
evidence was not well-preserved and that they presented this argument to the jury.
Some of their concerns included the fact that supposed blood found in the sink of
Mr. Stephens's cell and inside the door jamb of his cell were left untested by lab
technicians, indicating that the MHC officers failed to do their job properly.  The
State pointed out that defense counsel actively highlighted the problems with the
DNA evidence during Petitioner's trial to the jury.  The Petitioner conceded in his
opening statements that trial counsel's highlighting of the problems with the DNA
evidence was one of the stronger points that trial counsel made during the trial.
However, Petitioner maintains that the language in the stipulation was a
"devastating oversight" that precluded defense counsel from challenging the
integrity of the chain of custody of some of those items of evidence in question.

Based on the outlined *Strickland* test above, "There is a presumption that trial
counsel's actions were reasonable and the petitioner must overcome the
presumption that trial counsel's actions were not sound trial strategies."  *Strickland*,
466 U.S. at 689.  Based on the testimony provided during the Post Conviction
Hearing, this Court finds that the actions of counsel were not deficient as to
challenging the search of Petitioner's cell and subsequent collection of evidence.

> The stipulation created and settled upon by trial counsel appropriately stated the facts and was a clear trial strategy.  As such, counsel's actions were not unreasonable.  Accordingly, Petitioner's request for post-conviction relief based on this allegation is **DENIED**.

ECF No. 2 at 22-24 (footnotes omitted).

The postconviction court's determination that Stephens failed to meet his burden of establishing that his attorneys' representation was deficient or prejudicial constitutes a reasonable application of *Strickland*.  During the postconviction proceeding, counsel for Stephens stated that they wanted to challenge the chain of custody.  Lawlor stated that he usually considers stipulations to be "defense tactics" while Proctor testified that he was unsure of whether this particular language in the stipulation was "strategically written."  Proctor acknowledged, however, that there were 12 versions of the stipulation that were exchanged until one final version was chosen for use at trial.  From this record, the Court cannot conclude that the postconviction court's decision was based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, its ruling withstands scrutiny under 28 U.S.C. § 2254(d).

### F.  Cumulative Effect

Stephens claims he is entitled to relief based on the cumulative effect of counsel's errors.  ECF No. 1 at 98-101.  He acknowledges, however, that prejudice may only be considered cumulatively upon a finding of multiple, constitutional deficiencies.  ECF No. 1 at 52 n.30 (citing *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998)).  As in *Fisher*, "[h]aving just determined that none of counsel's actions could be considered constitutional error . . . it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived [Stephens] of a fair trial."  *Id.* (citations omitted).

## III.   Right to Fair Sentencing

Stephens's final claim is that he is entitled to a new sentencing proceeding based on a violation of his due process rights and ineffective assistance of counsel. (ECF No. 1 at 109-114). Because this Court did not find a violation of Stephens's due process rights nor ineffective assistance of counsel, it follows that Stephens is not entitled to any relief, be it a new trial or resentencing, on those grounds.

In any event, this Court proceeds to review the postconviction court's ruling on this claim. The state court ruled:

> In their Petition for Post-Conviction Relief, Petitioner cites to Section 7-102(a)(1) of the Uniform Post-Conviction Procedure Act, Maryland Code Ann. Crim. Procedure which provides for relief if, "sentence of judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State," MD. CODE ANN. CRIM. PROC. § 7-102. Petitioner contends that during the Sentencing Phase of the trial that the jury relied on false evidence that was introduced by the State to make their finding. Petitioner argues that if the jury had known that Defendant's prior murder conviction had been vacated, then at the time of sentencing there would have been a "substantial or significant possibility" that the Defendant would have received a sentence of life *with* the possibility of parole (instead of without).
>
> Petitioner made a Due Process argument at the Hearing, stating that the Wicomico County conviction was based on "false evidence" and therefore, the jury in the Anne Arundel case based their sentencing of the Defendant on a tainted conviction. In their Response, the State points out that, "the petitioner's case was overturned conditionally with the understanding that the Petitioner, who was already serving a life sentence in the above-captioned case, would agree to plead guilty to the murder and receive a reduced sentence."
>
> This Court is inclined to agree with the State on this claim for relief. The case before us is not an after-the-fact typical vacated conviction, but a vacated conviction that was based on the Petitioner pleading guilty to murder, thus maintaining the murder charge on his record. At this point, it would be too speculative in nature to pretend that if the *vacatur* had been secured before the Anne Arundel County trial that it would have made any difference to the jury. It is purely speculative that this information would have swayed the jury towards a sentence of life with the possibility of parole. The connection between the two is tenuous, and for the reasons articulated above, the relief sought in this allegation is **DENIED**.

ECF No. 2 at 38-39 (footnotes omitted).

Once again, the postconviction court's reasoning was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Stephens cites *United States v. Tucker*, 404 U.S. 443, 447-48 (1972), in support of his claim; however, that case is inapposite. In *Tucker*, the Supreme Court held that remand for reconsideration of the criminal defendant's sentence was proper where the sentence "might have been different if the sentencing judge had known that at least two of the [defendant's] previous convictions had been unconstitutionally obtained." *Id.* By contrast, here, Stephens remains convicted of the Wicomico County murder through a properly obtained *Alford* plea. *Cf. Johnson v. United States*, 544 U.S. 295, 303 (2005) (stating that "a defendant given a sentence enhanced for a prior conviction is entitled to a reduction if the earlier conviction is vacated"); *Johnson v. Mississippi*, 486 U.S. 578, 586 (1988) (ordering resentencing where jury was presented with evidence of prior conviction that was later vacated). As Stephens's Wicomico County conviction was not vacated, the postconviction court's determination was reasonable and survives scrutiny under 28 U.S.C. § 2254(d).

## Conclusion

Stephens was not unconstitutionally denied the right to testify in his own defense, nor was he denied effective assistance of counsel. Having found no meritorious claim for relief, Stephens is not entitled to a new trial or resentencing, and the Petition for Writ of Habeas Corpus shall be denied.

## Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2); *see Buck*, 137 S.Ct. at 773. The petitioner "must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2). Petitioner may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.

November 3, 2020                                    _____/s/_____
Date                                                RICHARD D. BENNETT
                                                    UNITED STATES DISTRICT JUDGE